Jon M. Sands
Federal Public Defender
District of Arizona
Dale A. Baich (OH No. 0025070)
Alexandra Hicks LeClair (AZ No. 026269)
Assistant Federal Public Defenders
850 West Adams Street, Suite 201
Phoenix, Arizona 85007
dale_baich@fd.org
alexandra_leclair@fd.org
602.382.2816 Telephone
602.889.3960 Facsimile

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Fernando Segoviano Almanza,<br><br>Petitioner,<br><br>vs.<br><br>Charles L. Ryan, et al.,<br><br>Respondents. | No. CV-15-02064-PHX-DLR (JFM) |

## AMENDED PETITION FOR WRIT OF HABEAS CORPUS
## 28 U.S.C. § 2254

# Table of Contents

Table of Contents ..................................................................................................... i

Introduction .......................................................................................................... 1

I.    Facts and Procedural History ........................................................................ 1

      A.    Personal History ................................................................................. 1

      B.    Facts of the Case ................................................................................ 3

      C.    Procedural History ............................................................................. 4

II.   State Court Presumption of Correctness ....................................................... 7

III.  Exhaustion .................................................................................................... 8

IV.   The AEDPA Is Unconstitutional ................................................................... 8

      A.    AEDPA Suspends the Writ of Habeas Corpus ...................................... 9

      B.    AEDPA Violates the Separation of Powers Doctrine .......................... 10

      C.    Conclusion ........................................................................................ 11

V.    Federal Constitutional Claims .................................................................... 11

Claim One .......................................................................................................... 12

      Trial counsel provided ineffective assistance during Almanza's trial, violating
      Almanza's rights under the Sixth and Fourteenth Amendments to the United
      States Constitution. ...................................................................................... 12

      A.    Trial counsel provided ineffective assistance when he failed to thoroughly
            investigate the case. ............................................................................... 16

      B.    Trial counsel provided ineffective assistance when he failed to thoroughly
            investigate Almanza's mental health and IQ. ........................................... 22

      C.    Trial counsel provided ineffective assistance when he failed to object to
            the numerous instances of prosecutorial misconduct. .............................. 23

D.    Trial counsel provided ineffective assistance when he failed to adequately prepare for the suppression hearing and failed to adequately pursue the suppression of Almanza's statements. ............................................................. 26

E.    Trial counsel provided ineffective assistance when he elicited testimony regarding Almanza's prior bad acts, failed to object to the testimony, and failed to request a limiting instruction. ...................................................... 29

F.    Trial counsel provided ineffective assistance when he failed to ask the trial court to instruct the jury that they could find the lesser included crime of Molestation. ................................................................ 32

G.    Trial counsel provided ineffective assistance by failing to meaningfully cross-examine A.W. ......................................................... 33

H.    The cumulative prejudicial impact of trial counsel's deficient performance denied Almanza's rights under the Sixth and Fourteenth Amendments. ............................................................... 35

Claim Two ................................................................. 36

Almanza's Sixth Amendment right to the effective assistance of counsel was violated by his direct appeal counsel's failure to raise meritorious claims on direct appeal. ................................................................. 36

A.    Appellate counsel failed to challenge the prosecutorial misconduct that occurred during Almanza's trial proceedings. ............................................... 38

B.    Appellate counsel failed to challenge the reasonable doubt jury instruction that shifted the burden to Almanza. .............................................. 39

C.    Appellate counsel failed to argue the appropriate standard for review, thereby waiving Almanza's meritorious claims regarding the admission of 404(b) and (c) evidence and the admission of jailhouse informant testimony.. ............................................................... 40

D.    Appellate counsel failed to argue about the correct offense in the Opening Brief. .................................................................................................. 42

E.    Appellate counsel failed to communicate with Almanza. .................... 43

Claim Three........................................................................................................... 44

Almanza was denied effective assistance of counsel during his state post-conviction proceedings in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution............................................. 44

A.    Deficient Performance .......................................................... 48

B.    Prejudice............................................................................... 53

Claim Four ........................................................................................................... 54

The trial court erred by failing to suppress Almanza's statements in violation of his constitutional rights to due process and against self-incrimination under *Miranda v. Arizona* and the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution. ............................................................. 54

Claim Five........................................................................................................... 62

The trial court violated Almanza's due process rights under the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution by admitting irrelevant, prejudicial, and inflammatory testimony about his alleged prior bad acts. .......................................................................................................... 62

Claim Six.............................................................................................................. 70

The State failed to present sufficient evidence to prove beyond a reasonable doubt that Almanza committed Sexual Conduct with a Minor; thus, the trial court erred in denying Almanza's motion for directed verdict, in violation of Almanza's rights under the Fifth, Eighth, and Fourteenth Amendments to the United States Constitution. .......................................................................... 70

iii

Claim Seven ............................................................................................. 76

    Almanza's Fifth and Sixth Amendment rights were violated by the admission of the jailhouse informant testimony of Johnny Boggs. ................................ 76

Claim Eight ............................................................................................. 82

    The trial prosecutor engaged in repeated and pervasive misconduct, violating Almanza's rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution. ................................................................ 82

    A.   Introduction ......................................................................... 83

    B.   Prosecutorial Misconduct ...................................................... 83

    C.   Conclusion ............................................................................ 93

Claim Nine .............................................................................................. 94

    The Arizona Court of Appeals erred in finding that Almanza's late Notice of Post-Conviction Relief barred review of his claims. ..................................... 94

Claim Ten ................................................................................................ 98

    The admission at trial of scientifically unreliable victimology evidence violated Almanza's constitutional rights to due process and a fair trial. ....... 98

    A.   The trial court erred procedurally and substantively in admitting Moncher's "expert" testimony. .................................................. 100

    B.   Moncher's proffered opinions do not satisfy the *Daubert* standard. ... 102

    C.   Moncher has a reputation for dishonesty and fraud. ............................ 109

Claim Eleven ......................................................................................... 109

    The reasonable-doubt instruction given to the jury impermissibly lowered the State's standard of proof and shifted the burden to Almanza, in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States

Constitution. .............................................................. 109

Claim Twelve ................................................................. 111

Almanza is actually and legally innocent of the offense of Sexual Conduct with a Minor. ................................................................... 111

Claim Thirteen ............................................................... 115

Almanza's conviction and sentence must be vacated due to the cumulative prejudicial effect of the errors in this case. ................................... 115

Prayer for Relief............................................................. 117

Certificate of Service ....................................................... 119

**INTRODUCTION**

Pursuant to 28 U.S.C. § 2254, Fernando Segoviano Almanza, through counsel, respectfully petitions this Court for a writ of habeas corpus freeing him from the custody of Respondents, pursuant to the judgment and sentence of an Arizona state court, on the grounds that the judgment and sentence were obtained and affirmed in violation of his rights under the United States Constitution.

Almanza is in the custody of the Arizona Department of Corrections ("ADC") because he was convicted of one count of Sexual Conduct with a Minor in 2013. He was sentenced to life imprisonment.

For the reasons alleged herein, this Court should grant the writ and any other appropriate relief.

**I.    FACTS AND PROCEDURAL HISTORY**

**A.    Personal History**

Fernando Segoviano Almanza (hereinafter "Almanza") was born in Irapuato, Guanajuato, Mexico, the second of four children. (Ariz. Ct. App. PFR, Mot. to Stay Pet. for Review, June 5, 2017, Ex. C at 2; Ariz. Ct. App. PFR, Pet. for Review, Feb. 21, 2017, Ex. B at 2.) [1] His mother, Jesusa Segoviano-Ceballos, died when he was

---

[1] Trial proceedings in the Pinal County Superior Court are docketed as case number CR2011-03026. Reporter's transcripts are designated "Tr." followed by the relevant date and page number. Indexed documents from the record on appeal are designated "ROA" followed by the docket number and relevant page number. Trial exhibits are designated "Trial Ex." followed by the exhibit number.

Direct appeal proceedings in the Arizona Court of Appeals Division Two are docketed as case number 2CA-CR 2014-0034. Documents from the court's record are designated "DA" followed by the title of the document, the relevant date and page number.

Post-conviction proceedings in the Pinal County Superior Court are docketed as case number CR2011-03026. Documents from the court's record are designated "PCR," followed by the title of the document, the relevant date, page number and docket number.

Petition for review proceedings in the Arizona Court of Appeals are docketed as case number 2CA-CR 2017-0064-PR. Documents from the court's record are designated "Ariz. Ct. App. PFR" followed by the title of the document, the relevant

1

10 years old and he mostly grew up alone after coming to the United States that same year. (Ariz. Ct. App. PFR, Pet. for Review, Feb. 21, 2017, Ex. B at 2.) When Almanza was 10 years old, he and his brother, Antonio Segoviano Almanza, moved to Mammoth, Arizona and were homeless. (Ariz. Ct. App. PFR, Mot. to Stay Pet. for Review, June 5, 2017, Ex. C at 2.) He remembers that he and his brother lived "by the river." (Ariz. Ct. App. PFR, Mot. to Stay Pet. for Review, June 5, 2017, Ex. C at 2.) When Almanza was about 17 years old, his father Lázaro was killed in Flagstaff, Arizona. (Ariz. Ct. App. PFR, Pet. for Review, Feb. 21, 2017, Ex. B at 2.)

Almanza hardly attended any school in his childhood, completing only one year of formal education in Mexico and instead spending most of his time from a young age working. (Ariz. Ct. App. PFR, Pet. for Review, Feb. 21, 2017, Ex. B at 2.) As a result, Almanza is illiterate in both English and Spanish and speaks very little English. Furthermore, Almanza has intellectual limitations due to both his lack of formal education and cognitive dysfunction. (Ariz. Ct. App. PFR, Pet. for Review, Feb. 21, 2017, Ex. B at 5; Ariz. Ct. App. PFR, Mot. to Stay Pet. for Review, June 5, 2017, Ex. C at 5.) Consequently, he is easily confused and coerced. (Ariz. Ct. App. PFR, Mot. to Stay Pet. for Review, June 5, 2017, Ex. C at 5.)

Almanza moved back to Mammoth approximately 15 years ago. (Ariz. Ct. App. PFR, Mot. to Stay Pet. for Review, June 5, 2017, Ex. C at 2.) Almanza lived in Dudleyville, Arizona where he owned his own small farm. Prior to his arrest, he split his time between working on his own land and working for the Schwennesens, who owned the Double Check Ranch.

Prior to his arrest, on October 5, 2011, Almanza had hernia surgery. It was

---

date and page number.

Petition for review proceedings in the Arizona Supreme Court are docketed as case number CR-17-0383-PR. Documents from the court's record are designated "Ariz. S. Ct. PFR" followed by the docket number and relevant page number.

1   his second hernia surgery and he was still recovering at the time of the alleged
2   offense. (Ariz. Ct. App. PFR, Pet. for Review, Feb. 21, 2017, Ex. C.) In fact, the
3   doctor noted that Almanza would limp for several weeks after the surgery and
4   advised him not to engage in any strenuous activity. (Ariz. Ct. App. PFR, Pet. for
5   Review, Feb. 21, 2017, Ex. C at 3-4.)

6       **B.    Facts of the Case**

7          This is a case of wrongful conviction. A.W., the four-year old daughter of
8   another ranch worker, Kathryn Quinn ("Quinn"), and her family lived at the Double
9   Check Ranch. (Tr. Oct. 1, 2013 at 103.) A.W. alleged that on October 22, 2011,
10  Almanza penetrated her vulva with his finger and that his long fingernails scratched
11  her. (Tr. Oct. 1, 2013 at 105, 147.) She claimed that he then hit her on the back with
12  a shovel. (Trial Ex. 113 at 11.) She alleged that this occurred while she was alone
13  with Almanza, who had been helping her and her older brother feed their mother's
14  pigs. (Tr. Oct. 1, 2013 at 106.)

15         There was no DNA evidence connecting Almanza with the crime. However,
16  on October 23, 2011, Almanza was stopped at gunpoint and arrested by the Pinal
17  County Sheriff's Office. Almanza was detained in a holding cell for more than four
18  and a half hours prior to his interrogation. (Trial Ex. 116 at 3.) Almanza was
19  interrogated predominantly in English, despite the fact that he explained to the
20  detectives that he did not speak English fluently. (Tr. Oct. 2, 2013 at 83.) During
21  the interrogation, he was told that his DNA had been found on A.W., which was
22  not true. (Tr. Oct. 2, 2013 at 91.) When he explained that he could not afford an
23  attorney, the detectives told Almanza that he could get one at a later time and
24  continued the interrogation. (Trial Ex. 116 at 23.) Throughout the interrogation,
25  despite expressing significant confusion about what was going on, Almanza
26  adamantly denied his guilt. (*See, e.g.*, Trial Ex. 116 at 34, 35, 37, 41, 51, 53, 54, 59,
27  61, 62, 64, 66, 68, 70, 71, 74, 77, 78, 84.)

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### C.   Procedural History

On November 30, 2011, a Pinal County grand jury indicted Almanza on one count of Sexual Conduct with a Minor. (ROA 1.) On December 2, 2011, he was assigned an attorney from the Pinal County Public Defender's Office to represent him. (ROA 6.) Shortly thereafter, on April 30, 2012, the Pinal County Public Defender withdrew from Almanza's case due to a conflict. (ROA 27.) On May 22, 2012, Bret Huggins ("Huggins") became Almanza's attorney. (ROA 31.) Unfortunately, Huggins also had a conflict of interest and on March 1, 2013, Matthew Lara of Cooper & Rueter, L.L.P., entered an appearance as Almanza's attorney. (ROA 72.) Nonetheless, on April 1, 2013, Paul Green ("Green") of Cooper & Rueter appeared on Almanza's behalf and, without filing a formal Notice of Appearance, represented Almanza for the remainder of his trial court proceedings. (ROA 77.)

Six months later, Almanza's case proceeded to trial with Green representing him. (ROA 96.) On October 7, 2013, the jury found Almanza guilty of one count of Sexual Conduct with a Minor. (ROA 116.) On January 10, 2014, in the Pinal County Superior Court, Almanza was sentenced to life in prison without the possibility of parole until after he had served 35 years. (ROA 131 at 3.)

On direct appeal, Almanza was represented by Lynn Hamilton ("Hamilton"). (ROA 134 at 2.) The Arizona Court of Appeals, Division Two, affirmed Almanza's sentence and conviction in an unpublished decision on August 29, 2014. (DA, Mem. Decision, Aug. 29, 2014 at 12.) Hamilton did not file a Notice of Post-Conviction Relief on Almanza's behalf.

Due to the fact that Almanza is a Spanish speaker and is illiterate in both Spanish and English, he could not read the Mandate issued by the Court of Appeals himself. (*See* DA, Mandate, Oct. 9, 2014; PCR, Notice of Post-Conviction Relief, Mar. 19, 2015 at 3 (Dkt. 2).) As Almanza explained in his pro per Notice of Post-Conviction Relief, Hamilton did not inform him of the Court's Mandate in person

4

or over the telephone, but instead sent him a letter, despite knowing that he was illiterate. (PCR, Notice of Post-Conviction Relief, Mar. 19, 2015 at 3 (Dkt. 2).) Thus, because he is illiterate, Almanza only became aware of the issuance of the mandate and the filing deadline for the Notice when he was able to get another prisoner to read the letter from Hamilton to him. (PCR, Notice of Post-Conviction Relief, Mar. 19, 2015 at 3 (Dkt. 2).) Almanza explained as much in his Notice of Post-Conviction Relief, which was filed on March 19, 2015. (PCR, Notice of Post-Conviction Relief, Mar. 19, 2015 at 3 (Dkt. 2).) Almanza also specifically pointed out to the trial court that his Notice was untimely and the meritorious reasons why, as required by Arizona Rules of Criminal Procedure 32.2(b) and Rule 32.1(f). (PCR, Notice of Post-Conviction Relief, Mar. 19, 2015 at 2-3 (Dkt. 2).) Accordingly, the trial court did not summarily dismiss the notice.

Instead, the trial court appointed post-conviction counsel to represented Almanza in his post-conviction proceedings. (PCR, Min. Entry, Apr. 6, 2015 (Dkt. 5).) Additionally, on October 15, 2015, after initial post-conviction counsel failed to contact Almanza and upon Almanza's pro per motion, the trial court appointed new post-conviction counsel, Harriette Levitt ("Levitt"), and gave Almanza until December 31, 2015, to file his post-conviction petition. (PCR, Min. Entry, Oct. 15, 2015 (Dkt. 7).)

On February 29, 2016, Levitt filed a Notice Pursuant to Rule 32.4(c) of the Arizona Rules of Criminal Procedure. (PCR, Notice Pursuant to Rule 32.4(c), Ariz. R. Crim. P., Feb. 29, 2016 (Dkt. 11).) In that Notice, Levitt represented to the Superior Court that, based on her review of the file, there were no colorable claims for post-conviction relief. (PCR, Notice Pursuant to Rule 32.4(c), Ariz. R. Crim. P., Feb. 29, 2016 at 1 (Dkt. 11).) However, during her representation, Levitt never met with Almanza in person to discuss the case—she only spoke to him a couple of times on the telephone through an interpreter. She also never conducted any investigation into the case, including failing to obtain and review any of the trial

transcripts prior to filing her Rule 32.4(c) Notice. (*See* Ariz. S. Ct. PFR Dkt. 3 Ex. G at 2.) In response to her allegations that there were no colorable claims for relief, the Court gave Almanza until May 31, 2016 to file a pro per Petition. (PCR, Notice/Order, Mar. 14, 2016 (Dkt. 12).) Almanza filed a pro per Petition for Post-Conviction Relief in the Pinal County Superior Court on May 19, 2016. (PCR, Pet. for Post-Conviction Relief, May 19, 2016 (Dkt. 13).) In his Petition, Almanza alleged claims of ineffective assistance of counsel and infringement of the right against self-incrimination. (PCR, Pet. for Post-Conviction Relief, May 19, 2016 at 2 (Dkt. 13).) The trial court denied Almanza's pro per Petition on August 5, 2016. (PCR, Ruling on Motions/Issues, Aug. 5, 2016 (Dkt. 16).)

On October 15, 2015, Almanza filed a pro per Petition for Writ of Habeas Corpus. (ECF No. 1.) However, because he was in custody and filing pro per, he neglected to pay the filing fee and this Court ordered him to pay it by November 26, 2015 or to submit an Application to Proceed in Forma Pauperis by that date. (ECF No. 4.) On November 19, 2015, Almanza filed a Motion for Appointment of Counsel and the Office of the Federal Public Defender was appointed to represent him on June 1, 2016. (ECF No. 5; ECF No. 19.) Subsequently, undersigned counsel was assigned to the case, the filing fee was paid, and it was determined that Almanza's state court proceedings had not yet been completed. (ECF No. 20; ECF No. 23.) As a result, this Court granted Almanza's request for the Office of the Federal Public Defender to appear in state court on his behalf for the remainder of his state court post-conviction proceedings and stayed consideration of his Petition for Writ of Habeas Corpus pending the resolution of his post-conviction proceedings. (ECF No. 27; ECF No. 28.)

Almanza filed his Petition for Review with the Arizona Court of Appeals on February 21, 2017. (Ariz. Ct. App. PFR, Pet. for Review, Feb. 21, 2017.) On June 5, 2017, upon undersigned counsel's further review of the case, Almanza filed a Motion to Stay Petition for Review and Request to File Amended Petition for Post-

Conviction Relief. (Ariz. Ct. App. PFR, Mot. to Stay Pet. for Review and Req. to File Am. Pet. for Post-Conviction Relief, June 5, 2017.) The Court of Appeals denied that request. (Ariz. Ct. App. PFR, Order, June 29, 2017.) The Court of Appeals then denied Almanza's Petition for Review based exclusively on the fact that he failed to file his notice of post-conviction relief within 30 days of the issuance of the mandate. (Ariz. Ct. App. PFR, Mem. Decision, July 25, 2017.) Almanza filed a Motion for Reconsideration, which was denied by the Court of Appeals on August 11, 2017. (Ariz. Ct. App. PFR, Mot. for Recons., Aug. 9, 2017.) Almanza filed his Petition for Review with the Arizona Supreme Court on August 25, 2017, which was also denied. (Ariz. S. Ct. PFR Dkt. 1; Ariz. S. Ct. PFR Dkt. 4.)

## II.    STATE COURT PRESUMPTION OF CORRECTNESS

Almanza hereby provides notice of his intention to challenge the presumption of correctness of specific findings of fact made by the state court in his case. Certain factual findings of the state court in Almanza's case, if any are found to exist, are not entitled to the presumption of correctness under 28 U.S.C. § 2254(e)(1). These include, but are not limited to, factual findings made by the trial court in Almanza's trial and sentencing, and the opinion by the Arizona Court of Appeals on direct appeal. Pursuant to 28 U.S.C. § 2254(e)(1), Almanza asserts that certain findings of fact by the state court at trial or on direct appeal, if any are found to exist, are not fairly supported by the record. Almanza also asserts other exceptions to the presumption of correctness, including, but not limited to: that the procedures employed by the state courts in making findings of fact were not adequate to afford him a full and fair hearing of his claims; that material facts were not adequately developed in state court proceedings; that Almanza did not receive a full, fair, and adequate hearing of his claims in the state court proceedings; and that Almanza was otherwise denied due process of law in the state court proceedings.

In addition, Almanza asserts that certain findings of fact by the state court in

1    regard to his state post-conviction proceedings, if any are found to exist, are not
2    entitled to the presumption of correctness under 28 U.S.C. § 2254(e)(1). These
3    include, but are not limited to: any and all factual findings made by the trial court
4    in regard to Almanza's state post-conviction proceeding, as well as the decision of
5    the Arizona Court of Appeals and Arizona Supreme Court on petitions for review.
6    Pursuant to 28 U.S.C. § 2254(e)(1), Almanza asserts that certain findings of fact by
7    the state court, concerning his state post-conviction proceedings, if any are found
8    to exist, are not fairly supported by the record.

9    **III.    EXHAUSTION**

10   Many of the federal constitutional claims alleged herein have been exhausted
11   in proceedings before the Arizona state courts. Some claims, however, were not
12   fully presented to the state court, were not ripe for review, or could only be raised
13   in this forum.

14   Almanza expressly reserves his right to amend this Petition. In *McCleskey v.*
15   *Zant*, 499 U.S. 467, 498 (1991), the Supreme Court reaffirmed the "principle that
16   [a] petitioner must conduct a reasonable and diligent investigation aimed at
17   including all relevant claims and grounds for relief in the first federal habeas
18   petition." Referring to Habeas Rule 6 (discovery), Habeas Rule 7 (expansion of the
19   record) and Habeas Rule 8 (evidentiary hearing), the Supreme Court held that a
20   habeas petitioner has to have reasonable means and the ability to investigate to form
21   a sufficient basis to allege a claim in the first petition. *Id*. Almanza believes
22   additional claims may be identified following a thorough review of the record,
23   through investigation, after discovery is conducted and completed, or after an
24   evidentiary hearing is held. At the appropriate time during these proceedings,
25   Almanza will present any additional claims through amendments to the petition.

26   **IV.    THE AEDPA IS UNCONSTITUTIONAL**

27   Almanza's case is governed by the Antiterrorism and Effective Death Penalty
28   Act ("AEDPA"). 28 U.S.C. § 2254. However, AEDPA is unconstitutional and its

strictures should not apply here. Central to fundamental fairness and the integrity of the United States' justice system is that every prisoner must have all of his constitutional claims heard by a court. *See Bounds v. Smith*, 430 U.S. 817, 822-23 (1977). One method of ensuring that a prisoner's constitutional claims are heard is through the writ of habeas corpus. However, the passage of AEDPA substantially changed the law that governs habeas petitions. *See Felker v. Turpin*, 518 U.S. 651, 654 (1996). AEDPA's restrictions suspend the writ of habeas corpus and violate the separation of powers, which results in prisoners remaining in prison without review of alleged constitutional defects of their convictions and sentences.

### A.   AEDPA Suspends the Writ of Habeas Corpus

Congress cannot define prisoners' habeas rights so narrowly that Congress, in effect, suspends the writ. The writ of habeas corpus is guaranteed by the United States Constitution in the Suspension Clause, which provides that "[t]he Privilege of the Writ of Habeas Corpus shall not be suspended, unless when in Cases of Rebellion or Invasion the public Safety may require it." U.S. Const. art. I, § 9, cl. 2. The Suspension Clause is a structural limitation on the power of Congress. Like bills of attainder and ex post facto laws, which are also prohibited in Article I, section 9, the suspension of habeas (except in cases of rebellion or invasion) belongs to a "category of Congressional actions which the Constitution barred." *United States v. Lovett*, 328 U.S. 303, 315 (1946). The writ "can be preserved in practice no other way than through the medium of the courts of justice; whose duty it must be to declare all acts contrary to the manifest tenor of the Constitution void." *Id*. at 314 (quoting The Federalist No. 78 (Alexander Hamilton)).

Because AEDPA prevents federal courts in certain circumstances from granting relief when it is undisputed that the conviction or sentence was unconstitutional, it suspends the writ of habeas corpus. *See* 28 U.S.C. § 2254. Under the tenets of AEDPA, the federal court must determine whether a federal constitutional violation, in a non-capital case, was a "reasonable" or "unreasonable"

1    constitutional violation.

2    **B.**      **AEDPA Violates the Separation of Powers Doctrine**

3          Congress cannot impinge on the courts' duty to say what the law is, but
4 Congress does so when it requires Article III courts to ignore any part of the
5 Constitution and to instead give effect to a contrary law. *See Marbury v. Madison*,
6 5 U.S. (1 Cranch) 137, 178 (1803).

7          Congress has the power to constrain courts' authority. *See Keene Corp. v.*
8 *United States*, 508 U.S. 200, 207 (1993). "The judicial Power of the United States,
9 shall be vested in one supreme Court, and in such inferior Courts as the Congress
10 may from time to time ordain and establish." U.S. Const. art. III, § 1. However,
11 Congress must not manipulate the "test for determining the scope of [habeas
12 corpus]" because the writ "is designed to restrain" Congress, and because the writ
13 is "an indispensable mechanism for monitoring the separation of powers."
14 *Boumediene v. Bush*, 553 U.S. 723, 765-66 (2008).

15          The separation of powers doctrine found in Article III "serves both to protect
16 the role of the independent judiciary within the constitutional scheme of tripartite
17 government . . . and to safeguard litigants' right to have claims decided before
18 judges who are free from potential domination by other branches of government."
19 *Commodity Futures Trading Comm'n v. Schor*, 478 U.S. 833, 848 (1986) (internal
20 citations and quotation marks omitted). When it was confronted with an
21 unconstitutional provision, the Supreme Court in *Marbury* asked whether courts are
22 bound by "an act of the legislature" that is "repugnant to the constitution;" the Court
23 answered that "[i]t is emphatically the province and duty of the judicial department
24 to say what the law is." 5 U.S. at 177.

25          "[I]f Congress does provide for habeas in the federal courts, Congress
26 cannot . . . instruct the federal courts, whether acting in a federal or in a state case,
27 how to think, how to ascertain law, how to judge." *Irons v. Carey*, 505 F.3d 846,

28

855 (9th Cir. 2007) (Noonan, J., concurring), *overruled on other grounds by Hayward v. Marshall*, 603 F.3d 546 (9th Cir. 2010). Because AEDPA requires courts to ignore unlawful detentions if the prisoner does not meet certain provisions, it unconstitutionally violates the separation of powers doctrine. The question before the federal court should simply be whether Almanza's constitutional rights were violated in such a way that he is entitled to habeas relief. Adding the gloss of "unreasonable" versus "reasonable" constitutional violations robs the courts of their ability to remedy constitutional wrongs.

### C.   Conclusion

AEDPA suspends the writ of habeas corpus and violates the separation of powers doctrine because it dictates that courts must not "grant relief to citizens who are being held in prison in violation of their constitutional rights unless the constitutional error that led to their unlawful conviction or sentence is one that could not have been made by a reasonable jurist." *Irons*, 505 F.3d at 859 (Reinhardt, J., concurring). Also, AEDPA does not allow an appellate judge to correct an unlawful detention if a lower court's "error is understandable," which is inconsistent with a judge's duty "to enforce the laws and protect the rights of our citizens against arbitrary state action." *Id*. Therefore, AEDPA is unconstitutional, and this Court should review Almanza's claims de novo.

## V.   FEDERAL CONSTITUTIONAL CLAIMS

Almanza petitions this Court pursuant to 28 U.S.C. § 2254 for a writ of habeas corpus freeing him from the custody of Respondents pursuant to the judgment and sentence of the state courts of Arizona, on the grounds that the judgment and sentence were obtained and affirmed in violation of his rights under the Constitution of the United States. In support of this request, Almanza offers the following:

11

1

**Claim One**

2

3

**Trial counsel provided ineffective assistance during Almanza's trial, violating Almanza's rights under the Sixth and Fourteenth Amendments to the United States Constitution.**

4      Almanza raised this claim in his post-conviction proceedings. (PCR, Pet. for

5    Post-Conviction Relief, May 19, 2016 at 2 (Dkt. 13); Ariz. Ct. App. PFR, Pet. for

6    Review, Feb. 21, 2017 at 11-18; Ariz. S. Ct. PFR Dkt. 1 at 12.) None of the Arizona

7    state courts addressed the merits of this claim. (PCR, Ruling on Motions/Issues,

8    Aug. 5, 2016 at 1 (Dkt. 16); Ariz. Ct. App. PFR, Mem. Decision, July 25, 2017 at

9    3; Ariz. S. Ct. PFR Dkt. 4 at 1.) Because this claim has not been adjudicated by the

10   Arizona state courts on the merits, the limitations on relief imposed by 28 U.S.C.

11   § 2254(d) do not apply to this Court's review of the claim and this Court may

12   consider the merits of this claim de novo. If this Court deems this claim

13   unexhausted, Almanza alleges he can overcome any default of this claim by

14   showing cause and prejudice, including because of the ineffective assistance of state

15   post-conviction counsel. *See Martinez v. Ryan*, 566 U.S. 1, 9 (2012); *Murray v.*

16   *Carrier*, 477 U.S. 478, 488-89 (1986); *Strickland v. Washington*, 466 U.S. 668, 687-

17   88 (1984). Almanza will demonstrate at an evidentiary hearing that post-conviction

18   counsel fell below the standards of minimally competent attorneys and that those

19   failures prejudiced him. Almanza incorporates by specific reference all facts,

20   allegations, and arguments made elsewhere in this Petition.

21      Almanza's trial counsel committed multiple serious errors during his trial,

22   and consequently, the result of those proceedings is unreliable. This claim is subject

23   to the two-prong standard established in *Strickland*: counsel's performance must be

24   deficient, and such deficient performance must have prejudiced the defense.

25   *Strickland*, 466 U.S. at 687. First, the inquiry under the deficiency prong is "whether

26   counsel's assistance was reasonable considering all the circumstances." *Id.* at 688.

27   Performance is deficient when the attorney renders objectively unreasonable

28   assistance. *Id.* at 687-88. Although defense counsel has broad discretion when

1   making strategic decisions, those decisions must be reasonable and informed. *Id*. at
2   691; *see also Correll v. Ryan*, 539 F.3d 938, 949 (9th Cir. 2008) (holding that an
3   "uninformed strategy" is "no strategy at all"). In assessing counsel's performance,
4   this Court should look to guides, such as the American Bar Association standards
5   at the time of trial, *Bobby v. Van Hook*, 558 U.S. 4, 7 (2009) (per curiam), as well
6   as the standards of practice in the defense community in Arizona, *Cullen v.*
7   *Pinholster*, 563 U.S. 170, 196 (2011). "[C]ounsel's function, as elaborated in
8   prevailing professional norms, is to make the adversarial testing process work in
9   the particular case." *Strickland*, 466 U.S. at 690. Moreover, "[t]rial lawyers have a
10  'duty to bring to bear such skill and knowledge as will render the trial a reliable
11  adversarial testing process.'" *Connick v. Thompson*, 563 U.S. 51, 65 (2011)
12  (quoting *Strickland*, 466 U.S. at 688).

13      The reasonableness of counsel's decisions is measured by the reasonableness
14  of the investigation done in making such a decision. *Cf. Wiggins v. Smith*, 539 U.S.
15  510, 523 (2003) (focusing on "whether the investigation supporting counsel's
16  decision not to introduce mitigating evidence of Wiggins' background *was itself*
17  *reasonable*."). "[S]trategic choices made after less than complete investigation are
18  reasonable precisely to the extent that reasonable professional judgments support
19  the limitations on investigation." *Strickland*, 466 U.S. at 690-91. In other words,
20  any strategic decision made by counsel must be "reasonable and informed."
21  *Jennings v Woodford*, 290 F.3d 1006, 1014 (9th Cir. 2002).

22      When assessing the second prong, a court must decide whether "counsel's
23  errors were so serious as to deprive the defendant of a fair trial, a trial whose result
24  is reliable." *Strickland*, 466 U.S. at 687. A petitioner does not have to demonstrate
25  by a preponderance of the evidence that "the result in his case would have been
26  different but for counsel's errors," but only that there was a reasonable probability
27  that the errors undermined confidence in the outcome of his trial. *Brown v. Myers*,
28  137 F.3d 1154, 1157 (9th Cir. 1998) (citing *Strickland*, 466 U.S. at 694); *see also*

13

1   *Jennings*, 290 F.3d at 1016 (quoting *Strickland*, 466 U.S. at 694 (rejecting explicitly
2   the preponderance standard)); *Lord v. Wood*, 184 F.3d 1083, 1085 (9th Cir. 1999).
3   And "despite the strong presumption of reliability," the question to be asked is
4   whether "the result of the particular proceeding is unreliable because of a
5   breakdown in the adversarial process that our system counts on to produce just
6   results." *Strickland*, 466 U.S. at 696. Moreover, "deficient performance and
7   prejudice questions may be closely related." *Correll*, 539 F.3d at 951 (citations
8   omitted). Indeed, counsel's performance in and of itself could undermine a court's
9   confidence in the outcome of the trial. *Id*.

10       "In making this [prejudice] determination, a court hearing an ineffectiveness
11   claim must consider the totality of the evidence before the judge or jury."
12   *Strickland*, 466 U.S. at 695; *see also Williams (Terry) v. Taylor*, 529 U.S. 362, 397-
13   98 (2000); *Alcala v. Woodford*, 334 F.3d 862, 882-83 (9th Cir. 2003) (granting relief
14   on basis of cumulative impact of multiple errors by counsel); *Harris ex rel.*
15   *Ramseyer v. Wood*, 64 F.3d 1432, 1439 (9th Cir. 1995) (holding that the cumulative
16   impact of numerous deficiencies in defense counsel's performance was prejudicial
17   to the defense, rendering the proceedings improper and warranting habeas relief).
18   Even if this Court finds that no single error amounts to prejudice, it, nonetheless,
19   should apply cumulative error principles to grant relief. *See Boyde v. Brown*, 404
20   F.3d 1159, 1176 (9th Cir. 2005) (quoting *Cooper v. Fitzharris*, 586 F.2d 1325, 1333
21   (9th Cir. 1978) (en banc)).

22       A critical aspect in assessing prejudice under *Strickland* is to consider
23   whether the combined errors by trial counsel impacted the trial in a manner that
24   violated the Sixth Amendment. The Supreme Court did not instruct that each
25   individual error should be reviewed for prejudice, but rather that the totality of the
26   errors by counsel should be reviewed collectively for prejudice. In fact, *Strickland*
27   established that assessing prejudice resulting from an ineffective assistance of
28   counsel claim is identical to assessing materiality for a suppression-of-evidence

14

claim under *United States v. Agurs*, 427 U.S. 97, 104, 112-13 (1976). *Strickland*, 466 U.S. at 694. And the Supreme Court has continually explained that when assessing materiality, the suppressed evidence must be "considered collectively, not item by item." *Kyles v. Whitley*, 514 U.S. 419, 436 (1995); *see also Strickland*, 466 U.S. at 695 ("In making this [prejudice] determination, a court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury."); *Williams (Terry)*, 529 U.S. at 397 (holding that when assessing prejudice, reviewing court must consider "the totality of the available mitigation evidence— both that adduced at trial, and the evidence adduced in the [post-conviction] proceeding"); *Alcala*, 334 F.3d at 882-83 (granting relief on basis of cumulative impact of multiple errors by counsel); *Martin v. Grosshans*, 424 F.3d 588, 592 (7th Cir. 2005) ("[E]ven if [trial counsel's] errors, in isolation, were not sufficiently prejudicial, their cumulative effect prejudiced Martin's defense."); *Lindstadt v. Keane*, 239 F.3d 191, 194, 205 (2d Cir. 2001) (granting relief where petitioner was prejudiced by cumulative effect of errors committed by trial counsel). Accordingly, "[s]eparate errors by counsel at trial and at sentencing should be analyzed together to see whether their cumulative effect deprived the defendant of his right to effective assistance." *Sanders v. Ryder*, 342 F.3d 991, 1001 (9th Cir. 2003) (citation omitted). "They are, in other words, not separate claims, but rather different aspects of a single claim of ineffective assistance of trial counsel." *Id*. Even if prejudice does not result from an individual error, it may nevertheless result from cumulative errors. *See Boyde*, 404 F.3d at 1176 (quoting *Cooper*, 586 F.2d at 1333).

Paul Green of Cooper & Rueter first appeared on Almanza's behalf on April 1, 2013. (ROA 77.) He was the fourth attorney to appear for Almanza in his trial proceedings. (*See* ROA 6; ROA 31; ROA 72; ROA 77.) Green believes that Almanza's case was the first sex case he handled. Six months after Green's first court appearance, Almanza's case proceeded to trial with Green representing him. (ROA 96.) Despite the short amount of time between his appointment and the

1    beginning of trial, Green did not ask for any continuances.

2         The following sections of this claim detail the ways in which Almanza's trial

3    counsel, Green, rendered constitutionally ineffective assistance of counsel

4    throughout Almanza's trial. These errors individually and in the aggregate "were

5    so serious as to deprive [Almanza] of a fair trial, a trial whose result is reliable."

6    *Strickland*, 466 U.S. at 687.

7         **A.    Trial counsel provided ineffective assistance when he failed to
          thoroughly investigate the case.**

8

9         Trial counsel failed to sufficiently investigate Almanza's defenses and thus

10   failed to present any evidence at trial on Almanza's behalf. Almanza's defense

11   offered no witnesses or exhibits for the jury to consider. Furthermore, trial counsel

12   offered only minimal challenges to the witnesses called by the State.

13              **1.    Trial counsel failed to investigate possible lay witnesses.**

14        Because there were no witnesses to the alleged offense, this case hinged on

15   credibility. But, Green failed to investigate or to call any witnesses to testify who

16   could have lent credibility to Almanza or who could have discredited Quinn or

17   A.W. One possible witness, Jaime Kame ("Kame"), another employee of the

18   Double Check Ranch who worked with both Almanza and Quinn, was contacted by

19   Patrick Cote ("Cote"), the defense's investigator, prior to the trial. (Ariz. Ct. App.

20   PFR, Pet. for Review, Feb. 21, 2017, Ex. D at 3.) Cote asked if Kame was working

21   at the Ranch on October 22, 2011, but when he said he was not, Cote did not ask

22   him any additional questions or contact him again. (Ariz. Ct. App. PFR, Pet. for

23   Review, Feb. 21, 2017, Ex. D at 3.) If Kame had been interviewed more thoroughly,

24   he would have provided additional information and been willing to testify on

25   Almanza's behalf. (Ariz. Ct. App. PFR, Pet. for Review, Feb. 21, 2017, Ex. D at 3.)

26   Specifically, Kame would have testified that Quinn has a reputation for dishonesty

27   and being manipulative. (Ariz. Ct. App. PFR, Pet. for Review, Feb. 21, 2017, Ex.

28

16

D at 2.) He would also have testified that, prior to Almanza's trial, he heard Quinn tell her children that they would own the Double Check Ranch someday because she planned to sue the owner, which she did after Almanza was charged with this crime. (Ariz. Ct. App. PFR, Pet. for Review, Feb. 21, 2017, Ex. D at 1.) Kame also is aware that Quinn has a history of lying to police and attempting to manipulate the legal system to her advantage.[2] (Ariz. Ct. App. PFR, Pet. for Review, Feb. 21, 2017, Ex. D at 2.) These statements are relevant to Quinn's motive and bias for the testimony that she offered and would have been admissible to undermine her credibility. Additionally, Kame was aware that during the course of the investigation and trial, Quinn began dating a Pinal County sheriff's deputy, which was the agency investigating the case. (Ariz. Ct. App. PFR, Pet. for Review, Feb. 21, 2017, Ex. D at 2.) Finally, Kame would have testified that, prior to Almanza's arrest, Kame urged him to flee to Mexico to avoid prosecution, but Almanza refused, adamant that he was innocent. (Ariz. Ct. App. PFR, Pet. for Review, Feb. 21, 2017, Ex. D at 2.)

Another possible witness that the defense team could have called to testify is Paul Schwennesen ("Paul"). The Schwennesens were the owners of the Double Check Ranch. In addition, Paul is a graduate of the Air Force Academy, has a master's degree in history from Harvard University, and is currently working on a Ph.D. in 16th Century Spanish history. He would have made a credible witness at trial. Paul would have testified that Quinn uses and abuses the legal system to her personal advantage, that he was skeptical that Almanza had molested A.W. and thought the whole thing was a set up, and that he believed Quinn likely used and

_____

[2] This history includes an incident that occurred in April 2016, after Almanza's trial, where Quinn called the police to report that her then-husband had assaulted her. After a brief investigation, the police determined that Quinn had rolled around on the ground and staged the incident in an attempt to get her husband arrested after he had confronted her about a possible affair with another man. No charges were ever filed against her then-husband.

abused drugs. Paul also believed that Quinn neglected her children and that they would do anything to get her attention. This testimony not only would have undermined the veracity of both A.W. and Quinn's testimony, but also would have provided a basis for the impeachment of Quinn that Green had pushed for and been denied by the trial court. (Tr. Sept. 30, 2013 a.m. at 44) ("The only information you have is what your client has told you? No corroboration of any kind? . . . motion in limine is [to preclude impeachment of Quinn] granted.")

The foundation for this impeachment testimony would have been further developed if Green had investigated or presented the testimony of the Morales family. A. Morales is the 16 year old boy who was rumored to be engaging in an affair with Quinn. According to Green, "we have searched and been unable to find the young man." (Tr. Sept. 30, 2013 a.m. at 44.) If the defense team had tried harder to located Morales and his family, they would have been able to learn that A. Morales's mother was also Quinn's babysitter. Felicia Morales loved Quinn's children, but found Quinn to be unreliable about picking her kids up and paying Felicia for watching them. Felicia also recalls being surprised by how calm Quinn was when she told her about the alleged sexual assault of A.W. and believes that there were "good odds" that A.W. was manipulated and coached by Quinn. Michael Morales, A. Morales's father, believes Quinn is a narcissist and manipulator whose word cannot be trusted. He reports that she is now a heavy drug user.

Paul's wife, Sarah Schwennesen ("Sarah"), also would have been willing to testify about Quinn's veracity and reliability, but no one from Almanza's trial defense team ever contacted her. Sarah, now a lieutenant colonel in the Air Force Reserve, is a graduate of the Air Force Academy and holds a master's degree in history from Harvard. She would have testified that Quinn lived on the ranch and was the senior employee there. Sarah was "skeptical" about the accusations leveled against Almanza because Quinn was "prone to histrionics." Sarah did not believe anything she said was truthful. She believes that Almanza was set up and that he is

innocent. Sarah would also have testified that Paul received two calls from Quinn complaining about Almanza. During the first call, she demanded Almanza be fired because he was sexually harassing her, a claim Quinn repeated at trial. However, the next time Sarah saw Quinn, Quinn told her that she was willingly working in proximity to Almanza, in fact, that he was helping her in the packing house at her behest. When Sarah expressed surprise at this, Quinn told her that she was "fine with him." During the second call, Quinn told the Schwennesens that Almanza had assaulted her daughter, but then admitted that she had not bothered to contact law enforcement about the alleged assault. Sarah also would have testified that when the Schwennesens fired Quinn, she refused to leave the ranch an attempted to extort money from them, threatening to divulge secrets about the ranch if they did not pay her.

Similarly, Johnny Ink ("Ink"), Quinn's oldest son, J.I.'s, father, would have been willing to testify about Quinn and her reputation for dishonesty if he had been contacted by defense counsel prior to trial. Ink would have been able to testify that, when he met Quinn in Washington, she was a call girl and a drug addict. At that time, she would cook methamphetamine in her apartment. Their brief fling led to her pregnancy and, the day after J.I. was born, Quinn abruptly left both J.I. and Ink behind. Ink did not see or hear from her again for more than a year. For the first year of J.I.'s life, Ink was J.I.'s primary caregiver and raised him alone. However, not long after J.I.'s first birthday, two Seattle police officers came to Ink's business and asked about the baby. They explained that Quinn was alleging that Ink was an unfit parent and that he had threatened to kill her at gun point, despite the fact that he did not even own a gun. The police officers observed J.I. and Ink together and determined that Ink was telling the truth. Ink was served with custody papers the next day. Quinn's parents paid for a better lawyer than Ink could afford and Quinn was awarded primary custody of J.I., taking him to Arizona after the custody proceedings were over. During the custody proceedings, Quinn's father apologized

to Ink for what was happening. Based on Ink's experiences with Quinn, he has grave doubts about the veracity of any report she made to law enforcement. He knows her to be manipulative and a liar because she falsely accused him of abusing and endangering his son whom she had, in fact, abandoned.

### 2.    Trial counsel failed to consult with and investigate possible expert witnesses.

Trial counsel also failed to consult with and call a medical expert to testify about A.W.'s injuries. As is discussed in Claim 6 *infra*, there were issues with some of the medical testimony and certainly with the colposcope photographs that were admitted. Furthermore, A.W.'s injuries were inconsistent with a barbed wire scrape, which was the main defense employed by Green in Almanza's case. (Tr. Oct. 2, 2013 at 228.) If Green had consulted with a qualified medical expert, that expert could have explained to him that the barbed wire defense was medically inconsistent with the facts of this case and therefore, that it was a flawed defense.

A medical expert also could have explained the problems with the medical examination, the colposcope photographs, and could have advised Green on how to appropriately and effectively cross-examine the State's medical experts. A qualified medical expert could have testified that Sharon Welch's expert testimony was unreliable and that the measured size of the abrasion that was testified to was nonsense. A medical expert could also have discredited Dr. Julie Klein's testimony that A.W.'s injury was unlikely to have been caused by something other than digital penetration. (Tr. Oct. 2, 2013 at 241-42.) In fact, a defense medical expert could have testified that this abrasion very likely could have been caused by a variety of other things, specifically, that it was more likely caused by rubbing up against something, like a bicycle seat or tree branch.

Additionally, a medical expert called by the defense would have testified that the injury does not appear to be within the vulva and therefore, that the elements of the crime were not proved. Finally, the medical expert would have testified that if

Almanza had actually hit A.W. in the back with a shovel, as she reported numerous times, there should have been some evidence of something on her back, which would have contradicted Dr. Klein's testimony that it was normal to see no signs of blunt trauma there. (*See* Tr. Oct. 2, 2013 at 226.)

Trial counsel also failed to consult with and present the testimony of a false confession expert. A false confession expert would have explained that Almanza's statements to the police during the interrogation were not a confession and that the coercive atmosphere of his interrogation, coupled with his inability to speak English, this cognitive dysfunction, and his limited education, make all of his statements unreliable. (*See* Claim 4 *infra*.) A false confession expert would have testified that Almanza was easily manipulated and coerced and that, coupled with the language barrier, he was likely to just agree or go along with someone like Detective Randall Snyder or Johnny Boggs ("Boggs"), despite not really understanding what was going on. (*See* Claims 4 and 7 *infra*.)

Similarly, trial counsel failed to investigate and present evidence corroborating Almanza's story about his recent hernia surgery. Almanza's medical records confirm that on October 5, 2011, Almanza had hernia surgery. (Ariz. Ct. App. PFR, Pet. for Review, Feb. 21, 2017, Ex. C.) It was his second hernia surgery and he was still recovering at the time of the alleged offense. (Ariz. Ct. App. PFR, Pet. for Review, Feb. 21, 2017, Ex. C.) The doctor noted that Almanza would limp for several weeks after the surgery and advised him not to engage in any strenuous activity. (Ariz. Ct. App. PFR, Pet. for Review, Feb. 21, 2017, Ex. C at 3-4.) This confirmed injury and its resulting limitations cast doubt on Almanza's ability to lift up and carry A.W. some distance to the pigpen on the day of the offense, which is what Almanza told police. (Trial Ex. 116 at 55-56.) Detective Snyder also testified to the jury that during the interrogation, Almanza "admitted that one hand had been on her butt when he was carrying her." (Tr. Oct. 2, 2013 at 94.) Had Green called Almanza's doctor to testify and offered these medical records as exhibits, he could

have called into question the testimony about the course of events that day, as well as Detective Snyder's characterization of Almanza's interrogation as a confession because it was inconsistent with what he would have physically been able to do.

Any reasonably effective trial lawyer would conduct a thorough investigation of all possible expert and lay witnesses to try to be able to present the best case possible in their client's defense, especially when the client himself is not testifying. In particular, it is essential in cases that rest on the credibility of witnesses to search for any witnesses who will be able to bolster your client's credibility and undermine that of the State's witnesses. Consulting with your own medical expert is also essential to understanding cases involving injuries, to being prepared to appropriately and effectively cross-examine the State's medical experts, and to presenting testimony contradicting the State's experts. Green failed to conduct any of this basic investigation.

By failing to conduct this investigation to determine what information was available and what the best and most persuasive defense would be, Green's failures were not the result of strategic decisions because, even if Green believed they were so, they were not reasoned and informed. Furthermore, Almanza was clearly biased by Green's deficient representation. Because of Green's failure to investigate, no witnesses were presented in Almanza's defense and Green pursued an impossibly flawed defense that A.W. had been injured by a barbed wire fence, despite the fact that A.W.'s injury was inconsistent with that theory. Had Almanza's been able to present a more complete and meaningful defense, including undermining the credibility of Quinn, the outcome of his trial would likely have been different. Thus, Green's errors undermine confidence in the outcome of Almanza's trial and he is entitled to relief.

**B.    Trial counsel provided ineffective assistance when he failed to thoroughly investigate Almanza's mental health and IQ.**

Although he was aware of Almanza's cognitive defects, trial counsel retained

no experts to evaluate Almanza or to determine whether he suffered from any cognitive limitations until after he was found guilty. (ROA 118.) This type of investigation was especially pertinent in light of Almanza's alleged incriminatory statements both to the police and to his fellow inmate, Boggs.

Recently, Almanza was evaluated by a psychologist retained by the Office of the Federal Public Defender, who discovered not only that Almanza's "cognitive functions have been impaired since an early age," making his test results comparable to that of an eleven-year-old, but who also expressed concerns regarding organic, neuropsychological impairments. (Ariz. Ct. App. PFR, Pet. for Review, Feb. 21, 2017, Ex. B at 5.) Additionally, the Office of the Federal Public Defender commissioned a post-trial neuropsychological evaluation which revealed that Almanza's "language deficits, his relatively low estimated intellectual functioning, and his borderline cognitive processing speed are most likely attributable to his poor early developmental experiences and his lack of formal education." (Ariz. Ct. App. PFR, Mot. to Stay Pet. for Review, June 5, 2017, Ex. C at 5.) This information would have been relevant in questioning the reliability and veracity of Almanza's alleged confessions and in explaining Almanza's susceptibility to manipulation and misunderstanding. Thus, had trial counsel consulted these types of experts and had Almanza evaluated, counsel would have been able to present testimony at trial on Almanza's behalf that would undermine the authenticity and appearance of confession described by both Boggs's and Detective Snyder's testimonies. This error undermines the confidence in the outcome of Almanza's trial and he is entitled to relief.

### C. Trial counsel provided ineffective assistance when he failed to object to the numerous instances of prosecutorial misconduct.

Throughout Almanza's trial, Matt Long ("Long") continuously made statements that violated Almanza's right to due process. These statements were improper because the State is not permitted to inflame the jury and appeal to their

emotions. "The evil lurking in such prosecutorial appeals is that the defendant will be convicted for reasons wholly irrelevant to his own guilt or innocence." *United States v. Koon*, 34 F.3d 1416, 1443 (9th Cir. 1994) (quoting *United States v. Monaghan*, 741 F.2d 1434, 1441 (D.C. Cir. 1984)), *aff'd in part, rev'd in part on other grounds*, 518 U.S. 81 (1996); *see also United States v. Nobari*, 574 F.3d 1065, 1076 (9th Cir. 2009) (finding error when the prosecutor's arguments "appear designed to encourage the jury to view the government's case more favorably by appealing to positive emotion for the law enforcement officers involved in the drug bust. This was improper commentary and should have been struck from the record, as a prosecutor may not 'tell[] the jury it had any obligation other than weighing the evidence'"(citation omitted)).

The rampant prosecutorial misconduct that occurred during Almanza's trial is discussed more fully in Claim 8 *infra*. Nonetheless, Almanza's trial counsel failed to object to the prosecutorial misconduct, allowing it to continue and to inappropriately influence the jury's consideration of the case, rendering his assistance ineffective. *See Zapata v. Vasquez*, 788 F.3d 1106, 1123-24 (9th Cir. 2015) (finding ineffective assistance of trial counsel for failing to object to prosecutor's misconduct).

During Almanza's trial, Long made twenty-four improper references in his opening statement to Almanza being a "poacher," a "hunter," a "fox," a "fox in a henhouse," and to A.W. being "prey" who was "selected" and "snatched up." (Tr. Oct. 1, 2013 at 4-6, 8-10, 18.) These comments are not only inappropriate and inflammatory, but they are also not supported by the facts that were introduced at trial. This proposition and the effect of dehumanizing Almanza to the jury was bolstered by many additional references in the prosecutor's closing argument to Almanza being a "hunter" or a "poacher" and A.W. being his "prey." (Tr. Oct. 7, 2013 p.m. at 4, 7, 30.) Moreover, these comments included references to Almanza's "hunting grounds, to his trap, the trap that he had laid." (Tr. Oct. 7, 2013 p.m. at 7.)

1    These characterizations of Almanza were even more improper given the racial
2    undertones and the fact that Almanza is Hispanic. Long's remarks thus constituted
3    a coded racial appeal to Almanza's jury as well.[3] However, Green did not object to
4    any of these characterizations of his client.

5        In Almanza's trial, the prosecutor also engaged in impermissible vouching
6    by vouching for A.W.'s credibility and for the minimal physical evidence in the
7    case. During his opening statement, Long made at least eleven references to the
8    "truth" spoken by A.W. and by her body. (Tr. Oct. 1, 2013 at 4, 5, 10, 12-13, 16-
9    18.) Furthermore, during closing argument, the prosecutor continued this thread of
10   statements, but heightened their impact by characterizing A.W.'s body as
11   "scream[ing]" the truth. (Tr. Oct. 7, 2013 p.m. at 8-11, 13, 18, 23, 26, 44.) This
12   statement was made at least ten times during the closing argument. Nonetheless,
13   Green did not object once.

14       Long also disingenuously vouched for Boggs during his closing argument.
15   During his closing argument, Long commented that Boggs had "absolutely nothing
16   to gain by speaking his truth." (Tr. Oct. 7, 2013 p.m. at 22.) Although it is unclear
17   whether Boggs received a better plea in exchange for testifying against Almanza,
18   his plea agreement did specifically specify that he would testify at Almanza's trial.
19   (Trial Ex. 128 at 3.) As a result, if he had refused to testify, the State could have
20   invalidated his plea agreement and he could have been imprisoned. Green was
21   aware of the plea agreement, but, nevertheless, failed to meaningfully cross-

22   [3] Scholar and University of California, Berkeley law professor Ian Haney López
23   describes a claim which, on the surface, appears to "have nothing to do with race,
     yet [] nevertheless powerfully communicate[s] messages about threatening
24   nonwhites". Ian Haney López, *Dog Whistle Politics: How Coded Racial Appeals
     Have Reinvented Racism and Wrecked the Middle Class* ix (2015); *see also* Eduardo
25   Bonilla-Silva, *Racism without Racists: Color-blind Racism and the Persistence of
     Racial Inequality in America* (4th ed. 2014) (discussing coded language that masks
26   racial prejudice as the product of the post-1960s rise in color blind ideology). López
27   explains that such references are in reality racial entreaties that "operate like a dog
     whistle" that is, "racial pandering [that] [ ] operates on two levels: inaudible and
28   easily denied in one range, yet stimulating strong reactions in another." *Id*. at 3.

examine Boggs or to object to the prosecutor's incorrect and impermissible assertion regarding Boggs's motives. Additionally, the characterization of Boggs's testimony as the "truth" is a prime example of impermissible vouching for a witness, but Green failed to object to that as well. (Tr. Oct. 7, 2013 p.m. at 22.)

In his final closing argument, Long also impermissibly commented on Almanza's failure to testify, emphasizing, "[t]here are two people who know what happened, and the defendant is the other." (Tr. Oct. 7, 2013 p.m. at 40.) He then went even further in his comments, ultimately shifting the burden of proof to Almanza through several statements, including "there's no evidence of [A.W. being coached]. Where is the evidence of that? There isn't any" (Tr. Oct. 7, 2013 p.m. at 43) and "why didn't [defense counsel] ask the expert in this case, is that reasonable. In this case, could that have happened. Because he [sic] rather have an argument than the facts because in this case there is no evidence that [A.W.] was impacted" (Tr. Oct. 7, 2013 p.m. at 43). Again, Green did not object.

Green's unreasonable failure to object to the continued instances of prosecutorial misconduct unduly prejudiced Almanza and amounted to constitutionally deficient performance. Almanza was prejudiced because the State was allowed to make numerous inappropriate and inflammatory statements to the jury and to make appeals to the jury's sense of community and safety that are impermissible. The prosecutor's inappropriate statements pervaded and infected the entirety of the proceedings and served to continually debase and dehumanize Almanza while praising and vouching for the virtues of Boggs, the jailhouse informant, and A.W.'s mother, Quinn. Green's ineffectiveness deprived Almanza of a fair trial because it is likely that without this misconduct, the outcome of Almanza's trial would have been different.

**D.    Trial counsel provided ineffective assistance when he failed to adequately prepare for the suppression hearing and failed to adequately pursue the suppression of Almanza's statements.**

In a pretrial motion, Almanza's previous defense attorney, Bret Huggins

("Huggins"), moved to suppress the warrantless arrest and the involuntary statements given to the police during their October 23, 2011 interrogation of Almanza. (ROA 42; ROA 43.) Huggins argued that due to Almanza's language barrier and confusion about what was going on, in addition to his statements that he did not want to answer questions and about whether he needed an attorney, all of the statements that he made were involuntary and should be suppressed. (ROA 42 at 3-4.) When Green became Almanza's trial lawyer, he did not file any reply in support of these motions. (Tr. Sept. 30, 2013 a.m. at 6.)

On the morning of trial, prior to jury selection, the trial court raised the fact that the suppression motion had not yet been ruled upon. (Tr. Sept. 30, 2013 a.m. at 5-6.) The trial court also asserted that it needed to rule on this motion prior to the commencement of the trial. (Tr. Sept. 30, 2013 a.m. at 5-6.) The trial court held an impromptu and cursory voluntariness hearing. (Tr. Sept. 30, 2013 a.m. at 49-83.) Green clearly was not prepared for the suppression hearing. He had not filed the motion and had not re-urged it for a ruling prior to the date of trial. As a result, he was caught off-guard when the trial court raised the suppression issue and engaged in a pretrial hearing to make a determination.

During a recess prior to the voluntariness hearing, the judge reviewed the transcript of Almanza's interrogation and listened "to the recorded conversations from the beginning through advisement of Miranda and about 15 minutes into the discussion, [his] thoughts being that the issues that are before [him] really are limited up to the time of the Miranda, the beginning of the questioning." (Tr. Sept. 30, 2013 a.m. at 49-50.) The State called Detective Snyder as a witness and Green did not call any witnesses. (Tr. Sept. 30, 2013 a.m. at 51-76.) At the conclusion of the hearing, the trial court ruled that the arrest was legal, although the trial court indicated that it did not believe Almanza was under arrest, that *Miranda* advisements were properly given, that Almanza appeared to understand what was going on, and that the statements Almanza made were voluntary. (Tr. Sept. 30, 2013

1    a.m. at 81-83.)

2          The Supreme Court has clearly established rules that police must follow

3    when interrogating a person in custody to ensure that the state does not violate the

4    "basic" and "precious" rights of the Fifth Amendment. *Miranda v. Arizona*, 384

5    U.S. 436, 442 (1966). *Miranda* mandates that when questioning an in-custody

6    suspect about criminal activity, police officers must inform the suspect of his right

7    to remain silent and his right to the presence of an attorney. *Id.* at 444. One of the

8    most important prongs of the *Miranda* analysis is whether the person is in custody

9    or free to leave and speaking to police voluntarily. The trial court emphasized the

10   importance of this consideration during its ruling, indicating that "I'm not going to

11   characterize it as an arrest. . . . He was told he was free to go." (Tr. Sept. 30, 2013

12   a.m. at 81.) This statement is not correct; Almanza was not told he was free to go

13   prior to or during the questioning. (*See generally,* Trial Ex. 116.) He was only

14   released and told that he could leave after the interrogation had concluded. (Trial

15   Ex. 116 at 103-04.)

16         The trial court's confusion about whether Almanza was actually placed under

17   arrest is exclusively attributable to Green's failure to establish that fact during the

18   hearing, as any reasonably competent attorney would have. In fact, Green even

19   alerted the trial court to his deficiency in his closing argument on the suppression

20   issue, explaining that "[w]e don't have testimony yet as to whether he was

21   handcuffed or not. I'm not sure whether he was or not." (Tr. Sept. 30, 2013 a.m. at

22   78.) Green could have easily established the fact that Almanza was in custody by

23   calling witnesses who, unlike Detective Snyder, had actually been present when

24   Almanza was stopped and arrested. Specifically, Deputy Parry and Deputy Foster

25   of the Pinal County Sheriff's Office, the two officers who stopped Almanza,

26   explicitly acknowledge in their report that Almanza was placed under arrest. Green

27   also failed to introduce testimony through Detective Snyder that Almanza had been

28   placed in a holding cell for more than four and a half hours prior to the beginning

of the interrogation, which then lasted over two hours. (Trial Ex. 116 at 3, 107.)[4] In addition to establishing that Almanza was "in custody" for the purposes of *Miranda*, these facts also establish the coercive atmosphere in which Almanza's interrogation was conducted. These external, influential factors, as well as Almanza's inability to read and also to speak English, are all relevant and persuasive facts that indicate that his statements were involuntary.

Nonetheless, Green failed to sufficiently address and advocate for the suppression of Almanza's statements, which were admitted at trial. The admission of these statements is clearly prejudicial because the State and Detective Snyder framed them as a confession and acknowledgement by that Almanza had digitally penetrated A.W., which they were not. This alleged confession persuaded the jury to determine his guilt. If these statements had not been admitted, the outcome of the trial would undoubtedly have been different. Therefore, Almanza is entitled to relief.

**E.    Trial counsel provided ineffective assistance when he elicited testimony regarding Almanza's prior bad acts, failed to object to the testimony, and failed to request a limiting instruction.**

As discussed further in Claim 5, *infra*, during Almanza's trial, defense counsel elicited the following testimony on cross-examination of Quinn:

> Q:    Do you ever remember punching Fernando in the face?
>
> A:    Yes, I do.
>
> Q:    Can you tell me about that.
>
> A:    He behaved inappropriately with me, and I turned around instinctively and I punched him.

---

[4] The transcript of Almanza's police interrogation does not include page numbers for the pages that transcribe and translate Almanza's Spanish communications with Sergeant Vargas. To avoid confusion, Almanza will pincite to the page numbers of the document as a whole and not the page numbers that appear on the actual transcript.

1

    . . .

2

    Q:    Were there other incidents where you and he did not

3

get along? I mean, punching in the face seems like you
didn't—

4

    A:    Yeah, that we – I just – I had bad feelings about him

5

and I just didn't want him near me.

6

    Q:    And yet you would work with him and he would help

7

you out occasionally?

8

    A:    Not once I got those bad feelings. I would not let him
around me or my children.

9

10 (Tr. Oct. 1, 2013 at 171-72.) The State seized upon this line of testimony and

11 followed up on redirect, asking Quinn to explain the instance when Almanza was

12 inappropriate with her. Quinn responded that, "[h]e came up behind me and he

13 pressed his body against me. He was clothed, I was clothed. . . . And he pressed

14 himself up against me and I felt him in a way I did not want to feel, so I turned

15 around and I punched him." (Tr. Oct. 1, 2013 at 176.) She also elaborated that

16 another time, "he came up behind me and grabbed me from my side, like this, and

17 pushed himself against me. I screamed." (Tr. Oct. 1, 2013 at 177.) Quinn further

18 testified that Almanza had asked her out "at least six" times, but that she had turned

19 him down (Tr. Oct. 1, 2013 at 177), that she saw him looking into her house at night

20 (Tr. Oct. 1, 2013 at 178-79), and that, on two occasions, he came into her bedroom

21 uninvited at 6 a.m. (Tr. Oct. 1, 2013 at 178). Defense counsel did not object to this

22 line of questioning until the prosecutor asked, "Well, then certainly, Ms. Quinn,

23 because of this animosity, you must have put your daughter up to accusing him of

24 touching her?" (Tr. Oct. 1, 2013 at 179.) Defense counsel also did not ask for a

25 limiting jury instruction regarding this prejudicial and irrelevant evidence.

26     An effective trial attorney would never have elicited this testimony in the first

27 place. There is no trial strategy where testimony about a defendant allegedly being

28

inappropriately physical and flirtatious with the mother of the victim would be beneficial or would endear him to the jury in any way. Green opened the door for the State to paint Almanza as a creepy and aggressive sexual predator, which suggested to the jury that he was therefore more likely guilty of this offense. Furthermore, Green failed to object to the additional testimony elicited by the State. Under 404(b) this testimony was not relevant and was certainly prejudicial. Green should have objected and attempted to prevent its admission.

Even if evidence objected to under Rule 404(b) is ruled admissible as relevant for a proper purpose and not unfairly prejudicial, "the trial court is required to give a limiting instruction on its use if so requested." *State v. VanWinkle*, 285 P.3d 308, 314 (Ariz. 2012); *see also State v. Mott*, 931 P.2d 1046, 1055 (Ariz. 1997). Due to the nature of the charges in this case and the nature of the 404(b) testimony presented, the need for a limiting instruction should have been apparent. *See Albrecht v. Horn*, 485 F.3d 103, 127 (3d Cir. 2007) (finding deficient performance for failing to request limiting instruction when evidence of prior bad acts "was not briefly or fleetingly presented, but instead was a substantial portion of the Commonwealth's case"). Nonetheless, despite this incident being one of the main focuses of Quinn's testimony, Green did not ask the trial court for a limiting instruction.

Furthermore, in his closing argument, Long returned to this testimony, commenting that

> It is a fact that her mother was divorced. He thought she might be easy, easy prey. Maybe it was the fact that the defendant pursued her mother and had been rebuffed by her mother.
> . . .
> But he knew this was his target.

(Tr. Oct. 7, 2013 p.m. at 5.) Because Long focused on this evidence and asked the jury to draw inferences about Almanza's character because of it, at the very least

the Long's closing argument should have alerted Green of the need for an instruction telling the jury the limited purposes for which this evidence could properly be considered. *See Musladin v. Lamarque*, 555 F.3d 830, 846 (9th Cir. 2009) (finding counsel performed deficiently by failing to ask for limiting instruction after prosecutor in closing argument "drew the jury's attention to the damaging statement and invited them to draw the precise inference that limiting instruction would have forbidden"); *Albrecht*, 485 F.3d at 128 ("[T]he need for a limiting instruction was not hypothetical. In closing, the prosecutor improperly related the evidence of spousal abuse to [the defendant's] character . . . In doing so, the prosecutor did not limit his use of the bad acts evidence to proving motive. Instead, he explicitly called upon the jury, by asking 'what type of man is [the defendant],' to view the evidence of prior bad acts as evidence of [the defendant's] bad character and propensity to commit this crime.").

A reasonable and effective trial attorney would have avoided eliciting this prejudicial 404(b) testimony in the first place, but, would have objected to it. There can be no strategy involved in presenting the jury with testimony that a defendant charged with a deviant sexual offense has committed various degrees of sexual assault on previous occasions. At a minimum, a reasonable and effective attorney would have recognized the prejudice inherent in this testimony and asked the trial court to give a limiting instruction to the jury. Almanza's trial counsel did not do any of these things and, given the nature of the charges, Almanza was undoubtedly prejudiced by the jury's perception of him as overly sexually aggressive in situations where his affections are not reciprocated. Thus, Almanza has satisfied both prongs of the *Strickland* test and he is entitled to relief.

**F.  Trial counsel provided ineffective assistance when he failed to ask the trial court to instruct the jury that they could find the lesser included crime of Molestation.**

Almanza was charged with Sexual Conduct with a Minor pursuant to A.R.S.

§ 13-1405.[5] Molestation is a lesser included offense of Sexual Conduct that requires only that the defendant engaged in "sexual contact" with a child, whereas Sexual Conduct requires penetration. A.R.S. § 13-1410 (2011); *see also* A.R.S. § 13-1401(3) (2011). Molestation of a child carries a maximum sentence of 24 years and a minimum of 10 years. A.R.S. § 13-705(D). The only possible sentence for Sexual Conduct with a Minor at the time of Almanza's conviction was a life sentence. Given the nature of the accusations in this case and the reluctance of Arizona juries to disbelieve child victims, Green should have asked that the jury also be given an instruction and verdict form on the lesser included of Molestation. In actuality, the alleged facts of the case are much more consistent with the elements of Molestation than those of Sexual Conduct with a Minor. Furthermore, if the jury had been given this option, it would have enabled them to find Almanza guilty of something, if they believed that he was, but also would have enabled him to be released after a maximum of 24 years, instead of being sentenced to life in prison. By depriving the jury of this option, Green deprived his client of the chance to avoid a sentence of life in prison. As a result, Almanza was clearly prejudiced by this failure and is entitled to relief.

### G.   Trial counsel provided ineffective assistance by failing to meaningfully cross-examine A.W.

A.W. was the most important witness against Almanza because she was the one who was accusing him of a crime. Nonetheless, Green's cross-examination of A.W. did nothing to undermine her credibility or to poke holes in her story. Instead, Green treated her like a victim who was recounting a painful story, which merely served to make the jury more sympathetic toward her and to bolster her credibility by suggesting that Green too believed that she was a victim. Green began his cross-

---

[5] The Arizona Revised Statutes related to sexual offenses have been updated since the time of Almanza's trial. With regard to these statutes, Almanza will cite to the statutes that were in effect at the time of his conviction, which was the 2011-2012 version that took effect on October 15, 2011.

examination of A.W. by apologizing and saying, "I'm sorry that I'm making you talk about it, but it's really important." (Tr. Oct. 1, 2013 at 117.) Green also apologized at the conclusion of his cross-examination, saying "I'm sorry we had to ask you all these questions. You've been a really good witness, though. You've done a good job." (Tr. Oct. 1, 2013 at 127.) These apologies presuppose that A.W.'s account of the events of October 22, 2011 are true and that it was a difficult day and therefore, painful to her to recall. By approaching the cross-examination of A.W. this way, Green completely betrayed Almanza's version of the day and made A.W.'s testimony appear more truthful.

Green further abandoned his client in his closing argument, vouching for A.W. by informing the jury that "there's only one person who truly knows what happened or didn't happen here beyond a reasonable doubt, only one, and that's [A.W.]" (Tr. Oct. 7, 2013 p.m. at 40.) In making this statement, Green is further undercut the credibility of Almanza's insistence on his innocence because clearly Almanza also would know what happened that day and whether or not he actually committed this offense.

Additionally, during A.W.'s initial interview by both the emergency room doctor and the Sexual Assault Nurse Examiner, she mentions that Almanza "whacked me with a shovel on my back." (Trial Ex. 113 at 11.) However, there was no injury to A.W.'s back observed by any of the medical professionals who examined her. During her trial testimony, A.W. did not mention being hit with a shovel at all. This portion of her story, coupled with the complete lack of injury, seems illogical and unlikely. As a result, it undermines A.W.'s credibility and her account of the events of that day. Nonetheless, Green did not mention it at all during his cross-examination of A.W. He did not question her about when or why or how Almanza hit her with a shovel. He also did not question or impeach either A.W. or Quinn about the fact that, although initially telling the police in their witness statement that A.W. told her mother that Almanza had "tickled her," they both

denied any tickling during their testimony, instead relaying that he "hurt" her. (*See* Tr. Oct. 1, 2013 at 107; Tr. Oct. 1, 2013 at 168-69.) Further, he did not mention any of these inconsistencies in his closing argument. Instead of highlighting the inconsistencies and flaws in A.W.'s story, Green argued that A.W. is the "one person who truly knows what happened or didn't happen here." (Tr. Oct. 7, 2013 p.m. at 40.)

Almanza was prejudiced by Green's deficient performance in his cross-examination of A.W. Instead of trying to undermine A.W.'s reliability and testimony, Green bolstered it, treating her like a victim and commenting that she knew the truth. By bolstering Almanza's accuser in front of the jury, Green prejudiced Almanza and his trial proceedings. If Green had done a more effective job of cross-examination, as a reasonably competent attorney would have, the outcome of Almanza's trial would likely have been different. Almanza is entitled to relief.

**H.    The cumulative prejudicial impact of trial counsel's deficient performance denied Almanza's rights under the Sixth and Fourteenth Amendments.**

Even if this Court finds that no single error of deficient performance in the trial alone amounts to prejudice, it must also apply cumulative error principles to determine whether to grant relief. *See Strickland*, 466 U.S. at 695 (the question is whether, "absent the errors," there would have been reasonable doubt); *see also Boyde*, 404 F.3d at 1176 (quoting *Cooper v. Fitzharris*, 586 F.2d 1325, 1333 (9th Cir. 1978) (en banc)). "[E]rrors that might not be so prejudicial as to amount to a deprivation of due process when considered alone, may cumulatively produce a trial setting that is fundamentally unfair." *Alcala*, 334 F.3d at 883 (internal quotation marks and citation omitted); *Harris*, 64 F.3d at 1439 (cumulative impact of numerous deficiencies in defense counsel's performance was prejudicial to the defense, rendering the proceedings improper and warranting habeas relief); *Mak v. Blodgett*, 970 F.2d 614, 622 (9th Cir. 1992) (finding counsel's deficiencies taken in

35

combination with two other errors constituted a denial of petitioner's due process rights). The multiple errors create a level of prejudice that renders a trial fundamentally unfair, which "constitutes a separate and independent basis for granting [relief]." *Alcala*, 334 F.3d at 883.

In this case, Green rendered deficient performance throughout Almanza's trial and it impacted the reliability of the entire proceeding. The cumulative prejudicial impact of Green's deficient performance produced a trial setting that was fundamentally unfair and denied Almanza's Sixth and Fourteenth Amendment rights. Almanza is therefore entitled to relief.

### Claim Two
**Almanza's Sixth Amendment right to the effective assistance of counsel was violated by his direct appeal counsel's failure to raise meritorious claims on direct appeal.**

Almanza incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Petition. Almanza raised this claim in his post-conviction proceedings. (PCR, Pet. for Post-Conviction Relief, May 19, 2016 at 2 (Dkt. 13); Ariz. Ct. App. PFR, Pet. for Review, Feb. 21, 2017 at 18-19; Ariz. S. Ct. PFR Dkt. 1 at 12-13.) None of the Arizona state courts addressed the merits of this claim. (PCR, Ruling on Motions/Issues, Aug. 5, 2016 at 1 (Dkt. 16); Ariz. Ct. App. PFR, Mem. Decision, July 25, 2017 at 3; Ariz. S. Ct. PFR Dkt. 4 at 1.) Because this claim has not been adjudicated by the Arizona state courts on the merits, the limitations on relief imposed by 28 U.S.C. § 2254(d) do not apply to this Court's review of the claim and this Court may consider the merits of this claim de novo. If this Court deems this claim unexhausted, Almanza can overcome any default of this claim by showing cause and prejudice, including because of the ineffective assistance of state post-conviction counsel. *See Martinez*, 566 U.S. at 9; *Carrier*, 477 U.S. at 488-89; *Strickland*, 466 U.S. at 687-88; *Nguyen v. Curry*, 736 F.3d 1287 (9th Cir. 2013); *but see Davila v. Davis*, 137 S. Ct. 2058. Almanza will demonstrate at an evidentiary hearing that post-conviction counsel fell below the standards of

1    minimally competent attorneys and that those failures prejudiced him.

2         The effective assistance of appellate counsel is guaranteed by the Due

3    Process Clause of the Fourteenth Amendment. *See Evitts v. Lucey*, 469 U.S. 387,

4    396 (1985) ("A first appeal as of right . . . is not adjudicated in accord with due

5    process of law if the appellant does not have the effective assistance of an

6    attorney."); *id.* at 395 ("Because the right to counsel is so fundamental to a fair trial,

7    the Constitution cannot tolerate trials in which counsel, though present in name, is

8    unable to assist the defendant to obtain a fair decision on the merits."). As such,

9    "nominal representation" during an appeal "does not suffice to render the

10   proceedings constitutionally adequate." *Id.* at 396.

11        Ineffective assistance of appellate counsel claims are governed by the

12   standard of review set forth in *Strickland*, 466 U.S. at 686-87. *See Smith v. Robbins*,

13   528 U.S. 259, 285 (2000). Accordingly, Almanza must show that appellate

14   counsel's representation "fell below an objective standard of reasonableness," and

15   that "there is a reasonable probability that, but for counsel's unprofessional errors,

16   the result of the proceeding would have been different." *Strickland*, 466 U.S. at 688,

17   694. In addition, the ABA Guidelines are instructive in evaluating the

18   reasonableness of counsel's conduct. *See Rompilla v. Beard*, 545 U.S. 374, 387

19   (2005). Regarding appellate counsel's performance, the Guidelines indicate that

20   "counsel should seek to litigate all issues . . . that are arguably meritorious" 2003

21   ABA Guidelines § 10.15.1(C). Therefore, when appellate counsel fails to raise

22   meritorious issues that could have resulted in a reversal of a conviction or sentence,

23   counsel has necessarily caused prejudice to the defendant. *See, e.g.*, *Strickland*, 466

24   U.S. at 694; *see also Nguyen*, 736 F.3d 1287; *Martinez*, 566 U.S. 1.

25        "In making this [prejudice] determination, a court hearing an ineffectiveness

26   claim must consider the totality of the evidence before the judge or jury."

27   *Strickland*, 466 U.S. at 695; *see also Williams (Terry) v. Taylor*, 529 U.S. 362, 397-

28   98 (2000); *Alcala v. Woodford*, 334 F.3d 862, 882-83 (9th Cir. 2003) (granting relief

on basis of cumulative impact of multiple errors by counsel); *Harris ex rel. Ramseyer v. Wood*, 64 F.3d 1432, 1439 (9th Cir. 1995) (holding that the cumulative impact of numerous deficiencies in defense counsel's performance was prejudicial to the defense, rendering the proceedings improper and warranting habeas relief). Even if this Court finds that no single error amounts to prejudice, it, nonetheless, should apply cumulative error principles to grant relief. *See Boyde v. Brown*, 404 F.3d 1159, 1176 *as amended by* 421 F.3d. 1154 (9th Cir. 2005) (quoting *Cooper v. Fitzharris*, 586 F.2d 1325, 1333 (9th Cir. 1978) (en banc)).

Individually and cumulatively, the deficiencies raised below constitute ineffective assistance of appellate counsel. *See Strickland*, 466 U.S. at 690 (allegations of ineffectiveness must be examined in light of all the circumstances); *Rompilla*, 545 U.S. at 393 (evaluating prejudice based on the evidence "taken as a whole"). Appellate counsel's deficient performance was prejudicial. Thus, Almanza is entitled to relief.

### A.   Appellate counsel failed to challenge the prosecutorial misconduct that occurred during Almanza's trial proceedings.

Almanza received ineffective assistance because his attorney, Lynn Hamilton ("Hamilton"), failed to raise all relevant issues on appeal. Specifically, she failed to raise a claim regarding the prosecutorial misconduct discussed in Claim 8 *infra*.

Hamilton's actions were plainly deficient. Even if Hamilton's actions could somehow be deemed strategic, that strategy was unreasonable and cannot be deferred to here. Most importantly, Hamilton should have known at the time of Almanza's appeal that meritorious prosecutorial misconduct claims did win in Arizona. The Arizona Supreme Court had taken drastic actions in several cases in the years prior to Almanza's appeal. In 2002, the Arizona Supreme Court reversed the defendant's conviction and sentence in a capital appeal involving three murders, and barred retrial due to the extreme misconduct by the trial prosecutor. *State v.*

1  *Minnitt*, 55 P.3d 774, 776 (Ariz. 2002); *see also id.* at 781 ("Prosecutorial
2  misconduct that permeates the process and intentionally destroys the ability of the
3  tribunal to reach a fair verdict must necessarily be remedied."). This decision was
4  based on other Arizona cases that reached similar results on the basis of
5  prosecutorial misconduct. *See Pool v. Super. Ct. In and For Cty. of Pima*, 677 P.2d
6  261, 271-72 (Ariz. 1984); *State v. Hughes*, 969 P.2d 1184, 1186 (Ariz. 1998); *see
7  also State v. Jorgenson*, 10 P.3d 1177 (Ariz. 2000). Further, the Arizona Supreme
8  Court had recently ordered disbarment of the capital prosecutor whose conduct was
9  at issue in *Minnitt*. *In re Peasley*, 90 P.3d 764, 779 (Ariz. 2004).

10  Based on the evidence of pervasive and outrageous misconduct in this case
11  and others prosecuted by Matt Long, as discussed in Claim 8 *infra*, Almanza was
12  prejudiced by Hamilton's failure to raise this issue on appeal. The Arizona Supreme
13  Court has a history of reversing cases based on prosecutorial misconduct, and
14  Almanza's claim is meritorious. Long is an experienced prosecutor. Based on
15  Long's history and experience, he should know not to make improper and
16  unsupported arguments. Long's misconduct can only be seen as intentional conduct
17  aimed to secure a guilty verdict, and the cumulative effect was undeniably
18  prejudicial to Almanza, ultimately denying his right to a fair trial. Consequently,
19  Almanza was prejudiced by counsel's failure to raise this claim on direct appeal
20  and he is entitled to evidentiary development and habeas relief. *See Strickland*, 466
21  U.S. at 694.

22  **B.    Appellate counsel failed to challenge the reasonable doubt jury
23       instruction that shifted the burden to Almanza.**

24  Almanza received ineffective assistance because Hamilton failed to
25  challenge the reasonable doubt jury instruction, discussed in Claim 11 *infra*, which
26  impermissibly shifted the burden to Almanza to prove that he was innocent. A
27  competent appellate attorney would have raised this claim to provide the Court with
28  a chance to remedy the trial court error that rendered Almanza's conviction and

sentence unconstitutional. *See In re Winship*, 397 U.S. 358, 364 (1970); *see also Holland v. United States*, 348 U.S. 121, 140 (1954) (quoting *Miles v. United States*, 103 U.S. 304, 312 (1880)); *United States v. Walton*, 207 F.3d 694, 705 (4th Cir. 2000) (King, J., dissenting) (discussing criticism of such instructions and citing *United States v. Porter*, 821 F.2d 968, 973 (4th Cir. 1987), and Lawrence M. Solan, *Refocusing the Burden of Proof in Criminal Cases: Some Doubt About Reasonable Doubt*, 78 Tex. L. Rev. 105 (1999)); *State v. Perez*, 976 P.2d 427, 442 (Haw. Ct. App. 1998), *aff'd in part, rev'd in part on other grounds*, 976 P.2d 379 (Haw. 1999). There is a reasonable probability that, but for appellate counsel's unprofessional error, the Arizona Court of Appeals would have determined that the trial court's error rendered Almanza's conviction and sentencing unconstitutional and granted relief. Consequently, Almanza was prejudiced by counsel's failure to raise this claim on direct appeal. *See Strickland*, 466 U.S. at 694.

### C. Appellate counsel failed to argue the appropriate standard for review, thereby waiving Almanza's meritorious claims regarding the admission of 404(b) and (c) evidence and the admission of jailhouse informant testimony.

In his direct appeal, Almanza received ineffective assistance of counsel because, even in raising meritorious claims for appeal, Hamilton neglected to argue the appropriate legal standard for review of those claim. In the Opening Brief, Hamilton raised the issue that it was fundamental error for the trial court to admit testimony regarding prior bad acts pursuant to Arizona Rules of Evidence 404(b) and (c). (DA, Opening Br., May 1, 2014 at 19.) However, in raising this claim, Hamilton did not sufficiently argue or explain that the error was fundamental or that the error prejudiced Almanza—mentioning the prejudice arising in Almanza's case in only one sentence at the conclusion of the claim. Instead, she focused the majority of the claim on the analysis that this error was not harmless and that the burden was on the State to prove that it was. (DA, Opening Br., May 1, 2014 at 25.) Consequently, in reviewing this claim, the Arizona Court of Appeals found that

40

Almanza had waived the argument, stating, "Although Almanza correctly identified fundamental error as the proper standard of review, he does not argue that the alleged error was fundamental or caused him prejudice. Instead, Almanza erroneously states that '[t]he State bears the burden of showing error was harmless.' Therefore, the argument . . . is waived." (DA, Mem. Decision, Aug. 29, 2014 at 11.)

Additionally, in the Opening Brief, Hamilton raised the issue that the testimony of the jailhouse informant, Boggs, violated Almanza's Fifth and Sixth Amendment rights. (DA, Opening Br., May 1, 2014 at 31-36.) Again, in raising this claim, Hamilton, although acknowledging that trial counsel made no objections at trial to this testimony, neglected to argue that the correct standard was fundamental error, instead citing de novo review and arguing harmless error. (*See* DA, Opening Br., May 1, 2014 at 31, 33, 35-36.) As a result, the Arizona Court of Appeals again ignored the claim, determining that "Almanza does not argue that the trial court committed fundamental error when it admitted J.B.'s testimony. Therefore, the issue is waived." (DA, Mem. Decision, Aug. 29, 2014 at 11.)

Because trial counsel failed to object to the prejudicial testimony at trial, the appropriate standard for appellate review is fundamental error, not harmless error. *See State v. Henderson*, 115 P.3d 601, 608 (Ariz. 2005). In the Opening Brief, Hamilton raised the incorrect standard for both claims, arguing that the burden was harmless error and attempting to shift the burden to the State. (DA, Opening Br., May 1, 2014 at 25, 35-36.) She furthermore failed to address and satisfy the burden for fundamental error review that is placed on the defendant: to prove both that the error exists and that the error caused him prejudice, s*ee Henderson*, 115 P.3d at 607.

By failing to make these arguments and failing to cite the appropriate burden, the Court of Appeals determined that Hamilton effectively waived these meritorious claims and thereby prevented the Arizona Court of Appeals from considering them in their review of Almanza's appeal. There is a reasonable probability that, but for appellate counsel's unprofessional error, the Arizona Court

1   of Appeals would have determined that the trial court's errors rendered Almanza's

2   conviction and sentencing unconstitutional and granted relief. Consequently,

3   Almanza was prejudiced by counsel's failure in raising these claims on direct

4   appeal. *See Strickland*, 466 U.S. at 694.

5         **D.**    **Appellate counsel failed to argue about the correct offense in the**

6                 **Opening Brief.**

7         In the third claim of the Opening Brief, Hamilton argued that the trial court

8   erred by denying Almanza's motion for a directed verdict and contended that the

9   State failed to prove all elements of "child molestation." (DA, Opening Br., May 1,

10  2014 at 28.) However, this argument is deeply flawed because Sexual Conduct with

11  a Minor, which is what Almanza was actually convicted of, is an entirely different

12  and separate legal offense from Molestation of a Child. *See* A.R.S. § 13-1405

13  (2011-2012) and A.R.S. § 13-1410 (2011). In the legal context, these terms cannot

14  be used interchangeably because they do not describe the same conduct and

15  constitute different crimes. Molestation requires that the defendant engaged only in

16  "sexual contact" with a child, whereas Sexual Conduct requires penetration.

17  A.R.S. § 13-1410 (2011); *see also* A.R.S. § 13-1401(3) (2011). These different

18  crimes also carry different punishments. In fact, as described in Claim 1(F), trial

19  counsel erred in failing to argue for Molestation of a Child to be included in the jury

20  instructions and verdict forms as an alternative option for the jury, since it carries a

21  lower sentence. The fact that Hamilton clearly did not know or understand what

22  Almanza was actually convicted of and spent an entire claim arguing about the

23  incorrect offense with different elements demonstrates her ineffectiveness and

24  inattentiveness to Almanza's case. There is a reasonable probability that, but for

25  appellate counsel's unprofessional error, the Arizona Court of Appeals would have

26  determined that the trial court's error rendered Almanza's conviction and

27  sentencing unconstitutional and granted relief. Consequently, Almanza was

28  prejudiced by counsel's failure in correctly litigating his claim on direct appeal. *See*

*Strickland*, 466 U.S. at 694.

     **E.**    **Appellate counsel failed to communicate with Almanza.**

In his direct appeal, Almanza received ineffective assistance because in addition to failing to raise all relevant issues on appeal, Hamilton also failed to adequately explain and discuss the issuance of the Mandate and the subsequent deadlines to file a Notice of Post-Conviction Relief with Almanza, thereby preventing him from timely filing. Because Almanza has no formal educational background, is illiterate in both Spanish and English, and does not speak English, it is difficult for him to navigate his appeals process without the assistance of an attorney. Upon the completion of his direct appeal, a competent appellate attorney would have filed or assisted Almanza in filing a Notice of Post-Conviction Relief to begin his post-conviction proceedings. However, Hamilton did not advise Almanza of the need to do this nor assist him with filing the Notice. In fact, she never met with Almanza once in person throughout her representation of him. Instead, she abandoned her client. As a result of this abandonment, Almanza's Notice of Post-Conviction Relief was untimely and that untimely filing was the basis for the Arizona Court of Appeals' rejection of the review of all of Almanza's post-conviction claims. There is a reasonable probability that, but for appellate counsel's unprofessional error, the Arizona state courts would have determined that Almanza's post-conviction claims rendered his conviction and sentencing unconstitutional and granted relief. Because the state court refused to consider any of Almanza's post-conviction claims on the basis of this untimely filing, Almanza was prejudiced by his counsel's failure. *See Strickland*, 466 U.S. at 694. Accordingly, Almanza's right to the effective assistance of counsel on appeal was violated and he is entitled to relief.

**Claim Three**

**Almanza was denied effective assistance of counsel during his state post-conviction proceedings in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.**

Almanza incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Petition. Almanza raised this claim in his post-conviction proceedings. (PCR, Pet. for Post-Conviction Relief, May 19, 2016 at 2 (Dkt. 13); Ariz. Ct. App. PFR, Pet. for Review, Feb. 21, 2017 at 18-19; Ariz. S. Ct. PFR Dkt. 1 at 12-13.) None of the Arizona state courts addressed the merits of this claim. (PCR, Ruling on Motions/Issues, Aug. 5, 2016 at 1 (Dkt. 16); Ariz. Ct. App. PFR, Mem. Decision, July 25, 2017 at 3; Ariz. S. Ct. PFR Dkt. 4 at 1.) Because this claim has not been adjudicated by the Arizona state courts on the merits, the limitations of relief imposed by 28 U.S.C. § 2254(d) do not apply to this Court's review of the claim and this Court may consider the merits of this claim de novo. Alternatively, there is no available state court corrective process. *See* 28 U.S.C. § 2254(b)(1)(B)(i). Accordingly, AEDPA's limitations on relief do not apply and this Court's review is de novo. *Dickens v. Ryan*, 740 F.3d 1302, 1320 (9th Cir. 2014) (en banc).

Almanza was entitled the effective assistance of post-conviction counsel. Arizona's post-conviction process was inadequate and ineffective to protect Almanza's constitutional right to counsel, and his post-conviction counsel performed deficiently and prejudiced him. As explained in *Martinez*, Arizona prisoners must raise claims regarding the ineffectiveness of trial counsel in a petition for post-conviction relief, not on direct appeal. 566 U.S. at 4 ("The State of Arizona does not permit a convicted person alleging ineffective assistance of trial counsel to raise that claim on direct review."); *see also State v. Spreitz*, 39 P.3d 525, 527 (Ariz. 2002). The same is also true of any other claims that are supported by evidence outside the trial record, even if not raised as an ineffectiveness of counsel claim. Almanza's post-conviction proceedings were his only opportunity to pursue

any claims that relied on extra-record evidence. Additionally, "'defendants pursuing first-tier review . . . are generally ill equipped to represent themselves' because they do not have a brief from counsel or an opinion of the court addressing their claim of error." *Martinez*, 566 U.S. at 11 (quoting *Halbert v. Michigan*, 545 U.S. 605, 617 (2005)); *see also Douglas v. California*, 372 U.S. 353 (1963). As such, to "present a claim of ineffective assistance at trial in accordance with the State's procedures, . . . a prisoner likely needs an effective attorney." *Martinez*, 566 U.S. at 12.

In Arizona, post-conviction review is an extension of a defendant's direct appeal, particularly post-conviction review of ineffective assistance of counsel claims. *See* Ariz. R. Crim. P. 32.3 (explaining that the post-conviction proceeding "is part of the original criminal action and not a separate action."). Also, because those proceedings are a defendant's sole opportunity to present constitutional claims, particularly claims regarding ineffective assistance of trial and appellate counsel, Rule 32 proceedings are appeals "as of right" for such claims. In first appeals as of right, due process requires that defendants have the effective assistance of an attorney. *Lucey*, 469 U.S. at 396 ("A first appeal as of right therefore is not adjudicated in accord with due process of law if the appellant does not have the effective assistance of an attorney."). Thus, Almanza's post-conviction proceedings were a "first appeal as of right" as to those claims, and he had a constitutional right to the effective assistance of counsel in those proceedings. *Id.*; *see also Strickland*, 466 U.S. 668; *Nguyen*, 736 F.3d 1287; *Martinez*, 566 U.S. 1. While the Supreme Court initially entertained the argument on this issue as part of the *Martinez* litigation, the Court eventually declined to decide this issue because the case could be resolved on equitable grounds instead. 566 U.S. at 9 ("This is not the case, however, to resolve whether that exception exists as a constitutional matter.").

Furthermore, to satisfy the due process guarantee of fundamental fairness,

the state must provide an indigent criminal defendant meaningful access to justice. *Ake v. Oklahoma*, 470 U.S. 68, 76 (1985) ("Justice cannot be equal where, simply as a result of his poverty, a defendant is denied the opportunity to participate meaningfully in a judicial proceeding in which his liberty is at stake.") In Arizona, Rule 32 mandates the appointment of an attorney in noncapital post-conviction proceedings when requested. *See* Ariz. R. Crim. P. 32.4(b)(2) (stating "No later than 15 days after the filing of a notice of a defendant's timely or first Rule 32 proceeding, the presiding judge must appoint counsel for the defendant if: (A) the defendant requests it; and (B) the judge has previously determined that the defendant is indigent or the defendant has completed an affidavit of indigency. Upon the filing of all other notices in a noncapital case, the presiding judge may appoint counsel for an indigent defendant if requested.").

Accordingly, implementation of this state-provided right must comport with due process: "when a State opts to act in a field where its action has significant discretionary elements, it must nonetheless act in accord with the dictates of the Constitution—and, in particular, in accord with the Due Process Clause." *Lucey*, 469 U.S. at 401; *see also Jackson v. Weber*, 637 N.W.2d 19, 24-25 (S.D. 2001) ("If the defense attorney was ineffective in the original criminal proceeding and habeas counsel was thereafter ineffective in ferreting out the invalidity of the conviction, we may never know if the convicted person had a fair trial or, God forbid, was actually innocent."). Therefore, due process demands that when a statutory right to counsel is established, the concomitant right to effective assistance of counsel must also be recognized; otherwise, the statutory right would be meaningless. *See Lucey*, 469 U.S. at 396 ("[A] party whose counsel is unable to provide effective representation is in no better position than one who has no counsel at all."); *but see Pennsylvania v. Finley*, 481 U.S. 551 (1987) (finding no general right to the effective assistance of counsel in state post-conviction proceedings); *Murray v. Giarratano*, 492 U.S. 1 (1989).

1    Although *Finley* and *Giarratano* suggest that indigent defendants do not have
2    a right to effective assistance of state post-conviction counsel, *Coleman v.*
3    *Thompson*, 501 U.S. 722 (1991), left open a possible "exception to the rule of *Finley*
4    and *Giarratano* in those cases where state collateral review is the first place a
5    prisoner can present a challenge to his conviction." *Id.* at 755. Nonetheless, the
6    Ninth Circuit has recognized that post-conviction counsel's failure to raise a claim
7    of ineffective assistance of appellate counsel can establish cause to excuse the
8    procedural default of a habeas claim in an extension of the holding in *Martinez*. *See*
9    *Nguyen*, 736 F.3d 1287. In this case, Almanza raises the issue left unresolved in
10   *Coleman*: the ineffectiveness of his appointed counsel in filing his initial petition
11   for state post-conviction relief. That issue has yet to be definitively resolved by this
12   Court or the United States Supreme Court.

13   The right to effective assistance of counsel recognized in *Lucey* and upon
14   which Almanza relies, is guaranteed by the Due Process Clause of the Fourteenth
15   Amendment, not the Sixth Amendment. *See Lucey*, 469 U.S. 387, 396 (1985) ("A
16   first appeal as of right therefore is not adjudicated in accord with due process of law
17   if the appellant does not have the effective assistance of an attorney."). Moreover,
18   for two reasons, 28 U.S.C. § 2254(i) does not preclude a federal court from
19   recognizing a right to the effective assistance of post-conviction counsel under the
20   facts presented here. Section 2254(i) provides only that "[t]he ineffectiveness or
21   incompetence of counsel during Federal or State collateral post-conviction
22   proceedings shall not be a ground for relief in a proceeding arising under section
23   2254." First, as Almanza explained above, in Arizona cases, the presentation of
24   claims of ineffective assistance of trial and direct appeal counsel are not "collateral"
25   proceedings, but are in reality first appeals as of right as to those claims. Second,
26   and more importantly, Almanza is not asserting the ineffectiveness of his post-
27   conviction counsel as "grounds for relief" from his conviction and sentence, which
28   is all that § 2254(i) prohibits. If this Court recognizes Almanza's due process right

47

1   to the effective assistance of his post-conviction attorney, the remedy is to

2   acknowledge post-conviction counsel's constitutional ineffectiveness as cause for

3   Almanza's failure to raise any claims in his state post-conviction proceedings that

4   the Court may deem procedurally barred and not eligible under the narrower

5   holding of *Martinez*. *See Martinez*, 566 U.S. at 17 ("Section 2254(i) provides that

6   'the ineffectiveness or incompetence of counsel during Federal or State collateral

7   post-conviction proceedings shall not be a ground for relief.' 'Cause,' however, is

8   not synonymous with 'a ground for relief.' A finding of cause and prejudice does

9   not entitle the prisoner to habeas relief. It merely allows a federal court to consider

10  the merits of a claim that otherwise would have been procedurally defaulted.").

11  Almanza had a right to the effective assistance of counsel in his post-conviction

12  proceedings, and his state appointed counsel failed to meet this standard.

13          **A.    Deficient Performance**

14          The Supreme Court promulgated a two-part test for determining ineffective

15  assistance of counsel in *Strickland*. 466 U.S. at 687. First, the defendant must

16  demonstrate that counsel's performance was "deficient," meaning that counsel's

17  errors were "so serious that counsel was not functioning as the 'counsel' guaranteed

18  . . . by the Sixth Amendment." *Id*. While the Court found that specific requirements

19  for counsel were not appropriate and that "[t]he proper measure of attorney

20  performance remains simply reasonableness under prevailing professional norms,"

21  *id*. at 688 (explaining that prevailing norms of practice as reflected in the ABA

22  standards and the like are guides to determining what is reasonable), the Court also

23  explained that counsel has a duty to make reasonable investigations and that

24  strategic choices made after less than complete investigation are only reasonable to

25  the extent that professional judgment would support such limits to investigation, *id*.

26  at 691.

27          Almanza's post-conviction counsel Harriette Levitt ("Levitt") did not meet

28

these standards. The fact that Levitt did not uncover or raise any meritorious claims of ineffective assistance of counsel, or any claims at all, shows that her representation "fell below an objective standard of reasonableness," and that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 688, 694.

Almanza filed a pro per Notice of Post-Conviction Relief and an Application to Proceed In Forma Pauperis on March 19, 2015. (PCR, App. to Proceed in Forma Pauperis, Mar. 19, 2015 (Dkt. 3); PCR, Notice of Post-Conviction Relief, Mar. 19, 2015 (Dkt. 2).) The Notice included the information that Almanza is not only indigent, but that he also does not read English and was previously unaware of his ability to file for post-conviction relief. (PCR, Notice of Post-Conviction Relief, Mar. 19, 2015 at 3 (Dkt. 3).) In response, on April 6, 2015, the Pinal County Superior Court appointed Richard Luff ("Luff") to represent Almanza for his post-conviction proceedings. (PCR, Notice, Apr. 6, 2015 at 1 (Dkt. 5).)

On September 22, 2015, Almanza filed a pro per Motion Requesting Appointment of Counsel and Extended Time to File Rule 32, explaining that Luff had, at that point, made no contact with Almanza, nor had he filed any pleadings. (PCR, Mot. Requesting Appt. of Counsel and Extended Time to File Rule 32, Sept. 22, 2015 at 1 (Dkt. 6).) As a result, on October 15, 2015, the Pinal County Superior Court rescinded the appointment of Luff and appointed Levitt to represent Almanza. (PCR, Notice/Order, Oct. 15, 2015 at 1 (Dkt. 7).) The court also gave Almanza until December 31, 2015 to file a Petition for Post-Conviction Relief. (PCR, Notice/Order, Oct. 15, 2015 at 1 (Dkt. 7).)

On February 29, 2016, Levitt filed a Notice Pursuant to Rule 32.4(c) of the Arizona Rules of Criminal Procedure. (PCR, Notice Pursuant to Rule 32.4(c), Ariz. R. Crim. P., Feb. 29, 2016 (Dkt. 11).) In that Notice, she represented to the court that, based on her review of the file, there were no colorable claims for post-conviction relief. (PCR, Notice Pursuant to Rule 32.4(c), Ariz. R. Crim. P., Feb. 29,

1   2016 at 1 (Dkt. 11).) In response to her allegations that there were no colorable

2   claims for relief, the court gave Almanza until May 31, 2016 to file a pro per

3   Petition. (PCR, Notice/Order, Mar. 14, 2016 (Dkt. 12).)

4        Levitt has a long track record of finding no colorable Rule 32 issues in post-

5   conviction cases to which she is appointed.[6] She often files Notices similar to the

6   one that she filed in this case. *See Martinez*, 566 U.S. at 6, 18 (holding—in a case

7   where Levitt represented the defendant and filed a virtually identical Notice on

8   Martinez's behalf to the one that she filed in Almanza's case—that ineffective

9   assistance of post-conviction counsel excuses the default of ineffective assistance

---

[6] Levitt is an attorney who, despite being qualified for appointment to capital cases under Rule 6.8(c), was excluded from appointments as a result of the work of the Committee on the Appointment of Counsel for Indigent Defendants in Capital Cases. Levitt had extensive experience in capital trial, appellate, and post-conviction representations, and she met the purely quantitative criteria of Rule 6.8(c). Levitt's history of poor performance, however, resulted in the screening committee recommending against her appointment. In a prior case, Levitt had submitted a capital post-conviction review petition that the Ninth Circuit later characterized as "cursory." *Stokley v. Ryan*, 659 F.3d 802, 810 (9th Cir. 2011). In another capital post-conviction case, Levitt filed a petition that was barely 13-pages long and contained no extra-record evidence. Pet. for Post-Conviction Relief, *State v. Walden*, No. CR-34752, (Pima Cty. Super. Ct. Jan. 9, 1998). Despite her performance, the Supreme Court appointed Levitt in 1998 to represent another death-row prisoner in post-conviction proceedings—resulting in another cursory petition. Orders, *Arizona v. Kemp*, No. CR-93-0332-AP (Ariz. July 14, 1997, Aug. 27, 1998, and Sept. 11, 1998); Pet. for Post-Conviction Relief, *State v. Kemp, Jr.*, No CR-38826 (Pima Cty. Super. Ct. Feb. 12, 1999).

After these post-conviction appointments, the Committee on Appointment of Counsel for Indigent Defendants in Capital Cases found Levitt technically qualified under Rule 6.8 and Arizona Revised Statute § 13-4041, but the Committee agreed by consensus that Levitt should not be appointed in a future case, with several committee members "express[ing] strong opinions" that she should not be appointed based on their evaluations of her work. (*See* Ariz. Ct. App. PFR, Mot. to Stay Pet. for Review and Req. to File Am. Pet. for Post-Conviction Relief, June 5, 2017, Ex. A at 3; *see also* Ariz. Sup. Ct. PFR, Dkt. 3 Ex. F at 3.) The Committee recommended that the Arizona Supreme Court not appoint Levitt even when no other qualified counsel are available, stating that despite her technical qualifications, the "Committee doesn't recommend her <u>in any way</u>." Notes, Comm. On the Appointment of Counsel for Indigent Defendants in Capital Cases (Sept. 25, 1998) (emphasis in original).

of trial counsel claims in federal habeas review)[7]. In fact, Levitt's practice of finding no colorable issues is so widely recognized that as early as 1998 the Arizona Supreme Court's hand-picked Committee on the Appointment of Counsel for Indigent Defendants in Capital Cases strongly opposed appointing Levitt to represent capital post-conviction defendants even when no other counsel are available. (*See* Ariz. Ct. App. PFR, Mot. to Stay Pet. for Review and Req. to File Am. Pet. for Post-Conviction Relief, June 5, 2017, Ex. A at 3; *see also* Ariz. S. Ct. PFR, Dkt. 3 Ex. F at 3.)

By itself, the fact that Levitt did not uncover or raise the meritorious ineffective assistance of trial counsel claims, much less raise any claims at all, shows that her representation "fell below an objective standard of reasonableness," and that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 668, 688, 694. However, Levitt's ineffectiveness in this case is even more egregious and obvious due to her failure to visit and communicate with her client and failure to conduct any investigation prior to alleging that there were no colorable claims.

Levitt acknowledged to Almanza (albeit not to the court in her Notice) that she was "not able to fully examine the record" because she did not obtain the transcripts of the trial proceedings. (*See* Ariz. S. Ct. PFR Dkt. 3 Ex. G at 2; *see also* PCR, Notice Pursuant to Rule 32.4(C), Ariz. Rules of Crim. P., Feb. 29, 2016 at 1 (Dkt. 11).) As a result, Levitt based her analysis regarding ineffectiveness of prior counsel on the opinion of Almanza's appellate counsel Hamilton, who likewise, failed to raise certain meritorious issues on direct appeal. (*See* Ariz. S. Ct. PFR Dkt.

---

[7] In *Martinez*, Levitt similarly made no claims of ineffectiveness of trial counsel and, instead, filed a statement with the court that Martinez lacked any meritorious claims. *See Martinez*, 566 U.S. at 6, 18. The Supreme Court reversed the court's decision holding that ineffective assistance of post-conviction counsel does excuse the default of ineffective assistance of trial counsel claims. *See id.* at 17.

3 Ex. G at 2; *see also* Claim 2 *supra*.) Levitt did not contact trial counsel, nor did she retain any experts, contact any witnesses, or conduct any investigation in her review of this case, including failing to obtain and review all relevant transcripts and records prior to filing her Rule 32.4(c) Notice. Obviously, post-conviction counsel cannot competently evaluate the effectiveness of trial counsel, especially with regard to pretrial preparation, by simply reviewing the trial file and not even reading the trial transcripts.

Levitt's ineffectiveness and abandonment of her client is also clear from her minimal communication with him. Despite not fully examining the record, Levitt failed to meet with Almanza in person. Instead, she opted to establish the attorney-client relationship through a couple of telephone calls with the assistance of an interpreter. Furthermore, once she determined that she would not raise any post-conviction issues, she only sent a letter to Almanza informing him of the fact that she had filed the Rule 32.4 Notice and telling him the time frame within which he would need to file a pro se petition. (*See* Ariz. S. Ct. PFR Dkt. 3 Ex. G at 2.) Levitt was aware that Almanza was a Spanish speaker and that he is illiterate in both Spanish and English and, thus, unable to read the letter. Nonetheless, instead of meeting with Almanza in person or at least calling him to explain what was going on and the important deadline for filing his pro per petition, she sent him a letter written in English (not even in Spanish) that she knew he would not be able to read or understand.

The functional denial of appointed counsel in Almanza's first state post-conviction proceeding was a denial of due process and fundamental fairness. Almanza never desired to represent himself in his post-conviction proceedings and specifically requested that the court appoint an attorney to represent him. (PCR, Notice of Post-Conviction Relief, Mar. 19, 2015 at 2 (Dkt. 2).) Instead, the court appointed two attorneys, one of whom never even contacted Almanza, and the other who did not even read the entire file, much less conduct any investigation, prior to

1    filing a notice that there were no colorable claims in his case.

2        **B.    Prejudice**

3        Due to the failure of his appointed counsel to present any arguments to the

4    court, Almanza filed a pro per Petition for Post-Conviction Relief in the Pinal

5    County Superior Court on May 19, 2016. (PCR, Pet. for Post-Conviction Relief,

6    May 19, 2016 (Dkt. 13).) In his Petition, Almanza alleged claims of ineffective

7    assistance of counsel and infringement of the right against self-incrimination. (PCR,

8    Pet. for Post-Conviction Relief, May 19, 2016 at 2 (Dkt. 13).) However, Almanza

9    has intellectual limitations as a result of both his lack of formal education and also

10   cognitive dysfunction. (*See* Ariz. Ct. App. PFR, Pet. for Review, Feb. 21, 2017, Ex.

11   B; *see also* Ariz. Ct. App. PFR, Mot. to Stay Pet. for Review, June 5, 2017, Ex. C;

12   Ariz. S. Ct. PFR Dkt. 3 Ex. C.) Therefore, since Almanza is not an attorney and, in

13   fact, has no formal education, is a Spanish speaker and is illiterate in English and

14   Spanish, he did little to substantiate and develop his legal claims in his Petition for

15   Post-Conviction Relief.

16       Moreover, undersigned counsel filed a Motion to Stay Petition for Review

17   and Request to File Amended Petition for Post-Conviction Relief with the Court of

18   Appeals in order to attempt to address any deficiencies in Almanza's pro per

19   Petition. (Ariz. Ct. App. PFR, Mot. to Stay Pet. for Review and Req. to File Am.

20   Pet. for Post-Conviction Relief, June 5, 2017.) That Motion was denied. (Ariz. Ct.

21   App. PFR, Order, June 29, 2017.) Consequently, Almanza was denied any

22   meaningful review or relief during his post-conviction proceedings.

23       As a result of Levitt's ineffective post-conviction representation, this Court

24   should excuse any procedural defaults or other errors with the pro per Petition for

25   Post-Conviction Relief and consider the defaulted claims de novo. *See Martinez*,

26   566 U.S. at 8. Many of the claims that Levitt failed to raise are meritorious claims

27   that, if she had raised them, may well have changed the outcome of Almanza's post-

28

conviction proceedings. Specifically, if she had raised the trial counsel ineffectiveness claims with supporting evidence, Almanza would likely have received a new trial. This undermines confidence in the outcome of the state-court proceedings. Levitt's failures constituted deficient performance that prejudiced Almanza.

## Claim Four

**The trial court erred by failing to suppress Almanza's statements in violation of his constitutional rights to due process and against self-incrimination under *Miranda v. Arizona* and the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution.**

Almanza incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Petition. Almanza raised this claim on direct appeal. (DA, Opening Br., May 1, 2014 at 8-18.) The Arizona Court of Appeals denied the claim on the merits. (DA, Mem. Decision, Aug. 29, 2014 at 3-10.) Almanza also raised this claim in his post-conviction proceedings. (PCR, Pet. for Post-Conviction Relief, May 19, 2016 at 2 (Dkt. 13).) In his post-conviction proceedings, the court did not specifically address the underlying merits of the claim, holding that the issues in the Petition had all been "previously ruled upon or untimely filed or the Petition lacks sufficient basis in law and fact to warrant further proceedings." (PCR, Ruling on Motions/Issues, Aug. 5, 2016 at 1 (Dkt. 16).) The state courts' rejection of this claim was contrary to, or involved an unreasonable application of clearly established federal law, as determined by the United States Supreme Court. 28 U.S.C. § 2254(d)(1). Additionally, it constituted an unreasonable determination of the facts in light of the evidence presented. 28 U.S.C. § 2254(d)(2).

The Fifth and Fourteenth Amendments "secure[] against state invasion . . . the right of a person to remain silent unless he chooses to speak in the unfettered exercise of his own will, and to suffer no penalty . . . for such silence." *Malloy v. Hogan*, 378 U.S. 1, 8 (1964); *see also* U.S. Const. amend. V. Thus, for a statement

to be admissible, it must be "free and voluntary." *Bram v. United States*, 168 U.S. 532, 542 (1897); *Malloy*, 378 U.S. 1. The Supreme Court has clearly established rules that police must follow when interrogating a person in custody to ensure that the state does not violate the "basic" and "precious" rights of the Fifth Amendment. *Miranda v. Arizona*, 384 U.S. 436, 442 (1966). *Miranda* mandates that when questioning an in-custody suspect about criminal activity, police officers must inform the suspect of his right to remain silent and his right to the presence of an attorney. *Id.* at 444. "If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease." *Id.* at 473-74; *see also Edwards v. Arizona*, 451 U.S. 477, 482 (1981) (quoting *Miranda*, 384 U.S. at 474). Similarly, if an individual "indicates in any manner and at any stage of the process that he wishes to consult with an attorney before speaking there can be no questioning." *Id.* at 444-45.

No purported statement is admissible against an accused unless he has given it voluntarily. A statement is voluntary only when it is "the product of a rational intellect and a free will." *Blackburn v. Alabama*, 361 U.S. 199, 208 (1960). "'[T]he coercion inherent in custodial interrogation blurs the line between voluntary and involuntary statements, and thus heightens the risk' that the privilege against self-incrimination will not be observed." *Missouri v. Seibert*, 542 U.S. 600, 608 (2004) (quoting *Dickerson v. United States*, 530 U.S. 428, 435 (2000)). Determination of the involuntary nature of a statement requires consideration of the "characteristics of the accused and the details of the interrogation" as part of the complex of circumstances that courts should evaluate when determining whether a suspect's statement is voluntary. *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973); *see also Edwards*, 451 U.S. at 482 (voluntariness of a statement requires assessment of "the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused." (internal quotation marks and citation omitted)).

1    In this case, Almanza was arrested on October 23, 2011, at 7:50 a.m. while

2    riding his bicycle to work. Police officers determined there was probable cause to

3    arrest him based on A.W.'s statements and were waiting for him on his route to

4    work. He was arrested, placed in a patrol car, and transported to the police station

5    where he was placed in a holding cell awaiting his interrogation. The police did not

6    begin to question Almanza until 12:32 p.m. and their questioning lasted over two

7    hours, ending at 2:30 p.m. (Trial Ex. 116 at 3, 107.) During the over four and a half

8    hours he waited prior to his interrogation, no one advised Almanza about why he

9    had been arrested nor did they advise him of his rights. He was also not given any

10   opportunity to contact family or counsel.

11   Prior to beginning the interrogation, the police served a warrant on Almanza

12   to collect fingernail clippings and other physical, biological evidence. Since

13   Almanza is illiterate, which he told the detectives, he could not read the warrant

14   that they presented to him. Unsurprisingly, he acquiesced to their demands. (Trial

15   Ex. 116 at 6.) Almanza was told only that they had a warrant to collect fingernail

16   clippings and that he had to comply with this order and had to permit them to take

17   whatever samples they wanted. Specifically, he was told that he had no choice and

18   could not refuse. (Trial Ex. 116 at 17.) Despite only informing him that the order

19   allowed them to take clippings of his fingernails, the detectives also proceeded to

20   take saliva samples for DNA testing and took several photographs. (Trial Ex. 116

21   at 20.) The confusion related to this partially-explained warrant caused Almanza to

22   speculate that he was being stopped about a traffic ticket that was outstanding. (Trial

23   Ex. 116 at 9.)

24   Prior to the interview and the enforcement of the search warrant, Almanza

25   made the detectives aware that he could not read and also that he did not speak very

26   much English. (Trial Ex. 116 at 6.) Nonetheless, Detective Snyder continued to

27   speak to Almanza in English. (*See* Trial Ex. 116.) A Spanish speaking police officer

28   was brought in to assist Almanza with translation, but the majority of the

56

interrogation was still conducted in English. (Trial Ex. 116 at 16.) Though Almanza never actually confessed, he made multiple seemingly incriminating statements during the interrogation. Specifically, he confirmed benign details of the events of that day as described by A.W. and offered that if he had inserted a finger into A.W.'s vagina, it would have been his middle finger. (*See* Trial Ex. 116 at 88.)

Before trial, Huggins moved to suppress the warrantless arrest and the involuntary statements given to the police during their October 23, 2011 interrogation of Almanza. (ROA 42; ROA 43.) Huggins argued that all of the statements that Almanza made were involuntary and should be suppressed. (ROA 42 at 3-4.) This argument was based on Almanza's language barrier and lack of understanding about what was going on, in addition to his statements about whether he needed an attorney and his indications that he did not want to answer the detectives'' questions. (ROA 42 at 3-4.) On the morning of trial, prior to jury selection, the court held a voluntariness hearing where Detective Snyder was called as a witness. During a recess prior to the voluntariness hearing, the judge reviewed the transcript of Almanza's interrogation and listened "to the recorded conversations from the beginning through advisement of Miranda and about 15 minutes into the discussion, my thoughts being that the issues that are before me really are limited up to the time of the Miranda, the beginning of the questioning." (Tr. Sept. 30, 2013 a.m. at 49-50.) The trial court ruled that the arrest was legal, although the trial court indicated that it did not believe Almanza was under arrest, that *Miranda* advisements were properly given, that Almanza appeared to understand what was going on, and that the statements Almanza made were voluntary. (Tr. Sept. 30, 2013 a.m. at 81-83.)

The trial court's admission of these involuntary statements was improper. The context in which Almanza agreed to waive his rights and speak to the detectives was highly coercive, calling into question the voluntariness of the proceedings. First, Almanza was stopped at gun point, placed in a police car, and placed in a

holding cell for several hours prior to the commencement of the interrogation. These factors alone make the interrogation unduly coercive. Second, the interrogation and the *Miranda* warnings themselves were in the context of a stern admonishment that Almanza had to comply with a judge's order that he could not read or understand and that he could not say no. Third, he was not informed about the nature of the questioning or why he was there until after the DNA samples had been taken and until he had already been talking to the detectives for a significant amount of time. Fourth, Almanza was clearly confused about his need for a lawyer and the detectives misled him, coercively intending to entice him to continue the conversation instead of invoking his rights. Finally, Almanza was misled into believing that his DNA had been found on A.W. and that, therefore, the detectives already had proof of his guilt.

Despite the fact that Almanza never explicitly asked for the interrogation to be conducted in Spanish and answered questions in English, the detectives were required to ensure that Almanza fully understood what they were talking about and that they fully understood his statements. Language barriers played a significant role in this interview, making ambiguous or confusing statements by Almanza appear in Detective Snyder's perception to be a partial confession. For example, Detective Snyder asked Almanza, "Did you look for blood on your hands?" and Almanza responded, "Yeah. And no – no blood on my hands." (Trial Ex. 116 at 66.) Detective Snyder perceive this as a confession that Almanza was concerned because of what he had done and, as a result, that he checked his hands for blood and ask, "Why would you look for blood on your hands?" (Trial Ex. 116 at 66.) Almanza respond, "I never – I never – I never look for blood – for blood on my hands because I know I no got nothing." (Trial Ex. 116 at 66.) Detective Snyder clearly inferred this ambiguous exchange as a confession of guilt, noting in his report that "[w]hen I asked him why he would check for blood if he had no prior knowledge of blood and had not injured or penetrated [A.W.], he was unable to

1    answer."

2        Almanza's concerns about needing a lawyer seemed to be focused on his
3    confusion because he had done nothing wrong and his inability to pay for an
4    attorney. In response to his concerns that he could not afford a lawyer, the detectives
5    did not explain to Almanza that he was entitled to have a court-appointed lawyer
6    present for all of his proceedings free of charge, including his interrogation, instead,
7    Detective Snyder told him, "[w]ell, and if you want one and you can't afford one,
8    then the court can appoint one at a – at a later time." (Trial Ex. 116 at 23.) This
9    statement is intentionally misleading in order to confuse Almanza and to
10   misrepresent to him that he could not have and did not need an attorney prior to
11   questioning. Additionally, after he was read his rights in English and Spanish,
12   Almanza was asked if he understood those rights and his response was "No no,"
13   but when pressed about whether he wants to answer their questions, he says, "I want
14   to answer, but . . . ." (Trial Ex. 116 at 24.) Almanza did not understand what was
15   going on and did not want to answer questions, but wanted to know why he was
16   arrested and the detectives implied that they would not tell him what was going on
17   unless he agreed to answer their questions, so he ultimately acquiesced. (Trial Ex.
18   116 at 23 ("they have a few questions for you. They can't begin with these questions
19   or explain everything that is happening, ugh, if you don't want to.").) The detectives
20   should have ended the interrogation when Almanza indicated that he did not
21   understand and did not want to answer the questions. However, Almanza's overall
22   confusion and the belief that he was not free to leave caused him to continue his
23   interaction with the detectives. Although the detectives did tell him, "[y]ou
24   understand that as we go through, if you decide you want to stop answering
25   questions, you can," it is unclear whether he actually understood this instruction
26   because it was only explained to him in English. (Trial Ex. 116 at 25.)

27       Furthermore, the detectives lied to Almanza, telling him that his DNA had
28   been found on A.W., proving his guilt. (Trial Ex. 116 at 52.) These

1  misrepresentations enhanced the already coercive atmosphere of the interrogation
2  and caused Almanza to confabulate and offer illogical versions of events in an
3  attempt to explain how his DNA could be found on A.W. when he knew that he
4  was innocent. Due to the language barrier and the confusing nature of the versions
5  of events that Almanza provided, the detectives mistook these statements as further
6  proof of his guilt.

7      The trial court's improper admission of the interrogation resulted in actual
8  prejudice. *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993) (citing *United States v.*
9  *Lane*, 474 U.S. 438, 449 (1986)). The interview was played to the jury several times
10 and Detective Snyder also testified about Almanza's interrogation. Despite the fact
11 that the audio recording and transcript of the interview confirm that Almanza never
12 actually confessed to sexually touching a child, the State and the detectives
13 theorized and argued to the jury that Almanza's statements confirmed "many parts
14 of the event described to the sex assault nurse and to [A.W.'s] mother" because he
15 agreed about some of the innocent details of A.W.'s timeline of events. Thus, the
16 State took Almanza's statements as confirmation of A.W.'s account of what
17 happened that day and, therefore, confirmation that she was telling the truth about
18 the entire incident. In this context, the State makes it appear as if there was some
19 sort of confession, despite the fact that there is none. In fact, Almanza adamantly
20 denied digitally penetrating A.W. throughout the interview. (*See, e.g.*, Trial Ex. 116
21 at 34, 35, 37, 41, 51, 53, 54, 59, 61, 62, 64, 66, 68, 70, 71, 74, 77, 78, 84.)
22 Nonetheless, the State focused more on the statements that overlapped with and
23 seemingly corroborated A.W.'s story, ignoring and downplaying Almanza's
24 continued and adamant denial of guilt. The State's argument that Almanza
25 confirmed A.W.'s story was undoubtedly very powerful, albeit misleading,
26 testimony for the jury. (Tr. Oct. 7, 2013 p.m. at 7, 11-12 (explaining that the
27 information provided by Almanza in his interrogation were "[c]orroborating,
28 confirming what [A.W.] said.").)

60

The Arizona Court of Appeals did not correct the trial court's prejudicial error. (DA, Mem. Decision, Aug. 29, 2014 at 3-10.) In addressing the apparent voluntariness of the interview, the Court of Appeals ignored Almanza's educational and language limitations and simply determined that "Almanza never asked that the interview be conducted in Spanish, and, as the [trial] court found, he answered Snyder's questions appropriately in English." (DA, Mem. Decision, Aug. 29, 2014 at 6.) Both Almanza's compliance with the search warrant and his general acquiescence with the detective's statements during the interview are unsurprising given his educational and cognitive limitations and the language barrier. People with enhanced vulnerabilities, like cognitive impairments and language deficiencies, tend to be more suggestible in aversive contexts. As a result, they may agree with things they are told, even if they do not understand the specifics of the complex language that they are exposed to. A close look at the interview in this case demonstrates that the detective proactively and suggestively provided much of the details of the accusation to Almanza, including A.W.'s account of what happened that day, and that Almanza merely went along with the detectives. Additionally, when Almanza did attempt to tell a story, his versions were frequently confusing and incoherent. As a result, the truthfulness and accuracy of his statements must be considered within the context of his psychological and intellectual vulnerabilities.

Furthermore, in its analysis, the trial court explained that it did not believe that Almanza's interrogation was as the result of an arrest, which would require a different analysis than that in *Miranda*. (Tr. Sept. 30, 2013 a.m. at 81 ("[i]f in fact you characterize it as an arrest, and I'm not sure that I would . . . But I'm not going to characterize it as an arrest.").) However, the trial court misinterpreted the facts in this case in its decision because, expressly state in the Pinal County police report that this stop was in fact an arrest. The report explains that, "[w]e confronted Fernando who verbally identified himself as Fernando Almanza and placed him under arrest." Despite the fact that the trial court ignored the fact that Almanza was

actually placed under arrest and, thus, applied an incorrect standard in considering the voluntariness of his statements, the Arizona Court of Appeals did not correct this error or investigate further, but instead, rubber stamped the trial court's analysis.

Given Almanza's limited educational background and his limited ability to speak and understand English, as well as the coercive techniques employed by the detectives, all of his statements to the police should have been suppressed. Almanza was not in a position to voluntarily waive his rights when he was attempting to communicate in a language that he does not speak, cannot read a warrant that he is being compelled to honor, and does not know the reason for his detention. Despite his obvious limitations, Almanza invoked his right to remain silent, which the detectives ignored and asked about his need for an attorney, which the detectives misleadingly told him he could not get until later. For the reasons discussed above, the trial court's admission of Almanza's involuntary and unreliable statements prejudiced Almanza and the Arizona Court of Appeal's conclusion otherwise was unreasonable. Consequently, Almanza's rights under the Fifth, Sixth, and Fourteenth Amendments were violated, and he is entitled to relief.

### Claim Five

**The trial court violated Almanza's due process rights under the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution by admitting irrelevant, prejudicial, and inflammatory testimony about his alleged prior bad acts.**

Almanza incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Petition. Almanza raised this claim on direct appeal. (DA, Opening Br., May 1, 2014 at 19-27.) The Arizona Court of Appeals court denied the claim on the merits, stating that he "[did] not argue that the alleged error was fundamental or caused him prejudice." (DA, Mem. Decision, Aug. 29, 2014 at 10-11.) The state court's rejection of this claim was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by

1    the Supreme Court. *See* 28 U.S.C. § 2254(d)(1). In addition, it constituted an

2    unreasonable determination of the facts in light of the evidence presented. *See id*.

3    § 2254(d)(2).

4            Alternatively, the state court did not address the merits of the underlying

5    claim itself, but determined that this claim had been waived due to Almanza's

6    erroneous statement that the "State bears the burden of showing error was

7    harmless," when in fact the standard was fundamental error. (DA, Mem. Decision,

8    Aug. 29, 2014 at 11.) If this Court determines that the state court did not address

9    the merits of the underlying claim, procedural default is no bar to merits review in

10   the federal court where the state court has not regularly followed its forfeiture rule

11   and applied it similarly in cases. *See Hathorn v. Lovorn*, 457 U.S. 255, 263 (1982)

12   ("State courts may not avoid deciding federal issues by invoking procedural rules

13   that they do not apply evenhandedly to all similar claims."); *Dugger v. Adams*, 489

14   U.S. 401, 410 n.6 (1989) (citing *Johnson v. Mississippi*, 486 U.S. 578, 589 (1988)

15   and recognizing that a state procedural default rule that is not "consistently or

16   regularly applied" by state courts is not an adequate state ground and may not

17   supply basis for denying federal habeas relief). In this case, the Arizona Court of

18   Appeals acknowledged that Almanza correctly identified fundamental error as the

19   proper standard for review, but then the Arizona Court of Appeals cited *State v.*

20   *Moreno-Medrano*, 185 P.3d 135, 140 (Ariz. Ct. App. 2008) for the proposition that

21   Almanza had waived this claim by arguing the incorrect burden, namely, that the

22   State could not show that the error was harmless. (DA, Mem. Decision, Aug. 29,

23   2014 at 11.) However, in the *Moreno-Medrano* case, the court determined that

24   because the defendant did "not argue the alleged error was fundamental. . . . That

25   argument is therefore waived." *Moreno-Medrano*, 185 P.3d at 140. That was not

26   the case here. In this case, the state court concedes that Almanza argued that the

27   error was fundamental, the problem was that Almanza's petition did not actually

28   elaborate on this argument, but instead focused on why the error was not harmless.

63

1    Thus, the state court decision illustrates the irregularity with which the Arizona
2    Court of Appeals applies the forfeiture rule it applied here.

3          Finally, Almanza can demonstrate cause and prejudice. *See Martinez*, 566
4    U.S. at 10 ("A prisoner may obtain federal review of a defaulted claim by showing
5    cause for the default and prejudice from a violation of federal law."). To the extent
6    that appellate counsel failed to raise the correct burden and, therefore, according to
7    the Arizona Court of Appeals, failed to preserve the claim for review, this
8    performance was deficient under the test established in *Strickland*, and therefore
9    constitutes "cause" to excuse a procedural default. *See Martinez*, 566 U.S. at 9;
10   *Edwards v. Carpenter*, 529 U.S. 446, 453 (2000); *Strickland*, 466 U.S. at 687-88;
11   *but see Davila v. Davis*, 137 S. Ct. 2058 (2017). Furthermore, as discussed below,
12   had the Arizona Court of Appeals not found this claim waived, Almanza would
13   have been entitled to relief. He therefore has demonstrated "a reasonable probability
14   that, but for counsel's unprofessional errors, the result of the proceeding would have
15   been different." *Strickland*, 466 U.S. at 694. In sum, the Arizona Court of Appeals'
16   conclusion that this claim was waived does not bar federal review of the merits.

17         During Almanza's trial, on cross-examination, A.W.'s mother, Quinn,
18   testified that she had previously punched Almanza in the face for behaving
19   "inappropriately" with her. (Tr. Oct. 1, 2013 at 171.) Prior to the trial, the State
20   never filed any notice of its intent to introduce prior bad act or sexual propensity
21   evidence under Rule 404 of the Arizona Rules of Criminal Procedure. Additionally,
22   defense counsel filed no motions in limine seeking to preclude the introduction of
23   Quinn's story that Almanza had previously been flirtatious and inappropriate with
24   her and made no objection to this testimony during trial. (Tr. Oct. 1, 2013 at 171-
25   72, 176-78.) No limiting instruction was offered. (ROA 113.)

26         The admission of evidence of Almanza's character and prior bad acts violated
27   his rights to due process and a fair trial. *See* U.S. Const. amends. V, VI, XIV. One
28   of the fundamental principles of American law is that evidence of other bad acts is

not admissible to show a defendant's bad character. *See McKinney v. Rees*, 993 F.2d 1378, 1380-81 (9th Cir. 1993); David P. Leonard, *In Defense of the Character Evidence Prohibition: Foundations of the Rule Against Trial by Character*, 73 Ind. L.J. 1161, 1162 (1998). This principle recognizes that character evidence would have a highly prejudicial effect on a defendant's case because the jury can use the character evidence to improperly conclude that the defendant is a bad person, and is thus more likely to have engaged in the charged offense. *See State v. Aguilar*, 97 P.3d 865, 867-68 (Ariz. 2004).

The Supreme Court has acknowledged that the impermissible admission of evidence can so infect a trial proceeding as to render the jury's verdict a denial of due process. *See Romano v. Oklahoma*, 512 U.S. 1, 12 (1994). Arizona state courts have also recognized in other contexts the value of eliminating irrelevant or inflammatory details and limiting evidence to its probative core. *See State v. Castro*, 788 P.2d 1216, 1225 (Ariz. 1989) (remanding for "balanced exclusionary application of Rule 403" to permit admission of probative evidence excluding prejudicial details). Thus, the discretion of the trial judge under Evidence Rule 403 to exclude otherwise relevant evidence because of the risk of prejudice should find its most frequent application in this area. *See State v. Taylor*, 817 P.2d 488, 492 (Ariz. 1991).

In Arizona, "evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith," but it may be admissible to show "motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Ariz. R. Evid. 404(b); *see State v. Terrazas*, 944 P.2d 1194, 1196 (Ariz. 1997) ("Evidence of prior bad acts committed by a defendant is usually inadmissible at trial."). Arizona Rule of Evidence 404(b) mirrors its federal counterpart. *See State v. Steinle (Moran)*, 372 P.3d 939, 941 (Ariz. 2016) ("Our interpretation is guided, but not determined, by federal court decisions when our evidence rules mirror the federal rules." (citation

omitted)). This Court has held that "[w]hen [other] bad act evidence has minimal probative value in contrast to its unfairly prejudicial impact it should be excluded." *State v. Elmer*, 815 F. Supp. 319, 321 (D. Ariz. 1993) (citing *United States v. Bettencourt*, 614 F.2d 214, 219 (9th Cir. 1980)).

Even if evidence is admissible under Rule 404(b), it must still be relevant, and all evidence is subject to Rule 403, which requires the exclusion of relevant evidence "if its probative value is substantially outweighed by the danger of unfair prejudice." *State v. Fernane*, 914 P.2d 1314, 1318 (Ariz. Ct. App. 1995) (internal quotation marks and citation omitted). "Unfair prejudice means an undue tendency to suggest decision on an improper basis, . . . such as emotion, sympathy or horror." *State v. Schurz*, 859 P.2d 156, 162 (Ariz. 1993) (internal quotation marks and citation omitted).

Although "'federal habeas corpus relief does not lie for errors of state law,'" relief is available if the error deprived the petitioner of a fundamentally fair trial and therefore rose to the level of a violation of due process. *See Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) (quoting *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990)). The introduction of character or propensity evidence violates due process if the evidence "is of no relevance, or if its potential for prejudice far outweighs what little relevance it might have." *United States v. LeMay*, 260 F.3d 1018, 1027 (9th Cir. 2001). Further, the erroneous admission of prejudicial and cumulative evidence violates a defendant's Fourteenth Amendment due process rights if the admission results in the denial of fundamental fairness. *See, e.g.*, *Dudley v. Duckworth*, 854 F.2d 967, 972 (7th Cir. 1988); *see also Duncan v. Henry*, 513 U.S. 364, 366 (1995) (per curiam). Because evidence related to Almanza's prior acts "served only to prey on the emotions of the jury," Almanza's constitutional rights were violated. *McKinney*, 993 F.2d at 1385.

During Almanza's trial, defense counsel elicited the following testimony on cross-examination of Quinn:

1    Q:    Do you ever remember punching Fernando in the
2    face?
     A:    Yes, I do.
3    Q:    Can you tell me about that.
     A:    He behaved inappropriately with me, and I turned
4    around instinctively and I punched him.
     . . .
5    Q:    Were there other incidents where you and he did not
     get along? I mean, punching in the face seems like you
6    didn't—
     A:    Yeah, that we – I just – I had bad feelings about him
7    and I just didn't want him near me.
     Q:    And yet you would work with him and he would help
8    you out occasionally?
     A:    Not once I got those bad feelings. I would not let him
9    around me or my children.
10

11   (Tr. Oct. 1, 2013 at 171-72.) The State seized upon this line of testimony and

12   followed up redirect, asking Quinn to explain the instance when Almanza was

13   inappropriate with her. Quinn responded that, "[h]e came up behind me and he

14   pressed his body against me. He was clothed, I was clothed. . . . And he pressed

15   himself up against me and I felt him in a way I did not want to feel, so I turned

16   around and I punched him." (Tr. Oct. 1, 2013 at 176.) She also elaborated that

17   another time, "he came up behind me and grabbed me from my side, like this, and

18   pushed himself against me. I screamed." (Tr. Oct. 1, 2013 at 177.) Quinn further

19   testified that Almanza had asked her out "at least six" times, but that she had turned

20   him down (Tr. Oct. 1, 2013 at 177), that she saw him looking into her house at night

21   (Tr. Oct. 1, 2013 at 178-79), and that on two occasions, he came into her bedroom

22   uninvited at 6 a.m. (Tr. Oct. 1, 2013 at 178). Defense counsel did not object to this

23   line of questioning until the prosecutor asked, "Well, then certainly, Ms. Quinn,

24   because of this animosity, you must have put your daughter up to accusing him of

25   touching her?" (Tr. Oct. 1, 2013 at 179.)

26        This testimony was inappropriate and inadmissible. The State gave no prior

27   notice that it would present this testimony to the jury. Nonetheless, even if the State

28   had given notice, this type of testimony was inadmissible under the Arizona Rules

67

of Evidence. The fact that Almanza had allegedly previously asked Quinn, an adult woman, out and been overly flirtatious with her, does not satisfy Rule 404(b) by establishing "the character of a person in order to show action in conformity therewith" because it is not indicative of a sexual or romantic interest in young children, like A.W. It is absurd to think that just because Almanza was interested in pursuing a romantic relationship with Quinn, that he would be similarly romantically or sexually interested in A.W. Similarly, it is absurd to think that Almanza would digitally penetrate a young child's vagina in order to seek revenge for Quinn's rebuff of his attentions. As a result, this testimony would not be admissible under 404(b).

However, even if this testimony was admissible under 404(b), it would clearly be inadmissible under Rule 403, because its very limited probative value would certainly not outweigh the potential for unfair prejudice based on the jury's emotional reaction to this information. As discussed in Claim 1(E), *supra*, defense counsel's failure to take any corrective measures with respect to the testimony constituted deficient performance that prejudiced Almanza. And the trial court did not, on its own accord, give the jury a curative instruction. Consequently, no action was taken to ensure that the jury did not consider prejudicial evidence in its deliberations.

Here, Almanza was already fighting an uphill battle against the deficient defense that Quinn was framing Almanza due to her dislike of him or that A.W. had been injured by a barbed wire fence. Quinn's prejudicial statements were totally irrelevant to the issue of whether Almanza had demonstrated previous sexual desires toward children and also as to whether he committed the alleged offense— they serve only to impugn Almanza's character and make the jury dislike him. As such, even though defense counsel did not object to the questioning, the trial court should have stricken the statements, and instructed the jury to disregard them. *See, e.g.*, *Dudley*, 854 F.2d at 972.

1   Furthermore, the Arizona Court of Appeals' opinion that Almanza
2   erroneously argued that the burden fell on the State to prove harmlessness of the
3   error resulted in the waiver of the claim was an unreasonable determination of the
4   facts. In this case, although spending significantly more of the argument discussing
5   the fact that the trial court's error was not harmless, the Court of Appeals
6   acknowledged that "Almanza correctly identifies fundamental error as the proper
7   standard of review." (DA, Mem. Decision, Aug. 29, 2014 at 11.) Although
8   inartfully, Almanza's appellate counsel did raise the issue and preserve the
9   argument on appeal. Therefore, the Court of Appeals should have considered it.
10  Almanza's arguments as to why the error was not harmless also served as arguments
11  for why it was prejudicial and fundamental error.

12  The United States Supreme Court has held that "'federal habeas corpus relief
13  does not lie for errors of state law.'" *McGuire*, 502 U.S. at 67 (quoting *Jeffers*, 497
14  U.S. at 780). Habeas relief is available, however, if the error deprived the petitioner
15  of a fundamentally fair trial and therefore rises to the level of a violation of due
16  process. *Id.* at 68; *see also LeMay*, 260 F.3d at 1026-27; *McKinney*, 993 F.2d at
17  1384. The bad act evidence here deprived Almanza of a fundamentally fair trial.
18  And, it was not harmless, because it "had substantial and injurious effect or
19  influence in determining the jury's verdict." *Brecht*, 507 U.S. at 623 (quoting
20  *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)). Almanza's Fifth, Sixth, and
21  Fourteenth Amendment rights were violated and the state court's decision was an
22  unreasonable application of clearly established law and constituted an unreasonable
23  determination of the facts. *See* 28 U.S.C. § 2254(d).

24
25
26
27
28

69

1

**Claim Six**

2

**The State failed to present sufficient evidence to prove beyond a**
**reasonable doubt that Almanza committed Sexual Conduct with a**
**Minor; thus, the trial court erred in denying Almanza's motion for**
**directed verdict, in violation of Almanza's rights under the Fifth,**
**Eighth, and Fourteenth Amendments to the United States**
**Constitution.**

3

4

5

6

Almanza incorporates by specific reference all facts, allegations, and

7

arguments made elsewhere in this Petition. Almanza raised this claim on direct

8

appeal. (DA, Opening Br., May 1, 2014 at 28-30.) The Arizona Court of Appeals

9

denied the claim on the merits. (DA, Mem. Decision, Aug. 29, 2014 at 11-12.) The

10

state court's rejection of this claim was contrary to, or involved an unreasonable

11

application of, clearly established federal law, as determined by the Supreme Court.

12

*See* 28 U.S.C. § 2254(d)(1). In addition, it constituted an unreasonable

13

determination of the facts in light of the evidence presented. *See id.* § 2254(d)(2).

14

"[T]he Due Process Clause protects the accused against conviction except

15

upon proof beyond a reasonable doubt of every fact necessary to constitute the

16

crime with which he is charged." *In re Winship*, 397 U.S. 358, 364 (1970). If the

17

State fails to present substantial evidence on any one element of an offense

18

necessary for a conviction on a specific charge, the court must, consistent with due

19

process, enter a judgement of acquittal on that charge. *State v. Guerra*, 778 P.2d

20

1185 (Ariz. 1989). When reviewing the sufficiency of the evidence, the inquiry

21

demanded by due process and the Fourteenth Amendment is "whether, after

22

viewing the evidence in the light more favorable to the prosecution, *any* rational

23

trier of fact could have found the essential elements of the crime beyond a

24

reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). Habeas relief is

25

appropriate where the state court's denial of a sufficiency of the evidence claim is

26

objectively unreasonable. *Cavazos v. Smith*, 565 U.S. 1, 2 (2011) (per curiam);

27

*Boyer v. Belleque*, 659 F.3d 957, 964-65 (9th Cir. 2011).

28

1    At the conclusion of the state's case, defense counsel moved the trial court

2 for a judgement of acquittal, contending there was insufficient evidence from which

3 a jury could reasonably conclude that Almanza committed sexual conduct with a

4 minor. (Tr. Oct. 7, 2013 a.m. at 59); Ariz. R. Crim. P. 20(a). The trial court denied

5 the motion. (Tr. Oct. 7, 2013 a.m. at 60.)

6    Pursuant to Arizona law, to prove sexual conduct with a minor, the State was

7 required to show that Almanza "intentionally or knowingly engag[ed] in sexual

8 intercourse . . . with any person who is under eighteen years of age." A.R.S. § 13-

9 1405(A) (2011). Specifically, that Almanza engaged in "penetration into the penis,

10 vulva or anus by any part of the body or by any object . . ." A.R.S. § 13-1401(4)

11 (2011). Under Arizona law, the State was required to prove each of these elements

12 in order for there to be sufficient evidence for the trial court to deny Almanza's

13 request for a directed verdict. However, the State failed to present sufficient

14 evidence to prove beyond a reasonable doubt that Almanza committed Sexual

15 Conduct with a Minor and the trial court erred in denying the motion for a directed

16 verdict.

17    First, as explained in Claim 2(D), both Almanza's appellate attorney and the

18 Arizona Court of Appeals erred in considering this claim because they analyzed it

19 in the context of the "elements of child molestation." (DA, Mem. Decision, Aug.

20 29, 2014 at 11.) However, this argument is deeply flawed because Sexual Conduct

21 with a Minor, which is what Almanza was actually convicted of, is an entirely

22 different and legally separate offense from Molestation of a Child. *See* A.R.S.

23 §§ 13-1405 and 13-1410 (2011). In the legal context, these terms cannot be used

24 interchangeably because they do not describe the same conduct and constitute

25 different crimes. Molestation requires that the defendant engaged only in "sexual

26 contact" with a child, whereas Sexual Conduct requires penetration. A.R.S. § 13-

27 1410 (2011); *see also* A.R.S. § 13-1401(3) (2011). As a result, Molestation is a

28 much lower burden than Sexual Conduct for the State to have to prove to survive a

1   directed verdict because it merely describes any type of sexual touching, except for
2   "sexual contact with the female breast." A.R.S. § 13-1410(A) (2011). Therefore, by
3   evaluating this claim in the context of whether the State proved the elements of
4   molestation, the Arizona Court of Appeals misapplied both the law and the relevant
5   facts of Almanza's case.

6        Second, the Arizona Court of Appeals' Decision demonstrated an
7   unreasonable determination of the facts. The Arizona Court of Appeals held that
8   "[t]here was ample evidence of Almanza's guilt" because the "doctor and nurse
9   who examined A.W. both observed an abrasion on her genital area that was
10  consistent with someone scratching her, and they both testified that A.W. told them
11  Almanza had put his finger in her." (DA, Mem. Decision, Aug. 29, 2014 at 12.)
12  While this is technically accurate, the Arizona Court of Appeals failed to take into
13  consideration the fact that it is unclear whether the actual location of the injury is
14  within the vulva and penetration of the vulva is a necessary element of the offense
15  of Sexual Conduct with a Minor. During A.W.'s initial interview, she was asked
16  "was it on the inside of your part that pees, or the outside part that pees?" and her
17  response was "[o]n the side." (Trial Ex. 113 at 9.) This information does not indicate
18  penetration of the vulva, but instead touching near the genitalia.

19       A.W.'s initial report of the location of the injury is similar to the medical
20  testimony presented at trial. During the trial, Dr. Julie Klein testified that A.W. "had
21  an abrasion just at the base of her left labia minora, inside the labia majora, but not
22  involving the hymen" and later, "at the base of the left labia minora. . . . it didn't go
23  into the hymen, but it was within the labia majora and it was affecting the base of
24  the labia minora." (Tr. Oct. 2, 2013 at 224, 232.) However, because the vulva of a
25  prepubescent female are thin and flat, and not, as Dr. Klein testifies "fairly well
26  protected," the abrasion being located at the base of the labia suggests that it was
27  likely not within the vulva. (Tr. Oct. 2, 2013 at 230.) Additionally, both the doctor
28  and the nurse identified the location of the abrasion in diagrams at the time of their

evaluations and neither diagram appears to reflect an injury within the vulva. (Trial Ex. 102 at 2; Trial Ex. 110 at 7.) Both injuries appear to be just outside the vulva, in the perineum region. (Trial Ex. 102 at 2; Trial Ex. 110 at 7.) The colposcope photographs, although incredibly blurry and insufficient to definitively diagnose or display the full extent of the injury, also appear to depict an abrasion on the perineum, which is outside of the vulva. (Trial Ex. 123; *see also* Tr. Oct. 3, 2013 at 88-89.) However, even if this injury was inside the vulva, Dr. Klein acknowledged that the injury she observed also could have been caused by something else. (Tr. Oct. 2, 2013 at 238.)

Third, A.W. is not a reliable witness. She was four years old at the time of the alleged offense and six years old at the time of trial. (Trial Ex. 113 at 2; Tr. Oct. 1, 2013 a.m. at 97.) Despite the fact that children are very impressionable witnesses and it is very important to interview them in an open-ended question manner to avoid any undue suggestion, during the initial interview with A.W., Kathy Bodwell, the forensic interviewer, asked almost exclusively leading questions where the answers were offered as part of the question. (*See* Trial Ex. 113.) These types of interviews do not traditionally lead to reliable testimony about what actually happened to a child because, in fact, the child is volunteering information based on either intentional or inadvertent coaching from the interviewer about what the correct answer to their question is.[8] The nature of this interview itself calls into question A.W.'s statements.

Additionally, A.W. told both Bodwell and Dr. Klein that, after digitally penetrating her, Almanza "whacked me with a shovel on my back." (Trial Ex. 113

---

[8] Debra A. Poole & D. Stephen Lindsay, *Interviewing Preschoolers: Effects of Nonsuggestive Techniques, Parental Coaching, and Leading Questions on Reports of Nonexperienced Events*, Journal of Experimental Child Psychology, 129-154 (1995); Colin Murray, *Child Witness Examination*, American Bar Association GP Solo Mag. (Spring 2005), http://www.americanbar.org/newsletter/publications/gp _solo_magazine_home/gp_solo_magazine_index/childwitness.html.

at 11; Tr. Oct. 2, 2013 at 220.) During the interview with Bodwell, it is first described as a shovel and it then changes from a shovel to a stick. (Trial Ex. 113 at 11, 20.) A.W. also volunteers that her brother slapped her as well. (Trial Ex. 113 at 20.) Nonetheless, there were no injuries or any markings on A.W.'s back from this alleged shovel attack. (Tr. Oct. 2, 2013 at 226.) In fact, by the time of trial, A.W. makes no mention during her testimony of being hit by a shovel—only Dr. Klein mentions this. (Tr. Oct. 2, 2013 at 220, 226.) Despite the fact that Dr. Klein attempts to explain that it would be normal to have no marks after being hit with a shovel, it is unreasonable to believe that a child who has been hit by a shovel or any object would not have any marks on her back at all reflecting this act. It is also unreasonable to believe that a child who has not only been digitally penetrated, but also hit with a shovel would report the incident in such a matter of fact way without any crying or complaining. None of the witnesses report that A.W. was crying when she told them or that she was complaining of being hurt. Instead, she merely reported that Almanza "has really sharp fingernails." (Tr. Oct. 1, 2013 at 168.)

Finally, the Arizona Court of Appeals ignored Almanza's principle argument in his Direct Appeal Opening Brief, namely, that the State failed to demonstrate the requisite mens rea to prove him guilty of Sexual Conduct with a Minor. In order to prove every element of Sexual Conduct with a Minor, the State was obliged to prove that Almanza intentionally or knowingly penetrated A.W.'s vulva. However, the State did not prove that this was Almanza's intention. The testimony presented by the State suggests that A.W. sustained a very small scrape near her vulva, which could or could not have been caused by a fingernail scratch, and that, based on the accounts of the detectives and Boggs, whose testimony regarding Almanza's statements are deeply flawed (as explained in Claims 4 and 7), Almanza's finger may have scratched A.W. or even possibly entered her vulva. However, none of the testimony demonstrates that this act was done intentionally or knowingly.

At most, based on Almanza's own statements to the detectives after a

coercive and intimidating interrogation, if Almanza's finger did enter A.W.'s vulva, it was done accidentally. During the police interrogation, Almanza was adamant that he did not commit this act and, if he did, he did not do it intentionally. (Trial Ex. 116 at 71 ("I not put a finger in – I not put a fingers . . . maybe an accident, I don't know, but I no do that. I no do that . . ."; *see also* Trial Ex. 116 at 89-91 (continually denying committing this act despite Detective Snyder's repeated insistence that he did).) Even if Almanza's alleged confession to Boggs that he "only put his finger in her" is to be believed, this statement does not demonstrate that Almanza did this intentionally, only that he acknowledges that it happened, which is completely consistent with his acknowledgement to the Detective that it was possible that his hand may have slipped while he was holding A.W. (Tr. Oct. 2, 2013 at 197.) At no point does Boggs testify that Almanza told him that he intentionally penetrated A.W. with his finger. (Tr. Oct. 2, 2013 at 189-213.) All of the testimony by the witnesses against Almanza is consistent with an accidental touching. As a result, the State failed to satisfy its burden of proving that Almanza knowingly or intentionally digitally penetrated A.W. and the Arizona Court of Appeals unreasonably interpreted the facts and testimony presented in holding that the burden had been satisfied.

The State failed to prove beyond a reasonable doubt every element of Sexual Conduct with a Minor. Thus, the trial court should have granted Almanza's motion for acquittal of Sexual Conduct with a Minor. Instead, the trial court unreasonably denied his motion, and Almanza was subsequently convicted of that charge. The Arizona Court of Appeals did not correct the trial court's error. Consequently, Almanza's Fifth, Eighth, and Fourteenth Amendment rights were violated, and accordingly, he is entitled to relief.

**Claim Seven**

**Almanza's Fifth and Sixth Amendment rights were violated by the admission of the jailhouse informant testimony of Johnny Boggs.**

Almanza incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Petition. Almanza raised this claim on direct appeal. (DA, Opening Br., May 1, 2014 at 31-36.) The state court did not address the merits of the underlying claim itself, but determined that this claim had been waived due to Almanza's failure to argue fundamental error with regard to this testimony. (DA, Mem. Decision, Aug. 29, 2014 at 11.) Because this claim has not been adjudicated by the Arizona state courts on the merits, the limitations on relief imposed by 28 U.S.C. § 2254(d) do not apply to this Court's review of the claim. If this instead constituted a decision on the merits, then the state court's rejection of the claim was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the United States Supreme Court. *See* 28 U.S.C. § 2254(d)(1). In addition, it constituted an unreasonable determination of the facts in light of the evidence presented. *See* 28 U.S.C. § 2254(d)(2).

Furthermore, Almanza can demonstrate cause and prejudice. *See Martinez*, 566 U.S. at 10 ("A prisoner may obtain federal review of a defaulted claim by showing cause for the default and prejudice from a violation of federal law.") To the extent that appellate counsel failed to raise the correct burden and, therefore, according to the Arizona Court of Appeals, failed to preserve the claim for review, this performance was deficient under the test established in *Strickland*, and therefore constitutes "cause" to excuse a procedural default. *See Martinez*, 566 U.S. at 9; *Carpenter*, 529 U.S. at 453; *Strickland*, 466 U.S. at 687-88 (1984); *but see Davila*, 137 S. Ct. 2058. Furthermore, as discussed below, had the Arizona Court of Appeals not found this claim waived, Almanza would have been entitled to relief. He therefore has demonstrated "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."

1    *Strickland*, 466 U.S. at 694. In sum, the Arizona Court of Appeals' conclusion that
2    this claim was waived does not bar federal review of the merits.

3        Presumably some of the most incriminating testimony during Almanza's trial
4    was the testimony of Boggs. Boggs had been in pre-trial custody in the county jail
5    with Almanza. According to Boggs, he was introduced to Almanza because
6    Almanza needed someone to help him understand what was going on with his case
7    and Boggs spoke both Spanish and English. (Tr. Oct. 2, 2013 at 195.) Because
8    Almanza told Boggs that he did not know why he was in jail, Boggs apparently
9    asked a Pinal County Sheriff, Detective Rushing, who told Boggs what Almanza
10   had been charged with. (Tr. Oct. 2, 2013 at 195-96.) Boggs also filed motions on
11   Almanza's behalf because Almanza cannot read or write. (Tr. Oct. 2, 2013 at 196-
12   97; *see also* ROA 14, 15, 17, 18.) Most importantly, Boggs claimed that Almanza
13   told him about his case and that "[h]e didn't understand how he was being charged
14   for sexual assault if he didn't put his penis in her, that he just put his finger in her."
15   (Tr. Oct. 2, 2013 at 197.) Allegedly, according to Boggs, after hearing this statement
16   Boggs offered to testify against Almanza out of the goodness of his heart and with
17   no expectation of any benefit because he thought what Almanza did was "messed
18   up." (Tr. Oct. 2, 2013 at 198.)

19       While Boggs had already received a plea offer that did not change after he
20   offered to testify in Almanza's case, it is clear that he was hoping to receive a benefit
21   by talking to police about Almanza. (*See* Trial Ex. 114 at 21-22) ("I'm trying to get
22   back out there as quick as I can for my family and kids. That's why, you know, if I
23   could get my sentence mitigated, where they bring it down to a year, nine months,
24   like I said, it would put me out a lot quicker.").) Boggs's plea offer was
25   subsequently altered to be contingent upon him testifying against Almanza in
26   accordance with his statements to the police. (Trial Ex. 127; Trial Ex. 128.) His
27   hopes for some benefit by snitching to the police are apparent because, after offering
28   information about Almanza, he also tried to offer information about several other

1   people. (Trial Ex. 114 at 20-34.)

2       On June 13, 2012, Almanza's first trial counsel, Huggins, filed a Motion for

3   Disclosure of Information Regarding Cooperating Jailhouse Witness. (ROA 33.) In

4   the motion, Huggins asked the trial court to order disclosure of all documents

5   related to Boggs's credibility and Boggs's testimony or statements against Almanza

6   and anyone else, including any plea bargains made to Boggs, Boggs's criminal

7   record, information suggesting motive for Boggs to testify falsely, any promises or

8   benefits provided to Boggs or his family, all documents reflecting any investigation

9   arising from Boggs's statements to police, any statements made to any law

10  enforcement agency, including information relating to other potential defendants,

11  and any prior contrary statements. (ROA 33 at 2-6.) Green never re-urged the

12  motion and it does not appear that the trial court ever ruled on it. Accordingly, Green

13  never received the requested information and was unable to challenge Boggs's

14  credibility or impeach his statements with the information.

15      Boggs's testimony was incredibly important at trial because it was deemed

16  to be a confession that Almanza had actually digitally penetrated A.W., which was

17  the missing piece in the police investigation. As a result, this testimony was likely

18  essential to the jury returning a guilty verdict.

19      It is well-settled law that it is a violation of the Sixth Amendment right to

20  counsel for a government agent to "deliberately elicit" incriminating statements

21  after an accused has been indicted and without an attorney present. *Massiah v.*

22  *United States*, 377 U.S. 201, 206 (1964) (finding a Sixth Amendment violation

23  when the police listened in on conversation between defendant and co-defendant on

24  a radio placed in co-defendant's car). In *United States v. Henry*, a defendant

25  awaiting trial made incriminating statements to a fellow inmate, who was acting as

26  a paid government informant, and who testified against the defendant at trial. 447

27  U.S. 264 (1980). The Court held that the informant's statements were inadmissible

28  because the government violated the defendant's Sixth Amendment right to counsel

1   by intentionally creating a situation likely to induce Henry to make incriminating
2   statements without the assistance of counsel. *Id*. at 274. The Court particularly
3   focused on the fact that Henry was unaware that the informant was acting for the
4   Government when he made his statements and that Henry was incarcerated at the
5   time that the statements were made. *Id.* at 273-74 ("[w]hile the concern in *Miranda*
6   was limited to custodial police interrogation, the mere fact of custody imposes
7   pressures on the accused; confinement may bring into play subtle influences that
8   will make him particularly susceptible to the ploys of undercover Government
9   agents."). However, the "defendant must demonstrate that the police and their
10  informant took some action, beyond merely listening, that was designed
11  deliberately to elicit incriminating remarks." *Kuhlmann v. Wilson*, 477 U.S. 436,
12  459 (1986).

13         The situation here is very similar to that in the *Henry* case. At the time of his
14  communications with Boggs, Almanza was in custody, had already been indicted,
15  and had been appointed a lawyer. Almanza did not know that Boggs was working
16  with the police and, as a fellow inmate who could speak both Spanish and English,
17  Almanza was particularly susceptible to Boggs's influence because he needed his
18  assistance to understand what was going on. Additionally, Boggs was not a mere
19  listener or sounding board for Almanza, but instead, took action to involve himself
20  in Almanza's case. When Almanza expressed confusion about his charges, Boggs
21  sought out the deputies to tell him what Almanza had been charged with and then
22  relayed that information to Almanza. (Tr. Oct. 2, 2013 at 195-96.) By learning about
23  Almanza's charges and discussing them with Almanza, Boggs initiated a
24  conversation that was unavoidably designed to elicit incriminating remarks. Then,
25  Boggs learned more about Almanza's case by assisting him in preparing motions to
26  file in court. (Tr. Oct. 2, 2013 at 196-97.) By seeking out and expressly having
27  conversations with Almanza about the facts of his case, the charges, and the status
28  of the court proceedings, Boggs's actions squarely constituted the type of

government informant behavior that has been renounced by the United States Supreme Court. Boggs's conversations were clearly intended to bait Almanza into making incriminating remarks that Boggs could use to attempt to induce the State to give him a better plea offer.

"The use of informers, accessories, accomplices, false friends, or any of the other betrayals which are 'dirty business' may raise serious questions of credibility. *On Lee v. United States*, 343 U.S. 747, 757 (1952); *see also United States v. Bernal-Obeso*, 989 F.2d 331, 333 (9th Cir. 1993) (criminal informant testimony "is a matter 'capable of accurate and ready determination by resort to sources whose accuracy cannot be reasonably questioned' and thus of which we can take judicial notice.") (internal citation omitted). Also, a conviction obtained using knowingly perjured testimony violates due process. *See Mooney v. Holohan*, 294 U.S. 103, 112 (1935) (per curiam). A defendant's due process rights are violated when the state, even if it does not solicit false evidence, allows it to go uncorrected when it appears. *See Alcorta v. Texas*, 355 U.S. 28, 313-32 (1957) (per curiam). This prohibition applies even when the testimony in question is relevant only to the witness's credibility. *See Napue v. Illinois*, 360 U.S. 264, 269 (1959).

Boggs's testimony lacks credibility. Boggs was a fellow inmate with access to Almanza's discovery and the ability to learn a large amount of information about Almanza's case due to the fact that he could speak and read English and Almanza could not. Similarly, it seems highly coincidental that the only piece of evidence that was clearly missing from the police reports and the police investigation in the case was an inculpatory statement from Almanza, and that is exactly what Boggs got. Boggs's only testimony at trial was that Almanza had admitted to digitally penetrating A.W. He did not offer any additional details that could confirm the veracity of his testimony. He did not offer Almanza's version of the events of the day with any sort of timeline or facts that the police were not privy to. He simply testified that Almanza told him he had "put his finger in her." (Tr. Oct. 2, 2013 at

197.) This lack of details and limited amount of information makes the credibility of Boggs's testimony highly convenient and highly questionable. Even the State has generally acknowledged the unreliability of Boggs, due to his lengthy history of felony convictions, and has repeatedly informed the state courts of his untrustworthiness and its desire to impeach his credibility should he testify in his own defense.[9]

Although Boggs's plea offer did not dramatically change with regard to the proposed sentence after he agreed to testify against Almanza, that fact does not bolster his credibility with regard to that testimony. It is clear that at the time Boggs spoke to Detective Snyder, he was anticipating that he would receive a benefit in exchange for his testimony. Boggs clearly was doing and saying anything he could think of to try to reduce his expected sentence and to get out of custody "as quick as I can for my family and kids." (Trial Ex. 114 at 22.) The fact that afterwards, prior to his trial testimony, the sentence in his plea agreement did not change does not change the dubiousness of his credibility. In fact, although the sentence did not change, the plea that he had previously received did change because it then became contingent upon him testifying in Almanza's case. Boggs had already spoken to Detective Snyder and told them his story about Almanza's supposed confession. If, after receiving no meaningful benefit for his plea offer, he had refused to testify, the State could have refused to honor that plea and his plea offer would have gotten worse, or he could have been offered no subsequent plea at all. Once he spoke to Detective Snyder, he was locked in to his story and obligated to testify to preserve the status quo. The fact that Boggs did not receive any actual benefit does not change the questionable nature of this alleged confession and Boggs's motives for speaking to the detectives.

---

[9] *See, e.g.*, State's Req. for Rule 609 Hr'g, *State v. Boggs*, CR201503115 (Pinal Cty. Super. Ct. Oct. 14, 2015); Mot. to Allow Impeachment by Prior Felony Convictions, *State v. Boggs*, CR17963 (Pinal Cty. Super. Ct. Dec. 3, 1992).

Nonetheless, despite the fact that Boggs's conversations with Almanza were clearly designed to elicit incriminating statements and that Boggs lacked credibility, the trial court allowed this testimony to be presented to the jury and Almanza's trial counsel failed to object to it. Boggs's testimony was highly prejudicial and very likely hugely important in the jury finding Almanza guilty. Boggs's testimony provided the missing piece of information that the State needed to prove its case—Almanza's alleged confession to digital penetration. The admission of Boggs's prejudicial testimony violated Almanza's rights under the Fifth and Sixth Amendments to the United States Constitution. Therefore, he is entitled to relief.

## Claim Eight

**The trial prosecutor engaged in repeated and pervasive misconduct, violating Almanza's rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.**

Almanza raised this claim in his post-conviction proceedings. (Ariz. Ct. App. PFR, Pet. for Review, Feb. 21, 2017 at 6-11; Ariz. S. Ct. PFR Dkt. 1 at 10-12.) None of the Arizona state courts addressed the merits of this claim. (Ariz. Ct. App. PFR, Mem. Decision, July 25, 2017 at 3; Ariz. S. Ct. PFR Dkt. 4 at 1.) Because this claim has not been adjudicated by the Arizona state courts on the merits, the limitations on relief imposed by 28 U.S.C. § 2254(d) do not apply to this Court's review of the claim and this Court may consider the merits of this claim de novo. Alternatively, if this Court deems this claim unexhausted, Almanza can overcome any default of this claim by showing cause and prejudice, including because of the ineffective assistance of appellate and state post-conviction counsel. *See Martinez*, 566 U.S. at 9; *Carpenter*, 529 U.S. at 453; *Strickland*, 466 U.S. at 687-88; *but see Davila*, 137 S. Ct. 2058. Almanza will demonstrate at an evidentiary hearing that appellate and post-conviction counsel fell below the standards of minimally competent attorneys and that those failures prejudiced him. Alternatively, he alleges that any procedural bar is not adequate or independent or that imposing default would be a miscarriage of justice. Almanza incorporates by specific reference all

facts, allegations, and arguments made elsewhere in this Petition.

### A.    Introduction

A prosecutor occupies a unique position in the Bar, and is subject to uniquely rigorous standards. "[W]hile he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one." *Berger v. United States*, 295 U.S. 78, 88 (1935). "Prosecutors are subject to constraints and responsibilities that don't apply to other lawyers. . . . [t]he prosecutor's job isn't just to win, but to win fairly, staying well within the rules." *United States v. Kojayan*, 8 F.3d 1315, 1323 (9th Cir. 1993) (internal citations omitted).

To succeed on a claim of prosecutorial misconduct, Almanza must meet one of two standards. Almanza must demonstrate either that the prosecutor's misconduct prejudiced a substantive right, *see Donnelly v. DeChristoforo*, 416 U.S. 637, 644 (1974) (internal citations omitted), or that the prosecutor's misconduct rendered the trial fundamentally unfair, *see Berger*, 295 U.S. 78. When evaluating various instances of prosecutorial misconduct, the reviewing court must consider the cumulative effect of the harm. *See Berger*, 295 U.S. at 89 (awarding a new trial because of "probable cumulative effect" of instances of prosecutorial misconduct). Almanza will show that the prosecutor's conduct both prejudiced his substantive rights and rendered the trial fundamentally unfair. The prosecutor in Almanza's case has a history of violating ethical duties and flouting the law to obtain a conviction at all costs. This misconduct pervaded Almanza's trial and rendered it fundamentally unfair.

### B.    Prosecutorial Misconduct

Prosecutorial misconduct may "so infect[] the trial with unfairness as to make the resulting conviction a denial of due process." *See Donnelly*, 416 U.S. at 643. Prosecutorial misconduct is not evaluated from isolated instances alone; rather, the

1    reviewing court must consider the cumulative effect of the harm. *Berger*, 295 U.S.
2    at 89. In Almanza's case, the State's misconduct was not confined to a single
3    instance but was persistent. Almanza was already facing an uphill battle as an
4    illiterate, Spanish speaker, accused of a crime against a child, whose trial counsel
5    was unprepared for his defense. (*See* Claim 1 *supra*.) His right to a fair trial was
6    eviscerated by the prosecutor's repeated instances of misconduct.

7        Both federal and Arizona courts recognize that whether a prosecutor's
8    misconduct is isolated or a consistent pattern is relevant to analysis of such a claim.
9    *See Lincoln v. Sunn*, 807 F.2d 805, 809 (9th Cir. 1987); *State v. Minnitt*, 55 P.3d
10   774, 782 (Ariz. 2002) ("Like the misdeeds in *Pool* [*v. Super. Ct. In and For Cty. of
11   Pima*, 677 P.2d 261, 271 (Ariz. 1984)], Peasley's misdeeds were not isolated events
12   but became a consistent pattern of prosecutorial misconduct that began in 1993 and
13   continued through retrial in 1997."); *State v. Jorgenson*, 10 P.3d 1177, 1180 (Ariz.
14   2000) ("This is perhaps the third or fourth time that the conduct of this same
15   prosecutor has raised the same type of problem. It is unfortunate that he was
16   permitted to try so serious a case and, without proper supervision, permitted to try
17   it in such an improper manner.").

18       The experience level of the prosecutor is also relevant. *See Minnitt*, 55 P.3d
19   at 782 (reversing a conviction for prosecutorial misconduct, which permeated the
20   trials in question, and noting, "Peasley is not an inexperienced prosecutor, but rather
21   a veteran homicide prosecutor."). In disciplinary cases involving prosecutorial
22   misconduct, the experience of the prosecutor renders conduct more egregious. *In re
23   Peasley*, 90 P.3d 764, 774 (Ariz. 2004) ("[W]hen a lawyer's substantial experience
24   places that lawyer in a position that would be unavailable to a less experienced
25   lawyer, and that lawyer's experience also affords, or should afford, a greater
26   appreciation of the advantages of eliciting false testimony, substantial experience
27   may be considered a relevant aggravating factor."); *In re Zawada*, 92 P.3d 862, 869
28   (Ariz. 2004) (citation omitted) ("Peasley's extensive experience as a prosecutor

helped him understand how a jury would react to unfavorable evidence. Accordingly, he suborned perjured testimony to destroy the negative inference the jury would otherwise have drawn.").

Long, the prosecutor in Almanza's case, was experienced and has a well-documented history of crossing ethical lines. Long was admitted to the Arizona State Bar in 2003 and practiced as a prosecutor at the Maricopa County Attorney's Office and then Pinal County Attorney's Office for the next twelve years, including serving as Chief of the Pinal County Major Crimes Bureau. He had been a prosecutor for ten years and was already a supervisor when he tried Almanza's case in October 2013.

Despite his experience, and while a supervising attorney at the Pinal County Attorney's Office in 2014, Long was implicated in two different ethics scandals that occurred at the office. First, the Pinal County Attorney's Office was disqualified from prosecuting a death-penalty case after several of its lawyers violated a court order by accessing and reviewing medical records that had been filed ex-parte and under seal. *See* Sean Holstege, *Pinal County Attorney's Office rebuked by Judge*, Arizona Republic (July 16, 2014), http://www.azcentral.com/story/news/arizona/politics/2014/07/17/pinal-county-attorneys-office-rebuked-judge/12769315; *see also* Sean Holstege, *Ethics concerns in Pinal death- penalty cases*, Arizona Republic (Aug. 4, 2014), https://www.azcentral.com/story/news/arizona/politics/2014/08/05/pinal-county-prosecutors-hit-barrage-ethics-concerns/13611183. Specifically, in July 2013, a paralegal at the Pinal County Attorney's Office logged into Pinal County Superior Court Clerk's Office computer system and accessed records that had been filed under seal records. This paralegal notified an attorney in the office and printed the records. Long was the supervisor of the attorney and was made aware of the office's access to sealed records maintained by the clerk's office.

News coverage regarding the sealed records also alludes to Ronald Thompson's case, which took place only nine months after Almanza's trial. This

case resulted in a mistrial when Long not only mislead the court, but also appeared to have unduly influenced a defense witness by waiting for him to arrive at the courthouse and then escorting him into a private interview with prosecutors without his attorney present. Sean Holstege, *Ethics concerns in Pinal death-penalty cases*, Arizona   Republic (Aug. 4, 2014), https://www.azcentral.com/story/news/arizona/politics/2014/08/05/pinal-county-prosecutors-hit-barrage-ethics-concerns/13611183. In the Ronald Thompson case, Long had not previously interviewed a defense witness, so he had someone from the Pinal County Attorney's Office intercept that witness after he had entered the courthouse and escort him to a room in the County Attorney's office. At the time, Long was in court for the Thompson matter and informed the judge that he had to step out briefly for "administrative matters." (Jury Trial Tr. at 38, 40-41, *State v. Thompson*, CR2009-00270 (Pinal Cty. Super. Ct. July 24, 2014)). The court later learned that Long had been interrogating the defense witness, who also had pending felony charges, without that witness's attorney or Thompson's defense attorney present. The subsequent testimony revealed to the judge that the witness's testimony may have been tainted by Long's interactions with the witness and that he had no choice but to declare a mistrial. (Jury Trial Tr. at 45, *State v. Thompson*, CR2009-00270 (Pinal Cty. Super. Ct. July 24, 2014); Min. Entry at 2, *State v. Thompson*, CR2009-00270 (Pinal Cty. Super. Ct. July 28, 2014)). The judge accused Long of unprofessional conduct for misleading him when he said he had to take care of "administrative matters." (Jury Trial Tr. at 40-41, *State v. Thompson*, CR2009-00270 (Pinal Cty. Super. Ct. July 24, 2014)).

In addition to these larger ethical scandals involving the Pinal County Attorney's Office, within the office, Long's personnel records reflect that he was the subject of several investigations resulting in verbal and written censures due to inappropriate conduct and statements in the workplace. These infractions included inappropriate comments about co-workers who were of the Church of Latter Day

1  Saints and demeaning comments to his colleagues. Overall, Long was considered
2  to be functionally third in command within the office and the accounts of several
3  former colleagues suggested that he created a very hostile work environment as a
4  supervisor.

5             **1.**     **The prosecutor impermissibly used insulting and**
6                         **inflammatory language.**

7        It is inappropriate for a prosecutor to make inflammatory or misleading
8  arguments or arguments that are intended to invoke inappropriate prejudice. *See*
9  *Darden v. Wainwright*, 477 U.S. 168, 180-81 (1986); *United States v. Young*, 470
10  U.S. 1, 18 (1985); *see also* ABA Standards for Criminal Justice § 3-6.8(c) (4th ed.
11  2015) ("prosecutor should not make arguments calculated to appeal to improper
12  prejudices"). In Arizona, there are two factors to consider in determining
13  prosecutorial misconduct, "(1) whether the prosecutor's statements called to the
14  jury's attention matters it should not have considered in reaching its decision and
15  (2) the probability that the jurors were in fact influenced by the remarks." *State v.*
16  *Nelson*, 273 P.3d 632, 641 (Ariz. 2012). As a result, the court also analyzes the
17  "context in which the statements were made as well as 'the entire record and [] the
18  totality of the circumstances.'" *Id.* (quoting *State v. Rutledge*, 66 P.3d 50, 56 (Ariz.
19  2003)). It is not sufficient for the prosecutor's statements to be "undesirable or even
20  universally condemned." *Darden*, 477 U.S. at 181. The relevant question is whether
21  the prosecutors' comments "so infected the trial with unfairness as to make the
22  resulting conviction a denial of due process." *Donnelly*, 416 U.S. at 643. Because,
23  as *Berger* made clear, when a prosecutor makes "improper insinuations and
24  assertions calculated to mislead the jury," reversal is required. 295 U.S. at 85.

25        During Almanza's trial, the prosecutor made twenty-four improper
26  references in his opening statement to Almanza being a "poacher," a "hunter," a
27  "fox," a "fox in a henhouse," and to A.W. being "prey" who was "selected" and
28  "snatched up." (Tr. Oct. 1, 2013 at 4-6, 8-10, 18.) These comments are not only

inappropriate and inflammatory, but they are also not supported by the facts that were introduced at trial. There was no evidence to support any inference that Almanza had previously strategized or planned the alleged misconduct. There was no evidence that Almanza "snatched" A.W. up by kidnapping her or taking her to any location against her will. There was also no evidence that he was lying in wait for her.

Instead, Long's arguments served only to inflame the jury. Because there was minimal physical corroborating evidence in this case, due to the type of allegation, and because the facts hinged largely on the testimony of a young child, the prosecutor's derogatory comments undermined any credibility that Almanza had from the beginning of trial, painting him as a monster or an animal, and ensured that the jury would approach all of the evidence with a bias against him.

In addition to the federal case law condemning the use of inflammatory language by prosecutors, the Arizona Supreme Court has specifically held that it is improper for the prosecutor during his opening statement to refer to a defendant as a "predator" or a "wolf" or to use similarly insulting and inflammatory language. *State v. Goudeau*, 372 P.3d 945, 960-61*, as amended on denial of reconsideration* (July 5, 2016), *cert. denied*, 137 S. Ct. 223 (Ariz. 2016). These types of comments are inappropriate because "[o]pening statement is counsel's opportunity to tell the jury what evidence they intend to introduce . . . [It] is not a time to argue the inferences and conclusions that may be drawn from evidence not yet admitted." *State v. Bible*, 858 P.2d 1152, 1205 (Ariz. 1993).

This proposition and the effect of demonizing Almanza was bolstered by many additional references in the prosecutor's closing argument to Almanza being a "hunter" or a "poacher" and A.W. being his "prey." (Tr. Oct. 7, 2013 p.m. at 4, 7, 30.) These comments included references to Almanza's "hunting grounds, to his trap, the trap that he had laid." (Tr. Oct. 7, 2013 p.m. at 7.) The purpose of a closing argument "is to explain to the jury what it has to decide and what evidence is

relevant to its decision." *Sandoval v. Calderon*, 241 F.3d 765, 776 (9th Cir. 2000). The constitutional guarantee of due process is violated by the admission of evidence that is not relevant to an element of the crime charged and is so inflammatory as to prevent a fair trial. *See, e.g.*, *Duncan v. Henry*, 513 U.S. 364, 366 (1995) (per curiam); *Romano v. Oklahoma*, 512 U.S. 1, 12-13 (1994) (holding that admission of irrelevant evidence violates due process if it so infected proceedings as to render jury's determination a violation of due process); *Estelle v. McGuire*, 502 U.S. 62, 70 (1991).

While closing arguments, unlike opening statements, are permitted to comment on the evidence that had been presented and to draw inferences, there was no testimony about Almanza planning this alleged conduct in advance or that he "laid" a "trap." (Tr. Oct. 7, 2013 p.m. at 7.) There was also no evidence presented at trial that he had committed any similar offenses against anyone else. As a result, these comments are baseless in the facts of the case and are merely inflammatory comments, intended to make the jurors perceive Almanza as an evil predator.

These characterizations of Almanza as an animalistic predator amounted to a coded racial appeal to Almanza's jury as well. Almanza is Hispanic and does not speak English. Undoubtedly, given the political atmosphere surrounding illegal immigration for the last decade, the jurors were also wondering whether he was undocumented. Long's statements racialized Almanza by appealing to deeply entrenched and stereotypical associations of the dangerousness of undocumented, Hispanic immigrants.[10] In describing Almanza as a "predator," Long painted Almanza as a continuing threat to the community, despite the fact that at the time of the prosecution of this case, Almanza had no prior felony convictions involving

---

[10] *Cf.* Br. for the Nat'l Black Law Students Ass'n as Amicus Curiae in Supp. of Pet'rs' at 2, *Buck v. Davis*, 137 S. Ct. 759 (2017) (No. 15-8049) ("[P]resented with a criminal defendant, even well-meaning people fall prey to the stereotype that, whether for reason of biology or culture, Black people are inherently violent and dangerous.")

crimes of violence or sexual offenses. In essence, Long urged jurors to convict Almanza based, in part, on an appeal to a vicious and degrading racial stereotype.[11]

Conversely, the prosecutor also engaged in misconduct in his opening statement by making complimentary statements about A.W. and her family, thereby appealing to the community and the juror's community ties. Specifically, he commented on the ranch itself and on A.W.'s mother's job there, explaining several times that Quinn does "what's necessary to provide food on our community's table." (Tr. Oct. 1, 2013 at 5.) These statements were irrelevant to any of the evidence that would be presented at trial. The only purpose of these statements was to endear A.W. and her mother to the jurors and to raise them up as essential and productive pillars of the community. This type of appeal to the jury's sympathies is improper.

## 2.    The prosecutor impermissibly vouched for State's witnesses.

Long's inappropriate comments in his opening and closing statements went farther. It is well-settled law that it is improper for a prosecutor to vouch for a witness. *See Young*, 470 U.S. at 18-19 ("The prosecutor's vouching for the credibility of witnesses and expressing his personal opinion concerning the guilt of the accused pose two dangers: such comments can convey the impression that evidence not presented to the jury, but known to the prosecutor, supports the charges against the defendant and can thus jeopardize the defendant's right to be

---

[11] *See generally* Ian Haney López, *Dog Whistle Politics: How Coded Racial Appeals Have Reinvented Racism and Wrecked the Middle Class* ix (2015) (explaining that such references are in reality racial entreaties that "operate like a dog whistle" –that amounts to "racial pandering [that] [ ] operates on two levels: inaudible and easily denied in one range, yet stimulating strong reactions in another."); *see also* Eduardo Bonilla-Silva, *Racism without Racists: Color-blind Racism and the Persistence of Racial Inequality in America* (4th ed. 2014) (discussing coded language that masks racial prejudice as the product of the post-1960s rise in color blind ideology).

tried solely on the basis of the evidence presented to the jury; and the prosecutor's opinion carries with it the imprimatur of the Government and may induce the jury to trust the Government's judgment rather than its own view of the evidence."); *see also Berger*, 295 U.S. at 88-89; *Bible*, 858 P.2d at 1204; *State v. Newell*, 132 P.3d 833, 846 (Ariz. 2006). There are two forms of impermissible prosecutorial vouching: "(1) when the prosecutor places the prestige of the government behind its witness, and (2) where the prosecutor suggests that information not presented to the jury supports the witness's testimony." *Bible*, 858 P.2d at 1204.

In Almanza's trial, Long engaged in the first type by vouching for A.W. and for the minimal physical evidence in the case. During his opening statement, Long made at least eleven references to the "truth" spoken by A.W. and by her body. (Tr. Oct. 1, 2013 at 4, 5, 10, 12-13, 16-18.) Furthermore, during closing argument, the prosecutor continued this thread of statements, but heightened their impact by characterizing A.W.'s body as "scream[ing]" the truth. (Tr. Oct. 7, 2013 p.m. at 8-11, 13, 18, 23, 26, 44-45.) This statement was made at least ten times during the closing argument. These statements by Long lent credibility to the statements of A.W. and the allegations for which Almanza was being tried. By proclaiming that A.W. and her body speak the "truth," the prosecutor is not asking the jury to make a determination about what is true and whether Almanza is guilty, but instead using the weight of the government to confirm to the jury that this information is true. Thus, any alternative information is presumptively false.

Long also disingenuously vouched for Boggs during his closing argument. During his closing argument, Long commented that Boggs had "absolutely nothing to gain by speaking his truth." (Tr. Oct. 7, 2013 p.m. at 22.) Although it is unclear whether Boggs received a better plea in exchange for testifying against Almanza, his plea agreement did specifically specify that he would testify at Almanza's trial. (Trial Ex. 128 at 3.) As a result, if he had refused to testify, the State could have invalidated his plea agreement and he could have found himself back in custody.

1

2

### 3.  The prosecutor improperly commented on Almanza's failure to testify.

3      Prosecutorial comment on "the refusal to testify at trial violates a defendant's

4   Fifth Amendment right against self-incrimination." *Cook v. Schriro*, 538 F.3d 1000,

5   1019 (9th Cir. 2008) (citing *Griffin v. California*, 380 U.S. 609, 615 (1965)). Where

6   the "prosecutor's reference to the defendant's opportunity to testify is a fair

7   response to a claim made by defendant or his counsel, . . . there is no violation of

8   the privilege." *United States v. Robinson*, 485 U.S. 25, 32 (1988). But "how-does-

9   he-explain" arguments are disfavored for two reasons—the *Griffin* violation, and

10   the apparent shift of the burden of proof to the defendant. *See United States v.

11   Skandier*, 758 F.2d 43, 45 (1st Cir. 1985) (finding that prosecutor's statements in

12   closing argument that, "at the close of [defense's counsel's] testimony, (sic) I will

13   have a chance to speak with you one more time and see if he can explain the story

14   that would be any different with regard to the responsibility of the defendant in this

15   case," impermissibly shifted the burden of proof to the defendant); *see also United

16   States v. Cox*, 752 F.2d 741, 745 (1st Cir. 1985) (finding prosecutor's repeated

17   statements during closing argument, asking "how does [defendant] explain" certain

18   evidence, "a fairly severe violation of the *Griffin* rule); *United States v. Wilkins*,

19   659 F.2d 769, 773-74 (7th Cir. 1981) (finding prosecutor's statements that the

20   government's theory was the "only explanation" and "[s]ee if [the defendant's]

21   attorney explains . . ." improper comment on the defendant's failure to testify).

22      Here, Long impermissibly commented on Almanza's failure to testify in his

23   final closing argument, emphasizing, "[t]here are two people who know what

24   happened, and the defendant is the other." (Tr. Oct. 7, 2013 p.m. at 40.) He

25   continued this theme, commenting that "what defense has asked you to do is guess

26   about facts." (Tr. Oct. 7, 2013 p.m. at 41.) He then went even further in his

27   comments, ultimately shifting the burden of proof to Almanza through several

28   statements, including "there's no evidence of [A.W. being influenced]. Where is

the evidence of that? There isn't any" (Tr. Oct. 7, 2013 p.m. at 43) and "why didn't [defense counsel] ask the expert in this case, is that reasonable. In this case, could that have happened. Because he [sic] rather have an argument than the facts because in this case there is no evidence that [A.W.] was impacted" (Tr. Oct. 7, 2013 p.m. at 43). Long's statements therefore prejudiced Almanza's substantive rights under the Fifth and Fourteenth Amendments and rendered his trial fundamentally unfair.

### 4.    The cumulative effect of the prosecutorial misconduct violated Almanza's due process rights.

Prosecutorial misconduct does not rise from one act of misconduct alone; rather, the reviewing court must consider the cumulative effect of the harm. *See Berger*, 295 U.S. at 89. In Almanza's case, Long's misconduct was not confined to a single instance, but was persistent. And all of these instances of misconduct, considered singly and collectively, involved improper and deceptive methods of persuasion, which rendered Almanza's trial fundamentally unfair and in violation of due process. *See Wood v. Ryan*, 693 F.3d 1104, 1116 (9th Cir. 2012) (explaining that "[e]ven when separately alleged incidents of prosecutorial misconduct do not independently rise to the level of reversible error, '[t]he cumulative effect of multiple errors can violate due process.'" (quoting *United States v. Nobari*, 574 F.3d 1065, 1082 (9th Cir. 2009))).

### C.    Conclusion

The Arizona Supreme Court has a history of reversing cases based on prosecutorial misconduct, and Almanza's claim is meritorious. Long's history and experience demonstrate that he should know that he should not make improper and unsupported arguments or misstate the evidence, but also that he is willing to engage in unprofessional behavior in order to obtain a conviction. Long's misconduct in this case can only be seen as intentional conduct aimed to secure a conviction and the cumulative effect was undeniably prejudicial to Almanza, ultimately denying him of a fair trial.

1    Based on the evidence of pervasive and outrageous misconduct in this case
2    and others prosecuted by Long, Almanza was prejudiced. Each of the prosecutor's
3    inappropriate comments constituted misconduct, as they were clearly intended to
4    inflame the passions of the jurors. Each comment continually denigrated and
5    dehumanized Almanza to the jury while simultaneously lending credibility to and
6    elevating the testimony of A.W. and her mother. Moreover, taken as a whole,
7    Long's statements unfairly infected the trial proceedings, poisoning the jurors
8    against Almanza, and denied his rights under the Fifth, Sixth, Eighth, and
9    Fourteenth Amendments to the United States Constitution. Accordingly, he is
10   entitled to evidentiary development and habeas relief.

### Claim Nine

11

**The Arizona Court of Appeals erred in finding that Almanza's late
Notice of Post-Conviction Relief barred review of his claims.**

12

13

14   Almanza incorporates by specific reference all facts, allegations, and
15   arguments made elsewhere in this Petition. Almanza raised this claim in his post-
16   conviction proceedings. (Ariz. S. Ct. PFR Dkt. 1 at 7-9.) The Arizona Supreme
17   Court issued a summary denial of Almanza's Petition for Review without any
18   analysis of the merits of his claims. (Ariz. S. Ct. PFR Dkt. 4 at 1.) Because this
19   claim has not been adjudicated by the Arizona state courts on the merits, the
20   limitations of relief imposed by 28 U.S.C. § 2254(d) do not apply to this Court's
21   review of the claim and this Court may consider the merits of this claim de novo. If
22   this instead constituted a decision on the merits, then the state court's rejection of
23   the claim was contrary to, or involved an unreasonable application of, clearly
24   established federal law, as determined by the United States Supreme Court. *See* 28
25   U.S.C. § 2254(d)(1). In addition, it constituted an unreasonable determination of
26   the facts in light of the evidence presented. *See* 28 U.S.C. § 2254(d)(2).

27   Rule 32 proceedings are intended to ensure that every defendant receives due

28

process of law. *See* U.S. Const. amends. V, XIV; *see also* Ariz. R. Crim. P. 32. Rule 32 also specifies that when a defendant files a timely notice of post-conviction relief, the trial court shall appoint counsel upon defendant's request. Ariz. R. Crim. P. 32.4(c)(2). However, pursuant to Rule 32.2(b), a claim raised in an "untimely post-conviction notice must include the specific exception to preclusion and explain the reasons for not raising the claim in a previous notice or petition, or for not raising the claim in a timely manner." Ariz. R. Crim. P. 32.2(b); *see also* A.R.S. § 13-4232(B). Furthermore, if "the specific exception and meritorious reasons do not appear substantiating the claim and indicating why the claim was not stated . . . in a timely manner, the notice shall be summarily dismissed." *Id.* However, Rule 32.1(f) provides that an untimely notice may be considered timely if the "failure to file a notice of post-conviction relief of-right or a notice of appeal within the required time was not the defendant's fault." Ariz. R. Crim. P. 32.1(f). With regard to Rule 32, preclusion rules "exist to prevent multiple post-conviction reviews, not to prevent review entirely." *State v. Rosales*, 66 P.3d 1263, 1267 (Ariz. Ct. App. 2003); *see also State v. Petty*, 238 P.3d 637 (Ariz. Ct. App. 2010).

Here, the Arizona Court of Appeals issued its Memorandum Decision on Almanza's direct appeal on August 29, 2014 and Mandate on October 9, 2014. (*See* DA, Mem. Decision, Aug. 29, 2014; DA, Mandate, Oct. 9, 2014.) Thus, pursuant to Rule 32, Almanza's Notice of Post-Conviction Relief was due November 10, 2014. Ariz. R. Crim. P. 32.4(a)(2)(D). However, Almanza did not file his Notice until March 19, 2015. (PCR, Notice of Post-Conviction Relief, Mar. 19, 2015 (Dkt. 2).)

Hamilton was appointed to represent Almanza in his direct appeal. Almanza is illiterate, a Spanish speaker, and has no formal education, which makes navigating the American legal system without assistance very difficult for him. Hamilton knew this. Nonetheless, as discussed in Claim 2 *supra*, Hamilton provided ineffective assistance to Almanza and after the decision was issued in

Almanza's direct appeal, Hamilton did not advise Almanza or take the necessary steps to assist Almanza in filing his Notice of Post-Conviction Relief. Not knowing that the clock was running on his time to initiate his post-conviction relief proceedings, Almanza did not file his Notice until he received assistance from another inmate, which was unfortunately after the time to file his Notice had expired. As such, the untimely notice was without fault of Almanza who, once he realized he needed to file something to initiate his post-conviction proceedings, did so immediately. Instead, it was the result of ineffective assistance of counsel.

During these ongoing proceedings, the trial court made no mention of Almanza's Notice being untimely and did not preclude any further post-conviction litigation on that basis. Similarly, the State, in its Response to Almanza's post-conviction petition, made no mention of Almanza's untimely notice or the need for summary dismissal. (PCR, State's Resp. to Pet. for Post-Conviction Relief, June 20, 2016.) Instead, the State addressed the merits of the arguments that Almanza had raised and the relevant procedural issues.

In reviewing Almanza's Petition for Post-Conviction Relief, the trial court did not specifically find the untimeliness of the Notice as the basis for its dismissal of the Petition, nor did the trial court assert that it lacked jurisdiction based on the untimely notice. Instead, in its Ruling on Motions/Issues, the trial court denied the Petition, finding that all claims raised were "precluded as having been previously ruled upon or untimely filed or the Petition lacks sufficient basis in law and fact to warrant further proceedings herein and no useful purpose would be served by further proceedings . . . " (PCR, Ruling on Motions/Issues, Aug. 5, 2016 at 1 (Dkt. 16).) Nonetheless, in considering Almanza's Petition for Review, the Arizona Court of Appeals determined that it did not need to address any of the claims raised in the Petition for Review, instead asserting that by failing to abide by the jurisdictional time limit for filing the notice of post-conviction relief, Almanza forfeited the review of his claims. (Ariz. Ct. App. PFR, Mem. Decision, July 25, 2017 at 3.) The

1    Court of Appeals also claimed that Almanza had not identified any claims that may

2    be raised untimely. (Ariz. Ct. App. PFR, Mem. Decision, July 25, 2017 at 3.)

3        The Court of Appeals' determination violated Almanza's right to due process

4    and to have his case reviewed by the appellate courts in Arizona. As the Arizona

5    case law makes clear, the purpose of the time limit is not to prevent review entirely,

6    which is exactly what happened here. Almanza received ineffective assistance of

7    counsel at every step of his legal proceedings and therefore, continually has been

8    denied any meaningful review of his case. One unfortunate result of the ineffective

9    assistance of his direct appeal counsel was his failure to file a timely notice of post-

10   conviction relief. However, this was not Almanza's fault, but the result of his

11   attorney's ineffectiveness. Furthermore, Almanza's post-conviction claims were

12   "sufficient to establish that no reasonable fact-finder would find the defendant

13   guilty beyond a reasonable doubt . . . " because he raised several claims throughout

14   both his post conviction proceedings and in this habeas petition that undermine the

15   reliability of his conviction and suggest the strong likelihood that he is actually

16   innocent of these charges. *See* Ariz. R. Crim. P. 32.1(h).

17       Furthermore, the Court of Appeals erred because Almanza did identify that

18   his claims were untimely and the excuse as required by Rule 32.2(b) and Rule

19   32.1(f). In his Notice, Almanza explained that he does not read English and "did

20   not know the court of appeal [sic] had reached it's verdic [sic]." (PCR, Notice of

21   Post-Conviction Relief, Mar. 19, 2015 at 3 (Dkt. 2).) He explained that he was not

22   informed of the deadlines or the verdict by his attorney and that he had to have

23   someone else read the letter to him. (PCR, Notice of Post-Conviction Relief, Mar.

24   19, 2015 at 3 (Dkt. 2).) He then requested the court permit him to "file this untimely

25   notice of post conviction relief" because he asserts his innocence. (PCR, Notice of

26   Post-Conviction Relief, Mar. 19, 2015 at 3 (Dkt. 2).)

27       Therefore, because the trial court afforded Almanza the right to proceed with

28   his post-conviction proceedings pursuant to Rules 32.2(b) and 32.1(f) and (h) and

97

1   considered his Petition for Post-Conviction Relief, the Arizona Court of Appeals

2   should similarly have considered the merits of Almanza's claims and not summarily

3   dismiss them as time-barred. By failing to review the claims, the state court violated

4   Almanza's due process rights and he is entitled to relief.

5                                    **Claim Ten**

6   **The admission at trial of scientifically unreliable victimology**
    **evidence violated Almanza's constitutional rights to due process**
7   **and a fair trial.**

8          This claim was not raised in state court. Almanza can overcome any default

9   of this claim by showing cause and prejudice, including because of ineffective

10  assistance of appellate and state post-conviction counsel. *See Martinez*, 566 U.S. at

11  9; *Carpenter*, 529 U.S. at 453; *Strickland*, 466 U.S. at 687-88; *but see Davila*, 137

12  S. Ct. 2058. Almanza will demonstrate at an evidentiary hearing that appellate and

13  post-conviction counsel fell below the standards of minimally competent attorneys

14  and that those failures prejudiced him. Alternatively, he alleges that any procedural

15  bar is not adequate or independent or that imposing default would be a miscarriage

16  of justice. Because this claim has not been adjudicated by the Arizona state courts,

17  the limitations on relief imposed by 28 U.S.C. § 2254(d) do not apply to this Court's

18  review, and the Court may consider the merits of the claim de novo. *Dickens v.*

19  *Ryan*, 740 F.3d 1302, 1320 (9th Cir. 2014) (en banc). Almanza incorporates by

20  specific reference all facts, allegations, and arguments made elsewhere in this

21  Petition.

22         At Almanza's trial, the state presented "victimology" testimony through

23  Carli Moncher ("Moncher"), a blind expert who was unfamiliar with the particular

24  facts of Almanza's case. (Tr. Oct. 1, 2013 at 14-87.) The testimony provided by

25  Moncher was scientifically unreliable and highly prejudicial, andshould have been

26  excluded. Because it was not excluded and the jury was allowed to rely on it when

27  determining guilt, Almanza's conviction fails under *Jackson v. Virginia*, 443 U.S.

28  307, 324 n.16 (1979) (requiring sufficient proof to convict a defendant of every

98

element of the crime charged); s*ee also In re Winship*, 397 U.S. 358, 361 (1970).

"Unlike an ordinary witness . . . an expert is permitted wide latitude to offer opinions, including those that are not based on firsthand knowledge or observation." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 592 (1993). Rule 702 accordingly permits a witness to present expert testimony only under strictly limited conditions, specifying that such testimony must be "based on sufficient facts or data," must be "the product of reliable principles and methods," and must involve the "reliabl[e]" application of those principles and methods to the facts of the case. Ariz. R. Evid. 702. In *Daubert*, which is the standard for expert testimony that has also been adopted by Arizona trial courts[12], the Supreme Court held that Federal Evidence Rule 702 (upon which Arizona Evidence Rule 702 is modeled) imposes a "gatekeeping role" upon trial courts reviewing requests to admit expert testimony. 509 U.S. at 597; *see also State ex rel. Montgomery v. Miller*, 321 P.3d 454, 463 (Ariz. Ct. App. 2014); *State v. Salazar-Mercado*, 325 P.3d 996, 1001 (Ariz. Ct. App. 2014); *State v. Steinle (Moran)*, 372 P.3d 939, 941 (Ariz. 2016) ("Our interpretation is guided, but not determined, by federal court decisions when our evidence rules mirror the federal rules." (citation omitted)). To discharge this duty, the trial court "must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Daubert*, 509 U.S. at 589. The burden falls upon the party putting forth the expert testimony to prove, by a preponderance of the evidence, that the testimony meets the requirements to be admissible. *Daubert v. Merrell Dow Pharm., Inc.*, 43 F.3d 1311, 1315 (9th Cir. 1995); *see also* Fed. R. Evid. 702 Advisory Committee Notes (2000 Amendments); Ariz. R. Evid. 702 cmt. (2012 Amendment); *Gaston v. Hunter*, 588 P.2d 326 (Ariz. Ct. App. 1978). Furthermore, the Supreme Court has held that *Daubert*'s basic gatekeeping obligation applies to *all* expert testimony. *Kumho Tire Co. v. Carmichael*, 526 U.S.

---

[12] *See, e.g.*, *Lear v. Fields*, 245 P.3d 911, 917 (Ariz. Ct. App. 2011).

1   137 (1999). Thus, the *Daubert* restrictions and analysis applied fully to Moncher's
2   expert testimony.

### A.   The trial court erred procedurally and substantively in admitting Moncher's "expert" testimony.

5   The inquiry regarding Moncher's expert testimony began on the first day of
6   trial before jury selection began. In discussing the expected witnesses, Almanza's
7   counsel raised concerns about the science of Moncher's testimony and expressed a
8   belief that Moncher's testimony would be "based on research that I believe is
9   questionable at best." (Tr. Sept. 30, 2013 a.m. at 45.) As a result of his concerns, he
10  requested to voir dire Moncher prior to her trial testimony, "to allow the Court to
11  make a determination whether . . . first of all, whether she is an expert; second of
12  all, whether the information that she is going to provide to the Court is good science,
13  . . . and third of all, whether it's relevant to the matter at hand." (Tr. Sept. 30, 2013
14  a.m. at 46.) Although Green did not specifically invoke the *Daubert* standard, it is
15  clear based on his request that he intended for the trial court to conduct a *Daubert*
16  hearing and the requisite analysis that accompanies it.

17  The trial court allowed the voir dire, however, while Green was attempting
18  to voir dire Moncher regarding her training, the studies upon which her testimony
19  is based, and her previous testimony in other cases, the trial court continually
20  interrupted and restricted his examination—either of its own accord or based on
21  sustained objections from the State. (Tr. Oct. 1, 2013 at 18-21.) As a result, trial
22  counsel was unable to develop anything more than a very cursory and superficial
23  background of Moncher's alleged expertise. (Tr. Oct. 1, 2013 at 18-21.)

24  Indeed, the trial court failed to undertake any inquiry into the reliability or
25  relevance of Moncher's opinions. Instead, the trial court admitted Moncher's
26  testimony on the basis of two questions by the State, neither of which addressed the
27  reliability of the science upon which she based her opinions:

28          Q:   Ms. Moncher, have you testified in the Pinal County

1    Superior Court before?

2    A:    Yes, I have.

3    Q:    Have you testified and been found to be qualified as
     an expert to testify about what you anticipate testifying to
4    today?

5    A:    Yes, I have.

6    (Tr. Oct. 1, 2013 at 20.) Then, after preventing any in depth inquiry into Moncher's

7    qualifications, based on her answers to these two questions, the trial court ruled the

8    testimony admissible.

9         This examination was not "the careful examination that *Daubert* and *Kumho*

10   *Tire* require." *United States v. Williams*, 506 F.3d 151, 162 (2d. Cir. 2007).

11   Almanza's trial counsel's main challenge to the admissibility of Moncher's

12   opinions was to the reliability of the methods and studies upon which she arrived at

13   these opinions. But, not once during the cursory discussion that comprised the trial

14   court's *Daubert* review did the court even address or acknowledge the question of

15   reliability. Instead, the trial court simply took this important and complex question

16   as a given, assuming that because Moncher had testified before, her methods were

17   reliable and skipping over this inquiry.

18        The trial court also conducted absolutely no inquiry into the relevance of

19   Moncher's testimony to the facts of Almanza's case. Moncher's testimony is

20   usually sought in cases where there is delayed disclosure of sexual abuse by child

21   victims. In those cases, the State believes that Moncher's testimony is necessary to

22   help the jury understand why a child would not disclose sexual abuse immediately.

23   However, that is not what happened here. In this case, A.W. told her mother and

24   brother about the alleged incident and the mother called the police that same day.

25   As a result, this testimony is not relevant to the facts in this case.

26        A trial court has wide discretion regarding its chosen method of inquiring

27   into the reliability of a proffered expert's opinions. *Kumho Tire*, 526 U.S. at 152.

28

101

1   But, "the trial court's broad latitude to make the reliability determination does *not*
2   include the discretion to abdicate completely its responsibility to do so." *Mukhtar*
3   *v. Cal. State Univ.*, 299 F.3d 1053, 1064 (9th Cir. 2002), *amended*, 319 F.3d 1073
4   (9th Cir. 2003), *overruled in part on other grounds by Estate of Barabin v.*
5   *AstenJohnson, Inc.*, 740 F.3d 457, 467 (2014); *accord Estate of Barabin*, 740 F.3d
6   at 464 ("The district court abused its discretion by admitting the expert testimony
7   without first finding it to be relevant *and reliable* under *Daubert*." (emphasis
8   added)). The trial court here abdicated its duty by failing to conduct a meaningful
9   inquiry into the reliability of Moncher's proffered expert opinions.

**B.    Moncher's proffered opinions do not satisfy the *Daubert* standard.**

**1.    The proffered foundation for Moncher's "expert" opinions did not provide a sufficient basis for the admission of her testimony under *Daubert*.**

13   The trial court's decision to admit Moncher's "expert" opinions was flawed
14   substantively, as well as procedurally, because those opinions could not have
15   satisfied an attentive *Daubert* gatekeeper. The State offered Moncher as an expert
16   qualified to testify about the experiences and behaviors of "victims of [child sexual]
17   abuse," (Tr. Oct. 1, 2013 at 33; *see also* Tr. Oct. 1, 2013 at 63-64), and the "study
18   of child victims of crimes" (Tr. Oct. 1, 2013 at 15). However, the State failed to
19   meet its burden of showing by a preponderance of the evidence that she could
20   reliably opine on that subject. *See* Fed. R. Evid. 702 Advisory Committee Notes
21   (2000 Amendments); Ariz. R. Evid. 702 cmt. (2012 Amendment); *Gaston v.*
22   *Hunter*, 588 P.2d 326 (Ariz. Ct. App. 1978). In fact, during the pre-trial voir dire of
23   Moncher to determine her qualifications as an expert, the State asked only two
24   questions, which did not sufficiently lay the foundation to satisfy the *Daubert*
25   gatekeeping standards. The trial court did not conduct a formal hearing or ask any
26   questions to determine the reliability of the scientific evidence that Moncher
27   intended to present. Furthermore, the trial court and the State actively prevented
28   Almanza's counsel in his attempts to elicit this type of information. (Tr. Oct. 1,

2013 at 18-21.) The fact that Moncher had previously testified is not sufficient to satisfy this standard since scientific evidence presented at trial—for example bite mark evidence,[13] hair sample analysis,[14] and forensic firearm or toolmark identification[15]—is often debunked as scientific knowledge develops. These examples show that, just because a certain type of science or expert testimony has been permitted or deemed sufficiently reliable once, does not mean that it can be taken for granted that it is always sufficiently reliable. A *Daubert* analysis is always required to ensure the continuing reliability and accuracy of the science and studies behind any expert's testimony.

The purported foundation for Moncher's opinions elicited during her actual trial testimony consisted of her education, training, experience, and the literature that she has reviewed. (Tr. Oct. 1, 2013 at 14-19, 27-29, 64-66.) But none of these foundations satisfy the standards under *Daubert*, *Kumho Tire*, or the applicable rules of evidence either.

---

[13] *See* Jordan Smith, *White House Report Concludes That Bite-Mark Analysis is JunkScience*, The Intercept (Sept. 7, 2016), https://theintercept.com/2016/09/07/white-house-report-concludes-that-bite-mark-analysis-is-junk-science; *see also* Radley Balko, *How the flawed 'science' of bite mark analysis has sent innocent people to prison*, The Washington Post (Feb. 13, 2015), https://www.washingtonpost.com/news/the-watch/wp/2015/02/13/how-the-flawed-science-of-bite-mark-analysis-has-sent-innocent-people-to-jail/

[14] *See* Spencer S. Hsu, *FBI admits flaws in hair analysis over decades*, The Washington Post (Apr. 18, 2015), https://www.washingtonpost.com/local/crime/fbi-overstated-forensic-hair-matches-in-nearly-all-criminal-trials-for-decades/2015/04/18/39c8d8c6-e515-11e4-b510-962fcfabc310_story.html

[15] *See* David P. Baldwin, Stanley J. Bajic, Max Morris, and Daniel Zamzow, *A Study of False-Positive and False-Negative Error Rates in Cartridge Case Comparisons*, (Apr. 7, 2014), https://afte.org/uploads/documents/swggun-false-postive-false-negative-usdoe.pdf; *see also* Clifford Spiegelman and William Tobin, 12 Law, Probability & Risk 115-133 (2013), https://doi.10.1093/lpr/mgs028; and "Absence of Statistical and Scientific Ethos: The Common Denominator in Deficient Forensic Practices," Journal of Statistics and Public Policy, https://tandfonline.com/doi/full/10.1080/2330443X.2016.1270175.

### i.    Education

Moncher testified that her education consists of a Bachelor's of Science degree in Criminal Justice and a Master's degree in Psychology. (Tr. Oct. 1, 2013 at 14-15.) The State did not explain how this education could provide a basis for Moncher to reach reliable conclusions about the experiences and behaviors of child sexual abuse victims, and it is not self-evident that it could. Moncher's education thus provided no sound basis for a *Daubert* reliability finding.

### ii.    Training

The majority of the trainings attended by Moncher, according to her CV, were provided by prosecution and law-enforcement entities, and the focus was on investigation and prosecution of sex offenses. This Court has observed that "a scientist's normal workplace is the lab or the field, not the courtroom or the lawyer's office." *Daubert*, 43 F.3d at 1317. It follows that a very significant fact to be considered in *Daubert* analysis is whether the expert "propos[es] to testify about matters growing naturally and directly out of research they have conducted independent of the litigation, or whether they have developed their opinions expressly for the purposes of testifying." *Id*. This insight applies with particular force here, because the bulk of Moncher's training was provided by the same interested parties that routinely call her to the stand to testify. Training in the art of testifying for the prosecution does not constitute a reliable basis for expressing expert opinions. *See Thomas J. Kline, Inc. v. Lorillard, Inc.*, 878 F.2d 791, 800 (4th Cir. 1989) ("it would be absurd to conclude that one can become an expert simply by accumulating experience in testifying"). But, when Almanza's trial counsel attempted to ascertain how often Moncher testified for the defense versus for the State, the State objected and the trial court sustained the objection. (Tr. Oct. 1, 2013 at 19.) Neither during her testimony at trial, and certainly not during her pre-trial voir dire, did the State nor Moncher explain how the training she had received provided a reliable basis for her proffered expert opinions.

104

### iii.    Literature

Moncher and the State also made references to her knowledge of "the literature" and vaguely-described "studies." (Tr. Oct. 1, 2013 at 16-18, 28-29, 34, 49, 66.) However, neither the State nor Moncher ever drew a connection between a particular opinion that she expressed and a specifically-identified study or piece of literature. In fact, there was no testimony at all naming any particular studies or literature on this topic. This fact belies any suggestion that "the literature" vindicated the trial court's admission of Moncher's expert testimony. The Supreme Court and the Ninth Circuit Court have found expert opinions inadmissible where close analysis of the literature purportedly supporting them failed to render them reliable. *See, e.g.*, *Gen. Elect. Co. v. Joiner*, 522 U.S. 136, 144-45 (1997) ("The studies [upon which the experts purported to rely] were so dissimilar to the facts presented in this litigation that is was not an abuse of discretion for the District Court to have rejected the experts' reliance on them."); *Domingo ex rel. Domingo v. T.K.*, 289 F.3d 600, 606 (9th Cir. 2002) ("the studies that were cited do not provide support for every necessary link in [the expert's] theory of causation."); *United States v. Rincon*, 28 F.3d 921, 924-25 (9th Cir. 1994) (party that proffered only insufficiently detailed article and general references to additional literature failed to establish admissibility of expert testimony). With no details about the "literature" and "studies" upon which Moncher purported to rely, the trial court had no basis upon which to conduct any analysis.

In this respect, Moncher's testimony violated Rule 702 as well as Rule 703, which "provides that expert opinions based on otherwise inadmissible hearsay are to be admitted only if the facts or data are 'of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject.'" *Daubert*, 509 U.S. at 595 (quoting Fed. R. Evid. 703); *see also id.* ("a judge assessing a proffer of expert scientific testimony under Rule 702 should also be mindful of other applicable rules"); *see also* Ariz. R. Evid. 703. As such, the

"literature" and "studies" vaguely referenced, did not provide a valid or sufficient basis for the trial court to admit Moncher's testimony and did not satisfy the *Daubert* standards.

### iv.   Experience

The final proffered foundation for Moncher's expert testimony was her experience, which consisted of "[j]ust over 1,700" forensic interviews of children who claimed to have been sexually abused. (Tr. Oct. 1, 2013 at 65.) But Moncher's experience interviewing children who *claimed* to have been abused provides no basis for her to reliably opine on the experiences and behavior of child sexual abuse victims because she does not know whether these children actually were sexually abused. The state did not show and Moncher did not testify that she had made any effort to determine whether the people she interviewed actually were "sexual abuse victims." Moncher's job as a forensic interviewer does not require her to determine whether or not something is truthful and does not require her to conduct any follow-up investigation to determine whether any of the children that she has interviewed were actually abused. Moncher has previously acknowledged that she does not make any effort to substantiate her interviewees' claims of abuse. Jury Trial Tr., *United States v. Young*, No. 3:13-cr-08084-SMM (D. Ariz. Jan. 10, 2014), ECF No. 224 at 757:5-10; Appellant's Opening Br., *United States v. Young*, No. 14-10160 (9th Cir. Dec. 4, 2014), ECF No. 10 at 18 & nn. 87, 88.

This fact invalidates any suggestion that Moncher's interviewing experience established the reliability of her expert opinions. The State did not proffer Moncher as an expert on accusers; it proffered her as an expert on victims. That was the capacity in which she testified and that was the premise underlying her testimony's purported relevance to the issues in Almanza's trial. But this theory of relevance was premised on the mere supposition that the individuals Moncher interviewed had actually been abused and mere supposition is not a proper basis for the admission of expert testimony. *Daubert*, 509 U.S. at 590. This missing link is

especially troubling in light of the fact that false reporting of child sexual abuse is a commonplace, and in some instances epidemic, phenomenon.[16] In fact, this Court has previously acknowledged that

> Moncher's testimony in particular may be insufficiently reliable to warrant admission. There is no indication from the Government's briefing that her knowledge of the "process of disclosure" is based on the behavior of known child sexual abuse victims, rather than merely on the behaviors of children who have alleged sexual abuse. Nor is there a valid basis for distinguishing those behaviors from those of children who have not been sexually abused.

*United States v. Woody*, No. CR-13-08093-PCT-NVW, 2018 WL 1851125, at *3 (D. Ariz. Apr. 22, 2015) (finding the government's argument that Moncher's testimony is exempt from *Daubert* standard is "without merit" in light of *Kumho Tire*).

### 2.   Moncher's testimony invaded the province of the jury.

It is established that "expert testimony should not invade[] the province of the jury," and that "expert testimony to bolster or impugn the credibility of a witness is properly excluded." *United States v. Rahm*, 993 F.2d 1405, 1413 (9th Cir. 1993) (internal quotation marks omitted). As the district court observed in *United States v. Woody*, the government's "principal purpose" in presenting Moncher's expert testimony is "plainly" to shore up the credibility of the alleged victims. The court specifically noted that, "[f]earing the victims will appear confused, inconsistent, or dishonest on the witness stand, the Government hopes to combat that perception through 'expert' testimony purporting to show that signs of disorientation are in fact compatible with telling the truth." *Woody*, 2015 WL 1851125, at *2. The court

---

[16] *See, e.g.*, David N. King, Ph.D. & Maureen Drost, B.A., *Recantations and False Allegations of Child Abuse: A Bibliography* (National Children's Advocacy Center 2005), https://icmec.org.wp-content/uploads/2015/10/Recantation-and-False-Allegations-Bibliography.pdf; *see also* Chris French, *False memories of sexual abuse lead to terrible miscarriages of justice*, The Guardian, Nov. 25, 2010, http://www.theguardian.com/science/2010/nov/24/false-memories-abuse-convict-innocent (last visited July 17, 2018).

1    continued to comment that "Federal Rules of Evidence 403 and 702 do not permit

2    vouching of this kind." *Id*. This insight applies equally to Almanza's case.

3         Moreover, even if such vouching were permissible, the jurors do not need

4    Moncher's expertise with respect to many of the matters about which she testified.

5    Factors such as discomfort, exhaustion, guilt, or shame which may affect a young

6    person's disclosure of sexual abuse are "easily understood by lay people and do not

7    require expert analysis." *Commonwealth v. Dunkle*, 602 A.2d 830, 836 (Pa. 1992).

8    Indeed, this is not a delayed disclosure case where an explanation of unusual or

9    unexpected behavior by the victim needs to be explained to a jury. Instead, the jury,

10   who should serve as the sole "lie detector in the courtroom," was perfectly capable

11   of assessing the credibility, or lack thereof, of A.W.'s testimony. *United States v.*

12   *Barnard*, 490 F.2d 907, 912 (9th Cir. 1973); *cf. United States v. Brewer*, 783 F.2d

13   841, 843 (9th Cir. 1986) (expert testimony regarding deficiencies in eyewitness

14   identifications are unnecessary where "jury could determine from observing the

15   witnesses and from hearing their testimony on direct and cross-examination

16   whether or not the witnesses were accurate in their perceptions" of the perpetrator).

17   However, the jury's "lie detector" function was usurped by Moncher's testimony,

18   which thus, invaded the province of the jury.

19         **3.     Moncher's testimony violated Rule 403.**

20         The admission of Moncher's "expert" testimony violated Arizona Rule of

21   Evidence 403, which also follows Federal Rule of Evidence 403 and "permits the

22   exclusion of relevant evidence 'if its probative value is substantially outweighed by

23   the danger of unfair prejudice, confusion of the issues, or misleading the jury….'"

24   *Daubert*, 509 U.S. at 595 (quoting Fed. R. Evid. 403); *see also* Ariz. R. Evid. 403.

25   "Expert evidence can be both powerful and quite misleading because of the

26   difficulty in evaluating it," and trial courts should accordingly "exercise[] more

27   control over experts than over lay witnesses" when applying Rule 403. *Id*. (internal

28   quotation marks omitted). Moncher's "expert" testimony fundamentally lacked the

type of probative value that *Daubert* and Rule 702 require. But even if her testimony carried a measure of legitimate probative value, its potential to unfairly prejudice Almanza was severe, and substantially outweighed whatever probative value it may have had.

### C.   Moncher has a reputation for dishonesty and fraud.

In 2017, the Arizona Department of Public Safety ("DPS") conducted an investigation of Moncher and her billing practices. The investigation focused on the period of time from March 23, 2014 through February 1, 2017, which includes the time period of Almanza's trial. The conclusion of the investigation was that during this time period, Moncher received compensation from various counties on thirty-two different dates for her expert witness assistance, while simultaneously claiming compensation from her employer, Safe Child Center. The DPS investigation revealed a total of 199 hours of compensation for private work with various county attorney offices while claiming a total of 288.51 hours of compensation from Safe Child Center for the same time period. As such, DPS recommended that Moncher be charged with several felonies related to her falsified billing practices for expert testimony for the State, including: Fraudulent Schemes and Artifices, Forgery, and Theft. Moncher's continued and criminal dishonesty with regard to her work as an expert witness undermines the credibility of her testimony.

The admission of unreliable and unsupported evidence, as well as the trial court's failure to serve its gatekeeping function, renders Almanza's conviction unconstitutional and he is entitled to relief.

### Claim Eleven

**The reasonable-doubt instruction given to the jury impermissibly lowered the State's standard of proof and shifted the burden to Almanza, in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.**

This claim was not raised in state court. Almanza he can overcome any default of this claim by showing cause and prejudice, including because of

ineffective assistance of appellate and state post-conviction counsel. *See Martinez*, 566 U.S. at 9; *Carpenter*, 529 U.S. at 453; *Strickland*, 466 U.S. at 687-88; *but see Davila*, 137 S. Ct. 2058. Almanza will demonstrate at an evidentiary hearing that appellate and post-conviction counsel fell below the standards of minimally competent attorneys and that those failures prejudiced him. Alternatively, he alleges that any procedural bar is not adequate or independent or that imposing default would be a miscarriage of justice. Because this claim has not been adjudicated by the Arizona state courts, the limitations on relief imposed by 28 U.S.C. § 2254(d) do not apply to this Court's review, and the Court may consider the merits of the claim de novo. *Dickens v. Ryan*, 740 F.3d 1302, 1320 (9th Cir. 2014) (en banc). Almanza incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Petition.

In the final jury instructions for Almanza's trial, the court defined the reasonable-doubt standard using the Arizona Supreme Court's articulation in *State v. Portillo*, 898 P.2d 970, 974 (Ariz. 1995). The court instructed:

> The State has the burden of proving the defendant guilty beyond a reasonable doubt. This means the State must prove each element of each charge beyond a reasonable doubt. In civil cases, it is only necessary to prove that a fact is more likely true than not or that its truth is highly probable. In criminal cases such as this, the State's proof must be more powerful than that. It must be beyond a reasonable doubt.
>
> Proof beyond a reasonable doubt is proof that leaves you firmly convinced of the defendant's guilt. There are very few things in this world that we know with absolute certainty, and in criminal cases the law does not require proof that overcomes every doubt. If, based on your consideration of the evidence, you are firmly convinced that the defendant is guilty of the offense charged, you must find him guilty of that charge. If, on the other hand, you think there is a real possibility that he is not guilty of the offense charged, you must give him the benefit of the doubt and find him not guilty of that charge.

1    (ROA 113 at 2.) The phrase "firmly convinced" reduced the State's standard of

2    proof to something less than reasonable doubt. It is akin to "clear and convincing."

3    *See, e.g.*, *State v. Perez*, 976 P.2d 427, 442 (Haw. Ct. App. 1998), *aff'd in part,*

4    *rev'd in part on other grounds*, 976 P.2d 379 (Haw. 1999). The instructions further

5    shifted the burden of proof, requiring Almanza to prove that there is a "real

6    possibility that he is not guilty." *See, e.g.*, *United States v. Walton*, 207 F.3d 694,

7    705 (4th Cir. 2000) (King, J., dissenting) (per curiam) (discussing criticism of such

8    instructions and citing *United States v. Porter*, 821 F.2d 968, 973 (4th Cir. 1987),

9    and Lawrence M. Solan, *Refocusing the Burden of Proof in Criminal Cases: Some*

10   *Doubt About Reasonable Doubt*, 78 Tex. L. Rev. 105 (1999)).

11          The reasonable-doubt standard "is indispensable to command the respect and

12   confidence of the community in applications of the criminal law." *In re Winship*,

13   397 U.S. 358, 364 (1970). "It is critical that the moral force of the criminal law not

14   be diluted by a standard of proof that leaves people in doubt whether innocent men

15   are being condemned." *Id.* A lesser standard of proof, such as "firmly convinced,"

16   violates a defendant's rights to due process. *See id.* As the Supreme Court has

17   explained, "'[a]ttempts to explain the term 'reasonable doubt' do not usually result

18   in making it any clearer to the minds of the jury.'" *Holland v. United States*, 348

19   U.S. 121, 140 (1954) (quoting *Miles v. United States*, 103 U.S. 304, 312 (1880)).

20   Here, the instructions were more than confusing. They lowered the State's standard

21   of proof and shifted the burden of proof to Almanza. As such, the instructions

22   violated Almanza's rights to a jury trial and due process and he is entitled to relief.

23                                   **Claim Twelve**

24          **Almanza is actually and legally innocent of the offense of Sexual**
       **Conduct with a Minor.**

25

26          This claim was not raised in state court. Almanza  can overcome any default

27   of this claim by showing cause and prejudice, including because of ineffective

28   assistance of appellate and state post-conviction counsel. *See Martinez*, 566 U.S. at

9; *Carpenter*, 529 U.S. at 453; *Strickland*, 466 U.S. at 687-88; *but see Davila*, 137 S. Ct. 2058. Almanza will demonstrate at an evidentiary hearing that appellate and post-conviction counsel fell below the standards of minimally competent attorneys and that those failures prejudiced him. Alternatively, he alleges that any procedural bar is not adequate or independent or that imposing default would be a miscarriage of justice. Because this claim has not been adjudicated by the Arizona state courts, the limitations on relief imposed by 28 U.S.C. § 2254(d) do not apply to this Court's review, and the Court may consider the merits of the claim de novo. *Dickens*, 740 F.3d at 1320. Almanza incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Petition.

Almanza is actually innocent of the offense of Sexual Conduct with a Minor under *Schlup v. Delo*, 513 U.S. 298, 319-22 (1995) *House v. Bell*, 547 U.S. 518 (2006), and *Carriger v. Stewart*, 132 F.3d 463 (9th Cir. 1997). The *Schlup* standard requires that a petitioner demonstrate that "more likely than not, in light of the new evidence, no reasonable juror would find him guilty beyond a reasonable doubt— or, . . . that more likely than not any reasonable juror would have reasonable doubt." *House*, 547 U.S. at 538. *Schlup* also permits the federal court to consider how reasonable jurors "would react to the overall, newly supplemented record," including "consideration of 'the credibility of the witnesses presented at trial.'" *Id.* at 538-39 (quoting *Schlup*, 513 U.S. at 330); *see also Del Prete v. Thompson*, No. 10 C 5070, 2014 WL 296094, at *44 (N.D. Ill. Jan. 27, 2014) (in the application of *Schlup* the Court need not accept the credibility of the prosecution's witnesses at the underlying trial). Furthermore, in determining if a colorable showing has been sufficiently made, the Court must accept the allegations of the petition as true. *See Wolfe v. Johnson*, 565 F.3d 140, 169-70 (4th Cir. 2009) (when assessing a request for evidentiary hearing to prove gateway innocence claim under *Schlup*, the court must assume pleaded fact allegations to be true).

As is discussed throughout this Petition, there was a significant amount of

relevant evidence regarding Almanza's innocence that was not presented at trial.[17]
Almanza has adamantly maintained his innocence since before his arrest. (Ariz. Ct.
App. PFR, Pet. for Review, Feb. 21, 2017, Ex. D at 2.) There is no physical or DNA
evidence that ties Almanza to this offense. In fact, even the medical evidence that
allegedly shows that this offense was committed is not definitive and conclusive on
that issue and leaves open room for other causes of injury or, in the very least, the
distinct possibility that there was no penetration of the vulva, which is a required
element of this offense. (*See* Claim 6 *supra*.)

Furthermore, there is ample evidence undermining the credibility of the
State's main witnesses. Quinn has a reputation for dishonesty, drug use, and
manipulation. (Ariz. Ct. App. PFR, Pet. for Review, Feb. 21, 2017, Ex. D at 2.) It
is widely believed that she manipulates the legal system for her advantage. (*See*
Claim 1(A).) It is also believed that her children would do anything to get her
attention. This information suggests that A.W. either fabricated this story to get her
mother's attention or that her mother coached A.W. that this offense had happened
in order to turn Almanza's arrest and conviction to her advantage. Quinn did not
like Almanza and he was aware that she was engaged in an affair with an underage
boy. She was concerned that he would report that and some of her other activities
related to poor job performance to their boss and she would lose her job. Having
Almanza arrested and imprisoned not only prevented him from using her actions
against her, but also enabled her to collect a financial settlement from the Double
Check Ranch.

A.W.'s continually changing account of the sequence of events of the day of
the offense also calls her credibility into question. A.W.'s assertion that Almanza
hit her on the back with a shovel, despite the fact that she had no marks or injuries

---

[17]Almanza anticipates including and disclosing additional evidence that is not
currently in the court record as part of his Motion for Evidentiary Development,
which he requests this Court's permission to file following the briefing of his
claims.

on her back, also undermines the credibility of her story. This incident is also completely illogical. Why would Almanza hit A.W. on the back with a shovel? If Almanza actually had committed this offense, it is much more likely that Almanza would be nice to A.W. in an effort to prevent her from disclosing the incident than that he would hit her, potentially causing injury and physical evidence of the encounter that might draw questions from her mother.

Boggs's credibility regarding his account that Almanza confessed to him is similarly unreliable. As a result of Almanza's illiteracy, inability to speak English, and general lack of education, he was and continues to be very confused about these legal proceedings. He did not understand what he was charged with or why he was arrested. He also could not read any of the discovery or legal paperwork that was provided to him. However, Boggs had access to Almanza's paperwork and the ability to read it. Boggs also was facing prison time on his own case and had every incentive to take advantage of Almanza's confusion and to invent a confession in order to obtain a reduced sentence for himself. Although his sentence does not appear to have actually changed, it is clear from the transcript of his conversation with the police that he was hoping to receive some kind of benefit from providing them with the information. (*See* Trial Ex. 114 at 21-22 ("I'm trying to get back out there as quick as I can for my family and kids. That's why, you know, if I could get my sentence mitigated, where they bring it down to a year, nine months, like I said, it would put me out a lot quicker.").) Additionally, once Boggs had spoken with the police and his plea had been updated, if he had not testified against Almanza and continued to tell the same story, he would have lost that original plea and been subject to a worse plea offer or no plea offer in the future. (Trial Ex. 127; Trial Ex. 128.)

Finally, as explained more fully in Claim 6 *supra*, the State did not and cannot prove the elements of this offense in this case. Both the medical expert testimony and the testimony of A.W. are unclear about whether the actual location of the

1   injury is within the vulva and whether the vulva was actually penetrated. (*See* Trial
2   Ex. 113 at 9; Tr. Oct. 2, 2013 at 224, 232; Tr. Oct. 2, 2013 at 230; Trial Ex. 102 at
3   2; Trial Ex. 110 at 7.) This penetration is an essential element of the offense of
4   Sexual Conduct with a Minor.

5       In order to prove every element of Sexual Conduct with a Minor, the State
6   was obliged to prove that Almanza intentionally or knowingly penetrated A.W.'s
7   vulva. However, the State did not prove that this was Almanza's intention. The
8   testimony presented by the State suggested that A.W. sustained a very small scrape
9   near her vulva, which could or could not have been caused by a fingernail scratch,
10  and that, based on the accounts of the Detectives and Boggs, Almanza's finger may
11  have scratched A.W. or even possibly entered her vulva. However, none of the
12  testimony demonstrates that this act was done intentionally or knowingly. At most,
13  based on Almanza's own statements to the Detectives after a coercive and
14  intimidating interrogation, if Almanza's finger did enter A.W.'s vulva, it was done
15  accidentally. (Trial Ex. 116 at 71 ("I not put a finger in – I not put a
16  fingers . . . maybe an accident, I don't know, but I no do that. I no do that . . ."); *see*
17  *also* Trial Ex. 116 at 89-91 (continually denying committing this act despite
18  Detective Randall Snyder's repeated insistence that he did it).)

19      Almanza is actually innocent of Sexual Conduct with a Minor. *See generally*
20  *Schlup*, 513 U.S. at 319-22; *House*, 547 U.S. at 536-37; *Carriger*, 132 F.3d at 476-
21  77. Based on the substantial amount of evidence that was and was not presented at
22  trial, it is more likely than not that, if presented with all of this evidence, any
23  reasonable juror would have reasonable doubt about what really happened in this
24  case. Accordingly, Almanza is entitled to relief.

25                              **Claim Thirteen**
26      **Almanza's conviction and sentence must be vacated due to the**
        **cumulative prejudicial effect of the errors in this case.**
27
28      The combination of errors in this case deprived Almanza of his fundamental

constitutional rights including his right to a fair trial, trial by jury, due process, effective assistance of counsel, presentation of a defense, reliable determination of guilt and penalty, and fundamental fairness. *See Taylor v. Kentucky*, 436 U.S. 478, 487 n.15 (1978). As a result of the cumulative effect of the errors in the trial against Almanza, his conviction and sentence are unlawfully and unconstitutionally imposed, in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution. When evaluating cumulative error, "*all* errors are relevant to the sentence." *Darks v. Mullin*, 327 F.3d 1001, 1018 (10th Cir. 2003) (emphasis added). Almanza incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Petition. In addition, he re-urges all objections, arguments, and claims of error made at trial and during direct appeal and post-conviction proceedings, and incorporates by reference herein those prior objections, arguments, and claims of error.

The Ninth Circuit Court of Appeals recognizes that, even in cases where no single trial error examined in isolation is sufficiently prejudicial to warrant reversal, the cumulative effect of multiple errors may still prejudice a defendant. *See Parle v. Runnels*, 505 F.3d 922, 934 (9th Cir. 2007) (finding habeas relief warranted when combined effect of multiple trial errors resulted in injurious effect on jury's verdict); *Alcala v. Woodford*, 334 F.3d 862, 894-95 (9th Cir. 2003) (affirming grant of habeas relief where multiple errors by court and counsel deprived defendant of a fundamentally fair trial); *Killian v. Poole*, 282 F.3d 1204, 1211 (9th Cir. 2002) (stating that the cumulative effect of errors may be so prejudicial as to require reversal); *Harris ex rel. Ramseyer v. Wood*, 64 F.3d 1432, 1438-39 (9th Cir. 1995) (holding that the cumulative impact of numerous deficiencies in defense counsel's performance was prejudicial to the defense, rendering the proceedings improper and warranting habeas relief); *Mak v. Blodgett*, 970 F.2d 614, 622 (9th Cir. 1992) (per curiam) (finding that counsel's deficiencies taken in combination with two other errors constituted a denial of petitioner's due process rights).

As the preceding claims illustrate, multiple grievous errors were committed during Almanza's trial proceedings. Even if the above errors are deemed harmless when viewed individually, their cumulative effect substantially prejudiced Almanza, and when viewed cumulatively in the totality of the circumstances, Almanza did not receive a fair trial or sentencing. "[T]he cumulative effect of two or more individually harmless errors has the potential to prejudice a defendant to the same extent as a single reversible error." *Darks*, 327 F.3d at 1018 (internal quotation marks and citations omitted).

Here, the cumulative effect of the errors in this case resulted in an abridgment of the fundamental fairness of the trial process during all phases. Each of these errors deprived Almanza of important constitutional rights including, but not limited to, his right to due process, equal protection, effective counsel, to present a defense and confront the witnesses against him, an impartial jury, and to be free of cruel and unusual punishment.

The aggregate harm of these constitutional violations warrants the granting of this Petition without any determination of whether these violations substantially affected or influenced the jury's verdict. *Brecht*, 507 U.S. at 638 n.9. Furthermore, these constitutional violations so infected the integrity of the proceedings that the errors cannot be deemed harmless. In any event, these violations of Almanza's rights had a substantial and injurious effect or influence on both the guilt and penalty judgments, rendering them fundamentally unfair. Considering all the errors above, this Court must conclude that Almanza was denied a fair trial and that he is entitled to relief.

**PRAYER FOR RELIEF**

WHEREFORE, Almanza respectfully prays this Court to:

1.     Order that Almanza be granted leave to conduct discovery pursuant to Rule 6 of the Rules Governing § 2254 Cases and permit Almanza to utilize the processes of discovery set forth in Federal Rules of Civil Procedure 26-37, to the extent

necessary to fully develop and identify the facts supporting his Petition, and any defenses thereto raised by Respondents' Answer;

2.     Order that upon completion of discovery, Almanza be granted leave to amend his Petition to include any additional claims or allegations not presently known to him or his counsel, which are identified or uncovered in the course of discovery and that Almanza be granted leave to expand the record pursuant to Rule 7 of the Rules Governing § 2254 Cases to include additional materials related to the Petition;

3.     Grant an evidentiary hearing pursuant to Rule 8 of the Rules Governing § 2254 Cases at which proof may be offered concerning the allegations of this Petition;

4.     Issue a writ of habeas corpus to have Almanza brought before this Court to the end that he may be discharged from his unconstitutional confinement and restraint;

5.     In the alternative to the relief requested in Paragraph 4, if this Court should deny the relief as requested in Paragraph 4, issue a writ of habeas corpus to have Almanza brought before it to the end that he may be relieved of his unconstitutional sentence;

6.     Grant such other relief as may be appropriate and dispose of the matter as law and justice require.

        Respectfully submitted this 26th day of July, 2018.

                                        Jon M. Sands
                                        Federal Public Defender
                                        District of Arizona

                                        Dale A. Baich
                                        Alexandra Hicks LeClair
                                        Assistant Federal Public Defenders

                                        s/ Alexandra H. LeClair
                                        Counsel for Petitioner

1

**Certificate of Service**

2          I hereby certify that on July 26, 2018, I electronically filed the foregoing

3    Petition for Writ of Habeas Corpus with the Clerk's Office by using the CM/ECF

4    system.  I certify that all participants in the case are registered CM/ECF users and

5    that service will be accomplished by the CM/ECF system.

6

7    s/ Jacci Lastra
     Assistant Paralegal
8    Capital Habeas Unit

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

119