# EXHIBIT A

IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

IN AND FOR THE COUNTY OF PINAL

THE STATE OF ARIZONA,           )     2 CA-CR 2014-0034
                                )
              Plaintiff,         )     No. CR201103026
                                )
        -vs-                     )
                                )
FERNANDO SEGOVIANO ALMANZA,      )
                                )
              Defendant.         )
_____)


Florence, Arizona
September 30, 2013
8:48 a.m.


BEFORE:   The Honorable Boyd T. Johnson,
          Judge of the Superior Court


REPORTER'S TRANSCRIPT OF PROCEEDINGS

JURY TRIAL, DAY 1


(COPY)

PREPARED FOR:
Arizona Attorney General
Criminal Appeals Section


REPORTED BY:
Jacquelyn A. Allen, RPR
AZ Certified Reporter No. 50151

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

<u>I N D E X</u>

M O T I O N S   T E S T I M O N Y

<u>WITNESS:</u>                                                      <u>PAGE</u>

DETECTIVE RANDALL SYNDER

    Direct Examination by Mr. Long ........... 51
    Cross-Examination by Mr. Green ........... 61
    Redirect Examination by Mr. Long ........ 73

E X H I B I T S

STATE'S EXHIBITS

| <u>NO</u>. | <u>DESCRIPTION</u> | <u>PAGE<br>IDENTIFIED</u> | <u>PAGE<br>MARKED</u> |
|---|---|---|---|
| 1-115 |  |  | 4 |
| 116 | Transcript | 70 | 4 |
| 117-126 |  |  | 4 |

1                    **A P P E A R A N C E S**

2     On Behalf of the State:

3              PINAL COUNTY ATTORNEY'S OFFICE
               By:  Matthew Long, Deputy County Attorney
4                    Bureau Chief
                     Major Offenders Bureau
5                  Thomas Kohler, Deputy County Attorney
               P. O. Box 887
6              Florence, Arizona 85132

7

          On Behalf of the Defendant:
8
               COOPER & RUETER, L.L.P.
9              By:  Paul Green
               P. O. Box 15005
10             Casa Grande, Arizona 85130-5005

11

12    ALSO PRESENT:

13             Detective Randy Snyder, Plaintiff's Case Agent
               Patrick Cote, Defense Investigator
14             Sabine Michael, Court Interpreter
               Danira Marinez, Court Interpreter
15             Laura Anderson, Court Interpreter

16

17

18

19

20

21

22

23

24

25

```
 1                                    Florence, Arizona
                                      September 30, 2013
 2                                    8:48 a.m.

 3              (Marked for identification State's

 4    Exhibits Nos. 1 through 126 before the proceedings

 5    began.)

 6         REPORTER'S TRANSCRIPT OF PROCEEDINGS

 7                   (The proceedings began outside the presence

 8    of the jury and with the presence of Sabine Michael,

 9    court interpreter.)

10                   THE COURT:  CR201103026, State versus

11    Fernando Segoviano Almanza.  This is the date and time

12    set for trial to begin.  Actually, it's about 15 minutes

13    before the time.

14                   The attorneys are here.  Mr. Long is

15    present, Mr. Kohler for the State; Mr. Green is present

16    with his client, who is present, along with their

17    investigator and, I assume, the investigator for the

18    State.

19                   MR. LONG:  Yes, sir.

20                   THE COURT:  Let me -- this is a Judge Olson

21    case.  Judge Olson asked me actually last week to cover

22    the trial, and I don't think I committed to doing it

23    until Wednesday or Thursday so a minute entry wasn't

24    sent out.  And I'm guessing that this is actually the

25    first time you knew for sure that I was covering the
```

1  okay.

2          MR. LONG:  Right.  And the only one that

3  I'm aware of is the voluntariness --

4          THE COURT:  No.

5          MR. LONG:  -- motion to suppress.

6          THE COURT:  There's a motion to suppress

7  evidence.  It's Mr. Huggins' kind of suppress-

8  everything-because-the-police-did-everything-wrong

9  motion.

10         MR. LONG:  Sure.

11         THE COURT:  Okay.  Mr. Huggins -- I've seen

12  that motion before.

13         In any event, but the State did file a

14  response to it.  So at one time or another somebody was

15  aware of it, but there are no replies.

16         And I take it, Mr. Green, you didn't intend

17  to file replies?

18         MR. GREEN:  Your Honor, I did not file a

19  reply, and I guess I don't intend to at this point.

20         THE COURT:  Okay.  Well, once the area --

21  once the issue of voluntariness has been raised, the

22  Court is obligated to make a ruling on it.  They are --

23  presumptively any statement is involuntary.  So I

24  suspect before we start the jury trial we're going to

25  have to conduct some form of evidentiary hearing on the

1    two -- on the issue.

2              And the way I read it is they're basically

3    an intertwined issue, so we can do it in one hearing.

4              Do you have any problem with that,

5    Mr. Long?

6              MR. LONG:  No, Judge.

7              THE COURT:  Mr. Green?

8              MR. GREEN:  No, Your Honor.

9              However, as part of the evidentiary

10   hearing, I will be requesting that the Court review the

11   recording and the transcript of the interview.

12             THE COURT:  Okay.  The State has attached a

13   copy of the transcript to its response, and I have

14   reviewed that.  I obviously haven't heard the recording.

15   Is there some difference between the recording and the

16   transcript?

17             MR. GREEN:  There is, Your Honor.  And I

18   don't know if the Court has seen, but there are two

19   pieces to this transcript.  There's the transcript that

20   was done by Mr. --

21             MR. COTE:  Garr.

22             MR. GREEN:  -- Garr, and then there was an

23   additional transcript that was done by the interpreters'

24   office as to those sections that are in Spanish on the

25   recording.

1      THE COURT:  You know, now that I look at
2  it, inside the file there is an envelope that has a CD
3  or a disk in it.  It's not marked in any way, but it was
4  attached to the State's response.

5      Okay.  Here's the English interview.  And
6  you say the interpreters' office separately did a
7  translation?

8      MR. GREEN:  And Your Honor, that is the
9  interview, I believe -- at least, that's what mine is --
10  the interview with Fernando Almanza.

11      THE COURT:  Right.

12      MR. GREEN:  And Your Honor, the reason I
13  ask that is because it's my opinion that in listening to
14  the interview, it's much more clear as to exactly what
15  my client understood and didn't understand than it is
16  from the language that's in the paper transcript.

17      And it's our argument, Your Honor, that
18  most of the interview was done in English, and my
19  client, while he professes to speak English, does not
20  speak English well.  He also does not read English and
21  he does not read Spanish.

22      THE COURT:  I can't tell from the
23  transcript but how long is the interview?

24      MR. LONG:  Pretty long, Judge.

25      THE COURT:  An hour?

1          MR. LONG:  An hour, hour and 20 minutes I

2     want to say.

3          THE COURT:  So obviously we're not going to

4     get any jury selection done, if that's what I do, at

5     least until probably after lunch.  Is that what you're

6     telling me?

7          MR. GREEN:  I believe that's true, Your

8     Honor, but I do request -- I believe that it's important

9     as to the issue of voluntariness that the Court hear

10    that.

11         THE COURT:  Okay.  Do you have any input?

12         MR. LONG:  I certainly don't have an

13    objection to the Court reading the -- or watching the

14    actual interview.

15         THE COURT:  Is it an audio or is it one

16    that I have to run through the computer?

17         MR. LONG:  Judge, it's audio and -- just

18    audio, Judge, so it's pretty easy to run through.

19         THE COURT:  I can run it on a CD, on a

20    tape -- a CD deck?

21         MR. LONG:  Yes, sir.

22         THE COURT:  Okay.  Then I guess I'll have

23    to do it.  Want me to do that before I hear testimony?

24         MR. GREEN:  Yes.  I believe that would

25    be --

1          THE COURT:  You think that might be
2  helpful?

3          MR. GREEN:  It would be, Your Honor, yes.

4          MR. LONG:  And I think it might be
5  dispositive to the State's issues, so I -- if the Court
6  is going to do that, I guess I'd withhold offering
7  testimony unless the Court determined that it was
8  necessary after listening to it.

9          THE COURT:  Okay.  Well, the first thing we
10 need to do, then, is notify the Jury Commissioner to
11 tell the jurors to all go away and come back after
12 lunch, which I suspect means we'll lose some of them
13 anyway.  And I don't think what you want me to do is
14 impanel a jury before I've made that decision.  I think
15 that might not be appropriate.  So we'll tell the Jury
16 Commissioner that as soon as I take a break.

17         What I have done as kind of a time-saver --
18 Todd, if you would, please, for each of you, one to each
19 of the attorneys -- there is a copy of what I would be
20 using for preliminary instructions once we seat a jury.
21 You know, there are things I'd normally do a couple
22 weeks before now that aren't done because I -- this
23 wasn't my case.  I did not see from either one of you
24 proposed jury instructions.

25         MR. KOHLER:  Your Honor, the State has

1    those prepared.  There's one more that I'll be adding,

2    but I will be providing a copy of that to the Court

3    today.

4                THE COURT:  Okay.  Generally I would have

5    wanted them this morning if not the end of last week.

6                I did not also -- Todd, if you would

7    again -- I also did not see a final witness list, which

8    normally I would have told the attorneys to deliver to

9    me the Friday before trial.

10               I do have from the file -- well, what

11   you're now getting is a draft of the final instructions

12   just in general, from the Court just in general.

13   They're not definitive.

14               But I did get from the discovery from the

15   State a potential witness list.  There was an initial

16   disclosure in December of last year -- I'm sorry.

17   December of -- my note says '11, 2011, and then a

18   supplement April of last year and January of this year.

19   Let me read those and you can correct me --

20               MR. LONG:  Judge, I have a final witness

21   list, a pared-down list, I believe --

22               THE COURT:  Good.

23               MR. LONG:  -- if the Court would like.

24               THE COURT:  Oh, yeah.

25               MR. LONG:  I do have some strike-throughs,

1   which are not anticipated but certainly potential

2   witnesses.

3               THE COURT:  Well, then I'll need to read

4   them to the jury.

5               Interesting.  Potentially Patrick Gard from

6   your office?

7               MR. LONG:  Yes, sir.  As well as Nicole

8   Severson.

9               THE COURT:  Severson.

10              MR. LONG:  Severson.

11              THE COURT:  You know, I'm not sure that

12  calling a member of your office might not create a

13  conflict for prosecution purposes, especially somebody

14  that theoretically I believe you supervise, don't you?

15              MR. LONG:  No, sir.

16              THE COURT:  Oh, you don't?  Okay.

17  Interesting.  Well, let's take a look.

18              Did you get a copy of this?

19              MR. GREEN:  I do not have a copy of that.

20              THE COURT:  Let me read the names and tell

21  me if you have it.

22              And I take it the AW in the indictment is

23  Ada Wilhelmi?

24              MR. LONG:  Yes, Judge.

25              THE COURT:  She was 4 at the time of the

```
1    incident?

2                    MR. LONG:  Yes, sir.

3                    THE COURT:  I have Carli Moncher, Ada

4    Wilhelmi, potential witness Kathy Bodwell.

5                    What I need when I talk to the jury is

6    general locations.  Now, Ada is, of course, the victim,

7    so you don't have to give it on her.

8                    Who is Carli Moncher?

9                    MR. LONG:  She's from Flagstaff, Judge.

10                   THE COURT:  Flag?  Okay.  Kathy Bodwell?

11                   MR.  LONG:  She's from Tucson.

12                   THE COURT:  Kathryn Quinn?

13                   MR. LONG:  She's the victim's mother.

14                   THE COURT:  Oh, which would be the

15   representative, so I don't need to do that.

16                   Jack?

17                   MR. LONG:  She's the victim's brother -- he

18   is the victim's brother.

19                   THE COURT:  Minor?

20                   MR. LONG:  Yes, and resides with the mother

21   and the victim.

22                   THE COURT:  Okay.  Deputy Pecora?

23                   MR. LONG:  He's with the Pinal County

24   Sheriff's Office.

25                   THE COURT:  PCSO?
```

1      MR. LONG:  PCSO.

2      THE COURT:  Detective Snyder.  PCSO?

3      MR. LONG:  Yes, sir.

4      THE COURT:  John Boggs.

5      MR. LONG:  John Boggs is from the Superior

6  area.

7      THE COURT:  I think I recognize his name.

8      Patrick Gard, obviously from the County

9  Attorney's Office.

10      Nicole Severson, private attorney.  And she

11  is out of Casa Grande, is she?

12      MR. GREEN:  No, Your Honor.  She is in --

13      THE COURT:  Maricopa?

14      MR. GREEN:  I want to say, yeah, she's in

15  Maricopa County, but I want to -- no, she's moved from

16  Maricopa.

17      THE COURT:  Oh, okay.

18      MR. GREEN:  I believe she's in Gilbert now,

19  but I'm not positive.  It's Gilbert and Chandler.

20  Southeast Valley somewhere.

21      THE COURT:  Okay.  Nikki Petrin?

22      MR. LONG:  She's with the Department of

23  Public Safety.

24      THE COURT:  DPS, oh, that's right.  So is

25  Peggy Toporek?

1      MR. LONG:  That's correct.

2      THE COURT:  Dr. Julie Klein.  Tucson?

3      MR. LONG:  Yeah, Tucson Medical Center.

4      THE COURT:  Jackie Hess?

5      MR. LONG:  ChildHelp, Phoenix.

6      THE COURT:  Sharon Welch?

7      MR. LONG:  And she is out of Tucson.  She's

8  a SANE nurse.

9      THE COURT:  A what nurse?

10      MR. LONG:  A SANE nurse, Sexual Assault

11  Nurse Examiner, out of -- I forget which agency she's

12  with.

13      THE COURT:  Let me see.  The original was

14  listed as Southern Arizona something.

15      MR. LONG:  That's correct, Judge.  It's an

16  advocacy center in Tucson.

17      THE COURT:  And that's all the State has

18  listed, correct?

19      MR. LONG:  Yes, sir.  We have potential

20  rebuttal and impeachment witnesses, but the State

21  doesn't anticipate calling any additional witnesses.

22      THE COURT:  Are there any other potential

23  rebuttal witnesses other than what you have here?

24      MR. LONG:  We do have, I suppose we should

25  add Sergeant Louie Vargas.

1    THE COURT:  Sergeant --

2    MR. LONG:  He's with --

3    DETECTIVE SNYDER:  Pinal County.

4    MR. LONG:  -- PCSO.

5    THE COURT:  Okay, wait a minute.  Is it

6  Luis or Louie?  Luis?

7    DETECTIVE SNYDER:  Luis.

8    THE COURT:  PCSO, okay.

9    MR. LONG:  And I guess we should include

10  Deputy Perry, PCSO.

11    THE COURT:  Perry?

12    MR. LONG:  Perry, P-e-r-r-y, PCSO, and

13  Detective Sanchez.

14    And what's his first name?

15    DETECTIVE SNYDER:  J.D.

16    MR. LONG:  J.D. Sanchez, PCSO.

17    THE COURT:  They're all PCSO, okay.

18    Now, Mr. Green, any witnesses other than

19  those listed you want to add?

20    MR. GREEN:  Your Honor, the only witness I

21  have would be Patrick Cote.  I know the State is

22  challenging that.  And again, the only evidence he'll

23  provide is foundation for photographs.

24    THE COURT:  Yeah.  I did not see in there,

25  and perhaps you can correct me, Mr. Green, that either

1    Mr. Huggins or you filed a notice of defenses and list

2    of witnesses.

3                MR. GREEN:  Your Honor, I filed -- and this

4    is the State's argument, Your Honor.  I filed that, I

5    believe, Friday.  Having gone through the file having

6    received it from Mr. Huggins, I didn't realize that he

7    hadn't done it, and I never did.

8                So the State has a reasonable argument I

9    would say, Your Honor, for late disclosure; however, the

10   only thing disclosed in that were some photographs and

11   a -- and Mr. Cote as a witness.

12               MR. LONG:  And I did file a motion -- I

13   drafted a motion on Friday -- I wasn't able to get it

14   filed until this morning -- that I have for the Court,

15   and that is -- it's an issue, not just the timeliness of

16   it, but there's some substance.  This is the basis for

17   my motion.  But I guess it's effectively a motion in

18   limine.

19               THE COURT:  On a defense or a witness?

20               MR. LONG:  On a witness and some -- and a

21   defense, I suppose.

22               THE COURT:  Is that Mr. Cote, you're trying

23   to keep him from testifying?

24               MR. LONG:  To testify as to certain things,

25   yes.

1          THE COURT:  The photographs that Mr. Green

2     is talking about or other issues?

3          MR. LONG:  Some of the photographs that

4     are -- that he's talking about.

5          THE COURT:  And they're photographs, I take

6     it, that weren't disclosed until Friday?  Or --

7          MR. LONG:  Correct.

8          And I guess more significantly, there was a

9     corresponding report that explained the photos that was

10    disclosed at 3:00 --

11         THE COURT:  On Friday?

12         MR. LONG:  -- p.m. on Friday.  So the

13    photos and the 15.1, along with Mr. Cote's CV, was

14    disclosed -- was hand-delivered to my office in the

15    morning on Friday.

16         I immediately reached out to Mr. Cote to

17    ask for an interview so I could see what he would be

18    testifying to.  Prior to that interview I asked him if

19    he has any reports, to please provide them.  That was

20    then emailed to me four minutes before the interview was

21    to begin right at 3 o'clock.

22         That report provides some real insight into

23    what the defense intends to use the photos for, which

24    the State submits would be an improper purpose, or at

25    least they lack the foundation to be able to do what

1    they want to do.

2              THE COURT:  Okay.  Do you have a motion in

3    limine drafted?

4              MR. LONG:  I do.

5              THE COURT:  Is that the original or a copy?

6              MR. LONG:  That is a copy, conformed copy.

7    The original was filed in this morning, a copy was

8    provided to Mr. Green.

9              THE COURT:  So it's downstairs?

10             MR. LONG:  Yes, sir.

11             THE COURT:  Okay.  Okay, I guess it's one

12   of the -- are you going to file a written response?

13             MR. GREEN:  I have not got one -- I just

14   received this just this morning myself, Your Honor, so I

15   can certainly file one by tomorrow.

16             THE COURT:  My understanding was that this

17   trial was four to five days, and that was paring it down

18   from originally, according to Judge Olson, projected six

19   to seven days, and that Judge Olson has allowed, I guess

20   because of your schedule, the jury not to appear

21   Thursday morning; is that correct?  So we're going to

22   lose --

23             MR. GREEN:  Your Honor -- okay, that may

24   be, Your Honor.  I didn't get that from the Judge's

25   order, but -- or notice, but the -- I did have a

1    conflict, trial on the 3rd and the 4th --

2                  THE COURT:  Right.

3                  MR. GREEN:  -- that was going to be brought

4    forward.  I have since addressed that, so I no longer

5    have a conflict.  So we can certainly run --

6                  THE COURT:  So we can do Thursday?

7                  MR. GREEN:  We can do the whole day

8    Thursday, yes, sir.

9                  THE COURT:  Okay.

10                 MR. GREEN:  I have no other interceding

11   events.

12                 THE COURT:  Okay.  But yeah, he did a

13   minute entry that indicated we would not have a jury

14   trial on Thursday morning because he had made some

15   arrangements with Judge White to --

16                 MR. GREEN:  Right.

17                 THE COURT:  -- get a jury selected and

18   delay the trial.  That's no longer an issue?

19                 MR. GREEN:  That's no longer an issue, Your

20   Honor.

21                 THE COURT:  Okay.

22                 MR. GREEN:  And I apologize for not letting

23   the Court know prior.

24                 THE COURT:  Well, let me ask the attorneys,

25   if I send the jury home now and we start tomorrow

1  morning, we resolve all these issues today, can we get

2  done by Friday?

3             MR. LONG:  No, sir.

4             THE COURT:  It's more than four days?

5             MR. LONG:  I had four days assuming

6  starting today.  I was hopeful when I learned that Your

7  Honor was going to be here that that would expedite the

8  jury selection process -- having been in front of Your

9  Honor numerous times in trial, those tend to go pretty

10  quickly even in these types of cases -- and that we

11  could -- that if we were going through -- all today

12  through, that there would be a possibility -- I was

13  accounting for Mr. Green's --

14             THE COURT:  Half day?

15             MR. LONG:  -- half day.

16             Mr. -- Detective Snyder also has a subpoena

17  in a dependency matter.

18             DETECTIVE SNYDER:  I haven't received it, I

19  just got notification.

20             MR. LONG:  He's got notification in an

21  anticipated dependency matter.  I am simply uneducated

22  on which would take precedence and if we would have to

23  defer to the dependency on that.

24             THE COURT:  Dependency takes priority.  But

25  as a witness he can be scheduled by the attorneys and

1    the Judge, so it does not or minimally interferes with

2    us.   But as far as between the two cases, dependency

3    takes priority.

4                MR. LONG:  And that was my belief, and so I

5    was operating on that.  The issue is is, depending on

6    what point of the trial it is, as a case agent and given

7    what he did, specifically the interviews, he is critical

8    to being present to certain aspects of the

9    cross-examination and --

10                THE COURT:  Oh, you bet.

11                MR. LONG:  I'm sorry?

12                THE COURT:  No, I said "you bet."

13                MR. LONG:  So that was the only other

14   concern as to that schedule.

15                The other thing is Sharon Welch is out of

16   town until Monday, so what I anticipated is that Monday

17   would be the final day that we could finish with

18   Ms. Welch.  And I believe that's the proper schedule.

19   Even if we were to go through these witnesses, that that

20   would take us into Monday.

21                THE COURT:  Okay.  That means I have to

22   change my Monday plans because of your witness's

23   schedule.

24                MR. LONG:  And when scheduling witnesses

25   and starting to do this, it was under the prior schedule

```
 1    of -- there was a discussion of going dark all day
 2    Thursday when we were initially scheduling this.
 3              THE COURT:  Well, I'm just thinking.  So we
 4    know we're going into next week, so we can get your
 5    witnesses -- get your witnesses done.  Most likely it
 6    would take this morning, at least, to resolve the issues
 7    that were just raised.
 8              Well, we know we have at least four days
 9    this week -- well, and actually, again, just thinking,
10    Wednesday morning is Judge Georgini's mother's services,
11    which I was not going to go to because I didn't want to
12    lose another half day.
13              The reason I have the podium -- I'm going
14    to give you guys my thinking.  The reason I have the
15    podium set up here is, rather than do my normal
16    strike-and-replace, which could be tedious, I was going
17    to get two things out of the way to begin with.  One was
18    the nature of the case, which is where we normally lose
19    a percentage of prospective jurors just because of the
20    nature of the case, and the other was length of trial.
21    My thought was that we pare the group down before we
22    call up our panel.
23              I do intend to call up 27; I do intend to
24    seat 15 so we have three alternates.  That will work
25    with the weekend in between, and I guess it will work if
```

1    we eliminate those who can't be here for a multiple-week
2    trial.  Although it's only one day, you've got to call
3    it a multi-week trial.  Okay.  I think jurors would be
4    more happy if, rather than we do five days, if we do six
5    so they can qualify for long trials.
6                    Okay, let me think about it.
7                    MR. LONG:  And so that would be the
8    hardship -- we would get rid of the hardship people
9    through the podium before we -- I think that's what Your
10   Honor did at the last trial.
11                   THE COURT:  Yeah.
12                   MR. LONG:  And I think it worked.  It was
13   very effective.
14                   THE COURT:  There are certain ones where it
15   pays to do that ahead of time instead of go through the
16   strike-and-replace, which is very tedious.  Yeah, it
17   would be the hardships and it would be nature of the
18   case that we'd get rid of at the podium before we draw
19   27 names and begin the strike-and-replace.
20                   Okay.  And the interview is at least an
21   hour?
22                   MR. LONG:  Yes, sir.  It's longer than
23   that.
24                   THE COURT:  Well, I've got a choice, but
25   let's do that, then.  Let's plan on starting again with

1  you guys here in the courtroom as soon as I get done

2  listening to the interview and reading the transcript

3  along with the interview.  So when I tell you folks to

4  be back here, be back at 10:30, but if I'm not done by

5  then, you're just going to have to wait.

6          I'll have the Jury Commissioner tell the

7  prospective jurors that we'll start at 1:30, and at

8  least today we'll get the -- get a panel seated if we

9  don't get any further.

10          MR. LONG:  Judge, I have two other motions

11  in limine that I would like to address orally which may

12  be -- or I'll do them whenever the Court would like to

13  do those.  It may be more appropriate after we deal with

14  this one.

15          But then the other issue is that due to my

16  status conference on Friday with Your Honor that we

17  attended in the Thompson matter, I was unable to

18  complete my interview with Patrick Cote, and so I just

19  would like an opportunity at some point this week prior

20  to testimony to continue the interview.

21          THE COURT:  I'm solving that.  When we --

22  when I leave here to listen to the interview, you finish

23  the interview.

24          MR. LONG:  Well, that raises an issue

25  regarding my motion, because one of the issues that were

1    raised is that Mr. Cote refused to answer certain

2    questions that provided the basis for his opinion that

3    he offered in his report, and so there needs to be

4    some -- maybe some clarification on that.

5              So I would like to provide the Court with

6    his report, and that, with my motion, kind of addresses

7    some of the issues I think the Court will understand.  I

8    asked specifically what he used or what factors went

9    into him forming an opinion, provided the basis for his

10   opinion in his report, and he said that's work product.

11   And I disagree that the basis for you offering an

12   opinion that you disclosed can be work product.

13             I didn't ask him what -- is there something

14   that somebody told Mr. Green or is there a particular

15   strategy or something.  It was specifically as to his

16   knowledge and what he -- what he learned that caused him

17   to author this report.  And he refused that.

18             THE COURT:  Okay.  So you think that issue

19   has to be resolved before you complete your interview of

20   Mr. Cote, right?

21             MR. LONG:  Yes, sir.

22             THE COURT:  Okay.

23             MR. LONG:  Additionally --

24             THE COURT:  Well, wait.  I'm going to do

25   one at a time.

1         MR. GREEN:  Okay.  Your Honor, as to the

2  interview, Mr. Cote was asked whether he had notes and

3  papers and information that he had used in making his

4  opinion.  Those notes and papers are in fact, it is our

5  opinion, are work product; are attorney/client privilege

6  as well, because some of the bases for Mr. Cote's

7  decisions were information that we received from my

8  client.

9         That information is not disclosable as

10  attorney/client privilege, and Mr. Cote, being an

11  extension of myself as working for my office, is covered

12  by my privilege with my client.  So I believe that the

13  most that we can tell Mr. Long is that he based his

14  opinion on information that he received from my client.

15         THE COURT:  Well, in fact that would be the

16  answer, and it should be the answer if that's the

17  answer.  But otherwise, in order to render an opinion in

18  front of a jury, he's going to have to give -- be able

19  to answer and will be ordered to answer the question

20  upon what do you base your opinion.  Examination and

21  information received from our client, Mr. Almanza,

22  whatever the answer is, but it has to be given.  Okay?

23         And then it leads you to argue the

24  reliability and weight to be given to evidence that's

25  based on what the Defendant says.

 1                MR. LONG:  Right, but I think I'm entitled
 2      to know what information that is --
 3                THE COURT:  Yeah.
 4                MR. LONG:  -- from Mr. Cote.  I mean,
 5      Mr. Cote, it can't be a sword and a shield where he's
 6      somehow an arm only of Mr. Green and yet a factual
 7      witness.  He was being offered as a material factual
 8      witness to suggest that I'm not able to inquire for --
 9      in order to vet, impeach, or just know.
10                Rule 15 certainly presumes the disclosure
11      of what the basis for a witness's opinion is.  I mean,
12      it would really be akin to -- the analysis should be
13      whether or not the State can do the same thing.  I mean,
14      there are certainly some things that may be work product
15      but other things that are not.
16                All right.  Focus on Rule 15.2, that is
17      authority.
18                THE COURT:  What are you looking at?
19                MR. LONG:  15.2(f), Scope of Disclosure.
20                THE COURT:  M'hm.
21                MR. LONG:  Pertains to -- extends to
22      "material and information within the possession or
23      control of the defendant, the defendant's attorneys,
24      staff, agents, investigators or any other persons who
25      have participated in the investigation or evaluation of

1  the case and who are under the defendant's direction or

2  control."

3          THE COURT:  Well, what would you -- for an

4  example, not what the answer might be -- but would you

5  expect him to be required to answer, well, it's based on

6  my client's or our client's statement that it was here

7  he took off her head?

8          MR. LONG:  Sure, or he observed her

9  crawling underneath a fence.

10          THE COURT:  Right.

11          MR. LONG:  I mean, he has some basis to his

12  own -- that that's the -- that that's the basis for the

13  opinion.  Whatever the answer is, the State should

14  certainly be entitled to know that in order to vet it.

15  And otherwise, it's -- it really is trial by ambush.

16          THE COURT:  Yeah, sort of.

17          I'm looking for the rules of evidence on

18  expert opinions.  Okay, you got -- there you go.

19          MR. LONG:  And I'd just point out, any

20  issues of waiver have certainly been -- or I'm sorry --

21  of privilege have certainly been waived by virtue of

22  disclosing this opinion.

23          THE COURT:  Yeah.  702, Testimony by

24  Experts.  Let's see what that says.

25          Bases, 703.  Disclosing Facts or Data.

1      Rule 705, "An expert may state an opinion

2   and give the reasons for it without testifying to

3   underlying facts or data, but the expert may be required

4   to disclose those facts or data on cross-examination."

5   And then you have whether or not the work product issue

6   would protect some of that.

7      And Mr. Long, your argument is logic --

8   logical.  I'm just thinking.  Yeah, it is.

9      To the extent you want -- and I'll make a

10   ruling.  To the extent you want Mr. Cote to render an

11   opinion, the facts that support that opinion are subject

12   to disclosure, even if it is based on information

13   provided from your client to you to Mr. Cote or directly

14   from your client to Mr. Cote.

15      So in other words, if you want to use that

16   opinion, he has to say why he arrived at that opinion

17   and give the bases for it, okay, which means if you

18   don't want to use the opinion, he doesn't have to

19   disclose that.  Simple enough.

20      MR. GREEN:  Fair enough, Your Honor.

21      THE COURT:  Okay.  What else did you want

22   to resolve before I can get started on my part?

23      MR. LONG:  The only other issue, or two

24   other issues, is there were two interviews that were not

25   able to be completed.  That is the interview of Peggy

 1    Toporek and the interview of Dr. Klein that Mr. Green

 2    was not able to complete.

 3                THE COURT:  Okay.

 4                MR. LONG:  To provide just -- Mr. Green had

 5    not asked for interviews.  He did not take any efforts

 6    in setting up those interviews himself.

 7                The State over the last month has

 8    proactively and on its own set up interviews and

 9    coordinated those with Mr. Green's offices -- or office.

10    And this is -- these are two of the interviews that just

11    were not able to be completed.  We've said that we will

12    also offer them available prior to their --

13                THE COURT:  I'm sorry --

14                MR. LONG:  -- testifying.

15                THE COURT:  -- but it can be interpreted

16    differently.  Were they started but not completed or

17    simply not arranged and done?

18                MR. LONG:  They were not arranged and done.

19    There was --

20                THE COURT:  Okay.

21                MR. LONG:  Scheduling issues between both

22    Mr. Green and the doctor and Ms. Toporek were not

23    consistent.

24                THE COURT:  There you go, they weren't

25    requested and they weren't done.  And it's just a little

1    different than saying they weren't completed.

2            MR. LONG:  Fair enough.

3            THE COURT:  I just wanted to make sure it

4    was clear.

5            Okay.  So he's not done it; you want to

6    make sure that's not an issue he raises?

7            MR. LONG:  Yes, sir.

8            THE COURT:  Okay.  Mr. Green?

9            MR. GREEN:  Your Honor, as to -- I believe

10   that interviews from other witnesses pretty much covered

11   the topics that those two are going to be testifying as

12   to.

13           THE COURT:  Ms. Toporek, yeah.  Pretty

14   straightforward.

15           MR. GREEN:  I have interviewed Ms. Toporek

16   in another case on related information.

17           THE COURT:  So you know her background?

18           MR. GREEN:  So -- yes, and so I don't

19   believe that I need to interview them.  I don't think we

20   need to delay anything for that.

21           THE COURT:  And you believe you can

22   adequately present your client's case and question those

23   witnesses without conducting such?

24           MR. GREEN:  I do, Your Honor.

25           THE COURT:  Okay, good.

1          MR. LONG:  And Dr. Klein did author or

2    did -- was part of some medical records and reports that

3    were disclosed, and Mr. Green does have those.

4          THE COURT:  Is Dr. Klein the one that at

5    least reportedly found the physical injury?

6          MR. LONG:  She is one of three medical

7    personnel that did -- at least viewed her physically or

8    viewed the colposcope pictures.

9          THE COURT:  Yeah, and I'm sure that's a

10   vital part of your presentation.

11         MR. LONG:  It is, Judge.  But those

12   records, which include statements by the witness and

13   medical findings and opinions, were disclosed.  I just

14   wanted to make sure that wasn't an issue.

15         Then the only other thing, Judge, is we

16   need a 609 hearing very quickly regarding Mr. Boggs and

17   the Defendant.

18         THE COURT:  Yeah, we probably ought to do

19   that real quickly.

20         And obviously, I recognize Mr. Boggs' name.

21   I may even have had some dealings with him.  I suspect I

22   did have dealings with him in the past, although I

23   didn't look for it.

24         Okay.  You want to tell me what his record

25   shows that you've disclosed to Mr. Green?

```
 1              MR. LONG:  Yes, sir.
 2              Boggs.  Do you have it in there?
 3              MR. KOHLER:  Not his criminal history.
 4              MR. LONG:  609 motion we filed on Boggs?
 5              THE COURT:  Criminal history.
 6              DETECTIVE SNYDER:  Probably somewhere.
 7              MR. LONG:  Yeah.  In our 609 motion we --
 8              THE COURT:  Do you remember when it was
 9    filed, and I'll look it up.
10              MR. LONG:  It was -- I don't, Judge.  I'm
11    sorry.  I was just looking at it last night.
12              THE COURT:  Maybe it's in file 1.
13              DETECTIVE SNYDER:  609.  Here we go.
14              MR. LONG:  Judge, it was dated June 13th.
15              THE COURT:  Of this year?
16              MR. LONG:  2012.
17              THE COURT:  Okay.
18              Motion for disclosure of information.  That
19    was when Mr. Huggins was on the case.  Yeah, there it
20    is.  Okay.  There's Mr. Boggs, and page 2 has a list of
21    convictions.
22              MR. LONG:  I don't believe this includes
23    the final conviction or the most recent conviction that
24    was in 2012.
25              THE COURT:  It doesn't.  Do you have a
```

1    2001, a 2004, a 2003, and 1987?

2              MR. LONG:  That's correct.

3              THE COURT:  So he had another one in 2012.

4    I saw the allusion or the reference to a plea bargain

5    and perhaps terms were disclosed or something.

6              MR. LONG:  There was no testimonial

7    agreement or any -- it was not tied in.  There was no

8    connection to this case.  He did, however, plead guilty

9    in that case.

10             MR. GREEN:  Your Honor, that's not quite

11   accurate.  There is a testimonial agreement as part of

12   the plea agreement that Mr. Boggs signed in the last

13   case.

14             THE COURT:  Oh.  Well, it's been disclosed

15   to you?  Do you have a copy of what it was?

16             MR. GREEN:  I do have a copy, yes, Your

17   Honor.

18             THE COURT:  Okay.  So the issue is what can

19   be used to impeach Mr. Boggs when he testifies?  Is that

20   what we're talking about, 609?

21             MR. LONG:  Yes, sir.

22             THE COURT:  Okay.  Well, you obviously --

23   again, you obviously have the new one, which is

24   certainly timely.  The next one prior to that in time

25   was the 2004, Drug Paraphernalia?  Is that right?

1    MR. LONG:  Yes, sir.

2    THE COURT:  Which would be a Class 6, and

3  that was Gila County.

4    Prior to that, 2003 Trafficking, second

5  degree, would be, what, a Class 3, and prior to that,

6  2001 Ag Assault on Law Enforcement.  That one in 2001

7  was maybe a Class 5.

8    MR. LONG:  Back then I think it was a

9  Class 6, Judge.

10    THE COURT:  Could've been a 6, yeah.

11    MR. LONG:  It was changed fairly recently.

12    THE COURT:  Yeah, depending on how they --

13  yeah, it could have been a 6.

14    Well, let's see what 609 says to me.  Limit

15  after ten years.  Okay.  So we in general have a

16  ten-year limit after either the date of conviction or

17  date of release on the conviction, and so we have 2004,

18  2003, 2012 are obviously admissible under that rule.

19    On the 2001, do we know if he served any

20  time in prison as a result?

21    MR. LONG:  Don't, Your Honor, although

22  there is certainly an argument that time in custody

23  would toll for 609 purposes in the same manner it would

24  for allegeability purposes, and I don't -- I don't take

25  issue with that analysis.

1          THE COURT:  Yeah, I don't think -- no.

2  Okay, you made a record, I overruled you, I'm not going

3  to do it that way.  But you get to use one, two, three,

4  2003, 2004, and 2012 specifically.

5          And you know my standard rule on the

6  impeachment is you can ask about the category of it

7  being a felony, where the conviction was essentially,

8  you know, Gila County, but not -- again, the sanitizing,

9  not what the conviction was for.  Okay?

10          MR. LONG:  That's our request.

11          THE COURT:  The exception might be on the

12  2012.  If the terms of the plea agreement become

13  relevant for impeachment purposes, then the full plea

14  agreement is admissible because the jury will need to

15  assess it, the value itself, which means they'd discover

16  what the plea was for, what the offense was, the date

17  and time, et cetera.  So impeachment, do you want me to

18  answer?

19          I'll find, definitely find, obviously, the

20  prejudicial -- or the probative value outweighs the

21  prejudicial effect of using the prior felony convictions

22  for impeachment purposes as to Mr. Boggs and limit it to

23  the use of the ones I just mentioned, 2003, 2004, and

24  2012.

25          I'll further find that if there is a

testimonial aspect to the 2012 plea agreement which

relates to this case in some manner, that may be

admissible, but the foundation, et cetera, will have to

be laid at the time prior to its use.  Okay?

The others, the 19- -- or the 2001 and the

1987 are not admissible for impeachment purposes.  Might

have been usable for his prior convictions, but not for

impeachment.

Okay, what else?

MR. LONG:  And then the Defendant has

a -- two aggravated DUI convictions -- one is from '98

and one from 2002 -- and a criminal damage conviction on

a separate incident in 2002.

THE COURT:  Okay.

MR. LONG:  And then he served -- he served

prison on at least that subsequent DUI.

THE COURT:  The 2002 ag DUI?

MR. LONG:  Yes, sir.

THE COURT:  Was it more than a year?

MR. LONG:  Yes, sir.

THE COURT:  So we've already brought it to

2013, okay.

Do you have anything there, Mr. Green, you

want to say about it?  Do you disagree with the time or

the comment?

1           MR. GREEN:  If I may have just a moment,
2   Your Honor.

3           THE COURT:  Go ahead.

4           Todd, would you let the Jury
5   Commissioner -- I'm sorry.  While we're doing this,
6   would you let the Jury Commissioner know to tell the
7   jury that the attorneys and I have matters that have to
8   be resolved, we'll start jury selection at 1:30.

9           THE BAILIFF:  Okay.

10          THE COURT:  So they're -- take a break, but
11  none of them are released at this time.

12          THE BAILIFF:  Okay.

13          THE COURT:  Mr. Green.

14          MR. GREEN:  Your Honor, the criminal
15  history on my client is accurate as far as I can tell.

16          THE COURT:  And you would like to use what
17  for impeachment, sir?

18          MR. LONG:  Just to say that he was
19  convicted of a felony.

20          THE COURT:  As of the 2002?  Or just --

21          MR. LONG:  That's fine.  I intend to be
22  very, very redactive.

23          THE COURT:  But are you -- you're asking
24  only for a felony, the ag DUI that falls within the
25  proper parameters?

1          MR. LONG:  There are two separate felony
2    convictions, one for criminal damage and one for ag DUI.
3    They are separate offenses, they are separate dates of
4    offense.
5          THE COURT:  Did he do time on both?
6          MR. LONG:  He was sentenced to prison.
7          THE COURT:  I knew he would be on the ag
8    DUI.
9          MR. LONG:  One year -- I'm sorry.  2.5
10   years on the criminal damage as well, 2.5 years on the
11   ag DUI.  So they would both, I believe, be appropriately
12   for impeach- -- submitted for impeachment purposes.
13         THE COURT:  Yeah.  And you don't disagree
14   with that --
15         MR. GREEN:  I don't, Your Honor.
16         THE COURT:  -- the timing anyway?
17         MR. GREEN:  No.
18         THE COURT:  Okay.  I'll find once again as
19   to Mr. Almanza that the probative value outweighs the
20   prejudicial effect, that the fact of conviction in 2002
21   on two separate felonies may be used for impeachment
22   without mentioning the nature of the felony, but the
23   date and the fact that they were each a felony
24   conviction is admissible for impeachment, if he takes
25   the stand.

1          MR. LONG:  Yes, sir.

2          THE COURT:  Okay.

3          MR. LONG:  I have one more, and it's

4    related to these issues.

5          THE COURT:  Oh, go ahead.

6          MR. LONG:  The allegation is that the

7    Defendant admitted to certain things or gave statements

8    to Mr. Boggs while in jail, and I want to clarify, I do

9    intend to get into that fact.  That fact, I submit, is

10   critical to understanding and is not unduly prejudicial.

11         So I just want a clear ruling that the

12   State and defense can get into the fact that the

13   Defendant was incarcerated for a period of time when he

14   had conduct -- or contact with Mr. Boggs.

15         THE COURT:  I'm presuming, based on what

16   you're telling me, Mr. Boggs is going to testify?

17         MR. LONG:  Yes, sir.

18         THE COURT:  And he is going to relate that

19   we were in custody and he was a cellmate and he said

20   such and such.  Correct?

21         MR. LONG:  Precisely.

22         THE COURT:  Okay.  You want to say anything

23   for the record?

24         MR. GREEN:  Your Honor -- well, I can

25   object, Your Honor, in that it shows that my client was

1    in custody.

2              THE COURT:  Yeah.

3              MR. GREEN:  I already anticipate your

4    ruling, however.

5              THE COURT:  You know, never anticipate.

6    Always be hopeful.

7              It's obvious that that portion, without

8    reference to specifically how long either was in

9    custody, at least for the purpose of impeachment, would

10   be admissible, so your objection to using -- mentioning

11   that he was in custody when he gave the statements is

12   overruled.  Okay.

13             It at least gives the background and

14   explanation for the scene, for the delivery, and

15   certainly it'll be important to you when you try to

16   impeach or want to impeach Mr. Boggs as to why he

17   contacted the law enforcement and let them know about

18   the statement.  Okay?  So I suspect it's really as

19   important to you as it is to the State to set the scene

20   for the delivery of the statement.

21             MR. GREEN:  Yes, Your Honor.

22             THE COURT:  Okay.  What else?

23             MR. LONG:  I just have one other motion,

24   oral motion in limine, but I don't know when the Court

25   wants to --

1          THE COURT:  When we're done with this one

2    do we move on to one more?

3          MR. LONG:  No.

4          THE COURT:  Okay.  Tell me what it is.

5          MR. LONG:  Specifically defense has raised

6    allegations that it intends to get into certain personal

7    issues regarding the victim's mother, that is, that she

8    supposedly had a sexual relationship with a 16-year-old

9    boy and/or took her children to drug houses and that

10   they intend to either offer that in opening or question

11   her regarding that information, and the State is seeking

12   to preclude those questions.  The defense does not have

13   a basis to ask them and it is not for a proper purpose.

14         THE COURT:  Okay.  Mr. Green?

15         MR. GREEN:  Your Honor, the issue at hand

16   in that questioning would be whether or not the mother

17   had a motive in order to bring these allegations against

18   my client; as a potential defense, Your Honor, that the

19   young Ada was coached, was told what to say; and that

20   there was animosity, a tense relationship between these

21   two coworkers during the time that they were on the

22   ranch, and that the basis for that animosity and that --

23   those bad feelings were that my client had called the

24   mother on issues of parenting, issues of inappropriate

25   conduct on her behalf with a -- who was, I believe, a

1    friend of his grandmother's.  The young man, the

2    16-year-old young man, was a friend of his

3    grandmother's.

4              To that end, Your Honor, we have searched

5    and been unable to find the young man.  We know sort of

6    where he is, but we have been unable to get in touch

7    with him to call him as a witness, so --

8              THE COURT:  The only information you have

9    is what your client has told you?  No corroboration of

10   any kind?

11             MR. GREEN:  No corroboration, no, Your

12   Honor.

13             THE COURT:  Okay, motion in limine is

14   granted.  If things change let me know and I'll

15   reconsider it, but no.  You can ask about animosity, do

16   you have -- isn't it true that you and Mr. Almanza used

17   to argue at work about a number of things and you don't

18   like him, but no, no details, no 16-year-old, no drug

19   houses, no.

20             MR. GREEN:  Okay.

21             THE COURT:  Okay?  What else?  Is there not

22   another one?

23             MR. LONG:  That is it.

24             THE COURT:  How about you?

25             MR. GREEN:  Your Honor, I -- again, I don't

1    know when you want to deal with this, but as far as the

2    testimony of Carli Moncher --

3                   THE COURT:  Remind me, Carli Moncher is?

4                   MR. GREEN:  Carli Moncher, Your Honor, is

5    a -- the State is calling her as a victimology expert.

6                   MR. LONG:  She effectively replaces Wendy

7    Dutton, Judge.

8                   THE COURT:  Oh, it's one of your cold

9    witnesses --

10                  MR. LONG:  Yes, sir.

11                  THE COURT:  -- you're going to be calling?

12                  MR. LONG:  Yes.

13                  MR. GREEN:  As a cold witness, Your Honor,

14   she has no information whatso- -- by definition, cold

15   witness --

16                  THE COURT:  Right.

17                  MR. GREEN:  -- she has no information about

18   this case.

19                  THE COURT:  No connection, no information.

20                  MR. GREEN:  No connection.

21                  THE COURT:  Right.

22                  MR. GREEN:  The information that she's

23   provided is based on research that I believe is

24   questionable at best.

25                  Your Honor, if the State wants to --

1    proceeds to wanting to call her as an expert, I would

2    request voir dire of the witness without the jury

3    present prior to her testimony to allow the Court to

4    make a determination whether or not the information --

5    whether -- first of all, whether she is an expert;

6    second of all, whether the information that she is going

7    to provide to the Court is good science, Your Honor; and

8    second of all -- and third of all, whether it's relevant

9    to the matter at hand.

10                  THE COURT:  Okay.  Three legitimate issues.

11                  Mr. Long?

12                  MR. LONG:  Judge, Ms. Moncher testified in

13   this court, before this -- before Your Honor, on the

14   very issue she's going to testify before.  This issue

15   has been addressed, re-addressed, by not just this

16   jurisdiction but other jurisdictions.

17                  We now have a draft -- a published

18   opinion -- I say "published."  It might not be published

19   yet -- but out of Division 1 that specifically addressed

20   cold experts and specifically victimology experts.

21                  THE COURT:  Yeah, I think there is an

22   opinion.                          .

23                  MR. LONG:  And stating -- really addressing

24   that it's appropriate testimony, and going further to

25   say that it does not even trigger Daubert.  So a Daubert

1    analysis isn't even in the cards.

2                So that's -- I would rely on, I guess,

3    precedence.

4                THE COURT:  Okay.  Well, what we're going

5    to do is when it's time to call her, I'll have the jury

6    out, he can ask her questions, just her background

7    questions, voir dire questions.  I'll make a ruling.

8                But in general, Mr. Long is correct.  As

9    long as she qualifies -- she has previously -- she can

10   testify.  You'll have the ability during cross to

11   question her about its real meaning in this case, if

12   any, and she will obviously tell you, well, I don't know

13   the facts so I don't know.  Sometimes it's this way,

14   sometimes it's this way.  Okay?

15               MR. LONG:  We'd obviously just ask that

16   during voir dire Mr. Green not provide any facts to now

17   make her no longer a blind or a cold --

18               THE COURT:  Cold witness or whatever we

19   call them?

20               MR. GREEN:  Your Honor, that would not be

21   my intention.  It would be strictly on her --

22               THE COURT:  Qualifications.

23               MR. GREEN:  -- her knowledge and

24   qualifications and --

25               THE COURT:  CV type of questions?

1          MR. GREEN:  Yes, correct.

2          THE COURT:  Which is what they should be,

3   yeah.

4          Well, and the attorneys might know that

5   a -- make an objection, I'll be happy to rule on it.

6   I'm somewhat aware of the rules.

7          Okay.  Anything else?  Oh, one more.

8          MR. LONG:  Can I provide Mr. Cote's report

9   just to supplement my written motion?

10          THE COURT:  Sure.

11          MR. LONG:  Thanks.

12          THE COURT:  Okay.

13          MR. GREEN:  And Your Honor, if I may, one

14   last -- and I did start to write this up -- and that is

15   that I'm requesting that any testimony regarding prior

16   statements of Ada Wilhelmi be stricken or be not allowed

17   as to -- as they are hearsay, outside of any hearsay

18   exception.

19          Certainly I can make my objections at the

20   time that statements are raised, Your Honor, but as a

21   general request, I believe that anything that anyone --

22   any witness testifies to as to what Ms. Wilhelmi said

23   would be inadmissible hearsay.  Ms. Wilhelmi is

24   available as a witness and she's the best source of that

25   information.

1          THE COURT:  Want to say anything, Mr. Long?

2          MR. LONG:  Just that we agree with the

3    general principles of the rules of evidence and their

4    exceptions.

5          THE COURT:  Okay.  Let's take a break, and

6    like I told you 20 minutes ago, I was guessing 10:30,

7    now I'm guessing I'll see you all at 11:00.

8          (Recessed from 9:41 a.m. until 11:05 a.m.

9    The proceedings resumed outside the presence of the jury

10   and with the presence of Danira Marinez, court

11   interpreter.)

12         THE COURT:  Let's have the record show

13   we're back on the record.  Both attorneys for the State

14   are present, Mr. Green is present, the Defendant is

15   present.  The jury has not yet been called.  It is a

16   little bit after 11:00, and I had told the attorneys we

17   would try to start again at 11:00.

18         To clarify things, first, the disk that I

19   had that was in the file jammed in my CD player and

20   cannot be retrieved without taking it apart.  Mr. Green

21   gave me one of his extra copies, which ran successfully

22   on my computer.  So I did, along with the transcript,

23   listen to the recorded conversations from the beginning

24   through advisement of Miranda and about 15 minutes into

25   the discussion, my thought being that the issues that

1    are before me really are limited up to the time of the

2    Miranda, the beginning of the questioning.

3              But I did want to listen to some of the

4    following dialogue, just as Mr. Green had alluded, to

5    confirm the extremely limited English ability of the

6    Defendant.  So I also, as part of the transcript,

7    reviewed the -- I think it's a two-page, maybe

8    three-page translation, partial transcript, done by

9    apparently the interpreters' office that was submitted

10   with the State's response.

11             So having done that, I think for the

12   purpose of going forward on the two motions to suppress,

13   we need to go ahead and get some testimony.  I want you

14   all to know what I've done for background.

15             Mr. Long, are you ready to proceed?

16             MR. LONG:  Yes, sir.

17             THE COURT:  Are you, Mr. Green?

18             MR. GREEN:  Yes, sir.

19             THE COURT:  Mr. Long, who do you want to

20   put on?

21             MR. LONG:  Detective Randy Snyder.

22             THE COURT:  Okay.  Over here and get sworn

23   in first.

24             (The witness, Detective Randall Snyder,

25   was duly sworn by the clerk of the court, according to

1    law.)

2                    THE COURT:  Thank you, sir.

3                    While he's getting seated, Mr. Long, did

4    you get your interview completed with Mr. Cote?

5                    MR. LONG:  I have not completed that,

6    Judge.

7                    THE COURT:  So you're not finished with

8    that?

9                    MR. LONG:  With the interview, no.

10                   THE COURT:  Okay.  Go ahead.

11

12                   **DETECTIVE RANDALL SNYDER,**

13   called as a witness herein, having been first duly

14   sworn, was examined and testified as follows:

15

16               D I R E C T   E X A M I N A T I O N

17   BY MR. LONG:

18       Q.   Sir, would you state your name.

19       A.   Randall Snyder.

20       Q.   Who do you work for?

21       A.   Pinal County Sheriff's Office.

22       Q.   And were you one of the investigators involved

23   in the Fernando Almanza matter?

24       A.   Yes.

25       Q.   Did you participate in the interview of

1    Fernando Almanza?

2        A.   Yes, I did.

3        Q.   And did you -- were you the person that

4    conducted the interview?

5        A.   Yes, I am.

6        Q.   Was Mr. Almanza in custody when you began the

7    interview?

8        A.   He had been detained for investigative purposes

9    but was not in any sort of handcuffs or anything.

10       Q.   Was he free to leave at any time?

11       A.   Yes, he was.

12       Q.   Was that articulated to him?  Was that told

13   him?

14       A.   I don't recall if we specified that.

15       Q.   After the interview, where did Mr. Almanza go?

16       A.   He left the substation.  I believe he was --

17   said he was going to go get a soda or something and then

18   he was headed home.

19       Q.   Was he booked at any point that day?

20       A.   No, he was not.

21       Q.   At any point during the interview was Miranda

22   read?

23       A.   Yes, it was.

24       Q.   In what language was it read?

25       A.   Both English and Spanish.

1    Q.   As you were speaking with Mr. Almanza, were any
2    threats made to him?

3    A.   No.

4    Q.   Were any promises made to him?

5    A.   No.

6    Q.   As you were speaking with Mr. Almanza, did he
7    answer your questions in English?

8    A.   Yes, he did.

9    Q.   Were the questions that he answered -- or that
10   is, were his responses, did they make sense given the
11   context of your questions?

12   A.   Yes, they did.

13   Q.   Did they appear to be responsive to your
14   questions?

15   A.   Yes, they were.

16   Q.   At some point did he indicate that he is a
17   Spanish speaker?

18   A.   Yes, he did.

19   Q.   And that Spanish is his first and primary
20   language?

21   A.   Yes.

22   Q.   And did he ask whether or not somebody speaks
23   Spanish?

24   A.   Yes, he did.

25   Q.   Was a Spanish speaker contacted?

1       A.   Yes.

2       Q.   And did a Spanish speaker respond?

3       A.   Yes.

4       Q.   With a Spanish speaker available, why, then,

5   was the entire interview not conducted in Spanish?

6       A.   At that point he was answering the questions

7   that I asked.  At any point if he had questions, it was

8   clarified through our Spanish speaker, but based upon

9   the contact he seemed comfortable responding to my

10  questions in English.

11      Q.   And in fact, through the course of your

12  interview were there times when he spoke Spanish?

13      A.   Yes, there were.

14      Q.   And was he ever instructed not to speak

15  Spanish?

16      A.   No, he was not.

17      Q.   Did you understand him clearly when he would

18  respond to your questions?

19      A.   He has a heavy accent, but I could understand

20  the majority of what he said and look for clarification

21  if I didn't understand -- or ask for clarification.

22      Q.   Did he ever tell you that he didn't want to

23  answer in English?

24      A.   He never made an indication that he was

25  uncomfortable with English.

1    Q.   Did he ever say that what he's saying isn't
2    accurate due to English?

3    A.   No.

4    Q.   Again, was he ever forced or induced to speak
5    only in English?

6    A.   No.

7    Q.   Tell me about the conditions of the room where
8    the interview took place.

9    A.   It's kind of a common area inside the
10   government building there.  Has a large conference table
11   that he sat at.  There was an exit door, glass doors
12   directly to one side of us, and then if you went down
13   the hallway you would go through the main exit door as
14   well.

15   Q.   Is this a place that has -- is accessible by
16   the public?

17   A.   It is -- houses our office as well as the
18   Department of Motor Vehicles' office in San Manuel, and
19   I believe the -- Adult Probations has an office in
20   there.  During normal business hours it is open to the
21   public.

22   Q.   But once you walk outside of the room that the
23   interview was conducted in, is that a public
24   thoroughfare or hallway?

25   A.   This was actually kind of a -- just an open

1    space in the -- the larger building.  It wasn't a room

2    specified for any particular use.  And it had a large

3    table in there.

4         Q.   So this room that you used, was it -- is it --

5    if I'm understanding you correctly, it's not only used

6    by the Pinal County Sheriff's Office?

7         A.   That's correct.

8         Q.   Was he handcuffed?

9         A.   Not upon my arrival, no.

10        Q.   And you already testified that after your

11   interview he was not handcuffed as well; is that

12   accurate?

13        A.   That's correct.

14        Q.   Was he provided an opportunity to take a break

15   if he wanted?

16        A.   Yes.

17        Q.   Did he take break that you know of?

18        A.   We took a break while we were waiting for

19   the translator, and then there was another break at

20   a point where I went and conferred with

21   Detective Sanchez.

22        Q.   And during that break, was Mr. Almanza free to

23   leave?

24        A.   Yes, he was.

25        Q.   Was he restrained or locked behind any doors

1   during those breaks?

2       A.   No.

3       Q.   Do you know if anyone stood by him to ensure --

4   stood by, either a guard or just standing by him, for

5   any purpose that you know of?

6       A.   Sergeant Vargas was in the room as a

7   translator.   They conducted a conversation while I was

8   gone.

9       Q.   Was he given an opportunity to have a glass of

10  water or some other refreshment?

11      A.   All of it was available, yes.

12      Q.   Do you know if it was provided?

13      A.   I don't recall him asking for one off the top

14  of my head.

15      Q.   Do you know if you offered it?

16      A.   I don't recall.

17      Q.   And at the end of the interview, how did he get

18  home?

19      A.   We offered him a ride.   He declined and he

20  walked.

21      Q.   Okay.   Was he permitted to go on his own?

22      A.   Yes, he was.

23      Q.   Find any means of transportation or way he

24  wanted to get home?

25      A.   Yes, he was.

1      Q.   And to your knowledge, did he do that?

2      A.   To the best of my knowledge.

3      Q.   But that notwithstanding, prior to you asking

4  any specific questions, Miranda -- his Miranda warnings

5  were given in both English and Spanish; is that

6  accurate?

7      A.   That's correct.

8      Q.   Did he indicate whether or not he understood

9  his rights?

10      A.   He had some questions that were answered for

11  him, but he indicated he wanted us to ask questions so

12  that he could understand what was going on.

13      Q.   And was he advised that he could stop asking

14  questions at any time?

15      A.   Yes, he was.

16           MR. LONG:  Those are all my questions.

17           THE COURT:  Before I turn it over to you,

18  Mr. Green, Mr. Long, Mr. Huggins had the motion -- one

19  of his motions is to suppress everything, alleging that

20  even the act of detaining Mr. Almanza may have been

21  unconstitutional.  Do you want to kind of ask a few

22  questions to kind of underline why he was detained and

23  what precipitated this?

24           MR. LONG:  Certainly.

25  BY MR. LONG:

1    Q.   Prior to your arrival, do you know how it was

2    that Mr. Almanza came to come to the San Manuel

3    substation?

4    A.   The evening prior when the allegation was first

5    brought to the attention of the Sheriff's Office,

6    Sergeant Agresta had notified the patrol officers in

7    that area that if located, we would like to speak to him

8    to determine what, if any, responsibility he had or what

9    part he played in the investigation or in the incident.

10         Patrol deputies located him the next

11   morning and brought him down to the substation so that

12   he could be talked to.

13   Q.   So he was brought by Pinal County Sheriff's

14   Office --

15   A.   Yes, he was.

16   Q.   I'm sorry -- the deputies from the Pinal County

17   Sheriff's Office?

18   A.   That's correct.

19   Q.   Do you know whether or not they put him in

20   handcuffs?

21   A.   I don't know.

22   Q.   At that point when he was contacted, had the

23   victim made statements alleging that Mr. Almanza had

24   put his finger inside of her?

25   A.   Yes, she had.

1   Q. Prior to him being contacted, was a medical

2 exam done?

3   A. Yes, it was.

4   Q. Did you learn about the results of that medical

5 exam?

6   A. Yes, I did.

7   Q. And what was that?

8   A. That the victim had injuries that were

9 consistent with the statements she made about how the

10 injuries were obtained.

11   Q. So that information was known prior to

12 Mr. Almanza ever being contacted; is that accurate?

13   A. That's correct.

14   Q. And you did not personally make a decision to

15 either take him into custody or contact him; is that

16 accurate?

17   A. That's correct.

18   Q. And you were called after the fact to conduct

19 the interview?

20   A. That's correct.

21   Q. But that information that you just relayed

22 about the disclosure and the medical findings were known

23 to both deputies that had contact with Mr. Almanza; is

24 that accurate?

25   A. That's correct.

1          MR. LONG:  Those are all my questions.

2          THE COURT:  All right.  Thank you, sir.

3          Mr. Green?

4

5          C R O S S - E X A M I N A T I O N

6    BY MR. GREEN:

7          Q.   When did you or law enforcement learn of the

8    incident that allegedly happened between Ada and

9    Mr. Almanza?

10         A.   The call was received by our Dispatch on

11   October the 22nd.  I believe it was about 4:50, 4:55 in

12   the afternoon.

13         Q.   And what was the -- something went out, you

14   said, to pick up Mr. Almanza; is that correct?

15         A.   I was contacted by Sergeant Agresta.  I was the

16   on-call that weekend, but I had somebody covering for me

17   for the first couple of hours.  I was out of town on a

18   conference.

19              I was notified by Sergeant Agresta that he

20   had discussed it with the patrol officers or the patrol

21   deputies in the area and had notified them that if they

22   located Mr. Almanza, that he was needed for questioning

23   and to contact me if he was -- if he was located.

24         Q.   Were they told to pick him up?

25         A.   I don't know the exact content of the

1    conversation Sergeant Agresta had with the patrol

2    deputies.

3        Q.   Did you tell Sergeant -- Agresta?  Is that

4    right?

5        A.   Sergeant Agresta.

6        Q.   Did you tell him that you wanted Almanza picked

7    up?

8        A.   No, I didn't.

9        Q.   But he was picked up, correct?

10       A.   That's correct.

11       Q.   And you have no recollection of whether he was

12   handcuffed when he was picked up?

13       A.   I wasn't present at the time, sir.

14       Q.   Was he given a choice of whether he came to the

15   office or not?

16       A.   I wasn't present for the conversation that he

17   had with the deputies.

18       Q.   Who was?

19       A.   I believe it was Deputies Perry and Bagwell

20   that made contact with him.

21       Q.   Now, when he was brought to the substation,

22   where was he placed?

23       A.   He was placed in one of our holding cells.

24       Q.   So he was locked up?

25       A.   He was placed in a location that would be

1    comfortable for him, yes.

2         Q.   That was secure?

3         A.   Yes.

4         Q.   And had he been Mirandized at any time between

5    the time that he was picked up on the road or the time

6    that he was placed in the holding cell?

7         A.   Not that I'm aware of.

8         Q.   So the first time that he was Mirandized was

9    the English and Spanish that was done by you personally?

10        A.   To the best of my knowledge.

11        Q.   Did he understand what you were talking about?

12        A.   He appeared to.

13        Q.   He asked an awful lot of questions.  Did he

14   have confusion about what it was that you were telling

15   him?

16        A.   You're asking me what your client's mental

17   state was when I was talking to him?

18        Q.   No.  I'm asking you, in your interview did

19   you -- did he exhibit confusion as to what you were

20   asking him or what you were telling him when you were

21   giving him Miranda rights?

22        A.   He seemed to have some questions.  And we tried

23   to explain them to him as best as possible in both

24   English and Spanish so that we could ensure that he

25   understood what we were saying.

1    Q.   And it was your belief that when you started

2  questioning him he understood what you were saying?

3    A.   That's correct.

4    Q.   Do you understand that at some point he said,

5  "No," right, "I don't want to answer questions."

6  Correct?

7    A.   That's correct.  And then he indicated after

8  that that he wanted us to ask the questions.

9    Q.   Did he indicate that unsolicited, or did you

10  ask him another question?

11    A.   I would have to refer to the transcript on

12  that.  I believe -- I believe we asked him if he

13  understood or if he wanted to ask any -- if he wanted to

14  answer any questions.

15    Q.   And his first answer was "No," correct?

16    A.   Again, I would have to refer to the transcript

17  to know the specifics of the conversation.

18    Q.   You Mirandized him after you had taken his

19  fingernails; is that correct?

20    A.   I believe we executed the search warrant first,

21  that's correct.

22    Q.   Was an arrest warrant ever issued?

23    A.   No, not at that time.

24    Q.   Did you have time to do it between the time

25  that he was picked up and the time that -- from the time

1    that you heard about this to the time that he was picked

2    up, did you have time to execute an arrest warrant?

3         A.   Not particularly.  I was driving back from

4    Nevada during that time.

5         Q.   Did any of the officers have an opportunity,

6    have time to do an arrest warrant?

7         A.   I don't know what their work schedule was like

8    during the rest of that shift for them.

9              MR. GREEN:  I'm sorry, Your Honor.  I'm

10   having a hard time finding the Miranda sections.

11             THE COURT:  Go ahead.

12   BY MR. GREEN:

13        Q.   Who was the Spanish speaker that you brought

14   over to assist you?

15        A.   Sergeant Louie Vargas.

16        Q.   Is Sergeant Louie Vargas a native speaker?

17        A.   To the best of my knowledge.

18        Q.   He's Hispanic?

19        A.   Yes.

20        Q.   So you read him his Miranda rights in English

21   first?

22        A.   That's correct.

23        Q.   And then Detective Sanchez allegedly -- in the

24   English transcript it says, "in-Spanish discussion,"

25   then it says Detective Sanchez says, "I just read him

1    his Miranda in Spanish and he stated he understood."

2        A.    There were some misstatements on the

3    transcripts that I had noted to --

4                THE COURT:  Let me stop you a minute.  Is

5    it Sanchez or is it Vargas?

6                MR. LONG:  I think Detective Snyder is just

7    going to explain that discrepancy, Judge.

8                THE COURT:  Okay.  I'm trying to figure

9    that out myself.

10               Go ahead.

11               THE WITNESS:  When I went through the

12   transcripts prior to the interview with your

13   predecessor, the -- I found that they had mislabeled

14   some of the conversation there.  Some of what they had

15   attributed to Detective Sanchez was actually

16   Sergeant Vargas.

17               And I had made notes of that and provided

18   that to the County Attorney's Office.

19   BY MR. GREEN:

20       Q.    So is it correct to say, then, as we go through

21   this entire transcript, that Detective Sanchez was not

22   in the room?

23       A.    Detective Sanchez was in the room, but most of

24   what was attributed in Spanish to Detective Sanchez was

25   actually Sergeant Vargas.

1      Q.   Okay.   And Sergeant Vargas is a native Spanish

2   speaker, to the best of your knowledge?

3      A.   To the best of my knowledge.

4               THE COURT:   Again, just to clear it up for

5   me, is his first name Luis?   Louis?

6               THE WITNESS:   It's L-u-i-s.

7               THE COURT:   Luis?

8               THE WITNESS:   He pronounces it "Louie."

9               THE COURT:   Okay.   The -- again, for the

10  attorneys, again, to clear it up for me, what is labeled

11  as the Almanza Interview that in the State's response is

12  Attachment 3, it refers to a Sergeant Louis, L-o-u-i-s.

13  That, I'm assuming, is Sergeant Luis Vargas, then?

14              MR. LONG:   Yes, sir.

15              THE COURT:   Does that sound right?

16              MR. LONG:   Yes.

17              THE COURT:   Do you have that there,

18  Mr. Green?

19              MR. GREEN:   I'm not seeing it in this

20  particular copy, Your Honor.

21              THE COURT:   Okay.   It was Attachment 3 to

22  the State's response.

23              MR. GREEN:   And that's what I'm looking at,

24  Your Honor.

25              THE COURT:   And it's a three-page, I

1    think -- what purports to be a three-page translation of

2    the Spanish portion with some of the English portion.

3                    MR. GREEN:  Is this the column --

4                    THE COURT:  No.

5                    MR. GREEN:  -- two-column report?

6                    THE COURT:  No, it's --

7                    MR. GREEN:  At the very beginning?

8                    THE COURT:  It's -- his Attachment 3 was at

9    the very end of the State's response that was filed last

10   year.  Let's see, when was it filed.  Filed on

11   October 3rd of last year.

12                   MR. GREEN:  Ah, okay.

13                   THE COURT:  Do you have it?

14                   MR. GREEN:  Yes.

15                   THE COURT:  And again, just to clear it up

16   for everybody, where it says "Sergeant Louis," it's

17   actually referring to Sergeant Luis Vargas.

18                   Okay.  Go ahead, Mr. Green.

19                   MR. GREEN:  And Your Honor, just for the

20   record, what I'm looking at here is the actual

21   transcript, not that translation.

22                   THE COURT:  Right.

23                   MR. GREEN:  I also have interjected in my

24   copy the columnar report that was done by the

25   interpreters' office, court interpreters' office.  That

has -- for those sections that -- where it says,
"in-Spanish discussion," Your Honor, it's my
understanding that that indicates -- in some cases that
indicates a one-sentence piece and in another case it
goes for three pages.

        THE COURT:  Okay.  I don't have that.
That's what I have.

BY MR. GREEN:

    Q.   And if I may, in the translation it says -- and
again, I'm going to read the English from the
translation:  "Did you understand the Miranda warning?"
That's the question.

        And he says, "Sí, yes."

        And then another voice, and I'm not sure
who this is, says, "I am."

        And then, "I just understood that I need an
attorney, but I don't understand why."  And again -- and
then he says that he'll read it to him in Spanish.  He
reads it in Spanish.  And he asks again, "Why do I now
need to get a -- why do I have to get an attorney if I
did not do anything?"

        So he's, at this point, fairly confused
about whether or why or how he needs an attorney; is
that correct?

    A.   That's correct.

1    And as I recall, we explained to him that

2    we weren't telling him he necessarily needed one, just

3    that he had the right to have one if he chose.

4    Q.   Okay.  And then it says -- again, I'm on page 5

5    of the supplement, which fits in at page 19 of the

6    transcript -- "No.  Well, I want them to ask me.  I want

7    to see what they want."

8    And then the officer, one of the officers,

9    says, "So you understand your rights and you want to

10   answer the questions?"

11   And he says, "No."

12   And the officer says, "You don't want to

13   answer the questions?"

14   And he says, "Yes, I want to answer,

15   but" --

16   "Okay.  Go ahead and say what it is you

17   want to say."

18   And at first he said, "No," and then you

19   continued to ask him questions.  My understanding --

20   MR. LONG:  Your Honor, if Mr. Green is

21   going to use the transcript and ask the witness to

22   testify, can he have access to the transcript?

23   THE COURT:  Sure.

24   MR. LONG:  This is Exhibit No. 116.

25   THE COURT:  Okay.  And you had him on

1    page 19?   Is that what you had, Mr. Green?

2             MR. GREEN:   I was on -- that's where I was,

3    yes, Your Honor.

4             Now, does that also include the Spanish

5    translation?

6             MR. LONG:   Yes.

7             And there are times in this transcript

8    where the page numbers aren't directly at the top, but

9    it does comport with the page numbers that he's

10   referencing.  So if you look at -- there will be numbers

11   on the left-hand side, often at the top but sometimes a

12   few lines down.

13            THE COURT:   Do you have it?

14            THE WITNESS:   I believe I'm on the right

15   page, yes, sir.

16            THE COURT:   Okay.  Go, Mr. Green.

17            MR. GREEN:   Okay.

18   BY MR. GREEN:

19        Q.   And at some point he said in English again --

20   and now I'm on page 19 of the original transcript, not

21   the translation -- Detective Snyder, you said, "We're

22   not saying that you need a lawyer, we're saying you have

23   the right to have one if you want one.  We're not saying

24   that you have to have one, we're just saying that if you

25   want one, you can have one."

1          And Mr. Almanza says, "Well, I ain't got no

2  money -- I ain't got money."  I'm sorry, I misquoted.

3  "Okay?"

4          And Detective Snyder said, "Well, and if

5  you want one and you can't afford one, then the Court

6  can appoint one at a later time."

7          It seems to me -- well, do you believe that

8  from this conversation that he understood what it was

9  you were talking about when you were giving him the

10  Miranda rights?

11     A.   He indicated that he understood and that he

12  wanted us to ask him the questions.

13     Q.   You weren't concerned about the language

14  problems?

15     A.   That's why we had a Spanish interpreter there

16  to help clarify.

17     Q.   But yet you continued the interview in English?

18  Most of this interview is in English, correct?

19     A.   And his answers were as well.

20     Q.   And it didn't concern you that he didn't speak

21  very good -- I mean, it's pretty clear when you talk to

22  him, isn't it, that he doesn't speak English well?

23     A.   Every time I asked him a question in English,

24  he gave a response that was appropriate based upon the

25  context of the question.  Anytime that there was --

1  seemed to be any sort of confusion, he would refer to

2  Sergeant Vargas, and they would -- Sergeant Vargas would

3  clarify.

4       Q.   Well, in fact didn't he give you answers that

5  you were looking for?

6       A.   (No verbal response.)

7       Q.   Correct?  When you say that the answers were

8  appropriate to the question, those were the answers that

9  you were expecting based on the knowledge that you had

10 about things that had gone on, correct?

11      A.   The questions that I asked him and the answers

12 that he provided were consistent.  He wasn't giving

13 answers that were out of line for the question I was

14 asking.  I didn't ask him his birth date and he would

15 respond with "purple," he would respond with an answer

16 that was appropriate to the question.

17           MR. GREEN:  I have no more questions, Your

18 Honor.

19           THE COURT:  All right.  Any redirect?

20           MR. LONG:  One follow-up.

21

22      R E D I R E C T   E X A M I N A T I O N

23 BY MR. LONG:

24      Q.   There was a question about -- Mr. Green said if

25 there was some confusion or questions about what was

1    being said, and I want to clarify that.  When he would

2    respond in English to one of your questions, did there

3    appear to be confusion as to what your question was?

4        A.   No, I don't think so.

5        Q.   At times was there confusion over why he was

6    there and why he was being asked questions?

7        A.   Yes.

8        Q.   And was that, those concepts, at times

9    explained in both English and Spanish?

10       A.   Yes.

11       Q.   Focusing on page 19, after he was -- after

12   there was this discussion about an attorney, did Mr. --

13   that is, Sergeant Vargas speak to him in Spanish after

14   there was this discussion about whether or not he could

15   afford an attorney and whether or not one would be

16   appointed at a later time?

17       A.   Yes.

18       Q.   And what was the -- what did Sergeant Vargas

19   say after that discussion?

20       A.   Did you want me to read it from the transcript

21   or just paraphrase?

22       Q.   The translation that you have in front of you,

23   please.

24       A.   The translation that I have, Sergeant Vargas

25   says, "That's only for a -- they ask you -- they have a

few questions for you.  They can't begin with these
questions or explain everything that is happening if you
don't want to."

Q.   And did Mr. Almanza respond to that?

A.   Yes, he did.

Q.   And what did he respond with?

A.   "No.  Well, I want them to ask me.  I want to
see what they want."

Q.   Then later -- was that then translated to you?

A.   Yes, it was.

Q.   And then did Mr. -- did Sergeant Vargas
continue with his explanation to Mr. Almanza?

A.   Yes, he did.

Q.   And what did he explain to Mr. Almanza?

A.   Sergeant Vargas asked, "So you understand your
right and you want to answer the questions?"

Q.   And that was in Spanish?

A.   Yes, it was.

Q.   And what did Mr. Almanza say?

A.   He said, "No."

Q.   And what did Sergeant Vargas say?

A.   "You don't want to answer the questions, sir?"

Q.   And what did Mr. Almanza say?

A.   "Yes, I want to answer, but -- okay, okay.  Go
ahead, say what it is you want to know."

1        Q.   And that came from Mr. Almanza?

2        A.   Yes.

3        Q.   And at that point did the interview -- were

4    questions, specific questions asked of him?

5        A.   Yes, they were.

6                MR. LONG:   Those are all my questions.

7                THE COURT:   Okay.  Go ahead and step down.

8    Let me have that exhibit, please.

9                Do you have any additional witnesses,

10   Mr. Long?

11               MR. LONG:   No, sir.

12               THE COURT:   Good.

13               Mr. Green, do you have any witnesses?

14               MR. GREEN:   No, Your Honor.  Just argument.

15               THE COURT:   Good.

16               Okay.  Mr. Long, do you want to add

17   anything to the response that you previously filed?

18               Mr. LONG:   No, sir.

19               THE COURT:   Mr. Green, you want to add

20   something new to Mr. Huggins' motions?

21               MR. GREEN:   Your Honor, only that I think

22   it's very clear from the interview, when you listen to

23   the entirety of the interview, and especially to this

24   portion around the Miranda warnings, that my client, who

25   speaks no English or very little English, who struggles

1   with, does not read, does not write, is illiterate, is a

2   farm worker with no education, that there was

3   significant confusion as to what they were talking about

4   when they were telling him these Miranda rights.

5          He kept asking, Your Honor, do you -- do

6   I -- he asked them, do I -- why do I need a lawyer,

7   because he thought that they were saying, Your Honor,

8   you need a lawyer, and he was confused by that.

9          I don't believe that he fully understood,

10  Your Honor, and I think the transcript, and especially

11  listening to the sound of the voices, that my client

12  understood anything that was being said to him.  He may

13  have answered appropriately, Your Honor, but his answers

14  may or may not have been the answers that he would have

15  given had he fully understood what the questions were.

16          THE COURT:  Okay.

17          MR. GREEN:  So Your Honor, I'm -- what I'm

18  asking, I guess, is that any statements made by my

19  client in this interview be stricken and that testimony

20  not be allowed.

21          THE COURT:  Did you want to add anything to

22  Mr. Huggins' motion to suppress everything because of an

23  illegal arrest, what he characterized as an illegal

24  arrest?

25          MR. GREEN:  Well, Your Honor, one of the

1  questions that my client asked during the interview is

2  why didn't you come to my ranch.  I live at my ranch.

3  Why didn't you come there if you wanted to ask me

4  questions?

5          And they didn't.  They picked him up on the

6  road, in a patrol car, marked patrol car.

7          We don't have testimony yet as to whether

8  he was handcuffed or not.  I'm not sure whether he was

9  or not.

10          But Your Honor, that seems, once you're in

11  custody, which he was in custody, because again, being

12  the person that he is, with the knowledge and level of

13  intelligence and understanding that he has, I don't

14  believe that anyone could believe that he didn't think

15  he was under arrest or in some way in custody when those

16  officers picked him up and brought him -- put him into a

17  locked cell and then had officers standing around him

18  while he was talking.  Nowhere in the transcript is he

19  told that he's free to leave, and I don't believe he

20  ever was told that.

21          THE COURT:  Okay.  Let's take all of that

22  as a given.  How does that lead to suppressing all of

23  the evidence, including the statements?

24          MR. GREEN:  Your Honor, well, the

25  statements were involuntary, Your Honor, and --

1          THE COURT:  Okay.  Here's Mr. Huggins.

2    This illegal arrest, as he defines it, happens, so

3    everything that follows, includes the -- including the

4    statements, is suppressible, is involuntary or in

5    violation of constitution.

6          Your argument is -- are you trying to argue

7    the same thing he did?  Putting aside whatever else

8    might have happened during the statements, let's assume

9    he spoke perfect English, waived his rights, and gave a

10    statement.  Mr. Huggins' argument would still be, well,

11    you picked him up and you didn't have a right to,

12    therefore, it's all suppressible.  Are you still making

13    that argument?

14          MR. GREEN:  As far as an issue of probable

15    cause, Your Honor, I guess is where you're headed with

16    this?

17          THE COURT:  I guess that's how he says it.

18          MR. GREEN:  Your Honor, I --

19          THE COURT:  I'm just asking for your

20    argument.

21          MR. GREEN:  I'm not making that argument,

22    Your Honor.

23          THE COURT:  Okay.  Well, and that's how I

24    read what Mr. Huggins was in effect saying is this is an

25    unconstitutional arrest and obviates or eliminates

1    everything that happens afterwards.

2              Okay.  Anything else you want to add?

3              MR. LONG:  As to that issue, just, clearly

4    there was sufficient facts for an arrest.  Arrest

5    warrants aren't necessary.  There was probable cause

6    given the information they had with the disclosure from

7    the medical evidence, so even if there was an arrest, an

8    arrest would be appropriate, lawful.

9              Even though he was ultimately allowed to go

10   at the end of the interview, he could have certainly

11   been booked, and I submit proof evident and presumption

12   great would have been fine on those facts alone.  So

13   there's not an illegal arrest.

14             THE COURT:  Okay.

15             MR. LONG:  And his will was not overborne

16   as to the statements, which is the clear standard for

17   voluntariness, and so suppression is not appropriate.

18             THE COURT:  Okay.  Well, let's deal with

19   them in just that order.

20             Based on the officer's testimony, it's

21   obvious if the picking up of Mr. Almanza was a

22   detention, not an arrest, that there was certainly

23   reasonable grounds to detain him for the purpose of

24   further investigation; that further investigation

25   apparently took, allegedly, three to four hours to

1    obtain the physical evidence warrant.  But in any event,

2    it was a detention and was grounded in -- on reasonable

3    grounds, very clear reasonable grounds.

4              If in fact you characterize it as an

5    arrest, and I'm not sure that I would, although arguably

6    you could because he was picked up -- let's assume he

7    was handcuffed, transported to the Sheriff's Office.  As

8    soon as the responsible officer arrived, he was released

9    from that holding cell, not a jail cell but a holding

10   cell, and placed in a position where, according to the

11   officer, was open to the public, he was free to leave,

12   if there were handcuffs they were removed, and the

13   questioning occurred in that kind of setting.

14             So if it came to it, based on the victim's

15   statement and the medical evidence, if it is an arrest,

16   there was sufficient evidence from which probable cause

17   could be found to make an arrest.  But I'm not going to

18   characterize it as an arrest.  Arguably if it were an

19   arrest for legal purposes, there was probable cause to

20   lead to that arrest.  The reason I don't, I've already

21   stated, call it an arrest is because there was no

22   follow-up.  There was no booking, there were no charges,

23   he was interviewed, and he was released.  He was told he

24   was free to go.

25             So Mr. Huggins' motion, the first motion

1    expressed by the Defendant, that is, to suppress

2    everything because of the arrest or the detainment, is

3    denied.

4              As to the motion to suppress the statements

5    based upon them being involuntary or in violation of

6    Miranda, the statements have all the criteria -- well,

7    let me back up.

8              Miranda was properly given both in English

9    and Spanish.  The question is whether Mr. Almanza

10   understood and how that affected him.  It's clear from

11   the transcript and even more clear when you listen to

12   the audio recording that Mr. Almanza's first language is

13   not English, but he did respond to questions asked in a

14   manner that was consistent with the questions.  It was

15   not, as the officer pointed out, answering "purple" to

16   the question "what's your birthday."

17             His answers sometimes indicated he didn't

18   understand the question or needed the question

19   clarified, but he certainly answered in response to

20   those questions.  So there's -- his English, although

21   his English is probably as good as my Spanish would be,

22   at least indicates he understood the concepts, the

23   basics that were being asked.

24             When you get to Miranda, Miranda was given.

25   The follow-up to Miranda is that -- to Miranda is that

question, do you understand these rights and do you want
to talk.  His questioning of the officers, and even
saying no and then yes, indicates that ultimately he did
understand those rights when they were explained to him.

He was clear, as you work down through that
transcript where both English and Spanish are presented,
that he got a clear explanation, and the bottom line is
you don't have to talk to us if you don't want to.  But
he wanted the questions asked so he would know, from all
appearances, what it is the officers were looking for,
what they thought they'd charge him with, what they
thought he had done.  And he did ask they ask the
questions, and he was.

The circumstances already pointed out
indicate that the statements were given voluntarily.
There's no indication at all of any promise of any type;
there's no indication of any coercion or duress.  The
only indication might be the understanding issue, and I
believe that it was -- that he ultimately understood,
and he understood before the bulk of the statements were
given or the questions were asked.

So the second motion to suppress the
statements is denied.  Okay.

Now, with that, did we have anything else
we need to cover?  We had Mr. Long's motion in limine as

1    to Mr. Cote.

2              You've indicated, again, you didn't finish

3    your interview?

4              MR. LONG:  I hadn't.  I have not finished.

5    I have just a few more questions that I'd like before he

6    testifies at some point, but I didn't finish the

7    interview.  And I don't know that -- I have not finished

8    it, Judge.

9              THE COURT:  Okay.  Now, do you want to

10   preclude him entirely -- at least your motion asks that,

11   but let's -- because of the lack -- the 15.2 violation,

12   failure to disclose?

13             MR. LONG:  And I'm candidly less concerned

14   about the timing of it and more -- would like to focus

15   more on the substance of why he should be precluded for

16   the lack of foundation.  So if Mr. Cote wants to testify

17   about things with which he has adequate knowledge --

18             THE COURT:  Well, how about the

19   photographs?  How about going out to the scene and

20   photographing the area?  That makes it clear for both

21   sides what it looks like, at least.

22             MR. LONG:  The problem is, Judge, is during

23   the interview, Mr. Cote was specifically asked whether

24   or not those fairly and accurately represent the --

25   what's being taken from the incident.  He said, "No,

1    they do not."  And so I think it lacks fundamental

2    foundation.

3                    THE COURT:  I'm sorry, does not fairly

4    represent what?

5                    MR. LONG:  Does not represent the location

6    and what the images depict from the time of the

7    location, so he lacks fundamental foundation.

8                    THE COURT:  You mean the time of the

9    incident?

10                   MR. LONG:  I'm sorry, the time of the

11   incident, yes, sir.

12                   THE COURT:  Okay, I gotcha.  Those

13   photographs were taken enough later than October of 2011

14   they don't fairly and accurately -- he can't say they

15   fairly and accurately represent it in October of 2011?

16                   MR. LONG:  Correct.

17                   THE COURT:  Okay, I gotcha.

18                   MR. LONG:  And that's specifically related

19   to the suggestion that's offered in his report that they

20   would like the argument that somehow those strands of

21   hair might be the victim, and that's specifically what

22   I'm seeking to preclude as even the inference or

23   question that those hairs, (a) might be human, and (b)

24   might be the victim's, that this witness lacks

25   foundation to offer that.

1      THE COURT:  Did you, Mr. Green, have any

2  intent to refer to that in your opening statement, any

3  of that information?

4      I'll tell you why I ask.  I'll make it real

5  clear.  I don't normally like to rule on motions in

6  limine that are dependent upon development of facts if I

7  don't have to, but if you're going to mention it in your

8  opening, I need to get it done now, and that's why I

9  ask.

10      MR. GREEN:  Your Honor, I don't believe I'm

11  going to -- well, the issue is, the photographs -- and

12  I'm not contradicting Mr. Cote at this point -- Your

13  Honor, the photographs fairly represent the layout of

14  the farm, of the ranch.  There are some photographs that

15  represent what we consider evidence, which are strands

16  of hair stuck in barbed wire.

17      THE COURT:  Is your investigator able to

18  say when he took the photographs in 2013 it accurately

19  depicts what it looked like in 2011?  I think that was

20  the point that Mr. Long was making.

21      MR. GREEN:  I don't believe he can, Your

22  Honor, because he was not there in 2011 to know whether

23  it did or not, based on --

24      THE COURT:  Isn't that foundational,

25  though?

1          MR. GREEN:  Well, it is, Your Honor, except

2     that it's mostly illustrative of the scene and how the

3     events occurred and so on and so forth.

4          THE COURT:  You can't even say that if you

5     don't know what it looked like in 2011.  I mean, you

6     can't even say that.  You can't say that angle is

7     illustrative of where he sat 2011 if you don't know what

8     was there in 2011, right?

9          MR. GREEN:  Correct.

10          THE COURT:  Well, if you are not going to

11     mention any of that in your opening, I'll wait for a bit

12     to rule on the motion in limine.  If you are going to

13     mention it, I'll tell you right now, it doesn't -- it

14     sounds like it's a motion that should be granted, okay?

15          MR. GREEN:  At this point I'll hold off,

16     Your Honor.

17          THE COURT:  Okay.

18          Why don't we -- I told the Jury

19     Commissioner 1:30 and we'll get started with

20     impanelment.  Why don't you guys go get some lunch and

21     come back here about 1:15.

22          The preliminary instructions that I gave

23     you are the real standard ones.

24          Mr. Kohler, Mr. Long, any problem with

25     them?  Have you even had a chance to go through them?

1          MR. LONG:  Judge, I haven't looked through

2    them.

3          THE COURT:  Okay.

4          MR. LONG:  I don't need to.  The

5    preliminary instructions, not concerned with them.

6          THE COURT:  You only have one charge here,

7    and so I modified it enough so it references one charge

8    in the passages where it matters.

9          Mr. Kohler, you're familiar with them.

10   Any --

11         MR. KOHLER:  No, Your Honor.  There's

12   nothing in there that we would dispute at this point.

13         THE COURT:  Okay.  How about you,

14   Mr. Green?

15         MR. GREEN:  Your Honor, I haven't had a

16   chance to review them, but I don't believe there will be

17   a problem, and I can review them over lunch.  I would be

18   happy to.

19         THE COURT:  Yeah, if you see any problem

20   let me know, but it is really the standards.

21         The tentative first draft of the finals,

22   they're just out there for you guys to say hey, Judge,

23   you forget number 22 or don't put in number 15 or

24   whatever it is.  So those are just for discussion down

25   the road.

1          Yes, sir?

2          MR. KOHLER:  I do have -- I did finish our

3   proposed final instructions, Your Honor, if you would

4   like a copy of that.

5          THE COURT:  Oh, good.  You mean by --

6   standard criminal?

7          MR. KOHLER:  Yes, and the statutory

8   criminal as well, Your Honor.

9          THE COURT:  Okay, good.  Yeah.  Is that the

10  original?

11         MR. KOHLER:  Your Honor, I have not signed

12  any of them, so it -- effectively, yes.

13         THE COURT:  Okay, good.  Sign that and I'll

14  give it to the clerk.  She'll stamp it as original.

15         MR. KOHLER:  Thank you.

16         THE COURT:  And you will file.  Okay, thank

17  you very much.

18         Okay.  Anything else before 1:15, Mr. Long?

19         MR. LONG:  Nothing from the State.

20         THE COURT:  Mr. Green?

21         MR. GREEN:  No, Your Honor.

22         THE COURT:  Okay, folks.  See you then.

23         (Recessed from 11:53 a.m. until 1:22 p.m.

24  The proceedings resumed outside the presence of the jury

25  and with the presence of Sabine Michael, court

1    interpreter.)

2            THE COURT:  Let's have the record show the

3    presence of the attorneys and Defendant.  The jury is

4    not here, prospective jury is not here.

5            Just wanted to finish a few things before

6    we start impanelment.  And again, the procedure I'm

7    going to follow is not what I'd normally do.  When the

8    jurors are here we'll have them sworn in, and what I'm

9    going to do is read them first the portion of the voir

10   dire that tells them what we're doing, asking questions,

11   et cetera.  I'll introduce everybody, and then I'm going

12   to read them the portion that deals with length of trial

13   and reasons to be excused.

14           And then what I'm going to do is ask them

15   first, because of the -- well, let me back up.

16           There's a place in the voir dire, the bench

17   book voir dire, where I tell them what the Defendant is

18   charged with, and I'm going to say:  The Defendant in

19   this case is charged with committing sexual conduct with

20   a minor.  The event is alleged to have occurred on

21   October 22nd, 2011, in or near the town of Dudleyville.

22   The name of the alleged victim is Ada Wilhelmi, who at

23   the time of the incident was alleged to be or is alleged

24   to be 4 years or was alleged to be 4 years old.  The

25   Defendant has pled not guilty to this charge.

1          And I'm going to do that because first
2    thing we're going to use to get rid of prospective
3    jurors, if necessary, is me asking them to come up to
4    the podium if they, because of the nature of the case
5    alone, feel they must be excused from the case.  We'll
6    go through that set.  I suspect we'll lose a percentage
7    because of the nature of the charge.
8          And then I'm going to ask those who feel
9    that they are qualified to be excused for the legal
10   reasons I had read to them, length of trial, the
11   hardship, to come forward and we'll get rid of those.
12         But in doing that, I need to check with you
13   guys.  What actually is the length of trial?  Because
14   we've changed things a little bit from this morning.
15   Hopefully -- hopefully -- we'll get a jury impaneled by
16   the end of the day today, hopefully.  May not have the
17   preliminary instructions read by the end of the day, may
18   start off with that tomorrow morning or start off with
19   the opening statements.  I really don't want to quit
20   today until we've got the 15 that we're going to have.
21         Again, for the record, 12-person jury,
22   three alternates, 15 will be seated, 27 will be called
23   up, and that's what we'll work from when we get to the
24   strike-and-replace.
25         Now, the trial.  If we start tomorrow,

1    which is Tuesday, with testimony -- and the State has

2    indicated that they have a witness, a very important

3    witness who cannot be here until Monday, a week from

4    today, so we know we're going to have this week and at

5    least Monday of next week.

6                And I take it it's not a witness that you

7    could hold calling until the Defendant has done whatever

8    he's going to do?  You need to put it on as part of your

9    case in chief?

10               MR. LONG:  Yes, Judge.

11               THE COURT:  Okay.  Okay.

12               Now, knowing that, knowing that your last

13   witness is coming in Monday morning, whenever that is,

14   do you think we're going to have four full days of

15   testimony, or are there going to be days that are part

16   days?

17               MR. LONG:  I think there will be days that

18   will be part days, although -- Judge, I think there is a

19   chance, if we go through full days from Tuesday through

20   Friday, that we will have, for all intents and purposes,

21   full days.

22               THE COURT:  Okay.  And that works out

23   because we had had the half day Thursday off, but we're

24   going to be able to get that in.  Okay.

25               MR. LONG:  The only --

1          THE COURT:  And do you take -- I'm sorry.

2          MR. LONG:  The only issue was, I guess

3   we'll have to play by ear, and for the Court, obviously,

4   on Detective Snyder's requirement if he does have to go

5   testify in that dependency matter, which is in Phoenix,

6   not here in this courtroom --

7          THE COURT:  Oh, too bad.

8          MR. LONG:  -- which presents a problem.

9          THE COURT:  And we don't know about that

10  yet?

11         MR. LONG:  Correct.  I think Detective

12  Snyder is waiting for a subpoena and confirmation

13  whether it goes.

14         My understanding is it's one of those --

15  it's in the very preliminary stages of the dependency,

16  so I really am not familiar with those.  Mr. Green would

17  probably be more helpful in telling us how likely they

18  are to go.

19         THE COURT:  Okay.  Well --

20         MR. LONG:  But that's the only other

21  wrinkle, Judge.

22         THE COURT:  -- for the purpose of talking

23  to the jury about the length of trial, I'll need to tell

24  them, as best we can estimate at this stage, it's not

25  going to finish at least until Monday, right?  And

1    that's if your last witness is on Monday and it depends

2    on what you do.

3              And I don't want an answer yet, but even if

4    you have one or two witnesses, we should be able to get

5    it to the jury Monday.  So do I need to tell them there

6    is a possibility, depending on deliberations, that you

7    may have to come back Tuesday morning to deliberate?  So

8    I need to let them know that it's that possibility,

9    right?

10             MR. LONG:  Yes, sir.

11             THE COURT:  Okay.  The way of

12   introducing -- or telling them what he's charged with,

13   any objection, Mr. Long?

14             MR. LONG:  No, sir.

15             THE COURT:  Mr. Green?

16             MR. GREEN:  No, Your Honor.

17             THE COURT:  Okay.  Then I have the witness

18   list.  Nothing has changed there.

19             Any objections to the process the way I

20   described it, Mr. Long?

21             MR. LONG:  No, sir.

22             THE COURT:  First, the nature of the case,

23   and then second, the hardship things?  Okay.

24             You either, Mr. Green?

25             MR. GREEN:  No, Your Honor.  That sounds

1    fine.

2              THE COURT:   Okay.   We know what happens

3    now.   I don't know how many jurors they have.   Hopefully

4    they've called at least 80.   It will take the next 20

5    minutes to get them all up here, and we'll get started

6    as soon as they're in here.

7              I should say I'm going to read the parts

8    that I told you I was going to read and then introduce

9    all of you.   So I'll introduce you, Mr. Long, you,

10   Mr. Kohler, you introduce your investigator; I'll

11   introduce you, Mr. Green, and then you can introduce who

12   is at the table with you.   You want to be identified as

13   from the law firm of Cooper & Rueter in Casa Grande?

14             MR. GREEN:   Sure, Your Honor.   I'm sure my

15   law firm would appreciate that.

16             THE COURT:   I do have to ask does anybody

17   know anybody in that firm.

18             MR. GREEN:   Right.

19             THE COURT:   They may not know you, but Liz

20   Rueter may have done a divorce for them or something.

21             MR. GREEN:   Right.

22             THE COURT:   County attorneys, there's no

23   problem.   I know how to introduce you.

24             I didn't, because it was not me that led

25   this up to trial, one of the other questions I ask at my

1  final pretrial, do you want me to mention the use of the

2  interpreter?  Because one of my -- it runs like this:

3  Ladies and gentlemen, during the course of the trial I

4  think you may see an interpreter assisting the

5  Defendant.  You are not to consider this in your

6  deliberations or allow it to affect you in any way.

7         Anybody have any problem with that?  Any

8  problem with that?

9         MR. GREEN:  I don't have any problem with

10  that, Your Honor.

11         THE COURT:  Okay.  It's just one of the --

12  and I think one trial we did catch one juror who said if

13  they can't speak English they shouldn't be here.  You

14  know, one of those kind.

15         So no problem, right?

16         MR. LONG:  Right.

17         THE COURT:  Okay.

18         MR. GREEN:  Your Honor, I do have -- if I

19  may, I do have a motion.  This is an easy one.

20         THE COURT:  You know, actually they're all

21  easy.  It's just a matter of applying the law to the

22  facts as you tell me.

23         MR. GREEN:  Well, Your Honor, this one is

24  for additional hours for Mr. Cote to be able to assist

25  me at trial.  I filed it downstairs, but the original --

1          THE COURT:  This is the second trial in a
2     row where the first day of trial they wanted more money.
3          MR. LONG:  I'll have --
4          MR. GREEN:  They work hard.
5          MR. LONG:  -- my motion prepared shortly,
6     Judge.
7          THE COURT:  Yeah.  Considering what he's
8     getting paid in an hour, I'm getting less than half
9     that.
10          What do you think you need, Mr. Cote?  20?
11     30?
12          MR. GREEN:  Your Honor, the motion was for
13     50, I believe.
14          THE COURT:  I didn't look.  I just looked
15     at the order.
16          MR. COTE:  It's mainly trial hours, Judge.
17          THE COURT:  Okay, done.
18          Okay.  Let's take a break and get the
19     jurors up and we'll get started.
20          (Recessed from 1:30 p.m. until 1:44 p.m.
21     The proceedings resumed with the presence of the
22     prospective jury panel.)
23          THE COURT:  Good afternoon, folks, and
24     welcome to the Pinal County courthouse in lovely
25     Florence, Arizona.

1          This is the time set for the trial in the
2     matter of CR201103026, State versus Fernando Segoviano
3     Almanza.
4              Is the State ready to proceed?
5              MR. LONG:  Yes.  Matthew Long for the State
6     of Arizona.  The State is ready to proceed.
7              THE COURT:  Thank you very much, sir.
8              And is the Defendant ready, sir?
9              MR. GREEN:  Yes, Your Honor.  Paul Green
10    for the Defendant.
11             THE COURT:  Thank you very much.
12             Okay.  Ladies and gentlemen, I need you all
13    to stand and raise your right hands.  We're going to
14    swear you in as prospective jurors, if you would,
15    please.
16             (The prospective jury panel was duly sworn
17    by the clerk of the court, according to law.)
18             THE COURT:  Thank you very much, folks.
19    Please have a seat.
20             (Pursuant to Pinal County Administrative
21    Order No. 94-07, jury voir dire is not included in this
22    transcript but was conducted at this time.)
23             THE COURT:  Subject to our discussion,
24    Mr. Long, do you pass the panel for the State?
25             MR. LONG:  Yes, sir.

1          THE COURT:  Subject to our discussion,

2   Mr. Green, do you pass the panel for the Defendant?

3          MR. GREEN:  I do, Your Honor.

4          THE COURT:  Okay.  That has a legal effect

5   I need to explain to you.  Those of you who are behind

6   the bar are now excused.  You can check out with the

7   Jury Commissioner.  I do want to thank you very much for

8   being here, for showing up, for waiting patiently, and

9   for listening and being ready to be called here, but you

10  are all excused.

11          And I suspect, Mr. Long, Mr. Green, we can

12  expect the normal 40 minutes to 60 minutes to get

13  through this, I suspect?

14          MR. LONG:  I won't need that long, but I'm

15  happy to take whatever the Court will give.

16          THE COURT:  What I'm going to suggest, and

17  now I'm doing it openly because 27 of you all have some

18  investment in it.

19          The next section, what normally happens,

20  the little script says I'm supposed to tell you this

21  will take 30 to 40 minutes, go downstairs and wait until

22  we call for you.  It's already ten to 5:00.  I have a

23  couple of options -- and it will probably take, at a

24  minimum, 30 minutes to get through the next section that

25  has to be done -- that is, to send you all home and have

1    all 27 of you come back in the morning and then we'll

2    seat the trial jury, or we can have you all sit

3    downstairs and wait downstairs until the attorneys and I

4    have finished the next section.

5                Mr. Long, you don't have any particular

6    preference?

7                MR. LONG:  I don't, Judge.

8                THE COURT:  Mr. Green?

9                MR. GREEN:  No, Your Honor.

10                THE COURT:  Well, ladies and gentlemen, I'm

11    looking to see if faces look happy or unhappy.  By 5:30,

12    if I keep you here, by 5:30 we'll pare it down to 15,

13    and that means 12 of the 27 of you are done.  If I send

14    you all home, that means all 27 of you need to be back.

15                I think probably it's fair to all of you to

16    ask you to please wait downstairs.  We'll get you up

17    here no later than 5:30 and we'll seat the 15 of you and

18    let 12 of you go home.

19                I always say this before I send you down

20    there:  Please believe me that all of you have been

21    found to be fair and impartial; you've all been found to

22    be qualified to be on the jury.

23                When we do get you back here you'll come in

24    at random, and then we'll call you up to seat the 15 of

25    you.  If you're not one of those 15, please do not be

1    insulted.  We simply have to pare it down a bit, and

2    that's the next step in it.  Okay?

3             Follow Todd down there, do not speculate

4    about the case, and we'll get you out as quickly as

5    possible.

6             (Recessed from 4:53 p.m. until 4:55 p.m.

7    The proceedings resumed outside the presence of the

8    prospective jury panel.)

9             THE COURT:  Mr. Long, anything else you

10   want to add?

11            MR. LONG:  No, sir.

12            THE COURT:  You ready to do the strikes?

13            MR. LONG:  I am.

14            THE COURT:  Mr. Green, you?

15            MR. GREEN:  I believe so, yes, sir.

16            THE COURT:  Okay.  I please ask you, both

17   of you, to work diligently and see if we can keep that

18   5:30 promise.  Okay?

19            MR. GREEN:  We'll do our best.

20            MR. LONG:  I got eight, so six won't be a

21   problem.  I'm kidding.

22            THE COURT:  Thank you.

23            (Recessed from 4:55 p.m. until 5:25 p.m.

24   The proceedings resumed with the presence of the

25   prospective jury panel and Laura Anderson, court

1    interpreter.)

2              THE COURT:  Let's have the record show the

3    presence of the attorneys, the Defendant, Mr. Almanza,

4    and the prospective jurors are present.

5              The clerk is now going to call the names of

6    those 15 that will hear the trial.  As your name is

7    called, please come on forward and the bailiff will get

8    you seated.

9              THE CLERK:  Kathleen Debnar, Joanne Winner,

10   Phillip Fox, Lee Nelson, John Fitch, Paul Mieras, Linda

11   Fedele, Heather Feniello, Cheryl Douglas, Darrel Snyder,

12   Frank Todaro, Nancy Fallon, David Mersy, Mia King,

13   Harold Swanson.

14             THE COURT:  Okay, thank you very much.

15             Okay, ladies and gentlemen.  As I mentioned

16   when we took the break, those of you behind the bar are

17   again -- please, thank you all very much -- have all

18   been found to be good jurors, qualified to sit as

19   jurors, but as I said, we narrowed it down.  You're all

20   excused.  Thank you very much.  The Jury Commissioner is

21   waiting for you.

22             Now for the 15 of you, I need you once

23   again to stand and raise your right hands, please.

24   She'll swear you in as a trial juror.

25             (The jury panel was duly sworn by the clerk

1   of the court, according to law.)

2               THE COURT:  Thanks, folks.  Have a seat.

3               Okay.  Ladies and gentlemen, what we're

4   going to do is we're going to take the evening recess

5   and we'll start in the morning with preliminary

6   instructions.  I actually don't have them copied for you

7   or I would do that right now.  So we'll pass those out

8   first thing in the morning and then we'll start with

9   opening statements.

10              I'm not going to read all those to you,

11  although I have a set.  What I do want to talk to you

12  about real briefly is your behavior as jurors, the

13  important parts, and I'll go into more detail tomorrow.

14              You've heard what the charge is.  You've

15  got kind of a basic idea of when it happened and who is

16  accused and who the alleged victim is, et cetera.  Do

17  not speculate about what's being presented to you.  You

18  will not be able to decide this case until you've heard

19  all the evidence, the arguments of counsel, and you've

20  gone back to the room, jury room to deliberate.

21              Please do not talk to anybody about the

22  jury service except to tell them that you're on a jury

23  and what the estimated length of the trial is.  I know

24  as we go along you will be getting information.  You

25  might be tempted by friends, spouse, you know, hey,

1   what's going on.  You can't talk about what's going on

2   during the trial.  All you can do is tell them how long

3   the trial is -- that you're on the jury and how long the

4   trial is.

5            When you come back in the morning, please

6   meet at the jury room, the assembly room downstairs.  Do

7   not come up to the courtroom.  The bailiff will bring

8   you up here.  We don't want you kind of drifting up

9   here.  The attorneys and I will be meeting at 8:30.  I

10   need you there at about a quarter to 9:00, and we'll do

11   our best to get you up here at 9 o'clock in the morning.

12            If you do have any questions about parking

13   or restaurants, that kind of thing, the bailiff and

14   other court staff downstairs can help you, but if

15   there's any questions about the case, you cannot talk to

16   the court staff about it.

17            You can, during the course of the trial --

18   and again, I'll give you more details later -- fill out

19   a little form, and you ask a question.  If you want to

20   ask a question of me or one of the witnesses or one of

21   the attorneys, there's a way to do that, and there's a

22   little form that will be in the booklet you'll get.  But

23   in the meanwhile, staff cannot talk about the trial

24   either, so if they kind of shrug you off when you

25   mention it, it's because they know they're not supposed

1    to talk.  Okay?

2              Any questions from any of you?

3              Let me double-check before I send you home.

4    Mr. Long, do you want to cover anything else before they

5    go home for the evening?

6              MR. LONG:  No, sir, nothing from the State.

7              THE COURT:  Good, thank you.

8              Do you, Mr. Green?

9              MR. GREEN:  Nothing, Your Honor.

10             THE COURT:  Okay, thank you.

11             Okay, folks.  Go ahead and follow the

12   bailiff out.  We'll see you -- I'll see you at 9:00, but

13   remember to be here at a quarter to 9:00.

14             Attorneys, please be here at 8:30.

15             (5:31 p.m.)

16                   ---o0o---

17

18

19

20

21

22

23

24

25

1                   C E R T I F I C A T E

2           I, Jacquelyn A. Allen, RPR, a Certified

3 Reporter in the State of Arizona, do hereby certify that

4 the foregoing pages 1 - 105 constitute a full, true, and

5 accurate transcript of the proceedings had in the

6 foregoing matter, all done to the best of my skill and

7 ability.

8          SIGNED and dated this 28th day of February,

9 2014.

10

11

12                          JACQUELYN A. ALLEN, RPR
                            Certified Reporter No. 50151

13                             For the State of Arizona

14

15

16

17

18

19

20

21

22

23

24

25