# EXHIBIT B

IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

IN AND FOR THE COUNTY OF PINAL

| | | |
|---|---|---|
| THE STATE OF ARIZONA, | ) | 2 CA-CR 2014-0034 |
| | ) | |
| Plaintiff, | ) | No. CR201103026 |
| | ) | |
| -vs- | ) | |
| | ) | |
| FERNANDO SEGOVIANO ALMANZA, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

Florence, Arizona
October 1, 2013
8:46 a.m.

BEFORE:  The Honorable Boyd T. Johnson,
Judge of the Superior Court

REPORTER'S TRANSCRIPT OF PROCEEDINGS

SUPPLEMENTAL RECORD

JURY TRIAL, DAY 2

**(Opening Statements)**

(COPY)

PREPARED FOR:
Arizona Attorney General
Criminal Appeals Section

REPORTED BY:
Jacquelyn A. Allen, RPR
AZ Certified Reporter No. 50151

1

2

## I N D E X

3

|  | Page |
|---|---|
| State's Opening Statement ..................... | 4 |
| Defendant's Opening Statement ................. | 19 |

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**A P P E A R A N C E S**

On Behalf of the State:

        PINAL COUNTY ATTORNEY'S OFFICE
        By:  Matthew Long, Deputy County Attorney
            Bureau Chief
            Major Offenders Bureau
         Thomas Kohler, Deputy County Attorney
        P. O. Box 887
        Florence, Arizona 85132


   On Behalf of the Defendant:

        COOPER & RUETER, L.L.P.
        By:  Paul Green
        P. O. Box 15005
        Casa Grande, Arizona 85130-5005


ALSO PRESENT:

        Detective Randy Snyder, Plaintiff's Case Agent
        Patrick Cote, Defense Investigator
        Laura Anderson, Court Interpreter
        Sabine Michael, Court Interpreter

Florence, Arizona
September 30, 2013
8:48 a.m.

<u>REPORTER'S TRANSCRIPT OF PROCEEDINGS</u>

(Proceedings occurred prior to opening statements which were reported and previously transcribed.  The following proceedings were held in open court with the presence of the jury and Laura Anderson, court interpreter.)


**STATE'S OPENING STATEMENT**

MR. LONG:  The Defendant's a hunter, but not a regular hunter.  Oh, he's a poacher.  A poacher who already had his prey selected.  What he searched for, this poacher, was the right time, place, and manner where he could snatch up his prey.  His prey was 4-year-old Ada, and the day he chose was October 22nd, 2011, when he lured 4-year-old Ada to a hidden, isolated place where he forced his finger into her vagina.

He picked this hidden place so that if she ever told, it would be his word against the word of a child.  He controlled everything so that she wouldn't believe, be believed, and so he could get away.  But there's one thing he couldn't control.  He couldn't control Ada's body and the truth that it would tell when he scratched the inside of her vulva with his finger.

1        And now the Defendant's going to ask you to

2    ignore that medical evidence, to ignore the truth that

3    her body tells, and to believe that she made it up or

4    was convinced to lie about what happened.  At the end of

5    this trial, ladies and gentlemen, your verdict will

6    decide which one that is.

7        This poacher was able to select his prey,

8    was able to find that little girl because he had access

9    to her.  And he had access to her because he worked on a

10   ranch, a ranch near Dudleyville, and this is the Double

11   Check Ranch, a cattle ranch that puts food on our

12   community's table.

13       And Ada's mother, Kathryn Quinn, worked on

14   this ranch as head butcher and as the manager of the

15   packing house, and as a result of that job, she was

16   given a home on this property.  And she spent most of

17   her time, hours and hours a day, working in this

18   building right here, the cutting house, where she worked

19   as a butcher cutting up the animals and grinding meat

20   and doing what's necessary to provide food on our

21   community's table.

22       And the Defendant was a ranch hand.  Worked

23   fixing fences and doing various things.  Kind of a

24   part-time employee.  But as a result of his work there,

25   trusted to work, trusted to do the job as an employee,

he was also trusted to be around Kathryn Quinn's family,
which includes Ada, her older brother, Jack, and her
younger brother, Arlo.  And the Defendant did have
access to these kids.

In fact, these kids, who loved to work on
the ranch, liked to play there.  They had a yard and a
swing set, but they also had access to the animals.
They had chores, and one of those chores included taking
care of some pigs that Ada's mom had.  And the pigs were
back here, kind of tucked back behind the ranch.

And the Defendant also helped out with
those pigs at times, so he knew the lay of the land and
he knew what this setup was.  And he knew that those
kids, Ada, had one pig in particular -- she loved Tinker
Bell, a larger black pig -- and that she liked to go
feed the pigs, liked to help her brother feed the pigs,
water the pigs.  Although she was too young to really do
anything about it or to help out with the chores, she
liked to be around them.

And the Defendant, put it this away, having
already selected his prey, realizing that this would be
a good place to strike -- the pig area is very isolated
with these mesquite trees, and you can see some of the
views that if you're looking towards there, how hidden
and isolated it would be.  This poacher, able to set

this trap, isolated his prey from her family and those
that protect.

So he looked for the day and the time.  And
that day came on October 22nd, 2011, when he convinced
Ada to go over to the pigs, to look at the pigs.  And
she did.  She was wearing a flowered pink dress, or
pink, green, and white dress, and that's what she was
playing in that day.  Maybe it was the dress; maybe it
was something else.  The Defendant decided this is the
day I can strike.

So he convinces Ada to leave the protection
of her home and that front yard, knowing that her mother
would be busy for hours in that cutting house working
away.  He would only need to contend to isolate her from
her older brother, Jack, because Jack was there with the
pigs as well.  It was his job to take care of the pigs,
although the Defendant would help him at times lift
things, water the pigs, do other things.  But Jack was
there.

And this is the path that they'd take in
order to get to the pigpen area.  They'd walk through
this corral area, across some fences, have to navigate
through this corral, and would come to this gate here.
And that's how these kids, and Jack in particular, would
go when he'd take the food with his little wagon, 50

1  pounds or 25 pounds of food, to head over to the pigs,

2  to open that gate, and then stand a good distance, many,

3  many, many yards until you got to the pigpens.  And this

4  is a view inside the gate of those pens, the location,

5  the place where this man snatched up his prey.

6         But Jack was there.  And the Defendant

7  convinces him, you know, go get some treats for the

8  kids.  He knows where those are, and those were on the

9  other side of the house or over where the house and the

10 packing area was.  So Jack, willing to do that, not

11 thinking anything about it, not -- him having already,

12 that is, the Defendant, gained the trust of this family,

13 of Jack and Ada, as a worker.

14        Jack goes and he gets the treats, and

15 that's the opportunity.  The Defendant controlled

16 things, a small window, knowing Jack would be back,

17 knowing Jack was just there, knowing that if Ada told,

18 no one would believe that he did this because Jack was

19 there or nearby.  Crafty like a fox.

20        But that gave the opportunity he needed for

21 Jack to walk back through that area, through the corral,

22 through those gates, to find the treats for the pigs, to

23 come back.  And in that moment, the Defendant took that

24 opportunity and finally completed his hunt by pulling

25 down her underwear and forcing his finger into her

1    vagina.

2              At some point Jack comes back and the

3    Defendant stops.  And Ada's now left there alone,

4    isolated, confused as to what happened.  And the

5    Defendant, like a fox in a henhouse, disappears, because

6    around that time was the end of his shift.  And he's

7    gone, convinced that if Ada tells, it will be his word

8    against the word of a child.

9              And these are the mesquite trees, the

10   isolation and cover, and this is the trap that was set

11   and the place where Ada was attacked and the place where

12   the Defendant left his mark, both emotionally and

13   physically.

14             Ada goes back with her brother, again

15   processing what happened, not -- as a 4-year-old, not

16   understanding what this means, but tells her brother

17   something.  And her brother tells her, You need to tell

18   mom.  And eventually she does.

19             She goes into mom while she's working,

20   distracted, doing her job, and she says something,

21   talking about the Defendant's fingernails and how sharp

22   they are.  Mom's confused, asks her to clarify.  And she

23   demonstrates what he did, talking about how he scratched

24   her.  Police are called, an investigation begins.

25             But how do you investigate, how do you

1   prove something that happened when the person planned it

2   to get away, leaving no evidence?  Well, as with a fox

3   in a henhouse, sometimes the best evidence is the

4   evidence left behind by that fox, feathers, claw marks.

5   The Defendant left his own claw mark on this little

6   girl.

7            It wasn't discovered right away.  Mom takes

8   Ada to the police.  Police are called, and they start an

9   investigation.  While she's waiting to be talked to,

10  while Ada's waiting, she has to go to the bathroom.  Mom

11  takes her to the bathroom.  Ada talks about that it

12  burns when she pees.  And that's when mom discovers that

13  the Defendant left his mark.  And Ada's body told the

14  truth, the same truth that she told:  Fernando stuck his

15  finger in me and he scratched me.

16           They find blood on Ada's underwear.  But

17  these officers, these investigators, don't just say,

18  Well, that's it, we're done.  They look, and they think,

19  Well, what else could have caused this injury?  And they

20  look at the underwear.  And there's something

21  significant, not about what's there, but about what's

22  not there.

23           And what they see is that there's no rips

24  or tears.  I mean, after all, this is a little girl who

25  walks around a ranch that has fencing and barbed-wire,

1    but they observe that without any damage to the

2    underwear, no rips, tears, the injury bypassed that

3    underwear.  It bypassed it exactly how Ada said it did,

4    the Defendant pulled her underwear down and stuck his

5    finger in her.

6              With this information, Ada is taken to a

7    medical exam.  Now, she's injured.  She needs to be

8    treated.  And they go to the Tucson Medical Center and

9    speak to Dr. Klein.  As part of the diagnosis and as

10   part of treatment, they talk to Ada.  And Ada tells

11   them -- that is, Dr. Klein -- Fernando asked me if I

12   wanted to go check the pigs with him.  When we went to

13   check the pigs, he pulled my panties down and he was

14   kissing me.  He put his fingers inside me, and his

15   fingernails are so sharp that they scratched me.  Very

16   clear, very precise, a sensory experience.

17             Dr. Klein observes her most sensitive areas

18   and sees a superficial abrasion.  An abrasion.  Not a

19   cut, not a tear, not a laceration, an abrasion.  And

20   it's at the base of the left labia minora or inside the

21   vulva.  Dr. Klein, who doesn't have the same training to

22   deal with kids and victims of sexual abuse, sends her to

23   a Sexual Assault Nurse Examiner, Sharon Welch.

24             Sharon Welch also speaks to Ada as a

25   treating medical personnel and gets some information.

1  And Ada very candidly tells the woman that Fernando
2  stuck his fingers and his nails in me where I go pee
3  from.  He told me to get on his lap, he pulled my
4  panties down, then he put his fingers inside me.  He
5  kissed me on the side of my check.  He touched my butt,
6  too.  Same concepts, same description, but different
7  words.  The words of a child relating what she
8  experienced.

9          Nurse Welch also examines her and takes
10  some photos as well that are called colposcope pictures,
11  and you'll hear about those.  And that -- it's a
12  medical -- it's a medical instrument that takes
13  pictures, in this case of victims of sexual abuse and
14  the genital area.  And she takes those pictures.  But
15  she observes an injury, observes an abrasion.

16          Now, Dr. Klein and Nurse Welch offer an
17  opinion based on this, based on their observations, and
18  they say this is consistent with a finger, and it's
19  exactly what you would expect given what this little
20  girl said.  Her body is telling the truth that her mouth
21  already spoke, and these two medical professionals
22  confirm it.

23          These doctors offer other opinions and tell
24  these detectives.  But could it have been caused by
25  something else?  What about barbed-wire?  They say, This

1    is not a barbed-wire injury.  There was no other

2    injuries on her, her underwear wasn't damaged, and this

3    is an abrasion, this isn't a cut.  There's no bruising

4    or anything else outside of -- on the outside of her

5    body or the outside of her vulva.  This is a friction

6    injury consistent with a finger.

7              With this information the detectives go and

8    get the Defendant's story.  They contact him and they

9    speak with him.  And you'll have an opportunity to hear

10   about that interview.  You'll hear that Mr. -- the

11   Defendant, although a Spanish speaker and that's his

12   primary language, speaks English, understands English

13   and speaks English.

14             And as the detectives speak with him, he

15   answers them.  He responds in English.  And they ask him

16   about what happened the day before.  And at times they

17   do use a Spanish interpreter, and we're not saying he's

18   the best English speaker, but he certainly understood,

19   based on his answers.

20             And Detective Snyder speaks with him,

21   knowing that this information is there, knowing that

22   Ada's body spoke the truth and revealed the truth that

23   Ada told.  And he confronts him and says, You know what?

24   Tell me about what happened yesterday.

25             And the Defendant says, Nothing.  Nothing

1    happened.

2            They ask him who he knows, and he says, I

3    know Pablo, known as Paul.  He's the owner.

4            He says he doesn't know the little girl's

5    name when he's asked about the little girl, but

6    acknowledges there was a little girl.  But then he

7    changes a little bit and says, You know, I did see the

8    little girl over by the pigs.  Focuses in on where he

9    saw her, acknowledging he was alone with her, just as

10   Ada said.

11           And he's asked, Well, did you ever touch

12   her?

13           He said, No, I never touched her.  Never

14   put my hands on her.

15           Detective pushes him a little bit and says,

16   Not sure that I believe you.  She says you touched her.

17           Well, I may have.  I may have.  I may have

18   touched her, I may have picked her up.

19           He says, Oh.  Continues on and pushes him.

20           And the detectives do something.  They

21   tell -- they give a ruse and tell the Defendant, Well,

22   you know, your DNA, your skin was found on her.  It

23   wasn't, and it wasn't expected to be, because the

24   officers, when they take him in and they speak to him,

25   they look at his hands and they notice that they're

1    clean.   Having worked on the farm earlier that day -- or

2    I'm sorry -- early the day before, he washed his hands a

3    number of times.

4                    And you can see this from the videos that

5    these aren't the hands of somebody who just got done

6    working on fences and working with pigs.   And they see

7    that and they know that obtaining DNA is going to be

8    very, very unlikely given his -- the fact that he washed

9    his hands.   But they tell him anyway, you know, Your DNA

10   is on her.   Your skin cells are on her.

11                   And that's when he changes his story.   And

12   he says, Well, I might have picked her up.   I might have

13   put her on my lap.   Telling a little truth, because Ada

14   said, He put me on his lap.   He doesn't know that, but

15   he confirms what Ada said.

16                   And then pushed a little more, the

17   Defendant says, Well, I might have kissed her on the

18   cheek -- exactly as Ada said -- but that's it.   No other

19   touching, nothing else.

20                   They ask him if he might have slipped or

21   put his finger up in near her vagina, and he says,

22   Absolutely not.   And then he changes a little bit and

23   says, All right, I might have touched her butt.   I might

24   have picked her up and cupped her butt.   But that's it,

25   nothing more.   Again, exactly as Ada said, He touched my

1   butt, too.  And the Defendant, with his own words,

2   confirms it, but ultimately denies putting his finger in

3   her, despite the truth that her body revealed.

4           Although his hands had been washed, the

5   detective's attempt to get scrapings from his nails and

6   take his fingernails to see if Ada's DNA -- the skin had

7   been somehow on his hands, knowing that the way DNA

8   works, how volatile it is, especially skin cells, that

9   that was unlikely since he had washed his hands.  But

10  they take it, as good investigators do.  And as

11  expected, Ada's skin cells aren't on his hands, given

12  the fact that he's already washed them.

13          But this isn't the last statement that the

14  Defendant makes.  The Defendant meets a man named John

15  Boggs.  And John Boggs is in jail, and he's in jail for

16  a domestic problem he had with his wife.  And John Boggs

17  speaks Spanish and is in the same pod, the same area as

18  the Defendant, and he helps the Defendant.  And he helps

19  him because he believes him.  He believes he was wrongly

20  accused and he's in there and he shouldn't be.  And so

21  he helps him write letters, helps him do some writing,

22  talks to him in Spanish.

23          But then he's surprised when the Defendant

24  finally tells him, I don't understand why they're

25  charging me with having sex with her.  All I did is put

1  my finger in her to about the first knuckle.

2            That's when John Boggs steps back and says,

3  I'm going to tell what he said, because you don't do

4  this to kids.

5            He tells John other things, that he

6  would -- wanted to date Ada's mom, that Ada's mom kind

7  of rebuffed him, turned him down, but repeatedly says

8  that he puts his finger just to the knuckle.  Says that

9  he's worried about DNA, worried about that coming back,

10  even though he washed his hands.  Admits to John that he

11  washed his hands and he's worried about that, but he's

12  still confused.  Why are they charging me with having

13  sex with her when all I did was put my finger in her,

14  confirming once again the truth that Ada's body

15  revealed.

16            Investigators want to be sure about the

17  evidence, be sure about what they have, and so they take

18  these colposcope pictures I spoke about that Sharon

19  Welch took, and they sent them independently to a nurse

20  practitioner who's got a specialization in dealing with

21  injuries and children of -- that have suffered physical

22  and sexual abuse.  And Jackie Hess is that nurse

23  practitioner.  And she looked at just the photos, knows

24  nothing about this case but the photos, and

25  independently says, This is a friction injury.  This is

1   an abrasion.   I think a finger or a penis would cause

2   this.

3                Said, Well, wait a minute.   What about

4   barbed-wire?   And she was asked by the detectives.

5                And she said, No, that's not that type of

6   injury and there's no other injuries outside,

7   confirming, again, the truth that Ada's body tells, that

8   Ada herself had already told, that the Defendant was a

9   poacher and she his prey, that he set it up so it would

10  be her word against his, controlling everything so he

11  could get away, not expecting the mark he left behind.

12               All these three doctors confirm what Ada

13  had already told.

14               Ladies and gentlemen, at the end of this

15  trial I'm going to ask you to find the Defendant is a

16  poacher, to find that Ada was his prey, that he searched

17  for the time, place, and manner where he could snatch

18  her up.   He did it so no one would know what he did, so

19  he could get away.

20               And now he's going to ask you to ignore the

21  truth that her body tells and to believe that she made

22  it up or was convinced to make it up and try to explain

23  that injury in a way that isn't supported by the facts

24  or the science.   And later, at the end of this trial,

25  your verdict will decide which one it is.

```
 1                    THE COURT:  Thank you, Mr. Long.

 2                    Mr. Green, would you like to make an

 3      opening statement at this time?

 4                    MR. GREEN:  I would, Your Honor.

 5                    THE COURT:  All right, sir.

 6

 7              DEFENDANT'S OPENING STATEMENT

 8                    MR. GREEN:  I want to thank you again for

 9      being here and for taking this as seriously as you do.

10                    This is an important trial.  The evidence

11      that the State talks about, some of it exists, some of

12      it is questionable, and none of it is absolutely

13      definitive of what happened in this case.  You're going

14      to have to decide based on what you hear whether or not

15      the little girl is telling the truth and whether or not

16      this actually happened.

17                    The State is saying that Ada's statements

18      are corroborated by physical evidence of an injury

19      that's located at the lower end of the -- inside the

20      vulva but -- inside the labia but under the vulva of her

21      vagina.  It's an abrasion, a friction injury, an injury

22      that happens when two things rub together.  The doctors

23      are going to say that this is consistent with a finger

24      or a fingernail, but it can also be consistent with so

25      many other things that that evidence alone cannot
```

1    possibly convict my client.

2            My client was a hard worker.  He worked on

3    the ranch.  He was at the ranch for approximately six

4    months prior to this additional family joining the

5    ranch.  He worked for Paul, he did not work for Katie.

6    When Katie and her family came to the ranch, she started

7    working there, then eventually moved her family into

8    that mobile home that the State showed you in the

9    pictures.

10           And she lived there on the ranch with her

11   two children.  And her two children, while she was

12   working, were playing -- would play around the ranch.

13   They would run around, go see the animals, climb the

14   fences, play on the -- there's a cattle trailer there

15   for transporting cattle.  They would play on that.

16   There were all kinds of ways that a child could get

17   injured on this ranch.

18           (The proceedings resumed with the presence

19   of Sabine Michael, court interpreter.)

20           MR. GREEN:  Now, there's blood in her

21   underwear, the underwear that she was wearing on the day

22   in question.  The question is, did that come from an

23   injury that was incurred by my client, or did that come

24   from some other injury that had happened either earlier

25   in the day or later in the day or whatever?  There's no

1    evidence that ties the two together.  It's all

2    circumstantial.  It matches in some ways; it doesn't

3    match in other ways, and you are going to have to decide

4    what those ways are.

5              It's the State's burden to prove that my

6    client is guilty; it's not my client's duty to prove

7    that he's not.  The State's going to put on a lot of

8    evidence.  I'm going to put on very little evidence, and

9    the reason for that is because it's the State's burden

10   to prove this.

11             So all I can ask at this point is that you

12   look carefully at the evidence.  The statements made by

13   Mr. Long are not evidence, nor are the statements that

14   I'm making right now.  The evidence will be presented to

15   you by witnesses, by physical objects, and you'll have

16   to determine based on that, not based on the statements

17   that we make.

18             All I'm asking is that you give my client

19   the constitutional right that he has to be presumed

20   innocent until the State proves him guilty.

21             (Further proceedings were reported and

22   previously transcribed.)

23                       ---o0o---

24

25

C E R T I F I C A T E

1

2          I, Jacquelyn A. Allen, RPR, a Certified

3   Reporter in the State of Arizona, do hereby certify that

4   the foregoing pages 1 - 21 constitute a full, true, and

5   accurate transcript of the proceedings had in the

6   foregoing matter, all done to the best of my skill and

7   ability.

8          SIGNED and dated this 22nd day of April,

9   2014.

10

11

12   _____
     JACQUELYN A. ALLEN, RPR
     Certified Reporter No. 50151
13   For the State of Arizona

14

15

16

17

18

19

20

21

22

23

24

25