# EXHIBIT C

IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

IN AND FOR THE COUNTY OF PINAL

| | | |
|---|---|---|
| THE STATE OF ARIZONA, | ) | 2 CA-CR 2014-0034 |
| | ) | |
| Plaintiff, | ) | No. CR201103026 |
| | ) | |
| -vs- | ) | |
| | ) | |
| FERNANDO SEGOVIANO ALMANZA, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

Florence, Arizona
October 1, 2013
8:46 a.m.

BEFORE:   The Honorable Boyd T. Johnson,
Judge of the Superior Court

REPORTER'S TRANSCRIPT OF PROCEEDINGS

JURY TRIAL, DAY 2

(COPY)

PREPARED FOR:
Arizona Attorney General
Criminal Appeals Section

REPORTED BY:
Jacquelyn A. Allen, RPR
AZ Certified Reporter No. 50151

I N D E X


T E S T I M O N Y


WITNESS:                                                    PAGE

CARLI MONCHER

        Voir Dire Direct Examination by Mr. Green ...   14
        Voir Dire Cross-Examination by Mr. Long .....   20
        Direct Examination by Mr. Long ..............   27
        Cross-Examination by Mr. Green ..............   68
        Redirect Examination by Mr. Long ...........   84


ADA WILHELMI

        Direct Examination by Mr. Long ..............   97
        Cross-Examination by Mr. Green ..............  117
        Redirect Examination by Mr. Long ...........  127
        Jury Questions ..............................  131
        Futher Examination by Mr. Long ..............  133


KATHRYN QUINN

        Direct Examination by Mr. Long ..............  134
        Cross-Examination by Mr. Green ..............  165
        Redirect Examination by Mr. Long ...........  176


KATHY BODWELL

        Direct Examination by Mr. Long ..............  185
        Cross-Examination by Mr. Green ..............  197
        Redirect Examination by Mr. Long ...........  200

E X H I B I T S

STATE'S EXHIBITS

| NO. | DESCRIPTION | PAGE IDENTIFIED | PAGE MARKED | PAGE ADMITTED |
|---|---|---|---|---|
| 1-101 | Photographs | 8 | | 9 |
| 102-103 | Diagrams | 10 | | |
| 104-106 | Photographs | 8 | | 9 |
| 120 | Drawing | 196 | | 197 |
| 126A | Bag with dress | 115 | 116 | 116 |
| 126B | Envelope with underwear | 163 | 163 | 164 |

1          **A P P E A R A N C E S**

2   On Behalf of the State:

3           PINAL COUNTY ATTORNEY'S OFFICE
            By:  Matthew Long, Deputy County Attorney
4                 Bureau Chief
                  Major Offenders Bureau
5                Thomas Kohler, Deputy County Attorney
            P. O. Box 887
6           Florence, Arizona 85132

7

        On Behalf of the Defendant:
8
            COOPER & RUETER, L.L.P.
9           By:  Paul Green
            P. O. Box 15005
10          Casa Grande, Arizona 85130-5005

11

12  ALSO PRESENT:

13          Detective Randy Snyder, Plaintiff's Case Agent
            Patrick Cote, Defense Investigator
14          Laura Anderson, Court Interpreter
            Sabine Michael, Court Interpreter
15          Alisha Olivarez, Court Interpreter

16

17

18

19

20

21

22

23

24

25

```
 1                                    Florence, Arizona
                                      October 1, 2013
 2                                    8:46 a.m.

 3              REPORTER'S TRANSCRIPT OF PROCEEDINGS

 4                    (The proceedings resumed outside the

 5       presence of the jury and with the presence of Laura

 6       Anderson, court interpreter.)

 7                    THE COURT:  Let's have the record show the

 8       attorneys are present, the Defendant, Mr. Almanza, is

 9       present, the jury is not yet.

10                    This is the time each morning when I try to

11       talk to the attorneys before the jury gets here.  We're

12       going to start off with the preliminary instructions.  I

13       passed them out to the attorneys yesterday.

14                    Mr. Long, any corrections, changes, or

15       anything you want to say about the preliminaries?

16                    MR. LONG:  No, sir.

17                    THE COURT:  How about you, Mr. Green?

18                    MR. GREEN:  No, Your Honor.

19                    THE COURT:  I've had copies made.  I'll do

20       it the way I normally do.  We'll start off with me

21       reading the preliminaries to the jury, I'll then invite

22       the attorneys to make their opening statements.

23                    You'll be ready, Mr. Long?

24                    MR. LONG:  Yes, Your Honor.

25                    One question, I guess.  There was -- our
```

1  first witness is Carli Moncher.  And there was a

2  discussion about doing -- needing to do a voir dire

3  before she testifies.

4          THE COURT:  Oh, yes.

5          MR. LONG:  I'm -- I may reference stuff

6  pertaining -- information pertaining to Ms. Moncher in

7  my opening.  Additionally, because she's the first

8  witness, I wonder if it would be appropriate to do that

9  before we start openings so there's not an opening,

10  break, and then the witness.

11          Those are the only issues I wanted to

12  present to the --

13          THE COURT:  Is she out there?

14          MR. LONG:  I don't know if she is now.  She

15  will be in the next few minutes, I know that.

16          THE COURT:  And you intend to mention her

17  prospective testimony in your opening?

18          MR. LONG:  Yes, Judge, that is certainly a

19  possibility.

20          THE COURT:  I see he's checking.

21  Mr. Kohler is seeing if she's out there.

22          We probably ought to get that out of the

23  way before we get the jury in here, so yes, we can do it

24  that way.

25          And as I said, Mr. Green, it's limited very

1  simply to voir dire about her CV or her ability to

2  testify on the area she's going to testify to.

3          Who else do you have coming as witnesses

4  this morning?  What I would like to do is get as many

5  sworn in at one time as we can.

6          MR. LONG:  The victim's mother will be

7  here; the victim, although she is not scheduled to be

8  here until just a few minutes before we expect to have

9  her on the stand.

10          THE COURT:  Oh, okay.

11          MR. LONG:  And then the victim's brother,

12  Jack Ink, again is a minor.  He likely won't be here

13  waiting around.

14          THE COURT:  Okay.

15          MR. LONG:  Those are -- and then -- those

16  are the only ones for this morning.  And then this

17  afternoon, Kathy Bodwell, which is the person who did

18  the forensic interview.  And she'll -- she won't be here

19  until lunchtime.

20          THE COURT:  Okay.  Well, then we'll just do

21  them one at time as you call them.  It's better that

22  way.

23          And I'm waiting for Mr. Kohler to come

24  back.

25          Any other areas we need to cover before we

1    start?

2              MR. LONG:  That's all I have, Your Honor.

3              THE COURT:  How about you, Mr. Green?

4              MR. GREEN:  No, other than the voir dire,

5    Your Honor.

6              THE COURT:  Okay.

7              MR. LONG:  Your Honor, I proposed to

8    Mr. Green or for ease of, I guess, or for efficiency,

9    that we stipulate to at least the photographs that are

10   106.  Mr. Green indicated yesterday he had no objection

11   to that, so I'd like to propose -- I'd like to propose

12   that.

13             THE COURT:  Do you know what the actual

14   exhibit numbers are?

15             MR. LONG:  Yes.  It's Nos. 1 through 106.

16             THE COURT:  So if it's 1 through 106,

17   wouldn't that be 107 photos?  Just a thought.

18             MR. LONG:  You know, that makes sense.  And

19   now you've corrected my horrible math problem as to why

20   I started with 107 and ended with 106, so I appreciate

21   that, Judge.

22             THE COURT:  I don't know, I'm just

23   thinking.  You're moving to admit them.

24             Mr. Green, you've had a chance to look

25   through them?

1          MR. GREEN:  I have looked through them,

2     Your Honor.

3          THE COURT:  Are you familiar with whatever

4     has been marked?

5          MR. GREEN:  Yes.  And Your Honor, I guess I

6     have no objection at this point to those.

7          THE COURT:  You have --

8          MR. GREEN:  Yes.

9          THE COURT:  -- no objection to it, either

10    on a foundational basis or any other basis at this time,

11    subject to the testimony of witnesses who testify from

12    the photos?

13         MR. GREEN:  Correct.

14         THE COURT:  Do you understand what I mean?

15         MR. GREEN:  Yes.

16         THE COURT:  Okay.  And that's what you're

17    all doing, right?

18         MR. GREEN:  Right.

19         THE COURT:  Let's show Exhibits 1 through

20    106 are marked as admitted and admitted.

21              And he still didn't come back.

22         MR. LONG:  She's on her way, Judge, and

23    she's in town, so she'll be here within five to ten

24    minutes.

25         THE COURT:  Okay.  Well, from my point of

 1    view, I'm going to step out, take the photos with me and

 2    keep marking them so they get done, and Todd will come

 3    and get me.

 4             You know, actually, Todd, come and get me

 5    when she's here.  After we get her on the stand you may

 6    want to go down and tell the jury we're going to start

 7    about 15 minutes after we had planned on.  Okay, we'll

 8    take a short break.

 9             (Recessed from 8:53 a.m. until 9:01 a.m.

10    The proceedings resumed outside the presence of the

11    jury.)

12             THE COURT:  Let's have the record reflect

13    again that the attorneys, the Defendant, Mr. Almanza,

14    are present in the courtroom, the jury is not here

15    yet.

16             For clarification real quickly, the

17    attorneys -- or the State had moved to admit Exhibits 1

18    through 106 and identified them as photographs.  The

19    Defendant's counsel indicated he had no objection.

20    Going through and marking these, I noted that

21    Exhibits 103 and 102 are not photographs but are

22    diagrams, and 102 had some commentary on it.

23             Mr. Green, you saw those.  And do you

24    intend to not object to those?  That was part of the

25    package to which you posed no objection.

1          MR. GREEN:  Those are the two I guess that

2    I had the most concern about, so if I can request that

3    the State has to prove foundation on those two exhibits,

4    I would.

5          THE COURT:  Let's do it a different way.

6    Are you withdrawing your statement that you did not

7    object to 1 through 106 as to Exhibits 103 and 102?

8          MR. GREEN:  Yes, Your Honor.

9          THE COURT:  There you go, okay.

10         They will not be, then, marked as admitted

11   at this time.  They are marked, though, and subject to

12   foundation, appropriate testimony, might be admitted on

13   the proper witness.

14         So make sure you show that, 102 and 103,

15   okay?

16         Okay.  And what we intended to do before we

17   got the jury in here is address Mr. Green's concern, and

18   this is to Ms. Moncher.

19         Is the State ready to proceed?

20         MR. LONG:  Yes, Your Honor.

21         THE COURT:  Are you ready, Mr. Green?

22         MR. GREEN:  Yes, Your Honor.

23         THE COURT:  Is Ms. Moncher here?

24         MR. LONG:  She is.

25         THE COURT:  Come on up, ma'am.

1        And who do you have lined up behind you on

2   this side of the bar?

3        MR. LONG:  I'm sorry.  This is a paralegal

4   and support staff that were just helping me with the

5   technical stuff that I think is resolved now.

6        THE COURT:  Okay.  Well, let's keep this

7   side of the bar as clear as we can.

8        Ms. Moncher, come on up front, please, over

9   here, please, and we'll get you sworn in.

10       (The witness, Carli Moncher, was duly sworn

11   by the clerk of the court, according to law.)

12       THE COURT:  Okay, ma'am.  Come on over here

13   and have a seat.  Just kind of pull up and get

14   comfortable.  And remember, you need to speak into the

15   microphone.  It will bend and move as you need it to.

16       MS. MONCHER:  Okay.

17       THE COURT:  We've had her sworn in.

18       And Mr. Long has indicated he intended to

19   call you as a witness.  When he did that, Mr. Green

20   interposed some concern and requested voir dire.

21       Why don't we just start with that voir dire

22   and ask her what you need to.  Well, let me back up.

23       For the record, with her here, just tell

24   me the purpose of calling her, what her presentation

25   is.

1    MR. LONG:  Yes.  Ms. Moncher is a cold

2  expert, is to testify about victimology and to educate

3  the jury about common reactions that victims have

4  towards abuse and to educate on what may be some

5  not-so-common reactions to abuse as well, dealing with

6  some of the myths; that is, myths that are out there.

7    She's also to testify generally about

8  memory, the forensic interview process, and to educate

9  the jury about that aspect of child abuse

10  investigations.

11    THE COURT:  Okay.  And you had indicated to

12  the Court previously that she has no knowledge of any of

13  the underlying facts of this particular case?

14    MR. LONG:  That's correct.

15    THE COURT:  And I think you asked me to

16  direct that Mr. Green in his voir dire not assert or use

17  in his voir dire process any of the facts of this case,

18  but to stick to the foundation, the voir dire issue.

19  Correct?

20    MR. LONG:  Correct.

21    THE COURT:  And Mr. Green, you understand

22  that is your limitation?

23    MR. GREEN:  Yes, I do, Your Honor.  Yes.

24    THE COURT:  Okay, go ahead.

25    MR. GREEN:  Okay.

1                          **CARLI MONCHER**,

2     called as a witness herein, having been first duly

3     sworn, was examined and testified as follows:

4

5                         V O I R   D I R E

6                 D I R E C T   E X A M I N A T I O N

7     BY MR. GREEN:

8          Q.   Ms. Moncher, thank you for being here today

9     and for allowing me to interview you just ahead of the

10    time that we're asking for your testimony.

11                   Ms. Moncher, can you tell me, what's your

12    educational background?

13         A.   I have a bachelor of science in criminal

14    justice from Northern Arizona University and a master of

15    arts in psychology, also from NAU.

16         Q.   And do either of those have a specialty

17    attached or are they general -- generalist degrees?

18         A.   The undergraduate degree had a specialty in law

19    enforcement or concentration in law enforcement.

20         Q.   And have you had -- in your master of

21    psychology, did you -- that one, you did not specialize?

22    That was a general --

23         A.   That was a general degree, yes.

24         Q.   -- degree?  Okay.

25                   You're being asked today to testify as to

1    victimology.  First of all, can you describe for me what

2    that is?

3        A.   Victimology being the study of victims of

4    crimes, specifically in my particular area would be the

5    study of child victims of crimes.

6        Q.   So you've done additional training or

7    additional education, or is that part of your master's

8    degree and bachelor's degree?

9        A.   Both.

10        Q.   I did ask a compound question, you're right.

11             Was that part of your bachelor's degree?

12        A.   No, part of my master's degree.

13        Q.   Okay.  And you've had additional training as

14    well?

15        A.   Correct.

16        Q.   And what does that additional training

17    entail?

18        A.   I typically will attend at least 40 hours,

19    generally more, per year of additional study related to

20    victimology, memory, suggestibility, things that would

21    be pertinent to the forensic interview field, as well as

22    the general 40-hour training, which I both attended and

23    now teach.

24        Q.   Okay.  By its name, "victimology," I get the

25    impression that this is presented as a scientific

1    process.  Is that correct?

2         A.   I don't necessarily present it that way, no.

3         Q.   Okay.  How would you present it?

4         A.   I don't really have an answer for you because I

5    don't know what's being asked of me.

6         Q.   Okay.  Well, my question is this:  Science

7    tends to rely on data that is based on research and that

8    is based on studies and things like that.  Is

9    victimology -- is the education that you have received

10   and the training that you have received, is that based

11   on some form of scientific research and data?

12        A.   Absolutely.  A great amount of research and

13   literature has been dedicated to child victims of crime,

14   particularly sexual abuse, as well as my own practice

15   with children in working with that particular type of

16   crime.

17        Q.   And what -- of that research, what research,

18   how many different studies, how many different -- well,

19   how many different studies have you studied related to

20   this topic?

21        A.   I don't have a specific number for you.  I have

22   read hundreds, maybe thousands of studies at this point.

23        Q.   And of those hundreds, maybe thousands of

24   studies, these are all different studies or studies that

25   have been updated or --

1    A.   Both.

2    Q.   Okay.  And of those, do they all agree?

3    A.   No.

4    Q.   Has the -- as you research over time -- you

5 said that every year you do 40 hours or something like

6 that.  Has the process of understanding victimology

7 changed over the course of the years?

8    A.   Certainly there are enhancements and changes

9 over time, but victimology has been a fairly consistent

10 body of literature over the past 15-ish years or so.

11    Q.   And you said that the studies don't always

12 agree.  Where they don't agree, where's the

13 disagreement?

14    A.   Well, if you look at things like

15 suggestibility, which would be included within the field

16 of victimology, particularly when dealing with children,

17 there are disagreements as to the level of

18 suggestibility depending upon the age of children,

19 depending upon the nature of the study themselves;

20 things like are you looking retrospectively at an actual

21 group of children who were involved in an evaluation for

22 some type of abuse versus a field type of study, if you

23 will, where they're setting up some type of experiment

24 and looking at suggestibility and -- suggestibility and

25 how that is reported and disclosed or not disclosed by

1   the children involved in that field study, of course

2   you're not going to have a direct translation from that

3   lab or field study as you would in working with children

4   who are directly involved in evaluation of some type of

5   criminal victimization.

6          So the outcomes of these studies are going

7   to be dependent upon how the studies themselves are set

8   up, what the group of individuals are who are

9   participants in those studies, what the nature is and

10  their involvement; many different factors in how the

11  results will either agree or disagree with each

12  independent study.

13      Q.   So if the studies disagree, and I'm assuming

14  there's -- you talked about one area where they

15  disagree.  I'm assuming that there may be other areas

16  that they don't always agree; is that correct?

17              MR. LONG:  Your Honor, I'm objecting to

18  this line of examination.  This is voir dire, not

19  cross-examination nor an interview.

20              THE COURT:  You're right.  Sustained.

21              Narrow it down, Mr. Green.  Let's deal with

22  whether she can testify or not, her background.

23  BY MR. GREEN:

24      Q.   Have you testified in court before?

25      A.   Yes, sir.

1        Q.    How many times have you testified?

2        A.    Approximately 25.  Within the capacity -- or

3   within my capacity as a forensic interviewer,

4   approximately 25, maybe 30 times.

5        Q.    And have you testified for the prosecution or

6   for the defense?

7        A.    Both.

8        Q.    Do you know the amount for each?

9             MR. LONG:  Your Honor, is this an interview

10  or voir dire?

11            THE COURT:  That's -- if you're objecting

12  to the form of the question or nature of the question,

13  it's sustained.  Those are subject to cross-examination

14  issues, not foundational, not voir dire.

15  BY MR. GREEN:

16       Q.    And are you currently employed by an agency or

17  are you self-employed?

18       A.    I am employed by Flagstaff Medical Center.

19       Q.    And does that employment -- does that

20  employment involve what you're doing today?

21       A.    Yes.

22       Q.    Is this part of your employment at Flagstaff?

23       A.    Yes.

24       Q.    What are your duties at Flagstaff Medical

25  Center?

1          MR. LONG:  Your Honor, I'm objecting to the

2    question.  This is beyond voir dire for foundation.

3          THE COURT:  It is, and your objection is

4    sustained.

5          Any additional foundational questions?

6          MR. GREEN:  No, Your Honor.

7          THE COURT:  Okay.  Mr. Long, do you want to

8    have any -- I guess you can call it cross -- any

9    questions of the witness?

10         MR. LONG:  One question.

11         THE COURT:  Go ahead.

12

13                    V O I R   D I R E

14               C R O S S - E X A M I N A T I O N

15   BY MR. LONG:

16    Q.  Ms. Moncher, have you testified in the Pinal

17   County Superior Court before?

18    A.  Yes, I have.

19    Q.  Have you testified and been found to be

20   qualified as an expert to testify about what you

21   anticipate testifying to today?

22    A.  Yes, I have.

23         MR. LONG:  Those are all my questions.

24         THE COURT:  That was two.  Just thought I'd

25   point that out.

1          MR. LONG:  My math is not my strong suit,

2     Judge.  I apologize.

3          THE COURT:  I noticed that.

4          Anything else?

5          MR. GREEN:  No, Your Honor.

6          THE COURT:  Okay.  Ma'am, we're going to do

7     it this way:  Because you're not actually on the witness

8     stand yet you have been sworn, I need you to wait

9     outside the courtroom until you're called to testify.

10    When I do bring you back in, I'll tell the jury that you

11    have been sworn, but we're not going to go through that

12    again.  Okay?

13         MS. MONCHER:  Okay.

14         THE COURT:  Thank you.

15         (The proceedings resumed outside the

16    presence of Ms. Carli Moncher.)

17         THE COURT:  Mr. Green, with Ms. Moncher now

18    off the stand, do you want to make any motion at this

19    time?

20         MR. GREEN:  Your Honor, I would like to

21    make the motion that Ms. -- that this testimony be

22    excluded --

23         THE COURT:  Okay.

24         MR. GREEN:  -- mainly on the basis, Your

25    Honor, of -- that I don't believe the science is

1    proven.

2            THE COURT:  All right.  Mr. Long, anything

3    you want to say quickly in response?

4            MR. LONG:  No, sir.

5            THE COURT:  Good.  Your motion is denied.

6    She's qualified.  Obviously, the questions you started

7    getting into are reasonable cross-examination questions,

8    but she's qualified to present the testimony she has

9    previously in this court and she has established her

10   credentials, so the motion is denied.

11           Are you ready now to start, Mr. Long?

12           MR. LONG:  Yes, sir.

13           THE COURT:  Are you, Mr. Green?

14           MR. GREEN:  I am, Your Honor.

15           THE COURT:  Did you bring them up or are

16   they still downstairs?

17           THE BAILIFF:  They're still downstairs.

18           THE COURT:  Okay, folks.  That means it

19   will be about five to ten minutes.  We'll start as soon

20   as the jury is in.

21           We're on a recess.

22           (Recessed from 9:15 a.m. until 9:28 a.m.

23   The proceedings resumed outside the presence of the

24   jury.)

25           THE COURT:  Let's show the attorneys and

1  Defendant are present.

2          The jury is now available, and Todd, if you

3  would bring them in, please, we can get started.

4          Let me double-check.  Mr. Long, anything

5  else?

6          MR. LONG:  No, Your Honor.

7          THE COURT:  Mr. Green?

8          MR. GREEN:  No.

9          THE COURT:  If you would, sir.

10          (The proceedings resumed with the presence

11  of the jury.)

12          THE COURT:  Let's have the record show

13  that the jury is now in the courtroom, and the attorneys

14  and the Defendant, Mr. Almanza, are also in the

15  courtroom.

16          Ladies and gentlemen, this is the beginning

17  of the trial.  I talked to you in voir dire about a

18  number of issues.  What we're going to do right now is

19  pass out to you the preliminary instructions.  They're

20  in this format.  When you get those, you're very welcome

21  to keep them out and follow along as I read the

22  instructions to you.

23          You can also, if you wish, just put them in

24  your notebook, in your notebooks, and listen to me as I

25  read these.  You'll keep these during the course of the

1  trial.  If at any time you want to review them, feel

2  free to do so, okay?  And I'm going to wait until

3  everything gets passed out.

4          Todd, would you -- I want to make sure the

5  attorneys each get one of those.  Would you give one to

6  the interpreter so she has one?

7          Okay, folks, let's get started.

8          (Pursuant to Pinal County Administrative

9  Order No. 94-07, preliminary instructions are not

10  included in this transcript but were conducted at this

11  time.)

12          THE COURT:  Okay.  As far as preliminary

13  instructions go, any additional, Mr. Long?

14          MR. LONG:  No, Your Honor.

15          THE COURT:  Okay.  Thank you, sir.

16          Do you, Mr. Green?

17          MR. GREEN:  No, Your Honor.

18          THE COURT:  Okay.  Thank you very much.

19          Ladies and gentlemen, now is the beginning

20  of the case, and as I told you, it is time for opening

21  statements.

22          Mr. Long, if you're ready, please proceed.

23          MR. LONG:  Thank you, Your Honor.

24          (Pursuant to Pinal County Administrative

25  Order No. 94-07, opening statements are not included in

1  this transcript but were conducted at this time.  The

2  proceedings continued with the presence of Sabine

3  Michael, court interpreter.)

4            THE COURT:  Thank you, Mr. Green.

5            Ladies and gentlemen, it is now 10:30, and

6  that's when we normally would take our short morning

7  break.  We have a witness lined up.  My concern would be

8  if we put the witness on, we're going to end up taking a

9  break pretty late in the morning, so I'm going to go

10 ahead and take the morning break right now.

11           Please remember the admonition I talked to

12 you about.  We'll try to start again hopefully at 10:45,

13 10:50 at the latest.  Follow Todd out and I'll see you

14 in about 15 or 20 minutes.

15           (Recessed from 10:30 a.m. until

16 10:54 a.m.  The proceedings resumed with the presence of

17 the jury.)

18           THE COURT:  Let's have the record show the

19 presence of the attorneys, the Defendant, Mr. Almanza,

20 and the jury is now back in the courtroom.

21           Is the State ready to proceed?

22           MR. LONG:  Yes, Your Honor.

23           THE COURT:  Mr. Green, are you ready to

24 proceed?

25           MR. GREEN:  I am, Your Honor.

1          THE COURT:  All right.  Mr. Long, if you

2   would, please.

3          MR. LONG:  State calls Carli Moncher.

4          THE COURT:  All right.

5          Ma'am, if you would, all the way forward,

6   please.  And if you would come on over and have a

7   seat.

8          Ladies and gentlemen, this witness has

9   already been sworn.

10          MR. GREEN:  Your Honor, for the record I

11   would just like to re-urge my objection to this

12   witness --

13          THE COURT:  Sure.

14          MR. GREEN:  -- for the reasons previously

15   stated.

16          THE COURT:  Okay.  And for the reason

17   previously stated on the record, your objection is

18   overruled.

19          MR. GREEN:  Thank you, Your Honor.

20          THE COURT:  Go ahead, have a seat, ma'am.

21   And again, just kind of pull up and get comfortable

22   and put the mic where you can speak into it.  Very

23   good.

24          Mr. Long?

25          MR. LONG:  Thank you, Your Honor.

**CARLI MONCHER,**

called as a witness herein, having been previously duly

sworn, was examined and testified as follows:


D I R E C T   E X A M I N A T I O N

BY MR. LONG:

Q.   Ma'am, would you introduce yourself to the

jury, please.

A.   My name is Carli Moncher.  I am a forensic

interviewer for the Safe Child Center at Flagstaff

Medical Center.

Q.   What is a forensic interviewer?

A.   I conduct evidentiary interviews of children

where there has been some allegation of abuse or

maltreatment as well as witnesses to major crimes, and

adults with developmental disabilities.

Q.   Now, in a little bit I'd like to ask you some

questions about that forensic interview and some

specific aspects about that, but first could you tell us

about your education that you have that qualifies you

for the job that you have?

A.   I have a bachelor of science in criminal

justice from Northern Arizona University and a master of

arts from -- also from NAU in psychology.

And I attended the basic forensic interview

1  training, which is an eight-hour course provided by the

2  State of Arizona through Prevent Child Abuse Arizona in

3  conjunction with the Governor's Office, as well as the

4  40-hour advanced forensic interview training also put on

5  through the Governor's Office, and have attended

6  numerous ongoing trainings since those initial

7  trainings.

8      Q.   And how long have you worked as a forensic

9  interviewer?

10     A.   About five and a half years at this point.

11     Q.   Through the course of your job, have you kept

12  yourself updated on literature pertaining to child

13  sexual abuse?

14     A.   Yes, I have.

15     Q.   Are you involved in any -- do you engage in any

16  peer review processes?

17     A.   Yes.  I attend and coordinate the peer review

18  for northern Arizona for forensic interviewers, as well

19  as attend and participate in a monthly peer review

20  process which is done nationwide through a telemedicine

21  type of conference setting, and then will, on occasion

22  with newer interviewers, do one-on-one type of peer

23  review training.

24     Q.   And what is peer review, if you could explain

25  that?

1    A.    Peer review is basically where we will take

2    interviews that are conducted, either by myself or other

3    forensic interviewers, we will take those interviews and

4    watch them, review them, either provide feedback or get

5    feedback from other interviewers, and basically use them

6    as a training tool for either myself or for other

7    interviewers in maintaining skills or building skills as

8    interviewers.

9    Q.    And you talked about staying up to date on the

10   literature pertaining to child sexual abuse.  Is there a

11   body of work that deals with this, this area?

12   A.    Yes, a rather large body of literature

13   pertaining specifically to this area.

14   Q.    And what types of things does the literature in

15   these studies talk about?

16   A.    Things such as victim responses to sexual

17   abuse, the -- sometimes offender behaviors involved,

18   particularly with sexual abuse, memory, suggestibility,

19   language development, cognitive abilities, specific type

20   of memories.  It's a pretty large area.

21   Q.    And this is, I guess, a thumbnail of some of

22   the areas that you're familiar with?

23   A.    Correct.

24   Q.    And you've kept up-to-date on this literature

25   and the studies pertaining to these areas you've just

1    discussed?

2        A.    Yes.

3        Q.    Do you do any teaching?

4        A.    Yes, I do.  I teach for the State of Arizona

5    through the Governor's Office, both the basic and the

6    advanced forensic interview training.  I teach classes

7    on memory, on linguistics, on suggestibility, on peer

8    review and multidisciplinary team building, a variety of

9    instruction.

10        Q.    Have you ever testified in court?

11        A.    Yes, I have.

12        Q.    Approximately how many times?

13        A.    Within the forensic interviewer capacity?

14        Q.    Let's start there, with the forensic interview

15    capacity.

16        A.    Roughly 25, 30 times.

17        Q.    Have you ever test- -- have you testified for

18    the State, defense, or both?

19        A.    Both.

20        Q.    In this case you're here to testify to, were

21    you -- did you conduct any of the interviews involved in

22    this case?

23        A.    No.

24        Q.    Do you know the gender of the Defendant in this

25    case?

1        A.    Yes, I do.

2        Q.    And how did you know that?

3        A.    Through my subpoena that was issued by the

4   County.

5        Q.    Okay.  So you were able to crack that code as

6   to who was being accused, at least?

7        A.    Correct.

8        Q.    Are you aware of how many victims are alleged

9   to be involved in this case?

10       A.    No, I am not.

11       Q.    Are you aware of the ages of the victims

12   involved in this case?

13       A.    No, I am not.

14       Q.    Did you learn whether or not -- the name or

15   gender of any victims in this case?

16       A.    I don't know if -- I did learn one name and it

17   was inadvertently given to me by the prosecution.  I

18   don't know if that is a victim or what role the

19   individual has, but I did learn a name, yes.

20       Q.    Okay.  Did you learn anything about that

21   person's name, that is, the age?

22       A.    Oh, no, I did not.

23       Q.    The grade?

24       A.    No.

25       Q.    The nature of the allegations?

1       A.    Outside of the fact that I'm aware we are
2   talking about a child sexual abuse case, no.
3       Q.    Okay.  Fair that within that realm, there are a
4   number of different types of acts?
5       A.    Yes.
6       Q.    And are you aware of what type of act the
7   Defendant is alleged to have committed?
8       A.    No, I am not.
9       Q.    Are you familiar with the relationship between
10  the Defendant and any potential victims?
11      A.    No, I am not.
12      Q.    Are you -- did you review any reports that
13  might have been generated?
14      A.    No, I have not.
15      Q.    Are you here to make a diagnosis?
16      A.    No.  I would not be able to with the
17  information that I know, and I would not do that anyway.
18      Q.    And that was my next question.  Even if you had
19  all the information, would you be able to make some sort
20  of diagnosis?
21      A.    No, I would not.
22      Q.    And why is that?
23      A.    Because even with the -- with having a full
24  account, if you will, of that information, it's not
25  my -- it's not in my professional capacity to make some

1   type of diagnosis that would be able to identify or say

2   that a child has or has not been abused.

3       Q.   Have you been given any information with which

4   you might be able to tailor your testimony today?

5       A.   No, I have not.

6       Q.   So if you didn't do an interview or really know

7   the facts of this case, what is it your understanding

8   you're here to testify about?

9       A.   General characteristics regarding abuse,

10  regarding victims of abuse, more of those kind of global

11  or general dynamics that are involved within the abuse

12  process.

13      Q.   And has there been any research done on how

14  children react to sexual abuse?

15      A.   Yes.

16      Q.   Tell us about that.

17      A.   Typically when we're talking about reactions

18  from children in regards to abuse, immediately at the

19  time of the abuse or as the event itself is occurring or

20  the events themselves are occurring, the typical

21  response that we see from children is something that's

22  referred to as the fight, flight, or freeze syndrome,

23  with the fight or flight being very characteristic to

24  what is commonly referred to in any type of stressful or

25  traumatic situation.

1        But with children, because their world

2   experience is fairly limited and their physical

3   resources are also fairly limited, particularly when the

4   offender is an adult, they don't have that ability,

5   typically, to be able to get up and run away or to be

6   able to fight off their offenders, and nor do they have

7   that world experience that would tell them what they are

8   supposed to do in those type of situations.

9        So typically what we will see from children

10  and what the literature reports is that children will

11  most often freeze.  They will play possum, if you will,

12  or do absolutely nothing in response to that assault or

13  to that trauma.

14       Q.   And is your experience consistent with the

15  literature that you just talked about?

16       A.   Yes, it is.

17       Q.   And so what can happen when a child does freeze

18  as you described?

19       A.   I think I'm going to have to ask you to clarify

20  the question.

21       Q.   Sure.  Are you familiar with the concept of

22  disassociation?

23       A.   Yes.

24       Q.   Could you explain what that is?

25       A.   Disassociation is basically where an

1  individual, doesn't necessarily have to be a child, but

2  where an individual will separate their cognitive

3  awareness from their actual physical body.

4      And in children, what is often reported,

5  particularly in -- related to these types of traumas, is

6  they will talk about being present in the room and can

7  identify themselves as a party who is in the room, and

8  yet will often talk about themselves in third person,

9  will talk about themselves as a separate being, will

10  talk about either being in a -- in a type of floating

11  type of capacity where they'll talk about being above

12  what's going on or sometimes just physically removed

13  from where that incident itself happened.

14      Say, for instance, if there was something

15  that happened on a couch, children will talk about being

16  in a different part of the room, and yet when you ask

17  them who was on the couch, they can identify that it was

18  them, themselves, on that couch.  So they are

19  disassociating, or taking themselves out of that

20  situation, as far as their mental or cognitive

21  affiliation with that incident goes.

22  Q.   Does research tell us or talk about how this

23  freezing response can impact specific details about an

24  incident and a child's ability to recall specific

25  details?

1   A.   Yes, it does.

2   Q.   Tell us about that.

3   A.   What the research has shown is that there are

4   some neurochemical types of responses that happen within

5   the brain with these traumatic incidents that are

6   happening, where basically we get -- people in

7   general -- where we experience trauma, and in this case

8   children, get a flood of certain types of hormones, and

9   they're distress hormones, that cause that fight or

10   flight syndrome to kick in.  We see things like

11   norepinephrine, cortisol, those stress hormones that are

12   in effect for all humans will peak or spike for children

13   as they are experiencing that traumatic situation.

14          How those are related is that those --

15   those particular hormones can be toxic for the brain.

16   And really what they tell the body to do is to shut down

17   those nonvital or noncore functions of the body because

18   there is some type of threat, something that is

19   happening that is dangerous for the body, and therefore,

20   it's looking to maintain resources.

21          So you'll see things like advanced

22   respiration, faster breathing, the heart rate will

23   increase.  We have things like lack of fine motor skills

24   in those situations oftentimes because that's not a core

25   body need or necessity at that point, as well as things

1    like difficulty with remembering precise details of

2    exactly what has happened, because again, it's not a

3    core necessity for that particular moment as far as

4    being able to stay alive or to address the threat.

5         Q.   So based on your training and experience and

6    research that you're familiar with, does an inability to

7    remember specific details indicate that the child's not

8    telling the truth about something that happened to them?

9         A.   No.

10        Q.   You talked about this disassociation.  Are you

11   familiar with instances where children report something

12   that either clearly didn't happen or is impossible to

13   happen?

14        A.   Yes.

15        Q.   Do you have a name for that?

16        A.   Yes.  We refer to that as something called

17   fantastic elements or fantastic statements.

18        Q.   Could you explain that to the jury.

19        A.   Basically what these are are, as the

20   prosecution has stated, they're things that we know for

21   certain did not happen, could not happen.  And they're

22   often reported in ways such as some type of act on the

23   child's part to aggress onto the offender or the

24   perpetrator.

25             So we'll see things like children will

1    report having stabbed or shot their perpetrator or run

2    them over, pushed them off a cliff, things of that

3    nature, which we know absolutely are untrue as the

4    perpetrator is still alive and breathing, and yet

5    children will report having done this, typically in the

6    fashion of this is what I was able to do.

7              It's a means for children to cope with what

8    has happened and what seems so irreconcilable for them

9    as the way that this abuse or this victimization has

10   occurred for them, and yet they had, because of their

11   state of being children and being fairly dependent and

12   helpless when compared to adults, they had no recourse

13   or no action to take.

14             Oftentimes children will create internally

15   these scenarios where they are able to take some

16   recourse, and oftentimes they are fairly exaggerated

17   like that.

18        Q.   And you gave us one example of these fantastic

19   elements of a child physically defending themselves.

20   Are there others that you're familiar with?  Is this the

21   only type of fantastic disclosure or fantastic elements?

22        A.   No.  Children will talk about being able to fly

23   or flee would be another type of fantastic element.

24   You'll have small children that will report being able

25   to drive vehicles or having some type of magical power

1    that allows them to flee the situation or escape what

2    has happened.

3           But typically within these fantastic

4    elements, it is somehow related to either an increased

5    sense of strength or some type of magical capability

6    that is going to allow them to somehow alter that

7    victimization process for them.

8        Q.   All right.  Have you -- are you familiar with

9    any instances where a child has described being

10   specifically attacked or overcome in explaining -- in

11   utilizing this fantastical element?

12       A.   Yes, for just that same reason where we have

13   children trying to cope with or reconcile that

14   victimization process.

15          And particularly when there are those

16   increased feelings of helplessness, as a way to sort of

17   explain or make sense to them as to how this

18   victimization has occurred, children will sometimes

19   describe a very exaggerated or overwhelming type of

20   being taken over or being taken captive as a way to help

21   them cognitively reconcile what has happened.

22       Q.   But if these types of elements might exist,

23   doesn't that indicate to us that the other things the

24   child said isn't true?

25       A.   No, not necessarily.  It could mean that there

1    are other mistruths within their statement, but the

2    research has shown in cases where there is external

3    corroborative evidence of what children are saying,

4    things like medical findings, sexually transmitted

5    infections, genital injuries, things of that nature,

6    suspect confession, media involving pictures or video of

7    the actual crime occurring, where there are these

8    fantastic statements or these fantastic elements

9    involved within the child's telling or report of that

10   incident, and yet there are these separate evidentiary

11   findings that would support what the child is telling

12   overall.

13        Q.   Are you familiar with the concept of

14   victimology or the stages of victimology?

15        A.   I'm familiar with something referred to as the

16   process of victimology.  Not so much stages.

17        Q.   Thank you for correcting.  The process of

18   victimology.  Could you explain to the jury what that

19   is?

20        A.   Yes.  The process of victimology is basically

21   contained within five different segments, if you will,

22   and not necessarily in any specific order, which is why

23   I needed to clarify that.

24             The components of the process of

25   victimization are targeting, engagement, grooming,

1    assaulting, and concealment.  And while they do

2    sometimes have some structure as far as order goes, they

3    oftentimes will kind of go back and forth within those

4    different components or elements, so not necessarily a

5    staged-type process in that way.

6        Q.   I'd like to talk about that first -- the first

7    segment that you talked about, targeting.  Did I get

8    that right?

9        A.   Yes.

10        Q.   What would make a child vulnerable to being the

11    target of sexual abuse?

12        A.    For children themselves there are many

13    increased risk factors, things like a lack of family

14    support or lack of family regular contact, lack of peer

15    interaction or peer support, which is going to leave a

16    child more isolated, more vulnerable to having somebody

17    else come in and fill some type of missing component or

18    void for that child.

19        Having an unrelated male living in their

20    home has been identified as a risk factor for children,

21    as well as some of the more personal dynamics for those

22    children or individual characteristics for children,

23    things like children who tend to be shy or reserved,

24    quiet, children who don't tend to interact well with

25    peers, who do not have an established relationship with

1    at least one caregiver to whom they can report or relate

2    significant information to, developmental disabilities,

3    particularly language or cognitive disabilities or

4    significant physical disability, as well as a host of

5    factors involving the family dynamic, particularly

6    involving caregivers.

7              Things like substance abuse, domestic

8    violence, those type of things are going to put children

9    at increased risk.

10   Q.   Can the offender's preference impact targeting?

11   A.   Absolutely, yes.

12   Q.   Tell us.  Explain that.

13   A.   As far as offenders go, there are some

14   offenders who will report having a specific either

15   gender preference, a specific age-range preference --

16   for some a very delineated or very specific age; some

17   just need to fall within a certain age range, such as

18   prepubescent range -- as well as other physical

19   characteristics.  Could be the color of hair, body type,

20   body size, that sort of thing.

21             And then outside of those physical

22   characteristics, some of those more individual

23   personality-type characteristics involving children are

24   often reported by offenders, looking for specifically

25   children who are more withdrawn, are more isolated, more

1    quiet, more unlikely to tell basically what has

2    occurred.

3        Q.   And what would be the impact on the victim of

4    this targeting?

5        A.   Typically the impact of targeting on the victim

6    is -- targeting itself is pretty low in that it's more

7    of an offender type of behavior.  It's a selection

8    behavior from that offender, that perpetrator.  But what

9    we often see is kind of the next step, or what happens

10   in conjunction with targeting is the engagement process,

11   which will tend to have a large impact on children.

12       Q.   Can you explain what engagement is, the

13   engagement process?

14       A.   Engagement is basically the developing of a

15   relationship with a child or a set of children.  And

16   oftentimes we see the perpetrators will do this with an

17   entire family, where if they are not already in the

18   midst of the family, if they're not a part of that

19   family, they will begin to insert themselves into that

20   family in a way that makes the members of that family,

21   including that child or those children, come to have a

22   loving and trusting relationship with them so that

23   they're -- they have more free access, basically, to

24   those children.

25              Within that engagement process, while we

most often see that development of a love and trust
relationship, we do sometimes see and have children
report more of a power and control type of relationship,
where there's more authority being instilled as opposed
to that more loving and dependent relationship.

And then sometimes we will have children
that will describe both, where there's very much a love
and trust relationship that is instilled until there is
some type of wrongdoing or some type of transgression,
and then there is that kind of instilling of sort of
that power and control type of scenario.  And then once
that wrong, whatever that was, has been addressed, it
will go back into that more loving and trusting type of
role.

But the overall goal of that
engagement-type behavior is to develop that
relationship, and particularly a relationship involved
in some type of dependency, be it for the things that
they need, for things that they crave, the things that
they want, but some type of dependent relationship upon
that individual.

Q.   And what impact does engagement have on the
victim?

A.   The children will report that this particular
component, the engagement component, very much ties them

1   to that individual, that they feel like this is a very

2   significant relationship for them, and that if the

3   relationship itself was to go away, that that would be

4   devastating somehow, that they would be losing something

5   significant.

6           And it also increases that sense of

7   helplessness for children that is attached to the

8   process of being a victim, where they don't feel that

9   they have anywhere else to go or have any control or

10  power to make those -- the situational, whatever is

11  happening for them, to make them change.  Because in

12  order to make that change, children understand that they

13  would have to somehow lose that relationship that has

14  become so significant or so dependent for them.

15      Q.   Does your training and experience tell you

16  anything about the level or length of engagement as it

17  relates to disclosure?

18      A.   Yes.

19      Q.   Explain that, please.

20      A.   Typically the longer that engagement process,

21  so the more seated and secure that relationship is, the

22  likelihood for the length of time that it's going to

23  take for children to tell somebody about what has

24  happened or what is happening will be longer.  There

25  will be a longer delay as that relationship or that

1    engagement is more secure.

2         Q.   What's the next step in the process of

3    victimization?

4         A.   Grooming.

5         Q.   Explain that, please.

6         A.   Grooming is basically a blurring of what we

7    would consider to be normal, healthy boundaries,

8    particularly related to sexual contact, sexual

9    information, that type of thing.

10             The way that grooming typically works is

11   that perpetrators will do things to start that are

12   seemingly fairly benign to you, to me, to children in

13   general.  They may have a child come sit on their lap or

14   wrestle with a child, tickle a child, help a child at

15   bath time or getting them ready for bed when that would

16   be age appropriate for that child.  Those would all be

17   some -- can be examples of how grooming behavior might

18   start.

19             But as it progresses, what we will see is

20   that perpetrators are increasing or advancing their

21   behavior from those initially innocuous types of

22   behaviors to either putting their hands on children in

23   ways that could be inappropriate or introducing material

24   to children that could be inappropriate, things like

25   sexual type of humor or walking out into a room without

1  their clothes on.  And as they do that, they offer

2  explanations or reasoning to children for what is

3  happening.

4            So for example, if they have started out by

5  putting a child on their lap and then their behavior

6  escalates, they may then at some point put their hands

7  on that child's buttocks, and as they are engaging in

8  that advanced behavior, will tell a child that it was an

9  accident or that their hand just was resting there and

10 it wasn't their intention to do anything that was

11 inappropriate or bad.

12           And they gauge that child's response to

13 see, basically, can I get away with this, can I tell

14 this child that this was an accident or that I didn't

15 mean to do something that was inappropriate and will

16 that child be receptive of that explanation.  And if so,

17 then that behavior can escalate and continue to escalate

18 over time.

19           And oftentimes what gets reported by

20 children is there is a point in time where they no

21 longer know what this behavior means, what is exactly

22 happening.

23           And if they question that offender or that

24 perpetrator about the behavior, perpetrators will --

25 they will take them back to that earlier behavior.  They

1  will point out the fact that the children were okay with

2  whatever that earlier behavior was, that touching of

3  their buttocks or that accidental putting of the hands

4  in their pants, or whatever that explanation was at an

5  earlier stage, and point out to children that they

6  didn't tell at that earlier stage and sort of manipulate

7  those facts so that children become very confused and

8  start to take ownership of what is happening.  They

9  start to take that responsibility, or at least share

10  that responsibility with that offender for not having

11  done something earlier to have stopped what they didn't

12  know was wrong at that point.

13      Q.   And I think you just touched on that, my next

14  question, which is what impact this has, this grooming

15  process has had, on the victim.

16      A.   The typical things that are reported are things

17  like confusion, not understanding what has happened to

18  them, and then that shared sense of responsibility or

19  that taking that ownership for what has occurred and

20  believing that, at least in part, that the abuse is

21  their fault because they didn't do what -- whatever they

22  should have done.

23          And for the most part, children will report

24  they didn't tell somebody about what had happened in

25  those earlier stages of the grooming process, and

1    therefore, they feel responsible for what has happened.

2         Q.   And are the grooming methods, do they need to

3    be the same for every child?

4         A.   No.

5         Q.   What is the next step in the process of

6    victimization?

7         A.   The next step would typically be the assault,

8    which is a -- pretty much going to be whatever that

9    sexual act, whatever that might be for that individual.

10   For the most part it's going to be a hands-on type of

11   behavior, but it could also be things like filming or

12   exposing oneself to a child.  It's really going to be

13   dependent upon the perpetrator.

14        Q.   In talking about assault, the assault phase,

15   are you familiar with instances of situations where the

16   victim was assaulted with others present or nearby?

17        A.   Yes.

18        Q.   What would the -- impact would this have on the

19   victim?

20        A.   What children reported to me directly and what

21   the literature says is, basically when children are

22   aware that there are others either in the same room or

23   within the same home in a nearby place, is that it

24   increases, one, that sense of responsibility that

25   children did not cry out, did not do something to alert

1    somebody that something was wrong, and also increases

2    that sense of helplessness, where children feel that

3    there was somebody nearby, somebody who could have

4    helped, and yet this continued to happen.  Nothing, no

5    intervention happened.  Even though perhaps mom or

6    grandma or somebody else was in the next room, this is

7    still continuing.

8                 And that will increase that sense of

9    victimization that these children really have -- there

10   is no other alternative for them.

11       Q.    What impact could this have -- that is, the

12   abuse with somebody present or nearby -- have on a child

13   who is witnessing or might be nearby the abuse?

14       A.    I'm sorry.  Can you repeat the question?

15       Q.    I can.  If the person that's nearby the abuse

16   is a child, might this have an impact on the child

17   witness that's nearby the abuse?

18       A.    Oh, certainly.  Witnesses to abuse,

19   particularly those who are within close proximity,

20   oftentimes describe that same type of fearful response

21   of freezing or of not knowing what to do at all, so they

22   oftentimes will not have much of a response, if any,

23   again, for the same reasons.  There's that terror or

24   fear that's instilled within them.

25                 They -- as witnesses, they too have a very

low level of world experience if we're still talking

about children, so although it's not being directed at

them, they're seeing this happen to another child,

another smaller, less powerful individual, and their

understanding of how the world works is still being

processed through that mind, through that experience of

a child, and can be very, very frightening.

Q.   What's the next segment in the process of

victimization?

A.   Concealment.

Q.   And could you explain that, please.

A.   Concealment is basically any action or behavior

on the part of the perpetrator to get that child or

those children not to tell.  And this can look

different, depending upon the perpetrator or depending

upon the different relationships with individual

children with the same perpetrator.

We see things like making overt threats to

children to either harm them, to harm their family, to

harm their pets, to take things away from them.

Sometimes the -- if there are threats involved,

sometimes they are much less direct or overt, more

covert or more manipulative, and just telling children

that if somebody is to find out or if that child is to

tell, that others will be angry with them, will be angry

1    with that child as opposed to being angry with the
2    perpetrator.
3                They will tell children that they
4    themselves -- that is, the perpetrator -- will get in
5    trouble and be sure that children understand that if
6    they do get in trouble, that it would be that child's
7    fault for having told.
8                We often will see things like bribes and to
9    very different levels or scales.  I've seen very
10   advanced or very sophisticated style of bribes, things
11   involving electronics, vehicles, phones, cash, all the
12   way down to very low level, a bag of Hot Cheetos and a
13   soda or a candy bar, things that are going to be
14   enticing to children but not very advanced or not much
15   in the way of monetary cost, and yet very effective with
16   children.
17               And then things like telling children that
18   if they are to tell somebody or if they don't continue
19   to engage in that behavior, whatever that sexual contact
20   is, that they will just move on and find another target,
21   perhaps a sibling or somebody else that would be of
22   significant value to that child.  And so children will
23   oftentimes report trying to protect those other siblings
24   or the other children that are involved.
25        Q.    Specifically dealing with younger children, are

1   there instances where a child might not know that the

2   touch or the conduct was wrong?

3       A.   Absolutely, yes.  I have had children report

4   not only that they didn't know it was wrong, but that it

5   was something that they enjoyed, particularly if it's

6   somehow connected to a positive interaction with that

7   perpetrator.

8            Typically, particularly with younger

9   children, they will sometimes report, if there's nothing

10  painful about that experience, nothing that's negative

11  or somehow associated with something bad, that they

12  don't know initially that it's a wrong behavior until

13  that perpetrator somehow indicates to them that it's a

14  secret, either because they have to do it when nobody

15  else is around or because that child isn't allowed to

16  tell, or just the way that the perpetrator acts in their

17  overall demeanor with that raised anxiety, that children

18  will start to learn that there is something wrong with

19  that interaction or that behavior.

20           But up until they start to understand that,

21  children oftentimes, particularly the young ones, don't

22  know that that behavior is wrong if it's not painful to

23  them.

24      Q.   And you talk about concealment.  At some

25  point -- are you familiar with the concept of

1    disclosure?

2         A.    Yes.

3         Q.    And are there different ways in which

4    disclosure happens?

5         A.    Yes, there are.

6         Q.    Explain that, please.

7         A.    There are direct or intentional disclosures,

8    where -- purposeful disclosures, where a child basically

9    will initiate telling somebody.  This is going to be

10   your child who approaches a teacher at school or goes up

11   to mom and says, I have to tell you something, and

12   discloses that information to that individual.

13             There's also something that's referred to

14   as a prompted disclosure, which basically is just where

15   somebody will ask a child about something that they're

16   seeing or some concern that they have, and the child

17   will then disclose in response to that prompt or to that

18   initial question or ask.

19             And then there's something that's referred

20   to as an accidental disclosure.  Typically we see with

21   accidental disclosures where the information is sort of

22   blurted out, where there was no intention on the part of

23   that child or no decision made on their part to actively

24   tell someone or looking for some type of assistance to

25   make that abuse stop.  They just, either in the context

1    of an argument or some type of emotional type of

2    setting, they just sort of blurt out this information.

3            And children will oftentimes, following

4    those, those type of disclosures, those accidental

5    disclosures, will oftentimes report wanting to take it

6    back, and yet understanding or knowing that they can't.

7        Q.   Are you familiar with the concept of piecemeal

8    disclosure?

9        A.   Yes, I am.

10       Q.   Explain to the jury what that -- what that term

11   means.

12       A.   Piecemeal disclosure is also referred to as

13   partial disclosure.  And it basically means that

14   oftentimes what we see with children is when they are

15   disclosing or when they are telling somebody about what

16   has happened to them, they will tell it in pieces.

17           So they may initially, if they are

18   reporting to mom, they might initially tell mom that

19   someone has touched them and not provide any more

20   information than that, and yet in talking about that in

21   the future, may disclose that there's been more than

22   just a touching type of contact, there might be an oral

23   and genital contact or genital-to-genital contact,

24   something of that nature.

25           And the reasons for this are many.  Some

1    are just the more conversational type of interactions

2    between humans.  It could be that when that child

3    initially discloses to mom, mom has a response in such a

4    way that makes that child determine that at least for

5    that period of time, that they don't want to or that

6    they don't need to tell any more than that.  Or it could

7    just be that mom sort of takes over that conversation at

8    that point and that child sort of loses control of the

9    situation that they started out by telling, and

10   therefore, for that period of time they are done

11   disclosing.

12            Some of it's related to memory and how --

13   the way -- the way that memory works and how we cue our

14   memories in that as we talk about things, we don't often

15   remember the entirety of things in one telling of it.

16   This is why we can go to work and tell one coworker

17   something, and then when we go to work and the next

18   coworker asks us the same question, there can be a very

19   small amount or difference in what we tell them, even if

20   it's something basic as like how was your night or what

21   happened yesterday or something to that effect.

22            And then sometimes children will report

23   that they are testing the waters, so to speak.  When

24   they tell people about what has happened, they will

25   sometimes give little pieces of information and see what

1    response they get, and if it seems like that response is

2    safe and appropriate, then they will give more

3    information.  Sometimes it can be immediately; sometimes

4    they will open up at a later time.  And they will

5    continue to do that, where they are giving more and more

6    information and making sure that the response that they

7    get is a safe response and an appropriate response.

8         Q.   Can the way that questions are asked impact the

9    amount of disclosure that a child gives?

10        A.   Absolutely, yes.

11        Q.   And in fact, as a forensic interviewer, are you

12   trained to ask questions in a certain way?

13        A.   Yes.

14        Q.   Explain that to the jury, please.

15        A.   Within my training, the way that we are trained

16   to ask questions is to ask questions in as open-ended of

17   a fashion as we can, things that are going to elicit as

18   much narrative response as possible.

19        Q.   Can I stop you, Ms. Moncher?  Why is it

20   important to elicit a narrative response from a child?

21        A.   Basically what we're looking to do and why it's

22   important to do this is because when we ask those

23   open-ended questions, when we gain that narrative

24   response from a child, it's their words.  It's their

25   telling of the story.  It's -- that information is not

1    coming from the person asking the question, be it myself

2    as an interviewer or mom or whoever it is that's asking

3    that question.  The information is coming from that

4    child.

5              And because of this, what we're doing and

6    the way that this training -- or what this training is

7    really focusing on is to minimize what we call

8    suggestibility.  And within children, particularly

9    younger children, the vulnerability to suggestibility is

10   higher.

11       Q.   And so this interview is structured to get

12   information from the child.  Are you looking for -- are

13   you looking for anything pertaining to language as

14   you're speaking with the child?

15       A.   Yes, and we evaluate their language

16   capabilities.  Are they developmentally appropriate for

17   their age; can they answer questions appropriately; are

18   they understanding the questions that are being asked of

19   them and then giving an appropriate response for that,

20   as well as looking at the child's language that they are

21   supplying to us and assessing if that is developmentally

22   appropriate language for a child of whatever age we have

23   with us.

24       Q.   Let me stop you.  Why are you looking for that,

25   or what does that tell you, if a child is not using

1    appropriate language for their development?

2         A.   It could be that we have a child who just has

3    an exemplary developed vocabulary, but typically what

4    that would mean is, if we have language that is above

5    what should be or would normally be considered

6    developmentally appropriate, typically when we see that,

7    we have some type of influence from an adult, be it a

8    directly intentional situation where we have a parent or

9    guardian who is coaching a child, or that the child has

10   overheard things being said between other adults.

11        But typically when we have that type of

12   language coming out, it's some type of external

13   influence on that child.

14        Q.   And is the interview, the techniques, and the

15   questions that you ask meant to be able to possibly

16   reveal that?

17        A.   Certainly.  If we have that style of language

18   coming out from children, we normally will ask them

19   where they where and how they know this language, where

20   is it coming from.

21        You know, if a child reports that they knew

22   words that were clearly above what would be considered

23   an average development for their chronological age,

24   we'll try to figure out what the source is of those

25   words.

1      Q.   As you're talking with children, are you

2   looking for instances where the child will correct you?

3      A.   Yes.

4      Q.   Is that important to identify?

5      A.   Absolutely, yes.

6      Q.   Why is that?

7      A.   It goes back to that vulnerability of

8   suggestibility.

9           Suggestibility basically means -- it's two

10  parts.  One, it could be that somebody introduces some

11  information to a child, be it accurate or not, and the

12  child will actually take that information into memory

13  and incorporate that information as their own, as if

14  they remember it.  This is -- for example, this happens

15  when children will be shown pictures of family vacations

16  or whatever the case may be and will then later report

17  that they recall actually being there when they earlier

18  had no memory of that at all.

19          And then sometimes children will get a

20  piece of information, and even though they know that the

21  information is incorrect, they will just acquiesce or

22  just agree that that information is correct rather than

23  saying no, that's not right.

24          And within the interview context, it's

25  particularly important that if we somehow, as the

1    interviewer, if we make an error, if we hear them wrong

2    about something or if we make some type of assumption

3    that is incorrect, it's important that they will correct

4    us, that they will tell us that we have made that error,

5    and would point out to us that this child is less

6    vulnerable to suggestion than another child who isn't

7    willing to do that.

8              THE COURT:  Hold on just a second.

9              (The proceedings resumed with the presence

10   of Alisha Olivarez, court interpreter.)

11             THE COURT:  All right, Mr. Long.  Go ahead.

12             MR. LONG:  Thank you.

13   BY MR. LONG:

14      Q.   You talked about, in the course of an

15   interview, attempting to get a narrative from a child.

16      A.   Yes.

17      Q.   Is that correct?

18             Are there times when you might need to ask

19   direct questions?

20      A.   Yes.

21      Q.   And is there a difference between a direct

22   question and a question which suggests information?

23      A.   There can be.  You can ask a different style of

24   a direct question, a direct question basically being

25   something that is going to limit the amount or the

1    possible amount of information that you might get in

2    response to your question.

3            Some styles of direct questions are going

4    to be yes-no questions, did this happen, did this

5    happen.  Those would be yes-no questions and would be

6    very direct, as opposed to a multiple choice, which

7    would also be a direct question, or a w-h question, who,

8    what, when, where.  All of those would be examples of

9    direct questions.

10           You can ask a child what happened, which is

11   still a direct question, still falls under that w-h

12   question, but a very open, non-suggestive question.  And

13   you can -- you can ask those yes-no questions which may

14   have to introduce a limited amount of information in

15   order to get some type of response to know if there is

16   indeed information to follow up with.

17           And oftentimes in clarifying things within

18   the interview with children or in trying to figure out

19   if there's additional information that's needed to be

20   gathered, you will have to ask those direct style of

21   questions before there's anywhere to move on.

22       Q.   When you are going through an interview, is a

23   child's ability to describe a sensory experience

24   something that's important for you to look for?

25       A.   Absolutely, yes.

1      Q.   Why is that?

2      A.   It basically provides not only context for how

3  the abuse itself occurred, but it provides insight into

4  whether or not that child has knowledge particularly

5  relating to sexual experience that a child of that age

6  or age range developmentally should not have and would

7  not have even if it was something that they had somehow

8  seen or overheard.

9           If a child is describing something that

10 they taste or something that they're actually feeling

11 physically on their body, even if it's something that

12 they had accidentally or if somebody had purposely

13 exposed them to that, say, on a computer screen or

14 something like that, they still should not have that

15 additional sensory experience or that knowledge that

16 they may be reporting within the interview.

17     Q.   I'd like to talk about your knowledge and

18 experience in behaviors of victims of sexual abuse.  Are

19 you familiar with the research regarding behaviors,

20 common behavior characteristics of victims of sexual

21 abuse?

22     A.   Yes, I am.

23     Q.   And is it possible to make a diagnosis of

24 whether or not a child has been a victim of sexual abuse

25 simply based on the behaviors that they exhibit?

1     A.   No.   There is no set behavior display or set of

2     behaviors that children will display as a response to

3     having been a victim of sexual abuse.   The literature

4     has been very consistent in stating that there is no

5     read, no magic symptomatology that we can look for in

6     order to say that yes, this child has been abused and we

7     can rule out this child as having been abused.

8          And in fact, in dealing with children

9     within my own practice, I have seen a very wide range of

10    behaviors from children, both within the interview

11    process itself as they're talking about the abuse, as

12    well as outside of the interview where they're just

13    playing or interacting with family members.   A very,

14    very extensive range of behaviors from children.

15    Q.   And just as a sample, could you give us some of

16    the range of behaviors that the research tells us might

17    exist?

18    A.   You might see things like aggression, you might

19    see things like children being very withdrawn or

20    isolated, you may see things where children act

21    flirtatiously or seductively wherein they are very flat

22    or have really no affect or emotional expression coming

23    across at all, sort of a blank type of expression or

24    affect.

25         I have had children laugh as they are

1    talking with me at seemingly very inappropriate times.

2    I certainly have had children cry, sob.  I have had

3    children intentionally run into the walls, climb on

4    things, crawl underneath things, touch me in very

5    inappropriate ways and places.  So that range of

6    behavior is incredibly large.

7        Q.   And do any of those behaviors indicate whether

8    or not the abuse happened?

9        A.   No.

10       Q.   And does research show that some children may

11   exhibit no behaviors?

12       A.   Yes.

13       Q.   I'd like to talk to you about your experience

14   and observations of the way children behave when talking

15   about abuse, which is a little different than what we

16   just talked about just a second ago.  Approximately how

17   many interviews have you conducted in the course of your

18   five-plus-year career?

19       A.   Just over 1,700.

20       Q.   And in addition to those 1,700, you've observed

21   interviews that other people have conducted?

22       A.   Yes, I have.

23       Q.   Is there any way that you could offer a guess

24   at how many interviews you've both conducted and

25   observed over your career?  And I understand that might

1    be a difficult question.

2        A.   My best estimate would be I've observed about

3    150 or so interviews, so maybe somewhere in the area of

4    1,850.

5        Q.   And based on your experience, additionally --

6    or let me ask this of you.  Is there any research or

7    studies that talk about behavior of the children who --

8    when they talk about sexual abuse?

9        A.   Yes, there are.

10       Q.   Are you familiar with those as well?

11       A.   Yes.

12       Q.   Given your experience, extensive experience and

13   knowledge on the subject, do children display a certain

14   mannerism when talking about sexual abuse?

15       A.   No, they do not.  There is --

16       Q.   Explain that, please.

17       A.   There is no prescribed mannerism that children

18   will display.  It's going to be unique to that child,

19   unique to the circumstances, as well as the connection

20   and interaction with the interviewer.  You may have a

21   child who is behaviorally acting one way with one

22   interviewer, and if you change the interviewer you would

23   get a different set of behaviors, just like children are

24   with other adults, teachers, caregivers, that type of

25   thing.  But no, there is no one way.

1              And in fact, the literature is very clear

2     in cautioning those of us who work within the child

3     maltreatment field to not make any prescriptions or any

4     judgments based upon the child's affect at the time of

5     disclosure.

6          Q.   Does the literature tell us anything about the

7     environment where a child is talking about sexual abuse

8     and how that might impact -- impact the child's

9     disclosure?

10         A.   Yes.

11         Q.   Explain that, please.

12         A.   The literature talks about the comfort level,

13    basically, of the environment in gaining information

14    from the child, as well as the level of vulnerability to

15    suggestion with children in different environments,

16    where basically children are less vulnerable to that

17    suggestion in an environment that is at least neutral,

18    if not somewhat child-friendly, somewhat less

19    frightening for children or somehow made accessible for

20    children.

21              And the information that is gained tends to

22    be -- you tend to gain more information, you get more of

23    that narrative information from children in a setting

24    that is physically comfortable for children.

25              MR. LONG:  May I have one moment?

1          THE COURT:  Go ahead, sir.

2          MR. LONG:  Thank you, Ms. Moncher.  Those

3   are all my questions.

4          THE COURT:  All right, thank you.

5          Mr. Green?

6

7          C R O S S - E X A M I N A T I O N

8   BY MR. GREEN:

9      Q.   Ms. Moncher, you talked us through the process

10  of victimology or victimization, I believe?

11     A.   Yes.

12     Q.   Which would it be?  Victimization?

13     A.   Yes.

14     Q.   And I'm sorry, but I'm a little bit confused,

15  so I just want to try to clarify some things.

16          You talked about targeting and targeting

17  being the purpose -- something that the perpetrator

18  does, correct?

19     A.   That is correct.

20     Q.   So it's not something that necessarily impacts

21  the victim?

22     A.   Outside of being selected or targeted, no.

23     Q.   So if there is abuse, that abuse was effected

24  because the perpetrator chose the victim?

25     A.   Yes.

1     Q.   And that's what the effect would be, correct?

2     A.   That's correct.

3     Q.   But the victim has no knowledge that they're

4  being targeted until something happens; is that correct?

5     A.   Most of the time, yes.

6     Q.   Okay.  And then you talked about engagement,

7  which is developing a relationship with a child; is that

8  correct?

9     A.   Yes.

10    Q.   And sometimes that's even with the entire

11 family?

12    A.   That is correct.

13    Q.   So I walk into a -- let's say I'm a soccer

14 coach and I want to be a coach to the family, you know,

15 to the kids in the family, and I build a relationship

16 with that family based on my coaching soccer, correct?

17    A.   Could be, yes.

18    Q.   Now, that could be either me coaching, being a

19 soccer coach, or it could be me being a potential

20 perpetrator; is that right?

21    A.   Yes.

22    Q.   So there's really no difference between the

23 normative and the -- and the person who is a victimizer?

24    A.   At the point that you are describing,

25 absolutely.  Up until the point that there's some type

1    of criminal act or sexual act, yes, they are often the

2    same.

3         Q.   Okay.  Now, in this engagement, you also talked

4    about love and trust and power and control?

5         A.   Yes.

6         Q.   And when we talk about power and control, it

7    has a tendency in society to be kind of a negative

8    connotation, but when you really look at parents, aren't

9    parents building a relationship of power and control at

10   some level --

11        A.   Certainly.

12        Q.   -- when they're raising their children?

13        A.   Yes.

14        Q.   And is that not appropriate?

15        A.   Hopefully so, yes.

16        Q.   And love and trust clearly -- I mean, parents

17   are building a relationship of love and trust?

18        A.   Hopefully, yes.

19        Q.   Sometimes even a soccer coach can build a

20   relationship with love and trust with some of his soccer

21   people; is that correct?

22        A.   Yes.

23        Q.   Nothing abnormal about that?

24        A.   Not at that --

25        Q.   Not at this point?

1        A.    Correct.

2        Q.    Now, then you talked about grooming, and you

3    talked about, you know, step by step, you know, things

4    getting a little bit more and a little bit more.   But

5    again, I want to go back to a normal family, okay?

6             We've got a father, we've got a friend,

7    we've got a coworker, we've got somebody who comes into

8    the household who is a lifelong friend of the parents.

9    And the kids know him or her, and the kids have known

10   this person for a long time.   They run and they jump and

11   they jump onto his lap and give him a big hug.   Anything

12   abnormal about that?

13       A.    No.

14       Q.    Wrestling with parents or with somebody.   Is

15   there anything abnormal about that?

16       A.    That's really going to be dependent upon what's

17   normal for that family.   If wrestling is not a normal

18   behavior, then perhaps, but if the wrestling is all in

19   appropriate body places, then no.   It could, however, be

20   inappropriate.

21       Q.    Okay.   Tickling.   I know that's a hot topic,

22   right?   Some people think tickling is abuse, some think

23   it's fun, but -- I don't know.   But tickling is a normal

24   behavior.   Grandparents come into the house and say, Oh,

25   come here, you know.   Is that an abnormal behavior?

1      A.   Again, outside of those private areas of one's

2   body, tickling would generally be seen as an

3   appropriate, non-abusive behavior.

4      Q.   And helping a child get dressed and bathing a

5   child, those are all normal behaviors in a family,

6   correct?

7      A.   When -- yes.  When developmentally appropriate

8   or age appropriate for that child, yes.

9      Q.   Okay.  And how do we determine whether it's age

10  appropriate or developmentally appropriate?

11     A.   Typically we wouldn't see a parent trying to

12  help a child get dressed, particularly from a totally

13  unclothed stage, when that child is maybe 11, 12, 14.

14  That's generally seen as not age appropriate, assuming

15  that that child is of average development and can do

16  those things for themselves.

17     Q.   Is that a societal norm?  Is that -- because

18  some families, maybe that is normal.

19     A.   Very much a societal norm.  But it is going to

20  be different within each individual family or within the

21  relationship with each child.

22     Q.   And the thing that makes these behaviors

23  problematic is when they move on to other conduct; is

24  that right?

25     A.   Well, certainly the individual behaviors

1   themselves would not necessarily be problematic.  And

2   they do escalate or would become problematic or seen as

3   problematic as they do escalate, but they also, in

4   retrospect, before they have escalated to that

5   sexualized contact, will help us understand or help

6   explain how that contact, how that hands-on assault,

7   whatever that was, how that came to be.  What was the

8   graduation or the progression of events to where that

9   perpetrator was able to put their hands on that child in

10   a sexually assaultive manner.

11      Q.  So this analysis -- is this analysis always

12   retrospective?  In other words, if you walk up to a

13   child or you see in a park a parent playing with his

14   child and they start wrestling, that doesn't

15   automatically set off a trigger in your head that says

16   sex abuse is going to be happening soon --

17      A.  That's correct.

18      Q.  -- right?  Okay.

19         So it's not a prospective or a symptomatic

20   kind of issue, it's more of when we look back -- when we

21   know that there's sexual abuse and we look backwards, we

22   can see where it started.

23      A.  Exactly.

24      Q.  Okay.  Does the process ever skip a step?  I

25   mean, you listed out five, I believe, steps in here.

1   What happens if there is no engagement, there's just

2   grooming?

3            And engagement and grooming are kind of

4   similar, aren't they?

5       A.   They're very much related, yes.  Not

6   necessarily -- not the same concepts, but they are very

7   much related concepts.

8       Q.   So if one of those is missing, does that

9   indicate more or less that there's actually a victim in

10  this case or that the victim was actually --

11  victimization actually happened?

12      A.   No.  You may have a less successful, if you

13  will, perpetrator who may be found out sooner, or where

14  the -- that sexualized-based relationship may not

15  continue on for nearly the amount of time.  But just

16  because a perpetrator doesn't engage in grooming or in

17  concealment or something along those lines doesn't mean

18  that you have a child who is or is not abused.

19      Q.   Okay.  So this may be a really difficult

20  question, because I'm having a really hard time

21  understanding how the information you're providing is

22  useful to us.  And I'm not saying that in a critical

23  way, honest to God.  I'm just trying to --

24            MR. LONG:   Objection, argument.

25            THE COURT:   Let him finish whatever the

1   question is.

2             Finish the question.

3   BY MR. GREEN:

4       Q.   How does that information help us to better

5   identify whether we have a victim in this case?

6             THE COURT:  Okay, hold on.  Don't say

7   anything.

8             Do you have an objection?

9             MR. LONG:  I do.  If we could approach,

10  Judge.

11            THE COURT:  Sure, come on up.

12            (Bench conference outside the presence of

13  the jury and the court reporter.)

14            THE COURT:  Okay.  For the record, the

15  objection was sustained and Mr. Green was directed to

16  rephrase the question.

17  BY MR. GREEN:

18      Q.   What I'm getting at here, I guess, is that if a

19  lot of these behaviors, a lot of these indicators that

20  you've described in here, a lot of the things that

21  happen when we have a victim, we see that in normal,

22  everyday families, we see that in normal, everyday

23  relationships, whether they're by families or teachers

24  or coaches or anybody else, how do we distinguish that

25  we have a victim when these behaviors are seen in

1    non-victims, I guess is the question?

2              THE COURT:  If you're able to answer, go

3    ahead.

4              THE WITNESS:  I leave that to you.  I can

5    give you the information that I know and -- both from

6    the literature and from working with hundreds and

7    hundreds of children, and would ask you, as the jury, to

8    take that information in total, because we are talking

9    about a total range of behaviors or set of behaviors

10   from perpetrators.

11             And as Mr. Green has been talking about it,

12   he's talking about it in one individual behavior of

13   helping a child to change their clothes or tickling a

14   child or wrestling with a child.  And absolutely those

15   individual behaviors, as they are taken on their own,

16   would likely be appropriate and certainly not criminal

17   in most situations with children, but it is a totality

18   or the entire explanation that I would leave to you, as

19   the jury, to take from that what would seem useful and

20   important to you.

21   BY MR. GREEN:

22       Q.   Even if we had all of those behaviors,

23   tickling, wrestling, even if we have all of that, it

24   could still be in a normal family?

25       A.   But you're only addressing one component of

1    that process of victimization.  At the point that there

2    is, say, penetration of a child's vagina, or

3    masturbation of a child's penis, or genital-to-genital

4    contact where we have the assault component of that

5    process of victimization, the tickling, the wrestling,

6    all of that stuff may no longer be as innocuous as a

7    situation or a family dynamic where there is no sexual

8    contact or no assault type of behavior involving a

9    child.

10       Q.   If we would have known, absolutely knew that

11   there was sexual contact, does that automatically mean

12   that all of those behaviors previous were -- prior to

13   this process, that they were inappropriate?

14       A.   I missed the -- can you repeat the first part?

15       Q.   If we know we have sexual contact, we're

16   looking backwards now and we look and we see tickling

17   and wrestling and things that could be indicating

18   grooming, things like that, does that automatically,

19   because we have sexual contact, automatically mean that

20   all of these behaviors were inappropriate?

21       A.   No.  And really, in order to solve the mystery

22   of that, we would have to ask the offender what were his

23   or her intentions in engaging in those behaviors.

24       Q.   I believe Mr. Long addressed this a little bit,

25   but what effect -- when a person discloses, a child

1    discloses, whether it be to a parent or teacher or

2    whatever, what part does the reaction of the person

3    receiving the information have on the child?

4        A.   It can have a huge reaction -- or a huge part

5    in how the child either continues to disclose or later

6    on whether or not a child retracts or takes back their

7    statement.

8              There are very multifaceted consequences to

9    how the individual who receives that information, how

10   they respond to that child.  And it's because of this

11   that we are trained for, at least in the forensic

12   capacity for those of us who do forensic interviews, to

13   very much modulate our response to children as they are

14   disclosing or talking about what has happened to them.

15             We certainly don't want to give them either

16   the impression that what they are saying is somehow

17   wrong or bad or shocking and shut down that child, which

18   is certainly possible with a parent or a teacher,

19   something of that nature, and nor do we want to somehow

20   offer to that child that they're doing good and that

21   they should provide more information than what they have

22   so that they get reinforcement or that we are somehow

23   giving them something in return for providing us

24   information that may not have been experienced.

25             So it's very much a balancing act.  But

1  that response from whomever is taking that information

2  then can be very, very significant.

3      Q.   And can that response go so far as to encourage

4  a child to -- let me rephrase it.

5           Have you seen where that -- where a

6  parent's response or reaction on the initial disclosure

7  affected the child to fabricate or make up more of the

8  story that maybe didn't happen?

9      A.   I certainly have had cases where that has been

10  a concern.

11           From my role within any investigative

12  process, I don't -- I don't go far enough within the

13  investigation to be able to say whether or not there was

14  any confirmatory or not evidence of what this child had

15  said, so I can't say that -- certainly that yes, it has,

16  but there certainly has been concern of that.

17      Q.   So that could happen whether the parent intends

18  to actually coach the child or just reacts in a certain

19  way naturally without any intention whatsoever, correct?

20      A.   Yes.

21      Q.   You talked about suggestibility, and as a

22  defense attorney, I have to talk to you about coaching.

23  And I have to -- what is the impact of coaching on

24  children who avow that there's been sexual abuse?

25      A.   Sometimes you will have children who will

1    basically parrot or give the information that they are

2    coached with, coaching being where an adult or a

3    caregiver will tell the child basically what information

4    to provide.  And sometimes with coaching you will have

5    exactly that, where children will parrot or give back

6    the information that they've been told to say.

7              Typically that's where we will start to see

8    that developmentally inappropriate language, where

9    children will talk in ways that are not appropriate for

10   their age level or their knowledge level.  Because

11   again, if we go back to that lack of world experience

12   with children, they can't change that language around to

13   make it match what would be appropriate for a 6-year-old

14   or a 7-year-old because they don't have that world

15   experience to be able to change that language and make

16   it appropriate for them.

17             Sometimes the coaching is ineffective or

18   the children will report what they've been told to say,

19   but then will also tell you that in fact they were told

20   to say it and who it was that told them to say it.  So

21   it can have a couple different effects with children,

22   and sometimes they don't say what they've been coached

23   to say.

24             It can -- coaching in itself can be very,

25   very stressful for children.  It can provide very, very

1    high levels of anxiety at times where children are very

2    torn, because they realize that they have been asked or

3    told to say something that is untrue and they don't want

4    to do that, and yet the person who has told them or

5    coached them to say this is somebody that they love and

6    that they realize it would be doing -- in that person's

7    eyes it would be doing something good, and yet they know

8    that to tell an untruth would be bad.  And so they feel

9    very conflicted, and it can be very anxiety producing

10   for them.

11       Q.   Just a couple questions for you.  As far as

12   coaching is concerned, are there -- other than

13   inappropriate language and/or language above their

14   developmental level, are there other indicators that

15   are -- that studies have found, I mean, or that you in

16   your experience have found, that indicate that, yeah,

17   maybe coaching has happened in this case?

18       A.   Yes, things like lack of being able to provide

19   really any contextual information for how something has

20   happened.  And this is where that kind of parroting

21   behavior will come in, where you'll ask a child to tell

22   you what happened, and really all they can tell you is

23   that single statement or set of statements that

24   something has happened, and they can't provide anything

25   further.

1      So we might ask them where something has

2  occurred.  And they can't answer that question, but they

3  can, then again, tell you that -- maybe if the initial

4  statement was daddy touched my pee-pee, and you're

5  asking that child where were you when daddy touched your

6  pee-pee, and this child doesn't have an answer for that

7  but they can reaffirm or re-tell you, daddy touched my

8  pee-pee, there's a parroting type of behavior that's

9  happening there, where we don't have any other

10  contextual information that's happening, again, because

11  children can't fill that information in with information

12  or world experience that they don't have.

13      So there's that lack of contextual detail

14  which will oftentimes point to us that there may be some

15  coaching that's going on, along with that

16  developmentally inappropriate language.

17      And then sometimes children will give more

18  nonverbal cues in more of that anxiety type of display,

19  where they will physically look towards or look back

20  towards the last place that they saw a parent, where

21  they're physically looking to them, even though they

22  can't see them, as a way to try to get some indicator of

23  what they're supposed to do, what they're supposed to

24  say.

25      So there are other indicators than that,

1   yes.

2        Q.   And when you have either known that there's

3   coaching, the child admits to it without -- I mean,

4   states that there was, or when it's you just have a

5   really good gut feeling that there is coaching going on,

6   are there particular types of family settings or

7   relationships -- I mean, just as an example -- well, I

8   won't give you an example.  You tell me what they would

9   be -- that would let the -- more likely that coaching

10  would be occurring in that kind of a situation?

11       A.   There are some situations where it is more

12  likely.

13            Things like child custody disputes, divorce

14  type of scenario, where even if custody is not an issue

15  at that particular time, it is likely to become an issue

16  at some point; where the breakup of some type of

17  relationship, even if there's not a legal marriage but

18  where the parties are separating, those do tend to have

19  higher incidence rates of coaching, as well as some type

20  of vengeance situation involving adults, where there

21  is -- somebody is trying to get back at another party.

22  Those would be the situations where it is more likely

23  that you would see some type of coaching with children.

24       Q.   Is there any way to know that a child is lying?

25  I mean, is there any way to know for sure that this

1    child is lying?

2        A.   Outside of, like, some form of media, a

3    recording or photographs, basically no.

4                    MR. GREEN:  Thank you.

5                    THE COURT:  Thank you, Mr. Green.

6                    Mr. Long, any redirect?

7                    MR. LONG:  Yes, Your Honor.

8

9            R E D I R E C T   E X A M I N A T I O N

10   BY MR. LONG:

11       Q.   Are you familiar with the concept of

12   corroborative evidence?

13       A.   Yes, I am.

14       Q.   What are some types of corroborative evidence

15   that you're familiar with?

16       A.   Things like eyewitnesses, admissions or

17   confessions that are made from the suspect themselves,

18   physical evidence from -- either from the child, from

19   their body or from a particular scene, things that a

20   child says that can be somehow externally corroborated,

21   where they may describe a certain viewpoint or vantage

22   point within a certain room and you can go out to that

23   location and actually see what that child is saying.

24                    That -- those physical sensations that a

25   child may describe within the context of an interview

1    that we were talking about earlier, where that

2    information really has to be experiential, children

3    don't gain that type of information, even if it's from

4    exposure, they don't gain that tactile or sensory

5    information unless it's somehow experienced or someone

6    has told them exactly what to say.

7              All of those would be examples of

8    corroboratory evidence, as well as the media we were

9    talking about before.

10        Q.   You testified earlier that you have observed

11   some concerns that indicated coaching to you.  Did I get

12   that right?

13        A.   Yes.

14        Q.   What types of concerns did you observe?

15        A.   The most striking would be those parroting

16   behaviors, where regardless of the question that was

17   asked of the child, the same statement or set of

18   statements gets said over and over and over again, as

19   well as those situations where there really truly is

20   just no context provided at all for what has happened;

21   or where an abuse situation took place, no additional

22   information other than that initial statement of

23   whatever it was, daddy touched my pee-pee, or whatever

24   that initial statement was.

25              And then obviously when children will tell

1    me, and sometimes very forthcomingly, children will say

2    that they have been told to tell whatever it was that

3    they walked into the room saying.

4              And you will, on occasion, get a child who

5    will, as you are trying to ask other questions, will

6    overspeak those questions and introduce information to

7    you in such a way that can be concerning as well.

8         Q.   In the course of your interview, do you talk to

9    the child about rules?

10        A.   Yes.

11        Q.   And is one of those rules to -- that they tell

12   the truth?

13        A.   Yes.

14             We don't typically word it in that way.   We

15   basically will give the child a very literal or very

16   concrete explanation of that, tell children that we are

17   only going to talk about the things that have really

18   happened, and we ask children to agree that they will do

19   that with us in that interview context.   But yes, in

20   effect we are asking them to tell the truth.

21        Q.   And in talking about -- and part of that, are

22   you trained to get the child to agree to talk about

23   things that are really happening or that really

24   happened?

25        A.   Yes.

1      Q.   And does research tell us what impact that has

2   on children?

3      A.   Yes.   If we get a child to agree that they will

4   tell the truth or that they will talk about only things

5   that have really happened, research has shown us that

6   children are indeed more likely to actually do just

7   that, to be truthful with us or to talk about those

8   things only that have happened.

9              MR. LONG:   Thank you.

10             That's all I have, Judge.

11             THE COURT:   All right.   Mr. Long, may this

12   witness be excused?

13             MR. LONG:   Your Honor, Ms. Moncher is

14   subject to recall.   And in fact, I anticipate recalling

15   her later this afternoon.

16             THE COURT:   Come up and visit with me,

17   please.

18             (Bench conference outside the presence of

19   the jury and the court reporter.)

20             THE COURT:   Okay.   Go ahead and step down,

21   please.   Apparently you're going to be recalled later.

22             If you have been watching the clock, it's

23   time for lunch.   It's almost 12:30.   It's a little later

24   than we would normally take lunch, but as I told you in

25   voir dire, sometimes there's a witness on the stand we

1   want to get done before we take a break.

2                   We're going to take a break now.   Because

3   it is almost 12:30, we will -- I would like you back in

4   that jury assembly room in an hour and 15, so that would

5   be, what, 1:45.   Gives you plenty of time for lunch.

6                   I would like the attorneys here at 1:30,

7   please.

8                   Remember the admonition.   Enjoy your lunch,

9   and you can follow Todd out.

10                   (Recessed from 12:29 p.m. until 1:29 p.m.

11   The proceedings resumed outside the presence of the jury

12   and Mr. Patrick Cote, defense investigator.)

13                   THE COURT:   Let's have the record show that

14   the attorneys are present, the Defendant, Mr. Almanza,

15   is present, the jury is not yet back.

16                   And as I try to do each time we have a

17   recess, I try to talk to the attorneys before the jury

18   comes back in the event that there's anything we need to

19   cover.

20                   So from the State's point of view, is there

21   anything that you think we need to discuss, Mr. Long?

22                   MR. LONG:   No, Your Honor.

23                   THE COURT:   How about you, Mr. Green?

24                   MR. GREEN:   I can't think of a thing, Your

25   Honor.

1          THE COURT:  Not a thing?

2          MR. GREEN:  Not a thing.

3          THE COURT:  Well, we're half a day into the

4  trial and you can't think of anything, and Mr. Long's

5  got nothing to cover.  That's just absolutely wonderful.

6          Did I understand, Mr. Long, your next

7  witness is going to be the victim?

8          MR. LONG:  Yes, Your Honor.

9          THE COURT:  Okay.  I just wanted to check

10  something.  She is now 6?

11          MR. LONG:  Yes, Your Honor.

12          THE COURT:  Did I also understand that you

13  had some -- you have formulated some plan about having

14  the prior witness, Ms. Moncher, listen to it?

15          MR. LONG:  Yes, sir.

16          THE COURT:  Well, I can say for the record

17  that neither party has invoked the rule yet, so like

18  anybody else, she's certainly welcome to stay in the

19  courtroom.

20          MR. LONG:  Oh, I'm sorry.  My -- I was not

21  intending to have her listen to the testimony, I was

22  just going to -- intended to have her listen to the

23  forensic interview, the recording, watch the forensic

24  interview recording.

25          THE COURT:  Okay.  And what was it you

1    planned on doing with her afterwards?

2         MR. LONG:  Well, I'd like the -- at this

3    point I don't have a plan.  I anticipate calling her as

4    a witness later today.

5         THE COURT:  Well, you indicated that, yeah,

6    you were going to recall her and, I take it, after

7    looking at the videotaped interview, correct?

8         MR. LONG:  Yes, sir.

9         THE COURT:  I guess, what's the subject of

10   recalling her?

11        MR. LONG:  Well, at this point I don't

12   intend to do that.  I was just advising the Court and

13   counsel that I was having her do that in anticipation of

14   testifying, and possibly testifying depending on issues

15   that are raised with the next two witnesses.

16        THE COURT:  Okay.  Such as?

17        MR. LONG:  To be very clear, and I don't

18   mean to be cryptic, Judge, if defense counsel intends to

19   claim coaching --

20        THE COURT:  Right.

21        MR. LONG:  -- then I intend to recall

22   Ms. Moncher to discuss that.

23        THE COURT:  To say in her opinion, having

24   watched the recording, that it does not appear that

25   coaching occurred, correct?

1        MR. LONG:  Effectively, Judge.

2        THE COURT:  In effect a rebuttal witness if

3   there is an allegation that the interview was conducted

4   inappropriately?

5        MR. LONG:  Yes, sir.

6        THE COURT:  Okay.  That's a little

7   different than what I -- my reaction to it was, and that

8   would -- which you know, of course, is prohibited, is

9   for her to get up here and in effect say, gee, I watched

10  it, and in my opinion she wasn't coached and she told

11  the truth.

12        MR. LONG:  Certainly can't do that.

13        THE COURT:  What I was looking for, I have

14  a vague memory there's a competency statute that

15  effectively says all witnesses are presumed to be

16  competent, but then it has some discussion about

17  children under 8 years of age, and that's what I was

18  looking for.

19        And here's the problem.  I've been doing

20  this so long, that may have been eliminated.

21        MR. LONG:  It might have.  Judge, I'm not

22  familiar with that.  I know Your Honor presided, I

23  believe, over the Toki trial two years ago.

24        THE COURT:  Uh-huh.

25        MR. LONG:  And one of the victims in there

1    was, I believe, 6 years old.

2              THE COURT:  I think -- I'm not disagreeing

3    with you, I just want to eliminate the thought, and I

4    kind of -- I thought there was some provision where the

5    Court qualifies the underage witness, at least, you

6    know, do you know the difference between telling the

7    truth and lying, if I tell you that this book is red is

8    that the truth or a lie, you know.  That kind of thing.

9              But it's not an issue that either one of

10   you have raised yet, it's just something I want to be

11   prepared for.

12             MR. GREEN:  Well, and Your Honor --

13             THE COURT:  I'm listening.

14             MR. GREEN:  -- it was an oversight on my

15   part not to request the rule be invoked, so --

16             THE COURT:  Request what?

17             MR. GREEN:  The rule be invoked.

18             THE COURT:  Rule of exclusion?

19             MR. GREEN:  Yes.  So at this point I would

20   invoke the rule.

21             MR. LONG:  And at this point, to my

22   knowledge, there has been no witnesses present other

23   than those who are legally allowed to, so the rule,

24   although not technically invoked, has certainly in

25   practice been invoked.

1          THE COURT:  Well, let's --

2          MR. LONG:  Or at least exercised.

3          THE COURT:  For the record, we'll show that

4    the rule has now been invoked, and both of you are

5    directed to properly notify your witnesses of that.

6          And I'm assuming from the traffic I can see

7    coming in and out in the back that we had victim and

8    victim representative back in the victim room, so they

9    have been here and are certainly qualified to be

10   present.  Wasn't anybody other than that, right?

11         MR. LONG:  Correct.

12         THE COURT:  Okay.  If you guys don't have

13   any issues, I'll leave, we'll send Todd to get the jury,

14   and we'll see what happens.  How's that?

15         MR. LONG:  Sure.

16         (Recessed from 1:43 p.m. until 1:53 p.m.

17   The proceedings resumed outside the presence of the

18   jury.)

19         THE COURT:  Show the jury is not yet back

20   in, the attorneys are in the courtroom, and Mr. Almanza

21   is present.  The jurors are waiting to be called in.

22         I just wanted to clarify some things.  As I

23   thought, there was a statute that dealt with witnesses

24   who are children under a certain age.  It's under 10,

25   but it's in civil cases.  And it's up to the person

1    opposing the testimony to convince the Court the child

2    is not competent to testify.  Otherwise, under Arizona

3    Rules of Evidence 601 and 13-4061, all persons are

4    presumed competent to testify.

5                    Okay, bring them in.

6                    (The proceedings resumed with the presence

7    of the jury.)

8                    THE COURT:  Let's have the record show the

9    presence of the jury now back in the courtroom after the

10   lunch recess, both attorneys, and the Defendant,

11   Mr. Almanza.

12                   Is the State ready to proceed, sir?

13                   MR. LONG:  Yes, Your Honor.

14                   THE COURT:  Is the Defendant ready to

15   proceed, sir?

16                   MR. GREEN:  Yes, Your Honor.

17                   THE COURT:  Okay.  Mr. Long?

18                   MR. LONG:  Your Honor, the State calls the

19   victim, Ada Wilhelmi.

20                   THE COURT:  All right, sir.  Do we have a

21   person sitting with her?  You're very welcome to have a

22   support person sit with her if you would like.

23                   MR. LONG:  I'll ask Ada.

24                   THE COURT:  Okay.

25                   (Mr. Long conferred with Ms. Wilhelmi off

1   the record.)

2                MR. LONG:  With the Court's permission,

3   Your Honor, Ada has requested that the victim advocate

4   sit up there with her.

5                THE COURT:  Okay.  We have a chair up

6   there.  It's a little awkward around the TV.

7                Young lady, why don't you come right up

8   over here.  We're not going to make you stop there.  You

9   can come right over to the chair, please.

10               MR. LONG:  Watch the cords, okay?

11               THE COURT:  I need to talk to you first

12   before you sit down.  I need to talk to you a little

13   bit.

14               Can you see the lady over here?

15               MS. WILHELMI:  Yeah.

16               THE COURT:  She's going to ask you to put

17   your right hand up, and we're going to swear you in.

18   Okay?

19               MS. WILHELMI:  Okay.

20               (The witness, Ada Wilhelmi, was duly sworn

21   by the clerk of the court, according to law.)

22               THE COURT:  You understand what that means?

23   Do you know what the truth is?  Do you know what telling

24   the truth is?

25               MS. WILHELMI:  Yeah.

1          THE COURT:  You know what a lie is?

2          MS. WILHELMI:  Yeah.

3          THE COURT:  And you know that one of your

4    promises is you won't tell any lies here.  Are you

5    willing to do that?

6          MS. WILHELMI:  No lies.

7          THE COURT:  No lies.  You're going to tell

8    the truth?

9          MS. WILHELMI:  (No verbal response.)

10         THE COURT:  You sure?

11         MS. WILHELMI:  (No verbal response.)

12         THE COURT:  Okay, that's what she's asking

13    you.  Do you agree with that?

14         MS. WILHELMI:  Yeah.

15         THE COURT:  Okay, thank you.

16         One of our little rules here -- one of our

17    rules here is you have to talk into that microphone so

18    everybody can hear you.

19         MS. WILHELMI:  Okay.

20         THE COURT:  But if you need to stop, tell

21    us you need to stop, you need to take a break.  Okay?

22         MS. WILHELMI:  Okay.

23         THE COURT:  He's going to ask you questions

24    first, and then the other man is going to ask you some

25    questions.

1          MS. WILHELMI:  Okay.

2          THE COURT:  Go ahead, sir.

3

4                    **ADA WILHELMI**,

5    called as a witness herein, having been first duly

6    sworn, was examined and testified as follows:

7

8              D I R E C T   E X A M I N A T I O N

9    BY MR. LONG:

10        Q.   Ada, would you say your name into the

11   microphone, please?

12        A.   My name is Ada.

13        Q.   Do you have a last name?

14        A.   Wilhelmi.

15        Q.   Do you have a middle name?

16        A.   Simone.

17        Q.   How old are you?

18        A.   6.

19        Q.   6 years old.  That makes you in kindergarten?

20   Did I get that right?

21        A.   No.  I'm in 1st grade.

22        Q.   Could you tell me about your teacher in 1st

23   grade?

24        A.   No.

25        Q.   Okay.  Does she have a name?

1       A.   Yeah.   It's Ms. Sherri.

2       Q.   Do you like school?

3       A.   Yeah.

4       Q.   What do you like about it?

5       A.   We -- science.

6       Q.   Science.   What do you like about science?

7       A.   We get to make stuff.

8       Q.   What types of stuff?

9       A.   Goo.   I don't know anything else.

10      Q.   Okay.   You just said you got to make goo.   Did

11   I get that right?

12      A.   Yes.

13      Q.   Is that a yes?

14      A.   Yes.

15      Q.   Can you tell me about goo?

16      A.   It's sticky and slimy and it's usually -- some

17   goo is red, blue, green, and purple.

18      Q.   And was there a certain type of goo that you

19   made?

20      A.   I didn't make one, but Ms. Sherri, I got to

21   help her, yeah.

22      Q.   Okay.   And the one that you helped, did it have

23   a certain color?

24      A.   We made, like, red, blue, green, and purple.

25   And also white.

1        Q.    You made all of them?

2        A.    Yeah.

3        Q.    Thank you for correcting me on that.

4              Ada, do you have -- can you tell us who is

5  in your family?

6        A.    My mom, my dad, my grandpa, my grandma, my

7  aunties, my uncle, my -- I don't know anything else.

8        Q.    Okay.  That's a pretty big family.  Do you have

9  brothers or sisters?

10       A.    Oh, yeah.  I got two brothers.

11       Q.    Okay.  What are their names?

12       A.    Arlo and Jack.

13       Q.    And is -- are you the oldest, the youngest, or

14  something else?

15       A.    The youngest.

16       Q.    You're the youngest in your family?

17       A.    Well, not the youngest, but -- Arlo's the

18  youngest, but I'm the middle youngest, sort of.

19       Q.    Okay.  So who is the oldest?

20       A.    Jack.

21       Q.    How old is Jack?

22       A.    10.

23       Q.    Do you like to play with Jack?

24       A.    No.

25       Q.    How come?

1        A.    He fights.

2        Q.    Brothers and sisters do that sometimes, I

3   guess.

4        A.    We do all the time.

5        Q.    Ada, the Judge talked to you about some things

6   before we started talking, about saying things that

7   really happened.  Do you remember that?

8        A.    Yeah.

9        Q.    And do you promise to say things that really

10   happened?

11        A.    Yes.

12        Q.    Have you ever talked to me before?

13        A.    Yes.

14        Q.    And when we've talked, do I have a rule?

15        A.    Yes.

16        Q.    And what is that rule?

17        A.    The number one rule, and it's telling the

18   truth.

19        Q.    And will you do that today?

20        A.    Yes.

21        Q.    Ada, did you ever live on a ranch?

22        A.    Yes.

23        Q.    Can you tell me about that ranch?

24        A.    It had some pigs, horses, cows, some bulls.

25   What else?  It -- that's it.

1      Q.   Okay.  What types of things did you like to do

2  on that ranch?

3      A.   I like playing on our play set.  It's really

4  fun.

5      Q.   Okay.  And you said there was a play set.  Can

6  you explain what that is?

7      A.   Oh, it's like a little playground, but it has,

8  like, some swings and slides.  You know, like things

9  like you'd use fun with.

10     Q.   And who would you play on that with?

11     A.   I would play it with my little brother, Arlo.

12     Q.   What about Jack?

13     A.   No.

14     Q.   No?

15     A.   No.  Me and Arlo get along.

16     Q.   How old is Arlo?

17     A.   He's 3.

18     Q.   Is he in school yet?

19     A.   He's in preschool.

20     Q.   Okay.  You talked a little bit about your mom

21  and your dad.  Does your mom and dad live together or in

22  different houses?

23     A.   Different houses.

24     Q.   All right.  And do you live with your mom only,

25  your dad only, or both of them?

1    A.   Both.

2    Q.   And when do you live with your mom?

3    A.   I don't really know.

4    Q.   Okay.  During the school, when school's --

5    during the school days, where are you living?

6    A.   Usually on Thursdays I go with my dad.  On the

7    rest of the days I go with my mom.

8    Q.   Okay.  When school's not in, are you living

9    with your mom, your dad, or sometimes both?

10   A.   Sometimes both.

11   Q.   Okay.  On the ranch, you said there were

12   animals on the ranch.  Were there any animals that you

13   liked particularly?

14   A.   The animal that I liked is the horses.

15   Q.   The horses?

16   A.   Because we got to ride on them.

17   Q.   Do they have names?

18   A.   One was Sterling, Cody, and Beauty.

19   Q.   You told me about some -- that there were some

20   pigs on the ranch.  Did I get that right?

21   A.   Yeah.

22   Q.   Can you tell me about the pigs?

23   A.   We always got to feed them.  We got -- Jack

24   got -- we always got to hold Tinker Bell's baby pigs and

25   we always got to have fun with them.

1   Q. Okay. You just said -- you said a name. You

2 said "Tinker Bell." What's Tinker Bell?

3   A. She's a pig. That's the mama of the pigs. She

4 had them.

5   Q. And did the other pigs have names?

6   A. I can't remember.

7   Q. What color was Tinker Bell?

8   A. She was mostly black and in the middle she was

9 pink.

10   Q. How old were you when you lived on the ranch?

11   A. Probably about 4.

12   Q. Is that a guess? Do you think you know, or are

13 you guessing?

14   A. I think I know.

15   Q. Okay. Do you live on the ranch now?

16   A. What?

17   Q. Do you live on the ranch now?

18   A. No. We moved.

19   Q. Okay. But when you were on the ranch, when you

20 lived on the ranch, did you have a bedroom at the ranch?

21   A. Yes.

22   Q. And that's where you slept and lived?

23   A. Yeah.

24   Q. Where did your mom work when you lived on the

25 ranch?

1    A.   She lived, like, at her work.  Like, she was a

2 butcher, and she lived, like, kind of close to our

3 house, but right, like, north of us.

4    Q.   Okay.  Was the place, the building that she

5 worked on, the same property as your house?

6    A.   Yeah.

7    Q.   And these pigs that you talked about, were they

8 also on the ranch?

9    A.   Yeah.

10    Q.   Did you know other people who worked on the

11 ranch?

12    A.   Yeah.  It's Fernando, Paul, and Jaime.  And my

13 mom.  That's it.

14    Q.   Okay.  You just said a name, "Fernando."  Do

15 you see anyone that works in the ranch today in the

16 courtroom?

17    A.   Not really.

18    Q.   Okay.  Did some of these workers, like

19 Fernando, did you like him?  Was he nice to you?

20    A.   I can't remember.

21    Q.   Okay.  Was there ever a day that you remember

22 where something happened with Fernando?

23    A.   Yes.

24    Q.   Will you tell us about that?

25    A.   He done a lot of inappropriate things to me.

1      Q.   Okay.  When you say "inappropriate things,"
2  what does that mean?
3      A.   Sticking his finger in my crotch.
4      Q.   Did you say "crotch"?
5      A.   (No verbal response.)
6      Q.   Now, you were pausing there for a minute.  Were
7  you thinking, trying to remember?  Is it hard to say?
8      A.   It's just hard to say.
9      Q.   Is it embarrassing?
10      A.   Yes.
11      Q.   Are you a little nervous today?
12      A.   Yes.
13      Q.   Okay.  I'm going to ask you a few more
14  questions about what you just talked about, okay?
15      A.   Okay.
16      Q.   And what I'd like you to do is talk about
17  everything you can remember from when you first were
18  with Fernando until the very end.  Is that something
19  you'd like to do?
20      A.   No.
21      Q.   Okay.  Even though it's not something you want
22  to do, will you do that for me?
23      A.   Yes.
24      Q.   First let me ask you, before you do that, Ada,
25  the thing that you just said about him putting his

1    finger in your crotch, is that something that really

2    happened?

3        A.   It really happened.

4        Q.   Or is that something that somebody told you

5    happened?

6        A.   No, I -- he just done it.

7        Q.   When you use that word, "crotch," what is a

8    crotch used for?

9        A.   Using the bathroom.

10       Q.   Okay.  Is that pee, poo, or something else?

11       A.   Pee.

12       Q.   Is it embarrassing to talk about those things?

13       A.   Yes.

14       Q.   Okay.  It's embarrassing for me sometimes to

15   talk about them too, but I'm going to ask a few more

16   kind of embarrassing questions, okay?

17       A.   Okay.

18       Q.   So tell me everything you can, from the very

19   beginning to the very end, about what you remember when

20   Fernando was inappropriate, okay?

21       A.   We were at the -- near the pigs.  He -- me and

22   him were feeding the pigs, and we were just -- I was on

23   his lap, and -- and we were just watching the pigs do

24   some stuff.  And then I was wearing a dress, and he just

25   pulled it up.

1    Q.    Okay.  What happened next?

2    A.    He sticks his finger in my crotch.

3    Q.    Okay.  You said your dress was up.  Were you

4    wearing underwear?

5    A.    Yes.

6    Q.    Tell me what happened to your underwear.

7    A.    Well, he just pulled it down.

8    Q.    Okay.  Did you feel anything?

9    A.    Yes.

10   Q.    Tell us about that.

11   A.    It's his finger.

12   Q.    Did it hurt, tickle, or something else?

13   A.    Hurt.

14   Q.    And you said you were near the pigs.  Did I get

15   that right?

16   A.    Yes.

17   Q.    Do you know which pigs you were near?

18   A.    All of them.

19   Q.    Okay.

20   A.    Because we were outside the fence.

21   Q.    And the pigs are inside the fence?

22   A.    Yes.

23   Q.    Is that right?

24   A.    Yes.

25   Q.    So you weren't in the fence with the pigs?

A.   No.

Q.   You said you were outside of the fence?

A.   Yeah.

Q.   Where was your mom when this was happening?

A.   She was butchering the animals.

Q.   Where was your brother, Jack, when this was happening?

A.   I think he was helping mom ground.

Q.   Okay.  You said you think.  Is that a guess or do you know?

A.   Just a guess.

Q.   Okay.  What about Arlo?  Do you know where he was when this was happening?

A.   I don't know.

Q.   Did Fernando say anything when he was doing this?

A.   No.

Q.   What made him stop?

A.   I don't know.  I just thought that he would get in trouble, but he just told me that he -- he just told me don't tell anyone.  But I had to tell my mom.

Q.   Okay.  So he told you not to tell anyone?

A.   Yes.

Q.   Did you ever tell anyone?

A.   Only my mom.  Well, my brother was in there,

1    so...  He would never tell anyone.

2         Q.    So your brother heard what you said, too?

3         A.    Yes.

4         Q.    After you told your mom, what happened very

5    next?

6         A.    She just called the police.

7         Q.    Okay.  Did you -- do you know, did you ever see

8    a doctor?

9         A.    I can't remember.

10        Q.    Okay.  Do you know, after -- after this

11   happened, after Fernando touched you in the crotch, did

12   you ever notice anything in your underwear?

13        A.    Only his finger.

14        Q.    Okay.  Would it be okay if I show you some

15   photos?

16        A.    Yes.

17        Q.    Would you be willing to look at some photos and

18   explain them to us?

19        A.    Yes.

20        Q.    Great.

21             THE COURT:  Mr. Long, hold on just a

22   second.

23             (The proceedings resumed with the presence

24   of Laura Anderson, court interpreter.)

25             THE COURT:  Mr. Long, whenever you're

1    ready.

2             MR. LONG:   Thank you, Your Honor.

3    BY MR. LONG:

4         Q.   I'm going to start with what's Exhibit 2.   And

5    Ada, there's a number of TVs here.   Can you see the TVs?

6    There's one right behind you.

7         A.   Yeah.

8         Q.   And if it's easier, there's also one right in

9    front of you, Ada, over here.   Can you see that one?

10        A.   Yes.

11        Q.   What I'm going to ask you to do, if you can, is

12   watch that TV right there and talk about some of the

13   pictures that are going to come up, okay?

14        A.   Okay.

15        Q.   I'm showing Exhibit No. 2.   And this may be --

16   this may be an easy picture.   Or maybe not.   Do you

17   recognize the person in that picture?

18        A.   Me.

19             THE COURT:   Just a thought, Mr. Long.   If

20   you move this way, she can see the screen a little

21   better.

22             THE WITNESS:   Me.

23   BY MR. LONG:

24        Q.   Do you know what grade you were when that

25   picture was taken?

1        A.   Kindergarten.

2        Q.   How old are you in kindergarten?

3        A.   5.

4        Q.   Okay.  Showing you Exhibit No. 3.  Do you

5    recognize what's in that picture?

6        A.   Yes.

7        Q.   Tell me about that.

8        A.   It's my house, mom's butchering work, the

9    field.

10       Q.   Would you --

11       A.   The --

12       Q.   Would you feel comfortable standing up next to

13   the TV behind you and pointing out some of the areas

14   that you're talking about?

15       A.   Yes.  Yes.

16       Q.   Okay.

17            THE COURT:  Now, when you do that, you're

18   going to have to speak as loud as you can so everybody

19   can hear you, okay?

20            THE WITNESS:  Okay.

21   BY MR. LONG:

22       Q.   That's a big TV, I know, and you're -- it's

23   hard to get to.

24            Show -- you said your house.  Will you

25   point to your house?

1          A.   Yes.  My house is right there.

2          Q.   Okay.

3               THE COURT:  And I want to tell you, that's

4    very good.  Keep talking like that, okay?

5               THE WITNESS:  Okay.

6               THE COURT:  Go ahead, sir.

7    BY MR. LONG:

8          Q.   And you said your -- where your mom works, the

9    butchering place, where is that?

10         A.   It's right there.

11         Q.   Okay.  And I'm going to show you -- can you

12   tell from this picture where the swing set you liked to

13   play on would be?

14         A.   It would be right there.

15         Q.   Okay.  Now I'm going to show you

16   Exhibit No. -- that's Exhibit No. 7.

17               Let me go to Exhibit No. 8.  Does that

18   picture show the swing set?

19         A.   No.

20         Q.   Was there a time when the swing set wasn't in

21   your yard?

22         A.   Yes.  All I know is that time.

23         Q.   All you know is that time what?  And I may have

24   confused you.  Did you say that there was a time when

25   the swing set wasn't in your backyard?

1        A.   Yes.

2        Q.   Okay.  Now let me show you Exhibit No. 15.  Do

3   you see what that is?

4        A.   Yes.

5        Q.   What is that?

6        A.   It's my mom's work.

7        Q.   Okay.  Now I'm going to show you Exhibit

8   No. 52.  Do you recognize that?

9        A.   Yeah.

10        Q.   What is that?

11        A.   Right here is where our pigs were.

12        Q.   Okay.

13        A.   And here's our fence and here's the trees, and

14   that's it.

15        Q.   Okay.  I'm going to show you Exhibit No. 58.

16        A.   Yeah, there's our pigs.

17        Q.   Okay.  And is that Tinker Bell or something

18   else?

19        A.   No, I think Tinker Bell's laying down.

20        Q.   Okay.  I'm going to show you Exhibit No. --

21        A.   And there's our dog, our old dog named

22   Winnie.

23        Q.   In that picture right there?

24        A.   Yeah.  That's our dog.

25        Q.   Exhibit No. 58, all right.

1        I'm going to show you Exhibit No. 59.

2    A.    Yeah, those are still the baby pigs.  I can't

3  really see Tinker Bell.

4    Q.    Okay.  Let me see if I have a picture with

5  Tinker Bell.  Going to show you Exhibit No. 63.

6    A.    Oh, now I see her.  She's right there.

7    Q.    Okay.  And you said that's the mama pig?

8    A.    Yeah.

9    Q.    Okay.  In any of the pictures that we saw, did

10  you see the place where you were when Fernando touched

11  you?

12    A.    Yes.  It was right there.

13    Q.    Okay.  Can you point again where that is?

14    A.    Yes.  It's right there.

15    Q.    Ada, you can go ahead and have a seat.  Don't

16  trip.

17        Would it be okay if I showed you a couple

18  things?

19    A.    Yes.

20    Q.    Ada, this is what we call Exhibit 126A, and not

21  the bag, but this thing.

22        Do you recognize this?

23    A.    No.

24    Q.    Okay.  Does this look familiar to you at all?

25    A.    Yes.

1    Q.   Well, how does it look familiar?

2    A.   It looks familiar because I worn it before,

3    because I just remembered it.

4    Q.   Okay.  You say you wore it.  What is this?

5    A.   My dress.

6    Q.   Okay.

7    A.   That's the kind of dress where Fernando touched

8    me.

9    Q.   This right here?

10    A.   Yes.

11    Q.   You said it's the kind of dress.  Is it similar

12    to this or was this the dress?

13    A.   It's the dress.

14         MR. LONG:  Your Honor, I move for the

15    introduction of Exhibit 126A.

16         THE COURT:  Is the dress labeled as A or

17    the bag?

18         MR. LONG:  The bag is actually dress -- is

19    A and the dress is in the bag.

20         THE COURT:  Okay.  So you want to move for

21    A, correct?

22         MR. LONG:  Correct.

23         THE COURT:  Mr. Green?

24         MR. GREEN:  No objection, Your Honor.

25         THE COURT:  All right, sir.  Let me have

1    the -- she'll give it to you.  Exhibit 126A will be

2    marked as admitted and admitted.

3                 (Marked for identification State's Exhibit

4    No. 126A.)

5    BY MR. LONG:

6        Q.   Ada, was there ever a time when you talked to a

7    lady about what Fernando did to you?

8        A.   Yes.

9        Q.   Do you remember talking to her?

10       A.   Yes.

11       Q.   Did you tell that woman the truth?

12       A.   Yes.

13       Q.   Were there some things that you talked about

14   then that you can't remember today?

15       A.   No.

16       Q.   Okay.  So the things that happened, the things

17   that you talked about today, are they in your mind right

18   now?

19       A.   Yes.

20       Q.   Are they things you'd like to forget?

21       A.   Yes.

22            MR. LONG:  Thank you, Ada.  Those are all

23   my questions.

24            THE COURT:  Thank you, Mr. Long.

25            Mr. Green?

C R O S S - E X A M I N A T I O N

BY MR. GREEN:

Q.   Ada, my name is Mr. Green, and I just have a few questions for you, okay?

What I want to understand is a little bit more about what you remember about the things that happened on the day that you're talking about.  Okay?

A.   Okay.

Q.   And I'm sorry that I'm making you talk about it, but it's really important.  We're in a court, and things are really important in court.  Okay?

A.   Okay.

Q.   So it's really important to talk about that.

MR. LONG:  What are you asking for, Mr. Green?

MR. GREEN:  Exhibit No. 3, please.

BY MR. GREEN:

Q.   Ada, we were just talking about this picture, or Mr. Long was just talking about this picture with you, correct?

A.   Yes.

Q.   And you pointed at where your house was and where the packing house were?

A.   Yes.

Q.   And did you point at where the pigs were

     1    located on that picture?

     2         A.   I can't really see them.

     3         Q.   Okay.  Do you know where in general, even

     4    though you can't see them, where they were?  Would you

     5    be able to find them on there?

     6         A.   I think so.

     7         Q.   I know it's really high.

     8         A.   Well, this was the way to get in.  That's how

     9    to get in.  I can't find them anywhere else.

    10              MR. GREEN:  Does it raise or lower at all?

    11    No?

    12              DETECTIVE SNYDER:  Here's a pencil that

    13    maybe she could use as a pointer.

    14              MR. GREEN:  Do we have a laser pointer?

    15              THE WITNESS:  Oh, here's the way to get in.

    16    BY MR. GREEN:

    17         Q.   That's how you get in?

    18         A.   Yeah.

    19         Q.   So where was the -- you said that one of the

    20    things that you did was feed the pigs, right?

    21         A.   Yes.

    22         Q.   Was that just you that fed the pigs, or did

    23    Jack help you or did other people help you?

    24         A.   My brother, which was Jack, and mom.

    25         Q.   Mom, Jack, and you --

1    A.   Yeah.

2    Q.   -- all fed the pigs?

3    A.   Yes.

4    Q.   Together?

5    A.   Yes.

6    Q.   Did you always feed the pigs together?

7    A.   Yes.

8    Q.   All three of you?

9    A.   Yes.

10   Q.   Okay.  Was there ever a time that you didn't

11   feed the pigs, where maybe just you and Jack fed the

12   pigs?

13   A.   No.

14   Q.   Okay.  So your mom was always with you?

15   A.   Yes.

16   Q.   Okay.  So if your mom was always with you when

17   you went to feed the pigs, then how did you end up with

18   Fernando by the pigs?  Was he already there?

19   A.   He walked me with him.

20   Q.   With him?

21   A.   Yeah.

22   Q.   Where did he walk with you from?

23   A.   He walked with me from probably right here.

24   Q.   Okay.  Do you remember when you first met up

25   with Fernando?

1        A.    No.

2        Q.    Do you remember if Fernando was eating lunch?

3        A.    No.

4        Q.    You don't?  Okay.

5              Was he in the front of the packing house or

6    in the back of the packing house?

7        A.    In the back.

8        Q.    In the back?

9        A.    Yes.

10       Q.    Okay.  And that's where you met up with him?

11       A.    Yes.

12       Q.    Okay.  And what caused you to meet up with him,

13   do you remember?

14       A.    I'd been walking down from the house all the

15   way to the -- right there.

16       Q.    Okay.  Were you going to see your mom?

17       A.    No, just Fernando.

18       Q.    Oh, you went to just see Fernando?

19       A.    Yeah.

20       Q.    And why were you looking for Fernando, do you

21   remember?

22       A.    No, I don't remember.

23       Q.    Okay.  But you know you were just going to see

24   him?

25       A.    Yes.  I remember.

1    Q.   Okay.  And was Jack with you?

2    A.   No.  He was in the -- in there.

3    Q.   He was in the packing house?

4    A.   Yes.

5    Q.   With your mom?

6    A.   Yes.

7    Q.   So you said you walked with Fernando.  Do you

8  remember how you walked to get to the pigs?

9    A.   We walked from there to there, and then we'd go

10  right over there.

11    Q.   So you said you were behind the packing house,

12  right, on the back side?

13    A.   Yes.

14    Q.   Did you walk all the way around the packing

15  house to get to the entrance, or did you walk some other

16  way?

17    A.   We just went walking all the way here and then

18  went to the pigs, to go feed them.

19    Q.   Okay.  You can have a seat.

20         Ada, Mr. Long asked you if you liked living

21  on the ranch.  Did you like living on the ranch?

22    A.   Yes.

23    Q.   Was it a fun place?

24    A.   Yes.

25    Q.   When your mom was working, what did you and

1   your brothers do?

2        A.   We would watch scary movies that were black and

3   white.

4        Q.   Black-and-white scary movies?

5        A.   Yeah.  We have 50.

6        Q.   Don't you get scared at --

7        A.   No.

8        Q.   -- scary movies?  No?  Okay.

9              And did you ever go outside and play?

10       A.   No.  Because our mom, she wouldn't let us

11  because she was afraid that we would get stolen.

12       Q.   Get stolen?

13       A.   Yeah.

14       Q.   Okay.  But on the property there, you didn't

15  play out in the yard or anything?

16       A.   No, until she came back.

17       Q.   From the packing house?

18       A.   Yes.

19       Q.   Okay.  And so she would come home and then you

20  would go out and play?

21       A.   Yes.

22       Q.   Did you ever play outside in the fenced area

23  when your mom wasn't around?

24       A.   Yes.  It was with my friend, Catherine.  We

25  were playing with a tea party.

1      Q.   Okay.  All right.  So occasionally you would

2  go -- you and Jack and your mom always were together

3  when you fed the pigs, right?

4      A.   Yes.

5      Q.   And when you and Fernando went to the pigs,

6  were you just going to look at them, or were you going

7  to give them water or food, or what were you going to

8  the pigs for?

9      A.   We were going to the pigs to feed, give them

10 food.

11     Q.   To give them food?

12     A.   Yes.

13     Q.   And Fernando was going to help you give them

14 food?

15     A.   He was the only one that done it, because I --

16 because I just didn't want to do it --

17     Q.   Okay.

18     A.   -- right there.

19     Q.   Do you remember where the food was kept?  Was

20 it kept right by the pigs?

21     A.   Well, no.

22     Q.   Where was --

23     A.   We would get it.

24     Q.   Where would you get the food from?

25     A.   Usually right next to the horses, usually,

1  because -- I don't know, actually.

2      Q.   Can we have the picture back, Exhibit No. 3,

3  please.

4            So the food, can you show me where the food

5  was stored --

6      A.   Yes.

7      Q.   -- in that picture?

8      A.   I think we were actually ...

9      Q.   Take your time, it's okay.  Do you remember?

10  You don't remember?

11      A.   No, I don't remember.

12      Q.   Okay.  That's an okay answer.  Anytime you

13  don't remember, you can tell me that.  Okay?

14      A.   Okay.

15      Q.   All right.  And did you -- how did you get the

16  food to the pigs from where it was stored?

17      A.   We would go from this way, all the way from

18  there, all the way over there.

19      Q.   Okay, good.  You reached that pretty good.  I

20  think you got taller in the last few minutes.

21            Did you carry the food?  Was it in bags?

22  How was the food -- how did you carry the food?

23      A.   It was in bags.

24      Q.   It was in bags?

25      A.   Yes.

1       Q.   Could you pick up a bag?

2       A.   Yes.

3       Q.   You could pick up a bag?

4       A.   Yes.

5       Q.   How big were the bags?

6       A.   Pretty big.

7       Q.   Could you carry the bag all the way from where

8  you got the food all the way to the pigs?

9       A.   Yep.

10       Q.   Wow.  You're a strong little girl.

11            Go ahead and have a seat.  Thank you.

12            Before you came to court today, Ada, did

13  you talk to anybody about what was going to happen

14  today?

15       A.   Only my mom.

16       Q.   Your mom?

17       A.   Because she was only going to keep that secret.

18       Q.   She was only going to do what?

19       A.   Keep that secret.

20       Q.   She was going to keep what secret?

21       A.   The secret that I had told her, that she would

22  never tell anybody else.

23       Q.   About what happened to you?

24       A.   Yes.

25       Q.   Okay.

1       A.   I would have to tell it to this building only.

2       Q.   Okay.  And so you and your mom talked about it,

3  but did you ever tell anybody else about it other than

4  your mom?

5       A.   I can't remember.

6       Q.   Okay.  And did you and your mom talk about what

7  was going to happen in court today?

8       A.   No.

9       Q.   No?  Okay.  She didn't tell you what -- were

10  you nervous coming to court today?

11       A.   Yes.

12       Q.   Did you tell your mom you were nervous coming

13  to court today?

14       A.   Yes.

15       Q.   And did she say anything to you to help you not

16  be nervous?

17       A.   She did a prayer.

18       Q.   She did a prayer?

19       A.   Yeah.

20       Q.   Okay.  Well, that was good.

21            Did you talk to anybody else about what was

22  going to happen in court today?

23       A.   No.

24       Q.   Okay.  How about the lady sitting next to you?

25  Did you talk to her about what was happening in court

1    today?

2        A.   I don't know.

3        Q.   Okay.  All right.  Ada, I'm sorry we had to ask

4    you all these questions.  You've been a really good

5    witness, though.  You've done a good job.  Okay?

6        A.   Okay.

7            MR. GREEN:  All right.  Thank you very

8    much.

9            THE COURT:  Thank you, Mr. Green.

10           Mr. Long?

11           MR. LONG:  Yes, sir.

12

13           R E D I R E C T   E X A M I N A T I O N

14   BY MR. LONG:

15       Q.   Ada, I'm going to go back to this picture,

16   which is Exhibit No. 3, and I'm going to see if I can't

17   make this a little bigger for you.  Let's see if you

18   can't reach that a little better.

19           Explain to us which way you'd go to get to

20   the pigs.

21       A.   We would go from our mom's working place to

22   here, and then we would go to here.

23       Q.   Okay.  And is there a gate or a fence or

24   something else there?

25       A.   A gate.

1      Q.   Okay.  I'm going to ask you to stay up there

2  for just a little bit.  I'm going to show you

3  Exhibit No. 30.

4           Do you recognize that?

5      A.   Yes.

6      Q.   And what is that?

7      A.   Right here is where mom would put all the

8  heads.

9      Q.   Okay.  What about to the left of the heads?

10     A.   This we would get in from that.

11     Q.   You would get into where from that?

12     A.   To the pigs.

13     Q.   I'm showing you Exhibit No. 31.  Tell me what

14  that is.

15     A.   This is one of the place.  This is just how to

16  get in.  Then we'd just go through that and then go

17  through there, and then we go through another gate.  And

18  then we would just start walking and then we'll get to

19  the pigs.

20     Q.   Okay.  I'm going to show you Exhibit No. 33.

21     A.   You just go through there, and here's the gate

22  to open it.

23     Q.   Can you show us where the gate is again?

24     A.   Yes.  It's right there.

25     Q.   Okay.  Were the --

1        A.   And then when we --

2        Q.   Hold on a second.  Exhibit No. 35.  Can you see

3    the gate better in there?

4        A.   Yeah, right there.

5        Q.   And Exhibit No. 36.  Can you tell us what that

6    is?

7        A.   Okay.  Here's the way to get in, and then

8    there's -- right there is the -- through that hole right

9    there, when you go over there, you're almost there.

10       Q.   Okay.  And then I'm going to show you

11   Exhibit No. 52.

12       A.   There it is right there.

13       Q.   Okay.  Now, if you'd stay up there for a

14   minute, we're back to this big picture.  And I'm going

15   to show you -- this little area is going to pop out.

16            Do you see the fence that's by the --

17       A.   Pig?

18       Q.   -- pigpen, yeah.

19       A.   It's right -- this one.

20       Q.   Okay.  Would you -- would you crawl over, under

21   that fence to get there?

22       A.   Well --

23       Q.   To get to the pigpens?

24       A.   To get to the pigs we would just go that way.

25       Q.   Okay.  Ada, you can go ahead and have a seat.

1          Ada, we talked about the number one rule.

2    What's that?

3          A.   It's the truth.

4          Q.   Okay.  And I want to be -- tell the truth to

5    you as well.  One of the things that's being said and

6    being claimed is that your mom told you what happened,

7    that this happened and that this didn't come from

8    yourself.  What do you think about that?

9          A.   I don't know.

10         Q.   Okay.  Did your mom tell you what to say?

11         A.   No.

12         Q.   When you talked what about Fernando did, is

13   that something that you experienced?

14         A.   No.

15         Q.   Okay.  Might have been a bad question.  When

16   you told us what happened with Fernando, was that

17   something that really happened?

18         A.   It really happened.

19         Q.   Okay.  And did that happen to your body?

20         A.   Yes.

21         Q.   And did you tell the truth today?

22         A.   Yes.

23         Q.   You were asked questions, about if mom always

24   feeds pigs, to you, and you said yes; is that right?

25         A.   Yes.

1      Q.   On the day when Fernando touched you, was mom

2  there?

3      A.   No.

4      Q.   Who was there?

5      A.   Only me and Fernando.  That's it.

6           MR. LONG:  Thank you, Ada.  Those are all

7  my questions.

8           THE COURT:  Okay.  Can I see both the

9  attorneys up here, please.

10           (Bench conference outside the presence of

11  the jury and the court reporter.)

12           THE COURT:  Ada, the attorneys and I were

13  talking because sometimes I have to ask some questions;

14  sometimes the jury wants to know things and they ask me

15  to ask some questions.  Okay?

16           THE WITNESS:  Okay.

17

18            J U R Y   Q U E S T I O N S

19           THE COURT:  Do you remember talking about

20  feeding the pigs?

21           THE WITNESS:  Yes.

22           THE COURT:  Do you remember how big the bag

23  of food was for the pigs, how big that pig feed bag is?

24           THE WITNESS:  No.

25           THE COURT:  Is it bigger than you, smaller

1   than you?  Is it a little bag or a big bag, do you

2   remember at all?

3                THE WITNESS:  It was a big bag.

4                THE COURT:  Were you able to actually lift

5   it up and carry it?

6                THE WITNESS:  Yes.

7                THE COURT:  Okay.  How many pigs could you

8   feed with one of those bags of food?

9                THE WITNESS:  Well, all the pigs were in

10  the same pen.

11               THE COURT:  Uh-huh.

12               THE WITNESS:  And so they -- if we would

13  just pour down the food into the hole, and then the pigs

14  would just start eating.

15               THE COURT:  They had to eat whatever you

16  gave them, right?

17               THE WITNESS:  Yes.

18               THE COURT:  Okay.  And did you feed them

19  one bag at a time or part of a bag or several bags?  How

20  did you do that?

21               THE WITNESS:  One bag at a time.

22               THE COURT:  Okay, good.  Okay.

23               Now, Mr. Long, do you have any follow-up

24  questions?

25               MR. LONG:  Not as to those questions, but

1    could we approach, please?

2                    THE COURT:  Sure.

3                    (Bench conference outside the presence of

4    the jury and the court reporter.)

5

6                F U R T H E R   E X A M I N A T I O N

7    BY MR. LONG:

8        Q.   Ada, I just need to ask you one more question,

9    okay?

10       A.   Okay.

11       Q.   And it's an embarrassing one, so I just want to

12   tell you that up front.

13                   You talked about Fernando's finger in your

14   crotch.  Was that inside your crotch, outside your

15   crotch, or something else?

16       A.   It was inside.

17                   MR. LONG:  Those are all my questions.

18                   THE COURT:  Okay.  Do you have any

19   additional questions, Mr. Green?

20                   MR. GREEN:  No, Your Honor.

21                   THE COURT:  Okay.  Ladies and gentlemen,

22   I'll remind you, I told you in voir dire some of your

23   questions are not asked.

24                   Okay, Ada, we're all done.  You can step

25   down now, okay?

1              MS. WILHELMI:  Okay.

2              THE COURT:  Thank you.  Do you want to take

3    your water with you or do you want to throw that away?

4              MS. WILHELMI:  I'll take my water with me.

5              THE COURT:  Mr. Long, your next witness?

6              MR. LONG:  Your Honor, State calls Kathryn

7    Quinn.

8              THE COURT:  Oh, okay.

9              Right up here, up front first, please.

10   We're going to get you sworn in.

11             (The witness, Kathryn Quinn, was duly sworn

12   by the clerk of the court, according to law.)

13             THE COURT:  Come on over and have a seat.

14   Just pull up to the table, get comfortable, but you can

15   move that microphone.  There you go.  If you move that,

16   it will also bend if you need to.

17             Mr. Long?

18

19                   **KATHRYN QUINN**,

20   called as a witness herein, having been first duly

21   sworn, was examined and testified as follows:

22

23            D I R E C T   E X A M I N A T I O N

24   BY MR. LONG:

25       Q.   Good afternoon.

```
 1        A.   Hi.

 2        Q.   Could you state your name, please.

 3        A.   Kathryn Quinn, but I go by Katie.

 4        Q.   Is it okay if I call you "Katie"?

 5        A.   Yes.

 6        Q.   Tell us about your family.

 7        A.   Single mom.  I have three children, Jack, Ada,

 8   and Arlo.  And other than that, I'm close with my mom,

 9   my sister.

10                   That's about it.

11        Q.   How old is Jack?

12        A.   10.

13        Q.   And what grade is he in?

14        A.   5th grade.

15        Q.   What types of things does he like to do?

16        A.   He likes to play chess, read.  He likes to

17   explore, likes to go shooting.  Just typical 10-year-old

18   stuff.

19        Q.   Okay.  Does he do well in school?

20        A.   Very well.

21        Q.   Okay.  What about Ada?  How old is she?

22        A.   6.

23        Q.   And what grade is she in?

24        A.   1st grade.

25        Q.   Tell us about Ada.
```

1    A.   She's very smart, and she's -- she's very

2    sweet, but she's also really strong.  And she likes to

3    do girly things, like painting nails and playing dolls,

4    and -- but she's just -- I don't know.  She's a great

5    little girl.  She's fun.

6         Q.   And Arlo, how old is he?

7         A.   3.

8         Q.   What does he like to do?

9         A.   He likes to make messes.  Everywhere.  He's --

10   I call him my little firecracker.

11        Q.   Sounds like you've got your hands full.

12        A.   Absolutely.

13        Q.   And back in October of 2011, where did you

14   work?

15        A.   I worked for the Double Check Ranch.

16        Q.   Can you explain what that is, what the Double

17   Check Ranch is?

18        A.   Yes.  It's a grass-fed natural beef company.

19   And I was the packing house manager and the butcher, the

20   head butcher.

21        Q.   So what types of things did you have to do for

22   your job when you worked there?

23        A.   Well, it's -- I was in charge of everything

24   from when it came into the corrals to basically until it

25   got to the farmers' markets or restaurants.

1          So I would help round up the animals to put
2     them in the corrals, I would slaughter the animals, with
3     a group.  I usually had someone working for me, and then
4     we had ranch hands in those days.  It was a big process.
5          Then I would also cut up the beef from
6     whole sides of beef and break it down into all the cuts,
7     cut, wrap, package, and then also load the trailers and
8     get it to the farmers' markets.
9        Q.  All right.  Was there a time when you worked
10    there that you didn't live on the ranch?
11       A.  That is correct, yes.
12       Q.  Okay.  At some point did that change?
13       A.  Yes.
14       Q.  Tell me about that.
15       A.  I was hired at the ranch in April of 2010.  I
16    was still a student at U of A at the time.
17          Then in May the following year, would have
18    been May of 2011, I moved into the house on the ranch
19    and brought my family.  And when that happened, the
20    position went from just a part-time job to a very
21    full-time job.
22       Q.  So was living on the ranch one of the perks of
23    the job?
24       A.  I paid rent living there.  It didn't come free.
25          But it was nice not having to commute from

1    Tucson, which is where I was living before.

2         Q.   I see.   And where is this ranch geographically?

3         A.   It's in Dudleyville, which is in the very

4    north -- it's like a north little -- it's almost in Gila

5    County, near Winkelman, Arizona.   And it's about, I

6    would say, 75 miles north of where my house was in

7    Tucson.

8         Q.   No real easy way to get there; is that --

9         A.   No.

10        Q.   -- right?

11        A.   No.

12        Q.   When you started living there, what types of

13   things would your kids do when they were at the ranch?

14        A.   We had a lot of fun.   And we would do

15   everything from go for -- we would go for walks through

16   the river, we would collect rocks, we would do a lot of

17   hiking, we would go hunt squirrels and little varmints

18   and things.

19             And, you know, they would play in the yard.

20   We -- you know, we'd find things out in nature and cook

21   them and -- not just animals, but vegetables and fruits

22   and cactus and things like that, too.   We were pretty

23   into the earth there and very excited about it.

24        Q.   Did the kids have chores or anything like that

25   that they had to do?

1     A.   Absolutely.  My kids have a lot of chores.

2   They -- and they went to school too, but after school

3   they had chores, before school they had chores, and on

4   the weekends they had chores.  We were a farming family.

5     Q.   And what types of things would they do for

6   chores?

7     A.   Well, Ada didn't really do a lot of chores, and

8   Arlo was only, like -- I mean, he was just a really,

9   really young toddler, so he didn't really have many

10   chores.  But Ada would do everything from help feed

11   chickens, which we had chickens, you know, or cleaning

12   up the yard and stuff.

13               Jack had more involved chores, and he would

14   do everything from get feed ready for the pigs, he would

15   even help me sometimes in the cutting room working the

16   grinder and stuff.  Ada would sometimes help me in there

17   as well.

18               They were in charge of, you know, sweeping

19   outside, they would have to rake leaves, you know.  Lots

20   of -- they were working kids.

21     Q.   Did you have pigs on the property?

22     A.   Yes, I did.

23     Q.   Tell me about them.

24     A.   They were my personal pigs.  Tinker Bell was my

25   first of my pigs of my breeding-stock stock, and I

1    raised my own natural pork.  And I bought Tinker Bell

2    pregnant.  And so this was my first real farming

3    adventure, my own thing.

4              But we loved them.  They had babies.  We

5    were there for them when they were born.  I even

6    bottle-fed a couple of them.  We buried them when they

7    died.  I mean, we named them.  And we also slaughtered

8    them and sold them, so, you know.

9        Q.   What would -- would Jack do anything with the

10   pigs?

11       A.   Absolutely.  Jack was -- I used to call him my

12   pig whisperer, because he could take Tinker Bell, and if

13   he was in the pen with her -- I never let them get in

14   the pens without an adult there, but if he was in the

15   pens with her, I'd see him do this, where he could pet

16   her shoulders and actually make her lay down.

17             But they would feed them, help me get stuff

18   together to water them.  Because feeding and watering

19   twice a day was a big, long process.  It took a lot of

20   time.

21       Q.   So the kids -- were the kids familiar with that

22   process?

23       A.   They were pretty familiar.  It changed daily,

24   though, because we didn't just have a set thing.  We

25   were feeding them all the time.

1    The feeds changed all the time.  Sometimes
2 feeds came in barrels, sometimes they came in bags,
3 sometimes it was food restaurants gave us.  Feeding
4 changed all the time.  There was no set pattern to it or
5 set thing.
6    Also, too, with the size of the animals it
7 changed.
8    Q.   Were there ever times when anyone else would
9 help the kids with the pigs?
10   A.   Yes.
11   Q.   Tell me about that.
12   A.   I would so often ask Fernando to help
13 sometimes.  Like, he would be done with -- it was never
14 while he was on his shift, though.  When he was done --
15 because he worked for Paul.  So when he was done with
16 his shift, he would -- I would sometimes ask him, hey,
17 could you go help me feed the pigs, or he would offer to
18 help me, and I would say yes, please.
19   And I had other people who worked for the
20 ranch sometimes help me as well.  Different people
21 worked at different times.  They often helped me.
22   Q.   Focusing on Fernando, when he would help feed
23 the pigs, would the kids -- would the kids be allowed to
24 be around him to help feed the pigs?
25   A.   Yes.  I mean -- and there was a certain point

1    in time where, yes, this was allowed.

2        Q.   Okay.   Now, were you familiar with the other

3    people that worked on the ranch?

4        A.   Yes.

5        Q.   In addition to Fernando, who else worked on the

6    ranch?

7        A.   At the time that he was working there, Paul was

8    the owner.   He would be there maybe one to two days a

9    week.   He was not there very often.

10            There was another man, Jaime Kahmie, and he

11   was there just -- he was there Monday through Friday at

12   this time, and then Fernando worked there Monday through

13   Sunday or Monday through Saturday.   But Jaime was the

14   other employee.   (Phonetic)

15            Occasionally we would have someone else pop

16   in maybe who was specialty in welding or specialty in

17   something else, but generally that was -- it was just

18   us.

19            And then I often had an apprentice that

20   would work for me.

21       Q.   Okay.   Was there any -- how many Fernandos

22   worked on the ranch?

23       A.   Just one.

24       Q.   Did Ada know that person?

25       A.   Yes.

1       Q.   Did Ada know him by name?

2       A.   Yes.

3       Q.   What would she call him?

4       A.   Fernando.

5       Q.   If she was to talk about Fernando, would you

6    know who he -- would you know specifically who she was

7    talking about?

8       A.   Yes.

9       Q.   Okay.  Do you see Fernando in the courtroom

10   today?

11      A.   Yes, I do.

12      Q.   If you would, please, indicate where he's

13   sitting --

14      A.   He's sitting --

15      Q.   -- and what he's wearing.

16      A.   He's sitting right there wearing a gray shirt,

17   and he has microphone set on him.

18               MR. LONG:  Your Honor, I'd ask that the

19   record reflect that the witness has identified the

20   Defendant, Fernando Almanza.

21               THE COURT:  It may.

22   BY MR. LONG:

23      Q.   Could you talk about what Fernando's work

24   schedule was.

25      A.   He worked Monday through Friday -- well, excuse

me.

One day a week, on Tuesdays and Thursdays, we had what we called a kill day.  That was our day of slaughter.  Usually it was on Tuesdays or Thursdays.  On those days he would usually arrive at about 6:00 a.m. and he would stay until kill was done.  And that was often around 3:30, 4 o'clock, kill would be done.  And he would stay until the end of that.

On the other four weekdays, usually he came from 7:30 in the morning to 10:30, depending on the time of the year.  If it was summer, work days started at about 6:00, they ended at 9:00.  He was usually scheduled for a three- to four-hour shift, so -- and then Saturdays and Sundays he often would just pop in to turn on the irrigation or it would be three to four hours.  The -- Paul would allot him a shift, and usually it was three or four hours per day, excepting kill days.

Q.   And what were his -- was Fernando's responsibilities on the ranch?

A.   It was just ranch hand work, sometimes moving cows up from the river if they escaped, moving cows from the field into the corrals to prepare them for kill day, mending fences.  That was -- I mean, just basic ranch repair-type stuff like that.

Q.   Okay.  I'd like to talk about a specific day.

1    A.   Uh-huh.

2    Q.   And that's October 22, 2011.

3    A.   Uh-huh.

4    Q.   Do you remember that day?

5    A.   Very clearly.

6    Q.   It's an odd -- sometimes odd to have a date
7  like that stand out.  Why does that stand out to you?

8    A.   Because I remember the events of that day very,
9  very clearly.

10   Q.   Do you remember what day of the week it was?

11   A.   It was a Saturday.

12   Q.   And so if it's a Saturday, I'm assuming your
13 kids weren't at school?

14   A.   No.

15   Q.   Where were they?

16   A.   Well, they were all over the ranch that day,
17 but they were on the ranch property the entire day.

18   Q.   And what were you doing that Saturday?  Was
19 that a work day for you?

20   A.   Yes.  I usually work Saturdays.

21        I -- that morning I began work at about
22 8 o'clock, and I finished work that day maybe around
23 5:00.  It was in the evening.

24   Q.   Okay.  At some point did Ada come to you?

25   A.   Yes.

1      Q.    Do you remember approximately what time that

2   was?

3      A.    About 4:30, 5 o'clock.

4      Q.    Okay.   Had Fernando been there that day?

5      A.    Yes, he had.

6      Q.    Do you know about what time he left?

7      A.    10:30 in the morning.

8      Q.    When Ada came to you, where were you?

9      A.    I was in the cutting room.

10     Q.    And were the kids allowed in that room?

11     A.    Yes, they were, if I was there.

12     Q.    Okay.   Did she talk to you?

13     A.    Yes, she did.

14     Q.    And did she tell you something?

15     A.    Yes, she did.

16     Q.    Did that -- and what is it that she told you?

17           MR. GREEN:   Objection, Your Honor.

18   Hearsay.

19           THE COURT:   Overruled.

20           You may answer.

21           THE WITNESS:   She came up to me.   I was

22   working at the meat grinder, and I was loading meat into

23   bags.   And the meat grinder is large.   It's the size of

24   this table top here.   And we had a pile of meat there.

25   And she liked to sometimes help out, so she was pushing

1    the meat towards me.

2              And she said, just suddenly, matter of

3    factually, she said, "Fernando has really sharp nails."

4              And I stopped the meat grinder.  The

5    button -- I'm like right here to the vent where it's --

6    the meat is coming out.  I slammed the button and I

7    stopped the meat grinder so I could listen to her.  And

8    I said, "What?"

9              And she said -- do you want me to continue

10   with what she said?

11   BY MR. LONG:

12       Q.   What did she say?

13       A.   Well, she said, "He touched me down there."

14              And I said, "What do you mean?"

15              And she said -- she just pulled down her

16   underwear and she showed me exactly what he did.

17       Q.   So she demonstrated it?

18       A.   Yes, she did.

19       Q.   How did you react?

20       A.   I immediately stood up -- I said, "Pull your

21   underwear up."  I stood up, I walked out of the room,

22   and I made a phone call.

23       Q.   Who did you make the phone call to?

24       A.   I first called my boyfriend at the time.  And I

25   told him, "Please come here right now and watch Jack,

1    and I need you to clean up this mess in this butchering

2    facility and I need to go talk to the police."

3        Q.   Did you speak with police?

4        A.   Yes, I did.

5        Q.   And who was with you when you talked to police?

6        A.   Well, I first called 911, and they told me that

7    they would have someone call me.

8                And at this point it's kind of getting hazy

9    because I was so emotional.

10               The kids were still alone in the cutting

11   room at this point in time.  And they said that I would

12   need to go talk to somebody in San Manuel, so I got the

13   kids, put them in the house, and I went into my bedroom

14   and I changed out of my butchering clothes, and I waited

15   for my boyfriend to get there.

16               When he arrived I just said, "I need to go

17   handle something."

18               And he was like, "You go handle what you

19   need to handle."

20               And so I drove to San Manuel with Ada and

21   we arrived at the police station.

22       Q.   Okay.  At some point when you were at the

23   police station, did Ada need to use the restroom?

24       A.   Yes, she did.

25       Q.   Tell me about that.

1    A.   We went to the restroom.  And she didn't want

2  to close the door, and -- we were obviously in the

3  women's restroom.  We were the only people in the

4  building other than the officer.

5         And she pulled down her underwear.  And I

6  didn't really want to look.  I mean, it's her thing.

7  And she says, "Mommy, it burns to pee."

8         And then when I saw her underwear, I saw

9  that there was blood in them.

10   Q.   Did you know that she had been injured prior to

11  that time?

12   A.   I did not know what had happened other than

13  what she had shown me.

14   Q.   Okay.  At some point do you know whether or not

15  a medical exam was conducted?

16   A.   Yes, there was.

17   Q.   And did you take Ada to that medical exam?

18   A.   Yes, I did.

19   Q.   Were you in the room when she spoke to doctors?

20   A.   Initially when she spoke to a nurse, I was in

21  the room, but she didn't say much.  The nurse told her

22  to wait to speak to a different doctor.

23   Q.   Okay.

24   A.   So then we waited and waited and waited.  And

25  during the actual examination I was not in the room.

1    Q.    Okay.  Was that the only medical exam that Ada

2  went through?

3    A.    It's kind of hard to remember, but I think that

4  was the only one.

5    Q.    Okay.  And at some point you learned -- or you

6  took her to a place where she would be interviewed; is

7  that accurate?

8    A.    Yes.

9    Q.    Were you present during that interview?

10    A.    I was not present during the interview.  I was

11  in another room.

12    Q.    What I'd like to do is to see if I can have you

13  go through some photographs and describe for us, if you

14  would, what they are, okay?

15          This is Exhibit No. 3.  Can you tell us

16  what that is?

17    A.    Yeah, that's the ranch.  Double Check Ranch.

18    Q.    And we've had a couple people kind of talk

19  about what is there.  Could you just tell us real

20  briefly, show us where the home is, where your packing

21  house is, and where the pigs are?

22    A.    Yeah.

23    Q.    Could you go ahead and stand up and show where

24  that is.

25    A.    This is the house, this is the packing house

1    right here.  The pigs would have been over in these

2    trees way over here.

3         Q.   And Exhibit No. 4, can you see what that shows?

4         A.   Yes.

5         Q.   Explain what you see there.

6         A.   This is the packing house here -- or actually,

7    we're -- the meat cutting room is actually over here.

8    House is over here.  This is where the pigs are, in this

9    area over here.

10        Q.   Okay.  And --

11        A.   Actually, right here is where the pigs are, I

12   think.

13        Q.   And what is Exhibit No. 6?

14        A.   This is the house.

15        Q.   And Exhibit No. 15?

16        A.   That's the packing house.

17        Q.   Exhibit No. 19?

18        A.   That's the entrance to the packing house to go

19   up onto the slaughter room.  So you would enter through

20   these doors right here to get into the kill floor, which

21   is right here.

22        Q.   I'm sorry, I'm showing you -- on the right is

23   Exhibit No. 20.

24        A.   Oh, okay.  That's the entrance to the packing

25   house.

1      Q.   Okay.  You just pointed to Exhibit No. 19; is

2   that accurate?

3      A.   Yes.

4      Q.   Now, Exhibit No. 20, explain what you see

5   there.

6      A.   That is walking through these doors right here,

7   and you are looking onto the kill floor.

8      Q.   And I'm going to show now Exhibit No. 21 on the

9   left.  Tell us what that shows.

10      A.   You would have walked through here, made a

11   left, and this is the cooler door.  The cutting room is

12   through that door right there.

13      Q.   And you can stay up for just a little bit,

14   Katie, if that's okay.

15      A.   I want to note, though, that in October of

16   2011, these flaps here, none of them were there.

17      Q.   Okay.  Exhibit No. 22, can you explain what

18   that is?

19      A.   That is the back exit that would go off to the

20   back of the building.

21      Q.   And then Exhibit No. 23?

22      A.   That's the kill chute door.  That's where the

23   animals roll out of.

24      Q.   And Exhibit No. 24?

25      A.   That would be looking towards the front

1    entrance, the original entrance that we looked at.

2        Q.   If I put Exhibit No. 24 next to Exhibit No. 19,

3    is that the same door?

4        A.   Yes, it is.

5        Q.   I'm showing you Exhibit No. 29.

6        A.   Uh-huh.

7        Q.   Can you tell us what this photo shows.

8        A.   Yeah.  That's the steps -- or that's actually

9    from standing on top of the steps looking.  The packing

10   house would have been right around that corner right

11   there.  That's standing from right next to the house.

12       Q.   Okay.  And the access to get to the pigpen, can

13   you show us where that is?

14       A.   You would have to go all the way across the

15   driveway here.  And there's a few different ways to get

16   there, but mostly this is the way we'd take.  We'd go

17   through here.  There is a corral gate right there.  Then

18   you would then go through that corral, open another

19   gate, and go way -- that way through the trees.

20            MR. LONG:  Okay.  One moment, Your Honor,

21   please.

22   BY MR. LONG:

23       Q.   I'm going to show you Exhibit No. 25.

24       A.   Uh-huh.

25       Q.   Can you tell us what that shows?

1    A.    That's the west side of the packing house.
2  This would be a freezer unit right here.  On this
3  underground -- under thing here is where I'm going to,
4  like, park a tractor.
5    Q.    Exhibit No. 25 side by side with Exhibit No. 3.
6  Can you show us where it is that that picture shows?
7    A.    This is right here, yes.
8    Q.    Okay.  So that's the left side of the packing
9  house in Exhibit No. 3?
10    A.    Correct.
11    Q.    And Exhibit No. 26, is that a similar view of
12  that same photo --
13    A.    Yeah.
14    Q.    -- from Exhibit 25?
15    A.    Yes.
16    Q.    And then Exhibit 27?
17    A.    Yes, although it just shows a little bit more
18  further this area right here.
19    Q.    Okay.  And then here's Exhibit No. 28.
20    A.    Uh-huh.
21    Q.    Can you tell us what that shows.
22    A.    Yeah.  That's the back side of the packing
23  house right in this area right here.  There's a propane
24  tank right here kind of in the shaded area, and that's
25  the propane tank that's right there.

1      Q.   And that's also towards the left side of the

2  packing house that's depicted in Exhibit No. 3?

3      A.   Correct.

4      Q.   Is that accurate?

5      A.   That would be the north side of the building.

6      Q.   That vantage point of Exhibit No. 28, is that

7  shooting towards where the pigpen is?

8      A.   Yes.  It -- the pigpens would be way -- were

9  right back behind here, behind this fence, all the way

10 in those trees.

11     Q.   Okay.  And if you would indicate on

12 Exhibit No. 3 kind of the direction that you're showing.

13     A.   You would be standing approximately right in

14 here, next to this tree right there, and you would be

15 looking back towards this area, all the way back here.

16          I mean, you can see these are two different

17 times of year here, too, because of the trees.

18     Q.   And that was going to be my next question.  At

19 some times do these photos -- some of these photos

20 appear to be taken at different times of the yeah?

21     A.   Uh-huh, correct.

22     Q.   Notwithstanding some of the differences in the

23 shrubbery, does the -- where the buildings are in these

24 pictures, is that the same as they were in October 2011?

25     A.   This is exactly where the buildings were in

1    2011.

2        Q.   And so far from what we've talked about, the

3    corral and the fence --

4        A.   Uh-huh.

5        Q.   -- is that also -- what the pictures depict, is

6    that also where they were in October 2011?

7        A.   Yes.  Some of the fences in the fields over

8    here changed, but I don't think that's relevant.

9        Q.   Okay, but nothing we've talked about so far?

10       A.   No.

11       Q.   If at any point I talk about an area in a photo

12   that was not the same as it was in 2011, will you please

13   let me know?

14       A.   Okay.

15       Q.   I'm showing you Exhibit No. 18 side by side

16   with Exhibit No. 3.  Tell us what Exhibit No. -- I'm

17   sorry -- No. 18 shows.

18       A.   18 shows the front east side of the packing

19   house.  That vehicle, Jeep right there, would have been

20   parked approximately right here, facing that direction.

21       Q.   Okay.  Now I'm showing Exhibit No. 30 side by

22   side with Exhibit No. 3.  If you would, tell us where

23   that's showing.

24       A.   This picture was taken probably standing

25   approximately about right here, and you would have been

1    facing this direction towards those corrals.

2        Q.    And Exhibit No. 31?

3        A.    You would be standing approximately right here

4    at the entrance to the corrals.

5              Now you would have just walked into the

6    corral, right here.

7        Q.    Okay.  And Exhibit No. 33?

8        A.    You would have walked a little further into the

9    corral.  You're still facing that same direction, this

10   way right here.

11       Q.    Let me direct you to Exhibit No. 35.

12       A.    Okay.  Now you're walking towards the corral.

13   That's called a squeeze chute right there.  And so you

14   would have then walked into the corral, you would have

15   been right there by the squeeze chute.

16       Q.    Is there a gate that you can see in this

17   photograph, Exhibit No. 35?

18       A.    Yes.  The gate is right here.

19       Q.    And I'm going to show you Exhibit No. 36.

20       A.    Uh-huh.  That's the gate.

21       Q.    Okay.  So can you tell us in Exhibit No. 36

22   where the pigpen -- pigpens would be?

23       A.    Yeah.  You would walk straight back that way to

24   approximately that mesquite tree, which is right back

25   over there, and then you would have turned right, and

1    the pigs would have been parallel to you.

2        Q.    And then Exhibit No. 51.

3        A.    Uh-huh.

4        Q.    Can you tell us what --

5        A.    Pigsties are right about here.  Turn right and

6    they were there.

7        Q.    Okay.  And Exhibit No. 52?

8        A.    There's the pigsties all hidden in those trees.

9        Q.    Okay.  And I'm going to put that one side by

10   side with Exhibit No. 4.  That's 52 with Exhibit No. 4.

11   Can you show us approximately in Exhibit No. 4 where

12   that pigpen would be?

13       A.    Deep in these thick trees right here.  I mean,

14   it's really hard to see in that picture just because of

15   how thick it is.

16       Q.    And then I'm showing you Exhibit No. 56.  Does

17   that show -- what does that show?

18       A.    Those are the pigsties.  I mean, they're

19   really -- they're camouflaged in there.  And you can see

20   a couple of the pigs right here.  Those are the pigsties

21   from here to about over there.

22       Q.    I'm sorry.  Go back.

23             And I'm showing a couple pictures.  Exhibit

24   No. 58.

25       A.    Uh-huh.  Those are the pigs.

1      Q.   And you told us about, I think, Tinker Bell.
2   That was the -- she was -- she had these pigs; is that
3   accurate?
4      A.   Yes, she did.
5      Q.   And Exhibit No. 63?
6      A.   That's Tinker Bell.
7      Q.   Now, I'm going to show you Exhibit No. -- let
8   me start here with Exhibit No. 73.  Can you tell us what
9   that shows?
10      A.   Yeah.  This is the field that would have been
11   to the west of the pigsties.
12      Q.   Okay.  Now, I'm going to put that side by side
13   with Exhibit No. 4.  Would you show us approximately the
14   angle that that shot shows us?
15      A.   It's about, like, right here, this area right
16   there somewhere, I think.  It's kind of hard -- maybe
17   right here.
18      Q.   All right.  Is that --
19      A.   Yeah.  I'm looking at the vegetation, yeah,
20   because this tree would have been that tree.
21      Q.   Can you see the fence in Exhibit No. 4?
22      A.   I believe it's kind of -- I don't know.
23   It's -- I believe it would be right along with this line
24   right here.
25      Q.   All right.  Give me one second.  Showing you

1    Exhibit --

2         A.   Because I see tractor lines.  That's what's

3    throwing me off.

4         Q.   Showing you Exhibit No. 4.  Let me see if I

5    can --

6         A.   Yeah, there it is.

7         Q.   -- zoom in on that.

8         A.   There's -- the fence line is right here.  Those

9    are power lines I guess, or something.  I think it's

10   right there.

11        Q.   Okay.  So then the picture that we just showed

12   in Exhibit No. 73, that was taken from the left of the

13   fence line; is that accurate?

14        A.   Well, yes.  It would be on the -- no.  Wait.

15   Hold on.  I'm confused now.

16        Q.   Okay, I'm sorry.

17        A.   Let me see the pictures again.

18        Q.   Let me put those back.

19        A.   I get those things confused --

20             THE COURT:  Wait a minute, wait a minute.

21   You're both talking over each other.  We finally got to

22   that stage.

23             THE WITNESS:  Okay.

24             THE COURT:  Stop talking and let him ask

25   whatever he's going to.

1                    THE WITNESS:  Okay.

2                    THE COURT:  He'll stop when you're talking.

3                    THE WITNESS:  Okay, got it.

4                    THE COURT:  She has to take down everything

5       that's said here.

6                    THE WITNESS:  Okay.

7                    THE COURT:  Try again.

8       BY MR. LONG:

9          Q.   I'm going to try this again with Exhibit No. 73

10      and Exhibit No. 4.

11                   So that Exhibit No. 73 is taken from the --

12      viewing the house or the packing house to the left of

13      the fence line; is that accurate?

14         A.   Packing house is over on this side, right over

15      here, so it would be on the west side of the fence line.

16         Q.   And if you're looking on Exhibit No. 4, can you

17      indicate kind of the angle that that Exhibit No. 73

18      shows?

19         A.   About right here, like this.

20         Q.   I'm going to show you Exhibit No. 75.

21         A.   Uh-huh.

22         Q.   Can you tell us what that shows?

23         A.   Yeah.  That's just a better shot.  It's more

24      grounded.  And that shows the packing house right over

25      there.

1        Q.   You testified earlier that you did observe

2   the -- there was some blood in your daughter's

3   underwear; is that accurate?

4        A.   Yes.

5        Q.   Let me show you Exhibit No. 83.  Do you

6   recognize those?

7        A.   Yep.

8        Q.   And what are those?

9        A.   Those are Ada's underwear.

10        Q.   And when was she wearing those underwear?

11        A.   She was wearing those on that one Saturday in

12   October.

13        Q.   Katie, you can have a seat.

14             Katie, I'm showing you Exhibit No. 126A.

15   Do you recognize this?

16        A.   Yes, I do.

17        Q.   And what is that?

18        A.   That's Ada's dress.

19        Q.   And when was she wearing this dress?

20        A.   The last day she wore it was that day in

21   October.

22        Q.   When you say "that day in October," what are

23   you talking about?

24        A.   The day that she came to me and talked to me

25   about what had happened to her.

1                    (Marked for identification State's Exhibit

2    No. 126B.)

3    BY MR. LONG:

4        Q.   I'm going to you show you Exhibit No. 126B.

5    And do you recognize what's in there?

6        A.   Yes, I do.

7        Q.   And what is that?

8        A.   Those are Ada's underwear.

9        Q.   Are those the same underwear that were depicted

10   in the photo you just described?

11       A.   Yes, they are.

12       Q.   And are those -- that is the underwear she was

13   wearing when you saw blood in her underwear?

14       A.   Yes.

15               MR. LONG:  Your Honor, I move for

16   introduction of Exhibit 126B.

17                 THE COURT:  All right.  Mr. Green?

18                 MR. GREEN:  No objection, Your Honor.

19                 THE COURT:  All right, sir.

20   BY MR. LONG:

21       Q.   And are those the underwear?

22       A.   Yes.

23                 THE COURT:  Mr. Long, let me have the

24   envelope and let me mark it.

25                 MR. LONG:  Sorry.

1         THE COURT:  Do you want to publish?  Do you
2    want to publish at this time?
3         MR. LONG:  I would, Your Honor.
4         THE COURT:  I haven't really had a chance
5    to tell you, ladies and gentlemen, "publish" just means
6    to let the jury see an exhibit.  Sometimes it's done by
7    showing it on the TV screen, sometimes the exhibit is
8    passed to the jury so each of the jurors can look at it,
9    sometimes the attorney just holds it up for you to see.
10         Go ahead, publish it.
11         And the clerk has the envelope.  For the
12    record I'll say Exhibit 126B has been marked as admitted
13    and admitted.
14         MR. LONG:  Katie, those are all my
15    questions.
16         THE WITNESS:  Okay.
17         THE COURT:  Thank you, Mr. Long.
18         Hold on.  We're not done yet.
19         Mr. Green, questions?  Or is your
20    cross-examination going to take more than 10, 15
21    minutes?
22         MR. GREEN:  It might, Your Honor, yes.
23         THE COURT:  What we're going to do, ladies
24    and gentlemen, is go ahead and take the afternoon
25    recess.

1          I do ask you all to please remember the

2     admonition.  Witness will be back on the stand when we

3     come back.  It's 3:20.  We'll start again as close as we

4     can to 3:35, 3:40.  Go ahead and follow Todd out.  We'll

5     see you after the recess.

6               (Recessed from 3:22 p.m. until 3:47 p.m.

7     The proceedings resumed with the presence of the jury.)

8               THE COURT:  Let's have the record show the

9     attorneys are back in the courtroom, the Defendant,

10    Mr. Almanza, is present, the witness is on the witness

11    stand, and the jury is back in the courtroom.

12               Mr. Long, are you ready to proceed?

13               MR. LONG:  Yes, Your Honor.

14               THE COURT:  Mr. Green?

15               MR. GREEN:  Yes, Your Honor.

16               THE COURT:  Mr. Green, I believe it's your

17    turn for cross-examination, sir.

18

19          C R O S S - E X A M I N A T I O N

20    BY MR. GREEN:

21         Q.  Just a quick question on -- I'm confused about

22    all of the names in this case, and so if you could help

23    clarify just for a moment.  What -- Ada's name is

24    Wilhelmi; is that correct?

25         A.  Correct.

1    Q.   And Jack's name is?

2    A.   Ink.

3    Q.   Okay.  And your legal name is Quinn?

4    A.   Correct, Quinn.

5    Q.   All right.  Okay.  I just wanted to make sure I

6    got them all right in my head.

7            Can you tell us again what happened when --

8    you weren't with Ada when she -- clearly when she -- if

9    anything happened when it happened, correct?

10   A.   Correct.

11   Q.   And at some point she came to you and you were

12   in, where?  In the packing house?

13   A.   Correct.

14   Q.   And she came -- do you remember if she came in

15   the front door?  The back door?

16   A.   I do not remember.  She came into the

17   packing -- the cutting room, so whether she came in the

18   back door or the front door, I don't know.

19   Q.   You would have had to -- she would have come

20   into the cutting room the same way regardless of --

21   A.   Yes.

22   Q.   -- which door you came in through?

23   A.   Uh-huh.

24   Q.   And what was the first thing that she told you

25   when she came into the room?

1      A.   Well, she actually was in there for a little

2   while, so I'm assuming "hello."  It was -- she was in

3   there for a little while before she came and talked to

4   me.

5      Q.   Okay.  And when the kids were in the packing --

6   cutting room, did you have a side of beef up or --

7      A.   No.  I was grinding or getting ready to grind,

8   because I was getting to the end of my day.  And I'm

9   sure I had a lot of packages of steaks and stuff on the

10  table, because at one point Jack was helping me label.

11  And I was working the meat grinder and then -- so I

12  wouldn't have had a side of beef up at that time of day.

13     Q.   And Jack was in there with you, helping you?

14  Is that what you said earlier?

15     A.   Yes, when Ada was in there.  They came in

16  together that afternoon.

17     Q.   Jack and Ada came in together?

18     A.   I believe so.

19     Q.   And so when the kids are in there with you, are

20  they just milling around the room?

21     A.   They usually stand and talk to me, and then

22  sometimes they jump in and help out with what is

23  appropriate for them to help out with.

24     Q.   They don't run the grinder?

25     A.   They don't actually work-work the grinder,

1    like, no.  That's my job.

2         Q.   Right.

3         A.   But Ada would stand there sometimes and push

4    meat towards me, but her little hands are never near the

5    grinder portion.  That's my job.

6         Q.   I wouldn't have thought they were, so --

7         A.   Yeah.

8         Q.   So at some point in the conversation Ada said

9    something to you --

10        A.   Yes.

11        Q.   -- that caused you pause, correct?

12        A.   Yes.

13        Q.   And what was it that she said?

14        A.   "Fernando has really sharp fingernails."

15        Q.   And that was the first thing she said to you

16   that was related to the incident?

17        A.   Yes.

18        Q.   Okay.  And did you ask her a question after

19   that or did she respond further?

20        A.   I said, "What do you mean?"

21        Q.   Okay.  And then what was her response?

22        A.   She said to me what happened, she showed me

23   what happened.  "He touched me," and she showed me what

24   happened.

25        Q.   Did she ever tell you that he tickled her?

1       A.   Not that I recall, but it was two years ago, so
2   I'm not sure.
3       Q.   As you remember right now, the first thing she
4   said was, "He has really sharp fingernails"?
5       A.   Yes.
6       Q.   What was your relationship with Fernando?
7       A.   Fernando would have been a coworker, but not a
8   close coworker.
9       Q.   Okay.  Were you his supervisor?
10      A.   No.
11      Q.   So he works directly for Paul --
12      A.   Correct.
13      Q.   -- correct?
14      A.   Yes.
15      Q.   And Paul is the owner of the ranch?
16      A.   Yes.
17      Q.   And did you have reason to work alongside of
18  Fernando ever or to work with him?
19      A.   The only times he really would work alongside
20  me were on kill days when he would be -- we would be
21  moving up animals up the chute.
22      Q.   Okay.  And did he do killing?  Did he --
23      A.   He was not permitted to kill.  Only I was.
24      Q.   Okay.  And the animals -- so he was just
25  driving the cows and --

1    A.    Uh-huh.

2    Q.    -- pushing them up the --

3    A.    Uh-huh.

4    Q.    -- whatever, the fence, the chute, whatever you

5    just --

6    A.    Correct.

7    Q.    And so he was never actually working, like, arm

8    to arm with you, it was just --

9    A.    There was a couple times a long time ago that

10   he had helped me in the cutting room, but not on a

11   regular basis.  And it was never for -- under the

12   employment of Paul.

13   Q.    Okay, it was never -- I'm sorry.  I didn't

14   understand that last comment.

15   A.    Paul paid him for a certain number of hours a

16   day to work.  He was not ever in the cutting room

17   helping me cut anything during his scheduled working

18   time with Paul.

19   Q.    Okay.  Were you cutting for Paul or were you

20   cutting for yourself?

21   A.    I was most of the time cutting for Paul.

22   Sometimes I would cut for myself, but I would pay Paul a

23   rental fee for the facility if I wanted to do my own

24   animals.

25   Q.    Okay.  So because Fernando wasn't hired to help

1    you out --

2         A.   Correct.

3         Q.   -- he would not do that on his regular work

4    hours?

5         A.   Correct.

6         Q.   Did he get paid for that time that he was

7    helping you out?

8         A.   No.

9         Q.   So he just did it as a favor?

10        A.   Uh-huh, yes.

11        Q.   Would you say -- you said that you were not

12   close coworkers.  Would you say that you didn't get

13   along very well?

14        A.   What I meant by not close was that his job at

15   the ranch was very different than mine, so it wasn't

16   like we worked in the same room together.  He worked

17   more out in the fields and mending fences.  That was not

18   my job.  I worked in the packing house.  So we were not

19   really around each other when we worked.

20        Q.   Do you ever remember punching Fernando in the

21   face?

22        A.   Yes, I do.

23        Q.   Can you tell me about that.

24        A.   He behaved inappropriately with me, and I

25   turned around instinctively and I punched him.

1      Q.    Okay.  Did that happen once or more than once?

2      A.    Just once.

3      Q.    Were there other incidents where you and he did

4   not get along?  I mean, punching in the face seems

5   like you didn't --

6      A.    Yeah, that we -- I just -- I had bad feelings

7   about him and I just didn't want him near me.

8      Q.    And yet you would work with him and he would

9   help you out occasionally?

10     A.    Not once I got those bad feelings.  I would not

11  let him around me or my children.

12     Q.    You said that your kids were all over the ranch

13  at one point in time.

14     A.    All over the ranch?

15     Q.    Yes.

16     A.    Yeah, they would be hanging around -- or not

17  all -- entirely all over the ranch.  The ranch was

18  12,000 acres total, so that's a big area to encompass

19  all over the ranch, but yeah, they run around all over

20  the area of the ranch.

21     Q.    The picture that was up there on the screen --

22     A.    Uh-huh.

23     Q.    -- that showed us the aerial view of the ranch,

24  sort of as bounded --

25     A.    Uh-huh.

1     Q.    -- by buildings --

2     A.    Uh-huh.

3     Q.    -- and fences --

4     A.    Correct.

5     Q.    -- is that what you're talking about?

6           THE COURT:  Let me stop just a second.

7   Several times you're going "uh-huh."  You can't do that.

8   You have to say "yes" --

9           THE WITNESS:  Okay.

10          THE COURT:  -- please.  Okay, go on.

11          MR. GREEN:  I'm sorry, Your Honor.  I'm not

12   very good at catching that.

13   BY MR. GREEN:

14    Q.    Is that what you're talking about is where the

15   kids played?

16    A.    It depended on what time of year it was.  It

17   depended on when it was in relation to this event.

18          When -- certain times when we lived there,

19   they were allowed to play in a much larger area, and

20   there were months where they had to play in a more

21   enclosed area.  And then there was a very long time up

22   until the point that we left the ranch that they had to

23   play basically only in the house while I worked, or they

24   could only go to other areas around the ranch when I was

25   home.

1                    So it depended on the situation.

2          Q.   So when Ada told us a few minutes ago that she

3     had to be in the house when you were in the packing

4     house --

5          A.   Correct.

6          Q.   -- then that's true?  I mean, you --

7          A.   At one point in time --

8          Q.   She did at some point?

9          A.   -- yes, that was very true.

10         Q.   Okay.  In relation to the incident that we're

11    talking about, what were the restrictions on the kids as

12    far as playing around the ranch at that point in time?

13         A.   That day, they were supposed to play within the

14    white picket fence of the yard.  If they needed to come

15    get me in the cutting room, they were allowed to cross

16    the driveway to go into the cutting room to get me.

17         Q.   Okay.  And did the kids always do what you told

18    them to do?

19         A.   No.  They're children.

20         Q.   And while you said earlier that Ada is a girly

21    girl in some ways because she plays with dolls and

22    things like that --

23         A.   Uh-huh.

24              THE COURT:  See, you did it again.

25              THE WITNESS:  Sorry.  Yes.

BY MR. GREEN:

Q.    -- she doesn't strike me as being a girly girl in my idea of what that means.  In other words, I think she seems like she's pretty rambunctious.  Is that true?

A.    True.

Q.    And she goes out and plays around the yard, doesn't worry too much about getting dirty?  Is that true?

A.    She's changed a lot in the last two years, and so --

Q.    What about when she was 4?

A.    She was both girly girl and she liked to explore and be rambunctious.

Q.    Okay.  She told us that she liked science, that that was her favorite subject.

A.    Yes.

Q.    Does she like to go out and pick up worms and do things like that, to explore and understand nature and the things around her?

A.    Yes.

MR. GREEN:  Okay.  And so she -- that's it.  I don't think I have any other questions.  Thank you.

THE COURT:  All right, sir.  Thank you.

1          Redirect, sir?

2          MR. LONG:  Yes, sir.

3

4          R E D I R E C T   E X A M I N A T I O N

5     BY MR. LONG:

6          Q.   You were asked questions about the time that

7     you punched Fernando.   That did happen?

8          A.   Yes.

9          Q.   You said he was inappropriate?

10         A.   Yes.

11         Q.   Explain that.

12         A.   It was a kill day.  It was a Thursday.  And I

13    had a stubborn cow that didn't want to go up the chute.

14    It was halfway up the chute.   And I was making my

15    motions -- it was a wild cow, so I didn't want to get

16    right in there with it, but I'm making my motions, "Yaw,

17    move," you know, you're banging sticks.

18              He came up behind me and he pressed his

19    body against me.   He was clothed, I was clothed.   Like

20    I said this was a kill day, so yeah.   And he pressed

21    himself up against me and I felt him in a way I did

22    not want to feel, so I turned around and I punched

23    him.

24         Q.   Okay.  Was there any other times where he

25    invaded your privacy?

1    A.   There would be times where I was working in the
2    cutting room.  One time in particular I was on the band
3    saw, which is a very dangerous piece of equipment, and I
4    was so focused in cutting bones that I was cutting, he
5    came up behind me and grabbed me from my side, like
6    this, and pushed himself against me.  I screamed.
7    Luckily I didn't cut my hand off.
8         Q.   Were there any other times where he invaded
9    your privacy?
10        A.   He would come up to me and he would just --
11   when I was -- he -- sometimes he would jump in and help
12   clean at the end of a kill day, and he would come up to
13   me and just kind of brush against me, put his hands near
14   me.  I did not like that.
15        Q.   Did he ever ask you out?
16        A.   Yes, he did.
17        Q.   More than once?
18        A.   Yes.
19        Q.   About how many times?
20        A.   At least six.
21        Q.   Did you -- what was your response to that?
22        A.   "No."
23        Q.   Had he ever been in your house?
24        A.   Yes.
25        Q.   Tell me about that.

A.   In addition to times where he helped me move furniture into my house when I was moving, helped me hang paintings in my house when I was moving in, there was -- I usually got up early, about 5:30, but there were two occasions where at approximately 6:00 a.m., shortly after he arrived to work, he walked into my house unannounced.

It was not uncommon for me to leave my doors unlocked or have them already be unlocked that time of day because the kids would have been in and out already or I would have just left them unlocked.  And he walked into my house unlocked, came into my bedroom.  I was in the bathroom brushing my teeth.

I told him to get out and asked him, "Why are you in my house?"  And he said that he wanted to come wake me up.

Q.   Did you ever observe him looking in your windows?

A.   Yes, I did.

Q.   Tell me about that.

A.   I was at home one evening.  I was on the couch. I was watching a movie with my boyfriend, and I noticed that his car was driving back and forth.  I didn't say anything to my boyfriend, I just -- my boyfriend and I were not on -- we were just not on those terms.  We were

1    not on really good terms.

2              But my boyfriend left, and then later that

3    evening I saw him looking in my house.

4        Q.   Who is "him"?

5        A.   Fernando.

6        Q.   Okay.  So it was -- prior to this incident

7    there was some animosity; is that fair?

8        A.   Yes.

9        Q.   Well, then certainly, Ms. Quinn, because of

10   this animosity, you must have put your daughter up to

11   accusing him of touching her?

12             MR. GREEN:  Objection, Your Honor.

13             THE COURT:  Go ahead and answer it.

14             THE WITNESS:  I did not put my daughter up

15   to that.

16   BY MR. LONG:

17       Q.   You didn't take your daughter to be examined by

18   at least one doctor in her most private of areas in

19   order to get back at him?

20             MR. GREEN:  Objection again, Your Honor.

21   It's argumentative.

22             THE COURT:  At this stage I'll sustain the

23   objection.

24             You don't need to answer that one, ma'am.

25   BY MR. LONG:

1      Q.   You took your daughter to get a medical exam;
2  is that right?
3      A.   Yes.
4      Q.   At what time did that take place?
5      A.   I took my daughter down to Tucson Medical
6  Center in -- it was already dark outside.  It was in the
7  evening, very, very late, and the exam did not take --
8  we went to the emergency room.  The exam, it did not
9  take place for a long time.
10     Q.   Was that into the early morning hours?
11     A.   Yes.
12     Q.   You talked earlier about Ada demonstrating what
13  Fernando did.
14     A.   Yes.
15     Q.   Okay.  When she demonstrated that, did she put
16  her finger inside of herself?
17     A.   She put her finger on -- on herself and
18  slightly inside, like, just a little bit, and pulled
19  right out.
20     Q.   Okay.  When you went to the police station in
21  San Manuel, did you talk with Ada about what happened?
22     A.   No.  I just wrote down the facts on a piece of
23  paper of what I remember from that day, I believe.
24     Q.   Were you talking to her about the facts?
25     A.   No.

1        Q.   Was she relaying to you about what happened?

2        A.   Yes.

3        Q.   Okay.  So she was talking to you about what

4    happened.  Did I get that right?

5        A.   Yes.

6        Q.   Were you talking to her?

7        A.   She was talking to me, and then I said -- the

8    police officer informed us that we should probably just

9    wait until we got down to the hospital.  And I said,

10   "Okay."

11       Q.   Explain that, if you would.

12       A.   He just said that we needed to talk to

13   professionals about -- she needed to talk to a

14   professional about this and it really wasn't his

15   place -- it's kind of hard for me to remember everything

16   he said.  It was a long time ago.  I was upset.

17       Q.   Well, let me focus you back a little bit.   In

18   the car ride to the police station --

19       A.   Uh-huh.

20       Q.   -- who was in that car?

21       A.   Just me and Ada.

22       Q.   And during that car ride, did you -- did you

23   and Ada talk about what Fernando did?

24       A.   No, we did not.

25       Q.   During your police -- during the ride to the

1   police station, did Ada give you any more facts about

2   what happened?

3       A.   No.

4       Q.   On your ride to the hospital in Tucson, did you

5   and Ada talk about what Fernando did?

6       A.   No.

7       Q.   Did Ada give you any more facts?

8       A.   No.

9       Q.   Did you give -- did you talk to her about it or

10   talk to her about the facts?

11       A.   No, I did not.

12       Q.   Do you know what your kids were doing on the

13   day, October 22nd, 2011, between the hours of 10:30 and

14   approximately 4:30 or 5:00 when Ada came and talked to

15   you?

16       A.   From 10:30 to 4:30 I would have been mostly in

17   the cutting room that day, and I'm sure they were

18   playing somewhere on the ranch.  I'm sure I fed them

19   lunch at some point.  I don't remember.

20       Q.   You talked to us about Ada's demonstration.

21       A.   Uh-huh, yes.

22       Q.   Did you see whether or not she injured herself

23   when she touched -- when she demonstrated what Fernando

24   did to her?

25       A.   I do not believe she injured herself.

1      Q.    And what do you base that on?

2      A.    Because she didn't make any noises of pain or

3   crying or ouch.

4      Q.    But did she ever refer to pain or sharpness in

5   talking about Fernando?

6      A.    Yes.

7      Q.    And what was that that she said?

8      A.    "He has very sharp fingernails."

9             MR. LONG:   Those are all my questions.

10            THE COURT:   All right, sir.   Thank you.

11            May this witness step down as a witness?

12            MR. LONG:   Can we approach, Judge?

13            THE COURT:   Sure, come on up.

14            (Bench conference outside the presence of

15   the jury and the court reporter.)

16            THE COURT:   Now, that brief discussion, may

17   she step down now?

18            MR. LONG:   Yes, Your Honor.

19            THE COURT:   Okay.   Thank you very much.

20            MR. LONG:   She's not excused.   Subject to

21   recall, please, Judge.

22            THE COURT:   Oh, and I should tell you that

23   what we call the rule of exclusion has been invoked, and

24   as a victim representative, of course you may stay and

25   listen to the trial if you wish, but you cannot talk to

1    any other witness about the testimony here at the trial,

2    and that really includes your daughter.  I mean, you

3    just cannot talk about your testimony.  Okay?

4                    MS. QUINN:  All right.

5                    THE COURT:  I'm going to guess you don't

6    have outside a 24-and-a-half-minute witness.

7                    MR. LONG:  Judge, I actually think we do.

8                    THE COURT:  Do you really?

9                    MR. LONG:  Yes.  We'd like to approach.

10                   THE COURT:  Yeah, come on up.

11                   (Bench conference outside the presence of

12   the jury and the court reporter.)

13                   THE COURT:  We're going to try to get

14   another witness in and still be done at a reasonable

15   time.  Go ahead and call your next witness, please.

16                   MR. LONG:  Thank you, Your Honor.  The

17   State calls Kathy Bodwell.

18                   THE COURT:  Ma'am, if you would come all

19   the way forward, please, and right over here to be sworn

20   in.

21                   (The witness, Kathy Bodwell, was duly sworn

22   by the clerk of the court, according to law.)

23                   THE COURT:  Okay, ma'am, come on over and

24   have a seat.  Kind of have to walk around the TV if you

25   would.  Just pull up to the table so you're comfortable,

1    and then that will bend and move.  Thank you.

2                Mr. Long?

3                MR. LONG:  Thank you, Your Honor.

4

5                **KATHY BODWELL**,

6    called as a witness herein, having been first duly

7    sworn, was examined and testified as follows:

8

9                D I R E C T   E X A M I N A T I O N

10   BY MR. LONG:

11       Q.   Ma'am, would you state your name, please.

12       A.   My name is Kathy Bodwell.

13       Q.   And are you currently employed?

14       A.   Not currently.

15       Q.   What are you currently doing to occupy your

16   time?

17       A.   I'm currently a student.  It's my last year of

18   my social work master's, so I want to focus on that and

19   my internship.

20       Q.   Prior to becoming a graduate student, where did

21   you work?

22       A.   I worked at the Southern Arizona Children's

23   Advocacy Center.

24       Q.   And what was your job there?

25       A.   I was a forensic interviewer.

1     Q.   And what was some of your training that enabled

2   you to do the work of a forensic interviewer?

3     A.   I have a bachelor's in psychology, and then I

4   attended two trainings.  One training is the basic

5   interviewing, forensic interviewing training, and that's

6   an eight-hour training, and then also the advanced

7   training, or advanced forensic interviewing training,

8   and that's a 40-hour training.

9               On top of that we get training --

10  at-the-job training, so we get mentored by other

11  interviewers there.

12    Q.   Are you -- do you observe other people's

13  interviews?

14    A.   Yes, that's part of it.  I observed interviews,

15  and then my colleagues would also observe mine, just to

16  provide me feedback until they felt that I was ready to

17  go on my own.

18    Q.   And approximately how many interviews have you

19  conducted as a forensic interviewer?

20    A.   At least 1,000 interviews, I would say.

21    Q.   And are you familiar with the concept of a

22  semi-structured cognitive interview?

23    A.   Yes.

24    Q.   And what is that?

25    A.   Okay.  So the semi-cognitive interviewing

1   approach is used by the Children's Advocacy Center, and

2   that is an empirically validated approach that's used to

3   obtain information from children that are suspected to

4   be involved in abuse or witness a violent crime.

5        Q.   Is the purpose of the techniques that you're

6   trained to use to get the child to express a narrative?

7        A.   Yes.

8        Q.   And is it also to get the child to talk in

9   their own words?

10       A.   Yes.

11       Q.   Is it to also avoid suggesting information?

12       A.   Yes.

13       Q.   Is it also to be able to determine if the child

14  has been influenced or coached in some way?

15       A.   There are things -- of course, if I feel during

16  the interview that the child has said something that

17  seems like they were coached, then I will further ask

18  clarification questions.

19       Q.   What types of things would you be looking for

20  to indicate that a child has been coached?

21       A.   Well, one of the things that might happen is

22  that right in the beginning of the interview, the child

23  is already telling me things, like disclosing --

24  disclosing things, or during the interview a child might

25  say that their parents or their friend told them what to

1   say.  So if that would come up during the interview,

2   then I would clarify, you know, investigate it more.

3                   THE COURT:  We'll hold on.  Go ahead and

4   change, please.

5                   (The proceedings resumed with the presence

6   of Alisha Olivarez, court interpreter.)

7                   THE COURT:  Thank you.  Are you ready?

8                   THE INTERPRETER:  Yes, Your Honor.

9                   THE COURT:  Okay.  Go ahead, Mr. Long.

10  BY MR. LONG:

11      Q.   What about the language that the child uses?

12  Is that something you look for?

13      A.   Yes.  You want to use their language.  You

14  don't want to use any words that they might not

15  understand.  So in the beginning of the interview during

16  rapport with the child, I just talk about a neutral

17  topic, just to kind of get that verbal sense of where

18  they're at verbally.

19      Q.   And in determining whether or not a child has

20  possibly been coached, do you look at whether or not the

21  child is using developmentally appropriate language?

22      A.   Yes.

23      Q.   Did you conduct an interview with Ada Wilhelmi?

24      A.   Yes, I did.

25      Q.   Did you have a chance to review a video of that

1    interview?

2         A.   Yes, I did.

3         Q.   As well as an audio?

4         A.   Yes.

5         Q.   And are all your interviews videotaped?

6         A.   Yes, all of the interviews are videotaped.

7         Q.   And is the place where the interview is

8    conducted, is it referred to as a soft room or a

9    child-friendly room?

10        A.   Yes.  The Children Advocacy Center, the room

11   where I interview the child is very child friendly.

12        Q.   Also, in talking about significant or important

13   information, is hearing sensory experience from the

14   child important?

15        A.   Yes.  During the interview, sensory details are

16   very important.

17        Q.   And why is that?

18        A.   Because research shows that children who are

19   coached, they won't provide you with those details, and

20   children that did experience that, they will have those

21   details, those sensory details, so whether they're

22   audio/visual, you know, tactile, all those.

23        Q.   What about demonstrations, the child

24   demonstrating things?  Is that something that is

25   important in looking for?

1    A.   Yes.

2    Q.   Why is that?

3    A.   Because it's -- most likely someone that's

4  coaching the child is not going to go through the

5  process of showing them things like that.

6         But also, a child her age is not going to

7  remember all of those details.

8    Q.   Are you looking for a child also to correct you

9  about things?

10    A.   Yes.  If a child corrects you, then that's very

11  good.  It illustrates that they're not suggestible, so

12  that's very good.

13    Q.   Okay.  Through the course of your interview

14  with Ada, in describing the incident, did she use

15  language that was appropriate to her development?

16    A.   Yes, she did.

17    Q.   During the course of the interview with Ada,

18  did she describe a sensory experience?

19    A.   She did.  Multiple.

20    Q.   Multiple?

21    A.   Yes.

22    Q.   Did she give any demonstrations?

23    A.   Yes, she did.

24    Q.   Multiple?

25    A.   I don't recall if there were multiples, but I

1  do remember that she was showing me how she -- she was

2  telling me that the alleged suspect was kneeling when

3  this occurred, so she showed me that.

4      Q.   And you use the word "alleged suspect."  Was

5  that your word or was that her word?

6      A.   I believe that is my word, yes.

7      Q.   Those weren't the words that she used?

8      A.   No, no, no.  That's just my words, yeah.

9      Q.   Did she correct you throughout the interview?

10     A.   Multiple times, yes, she did.

11     Q.   Was anyone other than yourself and Ada in the

12 room when you were interviewing her?

13     A.   No.

14     Q.   When you were talking to her, was she

15 forthright with information?

16     A.   Oh, yes.  She was very -- well, she was open

17 with me, but then something -- well, I could explain.

18              I was doing a body map with her.  So it's

19 something that you -- you do, you go over their body

20 parts, so what do you call this part of your body.  So

21 then you go through, ear, and you let the child name

22 them.  And then when we got to the part where she -- I

23 asked her what that part that she pees with is called,

24 that prompted her to tell me what happened.

25     Q.   And so based on your training and experience,

1    was her initial disclosure in context with what was

2    being discussed?

3        A.    Yes.

4        Q.    And is that important, that the disclosure

5    comes in context with what's being discussed?

6        A.    Yes, because like I mentioned before, you know,

7    if children are coached, they'll come in and just blurt

8    it out.

9              But this was -- you know, we were going

10   through a body map, and that -- you know, that part kind

11   of reminded her of what happened.

12       Q.    Are you familiar with the concept of script

13   memory and episodic memory?

14       A.    Yes.

15       Q.    Could you explain what those are?

16       A.    Script memory is kind of things that happen on

17   a daily basis, so you go to school every day or you go

18   to the market every day, and they're kind of like

19   present things.

20             And then episodic memory, those are, like,

21   major events that happen, so maybe going to watch a

22   specific movie, stuff like that.

23       Q.    Okay.  And talking about script memory, is this

24   something that happens over and over and over again?

25       A.    Yes.

1    Q.    That is generally handled the same way?

2    A.    Yes, that's correct.

3    Q.    And does the person have a difficult time

4    distinguishing between different events that are

5    similar?

6    A.    Yes.  One thing that you could see, if someone

7    stated, like, oh, this would always happen or he would

8    always do this, like that would be an example of a

9    script memory.

10   Q.    Okay.  And so using that language, "it would

11   always be this way," based on your training and

12   experience doesn't mean that it would in every instance

13   be what they said.  They're using --

14             MR. GREEN:  Objection, Your Honor.

15   BY MR. LONG:

16   Q.    -- script memory?

17             MR. GREEN:  He's leading the witness.

18             THE COURT:  You always let him finish, but

19   don't answer.

20             MR. GREEN:  Yeah.

21             THE COURT:  I'm sorry, back up.  Finish

22   your question so he can make his objection.

23   BY MR. LONG:

24   Q.    My question, just to clarify it is, so am I

25   understanding you correctly that, based on what you just

testified to, that when somebody is in script memory and
says something happened always this way, that doesn't
necessarily mean that it actually happened that way but
that they're in script memory; is that accurate?

THE COURT:  Okay, hold on.

Go ahead.

MR. GREEN:  Your Honor, that's a leading
question.  He's been leading throughout this line of
questioning.

THE COURT:  Okay.  And I'm going to
overrule you, although you're sort of correct.  But I'm
going to overrule you.  She can answer the question.

Go ahead and give an answer.

THE WITNESS:  Okay.  Can you repeat it one
more time?  Sorry about that.

BY MR. LONG:

   Q.   Prior to my question, you said that someone,
when they're in script memory, would use the term "it
would always be this way."  And so based on your
training and experience and research, saying that
something always happened that way doesn't mean that it
happened that way every single time, but is an indicator
that they're in script memory; is that accurate?

   A.   That's correct.

   Q.   If, for example, somebody feeds their dogs on a

1    regular basis twice a day and they've done it for a long

2    period of time and they do it with another person, if

3    they said I always do this, or this is how we do it,

4    would that indicate to you that they're in script

5    memory?

6        A.   Yes.

7        Q.   Then episodic, how is that different from

8    script memory?

9        A.   Because it's something that occurred, that's

10   occurring, but it's not, like, a daily-basis thing.

11       Q.   Is it --

12       A.   So like an event.

13       Q.   Or is it something that stands out?

14       A.   Yes.

15       Q.   So is it possible that somebody could be

16   discussing an event that generally is in script memory

17   but some unique event stands out to take them out of

18   that script memory?

19       A.   It's possible, yes.

20       Q.   Again, for example, if somebody goes to church

21   every week and it's the same kind of sermon or the same

22   type of people there, but then one day there's a car

23   accident and a car comes through the church, that might

24   be something that stands out.  Is that a fair

25   articulation?

1      A.   Yes, that's correct.

2      Q.   Showing you Exhibit No. 120 and ask you if

3 you'd look at that.

4           Do you recognize that?

5      A.   It looks familiar, yes.

6      Q.   Okay.  Can you tell us why that looks familiar?

7      A.   Because this is a drawing that I drew with Ada

8 when we were -- we call this a body map.  So we were

9 doing the body map, identifying the body parts.

10     Q.   And is this the drawing that you did with Ada

11 when she told you what happened?

12     A.   Yes.

13     Q.   And is this the map -- I'm sorry -- the drawing

14 that you used with Ada when she gave sensory experience?

15     A.   Yes.

16     Q.   And during the interview where she did

17 demonstrations?

18     A.   Yes, that's it.

19     Q.   And in the interview where she corrected you?

20     A.   Yes.

21     Q.   And in the interview where she used language

22 appropriate to her age?

23     A.   Yes.

24          MR. LONG:  Your Honor, I move for

25 introduction of Exhibit No. 120.

1          THE COURT:  All right.  Mr. Green?

2          MR. GREEN:  No objection, Your Honor.

3          THE COURT:  Okay.  Exhibit 120 will be

4    marked as admitted and admitted.

5          MR. LONG:  Thank you, Ms. Bodwell.  Those

6    are all my questions.

7          THE COURT:  Mr. Green?

8

9          C R O S S - E X A M I N A T I O N

10   BY MR. GREEN:

11     Q.   Ms. Bodwell, I have only one question, and that

12   is, as you were asking her and going through the body

13   map and drawing -- making your drawing, you were going

14   ears, eyes, nose?  I'm not sure if that's the exact

15   order, but that's the general thing, correct?

16     A.   Yes.

17     Q.   And when you got -- you say that when you got

18   to the place where you pee, I think is the way she used

19   it; is that correct --

20     A.   Yes, I believe so.

21     Q.   -- that she all of a sudden blurted out that

22   did you know Fernando touched me here; is that

23   correct?

24     A.   Yes.  From what I recall, yes.

25     Q.   And there was no question asked about that at

1    that point in time, correct?  You hadn't asked her

2    about --

3        A.    No.

4        Q.    -- if anybody ever touched you?

5        A.    No, I had not.

6        Q.    And so at this point you were just kind of

7    going through body parts?

8        A.    Correct.

9        Q.    So is your testimony, though, that you felt

10   like that was an appropriate answer, even though there

11   was no question asked and there was no, I guess,

12   connection to -- it seemed to me like that just came out

13   of the blue.

14               MR. LONG:  Objection; he's testifying.

15               THE COURT:  Well, let's -- I'll sustain

16   your objection and simply tell you to rephrase your

17   question.

18   BY MR. GREEN:

19       Q.    Does it seem to you like it came out of the

20   blue, that it was blurted?

21       A.    To me it felt -- I felt like it prompted her to

22   say it, because she -- she didn't -- okay, I don't think

23   I'm understanding your question.

24       Q.    Okay, let's try it again, because I'm not

25   understanding your answer either.

1    A.   Yeah.

2         THE COURT:  Okay.  You ready?

3         MR. GREEN:  Ready.

4         THE COURT:  Go ahead.

5  BY MR. GREEN:

6    Q.   She said -- well, she gave an answer to a

7  question that wasn't asked, correct?

8    A.   Yes.

9    Q.   And she did that in response as you were going

10 through the questioning on the body parts?

11   A.   Yes.

12   Q.   So you were asking her, what's this, what's

13 that, what's this, what's that?

14   A.   Correct.

15   Q.   And rather than answer what's that, she stated,

16 "Did you know Fernando touched me there"?

17   A.   From what I recall is I asked her to point to

18 where her -- I gave her a marker and I asked her to mark

19 where she pees, because I believe that she didn't know

20 the name.  So I asked her, "Can you show me on this

21 drawing where you pee?"

22        And then she showed me, and then she says,

23 "Oh, do you know Fernando touched me there."

24   Q.   Okay.  And in your opinion, that was an

25 appropriate answer at an appropriate time?

1        A.    Yeah.

2              MR. GREEN:  Okay.  No further questions.

3              THE COURT:  All right.  Redirect?

4              MR. LONG:  Yes, Your Honor.

5

6          R E D I R E C T   E X A M I N A T I O N

7    BY MR. LONG:

8        Q.    So what defense counsel is asking is, you

9    certainly must have thought, well, this girl's been

10   coached when she gave you that response to that; is that

11   right?

12       A.    No, I didn't feel like she was coached.

13       Q.    Well, why not?

14       A.    Because she could have said that in any --

15   like, when we were going over the ears, the hands, I

16   mean, at any point.

17       Q.    Based on your training and experience and the

18   thousands of interviews you did, did her disclosure at

19   that point, was that in context with what you all were

20   talking about?

21       A.    Yes, it was.

22       Q.    Did she make that disclosure when talking about

23   her ears?

24       A.    No.

25       Q.    Did she make that disclosure when talking about

1                    C E R T I F I C A T E

2             I, Jacquelyn A. Allen, RPR, a Certified

3    Reporter in the State of Arizona, do hereby certify that

4    the foregoing pages 1 - 203 constitute a full, true, and

5    accurate transcript of the proceedings had in the

6    foregoing matter, all done to the best of my skill and

7    ability.

8             SIGNED and dated this 28th day of February,

9    2014.

10

11                    _____

12                    JACQUELYN A. ALLEN, RPR
                      Certified Reporter No. 50151
13                    For the State of Arizona

14

15

16

17

18

19

20

21

22

23

24

25