# EXHIBIT D

IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

IN AND FOR THE COUNTY OF PINAL

| | | |
|---|---|---|
| THE STATE OF ARIZONA, | ) | 2 CA-CR 2014-0034 |
| | ) | |
| Plaintiff, | ) | No. CR201103026 |
| | ) | |
| -vs- | ) | |
| | ) | |
| FERNANDO SEGOVIANO ALMANZA, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

Florence, Arizona
October 2, 2013
8:44 a.m.

BEFORE:   The Honorable Boyd T. Johnson,
Judge of the Superior Court

REPORTER'S TRANSCRIPT OF PROCEEDINGS

JURY TRIAL, DAY 3

(COPY)

PREPARED FOR:
Arizona Attorney General
Criminal Appeals Section

REPORTED BY:
Jacquelyn A. Allen, RPR
AZ Certified Reporter No. 50151

I N D E X

T E S T I M O N Y

WITNESS:                                                      PAGE

JACK JOHN THOMAS INK

    Direct Examination by Mr. Kohler ...........  18
    Cross-Examination by Mr. Green .............  48
    Redirect Examination by Mr. Kohler ........  63
    Jury Questions ............................  65

DETECTIVE RANDALL SNYDER

    Direct Examination by Mr. Kohler ...........  70
    Cross-Examination by Mr. Green ............. 145
    Redirect Examination by Mr. Kohler ........ 168
    Jury Questions ............................ 174
    Further Examination by Mr. Kohler .......... 176

JOHNNY BOGGS

    Direct Examination by Mr. Kohler ........... 189
    Cross-Examination by Mr. Green ............. 207
    Redirect Examination by Mr. Kohler ........ 211

JULIE KLEIN

    Direct Examination by Mr. Long ............. 214
    Cross-Examination by Mr. Green ............. 237
    Redirect Examination by Mr. Long ........... 241
    Jury Questions ............................ 243
    Further Examination by Mr. Long ............ 244

```
 1                        E X H I B I T S

 2

 3    STATE'S EXHIBITS

 4    NO.       DESCRIPTION        PAGE         PAGE         PAGE
                                 IDENTIFIED    MARKED      ADMITTED
 5
      101       Diagram            230
 6
      102       Page out of
 7              computer-
                documented note    233                       233
 8
      109       Computer records   217
 9
      119       Exterior packaging
10              with DVD inside    126                       128

11    123       Envelope with
                CD inside          138
12
      126C-127                                   5
13
      128       Plea agreement     187          186
14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    A P P E A R A N C E S

 2   On Behalf of the State:

 3           PINAL COUNTY ATTORNEY'S OFFICE
             By:  Matthew Long, Deputy County Attorney
 4                   Bureau Chief
                     Major Offenders Bureau
 5              Thomas Kohler, Deputy County Attorney
             P. O. Box 887
 6           Florence, Arizona 85132

 7
         On Behalf of the Defendant:
 8
             COOPER & RUETER, L.L.P.
 9           By:  Paul Green
             P. O. Box 15005
10           Casa Grande, Arizona 85130-5005

11
     ALSO PRESENT:
12
             Detective Randy Snyder, Plaintiff's Case Agent
13           Patrick Cote, Defense Investigator
             Alisha Olivarez, Court Interpreter
14           Sabine Michael, Court Interpreter
             Danira Marinez, Court Interpreter
15

16

17

18

19

20

21

22

23

24

25
```

```
 1                                    Florence, Arizona
                                     October 2, 2013
 2                                   8:44 a.m.

 3                  (Marked for identification State's

 4     Exhibits Nos. 126C and 127 before the proceedings

 5     began.)

 6            REPORTER'S TRANSCRIPT OF PROCEEDINGS

 7                  (The proceedings resumed outside the

 8     presence of the jury and with the presence of Alisha

 9     Olivarez, court interpreter.)

10                  THE COURT:  Let's have the record show the

11     presence of the attorneys, the Defendant, Mr. Almanza.

12     The jury is not yet back.

13                  Preliminarily, Mr. Green filed today the

14     Defendant's proposed jury instructions and left them

15     with me so I could give them to the clerk.

16                  Based on his request, Mr. Long and

17     Mr. Kohler, did you get a copy of that?

18                  MR. KOHLER:  We did, Your Honor.

19                  THE COURT:  There were, as I counted it,

20     four that he's requested that weren't included in that

21     first draft of final instructions I gave everybody on

22     Monday, so I'll put them into the second draft.  And

23     Todd's going to give you each a copy of the second

24     draft.

25                  MR. LONG:  Judge, could you identify the
```

1    four?

2              THE COURT:  Sir, yes.  Oh, let me have that

3    back.

4              Yes, I will.  Standard Criminal 3,

5    Stipulations; Standard Criminal 6, Voluntariness of

6    Defendant's Statements; Standard Criminal 17, Voluntary

7    Act; and Standard Criminal 19, Defendant Witness Prior

8    Conviction.

9              Now, whether or not they're going to end up

10   being in the final instructions is something we'll get

11   to eventually, but what I try to do on my drafts is put

12   together everything that both sides want and then we'll

13   make a record of what actually is given to the jury.

14             So when you look through it, Mr. Kohler and

15   Mr. Long, the second draft, if there's some that the

16   State would want that are not in there, let me know,

17   okay?  You don't need to tell me what you don't want;

18   tell me if there's some that I need to add, then we'll

19   work it off in the complete set.  Okay?

20             Okay.  Now, the only reason for meeting

21   before we call the jury in, and I do thank everybody for

22   being here timely -- except the jail being ten minutes

23   late, but I thank you anyway.  At least you're here --

24   is to find if there's anything we need to cover.

25             MR. LONG:  There is a preliminary matter,

1   Judge, we'd like to cover.  Last night I did inform

2   Mr. Green of one of my intentions to present some

3   evidence today to give him an opportunity to research

4   the issue and provide any authority that he wanted.

5              THE COURT:  Okay.

6              MR. LONG:  I didn't want to do this in

7   front of the jury, so I bring it up now.

8              THE COURT:  Okay.

9              MR. LONG:  During Detective Snyder's

10  testimony, which will be, I believe, our second witness

11  today, we intend to play Ada Wilhelmi's forensic

12  interview.  The purpose in playing the interview is

13  because Mr. Green's questions to the mother, Kathryn

14  Quinn, specifically raised the issue of coaching.  He

15  indicated in his pretrial -- in the pretrial phase that

16  that was his theory specifically, and the animosity

17  questions that he asked went directly to that as

18  evidence at the pretrial argument and his theory.

19              That then opens the door clearly to whether

20  or not the child was coached.  The best evidence would

21  be for the jury to hear the interview and the mannerisms

22  and all that that the child goes through.  Rather than

23  talking about the animal, we would like to show the

24  animal.

25              And the State would request and agree that

1    a limiting instruction would be appropriate to tell the

2    jury that the purpose that the tape is being played for

3    is not for content, but for those purposes.

4              THE COURT:  Okay.  Let me ask you, because

5    I don't know and I'm sure the attorneys do, is it audio

6    only is is it audio and video?

7              MR. LONG:  Audio and video, Judge.

8              THE COURT:  So the jury -- your proposal is

9    to have the jury not only hear, but to watch the

10   reaction and behavior during the interview?

11             MR. LONG:  Correct.

12             And we do have transcripts as well, because

13   the words that are said are relevant to the extent that

14   they provide developmentally appropriate language.  So

15   I'm not saying that the language or some of the words

16   they're using are not appropriate or not relevant; they

17   certainly are and should be considered, but for that

18   purpose.  And so I also intend to hand out a transcript

19   as well.

20             THE COURT:  You intend to proffer for

21   distribution?

22             MR. LONG:  Yes, Judge.  I would request

23   that so that they could have that while they're watching

24   the video.  And then we obviously would not ask for the

25   tape or the -- well, then we would not ask for the

1    transcript to be admitted but only the tape.

2              THE COURT:  The recording, whatever it --

3              MR. LONG:  Correct.

4              THE COURT:  We call it a tape, but I assume

5    it's a disk of some kind.

6              MR. LONG:  It is.  It is a disk, Judge.

7              THE COURT:  That's us working in the '90s

8    instead of the '10s.

9              Okay, go.

10             MR. GREEN:  Your Honor, the proper use of

11   prior recorded testimony would be to refresh the memory

12   of a witness on the witness stand who states that they

13   don't remember a fact that they may have stated in that

14   earlier interview.  The State asked Ada Wilhelmi on two

15   separate occasions --

16             THE COURT:  Let me stop you just a second.

17   I saw a number of people go in the victim room.  Find

18   out if any are potentially witnesses, and if they are,

19   let them out.

20             DETECTIVE SNYDER:  Yes, Your Honor.  It's a

21   couple of our newer detectives that have requested to

22   sit in and watch testimony --

23             THE COURT:  Okay.

24             DETECTIVE SNYDER:  -- so they can be up on

25   it.

```
 1              THE COURT:  Okay.  I appreciate you telling
 2   me that, but Mr. Kohler, just verify that there's no
 3   potential witness so as an officer of the court you can
 4   tell me that.
 5              MR. KOHLER:  (Complies.)
 6              THE COURT:  As an officer of the court --
 7              MR. KOHLER:  As an officer of the court, I
 8   can avow that neither of the people in that room are
 9   witnesses.
10              THE COURT:  Great.  Then very well, they
11   can listen in.
12              Okay, go ahead and finish.  You were saying
13   that it is recorded recollection and it should not be
14   played.  Go ahead and finish.
15              MR. GREEN:  Exactly, Your Honor.  And the
16   witness on two separate occasions stated that she
17   remembered the events of that day when asked directly by
18   the State.
19              So we would object, Your Honor, to the
20   playing of that as improper.  It's prior hearsay, Your
21   Honor, which I have no opportunity to cross-examine
22   because it's -- it was done in a closed interview.
23              THE COURT:  Okay.  The question to you is
24   do you intend to raise as a defense or a partial defense
25   the issue -- the argument of coaching?
```

1          MR. GREEN:  I believe I already have, Your

2    Honor.  And yes, I do believe that that is a legitimate

3    defense.

4          THE COURT:  Ms. Wilhelmi, the young lady,

5    is still available, I take it, if she needed to be

6    recalled?

7          MR. LONG:  She is.

8          THE COURT:  Okay, good.

9          Okay.  You don't need to add anything.  The

10   objection is overruled, it can be played.  It's not

11   hearsay if the proponent, the speaker, is available for

12   cross-examination.  She not only was, she could be if

13   necessary.

14          And it's an appropriate response to the

15   issue of whether or not coaching occurred, at least

16   based on the information given to the jury by

17   Ms. Moncher, and they can make their own analysis

18   separately without asking any expert herself or himself

19   to say, well, gee, was she coached.  The jury will be

20   able to make their own assessments, so in that sense

21   it's very valuable to the jury's determination.

22          MR. LONG:  Okay.

23          THE COURT:  Did you want to add anything

24   else?

25          MR. LONG:  Not to that.  I wondered if the

```
 1   Court wanted to discuss scheduling for the rest of the
 2   week, given where we're at.
 3              THE COURT:  Yeah, I'll come back to that in
 4   a second, but you don't have any other pre-jury issues
 5   we need to talk about?
 6              MR. LONG:  No, sir.  That was it.
 7              THE COURT:  Okay.  I'll come back to you in
 8   just a second.
 9              Do you have any other pre-jury issues,
10   Mr. Green?
11              MR. GREEN:  No, Your Honor.
12              THE COURT:  Okay.  Yeah, let's get back to
13   scheduling.
14              MR. LONG:  The proposed schedule, given
15   the -- I guess the speed at which we're going, is that
16   we --
17              THE COURT:  You know, I do like to keep
18   trials moving.  Go ahead.
19              MR. LONG:  I think we've done that so
20   far.
21              THE COURT:  Yes, you have, and so has
22   Mr. Green.
23              MR. LONG:  -- is Jack Ink, Detective
24   Snyder, John Boggs, and then Dr. Klein.
25              THE COURT:  Dr. Klein?  Is that not the
```

1    doctor that's not coming until Monday?

2                 MR. LONG:  No, that's Sharon Welch.

3                 THE COURT:  Oh, Welch.  That's the

4    nurse?

5                 MR. LONG:  That's the SANE nurse, that's

6    correct.  Sharon Welch is the SANE nurse, Dr. Klein is

7    the medical doctor.

8                 THE COURT:  I'm sorry.  I was thinking it

9    was the medical doctor we were waiting for.  Okay.  So

10   you have four possible witnesses today?

11                MR. LONG:  Correct.  And then tomorrow what

12   we have scheduled are the DPS personnel, both of them,

13   Nikki Petrin and Peggy Toporek and Jackie Hess, and

14   those are the only -- those are the remaining witnesses.

15   Jackie Hess was the nurse practitioner that viewed the

16   colposcope pictures.

17                And those are the only witnesses we have

18   for tomorrow.  And then that leaves us with really no

19   additional witnesses or no other witnesses until

20   Ms. Welch on Monday.

21                THE COURT:  Does that mean, then, that we

22   might have Friday free?

23                MR. LONG:  Yes, sir.  And that's what I --

24   I guess I'm requesting that that be an -- that allowable

25   schedule.

1          We are moving quicker, I guess, than we

2     thought.  We picked up a day with Mr. Green's trial

3     going away, and we at this point still do not have a

4     conflict with Detective Snyder.  He has not received a

5     subpoena for that dependency hearing.

6          THE COURT:  Okay, good.  I also ought to

7     point out that I think the attorneys jointly saved some

8     time by the stipulation on the photographs.  Lots of

9     time.

10          MR. LONG:  And maybe the technology that

11     was used, Judge?

12          THE COURT:  Well, I'm not going to support

13     Apple for any reason.  You know how I feel about the

14     slide slows, but that's neither here nor there.

15     Technology advances.  Some of us don't.  Okay.

16          MR. LONG:  The boss agrees with you,

17     Judge.

18          THE COURT:  Okay.  If it works out that

19     way, it will work out that way.  It looks that way right

20     now, but let's wait and see where we actually stand

21     tomorrow morning.

22          Tomorrow morning if it looks like that

23     timing is correct, I'll be very happy to tell the jury

24     they can have Friday off, and I'll explain the delay is

25     because of the need to have a witness and that it

1    shouldn't be held against any party, it's necessary to

2    the presentation of the case.

3            After Ms. Welch is done, you, Mr. Green, I

4    take it, have not had -- are not ready at this stage to

5    make a decision along with your client about what you're

6    going to present?  Or have you?

7            MR. GREEN:  I have not at this point, no,

8    Your Honor.

9            THE COURT:  Okay.  And that's fair enough.

10   We'll need to talk about that, though.  I am hoping we

11   have some opportunity to get it to the jury Monday.

12   I've heard, although it's not been confirmed, that

13   somebody wants me to do another trial next week, so I

14   need to figure my own timing out.

15           What did you -- did you want to raise

16   anything else?

17           MR. GREEN:  I don't think so, Your Honor.

18           THE COURT:  Okay.  I know you think you can

19   get through all four today, and you very well might, but

20   you never know what might happen, so let's see what

21   happens.

22           Anything else, Mr. Long --

23           MR. LONG:  No, sir.

24           THE COURT:  -- Mr. Kohler, Mr. Green?

25           MR. GREEN:  No.

1          THE COURT:   Great.   Take a break and we'll

2    wait for the jury.

3          (Recessed from 8:55 a.m. until 9:12 a.m.

4    The proceedings resumed with the presence of the jury

5    and outside the presence of Mr. Matt Long.)

6          THE COURT:   Let's have the record show the

7    presence of the attorneys, the Defendant, Mr. Almanza,

8    and the jury is now back in.

9          Mr. Long is on his way?   Yep, there he

10   is.

11         Good morning, ladies and gentlemen.

12   Welcome back.

13         Mr. Kohler, is the State ready to

14   proceed?

15         MR. KOHLER:   We are, Your Honor.

16         THE COURT:   Very good.

17         Mr. Green, are you ready to proceed?

18         MR. GREEN:   Yes, Your Honor.

19         THE COURT:   Thank you very much.   First

20   witness -- next witness.

21         MR. KOHLER:   Thank you, Your Honor.   At

22   this time the State calls Jack Ink to the stand.

23         THE COURT:   Okay.   Come on up here.   What I

24   need you to do is, this young lady is going to ask you

25   to get sworn, so you need to raise your right hand.

1    Okay?

2                    (The witness, Jack John Thomas Ink, was

3    duly sworn by the clerk of the court, according to

4    law.)

5                    THE COURT:  Now, before you sit down, do

6    you understand what all that means?

7                    MR. INK:  Yes.  I'm going to tell the

8    truth, all of the truth, and I'm not going to lie.

9                    THE COURT:  That's the important part.  You

10   understand that's what you have to do?

11                   MR. INK:  Uh-huh.

12                   THE COURT:  Yes?

13                   MR. INK:  Yes.

14                   THE COURT:  One of the rules we have here

15   is don't say "uh-huh" and "huh-uh," say "yes" and "no."

16   Okay?

17                   MR. INK:  Okay.

18                   THE COURT:  Go ahead, have a seat.

19   Comfortable?

20                   MR. INK:  Uh-huh.

21                   THE COURT:  When you talk --

22                   MR. INK:  Yes.

23                   THE COURT:  You said "uh-huh," you didn't

24   say "yes."

25                   When you talk, talk into that microphone,

1    okay?

2                    MR. INK:  Okay.

3                    THE COURT:  Thank you.  Go ahead.

4

5                    **JACK JOHN THOMAS INK,**

6    called as a witness herein, having been first duly

7    sworn, was examined and testified as follows:

8

9                    D I R E C T   E X A M I N A T I O N

10   BY MR. KOHLER:

11       Q.   Jack, would it be more comfortable if that

12   microphone was a little lower?

13       A.   Maybe a bit.  There.

14       Q.   Okay.  Jack, can you go ahead and tell us all

15   what your name is.

16       A.   My name is Jack John Thomas Ink.

17       Q.   And Jack, how old are you?

18       A.   10.

19       Q.   Jack, do you go to school?

20       A.   Yes.

21                   THE COURT:  And I'm going to ask you to

22   speak up just a little bit, please.  Again, I want to

23   make sure everybody in the courtroom can hear you.

24   BY MR. KOHLER:

25       Q.   Jack, what grade are you in?

1      A.   5th.

2      Q.   And what's your favorite class in school?

3      A.   Reading.

4      Q.   What do you like best about reading, Jack?

5      A.   I don't know, I'm just fast.

6      Q.   And what kind of books do you like reading?

7      A.   Nonfiction.

8      Q.   What's your -- what's your favorite nonfiction

9  book that you've read recently?

10      A.   Recently Narnia.

11      Q.   Now, Jack, what other classes do you have in

12  school?

13      A.   Math, science, I already said reading.  We have

14  specials, which each -- every day it's different.  We

15  have recess, we have science, writing, spelling.  That

16  should be it.

17      Q.   What's your favorite thing to do during recess?

18      A.   Play tag.

19      Q.   And who do you play with, Jack?

20      A.   A kid named Tim, another Gilbert, Michaela,

21  Waylene.  Whoever will play.

22      Q.   Are these people all friends of yours?

23      A.   Yeah, sort of.

24      Q.   Now, what do you like to do at home for fun?

25      A.   I like to go play with my friend, Sebastian.

1          Q.   And anything else?

2          A.   Well, we go over to this kid's house.  His name

3    is Javie, and he has a giant trampoline, so we just go

4    over and jump on the trampoline.

5          Q.   What's your favorite part about jumping on the

6    trampoline?

7          A.   I -- just getting high, I guess.  Trying to

8    jump really high.

9          Q.   Now, Jack, I'm going to ask you a couple

10   questions about your family.  Is that all right?

11         A.   Uh-huh.

12              THE COURT:  Wait a minute.

13              THE WITNESS:  Yes.

14              THE COURT:  There you go.

15   BY MR. KOHLER:

16         Q.   Why don't you tell me -- tell me about your

17   family.

18         A.   I have my sister, Ada; my brother, Arlo; my

19   mom, Katie; my grandmama, my dad.  Other people I don't

20   know, but I don't know all of them.  I have some

21   cousins, my aunt.  Two aunts.

22         Q.   Jack, can you tell me who it is that you live

23   with?

24         A.   My mom, but then on weekends I go with my dad

25   usually.

1        Q.    And who lives with you at your mom's house?

2        A.    My sister, my brother on every other week.

3        Q.    Now, you guys used to live on a ranch, didn't

4    you?

5        A.    Yes.

6        Q.    Can you tell me about the ranch?

7        A.    It was big.  We had a slaughter house.  My mom

8    worked there as a butcher.  There was the shed.

9             Me and my sister lived there for some time,

10   and my brother.  And we had pigs, there was cows, there

11   was horses.  We had some chickens.

12       Q.    Did you like living on that ranch, Jack?

13       A.    Sort of.

14       Q.    What did you like best about it?

15       A.    When the river flooded there was no school.

16       Q.    You said "sort of."  Was there parts of the

17   ranch you didn't like very much?

18       A.    Yeah.

19       Q.    What were those?

20       A.    It got really hot.  Sometimes my mom had to

21   work, like, all day so I didn't really get to see her.

22   And then there was always killing, so it kind of

23   smelled.

24       Q.    Now, what kind of things would you do at this

25   ranch?

1      A.   I'd run around, shoot squirrels and do

2  homework, help my mom butcher sometimes.  Let's see.

3  Lots of things.

4      Q.   Did you have any chores while you were working

5  on the ranch?

6      A.   Well, the only chore would be feeding the dogs,

7  cats, making sure the pigs were okay.

8      Q.   What do you mean by making sure the pigs were

9  okay?

10      A.   Like, they had food, water, they weren't dead.

11      Q.   Was it your job to feed the pigs?

12      A.   Yeah, but I usually needed help.

13      Q.   Well, let's talk about feeding those pigs for a

14  bit.

15      A.   Okay.

16      Q.   Why don't you tell us -- tell us all about

17  feeding the pigs.

18      A.   Well, I had to get a bucket full of food, I had

19  to pour it down my trough, and I had to get it on the

20  right side.  And then I had to go get a hose and water

21  and give them water and feeding them a bit.

22           And then sometimes we had scraps, like,

23  just leftover food that we didn't want, so we would feed

24  that to them.

25      Q.   And let's talk about the food.  You said you

had to get a bucket of food; is that --

A.   Yeah.

Q.   Was that food kept right next to the pigpen or far from it or somewhere else?

A.   Far from it, in a shed.

Q.   Okay.  And about how much food did you -- did the pigs eat each time you fed them?

A.   Let's see.  The mom usually ate a bucket or a bucket and a half.  When she was pregnant, usually, like, two buckets, I think, but I'm not totally sure.

Q.   And how often did you feed the pigs each day?

A.   Once or sometimes twice, like if we were giving them half the food in the morning, half their food in the evening sometimes.

Q.   Now, when you were giving them half the food in the morning and half the food in the evening --

A.   Uh-huh.

Q.   -- do you remember how much food you would have to haul out to the pigpen?

A.   No.  Usually, like, let's say she was pregnant, then it would probably be about a bucket, I think.  Or if she wasn't pregnant, then, like, half a bucket for her.

         And then if she had any babies, then you'd have to make sure they got food.

1      Q.   How would you get the food out to the pigpen?

2      A.   With a wagon.

3      Q.   Can you tell us about that wagon?

4      A.   It was -- can't remember what it's called, but

5  it's red.   Small wagon.   The sides aren't very tall.

6      Q.   And would you just put the food right into the

7  wagon?

8      A.   Well, I would have to get it out of the barrel

9  or a bag.   And sometimes we would take the bags if there

10 was, like, only a little bit of food left, so we would

11 just take the bag.   But yeah, we would pour it or scoop

12 it or something like that.

13     Q.   And were those bags heavy?

14     A.   Yeah, 50 pounds before opening.

15     Q.   And would you take the whole 50 pounds out to

16 the pigpen?

17     A.   No.

18     Q.   So what would you do with the 50-pound bag?

19     A.   I open it, we either put it in a barrel so that

20 we could just use the bags for something else, or we

21 just put it in a barrel so that we didn't have bags all

22 over the place.   And there was a lot of -- there was a

23 couple empty barrels in there.   And then, yeah, we use

24 the bags for something else sometimes.

25     Q.   Now, generally when you go feed the pigs, about

1    how long would that take you?

2         A.   Can't remember.

3         Q.   Was it something that was over really quickly?

4         A.   I don't think so.

5         Q.   And about how long do you think you stayed with

6    the pigs when you were feeding them?

7         A.   It depends on if there was babies, I would have

8    to make sure they were all fine, no cuts or anything, or

9    if they were dead.

10        Q.   And so you were -- you would be out there with

11   the pigs for a little while?

12        A.   Yeah, sometimes.  But like, if she had no

13   babies, then I would just leave pretty quickly if I

14   didn't -- if there was nothing I had to do or if I had

15   something else to do.

16        Q.   Did you like being around the pigs?

17        A.   Yeah, except for the smell.

18        Q.   And were you pretty good at doing the pig

19   feeding?

20        A.   Yeah.  I just sometimes needed help, because

21   the buckets were -- I don't know, I don't remember how

22   many pounds.  But they were heavy, so I needed help

23   usually.

24        Q.   Now, you say you needed help?

25        A.   Uh-huh.

1      Q.   Who would help you feed the pigs?

2      A.   Jaime or Fernando.

3      Q.   Tell me who Jaime is.

4      A.   He's a guy who worked on the ranch.

5      Q.   Do you know Jaime's last name?

6      A.   No.

7      Q.   Okay.  Now, you also mentioned a person named

8    Fernando.

9      A.   Uh-huh.

10      Q.   Can you tell me who Fernando is?

11      A.   Yes.  He was Mexican.  I don't know where he

12    lived.  He was also a ranch hand.

13            That's pretty much all I know about him.

14      Q.   Now, tell me, when they would help you feed the

15    pigs, Jaime and Fernando, what kind of things would they

16    help you with?

17      A.   Like, pouring the buckets into there.  Because

18    we had to -- the things were kind of high, so lifting

19    the buckets that high I couldn't really do.

20      Q.   Now, you said something there that I want to

21    make sure I understand.  You said "pouring the buckets

22    into there."  Did I hear you right?

23      A.   I mean, pouring the buckets into, like, a

24    trough thing.  You can pour it onto both sides, but we

25    had to pour it onto just one.

1       Q.   Why did you pour it on just one side?

2       A.   Because usually the pigs were only on one side.

3    But if they were on both sides, then we pour it into

4    both.

5       Q.   And is that the kind of help that both Jaime

6    and Fernando would give you with those pigs?

7       A.   Yeah.

8            And sometimes, like, the hose wouldn't turn

9    on or we couldn't find the hose or we were out of food

10   or something like that.

11      Q.   What would you do if the hose wouldn't turn on?

12      A.   Well, I'd go get one of them.

13      Q.   And were they able to turn the hose on?

14      A.   Yeah.  Usually it was something that -- or

15   sometimes it had been, like, unconnected so we had to

16   get it in.  Like, sometimes we would have to scoop it

17   out of the cow trough, the cow thing, the cow bucket for

18   water.

19      Q.   Was that a lot of work, scooping out of the cow

20   bucket for water?

21      A.   Yeah, because it was like -- I don't know how

22   many feet away, but it wasn't very too close.  And we

23   had to go -- there was a fence so that we couldn't just

24   walk straight, too.  We had to curve, and yeah.

25      Q.   Sounds like a lot of work.

1          Tell me, was there ever a time where you

2     just carried the bags instead of using the wagon?

3          A.   No, unless my mom was there carrying the bags.

4          Q.   But when you did it, did you always have to use

5     the wagon?

6          A.   Yeah.  Unless it was something like scraps.

7          Q.   Tell me about scraps.  What are scraps?

8          A.   Leftover food that we don't want.  Or like when

9     my mom's cutting and she can't make it into ground beef

10    or any steaks, then we'll just feed those to the pigs.

11         Q.   Where did you and your mom keep scraps?

12         A.   Well, it either came from the house or in the

13    packing house where my mom butchered.  And if it was in

14    the house, then probably in the fridge, but if it was in

15    the packing house, in this giant cooler that -- where

16    they hang the beef.

17         Q.   Did anyone else ever give you guys scraps for

18    the pigs?

19         A.   Yes.

20         Q.   Who?

21         A.   Jaime, Fernando I think did a couple times.

22         Q.   And how did that work?

23         A.   Well, they would bring, like, leftover food or

24    food that's gone bad and they can't eat anymore but it

25    would be okay for pigs.

1      Q.    Where would they put that food?

2      A.    Usually in the packing house cooler, or they'd

3 just go feed it to the pigs then.

4      Q.    Okay.  Now, Jack, I want to talk to you -- I'm

5 sorry.  Before I talk to you about that, did any of your

6 siblings ever help you feed the pigs?

7      A.    Yeah.  Ada sometimes came and helped me throw

8 the meat.  Arlo did a couple times, I think.  But I'm

9 not sure.

10      Q.    When you say "throw the meat," what do you mean

11 by that?

12      A.    Well, we would just throw it in their pen,

13 usually, because we didn't need to pour it into their

14 troughs.  Because if we throw it in, usually they can

15 all get it, but if we put it in the trough, usually it

16 falls on the other side where there's no pig.  But if

17 there was on both sides, then we'd just pour it on both

18 sides.

19      Q.    So you would throw it -- you would throw the

20 scraps into the pigs to make sure it got to the pigs and

21 didn't fall somewhere else?

22      A.    Yeah.

23      Q.    Okay, great.  Now, I want to talk to you about

24 the last time that Fernando helped you with the feeding

25 of the pigs.  Do you remember that time?

1     A.   Yeah.  When my sister came with us, I think?

2     Q.   Let's talk about that.  Can you tell me -- tell

3  me about that time.  What do you remember?

4     A.   Not very much because it was a long time ago.

5  But I remember we were going -- we were getting the

6  wagon to feed the pigs.  We -- I think we brought the

7  wagon there.  I think Fernando either joined us with

8  there or I had to go get them.  I can't remember which.

9     Q.   And what happened next?

10     A.   Then we would take it to the pigs.  He would --

11  Fernando helped us.  I went to go get -- he told me he

12  had brought some scraps, so I went and got the scraps.

13     Q.   Where did you go to get those scraps?

14     A.   Packing house, hanging room or fridge.

15     Q.   And what happened next?

16     A.   Then I got the scraps, came back, and we fed

17  the scraps to the pigs.

18     Q.   All right.  Now, I want to walk through what

19  you just told us a little bit and ask you a few more

20  questions about that.  Would that be okay?

21     A.   Yes.

22     Q.   All right.  So you said, "We got the food" --

23     A.   Uh-huh.

24     Q.   -- "and went to the pigs."

25     A.   Uh-huh.

1     Q.   Am I remembering what you said right?

2     A.   Yes.

3     Q.   Okay.  Where were you when you got the food?

4     A.   The shed.

5     Q.   Okay.  And after you got the food, who was the

6   "we" that was there getting the food?

7     A.   Me and my sister.  I remember for sure it was

8   me and my sister getting the food, but Fernando might

9   have been helping us.  But I can't remember.  I don't

10   think he was.

11     Q.   Now, when you say "getting the food," does that

12   mean you're taking feed out of bags and putting it in

13   buckets?

14     A.   Yes, or out of barrels.  I can't remember which

15   it was, out of the feed -- out of the bags or the

16   barrels.

17     Q.   And then -- correct me if I'm wrong -- then you

18   put those buckets in your wagon, right?

19     A.   Yes.

20     Q.   So then what happened after you and Ada had --

21   and possibly Fernando -- had the food?  What did you do

22   next?

23     A.   We went back to the pigs to feed it to them.

24     Q.   Okay.  And what happened when you got to the

25   pigs?

1      A.   Well, it was -- either I went to go get

2  Fernando, or we fed them and then he told me that -- I

3  remember he was there, and he told me he had some scraps

4  and that he had brought some scraps.  So I went to

5  get -- he told me why don't I go get the scraps.

6      Q.   Okay.  So you got to the pigs?

7      A.   Uh-huh.

8      Q.   And you're not really sure if Fernando came

9  with you or if he was already there or if you went and

10  got him.  Is that an accurate statement?

11      A.   Yes.

12      Q.   But do you remember Fernando being with you at

13  the pigs at some point?

14      A.   Yes.

15      Q.   Okay.  And once you were there at the pigs,

16  what do you remember happening next when all three of

17  you were there?

18      A.   Well, we fed the pigs the food, or maybe it was

19  we -- he told me to go get the scraps while he fed them,

20  I can't remember which.  Or maybe it was after he had --

21  we had fed the pigs, but I don't remember.

22      Q.   What did you do when he told you to go get the

23  scraps?

24      A.   I went and got the scraps.

25      Q.   And where did you go to get these scraps?

1        A.    In the packing house, in the fridge or cooler.

2        Q.    Did Ada come with you, stay at the pigpen, or

3  something else?

4        A.    She stayed at the pigpen.

5        Q.    Was she there -- was Fernando with you at the

6  pigpen or was he somewhere else?

7        A.    He was with us at the pigpen, but he stayed

8  with Ada --

9        Q.    Okay.

10       A.    -- when I went to get scraps.

11       Q.    So after you got the scraps, did you take your

12 wagon with you to get the scraps?

13       A.    I don't think so, but -- I can't remember for

14 sure, but I really don't think so.

15       Q.    Okay.  And then did you -- what did you do once

16 you had the scraps in your hand?

17       A.    I shut the fridge, then I went back to the --

18 to the pigpens.

19       Q.    And what did you see when you got to the

20 pigpen?

21       A.    Fernando and Ada I think sitting there, or

22 maybe they were standing.  I can't remember.

23       Q.    And what happens next with those scraps?

24       A.    We fed it to them.  To the pigs, I mean.

25       Q.    Thank you for clarifying that.

1            And then what did you do?

2       A.   Then I think we went back.

3       Q.   Okay.

4       A.   But we may have stayed for a little while

5  longer to do something, but I think we went back after

6  that.

7       Q.   And when you say "we went back," who do you

8  mean?

9       A.   Me and my sister.

10      Q.   And what about Fernando?

11      A.   Him -- I think he just went over to get on with

12  other stuff he had to do.

13      Q.   Did he walk with you back to the house?

14      A.   No.

15      Q.   So while you're walking with Ada, did anything

16  happen that you remember?

17      A.   Well, we walked up to the house and she said

18  Fernando had touched her private.  And I'm like -- and

19  then I said, "Go tell mom, not me."

20      Q.   And what did Ada do next?

21      A.   Went and told mom.

22      Q.   Jack, I'd like to -- I'd like to use these big

23  TVs here for a minute.  Can you see these big TVs we've

24  got here?

25      A.   Yes.

Q.   Those look pretty cool?

A.   Yeah.

Q.   I'm going to show you some stuff on the TVs.
It might be a little more boring than other stuff you've
watched on TV, but I'm going to show you some pictures,
all right?

A.   Okay.

Q.   Just show you -- I'll be showing you shortly
what's been marked as State's Exhibit No. 3.

A.   Okay.

Q.   Now, we've got this one right behind you here,
so I'm going to have you look at that one.  And I may
have you show us a few things on that if that's all
right with you.  Can you do that?

A.   Yes.  Will I have to, like, point at them or --

Q.   You know what?  I think, if it's okay with you,
I'm going to have you stand up and show us in a minute
once we get them working.

A.   Okay.

Q.   Thanks, Jack.

A.   Okay.

            THE COURT:  Jack, let me tell you, if you
are going to get up there and stand, if you're talking,
you have to speak out very loudly, because everybody has
to hear you, okay?

1           THE WITNESS:  Okay.

2           THE COURT:  And if you can't speak out loud

3    enough when you answer, I'm going to have you come back

4    to the microphone, so give it a good try.

5           THE WITNESS:  Okay.

6           THE COURT:  Go ahead.

7    BY MR. KOHLER:

8        Q.   Well hey, Jack, before we get into this, what

9    are we looking at here in State's Exhibit No. 3?  Just

10   tell us.

11       A.   We are looking at the top of the ranch or --

12   well, from a helicopter.

13          THE COURT:  Let me check.  Can everybody

14   hear him?

15          Okay.  Go ahead, sir.

16          MR. GREEN:  Your Honor, may I approach to

17   grab the photos?

18          THE COURT:  Sure, go ahead.

19          MR. GREEN:  Thank you, Your Honor.

20          THE COURT:  Do you have what you need?

21          MR. GREEN:  Yeah.

22          THE COURT:  Okay.  Go ahead, sir.

23   BY MR. KOHLER:

24       Q.   Jack, is that the picture -- you said it's a

25   picture of the ranch.  Is that the ranch you used to

1    live on?

2        A.    Yes.

3        Q.    How do you know?

4        A.    Well, it looks exactly the same.  It's still

5    kind of big, but it has changed, probably.

6        Q.    Is that about what you remember it looking like

7    when you lived there?

8        A.    Yeah.

9        Q.    Okay.  Can you show us on there where it was

10   that the pig food was kept?

11       A.    The pig food was kept in this building right

12   here.

13              THE COURT:  Just a little bit louder if you

14   can.

15              THE WITNESS:  The pig food was kept right

16   here, in the shed right there.

17   BY MR. KOHLER:

18       Q.    All right.  Now, on that map can you tell me

19   where it was that your scraps that you talked about,

20   where did those get kept?

21       A.    Those are either in the packing house right

22   here, or sometimes we put our food scraps, like, from

23   the meal we had last, and we kept it in a fridge in the

24   house.

25       Q.    Okay.  Now Jack, I'm going to show you what's

1    been marked as State's Exhibit No. 29.  Can you tell

2    what we're looking at there?

3         A.   We're looking at the ranch.  But mainly what

4    you see is part of the shed.  The car's there, and

5    there's the pen where we sometimes kept cattle, the

6    trailer that we lock the cattle on, and then over here

7    is the gate where you went to the pigpen.

8         Q.   Now, Jack, is that the shed there on the right

9    that you said you see part of a shed there?  Is that

10   the -- where the pig food was kept?

11        A.   Yes.

12        Q.   And is that where that red wagon you mentioned

13   was also?

14        A.   I don't remember.  Might have been in there,

15   but I might -- it may have been left over somewhere

16   else.  It's not always in there.  Sometimes we will

17   leave it at the pigpen, but usually it is in there.

18        Q.   Now, is that where you would have to take the

19   wagon to pick up the food?

20        A.   Yes.

21        Q.   Okay.  And then after you filled up that wagon

22   with the food, can you show us on that picture where it

23   is that you'd go with that wagon?

24        A.   I would take the wagon, I'm not sure where.

25   Sometimes I would go this way if I knew there was scraps

1   in the packing house and I'd go this way, there towards

2   the packing house on this side of the trailer.  But then

3   if I knew there was no scraps, then I would just go

4   behind the trailer straight to the pigpen.

5        Q.   You know what, Jack?  We're going to go back to

6   State's Exhibit No. 3 again.  Remember that one?

7        A.   Yes.

8        Q.   Can you draw with us -- with your finger, just

9   show with us -- I'm sorry -- show us with your finger on

10   that picture where it was that you would haul your

11   wagon.

12        A.   If there was scraps in the packing house I

13   would go this way, but if there was no scraps, I would

14   go this way, probably, and then go through the gate.

15   And the pigpen is right up here, in this tree area.

16        Q.   Now, you just mentioned a gate.  I'm going to

17   show you what's been marked as State's Exhibit No. 36.

18   Do you recognize what we're looking at there, Jack?

19        A.   Yes.

20        Q.   What are we looking at?

21        A.   We're looking at the shop from in the cattle

22   pen.  There's the gate, there's the second gate, because

23   sometimes the gate they first go through and this gate

24   are shut because we need cows there for slaughter day.

25   But I guess we had to open it.  I remember there was no

1  cows in the pen, so we would open the gate that I showed

2  you that -- on 3 that I showed you, and we would open

3  this gate.  We would shut the gates after we went.

4          And then the pigpens were back here.

5      Q.  Now, Jack, right there where you were pointing,

6  is there a water pipe running somewhere there in the

7  road?

8      A.  It's right across there.  And it leads to the

9  cow trough so that we can just turn the water on and

10 it'll just pour into the cow trough without us having to

11 bring buckets or anything else.

12     Q.  Is it kind of like a bump in the road?

13     A.  Yes.

14     Q.  Was it easy to get your wagon over that bump?

15     A.  No.

16     Q.  What did you have to do to get over that bump?

17     A.  Usually I would scoot the food back to the end

18 while I'm doing on the first side, then while half of it

19 was over, I moved the food to the front of the wagon.

20     Q.  And then were you able to get over the wagon --

21 or get over the bump that way?

22     A.  Yeah.  But if there was two buckets in the

23 thing, we'd have to get it over the thing without using

24 that.

25     Q.  I'm going to have you look now at State's

1  Exhibit No. 62.  What are we looking at there?

2       A.   The pigs, the back of the pigpen, my dog, my

3  old dog.  Here's the hose that we would use for the

4  water.  Looks like here our mama pig had just had a

5  litter not too long ago, and yeah, the back of the

6  trough.

7       Q.   Now Jack, is that what the pigpen looked like,

8  about what the pigpen looked like on the last day

9  Fernando fed the pigs with you?

10       A.   I don't think so because I don't think there

11  was any babies left.  There might have been.  I can't

12  remember.

13       Q.   So maybe the pigs are different?  Is that what

14  you're saying?

15       A.   Yeah.  But the trough was -- wait.  Oh, yeah.

16  I think they had made them longer that time before that.

17  Or after that.  Maybe it was -- maybe it was before that

18  and they were longer when that happened, but I don't

19  think they were.

20       Q.   Okay.

21       A.   I think that was later.

22       Q.   I'm sorry.  I don't mean to confuse you by

23  asking confusing questions, and if I ever confuse you,

24  just tell me and I'll try again.

25            So looking at this view of the pigpen,

1  where would you have put the food?  Can you see it from

2  here?

3       A.   Sort of.

4       Q.   Show us where.

5       A.   Well, here is, like, the lid we would put over

6  so nothing can get into the top of it.

7       Q.   I'm sorry.  Did you say "lid"?

8       A.   Yeah, kind of like a lid or shutter so that you

9  can, like, shut it so nothing can get in.

10           But yeah, you can see the pigs right there.

11  You can't really see them because they were probably

12  eating.

13       Q.   So are they eating out of the trough where you

14  would have put the food?

15       A.   Yes, it looks like that.  Because if they

16  weren't, then they would probably be, like, scattered

17  about, like, getting scraps if we had been throwing them

18  in.

19       Q.   Going to show you what's been marked as State's

20  Exhibit No. 66.  Is that kind of the same view we were

21  just looking at?

22       A.   Yeah.

23       Q.   Okay.  So that's the same side?

24       A.   These are just a little bit different and just

25  the camera angle.  Can you go back to the other one?

1          Q.   I can.   I'm showing you what's been marked as
2     State's Exhibit No. 62 now.
3          A.   Yeah, but the other one.
4               Yeah, this one.   That's just the tree
5     showing closer up than the other one.
6          Q.   Okay.   So I'm going to show you a different one
7     now, and maybe that one will help us a little more.
8               Now, what are we looking at there?
9          A.   The pigpen after it had been -- like, we had
10    put the -- we had -- some of my mom's friends help us
11    put this up, but I'm pretty sure it wasn't this long
12    when Fernando had been feeding the pigs with us.
13         Q.   All right.   Now, on this picture, even though
14    it's longer than it used to be, does this picture show
15    where it is that you put the food?
16         A.   Not really.   This tree and that tree are kind
17    of in the way.   You can see the lid on this one.   And
18    here's, like, the body of the thing, because it was big.
19         Q.   All right.   Now, I'm going to show you what's
20    been marked as State's Exhibit No. 68.   Is that the
21    fence that was around the pigpen when you and Fernando
22    were feeding the pigs?
23         A.   No.   We can see there, right there is where it
24    was.   And this thing, I'm pretty sure that it wasn't,
25    like I said, long like this, but you can see just the

1   edge of the fence right there where there was -- right

2   there.

3        Q.   I've got one more pigpen picture for you, okay?

4   Is that a picture of the pigpen like it looked when you

5   and Fernando were feeding the pigs?

6        A.   I don't think so, because I don't think this

7   fence was there.

8                But I can pretty much show you, because

9   just this part was part of the pigpen.  Here's the

10  trough hole we said right there.  You can kind of see

11  it.

12       Q.   So I've finally gotten a picture that actually

13  shows us the trough?  Is that what you're telling me?

14       A.   Yes.

15       Q.   Excellent.  And you are saying that big fence,

16  that wasn't there?

17       A.   Yes, I'm pretty sure it wasn't.

18       Q.   What about the little fence there next to it?

19       A.   Right here?

20       Q.   Yeah.

21       A.   Yes, that was there.

22       Q.   So did you have to lift the food over that

23  fence to put it in there?

24       A.   Well, we had to get the food up here.  This one

25  I'm pretty sure the lid was usually shut, so usually we

1   had to open a lid, I think.   I don't remember what we

2   did, if the lid was shut.

3           But yeah, you can see, here is where the

4   food was kept.   We'd usually, when I could feed the pigs

5   by myself when I got to that point, I would just climb

6   up with the tree.   Sometimes I would hang the bucket on

7   a limb or something, then climb up to the top, bring it

8   up, feed them.

9       Q.   Thanks, Jack.

10          Now, I'm seeing a lot of trees there.   Do

11  you remember what kind of trees those are?

12      A.   Mesquite.   Other ones -- I don't think there

13  was any other kind of trees.

14      Q.   Were those mesquite trees all around the

15  pigpen?

16      A.   Yes.

17      Q.   And did they make it hard to see the pigpen as

18  you're walking up to the pigpen?

19      A.   Yeah, kind of.

20          Can you go back to the one where you see

21  the gate opening?

22      Q.   I sure can.   That would be State's Exhibit 36.

23  Correct me if I'm wrong when I show you the picture.

24          Is this the one you meant?

25      A.   Yes.   Like right here, you can kind of see.

1    It's kind of hard to see back there.

2             And then if you go back to Exhibit 3.

3        Q.   I will indeed, sir.

4        A.   Right here is about where the pigpens were.  So

5    you can see, there's lots of trees.

6        Q.   Thanks, Jack.  Go ahead and have a seat.  I

7    really appreciate you showing me all these trees.

8        A.   Okay.

9        Q.   Jack, tell me something.  When you were at the

10   pigpen, could you see the packing house, or was that

11   view obscured?

12       A.   I can't remember.

13       Q.   Okay.  Were there trees in between -- and go

14   ahead and look at State's Exhibit 3 if you want.  Does

15   that show that there are trees in between the packing

16   house and the pigpen?

17       A.   Yeah.  Right here you can kind of see -- you

18   could kind of see the packing house, but I don't -- but

19   I could, like, see glimpses of it, like, because the

20   trees wouldn't cover everything.  But you couldn't

21   really, like, see it, like, if -- as good as if you

22   were -- like, from right here you can see it really

23   good, but if you were over by the pigpen, you can see it

24   sort of.

25       Q.   All right.  Jack, I just have --

```
 1              THE COURT:  Hold on just a second.
 2              Go ahead and get back in this chair,
 3    please.
 4              MR. KOHLER:  Thank you, Your Honor.
 5              Thank you, Jack.
 6              THE WITNESS:  Okay.
 7    BY MR. KOHLER:
 8         Q.   Jack, I don't have very many more questions for
 9    you, just a few today.
10         A.   Okay.
11         Q.   Jack, did Fernando, the last day that Fernando
12    fed the pigs with you, the day that Ada told you that
13    Fernando touched her, did Fernando tell you to go get
14    the snacks that day?
15         A.   Yes.  He told me to go get the treats.
16         Q.   Treats, I'm sorry.  I used the wrong word.
17              And were those treats what we were calling
18    "scraps" earlier?
19         A.   Yeah.  Scraps, treats.
20         Q.   And that day Fernando told you he brought those
21    from home?
22         A.   Yeah, I think.  Or I don't know if he -- I
23    think he brought them or he just knew -- I'm sorry if I
24    confused you, but now I'm trying to remember.  He may --
25    he may have brought them, but he may have just, like,
```

1  known that somebody else did.

2      Q.   Thank you for clarifying that.  I appreciate

3  that.

4           And did -- when he talked to you, did he

5  use the word "treats" or "snacks" or something else?

6      A.   Don't remember.

7      Q.   Okay.  Now, I just have one last question for

8  you here, Jack.  When Ada told you that Fernando had

9  touched her and you told her to go tell mom, how did you

10  feel?

11     A.   Like, I was like -- don't really remember, but

12  I think I was surprised, or like, whoa.

13           MR. KOHLER:  I have no further questions,

14  Your Honor.

15           THE COURT:  All right, thank you.

16           Mr. Green?

17

18           C R O S S - E X A M I N A T I O N

19  BY MR. GREEN:

20     Q.   Hi, Jack.  How are you doing?

21     A.   I'm good.

22     Q.   Good.  Are you nervous?

23     A.   No.

24     Q.   Good.  You don't need to be nervous.

25           Jack, how often did you -- it was your

1  chore to feed the pigs, correct?

2      A.   Correct.

3      Q.   And how often did you feed the pigs?

4      A.   During the summers, sometimes in the evenings

5  after school.  But sometimes I was in school so I didn't

6  have to feed them.

7      Q.   So who fed them when you didn't feed them?

8      A.   Sometimes Jaime, Fernando, or my mom.

9      Q.   Okay.  And when you went -- when you fed the

10  pigs, did your mom ever go with you?

11      A.   Yes, she sometimes did.

12      Q.   And did your mom and Ada go with you

13  sometimes?

14      A.   Yes, I think there was a couple times it was

15  like that.

16      Q.   Okay.  And you said that when you got to the

17  trough, to the thing where you --

18      A.   The feeder thing?

19      Q.   The feeder?  Is that what it is?

20      A.   Yeah.  I call it usually a trough, but it could

21  also be known as a feeder.

22      Q.   Okay.  So when you got to the -- I'll use your

23  word, okay? -- to the trough, you -- in that picture it

24  showed that there was, like, a big, heavy roof or

25  something on the top of that, right?

1       A.    Yes.

2       Q.    And was that -- does it lift up and fold open?

3       A.    Yes, it can.  But if -- sometimes it was shut.

4   But I needed help to get it open because it was heavy.

5       Q.    Okay.  So when you were -- this was a couple

6   years ago, so you were pretty young and a little bit

7   smaller than you are now, right?

8       A.    Correct.

9       Q.    And so you weren't able to get that lid lifted

10  up?

11      A.    Probably not.

12      Q.    And is there any way to get food in there if

13  the lid isn't lifted up?

14      A.    Well, you can throw it in.  And like, sometimes

15  if the pigs are sleeping it can go in real quietly, and

16  like, you can throw the food into the trough, like

17  sometimes scraps.

18            But usually we would just throw them in or

19  sometimes put them in the trough.  We could, like, throw

20  them into the trough, and then we would probably -- I

21  think we did that a couple times, and then we would just

22  throw them somewhere else so that all the pigs would get

23  a chance.

24      Q.    Okay.  Now, you said that when -- you had to go

25  in real quiet when the pigs were sleeping.  Is that

1    because it's dangerous to go into the -- in there with

2    the pigs?  Or --

3        A.   No.  I meant, like, if they're sleeping, you

4    can sneak in and then throw the food in without them

5    waking up for a while.  But then they will wake up once

6    they smell the food enough.

7        Q.   Okay.  And so you said that two different

8    people -- well, sometimes your mom was there.  So was

9    she able to lift the lid?

10       A.   Yes.

11       Q.   And sometimes you said Jaime would help you?

12       A.   Correct.

13       Q.   And then sometimes you said Fernando would help

14   you?

15       A.   Yes.  And then a couple times, I don't know how

16   many times, one of my mom's apprentices did.

17       Q.   Okay.

18       A.   Most of the time -- most of the time it was

19   Jaime, Fernando, or my mom.

20       Q.   And who were the apprentices?

21       A.   One was named Antonio.  The other, I can't

22   remember his name.

23            And they both helped out a couple times,

24   but not very many.

25       Q.   Okay.  Now, you described how you would put --

1    if the lid was open.

2         A.    Uh-huh.

3         Q.    Was the lid left open sometimes?

4         A.    Yes.   Usually we'd just leave it open so that

5    we didn't have to go through the trouble of opening it

6    again, because sometimes it would get stuck if you open

7    it -- if you close it, I think.

8         Q.    And the lid was -- what was the lid for, do you

9    know?

10        A.    Yeah, to keep out critters.   Like, there was a

11   bunch of raccoons -- which I don't think there ever

12   were; I never saw any raccoons myself -- but like, so

13   that they couldn't, like, just jump through the trees

14   and, like, get into the pig food and eat their food.

15        Q.    Okay.   So why would you leave the lid open if

16   you were worried about critters?   Not you, but why would

17   the lid be left open?

18        A.    Well, because usually there wasn't any

19   critters.   I think that was how it was built, but --

20   like, back then where it was built.

21              But we didn't really have any critters,

22   unless birds.   But the birds, I never saw any do that.

23        Q.    Okay.   So if the lid was open, you just

24   described a fairly creative way that you would put the

25   food into the feeder, into the trough, right?

1    A.   Correct.

2    Q.   What was that?  How did you do that?

3    A.   Can you say it again?  Say it again.

4    Q.   How did you -- what was the way that you used

5    when you were alone to put the food into the feeder?

6    A.   Well, if I was big enough, because I was

7    sometimes -- well, I was -- I don't know when, but I

8    would -- if I was alone and I was big enough to do it, I

9    would, like, just leave it on a tree branch and then

10   climb up, lift it as high as I can, and try to get it

11   onto the tree branches or something like that, or caught

12   up on something so I can lift it up easily after I climb

13   up onto the top.

14   Q.   And you say when you were big enough.  Were you

15   big enough when Fernando was still on the ranch?

16   A.   I don't think so.

17   Q.   So that would have been after Fernando was

18   gone; is that right?

19   A.   Yes, pretty sure.

20   Q.   So this time that you fed the pigs with

21   Fernando, you said you got the food from the shed,

22   right?  And the food is in 50-pound bags.  Are you able

23   to pick up a 50-pound bag?

24   A.   Not back then.  But when I was big enough, I

25   could hold it for a couple seconds, but I had to put it

1  down real fast.

2      Q.   Let's talk about back then, because that's sort

3  of what we're talking about today.   Back then you say

4  you weren't big enough to pick up a 50-pound bag; is

5  that correct?

6      A.   Correct.

7      Q.   So how did you get the food from the 50-pound

8  bag into the buckets?

9      A.   Well, I would open the bag, because I could do

10 that, and then I would use a scooper.   Or it would be in

11 a barrel, so I could just get on something high, scoop

12 it out of the barrel.

13     Q.   And was this a full barrel or a --

14     A.   Sometimes it was full.   Sometimes it was, like,

15 halfway, because after trying -- it would get lower and

16 lower because you would take out food.

17     Q.   I know that my question confused you a little

18 bit because I asked it wrong.   The -- what I'm talking

19 about is this barrel, whether it's empty or full, is it

20 a full-sized barrel, or is it, like, a barrel that's

21 been cut in half, or --

22     A.   It was full-sized, about, if I remember

23 correctly, this high.   (Indicating.)

24     Q.   From the floor down here?

25     A.   Wait, I'll show you.

1           I think this high, about.  But I was

2   smaller then, so I may have -- it probably looked

3   bigger.  (Indicating.)

4       Q.   Okay.  What color was the barrel?

5       A.   The inside was usually green or -- and then the

6   outside was -- I don't really remember, but dark

7   colored.  It wasn't, like, painted red or yellow or ...

8       Q.   Okay.  And did you ever put the food from the

9   bag into the barrel?

10      A.   I think sometimes I would, like -- I would have

11  to scoop it into the barrel.

12      Q.   Okay.  And when you say "scoop it," what did

13  you use to scoop with?

14      A.   It was this -- sometimes it was a coffee cup

15  with this coffee -- not a coffee cup, but one of those

16  things you sometimes get coffee in.

17      Q.   Okay.  All right.  But a scoop of some kind?

18      A.   Yeah.

19      Q.   All right.  And then is that how you would get

20  the food into the buckets as well?

21      A.   Yes.

22      Q.   And again, just for clarification, when you're

23  talking about a bucket, is it, you know, a little

24  bucket?  How big was the bucket that you were putting

25  the food into?

1      A.   It was one of the pickle buckets.  Like, the

2   bucket was about this high, I think, but I'm not for

3   sure.  (Indicating.)

4      Q.   Okay.  And there were two of those buckets,

5   right, that you would use sometimes; is that right?

6      A.   Yeah.  Mainly I'd just use two with them.

7   Sometimes we had to use more, and then sometimes we use

8   cat litter buckets that we had emptied out.

9      Q.   And how many buckets would fit in your wagon?

10      A.   Two, but you could -- like, if one of them was

11   halfway full, you could put the halfway full one in

12   first and then you would put, like, a full one in or

13   another halfway full one on top of it.

14            But if it was all the way full and you

15   tried putting another bucket on, it wouldn't really

16   work.

17      Q.   Now, on this day you said you took the buckets,

18   you filled the buckets, and -- one or two buckets.  You

19   don't remember, right?

20      A.   No.

21      Q.   And then you took those and put them in your

22   wagon and you took the wagon to where the pigs were?

23      A.   Correct.

24      Q.   Okay.  Can you describe, when you get to the --

25   outside the gate there, one of the pictures showed a

1    great big pipe sitting there, right?

2         A.    Yes.

3         Q.    That goes across, and you described how you got

4    over that pipe.

5         A.    Yes.

6         Q.    Okay.  And you were able to do that fairly

7    easily, or was that really hard?

8         A.    It was kind of hard.  I -- well, kind of tough,

9    but I don't remember for sure.

10        Q.    I want to go back for just a minute.  You said

11   that Fernando helped you more than one time; is that

12   right?

13        A.    Yes.

14        Q.    Okay.  And do you remember Fernando helping you

15   and Ada more than one time?

16        A.    No, I don't remember.

17        Q.    You don't remember or it didn't happen --

18        A.    I don't remember.

19        Q.    -- or something else?  You don't remember?  Is

20   that what you said?  I'm sorry.

21        A.    Yes.

22        Q.    And so you might have helped more than one

23   time?

24        A.    Correct.

25        Q.    Okay.  And do you know -- do you remember how

1    you connected up with Fernando on that day?

2        A.   No.

3        Q.   You don't know where -- was he already at the

4    pigpen, do you remember?

5        A.   No, but -- I remember that we were with

6    Fernando at a certain time, but I don't ...

7        Q.   Okay.  Do you remember if you were with

8    Fernando when you came through the gate?

9        A.   No.

10       Q.   No, I don't remember; is that right?

11       A.   Yes.

12       Q.   Okay.  And do you remember if you were with

13   Fernando, you and Ada were with Fernando, as you were

14   walking towards the pigpen?

15       A.   No, I don't remember if it was just me or Ada

16   or if Fernando had joined us or -- I don't remember.

17       Q.   Okay.  Kind of a big event as you're taking

18   this wagon through -- getting over that pipe.  Was

19   Fernando there that day to help you get over that

20   pipe?

21       A.   I don't think so, but I don't remember.

22       Q.   Okay.  So we don't know exactly where

23   Fernando or when Fernando connected up with you; is that

24   right?

25       A.   Yes.

1    Q.   You and your sister get along pretty well?

2    A.   No.

3    Q.   Would it surprise you to say that that's the

4    same answer your sister gave?

5    A.   No, wouldn't surprise me.

6    Q.   All right.  Do you fight a lot?

7    A.   Yeah.

8    Q.   Okay.  What kind of things do you and your

9    sister do when you're running around the ranch?

10   A.   Back then sometimes we would play tag.  Usually

11   she was playing -- she would play with the owner's

12   daughter.

13   Q.   The owner.  That was Paul, right?  Is that

14   correct?

15   A.   Yes, if she was there.  But sometimes she

16   wasn't.  Or she would, like, stay inside with Arlo or

17   something like that.

18   Q.   Okay.  So on the day that this happened, do you

19   remember what you guys were doing when you weren't

20   feeding the pigs that day?

21   A.   No.  Besides coming up to the house and Ada

22   telling me what happened and going to get mom, I don't

23   remember.

24   Q.   Okay.  So when did Ada tell you that this --

25   something had happened to her?

1      A.   I don't remember the time, but I remember we

2    were at the house.  You can't really see on any of the

3    pictures, but there was, like, a rocky -- like, it was

4    kind of like a step that you would step onto, and it was

5    kind of long and it had rocks on it.  And she told me

6    about right when we were getting there.

7      Q.   Okay.  And so where was your mom at that time?

8      A.   In the packing house.

9      Q.   Okay.

10     A.   Pretty sure.  But she may have been, like,

11   outside or -- pretty sure, though, she was in the

12   packing house.

13     Q.   Okay.  And you said you told Ada that she

14   should tell mom, right?

15     A.   Correct.

16     Q.   And did Ada go straight over to the packing

17   house then, or did you guys go inside and play for a

18   while?

19     A.   She went to find mom, and I just went into the

20   house, I think.  But I don't remember anything after

21   that.

22     Q.   Okay.  Did you ever go to the packing house

23   with Ada?

24     A.   Yes.

25     Q.   Let me clarify.  Did you ever go to the packing

1   house after Ada told you on that same day?

2       A.   With Ada, like, going after that had happened?

3       Q.   Yeah.

4       A.   Like, later that day?

5       Q.   Yes.

6       A.   I don't think so.

7            Wait, let me think.  No.

8       Q.   Okay.

9            MR. GREEN:  Bear with me for just a minute,

10  Jack.

11           THE COURT:  Certainly.  That means just

12  wait a little bit.

13           THE WITNESS:  Okay.

14  BY MR. GREEN:

15      Q.   Jack, do you remember, when you got to the pigs

16  that day, was the roof open or closed?

17      A.   Don't remember.

18      Q.   When you went to the pigs to -- did the pigs

19  need water along with their food?

20      A.   I don't think so.

21      Q.   You didn't give the pigs water if they didn't

22  have water?

23      A.   I don't -- I think they had enough water, so --

24  but I don't remember for sure.  But I don't think we had

25  to give them water.

1    Q.   And in general did you have to give the pigs

2  water sometimes?

3    A.   Yes, sometimes we did.

4    Q.   How did you do that?

5    A.   We would get a hose.  I pointed at it in one of

6  the pictures.

7    Q.   Okay.

8    A.   And we would turn it on, put it in there.

9         But sometimes we would have to get a bucket

10 and scoop it into the -- from the cow trough.

11   Q.   So to get water from the cow trough you would

12 carry a bucket over there?

13   A.   Yeah.  I would usually use the wagon, because

14 usually when they -- like, if they had some water, I

15 would usually just -- if they had enough water to get

16 through the day, then I would just leave it -- enough

17 water for a couple days, I mean -- just leave it.

18        But if they only had, like, enough -- if

19 they had no water, then we would give them water, or if

20 they were just -- the hose was working and we had to

21 disconnect it the next day, so we would fill it up to

22 the top.

23   Q.   Where did the hose connect to?  Did it run all

24 the way back to the packing house or --

25   A.   I don't remember.

1    Q.   When -- do you remember your mom and Ada going

2    to the doctor?

3    A.   No.  I -- no.

4    Q.   Okay.  Well, let's think about that day for

5    just a second.  Do you remember after Ada went to talk

6    to mom, do you remember anything else that happened

7    later that day?

8    A.   No.

9    Q.   Okay.  And where were you for the rest of the

10   day?

11   A.   Don't remember.

12        MR. GREEN:  Okay.  All right.  No more

13   questions, Your Honor.  Thank you.

14        THE COURT:  All right, thank you.

15        MR. GREEN:  Thank you, Jack.

16        THE COURT:  Mr. Kohler, any redirect?

17        MR. KOHLER:  Just briefly, Your Honor.

18

19        R E D I R E C T   E X A M I N A T I O N

20   BY MR. KOHLER:

21   Q.   Hey, Jack.  Now, you talked to Mr. Green and to

22   me a little bit about not remembering when it was that

23   Fernando joined you at the pigpen.  Is that an

24   accurate -- is that right?

25   A.   Yes.

1    Q.   Okay.  So you don't remember when you met up
2  with Fernando that last day, right?
3    A.   No.
4    Q.   Is there any question in your mind that
5  Fernando was at the pigpen with you and Ada?
6    A.   I'm just -- I don't know when -- and actually,
7  can you re-say that?
8    Q.   Sure.
9    A.   Say it somewhere different?
10    Q.   I'll just say it simply.  Was Fernando at the
11  pigpen with you and Ada at some point?
12    A.   Yes.
13    Q.   Now, were there any other Fernandos that worked
14  on the ranch?
15    A.   What do you mean, Fernandos?
16    Q.   How many people named Fernando worked on that
17  ranch?
18    A.   One.
19    Q.   And do you see that person named Fernando in
20  the courtroom here today?
21    A.   I think so.
22    Q.   Can you go ahead and tell us where that person
23  is and what that person is wearing?
24    A.   Right there, I think.  But two years, you can
25  look a lot different, so I'm not for sure at all.

```
1        Q.   Okay.  Do you think that that's the person who
2   told you to -- told you to go get those scraps from the
3   kitchen?
4        A.   If I could hear his voice I could tell.
5                  THE COURT:  Go on, Mr. Kohler.
6                  MR. KOHLER:  Your Honor, could I have a
7   second?
8                  I have no further questions, Your Honor.
9                  THE COURT:  All right.  Could I see the
10  attorneys real quickly.
11                 (Bench conference outside the presence of
12  the jury and the court reporter.)
13                 THE COURT:  Jack, I'm going to ask you a
14  couple of questions in just a second.
15                 THE WITNESS:  Okay.
16                 THE COURT:  And then after I ask you these
17  questions, I'm going to see if the attorneys have any
18  more questions.
19                 THE WITNESS:  Okay.
20
21               J U R Y   Q U E S T I O N S
22                 THE COURT:  When you were out at the pigpen
23  and you went to get the scraps from the cooler, did you
24  go to the cooler or to the slaughter house, do you
25  remember?
```

1    THE WITNESS:  The slaughter house is pretty
2  much -- it's the same building.

3    THE COURT:  Same building?

4    THE WITNESS:  Yeah.

5    THE COURT:  Okay.  Do you remember how long
6  it took you, how long you were gone from the pigpens
7  when you went to get those scraps?

8    THE WITNESS:  Not for sure, but if I would
9  estimate I would say about ten minutes, probably, at the
10  most.

11    THE COURT:  Did you stop anywhere or do
12  anything?

13    THE WITNESS:  Well, I stopped at the
14  packing house to get the treats, but after that the only
15  other things that I had to stop for was to open the
16  gates and --

17    THE COURT:  You close those and open those
18  each time you go through?

19    THE WITNESS:  Yes.

20    THE COURT:  Or open and close them.

21    So you didn't stop anywhere?  You went, you
22  got the scraps, you went back out?

23    THE WITNESS:  Yes.

24    THE COURT:  Okay.  When you were done at
25  the pigpen and you and Ada went back to the house when

1    Ada talked to you, she told you what she said happened,

2    do you remember if it was still daylight?  Was the sun

3    still shining?

4                    THE WITNESS:  No.

5                    THE COURT:  Was it already dark?

6                    THE WITNESS:  I don't remember.

7                    THE COURT:  Oh, you just don't remember

8    what time?

9                    THE WITNESS:  Yes, I don't remember what

10   time.

11                   THE COURT:  Okay.  You don't remember if it

12   was sunshiny or dark?

13                   THE WITNESS:  Sun might have been setting,

14   but I don't remember.

15                   THE COURT:  Are you just not sure?

16                   THE WITNESS:  (No verbal response.)

17                   THE COURT:  Is that right?

18                   THE WITNESS:  Yes.

19                   THE COURT:  Let me see if the attorneys

20   have any questions.

21                   Mr. Kohler?

22                   MR. KOHLER:  Your Honor, I don't have any

23   follow-up from the State.

24                   THE COURT:  All right, sir.

25                   Mr. Green?

1           MR. GREEN:  No, Your Honor.

2           THE COURT:  Jack, what I'm going to do is

3    tell you you're done as a witness today, but the

4    attorneys may want you to come back, so please don't

5    talk to anybody, which includes Ada or your mother or

6    anybody else, about what you talked about today.

7    Okay?

8           THE WITNESS:  Okay.

9           THE COURT:  Thank you.  Go ahead.

10          Mr. Long?

11          MR. LONG:  It's Mr. Kohler's witness.

12          THE COURT:  Oh, I'm sorry.  Okay.

13          MR. KOHLER:  Your Honor, at this time the

14   State calls Detective Snyder with the Court's

15   permission.

16          THE COURT:  All right, sir.  Let me ask

17   you, we're not real close to the normal break time, but

18   will Detective Snyder's testimony take a substantial

19   amount of time, like 20, 30, 40 minutes?

20          MR. KOHLER:  I anticipate it taking 30 --

21   at least 30 minutes.

22          THE COURT:  At least, 30.  Okay.  Why don't

23   we go ahead and just take a break now and we'll come

24   back, and that way we don't have to break in the middle

25   of the testimony.

1          Ladies and gentlemen, it is now 10:10.

2    We're going to try to start again at 10:30, so that's a

3    20-minute break.   Please remember the admonition.

4    Please do not discuss the case or the witnesses with

5    each other.

6          Go ahead and follow Todd out.   We'll see

7    you in about 20 minutes.

8          We're on recess.

9          (Recessed from 10:13 a.m. until

10   10:39 a.m.   The proceedings resumed with the presence of

11   the jury and Sabine Michael, court interpreter.)

12          THE COURT:   Let's have the record show the

13   presence of the attorneys, the Defendant, Mr. Almanza,

14   and the jury is now back in the courtroom.

15          State ready to proceed, Mr. Kohler?

16          MR. KOHLER:   Indeed, Your Honor.

17          THE COURT:   And is the Defendant ready to

18   proceed, Mr. Green?

19          MR. GREEN:   Yes, Your Honor.

20          THE COURT:   All right.   And you started to

21   call Detective Snyder?

22          MR. KOHLER:   Detective Snyder, yes, sir.

23          THE COURT:   Sir, if you would, please.

24          (The witness, Detective Randall Snyder,

25   was duly sworn by the clerk of the court, according to

1    law.)

2              THE COURT:  All right, sir.  Come on over

3    and have a seat.

4              All right, sir.  Go ahead.

5              MR. KOHLER:  Thank you, Your Honor.

6

7              **DETECTIVE RANDALL SNYDER**,

8    called as a witness herein, having been first duly

9    sworn, was examined and testified as follows:

10

11             D I R E C T   E X A M I N A T I O N

12   BY MR. KOHLER:

13       Q.   Detective Snyder, can you please spell your

14   last name and give us your badge number.

15       A.   S-n-y-d-e-r, badge number 1193.

16       Q.   And how are you employed, sir?

17       A.   Pinal County Sheriff's Office.

18       Q.   And in what capacity are you employed with the

19   Pinal County Sheriff's Office?

20       A.   Persons Crimes detective.

21       Q.   Now, let's talk a little bit about your

22   training and experience.  In order to become a police

23   officer, is there any special training and experience

24   that you need to have?

25       A.   Yes.

1    Q.   Can you tell us all about that.

2    A.   I attended the Central Arizona Regional Law

3    Officer Training Academy.  I received approximately 500

4    hours of training over the course of the academy period

5    on various tactics and legal concepts, things like that.

6    Q.   And then following that, was there any field

7    training that you needed to complete?

8    A.   Yes.

9    Q.   And tell us about that.

10   A.   I spent approximately three months with senior

11   officers and supervisors riding along.  That way they

12   could evaluate my performance and determine whether or

13   not I could be passed from the field training to be

14   allowed on my own.

15   Q.   Now, you mentioned that you're a Persons Crime

16   detective.  Is that different from a patrol officer?

17   A.   Yes, it is.

18   Q.   What kind of training do you have to, if any,

19   undergo to become a detective?

20   A.   Typically the new detectives are sent to a new

21   detective or new investigator school to get some

22   advanced training on the different types of

23   investigations that are conducted.  I actually attended

24   two different new detective schools, one that I put

25   myself through and another one sponsored by my agency.

1    Q.   Now, what about any training that you have

2  after completing detective school?   Have you had any?

3    A.   Yes.

4    Q.   Could you please tell us about some of that

5  training.

6    A.   Over the course of my time as an investigator

7  and overall as a deputy, I've attended a little over 400

8  hours of various schools focused on child crime, sex

9  crimes, violent crimes, things like that, above and

10 beyond the mandatory trainings that were required to

11 attend each year to maintain our certification.

12   Q.   Other than your trainings that you've just

13 mentioned, do you have any special education as it

14 relates to law enforcement?

15   A.   Yes.

16   Q.   Could you tell us about that.

17   A.   I have a bachelor's degree from Arizona State

18 University in justice studies.   I'm also a little over

19 halfway done with my master's degree in criminal justice

20 from Arizona State.

21   Q.   Now, did you graduate with honors?

22   A.   Yes, I did.

23   Q.   What were those honors?

24   A.   Summa cum laude.

25   Q.   Now, tell me about your -- any teaching

1    experience that you have, first, specifically, to

2    training of officers.

3        A.    I have a general instructor certification

4    through Arizona Peace Officer Standards and Training.

5    Utilizing that, I instructed at Central Arizona Regional

6    Law Officer Training Academy for approximately five

7    years on a variety of different topics.

8              I have also trained within my agency both

9    for our posse academy and for other individuals within,

10   and then I've also trained a couple of times two outside

11   agencies.

12       Q.    Now, do you have any teaching experience that

13   doesn't involve law enforcement?

14       A.    Yes.

15       Q.    Can you tell us about that.

16       A.    I'm a teaching instructor at Arizona State.

17   This is my, I believe, third semester that I have

18   assisted in instructing undergraduate courses at Arizona

19   State University.

20             In addition, I have been asked by

21   professors at Arizona State to act as a guest lecturer

22   for the Juvenile Justice Program.

23       Q.    Were all the courses you taught in the Juvenile

24   Justice Program?

25       A.    No, sir.  I've taught a variety of different

1    courses.

2        Q.   Now, in all this training and experience and

3    teaching that you've done, have you had any training

4    specifically on conducting of interviews?

5        A.   Yes, I have.

6        Q.   Tell us what training that was.

7        A.   I've attended trainings, not only on interview

8    and interrogation, but I have also attended the

9    eight-hour basic forensic interview training, the

10   40-hour advanced forensic interview training, several

11   other specific trainings regarding forensic interviewing

12   of extremely young children, mentally disabled, things

13   like that, and I have been to a couple of courses on

14   detecting deception through statement analysis.

15       Q.   Now, you mentioned forensic interview training

16   and interviewing of children.  Have you had any training

17   specifically on the interviewing of suspects?

18       A.   Yes.

19       Q.   And are those different than the forensic

20   interviewing trainings you've received?

21       A.   Yes.

22       Q.   Now, in all that training and experience you've

23   mentioned, have you had any trainings on the collection

24   of physical evidence?

25       A.   Yes.

1        Q.   Can you tell us about that, those trainings.

2        A.    In addition to the basic courses that we

3   receive in the academy and the additional instruction

4   that we receive as policies and procedures change, I

5   have attended courses on DNA evidence, collection, and

6   analysis.

7        Q.   And do those courses include training on how to

8   properly and forensically do a scraping for DNA?

9        A.   Yes.

10       Q.   Do they include any information on how to

11   properly preserve collected evidence?

12       A.   Yes.

13       Q.   Now, are you familiar with the case involving a

14   person by the name of Fernando Almanza?

15       A.   Yes.

16       Q.   Now, do you see that person here in the

17   courtroom today?

18       A.   Yes, I do.

19       Q.   Can you please tell us where that person is and

20   what that person is wearing?

21       A.    Mr. Almanza is sitting over at the defense

22   table, it looks like a gray button-down shirt.  He has

23   the microphone in his ear that -- speaker in his ear.

24            MR. KOHLER:  Your Honor, could the record

25   reflect the witness has identified the Defendant?

1          THE COURT:  It may.

2    BY MR. KOHLER:

3      Q.   Now, are you familiar with the location called

4    the Double Check Ranch?

5      A.   Yes, I am.

6      Q.   Could you tell us where that is?

7      A.   Double Check Ranch is off of Camino Rio in the

8    Dudleyville area up off of Highway 77, between Mammoth

9    and the Hayden-Winkelman area.

10     Q.   Within the boundaries of Pinal County?

11     A.   Yes, it is.

12     Q.   Is that within the jurisdiction of this Court?

13     A.   Yes, it is.

14     Q.   Now, I'd like you to walk us through your

15   involvement in the case against Mr. -- or in the

16   investigation of Fernando Almanza.  Could you tell us

17   what you did and when.

18     A.   The initial contact that I received was on the

19   22nd of October.  I was the on-call detective for the --

20     Q.   I'm sorry.  What year?

21     A.   I'm sorry, 2011.

22          I was the on-call detective at the time;

23   however, because I was out of state on a conference with

24   some coworkers, I had another detective that was

25   covering until I made it back into town.

1          I received a phone call advising me of the

2     report that had been called in by Ms. Quinn.  I advised

3     the deputy at that time to contact my coworker that was

4     covering as I wasn't in town yet, and then to keep me

5     apprised of the investigation as it progressed.

6          Q.   What did you -- what was your next involvement

7     in the case?

8          A.   I received a contact from my sergeant,

9     Sergeant Jason Agresta, who advised me of the steps that

10    had been taken up to that point.  He also advised me

11    that there was going to be an attempt-to-locate put out

12    for Mr. Almanza so that we could conduct additional

13    investigation and interview.

14         Q.   And was Mr. Almanza located?

15         A.   Yes, he was.

16         Q.   And was he -- where was he taken upon being

17    located?

18         A.   Mr. Almanza was located actually the next

19    morning on the 23rd, and he was taken by patrol deputies

20    to the San Manuel substation.

21         Q.   Now, describe the San Manuel substation for us.

22         A.   The San Manuel substation is a joint government

23    building.  It also houses the Motor Vehicle Division,

24    and I believe there's an office for Adult Probations in

25    there.

1          We have the administrative office for our

2     regional lieutenant as well as a couple of offices

3     specifically for our deputies to have access to

4     computers, write reports, things like that, and then

5     there's a couple of holdings cells for them while they

6     complete paperwork before they can drive individuals

7     down to be booked into the jail.

8          Q.   Now, did you report to the -- or did you go to

9     the San Manuel substation on the 23rd?

10         A.   Yes, I did.

11         Q.   And what was your purpose?  What were you going

12    there for?

13         A.    Initially I wanted to make contact with

14    Mr. Almanza; I wanted to write and receive a search

15    warrant so that I could check to see if there was any

16    biological evidence available and then see if he was

17    willing to have an interview.

18         Q.   Now, you mentioned the word "search warrant"

19    and the writing of a search warrant.  Is that something

20    that you were trained to do in that previous training

21    and experience we mentioned?

22         A.   Yes.

23         Q.   And did you in fact do that in this case?

24         A.   Yes.

25         Q.   And when you got to the San Manuel substation,

1    did you -- did you in fact take samples from

2    Mr. Almanza?

3        A.   Yes.

4        Q.   Could you tell us about that.

5        A.   Basically after we received the search warrant,

6    we conducted a scraping of Mr. Almanza's fingernails.

7    Along with that we clipped his nails in case there was

8    any biological evidence either under or on his nails.

9            We also took two buccal swabs -- that's a

10   swabbing of the inside of the cheeks -- so that we could

11   get a comparative DNA sample.

12       Q.   Now, can you describe for us what the

13   Defendant's hands looked like?

14       A.   The nails were fairly ragged; there was some, I

15   guess, dirt or debris underneath his nails.  They

16   appeared to be fairly clean for somebody that worked out

17   on a farm or worked with their hands.  But other than

18   that, they appeared to be pretty consistent with

19   somebody who does manual labor.

20       Q.   Now, when you took scrapings, did you take

21   scrapings for each fingernail?

22       A.   There were scrapings taken from each nail on

23   both hands.

24       Q.   And you say there were scrapings taken.  Were

25   you supervising another officer who was doing this?

1    A.    I was.

2    Q.    And who was that officer?

3    A.    Detective Juan Sanchez.

4    Q.    And how did it happen that Detective Sanchez

5    arrived at the scene?

6    A.    Detective Sanchez was new to our unit.  I was

7    assisting in his field training as a new investigator.

8    When I received contact that we needed to contact

9    Mr. Almanza to conduct the investigation, I called

10   Detective Sanchez and asked him to respond to the

11   substation so that he could use part of this as a

12   learning exercise.

13   Q.    And did you observe Detective Sanchez taking

14   these scrapings?

15   A.    Yes, I did.

16   Q.    And was his method of taking the scrapings

17   consistent with your training and experience?

18   A.    Yes, it was.

19   Q.    Was there anything that happened while he was

20   taking these scrapings that alarmed you in any way?

21   A.    No.

22   Q.    Was there anything that happened while he was

23   taking those scrapings which would cause you to doubt

24   that those scrapings were taken properly?

25   A.    No.

1      Q.   Now, you also mentioned that clippings were

2   taken of those fingernails.

3      A.   Yes.

4      Q.   Could you tell us the difference between

5   scrapings and clippings?

6      A.   In scrapings we take an instrument and actually

7   clean out underneath the nail, kind of like anybody

8   would if you have dirt or debris underneath your nail.

9   That was done over a piece of paper that was part of the

10  scrapings and clippings kit so that we knew that it

11  didn't have any prior items or any contaminants on it.

12  Each nail was scraped independently so that we could see

13  the collection.

14             And then after that, each nail was clipped.

15  And all of that was collected right there on the same

16  piece of paper so that we had all of the items together

17  and there wasn't any cross-contamination.

18      Q.   Now, you may have mentioned this already and I

19  may have missed it.  Was there debris under each nail?

20      A.   Yes, there was.

21      Q.   Now, at some point did you conduct an interview

22  with Mr. Almanza?

23      A.   Yes, I did.

24      Q.   Prior to asking him any questions, is there a

25  procedure that you're trained to follow?

1     A.   Yes, there is.

2     Q.   What is that procedure?

3     A.   We provide each individual with their Miranda

4  advisements.

5     Q.   And roughly what is that Miranda advisement?

6     A.   Any time that I provide Miranda to somebody, I

7  actually read it off of a card that I carry in my wallet

8  to make sure that I am consistent each time.

9          But essentially it's advising them of their

10  right to remain silent, that anything they say can and

11  will be used against them in a court of law, that they

12  have the right to an attorney, and if they can't afford

13  an attorney, one can be appointed to them by the courts.

14          I then ask them whether they understand

15  those rights, and if they acknowledge that they

16  understand, I ask them would they like to answer any

17  questions at that time.

18     Q.   Now, do you remember what time it was when

19  you -- roughly what time it was when you began this

20  interview?

21     A.   If I remember correctly, we started the entire

22  process at, I want to say it was about ten minutes to

23  1:00 in the afternoon.  Something like that.

24          We did the execution of the search warrant

25  and the scrapings and clippings before Miranda and

1    before any questions, so it was probably, by that point,

2    maybe about 1:00 or 1:15 or something like that.

3        Q.   Detective Snyder, you mentioned what process

4    you follow in providing someone with their Miranda

5    rights.  Did you provide Mr. Almanza with his Miranda

6    rights in this case?

7        A.   Yes.

8        Q.   Now, was there another officer who assisted you

9    in providing him his Miranda rights?

10       A.   Yes.

11       Q.   Can you tell us about that.

12       A.   Mr. Almanza, upon initial contact, made it

13   clear to us that he understood Spanish better than he

14   understood English.  At that point I contacted our

15   patrol sergeant on duty, who is Sergeant Louie Vargas,

16   knowing that he is a Spanish speaker, and asked that he

17   assist us in any sort of translation necessary.

18       Q.   Now, did it take a while for Sergeant Vargas to

19   arrive?

20       A.   I think it was about 15 minutes or so.  He

21   wasn't too far away.  I think he indicated later that he

22   was up in the Mammoth area when we called, so it wasn't

23   too far a drive.

24       Q.   Now, when he arrived, did you provide

25   Mr. Almanza with his Miranda rights in English?

1    A.   Yes, I did.

2    Q.   And subsequent to providing him with those

3 rights in English, did Sergeant Vargas provide him with

4 his rights in Spanish?

5    A.   Yes, he did.

6    Q.   And did the Defendant indicate to

7 Sergeant Vargas and to you that he understood?

8    A.   Yes.

9    Q.   Now, did he also indicate that he wanted to

10 answer your questions?

11    A.   Yes, he did.

12    Q.   At the time was he restrained?  Was Mr. Almanza

13 handcuffed or restrained?

14    A.   No.

15    Q.   Was he in a jail cell of any kind?

16    A.   No.

17    Q.   Describe the room where this all transpired.

18    A.   The setup at the San Manuel substation, we have

19 our administrative office in one corner; the Department

20 of Motor Vehicles takes up the middle section of the

21 building.  We then have a couple of other offices on the

22 far side.

23         Kind of -- I guess it would be the

24 southeast corner of the building is kind of a wide-open

25 general area.  Has access to doors from several

1  different directions.  Then in the middle of it there's

2  a fairly large table that can be used for meetings,

3  conferences, different activities.  We were in that

4  large kind of common area at that table.

5      Q.   Now, you mentioned just now that while you were

6  waiting for Sergeant Vargas to arrive, there was a small

7  time lapse there?

8      A.   Yes.

9      Q.   During that time were you conversing with the

10 Defendant at all?

11     A.   I think we had a couple of exchanges regarding

12 questions that he had about why he was there, things

13 like that.

14     Q.   And was he asked any of those questions in

15 English?

16     A.   Yes, he was.

17     Q.   And were your responses in English?

18     A.   Yes.

19     Q.   Did he appear to you at that time to be able to

20 converse passably in English?

21     A.   Passably.

22     Q.   What do you mean by passably?

23     A.   He has a fairly strong accent and so there were

24 times where I didn't quite understand him.  There were

25 some words in English that he needed additional

1    clarification for.  I tried to speak slowly so that what

2    I was saying was clear, that I wasn't using language

3    that would be hard to translate.

4        Q.   Now, after you provided him with his Miranda

5    warnings in English and Spanish, did you then begin to

6    question him?

7        A.   Yes, I did.

8        Q.   And did you question him in English or in

9    Spanish?

10       A.   In English.

11       Q.   And was he able to understand your questions?

12       A.   I believe so.

13       Q.   And what makes you think that?

14       A.   The responses that he provided to the questions

15   that I asked were appropriate for the context.

16       Q.   Now, did you start out asking him general

17   questions?

18       A.   Yes.

19       Q.   Did you at some point ask him if he had any

20   hand in feeding the pigs on the Double Check Ranch?

21       A.   Yes, I did.

22            MR. GREEN:  Objection, Your Honor, for the

23   reasons previously explained.

24            THE COURT:  Okay.  And the ruling

25   previously issued remains, so the objection is

1    overruled.

2              Go ahead.

3    BY MR. KOHLER:

4        Q.   And what was his response when you asked him if

5    he fed the pigs?

6        A.   He stated that he did not feed the pigs.

7        Q.   Now, did you ask him who he knows on the Double

8    Check Ranch?

9        A.   Yes.

10       Q.   And what was his response initially?

11       A.   Nobody but Pablo.

12       Q.   Did that story change?

13       A.   Yes.

14       Q.   What did he say later?

15       A.   A couple of sentences later he mentioned that

16   he had spoken to Katie on the day in question.

17       Q.   And by day in question, you mean the previous

18   day?

19       A.   Yes.

20       Q.   Now, at some point you and he began discussing

21   Ada; is that accurate?

22       A.   Yes.

23       Q.   And did he -- did he tell you that he had seen

24   Ada the previous day?

25       A.   Yes.

1    Q.   What did he tell you about that, or where did
2    he say he'd seen her?
3    A.   Over by the pigs.
4    Q.   Did he describe what his interaction, his
5    initial -- I'm sorry.  Did he initially describe an
6    interaction with Ada?
7    A.   Yes.
8    Q.   What was that interaction?
9    A.   He said he went over by the pigs to check on
10   them, to check on her, and that he picked her up.
11   Q.   Now, as you continued to talk about Ada, did
12   you ask Mr. Almanza if he had ever touched Ada?
13   A.   Yes, I did.
14   Q.   And what was his response to that question?
15   A.   No, he had never touched her.
16   Q.   Now, did you -- in asking about touching Ada,
17   did you ask the Defendant if he had ever given Ada a
18   hug?
19   A.   Yes, I did.
20   Q.   And do you remember what his initial response
21   was?
22   A.   He had never given her a hug.
23   Q.   Did that change?
24   A.   Yes.
25   Q.   What did he state later?

1    A.    That he had hugged her approximately two weeks

2    prior.

3    Q.    Did he say how many times?

4    A.    One time.

5    Q.    Did you ask him if he had ever given Ada a

6    kiss?

7    A.    Yes.

8    Q.    And what was his initial response?

9    A.    No, he had never kissed her.

10   Q.    And a short time later did that answer change?

11   A.    Yes.

12   Q.    What did he say then?

13   A.    He stated that on the prior day he had kissed

14   her on the cheek.

15   Q.    And did he describe their position when he

16   kissed her?

17   A.    Yes.

18   Q.    What did he say?

19   A.    He stated that they were standing over by the

20   pigpen, that they were in the process of watering the

21   pigs, he was standing behind her, and that he leaned

22   down and kissed her on the cheek.

23   Q.    Now, you initially -- when you initially asked

24   him if he had ever touched her and he responded no --

25   I'm sorry.  You initially asked him if he had ever

1  touched her and he responded no; is that correct?

2      A.   Correct.

3      Q.   And then you mentioned skin cells; is that

4  accurate?

5      A.   Yes.

6      Q.   What was your purpose in mentioning skin cells

7  at that point in the interview?

8      A.   At that point I was trying to still determine

9  whether or not there had ever been any contact or

10  interaction.  Based upon the scrapings that we had done,

11  I felt that there was some possibility of finding some

12  skin cells either on his hands or on Ada.

13      Q.   And after the mention of skin cells, that was

14  when he mentioned that he had kissed her; is that

15  accurate?

16      A.   It was about that same time that he had not

17  only mentioned kissing her but also touching her.

18      Q.   Now, at some point in that interview or shortly

19  after mentioning skin cells and talking about hugging

20  and kissing in that interview, did you ask him any

21  questions about his relationship with Ada's mother?

22      A.   Yes.

23      Q.   And what was his response when you asked him

24  about that?

25      A.   He indicated that they had a, I guess, friendly

1  relationship, that they were -- had talked several

2  times.

3      Q.   Did he mention any comments that he had made to

4  Ada -- I'm sorry -- to Ada's mother?

5      A.   He mentioned that at one point he had told her

6  that she was beautiful.

7      Q.   Now, in the interview after hearing that, did

8  you then talk about DNA?

9      A.   Yes.

10      Q.   And what was your purpose in mentioning DNA at

11  this point?

12      A.   At that point I wanted to see how he would

13  react in the possibility that there could be some DNA

14  either of hers on him or his on Ada.

15      Q.   And is that something that you were trained to

16  do in your interrogation techniques?

17      A.   Yes.

18      Q.   And just to be clear, at that point you knew

19  nothing about whether there was any DNA evidence

20  available; is that correct?

21      A.   That's correct.

22      Q.   Now, after you mentioned DNA, did the

23  Defendant's statement about having touched Ada -- having

24  never touched Ada change?

25      A.   Yes.

1    Q.   What did he say about having touched Ada after

2    you brought up DNA?

3    A.   Initially he stated that he might have touched

4    her arm or shoulder when handing her the water hose,

5    said that there may have been some DNA on her dress from

6    when they hugged.

7    Q.   Now, he had previously told you that he hugged

8    Ada once two weeks prior?

9    A.   Correct.

10   Q.   I'm sorry.  Let me trace it all the way

11   through.  He first told you that he had never hugged

12   Ada?

13   A.   Correct.

14   Q.   And then immediately following that he said

15   that he had hugged Ada once two weeks prior; is that

16   accurate?

17   A.   Correct.

18   Q.   And then after you mentioned DNA he said there

19   may have been something on her dress from when she

20   hugged him?

21   A.   That's correct.

22   Q.   Did he make clear to you when she hugged him?

23   A.   The day prior.

24   Q.   Now, you had asked him if he had -- I'm sorry.

25   Did you ask him if he had picked Ada up?

1      A.   Yes.

2      Q.   And what was his response?

3      A.   Initially his response was that he had never

4  picked her up.

5      Q.   Now, after you mentioned DNA, did that change?

6      A.   Yes.

7      Q.   What was the answer then?

8      A.   That he had picked her up and carried her some

9  distance across the ranch.

10     Q.   Did he describe to you the manner which he

11  carried her?

12     A.   Yes.

13     Q.   Could you describe what he said for us.

14     A.   He indicated that he put his hands underneath

15  her, that one hand was underneath her legs, kind of in

16  the area of the backs of her knees, and the other hand

17  was underneath her butt.

18     Q.   Now, you asked him at some point if it was

19  possible that his hands slipped; is that accurate?

20     A.   That's correct.

21     Q.   And what was his response?

22     A.   No, it wasn't possible.

23     Q.   And you also asked him -- or did you ask him if

24  he had put his hand on her butt?

25     A.   Yes.

1      Q.    And what was his response?

2      A.    No.

3      Q.    Did that response change throughout the course

4  of your interview?

5      A.    Yes.

6      Q.    Describe what happened.

7      A.    Initially I had asked if he had ever touched

8  her butt, patted her on the butt in friendly fashion or

9  teasing fashion, anything like that.  He indicated he

10  had not.

11          When we got to the point where he was

12  talking about picking her up and carrying her, that's

13  when he admitted that one hand had been on her butt when

14  he was carrying her.

15      Q.    Now, at some point -- or after talking about

16  DNA and after talking about him carrying her, after

17  talking -- after talking about his hand placement on her

18  butt, did you ask him if his finger might have gone

19  somewhere it shouldn't?

20      A.    Yes.

21      Q.    And what was his response to that?

22      A.    Essentially he said maybe, but he didn't think

23  so.

24      Q.    Did he initially deny that his finger went

25  where -- did he initially deny that his finger went

1    where it shouldn't?

2         A.   Yes.

3         Q.   Immediately following that denial, that first

4    denial, did he say anything that catches your memory?

5         A.   Yes.

6         Q.   Could you tell us what it was that he

7    volunteered at that point?

8         A.   There were a couple of things that he said

9    throughout the course of the interview that seemed a

10   little striking, but at that particular point I seem to

11   think one of the statements that he made was about his

12   hand and the hand placement and that he didn't think

13   that any -- he didn't think there was any possibility

14   that his finger had slipped, but it might have.

15        Q.   At some point did he mention anything about

16   looking at his hands?

17        A.   Yes, he did.

18        Q.   And tell us about that.

19        A.   After asking him about whether his hands had

20   slipped, he said, "But there was no blood."

21        Q.   Let me just make sure I understand.  You asked

22   him if his hand slips, and does he deny at that point?

23        A.   Yes.

24        Q.   And then what happens?

25        A.   And then he indicates that he had looked at his

1   hands and there was no blood.

2       Q.   Did you ask him about blood on his hands,

3   though?

4       A.   No, I didn't.

5       Q.   Had you been talking about his -- or blood on

6   his hands at any point?

7       A.   No.

8       Q.   After talking about that, did he mention

9   anything about where Ada had been sitting?

10      A.   Yes.

11      Q.   Where did he say Ada was sitting?

12      A.   Initially he indicated that Ada had sat down

13  next to him, then he, through the progression of the

14  questions, indicated that she had come and sat down on

15  his lap.

16      Q.   Towards the end of the interview, the Defendant

17  was asked if his hand could have slipped by accident,

18  right?

19      A.   Correct.

20      Q.   And what was his response?

21      A.   He didn't think so, but maybe.

22      Q.   And then following that "but maybe," he then

23  goes on to say that -- does he then go on to deny it,

24  that it happened?

25      A.   Yes.

1      Q.   As you closed your interview, did you have the

2   Defendant draw or diagram anything?

3      A.   Yes.

4      Q.   Why don't you tell us about that.

5      A.   One technique that I've learned is that in

6   certain circumstances, you can have an individual use a

7   body drawing or something like that to help explain a

8   situation.  I had Mr. Almanza put his hands down on a

9   piece of paper, sketched around them to show an outline

10   of his hands, and then asked him if one of his hands

11   were to accidentally slip and penetrate into Ada's

12   vagina, which finger might it have been.

13      Q.   And what was his response to that question?

14      A.   It was the middle finger.

15      Q.   So just let me be clear here.  You asked him,

16   "If one of your hands slipped and one of your fingers

17   went inside Ada's vagina, which one would it be"?  Is

18   that an accurate --

19      A.   That's correct.

20      Q.   And his response was, "It would have been the

21   middle one"?

22      A.   Yes.

23      Q.   Now, prior to your interview with Mr. Almanza,

24   did you have any indication, had there been any talk

25   about the pigs or the pig shed that you're aware of?

1    A.   Are you asking if I had had any conversations
2  with him about the pigs?

3    Q.   No.   Thank you for clarifying.   What I'm asking
4  is, had your investigation given you any indication or
5  any -- had it pointed you in the direction of the pigpen
6  at all?

7    A.   Prior to my contact with Mr. Almanza, the only
8  information that I had received was from patrol and some
9  of the information that they had received from the
10  doctors that had conducted the examination.   Off the top
11  of my head I don't recall the pigpen being specifically
12  mentioned anywhere, although it may have been.

13    Q.   Do you recall if there was any mention of Ada
14  being by the pigpen prior to your interview with
15  Almanza?

16    A.   I believe there might have been, but I don't
17  recall specific.

18    Q.   Is Almanza the first person to talk about
19  seeing Ada by the pigs?

20    A.   I believe so.

21         MR. KOHLER:   Excuse me, Your Honor, if I
22  could have a moment.

23         THE COURT:   Go ahead, sir.

24  BY MR. KOHLER:

25    Q.   I'm going to show you an exhibit now.   Show you

1    what's been marked as State's Exhibit No. 116.

2              Can you tell us what you are looking at

3    there?

4        A.   It's labeled as Transcript of Recorded

5    Interview of Fernando Almanza.

6        Q.   And is that -- have you seen that transcript

7    before?

8        A.   Yes, I have.

9        Q.   Is that a transcript of the interview that you

10   conducted with Fernando Almanza on October 23rd of 2011?

11       A.   Yes, it is.

12       Q.   Is that the transcript of the interview that we

13   have been talking about here in court today?

14       A.   Yes, it is.

15       Q.   Okay.  Now, you mentioned some comments that

16   were made in that, and we're going to go through them

17   and we're going to flesh them out a little bit.

18              Could you turn to page 23 of that

19   transcript.  Page number should be at the top right

20   corner.

21       A.   Okay.

22       Q.   Okay.  And on lines -- I'm sorry.  I said right

23   corner.  I meant left corner.

24              Lines 15 to 16.  Do you see those

25   statements there?

1      A.   This particular transcript doesn't have the

2   line numbers indicated on it.

3      Q.   Could you -- can you count down to line 15?

4      A.   Sure.  Okay.

5      Q.   Now, we're talking there about -- or in that

6   part of the interview, are you talking about Ada?

7      A.   Yes.

8      Q.   And are those lines statements the Defendant

9   made about seeing Ada that day?

10      A.   Yes.

11      Q.   What are those statements?

12      A.   Specifically line 15 is my question about

13   whether he had seen Ada -- "yesterday" is the term

14   used -- the day prior to the interview, and Mr. Almanza

15   replies, "Yeah, I see her in the pigs."

16      Q.   And does the statement continue?

17      A.   Yes.

18      Q.   What does it go on to say?

19      A.   I asked Mr. Almanza to tell me about it, and

20   his statements were, "I went to the pigs and I go check

21   over there and I go pick her up.  That's it.  And I'm

22   going -- I'm going to the -- to the -- I went to my bike

23   and tried to -- tried to," and then there's a word that

24   was indiscernible for the transcript purpose, "and I'm

25   going to my house, and that's it."

1        Q.   Go ahead and go to page 29, if you would.

2             On page 29, lines 4 and 5, you asked her --

3   do you ask Mr. Almanza if he moved her at all?

4        A.   Yes, I did.

5        Q.   And go ahead and read his response.

6        A.   I asked Mr. Almanza, I said, "Okay.  You didn't

7   do anything but talk to her?"

8             He said, "No."

9             I said, "You didn't try to move her out of

10  the way or move her away from the pigs or anything like

11  that?"

12            He said, "No.  I put the water for the

13  pigs."

14       Q.   Okay.  On page 29, if you would count down to

15  lines 15 and 16, do you further clarify at that point

16  what you meant by touch her?

17       A.   I ask, "But you never put your hands on her?"

18       Q.   And what is his response?

19       A.   "No."

20       Q.   Let's move on to page 31.  Line 1 of that page

21  should talk -- is that where you're talking to him about

22  hugs?

23       A.   Yes.

24       Q.   Could you go ahead and tell us what you said

25  and what his response was regarding that?

1      A.   I asked Mr. Almanza, "Have you ever given her a
2   hug?"
3                He said, "No."
4                I questioned, "No?"
5                And he said, "I give one hug that's going
6   two weeks," some indiscernible word, "two weeks I give
7   her a hug."
8      Q.   Did you then ask him about giving her a kiss?
9      A.   Yes.
10     Q.   Could you read for the jury that interaction.
11     A.   I said, "Have you ever given her a kiss?"
12               He said, "No."
13               I said, "Not a kiss on the cheek or
14   anything?  Cute little girl like that, you never -- you
15   never gave her a little kiss on the cheek?"
16               And he said, "No.  I didn't touch her."
17               MR. GREEN:  Objection, Your Honor.  That
18   does not completely state the communication.
19               THE COURT:  Would you like him to read it
20   verbatim?  Is that the objection?
21               MR. GREEN:  I would like him to read it --
22   the parts that he's reading I would like to be read
23   verbatim.
24               THE COURT:  Okay.  For the record, that
25   objection is sustained.

1          Please direct the witness to read it

2   direct, verbatim, that portion.

3          MR. KOHLER:   Thank you, Your Honor.

4   BY MR. KOHLER:

5      Q.   Detective Snyder, if you would, please, as we

6   go through reading these, if you could just read them

7   verbatim from the transcript, I'd appreciate it.

8      A.   Okay.

9      Q.   Thank you, sir.  Go ahead and do it again, this

10  time verbatim.

11     A.   I said, "Not a kiss on the check or anything?

12  Cute little girl like that, you never -- you never gave

13  her a little kiss on the cheek?  I mean, are you

14  kidding?"

15          He said, "No, I didn't touch her.  I didn't

16  touch the girl."

17          And then he goes on from there.  Do you

18  want me to keep --

19     Q.   Yes, please.

20     A.   "One time when I go in the ranch and they were

21  there," something indiscernible, "Katie, the mother,

22  Katie and baby was," indiscernible, "and that's it."

23     Q.   And what do you ask next?

24     A.   "Okay, but you didn't give her a little kiss on

25  the cheek yesterday?"

1        Q.   And's what his answer?

2        A.   "Yeah, just one right here.  That's it."

3        Q.   And when he said "right here," do you recall

4   what he did?

5        A.   Pointed to his cheek.

6        Q.   Now, look at line 11 of that page.

7             Did you ask the Defendant how they were

8   positioned --

9        A.   Yes, I did.

10       Q.   -- when he gave her that kiss?

11       A.   Yes.

12       Q.   Go ahead and read verbatim the question and the

13  response.

14       A.   "And what were you doing?  Were you standing

15  up, sitting down, or something else?"

16             And Mr. Almanza replies, "Stand up."

17       Q.   Now, on page 31 -- I'm sorry -- page 37,

18  looking at lines 9 and 10, in that portion are you

19  talking about the Defendant's relationship with Ada's

20  mother?

21       A.   Yes.

22       Q.   Could you go ahead and read us your question

23  and her response?

24       A.   Said, "Okay.  What's your relationship like

25  with -- with Katie?"

1    Q.   And I'm sorry, I said "her" response.  What I
2  meant was go ahead and read his response.
3    A.   His first response was, "Huh?"
4         I then asked, "How is your relationship
5  with Katie?"
6         He said, "Good."
7    Q.   Now, what did you understand him to mean by
8  that "huh"?
9    A.   That he was getting -- or asking for
10  clarification as to what my question was.
11    Q.   And did you then clarify the question?
12    A.   I asked him again what the relationship was
13  like.
14    Q.   And his response was, "Good," yes?
15    A.   Yes.
16    Q.   Now, does he -- later on, on that same page,
17  did you ask him if he had had any arguments with --
18  actually, the following line, "Did you have any
19  arguments about anything?"  Is that what you asked?
20    A.   Yes.
21    Q.   And what was his response?
22    A.   "No."
23    Q.   What was your next question?
24    A.   "Did you ever try and hit on her?"
25    Q.   And what was his response?

1          A.    He asked, "Who?"

2                     And I clarified, "Katie."

3                     His response was, "No."

4          Q.    Okay.  Let's move on to page 46, line 21.  What

5     are you and Mr. Almanza speaking about then?

6          A.    I'm sorry, which line?

7          Q.    Go ahead and count down to 21.

8          A.    I only have 19 lines on page 46.  Am I on the

9     wrong page?

10         Q.    It's quite possible that I miscounted.  On

11    page -- on your page 46, does it begin with a discussion

12    of DNA?

13         A.    Yes.

14         Q.    Somewhere on that page do you talk about -- you

15    talk about -- does he change his story about where he

16    touched her at some point?

17         A.    Yes.

18         Q.    Could you go ahead and read that interaction to

19    us.

20         A.    Started out with a discussion of where DNA is

21    located, how it's passed.  Specifically I state that

22    "When you put your fingers on her, when you -- when you

23    put your hands on her, it would pass DNA, okay, the skin

24    cells."

25                     Mr. Almanza says, "On the clothes,"

1  something indiscernible, "on the clothes," question.

2      Q.   Now, before you go on, you made a statement to

3  him.  You're describing DNA, "When you put your hands on

4  her, it would pass DNA on the skin cells."  Is that the

5  correct statement that you made?

6      A.   That's correct.

7      Q.   Now, based on your training and experience, how

8  accurate was that statement?

9      A.   DNA can be located in the skin cells; however,

10 skin cells are not the best locator for DNA because they

11 don't always adhere to everything.  They're easily

12 washed off, brushed off, things like that.

13     Q.   Okay.  Now, let's read a little bit further.

14 What happened next?

15     A.   My next statement or question was, "Well, and

16 other places.  So you can't explain to us how we found

17 your DNA inside your body -- inside her body," excuse

18 me.

19         Mr. Almanza replies, "You say -- you -- you

20 try to tell me I did touch it.  Yeah, wait, I touch a --

21 I touch the dress right here, and that's all.  That's

22 it."

23         MR. GREEN:  Objection, Your Honor.  I'd

24 like him to re-read that.  That is not accurate as to

25 what it says.

1          THE COURT:  All right.  Go ahead and

2    re-read it.

3          THE WITNESS:  Says, "You say -- you -- you

4    try to tell me did I touch it.  Yeah, wait, I touch a --

5    I touch the dress right there, and that's all.  That's

6    it."

7          THE COURT:  Go ahead, Mr. Kohler.

8          MR. KOHLER:  Thank you, Your Honor.

9    BY MR. KOHLER:

10         Q.   Now, Detective, you said -- you confronted him

11   with the fact that you said something about finding DNA

12   in Ada's body.  Is that an accurate representation of

13   what you said?

14         A.   That's correct.

15         Q.   And had you found any DNA in Ada's body at that

16   point?

17         A.   No.

18         Q.   So were you lying to him?

19         A.   Yes.

20         Q.   And is that something that you -- that you're

21   trained to do in your interrogation schools?

22         A.   Yes.

23         Q.   And what's the purpose of that method of

24   interrogation?

25         A.   At different times you can confront individuals

1    with information that may not be entirely accurate to

2    gauge their reaction to it.  In a lot of circumstances

3    it's able to elicit a reaction from an individual about

4    information that they might otherwise want to try and

5    conceal.

6         Q.   And in this case did that ruse elicit a

7    reaction?

8         A.   Yes, it did.

9         Q.   And what was that reaction?

10        A.   He essentially indicated that yes, he had

11   touched her dress, which is more than he had indicated

12   he had touched prior to that.

13        Q.   Okay.  Go ahead and go to page 47.  And this

14   is -- that was 46 where you talked about DNA, so

15   immediately following that on page 47, on line 11, what

16   are you guys talking about there?

17        A.   It started out Mr. Almanza said, "No, I tell --

18   I told you all the time I went over there and Ada gave

19   me a hug, and that's it."

20        Q.   Now, later on on that page -- I'm sorry.  So

21   line 11 he's talking about her giving him a hug and

22   that's it, right?

23        A.   If I'm counting down correctly, yes.

24        Q.   Following that on page 48, go ahead and go to

25   line 4.  This is, again, after you've spoken about the

1    DNA, right?

2        A.   Yes.

3        Q.   What does he say then?

4        A.   Just above line 4, or at least on my

5    transcript, Mr. Almanza says, "I don't know.  Like I

6    said, like I tell you, I placed a hand sometimes."

7        Q.   What is your response?

8        A.   "You -- you touched her hand?"

9             MR. GREEN:  Your Honor, I'm going to object

10   at this point in time.  I've acquiesced up to this

11   point, but I believe that if the State is going to use

12   this information as to this interview, the best evidence

13   rule would require that it be the tape and the recording

14   itself.  By reading the transcript Your Honor, the

15   inflections --

16             MR. KOHLER:  Your Honor, may we approach?

17             THE COURT:  Hold on.

18             MR. GREEN:  -- inflections, the voices, are

19   not represented in this flat transcript.

20             THE COURT:  Let's get up, over here.

21   Jackie, in the corner, please.

22             (Sidebar conference outside the presence of

23   the jury.)

24             THE COURT:  You made your objection.

25             Make your response.

1       MR. KOHLER:  My response is, Your Honor,

2    that the -- right now we're talking about statements

3    made by the Defendant.  The defense is perfectly capable

4    of asking the witness about inflection, about anything

5    like that that he wants to ask, and then he can also

6    give a little -- put his client on the stand, talk about

7    his inflection at the time.

8       There are things in that interview which

9    are properly not admissible and during the entire

10   interview would not serve the purpose of -- it would

11   confuse the jury and not clarify any of the issues in

12   the trial.

13      THE COURT:  Okay.

14      MR. GREEN:  Your Honor, I'm not asking that

15   the whole interview be played.  I'm asking that the

16   parts that he's referring to be identified and played

17   rather than the transcript being used, because the

18   transcript is not an accurate reflection of what the

19   conversation was like.

20      THE COURT:  Okay.  Is that it?

21      MR. GREEN:  That's it.

22      THE COURT:  Okay.  Well, you've already in

23   fact acquiesced in the reading of portions of the

24   transcript.  You have available as far as -- if your

25   only desire is to get comments about inflection from

1    those particular passages and not to play the entire

2    tape recording, then you are going to have to do it on

3    cross-examination.

4              So your objection is overruled, but you

5    certainly on cross have a right to talk to him about the

6    issues of inflection and meaning if you wish.

7              MR. GREEN:  Well, and again, my objection,

8    Your Honor, is based on the best evidence.

9              THE COURT:  Okay.

10             MR. GREEN:  Which this is not.

11             THE COURT:  I'm going to overrule you

12   because you've already acquiesced by not objecting to

13   the earlier use of it at this point.  Okay?

14             MR. GREEN:  Uh-huh.

15             (The proceedings resumed with the presence

16   of the jury.)

17             THE COURT:  For the ruling in open court,

18   the objection is overruled.

19             Okay, Mr. Kohler.  Proceed.

20             MR. KOHLER:  Thank you, Your Honor.

21   BY MR. KOHLER:

22        Q.   You're on page 50, right?

23        A.   48.

24        Q.   Why don't we go ahead and -- go ahead and move

25   on to page 50.

1    A.    Okay.

2    Q.    About five lines up from the bottom -- I'm

3  sorry, six lines up from the bottom there, seven lines,

4  there's a statement made by him that begins, "I hold her

5  like this."  Have you found that?

6    A.    Yes.

7    Q.    Go ahead and move up two statements there to

8  your question beginning, "And when you picked her up."

9    A.    Okay.

10   Q.    Have you seen that there?

11   A.    Yes.

12   Q.    Could you read that, that segment for us?

13   A.    "And when you picked her up, where were your

14  hands?"

15          Mr. Almanza replies, "Huh?"

16          And I ask, "How -- how were you holding

17  her?"

18   Q.    And what is his response?

19   A.    "I hold her like this, like that.  I pick her

20  up like that and I hold her leg right here, right here

21  like this."

22   Q.    Now, do you recall during this interview if he

23  was making any gestures that coincide with these

24  statements?

25   A.    Yes.

1    Q.   And describe for us how he was holding his

2    hands.   What was he -- what was he describing?

3    A.   He had his hands kind of like this, kind of a

4    basket carry, or I guess the best way I can articulate

5    my thought of it is as you would carry somebody, carry

6    the bride over the threshold or something like that, you

7    have them scooped up in your arms like this.

8    (Indicating.)

9    Q.   And then later on on that same page, you ask

10   him if he had his hands under her legs when he picked

11   her up; is that correct?

12   A.   That's correct.

13   Q.   And what is his response?

14   A.   The question was, "So when you picked her up,

15   you had your hands under her legs?"

16          His response was, "Right here," and then he

17   made a comment that was undiscernible on the transcript.

18   Q.   Okay.   Now, moving on to page 59 of this

19   interview --

20   A.   Okay.

21   Q.   -- towards the end of that page there's a

22   portion beginning, "Did you touch her butt when you

23   picked her up."   Is that a question you made?

24   A.   Yes.

25   Q.   Could you go ahead and read those, that segment

1   for us?

2       A.   I asked, "Did you touch her butt when you

3   picked her up?"

4           Mr. Almanza's response was, "Uh-huh" --

5   that's how it's phrased on the transcript -- there was

6   something undiscernible, he said, "and that's it."

7       Q.   Do you clarify in your next question?

8       A.   I state, "Okay.  Is it possible that when you

9   picked her up and your hand touched her butt?  You've

10  got big hands."

11      Q.   And what's Almanza's response?

12      A.   "Yeah."

13      Q.   Now, there's a comment that you make on the

14  beginning of page 60, the first portion there.  Could

15  you go ahead and read that for us?

16      A.   "Is it possible your finger might have gone the

17  wrong place?"

18      Q.   Go ahead and read the response and -- go ahead

19  and read the response.

20      A.   He said, "No."

21      Q.   What did you then ask?

22      A.   I said, "Not possible?"

23      Q.   And the response?

24      A.   He said, "My finger," and then the next

25  statement was indiscernible.

1      Q.   And then what do you say?

2      A.   I say, "Okay."

3      Q.   What does Mr. Almanza say next?

4      A.   "And I -- I pick her up, like I said, and I

5   leave her down."

6      Q.   And your response?

7      A.   "Okay."

8      Q.   What did he say after that?

9      A.   "But I not see blood or nothing."

10      Q.   Going to go ahead and show you a few photos

11   now, Detective, if that's all right with you.

12      A.   Okay.

13      Q.   Did you take any photographs the day of that

14   interview?

15      A.   Yes.

16      Q.   What did you take photographs of?

17      A.   I took photographs of Mr. Almanza and his

18   hands.

19      Q.   Eventually here I'm going to be showing you

20   what's been marked as State's Exhibit No. 76.

21           Do you recognize that photo?

22      A.   Yes, I do.

23      Q.   Can you tell us who that's a photo of?

24      A.   Mr. Almanza.

25      Q.   Is that the photo that you took of Mr. Almanza

1    on the day of this interview?

2        A.   Yes, it is.

3        Q.   Now, you mentioned that you also took other

4    photos that day.  Did you take photos of his hands?

5        A.   Yes, I did.

6        Q.   Showing what's been marked as State's

7    Exhibit No. 77.

8             What are we looking at there?

9        A.   That's Mr. Almanza's hands placed on the table.

10       Q.   Now, were these photos taken before or after

11   the clippings and scrapings were taken?

12       A.   Before.

13       Q.   And could you describe for us the hands that

14   you see in that picture?  And if you want a closer look,

15   you've got the screen behind you as well.

16       A.   Mr. Almanza's hands appear to be fairly clean

17   considering he works in fields, works around animals,

18   things like that.  However, he's -- notice, the nails

19   are pretty ragged, like they've been torn, not cut.

20   They certainly haven't been filed or anything like that.

21   And you can see that there's some injuries to his

22   fingers, things like that, some dirt underneath the

23   nails.

24       Q.   I'm showing you what's been marked as State's

25   Exhibit No. 78.  What are we looking at there?

1      A.   That's the palms of his hands.  Basically he

2   just rotated them to look at the undersides to see,

3   again, cleanliness, things like that.

4      Q.   Going to go ahead and show you what's been

5   admitted as Exhibit No. 79.

6           What are we looking at there?

7      A.   That's a close-up of Mr. Almanza's right hand.

8      Q.   In that picture are you able to see the nails

9   more clearly?

10      A.   A little bit, yes.

11      Q.   I'm going to show you Exhibit No. 80 at this

12   time.

13           What are we looking at there?

14      A.   Mr. Almanza's left hand.

15      Q.   And again, in that picture are we able to see

16   the nails?

17      A.   Yes.

18      Q.   What are we looking at in Exhibit No. 81?

19      A.   Mr. Almanza's right palm.

20      Q.   And showing you now what's Exhibit No. 82.

21           What are we looking at there?

22      A.   Mr. Almanza's left palm.

23      Q.   Now, at some point during your investigation

24   did you take pictures of anything else?

25      A.   Yes.

1  Q. At some point did you take pictures of

2 underwear that Ada was wearing on that day in question?

3  A. Yes.

4  Q. And how did you come by that underwear?

5  A. They were collected as part of the sexual

6 assault examination.

7  Q. And did you retrieve them from the evidence

8 locker where they were stored?

9  A. Yes, I did.

10  Q. And what did you do with them at that point?

11  A. At that point I checked to make sure that all

12 of the seals were intact to make sure that the underwear

13 hadn't been tampered with.  I then went ahead and opened

14 up the bag that they were in, utilizing gloves to make

15 sure that I didn't contaminate the underwear at all.

16   I pulled them out, took photographs, not

17 only of the outer packaging with the seals, but after

18 opening it, I took photographs of the underwear, front,

19 back, bottom, and then turned them inside out and took

20 pictures of the inside.

21  Q. I'm showing you what's been marked as State's

22 Exhibit No. 83.

23   What are we looking at there?

24  A. That's a picture of the underwear after they've

25 been removed from the evidence packaging.

1      Q.   And removed by you from the evidence packaging?

2      A.   Yes.

3      Q.   Showing you what's been marked as State's

4    Exhibit No. 84.

5           Is that the same pair of underwear?

6      A.   Yes.

7      Q.   Now, when you were taking photos of this

8    underwear, did you take photos of a lot of different

9    angles?

10     A.   Yes, I did.

11     Q.   What was your purpose there?

12     A.   To make sure that we could document whether or

13   not there was any damage to the underwear, any tears,

14   snags, rips, holes, any kind of -- anything that wasn't

15   on the underwear when they were brand new.

16     Q.   Now, looking at it from the angle displayed in

17   Exhibit 84, are there any holes, tears, rips, snares, or

18   anything on that underwear that you can see?

19     A.   No.

20     Q.   Showing you what's been marked as

21   Exhibit No. 86.

22           What are we looking at there?

23     A.   That's a close-up of the crotch area of the

24   underwear.

25     Q.   And from that angle do you see any holes,

1    tears, or marks of any kind?

2        A.   No.

3        Q.   Showing you what's been marked as Exhibit 86.

4            What portion of the underwear are we

5    looking at there?

6        A.   Again --

7        Q.   I'm sorry, 87.

8        A.   Again, it's a close-up of the crotch area, more

9    from I -- guess it would be the backside.  The top of

10   the picture would be the crotch area, and then that

11   would be kind of the seam where they roll under where

12   her butt would be.

13       Q.   And is there a discoloration in the center of

14   the underwear at this point?

15       A.   Yes.

16       Q.   I'm showing you what's been marked as -- oh,

17   I'm sorry.  And in that -- go back to it.

18            In the photograph there, can you -- do you

19   note any tears, rips, abrasions, anything, any marks of

20   any -- any irregularities of any kind?

21       A.   No.

22       Q.   Showing you what's been marked as Exhibit 88.

23            There's some drawing on that.  Do you know

24   what that drawing is?

25       A.   I believe those are the markings that were made

1   by Department of Public Safety after they had done their

2   analysis of the underwear.

3       Q.   And in that photo, what are we looking at?

4       A.   The underwear have been turned inside out, and

5   it's the front crotch area.

6       Q.   Are there any tears, rips, snags, or mends in

7   that underwear anywhere?

8       A.   No.

9       Q.   Showing you what's been marked as

10  Exhibit No. 91.

11           What are we looking at there?

12      A.   Close-up of the same area of the underwear.

13      Q.   And in that close-up are there any tears, rips,

14  shreds, snags, or mends that you are aware of?

15      A.   No.

16      Q.   Sorry.  I'm showing you what's been marked as

17  State's Exhibit No. 93.

18           Is that another angle of the interior of

19  the underwear?

20      A.   Yes.

21      Q.   And is that the front crotch, the back crotch,

22  or something else?

23      A.   Appears to be the front crotch.

24      Q.   And from that picture -- from that picture, do

25  you note any snares, tears, rips, snags, or mends?

1        A.    No.

2        Q.    Showing you what's been marked as State's -- as

3    Exhibit 97.

4              Can you tell us what that is?

5        A.    That would be the exterior of the underwear on

6    the backside.

7        Q.    And in that picture do you see any tears,

8    shreds, rips, mends, or snags?

9        A.    No.

10       Q.    What are we looking at there?  That's

11   Exhibit No. 99.

12       A.    It would be a close-up of the exterior of the

13   crotch area.

14       Q.    And from that angle in that picture, do you see

15   any tears, rips, mends, shreds, snags?

16       A.    No.

17       Q.    Now, other than pictures of Mr. Almanza's hands

18   and pictures of Ada's underwear, you took some other

19   photos, right?

20       A.    Yes.

21       Q.    Did you take a lot of the photos we have been

22   seeing with other witnesses in this trial?

23       A.    Yes.

24       Q.    And were those photos of the ranch?

25       A.    Yes.

1        Q.   Now, I'm going to show you what's been marked

2   as State's Exhibit No. 106.

3               THE COURT:  Okay, hold on just a minute.

4   Let's let them change.

5               (The proceedings resumed with the presence

6   of Danira Marinez, court interpreter.)

7   BY MR. KOHLER:

8        Q.   Can you tell us what we're looking at there in

9   that picture?

10       A.   While we were walking around the ranch,

11  Ms. Quinn was showing us the areas as I was

12  photographing.  At one point Ms. Quinn brushed against

13  or got too close to one of the barbs on a piece of

14  barbed-wired fence and scratched her arm.  Took a

15  photograph of what a barbed-wire injury looked like.

16       Q.   I'm going to show you another exhibit here I'd

17  like you to identify for us.

18               Detective, I'm showing you what's been

19  marked as State's Exhibit No. 126B.  Go ahead and glove

20  up.

21       A.   Okay.

22       Q.   Could you go ahead and open the exhibit that

23  I've given you and pull out what's contained inside.

24               Can you tell us what that is?

25       A.   These are the underwear that were collected

1    from Ada during the course of the sex assault exam.

2        Q.   Now, we've talked a lot about what you could

3    see from the photos.  Could you go ahead and examine

4    that here before us and look up when you've had a chance

5    to look it over.

6        A.   Okay.

7        Q.   Are there any rips in that underwear?

8        A.   No.

9        Q.   Any tears?

10       A.   No.

11       Q.   Any shreds?

12       A.   No.

13       Q.   Any snags?

14       A.   No.

15       Q.   Any mends?

16       A.   No.

17       Q.   Is that underwear consistent with the

18   photographs that we've already looked through in the

19   other exhibits?

20       A.   Yes.

21       Q.   Now, were you present -- you can go ahead and

22   put that back in and take the gloves off now.

23            Were you present during an interview of Ada

24   that was conducted at the Tucson Family Advocacy Center?

25       A.   Yes.

1    Q.   And did you witness that interview?

2    A.   Yes, I did.

3    Q.   How does that work?  Were you in the room with

4  her?

5    A.   No.  We're -- actually, there's a separate room

6  down the hallway from the actual interview rooms that

7  has a couple of monitors on it where we have sight and

8  sound access, but we're not actually in the room for the

9  interview.

10    Q.   Now, was that interview video recorded?

11    A.   Yes, it was.

12    Q.   And were you able to obtain a copy of the video

13  recording of that interview?

14    A.   Yes.

15    Q.   And what did you do with that copy?

16    A.   One copy -- they actually, I think, gave me two

17  disks that day.  One copy was placed into evidence, and

18  the other one has been maintained in my file for review.

19    Q.   I'm showing you what's been marked as

20  Exhibit No. 119.

21         Go ahead and look at this and tell us what

22  it is.

23    A.   Exterior packaging is our standard packaging

24  for items of evidence.  Shows the item number as well as

25  the evidence seals that show that it was sealed

1     completely.

2              Inside is a DVD with the markings on it

3     that indicate it was the name of the interviewee and the

4     report number and the date of interview.

5        Q.   Is that disk there the interview that -- a

6     recording of the interview that you impounded of Ada's?

7        A.   Yes.

8        Q.   That was a horrible question.  Let me try it

9     again.

10             Is that DVD a video recording of Ada's

11    interview?

12       A.   Yes.

13       Q.   Did you witness that interview?

14       A.   Yes.

15       Q.   And does that video recording fairly and

16    accurately represent the events that transpired in that

17    interview?

18       A.   Yes.

19             MR. KOHLER:  Your Honor, at this time the

20    State moves to admit the State's Exhibit -- or I'm

21    sorry -- Exhibit 119.

22             THE COURT:  All right.  Mr. Green?

23             MR. GREEN:  Your Honor, I object to its

24    admission.

25             THE COURT:  All right.  Subject to our

1    prior discussion and the Court's ruling, the objection

2    will be overruled.

3              119 will be marked as admitted and admitted

4    for the reasons previously stated.

5              MR. KOHLER:  Your Honor, may we approach?

6              THE COURT:  You might, if you wish.

7              MR. KOHLER:  Thank you, sir.

8              THE COURT:  Bring Mr. Green with you.

9              (Bench conference outside the presence of

10   the jury and the court reporter.)

11             THE COURT:  As a matter of timing, just

12   trying to keep things on schedule, we're going to go

13   ahead and take the lunch break now.  It is about quarter

14   of -- call it ten of 12:00.  I would like to have you

15   all back here in the courtroom by 1:15 at the latest, so

16   please be back in the jury assembly room by 1 o'clock,

17   and I will ask the attorneys to please be in the

18   courtroom at 1 o'clock.

19             With that, remember the admonition.  Follow

20   Todd out.  Enjoy your lunch, and I'll see you in a

21   little bit.

22             (Recessed from 11:49 a.m. until 1:06 p.m.

23   The proceedings resumed outside the presence of the

24   jury.)

25             THE COURT:  Let's have the record show the

1    attorneys are present, the Defendant is present.  The

2    jury is not here.  They're still on their lunch break.

3    And I had told the attorneys I would like to talk to

4    them at 1 o'clock.

5              Okay.  The thing I was waiting for, the

6    State is going to play, I suspect, what's been marked as

7    Exhibit 129, the audio recording.

8              Limiting instruction?  Do we get one?

9              MR. LONG:  I have a proposed one that I

10   showed Mr. Green.

11             And Judge, for scheduling purposes, we

12   would like to maybe withhold playing the tape today and

13   wait until tomorrow, simply because of the length of

14   testimony that Detective Snyder has been going through.

15   We're almost done and he can begin cross, but we have

16   John Boggs, who has traveled up from Superior and is

17   waiting, has been waiting all morning, and Dr. Klein,

18   who is from Tucson and is not able to come back.

19             So to ensure that we get those witnesses

20   on, what I'd like to do is continue with

21   Detective Snyder.  He's obviously laid the foundation,

22   the tape is admitted.  It's not something that requires

23   commentary or examination by Detective Snyder.  And then

24   we would like to play the tape if there's time at the

25   end of the day after those two witnesses or sometime

1    tomorrow.

2              THE COURT:  Okay.  Mr. Green, any problem

3    with that, other than your objection to playing it at

4    all?

5              MR. GREEN:  I'm not sure -- is

6    Detective Snyder coming back tomorrow, Your Honor?

7              THE COURT:  Well, if you think he's

8    necessary for the purpose of playing it.  As I

9    understand, the intent is to get his direct, cross, and

10   redirect done today so we can move on to the other

11   witnesses.

12             MR. GREEN:  Well, Your Honor, my preference

13   would be to wait until they're done with him and do my

14   cross at that point in time, so --

15             THE COURT:  I'm missing you entirely.

16             MR. GREEN:  Well, if this -- playing the CD

17   is evidently part of Detective Snyder's testimony, Your

18   Honor.

19             THE COURT:  Well, I think what Mr. Long is

20   proposing is it just simply be an independent playing

21   now that it's been admitted.  That -- I suppose you

22   could always recall Detective Snyder if you want to ask

23   him about the tape or the recording after it's played.

24   Okay?

25             MR. GREEN:  That's fine, Your Honor.

1              THE COURT:  Well, and I think that's

2    probably a better way to do it.

3              Mr. Long said he shared this limiting

4    instruction with you.  Did you have a chance to look at

5    it?

6              MR. GREEN:  I did, Your Honor.

7              THE COURT:  And again, your objection

8    stands, my ruling stands.  What do you say about the

9    limiting instruction?

10             MR. GREEN:  Your Honor, it's -- I have no

11   problem with it, Your Honor.  It's not very limiting,

12   but ...

13             THE COURT:  Well, subject to your objection

14   to playing it at all --

15             MR. GREEN:  Right.

16             THE COURT:  -- is that satisfactory

17   language for you?

18             MR. GREEN:  Yes, Your Honor.

19             THE COURT:  Okay.  I'll put that aside and

20   I'll read that before it's played, whether it's the end

21   of the day today or tomorrow morning.

22             So we're going to start and finish with

23   Detective Snyder right after -- as soon as the jury gets

24   back, and then move on to Mr. Boggs or Dr. Klein?

25             MR. LONG:  I believe we'll go Mr. Boggs and

1    then end with Dr. Klein.

2              THE COURT:   Okay.   So we don't run into any

3    snags with Mr. Boggs, any plea agreements, whatever you

4    have, all the criminal history has been shared with the

5    Defendant?

6              MR. LONG:   With defense counsel, yes.

7              THE COURT:   Yeah, defense counsel,

8    Defendant.

9              MR. LONG:   Yes, it's been disclosed.

10             THE COURT:   Okay.

11             MR. LONG:   The plea agreement he has a copy

12   of; we have a copy of it that's marked.

13             I guess I would like to address that, is --

14             THE COURT:   Sure.

15             MR. LONG:   -- the specific charge of -- is

16   unlawful imprisonment, which is a DV offense.   The State

17   would request that that portion be redacted and any --

18   any comments in the plea regarding a domestic violence

19   claim, that the State submits that would be unduly

20   prejudicial and not relevant to him as a witness.

21             THE COURT:   Depends on what he was charged

22   with.   What was he originally charged with?   Or is that

23   the original charge?

24             MR. LONG:   I know it was amended, Judge.

25   It's not the original charge.

1        But I submit that the classification would

2   be the relevant and critical component, not the charge,

3   so if it was a reduction by two or three or whatever

4   that was, that that would be the portion that would be

5   irrelevant.  But the fact that it's a

6   domestic-violence-related offense is unduly prejudicial

7   and not relevant to credibility or to impeachment.

8        THE COURT:  Well, the classification

9   reduction alone is not necessarily all that's necessary.

10  For example, if you had an armed robbery that you

11  reduced to an unlawful imprisonment, might be nice to

12  know that.  That's a significant change.

13       I don't know what it is.  If you're asking

14  simply to redact the allusion, the reference to domestic

15  violence, rather than just the name of whatever he pled

16  to -- and it may be logical.  For example, if he was

17  charged with kidnapping and he pled to unlawful

18  imprisonment, it's a very logical reduction.

19       It doesn't tell you normally on page 2 the

20  charge is dismissed, or it just says the count number?

21       MR. LONG:  It's just -- it does say there

22  were multiple counts, Counts 1, 3, 4, 5, and 6 were

23  dismissed, and then he pled to Count 2.

24       THE COURT:  Okay.  Is your real concern of

25  what you're stating is prejudicial is the fact that it's

1    domestic violence?

2            MR. LONG:  It is.  That's primarily the

3    portion that I would ask to be redacted.

4            THE COURT:  Okay, let's focus on that.

5            Mr. Green, any problem with that?

6            MR. GREEN:  Your Honor, I would argue that

7    domestic violence may very well be a crime of -- and I'm

8    going to get the language wrong, Your Honor, but --

9            THE COURT:  Shoot.

10           MR. GREEN:  -- that impinges on his

11   credibility and impinges on his honesty, Your Honor.

12           THE COURT:  Meaning it may have some

13   special reflection on credibility because it's domestic

14   violence as opposed to any other unlawful imprisonment?

15   Is that your --

16           MR. GREEN:  Yeah.

17           THE COURT:  -- logic?

18           MR. GREEN:  That's my argument, yes.

19           THE COURT:  Okay.  Can you, for the sake of

20   making your own record, can you tell me how that adds

21   or -- anything to the issue of credibility based on a

22   Class 6 felony conviction?

23           Todd, why don't you bring them up and put

24   them in the jury room as soon as they're all gathered.

25           THE BAILIFF:  They're in the jury room.

1          THE COURT:  Oh, they're here?  Okay, good.

2          MR. GREEN:  Your Honor, only in that it's

3    the type of crime that is -- it's a crime involving a

4    relationship, and as such, it lends itself to deceit,

5    deception, things like that during -- that could or

6    could not be part of the cause of that domestic

7    violence.

8          THE COURT:  I've seen hundreds of domestic

9    violence cases that didn't involve deception of any

10   kind.

11          And it's true, society, at least the way

12   it's been portrayed, domestic violence carries a special

13   cachet of egregiousness, disgust, I suppose, whatever

14   you want to call it.  So there's a -- domestic violence

15   alone, whether it's -- whatever level offense it is,

16   adds a special sense of badness to it.  And it's

17   probably appropriate to keep it out as long as you know

18   and the jury knows that he had -- however many felonies

19   he had charged, he ended up with one Class 6 felony.

20   And I have no idea what the other three were, but you

21   certainly have a right to explore that.

22          Did you get a copy of his indictment so you

23   know what was --

24          MR. GREEN:  Your Honor, I'm not finding his

25   indictment, Your Honor.  I may very well have, but I

1   certainly don't have it handy.

2           THE COURT:  Well, I've got theoretically

3   five -- well, three minutes.  Tell me the case number.

4           MR. LONG:  CR201200273.

5           THE COURT:  Okay.

6           MR. LONG:  I'm sorry, 237.

7           THE COURT:  237?

8           MR. LONG:  Yeah.  Did I transpose those?

9   Yeah, 237, Judge.  2012.

10          THE COURT:  Okay.  Mr. Green, don't bother.

11  I'm going to print out a copy of the indictment for both

12  of you, and we'll start in about five minutes.

13          Anything else, Mr. Long?

14          MR. LONG:  Just again, to clarify, so when

15  we talked about the domestic violence, I would also

16  further move that the charge itself is redacted, as well

17  as the charges in the indictment be redacted.  My

18  position is that historically, absent there being some

19  fraud or something that directly relates to honesty,

20  that the nature of the offense itself is generally

21  sanitized.

22          THE COURT:  You don't need to respond.

23          That request is denied.  Domestic violence

24  will be removed.  He can talk about what was pled down

25  to what without any reference to the egregiousness of it

1    being a domestic violence offense.

2                    MR. GREEN:  That's fine, Your Honor.

3                    MR. LONG:  Or the underlying facts, Judge,

4    correct?

5                    THE COURT:  Pardon?

6                    MR. LONG:  Or the underlying facts?

7                    THE COURT:  Or the underlying facts.

8    They're just simply not -- unless they -- the charges --

9    see, and this is speaking in the dark.

10                   Unless the charges are credibility related

11   charges, you're dismissing a burglary that might have,

12   you know, that kind of moral turpitude connection to it,

13   unless that's a relevant factor, yeah, any of the

14   underlying factors are not relevant to whether he's

15   telling the truth or not.  What is is that he got the

16   Class 6 deal for four felonies.

17                   Okay.  Anything else?

18                   MR. LONG:  No, sir.

19                   THE COURT:  How about you?

20                   MR. GREEN:  No, Your Honor.

21                   THE COURT:  Okay.  About five minutes.

22                   (Recessed from 1:16 p.m. until 1:21 p.m.

23   The proceedings resumed with the presence of the jury.)

24                   THE COURT:  Let's have the record show the

25   attorneys, the Defendant, Mr. Almanza, and the jury are

1 now back in the courtroom after the lunch recess.

2      Is the State ready to proceed, Mr. Kohler?

3      MR. KOHLER:  We are indeed, Your Honor.

4      THE COURT:  Thank you, sir.

5      And Mr. Green, are you ready to proceed?

6      MR. GREEN:  I am, Your Honor.

7      THE COURT:  Okay.  Thank you, sir.

8      Let's show the witness is back on the

9 witness stand.

10      And just before we get started, Todd, if

11 you would, please.

12      Attorneys, the document we discussed just

13 before the jury came in, I have a copy for each of you

14 of that document.  And Mr. Long and Mr. Green, you will

15 have further discussions before the relevant witness is

16 called.

17      Okay.  Mr. Kohler, go ahead.

18      MR. KOHLER:  Thank you, Your Honor.

19 BY MR. KOHLER:

20  Q.   Detective Snyder, I'm going to hand you what's

21 been marked as Exhibit No. 123.  Can you tell us what

22 that is?

23  A.   Listed as Evidence Number 1193-7, it's the

24 internal envelope that's from the Southern Arizona

25 Center Against Sexual Assault, and inside of that is

1    another envelope which protects the CD that I received.

2        Q.   And from whom did you receive that CD?

3        A.   From the Southern Arizona Center Against Sexual

4    Violence.

5        Q.   And are you aware of what that DVD or CD

6    contains?

7        A.   Yes.

8        Q.   What is that?

9        A.   This has colposcope photos that were obtained

10   during the examination of Ada.

11       Q.   Can you tell the jury what a colposcope photo

12   is?

13       A.   Colposcope is a medical instrument that is

14   frequently used during sexual assault examinations to

15   obtain forensic evidence of any sort of injury.  This

16   particular disk obtained four -- or contains four

17   photographs that were obtained during the course of that

18   examination.

19       Q.   And once you received that disk, what did you

20   do with it?

21       A.   It was booked into evidence.

22       Q.   Now, did you make a copy of that disk and

23   provide it to anyone?

24       A.   Yes.

25       Q.   To whom?

1    A.   To Jackie Hess.

2    Q.   And are you familiar with what Jackie Hess is

3  or what she does?

4    A.   She is a nurse examiner for Phoenix Children's

5  Hospital in conjunction with ChildHelp.

6    Q.   And did anyone besides you have care and

7  custody of that disk in between transporting it from

8  evidence to Ms. Hess?

9    A.   No.

10   Q.   And how are you able to make that assertion?

11   A.   It was in my care and control until I booked it

12  into evidence.  At that point I filled out a chain of

13  custody, both -- there was a partial chain of custody

14  that was on the envelope that I signed over when I

15  received it from the individual at the center, and then

16  I filled out another chain of custody when I booked it

17  into evidence, and that shows every time that it's been

18  accessed.

19   Q.   And were you able to provide a copy of that to

20  Ms. Hess?

21   A.   Yes.

22   Q.   Was the copy that you provided in an unaltered

23  form?

24   A.   Yes.

25   Q.   Was that copy in the same form that you

1    received it from the Tucson -- I'm sorry, from which

2    location?

3        A.   I believe the Southern Arizona Center Against

4    Sexual Assault.

5        Q.   Was that disk in the same condition as the one

6    that you received from Southern Arizona --

7        A.   Yes.

8        Q.   Thank you.

9             Now, you're the case agent on this case.

10   Is that an accurate assertion?

11       A.   Yes.

12       Q.   And what is the responsibility of the case

13   agent as it relates to assembly of evidence and police

14   reports?

15       A.   It's my job as the case agent not only to be

16   aware of the investigation as it goes on and to conduct

17   the majority of the investigation, but also to be aware

18   of other parts of the investigation that have taken

19   place, to make sure that I have copies of those reports

20   and I have reviewed them, and to be aware of any

21   evidentiary items that have been obtained.

22       Q.   Were you familiar with all aspects of this

23   investigation as it was going forward?

24       A.   For the most part, yes.

25       Q.   At what point in the investigation or at what

1    point in time did you become aware that Jack was

2    claiming to have been with Ada on the date of the

3    offense?

4        A.   The initial information was received about

5    Jack's general involvement, as far as the fact that he

6    was at the ranch, at the time when the interview was

7    conducted with Ada.

8                As far as his specific locations throughout

9    the events, it was not until his forensic interview was

10   conducted.

11       Q.   And when was that forensic interview conducted?

12       A.   That was about two months ago now.

13       Q.   Why was the interview of Jack conducted so far

14   after the fact?

15       A.   Based upon all of the information that we had

16   at the time of the initial investigation and even in the

17   intervening months, there was no indication that Jack

18   was present at the time that the incident occurred, that

19   he was actually at the location with Ada and Fernando

20   when the alleged incident occurred, and so I didn't feel

21   that it was exactly necessary to question him as to

22   where he wasn't.

23       Q.   Then why was he interviewed, then -- why was he

24   ultimately interviewed if your initial impression was

25   not to question him?

1      A.   In an effort to maintain thoroughness and to

2  ensure that all avenues had been explored, we did

3  eventually go ahead and conduct a forensic interview

4  with him.

5      Q.   And that would have been two months ago, so

6  about what month and what year?

7      A.   It was 2013.  I would have to look at my notes

8  to give it a specific date, but I want to say it was

9  late August or early September, something like that.

10     Q.   Now, did you conduct an interview with a person

11 by the name of Johnny Boggs?

12     A.   Yes, I did.

13     Q.   Was that interview conducted on February 27th,

14 2012?

15     A.   Yes.

16     Q.   At the time that interview was conducted, were

17 there any police reports that you are aware of

18 indicating -- indicating Jack's closeness to Ada at the

19 time of the event?

20     A.   As far as his geographic proximity?

21     Q.   Physical --

22     A.   No.

23     Q.   -- proximity, yes.

24     A.   No, there was not.

25     Q.   Now, let's go back to the interview of Jack,

1    this recent interview of Jack.  You mentioned that it

2    was done in the interest of thoroughness.

3         A.   Yes.

4         Q.   Are you aware if there was a request for an

5    interview of Jack by the defense?

6         A.   I believe there was.

7         Q.   And was the forensic interview done in part to

8    bring out all the information prior to that defense

9    interview?

10        A.   Yes, it was.

11        Q.   And why was that?

12        A.   Because, especially when dealing with children,

13   the best format in which to conduct that interview is a

14   forensic interview so that the questions are asked in a

15   non-suggestive, non-leading manner.  That way we could

16   make sure that we received all of the information in the

17   best possible format without any question of any sort of

18   problems with the way the questions were asked or the

19   interview.

20        Q.   Now, as a result of that forensic interview --

21   I'm sorry.  Let me rephrase.

22             The information that we heard here today in

23   court, was the -- from Jack, was the first time that law

24   enforcement became aware of Jack's physical proximity to

25   Ada, was that in that interview?

1    A.   Yes.

2    Q.   Before that interview about two months ago, did

3    law enforcement have any idea that Jack was approaching

4    Ada at the time of the violation or near the time of the

5    violation?

6    A.   We had received no reports from anybody that

7    was involved that there was any sort of proximity.

8         MR. KOHLER:   No further questions, Your

9    Honor.

10        THE COURT:   All right, sir.

11        Mr. Green?

12

13        C R O S S - E X A M I N A T I O N

14   BY MR. GREEN:

15   Q.   Let's start there.   The interview with Jack was

16   in fact done after the defense -- after I requested an

17   interview with Jack, correct?

18   A.   Yes.

19   Q.   And no investigation into Jack had been done

20   prior to that, right?

21   A.   Correct.

22   Q.   Jack lived on the property, correct?

23   A.   Yes, he did.

24   Q.   And he was a -- could have been a potential

25   witness, right?

1    A.    Based upon the information that we had at that

2    time, it was not believed that he had witnessed any of

3    the incident.

4    Q.    That wasn't my question.  He could have been a

5    potential witness, correct?

6    A.    Correct.

7    Q.    And were there other people on the ranch?

8    A.    Yes.

9    Q.    We've heard about somebody named Jaime, right?

10   A.    Yes.

11   Q.    Did you ever talk to Jaime?

12   A.    I was unable to make contact with Jaime.

13   Q.    But you tried, right?

14   A.    Yes.

15   Q.    Was there anybody else on the ranch that you

16   tried to make contact with?

17   A.    Ms. Quinn.

18   Q.    And you had a conversation with her, correct?

19   A.    Yes.

20   Q.    All right.  What about the owner of the ranch?

21   I only know him as "Paul," but did you ever contact him?

22   A.    We had a brief contact with him at one point,

23   but he was not interviewed.

24   Q.    But you had contact with him?

25   A.    Yes.

1        Q.   You made contact, you sought him out to find

2   out something from him, correct?

3        A.   He was on the property at the time that we went

4   up to obtain photographs.

5        Q.   And was Jack on the property at the time that

6   you went up to -- when the initial investigators were

7   there?

8        A.   I'm sorry.  I'm going to ask for

9   clarification --

10       Q.   Okay.

11       A.   -- on that.  The initial investigators being --

12       Q.   When --

13       A.   -- the deputies?

14       Q.   When the event happened, when the deputies went

15   onto the property, was Jack present at the time?

16       A.   To the best of my knowledge, the deputies

17   didn't go on the property at the time of the initial

18   investigation when it was reported.

19       Q.   The investigators, the -- okay.  The deputies,

20   where did they go, the first responders, the first

21   people that responded to this case?

22       A.   My understanding is she went to the --

23   Ms. Quinn went to the San Manuel substation where she

24   made contact with the deputies.

25       Q.   When did you find out about the incident?

1      A.   I received a phone call on October the 22nd,
2  2011.

3      Q.   And where were you at that time?

4      A.   I was driving back from Laughlin, Nevada.

5      Q.   And why were -- if you're out of town, why
6  would they call you?  Why would somebody call you?

7      A.   I was listed as the on-call detective for the
8  Persons Crimes unit at the time.  Unfortunately, because
9  of my conference out of state, I had asked one of our
10  other detectives to cover the on-call during that
11  timeframe, and Dispatch either didn't know or forgot,
12  and so they initially routed the call to me.

13      Q.   So then did you refer the call back to that
14  person who was covering for you?

15      A.   Yes, I did.

16      Q.   Okay.  And when was your first -- you were on
17  your way back from Laughlin, so when did you first
18  become involved in the case other than the phone call?

19      A.   The next morning, on October the 23rd, just
20  before 8:00 a.m., I received a phone call indicating
21  that Mr. Almanza had been located and requesting my
22  presence in San Manuel.

23      Q.   Okay, so he had been located.  Had he been
24  picked up?

25      A.   To the best of my knowledge, yes.

1    Q.   Had he been arrested?

2         MR. KOHLER:   Objection, Your Honor.

3         THE COURT:   Yeah, sustained.

4         Go ahead, ask your next question.

5         MR. GREEN:   May I have the basis for the

6    objection, Your Honor?

7         THE COURT:   No.   But you can rephrase your

8    question.

9    BY MR. GREEN:

10   Q.   Had you reviewed -- when you first were

11   involved, had you reviewed any other police reports?

12   A.   At the time that I received the call that

13   morning?

14   Q.   Yes.

15   A.   No.   I had not had an opportunity to read any

16   of the reports.   That didn't happen until I made it to

17   San Manuel.

18   Q.   So you arrived at San Manuel, and were the

19   reports provided to you then?

20   A.   Yes.

21   Q.   Whose reports were you provided with?

22   A.   Deputy Pecora, and then there were the notes

23   from the physical examinations that were conducted.   Or

24   medical examinations, excuse me.

25   Q.   And who was Deputy Pecora and what informa- --

1    what was his role?

2                MR. KOHLER:  Objection, Your Honor.  Can we

3    approach?

4                THE COURT:  Sure, come on up.

5                (Bench conference outside the presence of

6    the jury and the court reporter.)

7                THE COURT:  For the purpose of the record,

8    the objection was overruled.

9                Go on, Mr. Green.

10   BY MR. GREEN:

11       Q.   What was -- once you got involved with the

12   case, what was the first thing that you did?

13       A.   I'm sorry, I need some clarification on that.

14   Are you talking about the first phone call I received on

15   the 22nd or on the 23rd?

16       Q.   You received a phone call on your way back from

17   Laughlin, right?

18       A.   Yes.

19       Q.   You weren't involved at that point, correct?  I

20   mean, you heard about it, but somebody else was handling

21   it at this end?

22       A.   Correct.

23       Q.   Okay.  So let's start from when you actually

24   physically were here and involved.  What was the first

25   thing that you did?

1      A.    Initially I responded to the San Manuel

2  substation.   At that point I obtained copies of the

3  relevant documentation so I could get caught up to speed

4  with exactly what had occurred the previous night.

5               At that point, determining that there was

6  probable cause to go forward with writing a search

7  warrant, I began writing the search warrant and locating

8  a judge to sign that warrant.

9      Q.    At the time that you were drafting this search

10  warrant, did you have probable cause to believe that

11  there was someone involved in this case?

12               MR. KOHLER:   Objection, Your Honor.

13               THE COURT:   Go ahead, what?

14               MR. KOHLER:   This is calling for a legal

15  conclusion before the jury and it's improper and

16  irrelevant to the matter at hand.

17               THE COURT:   I'm sorry --

18               MR. KOHLER:   We've already had a pretrial

19  ruling on this as well, Your Honor.

20               THE COURT:   What was your question again,

21  just briefly?

22               MR. GREEN:   My question was, was there

23  probable cause to be -- to believe that there was a

24  person who was involved in this case that could have

25  committed this crime.

1          THE COURT:  Well, I'm going to sustain the

2    objection as to your phrasing.  Probable cause has its

3    own connotations.  You can rephrase it and ask the

4    question differently.

5          So the objection is sustained.

6    BY MR. GREEN:

7        Q.   So you brought yourself up to speed?

8        A.   Yes.

9        Q.   And Mr. Almanza, where was he at that time?

10       A.   He was in one of the holding cells at the San

11   Manuel substation.

12       Q.   And was this a locked cell?

13       A.   Yes.

14       Q.   And was he in handcuffs?

15       A.   Not at the point that I went in and made

16   contact with him.

17       Q.   Had he been in handcuffs before that?

18       A.   I wasn't present prior to his arrival in San

19   Manuel.  I don't know if he had handcuffs placed on him

20   prior to that or not.

21       Q.   Who brought him in?

22          MR. KOHLER:  Your Honor, we object to

23   relevance of this line of questioning.

24          THE COURT:  Sustained.

25   BY MR. GREEN:

1    Q.   You're the case agent, right?

2    A.   Yes.

3    Q.   So you're the person that's supposed to have

4  the balance of the knowledge on this case, right?

5    A.   Yes.

6    Q.   So when people work on your case, do they

7  report to you?  And by "report," I don't mean that

8  you're their boss.  I mean since you're the case agent,

9  you are the one that gets the information presented to

10  you, correct?

11    A.   At some point they submit a report that I read,

12  yes.

13    Q.   Do you ever talk to the agent -- to the other

14  officers directly?

15    A.   Depending upon the circumstances.

16    Q.   Do you talk to the -- did you that day talk to

17  the officers who brought my client in?

18    A.   I don't recall any specific conversations that

19  morning outside of general -- just general conversation.

20  I don't recall any -- anything specific to your client.

21    Q.   And did the officers -- so you -- who called

22  you that morning and told you that my client was in

23  custody?

24         MR. KOHLER:   Objection, relevance, Your

25  Honor.

1        THE COURT:  No, overruled.

2        Go ahead and answer if you can.

3        THE WITNESS:  Off the top of my head I

4   don't recall if I received the phone call from our

5   Dispatch asking us to call one of the deputies or if the

6   deputy called directly.  Some deputies have my phone

7   number, some don't, and so I don't recall off the top of

8   my head who it was specifically.

9   BY MR. GREEN:

10       Q.   Do you recall whether it was one of the

11  deputies that was actually bringing him in or was it

12  some other deputy?

13       A.   I -- I don't recall if I talked to Dispatch or

14  if I talked directly to a deputy.

15       Q.   Had you at this time had any conversation with

16  the victim of this case?

17       A.   No.

18       Q.   Had you had any conversation with the victim's

19  representative or the mother of the victim in this case?

20       A.   No.

21       Q.   So other than the reports that you read, the

22  first information you received about this case was an

23  interview with my client; is that correct?

24       A.   Other than the contact that I had had with

25  Deputy Pecora the night before when he initially called

1    on the case, that's correct.

2        Q.   And Deputy Pecora gave you a summary of what

3    the case was about at that point --

4        A.   Briefly.

5        Q.   -- over the phone?

6        A.   Yes.

7        Q.   All right.  Now, State asked you whether you

8    Mirandized my client.  Did you in fact read him the

9    Miranda off your card?

10       A.   To the best of my knowledge, yes.  I tend to do

11   that every time.

12       Q.   But do you specifically remember doing it to my

13   client?

14       A.   No, not specifically.

15       Q.   Okay.  And do you recall that there was some

16   conversation about my client and whether he was able to

17   speak English or whether he was better at Spanish?

18       A.   Yes, I do.

19       Q.   And did you have the Miranda rights read to him

20   in Spanish?

21       A.   Yes.

22       Q.   And you recall that?

23       A.   I recall Sergeant Vargas reading the Miranda

24   rights in Spanish.

25       Q.   To my client?

1    A.   Yes.

2    Q.   And that is not something that you generally

3    do, but you don't remember specifically.  That, you

4    remember specifically.  Correct?

5              That was a convoluted question.  I'm sorry.

6    A.   Yeah.

7    Q.   You just said that you didn't remember --

8    generally you read the Miranda warning off your card,

9    but you didn't remember whether or not you ever read it

10   to my client in English, correct?

11   A.   I recall providing him his Miranda.  I can tell

12   you that I don't typically try and go off by memory on

13   that.  I read it off of the card to make sure that it's

14   done properly.

15   Q.   Okay.  Thank you for clarifying.

16              The rest of the -- or most of the rest of

17   the interview was done in English, correct?

18   A.   Yes.

19   Q.   And during the questioning, did my client, in

20   your opinion -- and I'm asking for just a general

21   opinion, not a professional opinion -- did he understand

22   what you were talking about?

23   A.   Yes.

24   Q.   You asked him questions and he gave you an

25   answer, correct?

1      A.   Correct.

2      Q.   Now, a little while ago you were asked by the

3  State to read several sections of your interview with my

4  client.  And you read a section on page 60, and I'm

5  going to offer you the --

6           If I may approach, Your Honor?

7           THE COURT:  I believe he has it.

8  BY MR. GREEN:

9      Q.   Oh, do you still have the transcript?

10      A.   Yes.

11           THE COURT:  Give us that exhibit number

12  again.

13           THE WITNESS:  116, Judge.

14  BY MR. GREEN:

15      Q.   So on Exhibit 160, which you still have in your

16  possession --

17      A.   116, one-one-six.

18      Q.   Okay.  I'm looking at page 60, and I'm not

19  sure -- my copy may have different numbering than your

20  copy, so if the lines don't line up we'll find what

21  we're looking for, okay?

22           You were asked about the comment that

23  Mr. Almanza said -- in mine, it's on line 10 --

24  regarding some blood.  Can you find that comment?

25      A.   Yes.

1    Q.   Okay.  And can you read that?

2    A.   You're wanting Mr. Almanza's comment or mine?

3    Q.   Give Mr. Almanza's comment starting there.

4         THE COURT:  Hold on a minute.  Could you

5    make it clear if you are asking him to read out loud or

6    read to himself?

7         MR. GREEN:  I'm asking him to read out

8    loud.

9         THE WITNESS:  The first comment that

10   references blood is Mr. Almanza saying, "But I did not

11   see any blood or nothing."

12   BY MR. GREEN:

13   Q.   Okay.  And then you stated after that?

14   A.   "Okay, you didn't see any blood or nothing.

15   Did you look for blood on your hands?"

16   Q.   Okay.  Now, is it your recollection that that

17   was the first comment referencing blood?

18   A.   To the best of my recollection, yes.

19   Q.   Would you turn to page 56, please.  You asked

20   with your question -- about the one, two, three, four,

21   five, sixth line down, beginning with "And the," can you

22   read that out loud, please?

23   A.   "And the blood is made up, too?"

24   Q.   And what did Mr. Almanza say?

25   A.   He questioned, "Blood?"

1     Q.  And then you said?

2     A.  "Yeah, and the injuries that she's got.  I

3 don't think you meant to hurt her.  You don't seem like

4 the kind of guy that meant to hurt a little girl."

5     Q.  So you made reference earlier to the blood and

6 then Mr. Almanza made a comment later, correct?

7     A.  That would be correct.

8     Q.  All right.  Now, you told Mr. Almanza that you

9 had some really good evidence against him, right?

10    A.  Yes.

11    Q.  That you had DNA evidence.  Correct?

12    A.  Correct.

13    Q.  Did you have DNA evidence?

14    A.  We had taken samples to test for that, but --

15    Q.  At the time that you made this statement, did

16 you have DNA results back?

17    A.  No.

18    Q.  Did you have any idea whether Mr. Almanza's DNA

19 was going to come back anywhere near that young lady?

20    A.  No.

21    Q.  But you told him that you did, right?

22    A.  Yes.

23    Q.  So you lied?

24    A.  Yes.

25    Q.  And even before that, you talked about having

1    skin cells, correct?

2        A.   Yes.

3        Q.   And that you had found skin cells on her,

4    correct?

5        A.   Correct.

6        Q.   That was a lie, too?

7        A.   Yes.

8        Q.   Now, you explained earlier that this is a

9    common technique that you use, to lie to clients -- or

10   to lie to defendants or potential defendants to try to

11   get them to admit to something, correct?

12       A.   It is a common practice, yes.

13       Q.   So my question to you is, how far do you go?

14           MR. KOHLER:  Objection, Your Honor.  The

15   question is confusing.

16           THE COURT:  Sustained.  Sustained.

17           Rephrase it.

18   BY MR. GREEN:

19       Q.   How far do you go in telling lies before you

20   get to the point where you're overpowering the will of

21   the person being interviewed?

22           MR. KOHLER:  Objection, Your Honor.

23   Argumentative.

24           THE COURT:  Sustained.

25           Mr. Green and one of the attorneys come up

1    here real quickly.

2               (Bench conference outside the presence of

3    the jury and the court reporter.)

4    BY MR. GREEN:

5       Q.   Were you aware that Mr. Almanza was injured at

6    the time of your interview?

7       A.   At one point during the course of the interview

8    he made reference to having had a hernia surgery, I

9    believe about two weeks prior.

10      Q.   And do you remember what he told you about

11   that?

12              MR. KOHLER:   Objection, Your Honor,

13   relevance.

14              THE COURT:   No, overruled.

15              You can answer.

16              MR. KOHLER:   Your Honor, I also object on

17   the grounds of hearsay, self-serving hearsay, beyond the

18   scope of cross.

19              THE COURT:   Okay.  Let's go back here in

20   the corner, please.

21              (Sidebar conference outside the presence of

22   the jury.)

23              THE COURT:   Ready?

24              THE COURT REPORTER:   Ready.

25              THE COURT:   Okay.  Go.

1   MR. KOHLER:  Your Honor, first of all, I'd
2   like to amend what I said earlier.
3   THE COURT:  I'm sorry?
4   MR. KOHLER:  I would like to amend what I
5   said earlier.  It's not beyond the scope of cross;
6   however, the statement is self-serving hearsay, hearsay
7   in that the statements made by the Defendant to this
8   deputy are admissible only -- from the defense side,
9   admissible only insofar as they clarify statements that
10  he made.  I think there's been no information about
11  this.  If the Defendant wishes to bring out information
12  about his supposed injury, then he has every opportunity
13  to take the stand and do that himself.
14  THE COURT:  I have no idea what he
15  answered to the question.  What was the answer to the
16  question?
17  MR. KOHLER:  The Defendant --
18  THE COURT:  What did he say?
19  MR. KOHLER:  The Defendant brought out
20  information about a hernia surgery.
21  THE COURT:  We've already got that.  What
22  was the next -- what would the answer be to the next
23  question?
24  MR. KOHLER:  Your Honor, I can't remember
25  exactly.

1          THE COURT:  What is it you thought he was

2  going to say?

3          MR. GREEN:  I'm trying to remember what the

4  question I asked was, but --

5          THE COURT:  The objection in general is

6  correct, and that is unless it's exculpatory, and it's

7  not, at this stage it's self-serving hearsay to try to

8  induce a statement.

9          Now, you can still ask me if you want to

10  play the whole recording, because they've talked about

11  it, but you can't do bits and pieces just to serve your

12  client's interest alone, okay?  So the objection will

13  end up being sustained until somebody can tell me there

14  is something truly relevant in what that response was or

15  what the response would be.

16          MR. GREEN:  Well, Your Honor, the relevance

17  is that there's significant evidence that's been put

18  forward that my client helped these kids lift barrels

19  and lift things like that.

20          THE COURT:  Are you just going to argue,

21  well, he couldn't have because he had --

22          MR. GREEN:  -- surgery.

23          THE COURT:  It's already in front of the

24  jury, so the objection will be sustained.

25          (The proceedings resumed with the presence

1   of the jury.)

2              THE COURT:  For the record, the objection

3   is sustained.

4              Go ahead, Mr. Green.

5   BY MR. GREEN:

6       Q.   Talking to my client was the first information,

7   and we just talked about that, that you received about

8   the case, other than some summary information you

9   received and the reports that you read, correct?

10      A.   Correct.

11      Q.   What was the next step after talking to my

12  client in pursuing this investigation?

13      A.   The next day we conducted the forensic

14  interview with Ada.

15      Q.   Okay.  And you were present for that?

16      A.   Correct.

17      Q.   All right.  And after you had talked to Ada,

18  what was next?

19      A.   We had to do repackaging of the sex assault kit

20  to conform to our packaging policies, and then it was

21  sent off to Department of Public Safety.

22      Q.   So repackaging to meet company policy, did that

23  involve anything that could have caused problems with

24  the evidence?

25      A.   No.

1     Q.   Was the evidence entirely taken out of its

2  packaging?

3     A.   No.

4     Q.   Okay.  Can you describe what you did in order

5  to repackage the evidence?

6     A.   The items were originally placed in paper bags.

7  The correct procedure is to put them into boxes.  At

8  that point basically what I did was check the bags to

9  make sure that all of the seals were still intact and

10  then placed the entire bags into boxes and properly

11  packaged the boxes.

12     Q.   Okay.  So when you're saying "the seals," those

13  were the envelopes that we can see up here and the

14  packaging that were inside the bags?  There were two

15  levels of bags, correct?

16     A.   That's correct.

17     Q.   And one level of bags was improper, the other

18  level was fine?

19     A.   The external bag that was used to package the

20  actual items should have been a box instead of a bag.

21  That seal was intact.  There was nothing to show that

22  the bags had been opened or tampered with, and so I

23  placed the entire bag into a box so that it would

24  conform to policy.

25     Q.   Okay.  Did you ever go back out to the

1    property?

2        A.   Eventually, yes.

3        Q.   When you say "eventually," how long after the

4    time that you -- that -- let's say from the forensic

5    interview, how long was it before you went onto the

6    property?

7        A.   Detective Sanchez went out I think a day or two

8    days later -- I would have to refer to his report to

9    check the exact date -- and took initial photographs.

10   Based upon those I didn't go out until about a year

11   later to take some additional photos when it was decided

12   that we needed some additional images to get a full

13   picture.

14       Q.   Was there anything about -- was there anything

15   about the site itself that seemed important to

16   investigate, based on the evidence that you had in

17   hand?

18       A.   Not sure I entirely understand your question.

19       Q.   Well, in some cases there's footprints or in

20   some cases there may be blood evidence or in some cases

21   there may be -- that might show up on site, correct?

22   And I'm talking generally, not about this case.

23       A.   Generally, yes, in some circumstances there's

24   that type of evidence.

25       Q.   Was there any of that type of evidence or

1    anything similar to that that would have been important

2    to get to the site early in the case?

3        A.   I had no indication of that, no.

4        Q.   We've been looking at several photographs that

5    the State has been putting up.  One of the photographs

6    is an aerial photograph, correct?

7        A.   Yes.

8        Q.   Who took that?

9        A.   That was taken by one of our ID techs.

10       Q.   Okay.  Do we have a name?

11       A.   I believe it was Heidi Carino.

12       Q.   And do you know when those photographs were

13   taken?

14                MR. KOHLER:  Objection, relevance, Your

15   Honor.

16                THE COURT:  Overruled.  He can answer.

17                THE WITNESS:  I would have to refer to my

18   report for the exact date, but I want to say it was,

19   like, November of 2012, something like that.

20   BY MR. GREEN:

21       Q.   So almost -- a little more than a year

22   afterwards?

23       A.   Approximately.

24       Q.   So at what point did you feel like you had

25   enough information to charge my client?

1          MR. KOHLER:  Objection, Your Honor,

2     relevance and calls for a legal conclusion.

3          THE COURT:  Yeah, sustained.

4          Would you like to go to the corner and make

5     a record?

6          MR. GREEN:  No, Your Honor.  That's fine.

7          THE COURT:  Okay, go ahead.  Do you have

8     another question?

9          MR. GREEN:  No, Your Honor, I don't.

10          THE COURT:  Okay, thank you.

11          Redirect?

12          MR. KOHLER:  Just briefly, Your Honor.

13

14          R E D I R E C T   E X A M I N A T I O N

15     BY MR. KOHLER:

16     Q.   Detective Snyder, you have been here in this

17     courtroom for the past -- or today and the two previous

18     days, right?

19     A.   That's correct.

20     Q.   During your time in this courtroom, have you

21     had the opportunity to observe the Defendant?

22     A.   Yes, I have.

23     Q.   And have you observed the Defendant engaging in

24     conversations?

25     A.   Yes, I have.

1    Q.   And have you observed the Defendant engaging in

2    conversations that you were able to determine were in

3    English?

4    A.   Yes.

5    Q.   And is this something that you've observed only

6    once, more than once, or something else?

7    A.   More than once.

8    Q.   Now, I'm going to refer to the exhibit that you

9    have there, Exhibit 116.  Do you still have that in

10   front of you?

11   A.   Yes, I do.

12   Q.   I'm going to refer you to page 18 of that

13   exhibit.

14        Do you see page 18 there?

15   A.   Okay.

16   Q.   And on page 18, if you could start at line 6,

17   could you review, starting there at line 6, and review

18   that paragraph.

19   A.   Is that the one where I start, "Okay.  Let's

20   try this in English first"?

21   Q.   Yes.  Go ahead and review that and let me know

22   when you've had a chance to read it.

23   A.   Okay.

24   Q.   Is that a transcript of you providing the

25   Miranda rights to the Defendant?

1      A.   Yes.

2      Q.   Okay.  Let's go to the previous page, page 16.

3  Does your page 16 begin with a lengthy quote in Spanish

4  by Sergeant Vargas?

5      A.   My 16 starts with -- at the very top it says,

6  "Just Miranda and see if he wants to answer any

7  questions," and then it starts in with Sergeant Vargas.

8      Q.   Let's -- I'm sorry, I may have given you the

9  wrong page.  Could you go to page 18.

10     A.   18 is the one we just looked at with my reading

11  of Miranda.

12     Q.   Go to the following page.

13     A.   Okay.

14     Q.   Does that one begin with a lengthy quote in

15  Spanish by Sergeant Vargas?

16     A.   Yes.

17     Q.   Is it accompanied by a translation at the

18  end?

19     A.   Yes.

20     Q.   Could you review that translation and let me

21  know when you've had a chance to read it.

22     A.   Okay.

23     Q.   Is that a transcription of Sergeant Vargas

24  providing Miranda rights to the Defendant in Spanish?

25     A.   Yes.

1      Q.   Now, there was some talk about your quotes on

2  page 60 regarding blood.  Do you recall that discussion

3  you had with defense counsel?

4      A.   Yes.

5      Q.   Now, on page 56 of the interview, you raise the

6  issue of injury and blood.  Is that accurate?

7      A.   Yes.

8      Q.   Okay.  And looking -- we're going to look at

9  page -- the pages between 56 and 60.  Do you guys talk

10  about blood that whole time?

11      A.   Not the whole time, no.

12      Q.   Do you talk about her -- talk about him hugging

13  her at some point?

14      A.   Yes.

15      Q.   Do you talk about -- do you talk more about

16  doctors' reports?

17      A.   Yes.

18      Q.   Do you ever mention blood on his hands in those

19  intervening pages?

20      A.   No.

21      Q.   Do you talk about how he carried her on

22  page 59?

23      A.   Yes.

24      Q.   And then when we finally get to page 60, are

25  you discussing blood with him at all at that point?

1      A.    Not at that point.

2      Q.    And go ahead, there's a portion there where he

3    says -- okay, where he says, "But I not see any blood or

4    nothing."  Do you see that portion on page 60?

5      A.    Yes.

6      Q.    Was that quote in response to your previous

7    conversation about blood or was that out of the blue?

8      A.    Out of the blue.

9      Q.    Now, the defense talked to you about lying to

10   the Defendant, about DNA, and about skin cells.  What

11   was the reason that you -- that you told the Defendant

12   that we had skin cells and DNA?

13     A.    It's not an uncommon tactic, when discussing or

14   when interviewing a suspect, to provide information

15   outside the realm of what we have initially to gauge

16   their reaction, to see if they have any sort of reaction

17   or make any sort of statements that would be outside the

18   realm of normal under those contents -- context.

19     Q.    In your training and experience, when presented

20   with more information, be it false or true, does -- do

21   stories change sometimes?

22     A.    Yes.

23     Q.    Is that what happened in this case?

24     A.    Yes.

25     Q.    Now, I want to clarify the issue about the

1   packaging of the materials.  You talked about how

2   following Ada's forensic interview -- I believe you were

3   asked if it was after you talked to Ada, and I want to

4   clarify that.  You never had a forensic interview with

5   Ada, did you?

6        A.   No, I didn't.  I observed the forensic

7   interview that was conducted by Ms. Bodwell.

8        Q.   And was it after that that you repackaged the

9   evidence?

10       A.   Yes, it was.

11       Q.   Now, defense mentioned something about them

12   being improperly packaged.  Was there anything that

13   compromised the content of those bags?

14       A.   No.

15       Q.   And did you open those bags at all?

16       A.   No.

17       Q.   So what we're talking about is you took bags

18   that were sealed and you put them in a box; is that

19   accurate?

20       A.   That's correct.

21       Q.   And is it easier to transport a box than a

22   bag?

23       A.   Yes.

24       Q.   Is the evidence more secure in a box than in a

25   bag?

1     A.   Yes.

2          MR. KOHLER:  I have nothing further, Your

3  Honor.

4          THE COURT:  Can I see the attorneys up

5  here, please.

6          (Bench conference outside the presence of

7  the jury and the court reporter.)

8          THE COURT:  You might gather, Detective, I

9  have a few questions.

10

11              J U R Y   Q U E S T I O N S

12          THE COURT:  Okay, sir.  Let me ask you, one

13  of the photographs shown to the jury was a scratch on

14  the arm of Ms. Quinn.  Were you there when that

15  occurred?

16          THE WITNESS:  Yes, I was.

17          THE COURT:  And was that scratch

18  accidental?

19          THE WITNESS:  Yes, it was.

20          THE COURT:  Okay.  Did you actually observe

21  the event, the occurrence of it?

22          THE WITNESS:  Yes, I did.

23          THE COURT:  Okay, thank you.

24          Speaking of the exhibit which were the

25  underwear, Ada's underwear, were they -- have the stains

1  been or were the stains, the underwear themselves,

2  submitted for analysis?

3          THE WITNESS:  Yes, they were.

4          THE COURT:  And there was some result

5  produced as to that analysis?

6          THE WITNESS:  Yes, there was.

7          THE COURT:  Okay, thank you.

8          Did the Defendant, Mr. Almanza, request to

9  have a translator present for his interview, and this

10  says, "or did someone make the decision that it was not

11  needed."  Was there an individual who is capable, fluent

12  in English and Spanish, available?

13          THE WITNESS:  That was Sergeant Vargas, and

14  that was why I requested that he be there, to make sure

15  that there was no confusion.

16          THE COURT:  Did he remain there during the

17  interview?

18          THE WITNESS:  Yes.  He was there the entire

19  time.

20          THE COURT:  All right.  And was that as a

21  result of Mr. Almanza's request or your decision?

22          THE WITNESS:  That was my decision.

23          THE COURT:  All right.  And of course I'm

24  going to give the attorneys a chance to ask follow-up if

25  they have any.

1          When Ms. Quinn made her statement at the
2     police department or the substation, was there any
3     record of her made or did she mention Jack having been
4     with Ada at the ranch that morning, or do you know?
5          THE WITNESS:  Off the top of my head I
6     don't recall specifically what was in her statements.  I
7     could review them if you would like.
8          THE COURT:  Okay.  Let me give the
9     attorneys the opportunity to follow up.
10         Mr. Long, any follow-up?  Or Mr. Kohler.
11    Pardon me.
12         MR. KOHLER:  Thank you, Your Honor.
13
14          F U R T H E R   E X A M I N A T I O N
15    BY MR. KOHLER:
16         Q.   Just real briefly, on the issue of
17    Sergeant Vargas, you mentioned to the Judge that
18    Sergeant Vargas was present throughout the interview; is
19    that accurate?
20         A.   Yes.
21         Q.   Now, did Sergeant Vargas assist at any point
22    during the interview for clarification?
23         A.   Yes.
24         Q.   And we looked at the portion of Miranda where
25    Sergeant Vargas read it to him in Spanish.  Was that the

1    only time that Sergeant Vargas stepped in, or were there

2    other times, too?

3        A.   There were other incidents where some

4    clarification was needed and he was able to assist.

5                MR. KOHLER:  Nothing further.

6                THE COURT:  Thank you.

7                Mr. Green?

8                MR. GREEN:  Your Honor, my only -- I

9    believe we can answer the jury's questions, Your Honor,

10   by playing the entire interview, and I would request

11   that that be admitted at this point and that we go ahead

12   and play that for the jury and publish it to the jury,

13   Your Honor.

14               THE COURT:  We will talk about it when the

15   jury is not here.  Do you have any follow-up

16   questions --

17               MR. GREEN:  No, Your Honor.

18               THE COURT:  -- on the questions asked?

19               Okay.  Are you done with this witness?  May

20   Detective Snyder step down?

21               MR. KOHLER:  Yes, Your Honor.

22               THE COURT:  Okay.  If those are exhibits,

23   let me have them back, please.

24               MR. KOHLER:  Subject to recall, of course,

25   Your Honor.

1         THE COURT:  Of course.

2         Why don't we do this.  Why don't I ask the

3    jury to step out -- it's way too early for the afternoon

4    break.  Let me ask you to step out to the jury room for

5    about five minutes while I have a discussion with the

6    attorneys.

7         (The proceedings resumed outside the

8    presence of the jury.)

9         THE COURT:  Mr. Green has made a request

10   that the entire recording be admitted and presumably

11   played for the jury.  Go, Mr. Kohler or Mr. Long.

12        MR. KOHLER:  Thank you, Your Honor.

13        First of all, the timing of that request is

14   inappropriate.  The request should be stricken on those

15   grounds alone.  Defense has already ended

16   cross-examination.  Your Honor gave the defense an

17   opportunity to make that request during

18   cross-examination.  He neglected to do so and has waived

19   any opportunity to do that.

20        Furthermore, Your Honor, even if the

21   request is not stricken, that interview contains

22   multiple statements of self-serving hearsay, which do

23   not -- are not admissible in the -- against the State on

24   account of the -- for the rule of completeness purposes,

25   which would be the only reasons the Defendant -- or the

1    proponents of the statements could introduce their own

2    statements through hearsay.

3            Because of that, Your Honor, we request

4    that the interview not be played, that the motion be

5    stricken.

6            THE COURT:  Is there anything -- and I told

7    you early on when I made the pretrial ruling I had

8    listened to the portion and read the portion through the

9    reading of the rights and into a bit of it, but I did

10   not listen to the entire body of the recording.  Is

11   there anything in the recording, in the statement, that

12   is, in and of itself, inadmissible, I guess is the best

13   way, an admission to a prior conviction, that kind of

14   thing?  Anything like that?

15           MR. KOHLER:  Your Honor, the Defendant

16   denies the allegations multiple times, which --

17           THE COURT:  I understand that.

18           MR. KOHLER:  And furthermore, there's a

19   portion of the interview or the translation of the

20   interview where the Defendant is making, despite his

21   previous assertion that he was on good terms with Katie,

22   he's making multiple allegations against Katie which are

23   unfounded by anything except his own statements.

24           THE COURT:  Okay.

25           MR. KOHLER:  He does also mention being

1  accused of a prior sex offense during that portion of

2  the interview if I remember correctly, Your Honor.

3              THE COURT:  Okay.  Good.

4              What do you want to say, what else?

5              MR. GREEN:  Your Honor, the State has been

6  using the transcript, and I've explained before, Your

7  Honor, that the transcript doesn't show what happened at

8  the interview.  All it says is the words that were said.

9  It doesn't show the emotions, it doesn't show the

10  inflections in the voices, it doesn't show the confusion

11  or lack thereof of the conversation that occurred.  If

12  the State wants to redact certain parts of this, I'm

13  fine with that, Your Honor, but there's at least as many

14  admissions in this transcript as there are self-serving

15  statements, so it's --

16              THE COURT:  No, don't get up.

17              MR. GREEN:  -- it's absolutely a risk on my

18  part, Your Honor, to ask that this be played, but I do

19  believe that it will benefit the jury and some of the

20  confusion that's created by piecemealing it out, first

21  of all, taking things out of context and not having the

22  voices and the sounds that go along with the words.

23              THE COURT:  Very simple principle of law is

24  involved, and hearsay, generally speaking, is not

25  admissible at all.  There's an exception when the

1    hearsay is a statement made by a party opponent, in this

2    case, the Defendant, and that's what allows the portion

3    that came in at the State's request.

4              The remaining portion is simply hearsay as

5    to your client, particularly if it has self-serving

6    statements like, gee, I didn't do it, or ten different

7    versions of it.  In the face of the State objecting to

8    the admission of it in total, I'm not going to allow

9    that.

10             Now, here's something, though.  The State

11   used portions of it.  If you want to produce a redacted

12   version that has only those passages in it, I'll be

13   happy to reconsider a ruling as to that portion, but as

14   far as the entire transcript goes, no.

15             Your objection -- the objection is

16   sustained, your request is overruled.

17             Okay.  Do we have another witness ready?

18             MR. KOHLER:  We do, Your Honor.

19             MR. LONG:  Yes, sir.

20             THE COURT:  Okay.

21             MR. LONG:  And Judge, here are proposed --

22   I guess our proposed redactions of -- I only have two

23   copies, but if the Court and defense counsel want to

24   view those and see if there's an objection.

25             THE COURT:  Oh, is Mr. Boggs next?

1          MR. LONG:  Yes, sir.

2          THE COURT:  Oh, I'm sorry.  Don't bring him

3    in yet.  I'm sorry, I did want to address that.  Thank

4    you.

5          I had the indictment produced for

6    everybody.  And I was looking at the original

7    indictment, and it is very difficult, at least in my

8    mind, having done a few of these cases, to figure out

9    how to identify an aggravated domestic violence without

10   talking about domestic violence.  I suppose you could

11   sort of fight it and make a new crime called aggravated

12   disorderly conduct, which sounds a little bit

13   inappropriate.

14         I do believe the whole purpose is to have

15   the defendant, if you're going to use it for

16   impeachment, to acknowledge having made a Class 6 deal

17   in exchange for information and the dismissal of

18   charges, that is, a Class 4, a Class 5 -- two

19   Class 5s, and a Class 1 misdemeanor.

20         So I'm going to go ahead and sort of modify

21   what I did before.  The nature of the offenses in total

22   will be sanitized.  The level of offense as far as

23   identifying the seriousness, without giving the jury an

24   idea of the range of penalties, but the level of

25   seriousness will be identified so that the jury can at

1    least understand that in exchange for his assistance,

2    that he received a Class 6 lowest level felony and had

3    dismissed one felony that's a slightly greater felony or

4    slightly more egregious, and two that are -- I'm

5    sorry -- two that are slightly more egregious and one

6    that is more egregious than that.  Okay.

7                    Yes?

8                    MR. LONG:  Clarifying, so does that ruling

9    also apply to the plea agreement?  Can I then further

10   redact the charge --

11                   THE COURT:  Yes.

12                   MR. LONG:  -- that was --

13                   THE COURT:  Yes.

14                   MR. LONG:  -- pled to?

15                   THE COURT:  Yeah, it has to be consistent.

16   The two things have to be consistent with each other.

17                   Now, Mr. Green, having made that ruling, do

18   you have anything you want to make of a record?

19                   MR. GREEN:  Just a clarification, Your

20   Honor.

21                   THE COURT:  Sure.

22                   MR. GREEN:  And that is that I am permitted

23   to ask by number --

24                   THE COURT:  By level.

25                   MR. GREEN:  -- by level, so a Class 6

1    felony -- what you said is a Class 6 felony and a

2    slightly more --

3              THE COURT:  Okay.  I have no other way that

4    we can do it, but we have to avoid mentioning the

5    penalties, simply the fact that one is two levels above,

6    two are one level above, and two are actually one level

7    below what he actually pled to.

8              And yes, you can do it that way.  And the

9    only way to make sense in doing that is to mention the

10   numbers, one F4, two F5s, two M1s, for an F6.

11             MR. LONG:  And again, further clarification

12   or request, in the avowal section I neglected, Judge --

13   on paragraph 5 I neglected to redact --

14             THE COURT:  Prior felonies?

15             MR. LONG:  Correct.  And obviously, based

16   on the 609 hearing, that -- the State submits that that

17   should be redacted as well, that Mr. Green certainly

18   can talk about that and ask questions -- and we will

19   also be eliciting the number of priors that he has that

20   are allowed to be mentioned under 609 -- but it would

21   be inappropriate to include non-609 priors in this

22   exhibit.

23             THE COURT:  Boy, I love it when attorneys

24   start doing this.  Instead of saying 13, you've already

25   figured out that it was really only two or three or

1    four?  Is that what you're telling me?

2              MR. LONG:  Which is what we're allowed to

3    mention is all.

4              THE COURT:  I know.  I don't have the file

5    in front of me.  I have no idea what of his priors call

6    for 609.

7              MR. KOHLER:  Your Honor, if I could

8    clarify?

9              THE COURT:  Yeah.

10             MR. KOHLER:  The Defendant does in fact

11   have 12 prior felony convictions; however --

12             THE COURT:  It says 13.  Oh, no more than

13   13.

14             MR. KOHLER:  However, Your Honor, when we

15   did our 609 hearing --

16             THE COURT:  Yes.

17             MR. KOHLER:  -- the Court evaluated the

18   prior felonies which would have been allegeable, and the

19   defense is allowed to impeach him with only the three

20   that you -- that you mentioned.

21             THE COURT:  Three.  Okay.  Well, that's

22   it.  I have no idea what the numbers are, but I'm sure

23   some brilliant judicial officer figured that out.

24   Three.

25             So let's get it redacted, get it corrected.

1    Take a copy of the indictment, get the redactions made

2    on that, because I'm sure Mr. Green would like to have

3    that when he talks to Mr. Boggs if you don't use it.

4    Okay.

5              And I'm afraid we can't really start with

6    Mr. Boggs until we have these ready.

7              MR. KOHLER:  It won't take us long, Your

8    Honor.

9              THE COURT:  Well, let's do this.  Although

10   it's early and I really want to get done with the two

11   witnesses today, tell the jury they're taking their

12   afternoon break now.

13             THE BAILIFF:  Okay.

14             THE COURT:  They have 15 more minutes and

15   we'll start no later than a quarter to 3:00, and we're

16   not taking another break today.

17             THE BAILIFF:  Okay.

18             THE COURT:  Got that everybody?  Be back --

19   you guys be back at 20 of.  We'll try to get the jury in

20   close to that.

21             (Recessed from 2:27 p.m. until 2:48 p.m.

22   The proceedings resumed outside the presence of the jury

23   and with the presence of Alisha Olivarez, court

24   interpreter.  Marked for identification State's

25   Exhibit No. 128.)

```
 1                  THE COURT:  Did you get your final redacted
 2       version of the plea agreement?
 3                  MR. KOHLER:  I did, Your Honor.  It's been
 4       marked as Exhibit 128.
 5                  THE COURT:  Does the clerk have it?
 6                  MR. KOHLER:  She does.
 7                  THE COURT:  Can I see it?  Thanks.
 8                  Real quickly, I just wanted to double-check
 9       before we got the jury in.  I will tell you, one of the
10       jurors reported to the bailiff that he or she was having
11       some stomach problems, so if a hand is raised we're
12       going to take a break, just to let you know.
13                  Mr. Green, are you satisfied with the
14       redacted Exhibit 128?
15                  MR. GREEN:  Yes, Your Honor.
16                  THE COURT:  Okay, good.  Everybody ready?
17       Mr. Long or Mr. Kohler, who is going?
18                  MR. LONG:  This will be Mr. Kohler.
19                  THE COURT:  Mr. Kohler, are you ready?
20                  MR. KOHLER:  I am, Your Honor.
21                  THE COURT:  Mr. Green?
22                  MR. GREEN:  Yes, Your Honor.
23                  THE COURT:  Bring them in.
24                  (The proceedings resumed with the presence
25       of the jury.)
```

1          THE COURT:  Let's have the record show the

2    presence of the attorneys, the Defendant, Mr. Almanza,

3    and the jury is now back in the courtroom.

4          Mr. Kohler, is the State ready to

5    proceed?

6          MR. KOHLER:  We are indeed, Your Honor.

7          THE COURT:  Mr. Green, are you ready to

8    proceed?

9          MR. GREEN:  I am, Your Honor.

10         THE COURT:  All right.  If you would,

11   Mr. Kohler.

12         MR. KOHLER:  Yes, Your Honor.  At this

13   time, the State calls John Boggs to the stand.

14         THE COURT:  All right, sir.  All the way

15   forward, please, and right over here to the clerk and

16   she'll swear you in.

17         (The witness, Johnny Boggs, was duly sworn

18   by the Clerk of the court, according to law.)

19         THE COURT:  All right, sir.  Come on over

20   and have a seat.  Just kind of pull up to the table.

21   That microphone moves and bends, but you need to speak

22   into it, sir.

23         MR. BOGGS:  All right.

24         THE COURT:  Okay.  Mr. Kohler?

25         MR. KOHLER:  Thank you, Your Honor.

**JOHNNY BOGGS**,

1

2   called as a witness herein, having been first duly

3   sworn, was examined and testified as follows:

4

5                 D I R E C T   E X A M I N A T I O N

6   BY MR. KOHLER:

7       Q.   Good afternoon, Mr. Boggs.  Could you please

8   state your full name for the record and spell it for us.

9       A.   Johnny Boggs, J-o-h-n-n-y B-o-g-g-s.

10      Q.   And Mr. Boggs, where do you currently live?

11      A.   In Superior.

12      Q.   Now, Mr. Boggs, how long have you lived in

13   Superior?

14      A.   All my life.

15      Q.   Mr. Boggs, I'm just going to kind of jump right

16   in here.  You've had some trouble with the law in the

17   past.

18      A.   Yes, sir.

19      Q.   Is that an accurate statement?

20      A.   Yes, sir.

21      Q.   And you've had several convictions for felony

22   offenses.  Is that true?

23      A.   Yes, sir.

24      Q.   And in 2004 you were convicted of a felony,

25   right?

1          A.    Uh-huh.

2                     THE COURT:   Hold on.   You have to say

3     "yes."

4                     THE WITNESS:   Yes.   Yes.

5     BY MR. KOHLER:

6          Q.    I'm sorry.   And in 2003 you were also convicted

7     of a felony?

8          A.    Yes.

9          Q.    And then most recently, you were convicted of

10    another felony in 2012?

11         A.    Uh-huh, yes, I was.

12         Q.    Now, did you -- that felony in 2012, could you

13    tell the jury whether you took that matter to trial or

14    whether you took a plea agreement?

15         A.    I took a plea agreement.

16         Q.    And tell the jury what a plea agreement is.

17         A.    I pled guilty to a lesser charge.

18         Q.    Instead of doing what?

19         A.    Taking it to trial.

20         Q.    Okay.   Now, in that 2012 matter, there was a

21    period of time where you were in jail, right?

22         A.    Yes.

23         Q.    Do you remember how long you were in jail for?

24         A.    Nine months I think it was.

25         Q.    And the period of time that you were in jail,

1    was that before you took the plea agreement?

2         A.   Yes, it was.

3         Q.   And at some point during those -- during that

4    time that you were in jail, did the State make any kind

5    of a plea offer to you?

6         A.   No.

7         Q.   Do you know what a plea offer is?

8         A.   Oh, yeah, yeah.  I was offered a plea.

9         Q.   So you were offered --

10        A.   Yes.

11        Q.   -- a plea agreement?

12        A.   Uh-huh.

13        Q.   Do you remember what that plea agreement was

14   that you were offered?

15        A.   I think it called for a year and a half.

16        Q.   A year and a half of what?

17        A.   Of DOC.

18        Q.   And was DOC a --

19        A.   Department of Corrections.

20        Q.   Okay.  And is that another name for prison?

21        A.   Yes.

22        Q.   Now, do you remember, did you eventually enter

23   into that plea agreement?

24        A.   Yes, I did.

25        Q.   And at the end of the day, how much time did

1  you do in the Department of Corrections for your 2012

2  felony?

3       A.   Is that before my parole or after?

4       Q.   How much time were you sentenced to?  Let's --

5       A.   To a --

6       Q.   -- talk about that.

7       A.   -- year and a half.

8       Q.   To a year and a half?

9       A.   Yeah.

10      Q.   Okay.  So from the first time you were made an

11  offer in your case --

12      A.   Uh-huh.

13      Q.   -- you were made an offer to a year and a half

14  in prison, and then you ultimately served how long?

15      A.   Four months, I think.

16      Q.   And is that counting the time that you were in

17  jail?

18      A.   Yes.

19      Q.   Total time, how much time did you serve total?

20      A.   Thirteen months, or ...

21      Q.   Were you sentenced to a year and a half?

22      A.   Yes, I was.

23      Q.   Now, does Department of Corrections have

24  various mechanisms that they use to allow people to

25  leave early on parole?

1      A.   Well, the 85 percent, then they allow you out

2  on parole.

3      Q.   So your ultimate plea agreement, you agreed to

4  go to prison for a year and a half?

5      A.   Yes, I did.

6      Q.   In exchange for pleading guilty; is that

7  accurate?

8      A.   Yes.

9      Q.   Now, do you remember about when it was that you

10  signed your plea agreement and it was accepted by the

11  Court?

12      A.   It think it was April, or maybe I'm -- March or

13  April.

14      Q.   Let's talk about it in relation to various

15  other events, okay, because at some point you did sign a

16  plea --

17      A.   Yeah.

18      Q.   -- agreement, right?

19      A.   Uh-huh.

20      Q.   Now, at some point while you were in jail, did

21  you meet a person by the name of Fernando Almanza?

22      A.   Yes.

23      Q.   Now, I'd like you to look around the courtroom.

24  Do you see anyone in this courtroom who is Fernando

25  Almanza?

1          A.   Sitting right over there.

2          Q.   Can you tell us what that person is wearing for

3    the record?

4          A.   A grayish-blue shirt.

5          Q.   Your Honor --

6          A.   Dark trousers.

7          Q.   -- could the -- I'm sorry.  Finish.

8          A.   Grayish-blue shirt with some trousers.

9               MR. KOHLER:  Your Honor, could the record

10   reflect the witness has identified the Defendant?

11              THE COURT:  It may.

12   BY MR. KOHLER:

13         Q.   About when did you first meet Mr. Almanza, if

14   you can recall?

15         A.   Late February, around -- or February or April,

16   around there.

17         Q.   Okay.  Now, how did you meet Fernando

18   Almanza?

19         A.   Through a mutual friend, I can say.

20         Q.   Who was that?

21         A.   Pete Ortiz.

22         Q.   Was he also in jail?

23         A.   Yes.

24         Q.   And how were you introduced to Fernando?

25         A.   That they knew each other from their -- from

1    around the same area.

2         Q.    Sorry.  Could you say that one more time?

3         A.    They were both from the same area, so they had

4    known each other.

5         Q.    And why did Mr. Ortiz introduce you to

6    Fernando, if you know?

7         A.    He had me -- he needed somebody to help him

8    out, understand what was going on with his case.

9         Q.    Now, do you speak fluent Spanish?

10        A.    Yes.

11        Q.    Was that something that was -- that enabled you

12   to help out Mr. Almanza?

13        A.    Yes.

14        Q.    Did you ever discuss Fernando Almanza's case

15   with him?

16        A.    Yes.

17        Q.    Did Fernando tell you what he was incarcerated

18   for?

19        A.    Well, first he said he didn't know what he was

20   incarcerated for.  And then I had talked to Dion

21   Rushing, one of the --

22        Q.    Who is Dion Rushing?

23        A.    He's a detective here in Pinal County Sheriff's

24   Office.

25        Q.    Okay.  What did -- did the Defendant -- was the

1    Defendant later made aware of what his charges were?

2       A.   Well, when I talked to Mr. Rushing about it, he

3    looked it up and he told us what he was in here for.

4       Q.   And were you able to convey that to the

5    Defendant?

6       A.   Yes, I was.

7       Q.   Did you provide any kind of helps to the

8    Defendant while -- to Mr. Almanza while he was in jail

9    with you?

10      A.   I wrote letters for him and to his family and

11   stuff along the line.

12      Q.   Were those letters in English or in Spanish?

13      A.   They were in Spanish.

14      Q.   And were you -- why was it that you were

15   writing them?

16      A.   He can't read or write.

17      Q.   Now, did you do any court work?

18      A.   Yes.

19      Q.   What kind of stuff did you do?

20      A.   At one time he wanted to do a fast-and-speedy,

21   another time he wanted to get rid of his lawyer.

22      Q.   What do you mean by fast-and-speedy?

23      A.   Invoke the rights for his fast and speedy

24   trial.

25      Q.   So would that be, like, a formal motion --

1      A.   Yeah.

2      Q.   -- that you would file with the Court?

3      A.   Uh-huh.

4      Q.   Did you do that for him on another occasion as

5  well?

6      A.   Yes.

7      Q.   Now, did you ever talk with Fernando Almanza

8  about the specifics of his case?

9      A.   Yeah.  Yes, I did.

10      Q.   And what did he tell you about his case?

11      A.   He told me that he was on his ranch, he -- I

12  guess he was -- he had been castrating some pigs, and

13  that the victim in the case was a little girl, and he

14  didn't understand how they could charge him for child --

15  sexual assault if he didn't insert his penis in her,

16  that he only put his finger.

17      Q.   I'm sorry.  Repeat that last part again.

18      A.   He didn't understand how he was being charged

19  for sexual assault if he didn't put his penis in her,

20  that he just put his finger in her.

21      Q.   And did he come to you with this question?

22      A.   Yes.

23      Q.   And how did you react when you learned of that

24  information?

25      A.   It -- it made me feel messed up, because, I

1    mean, I was helping him out, believing he was

2    innocent.  And when he made that statement is when it

3    was like ...

4              MR. GREEN:  Objection, Your Honor.  May we

5    approach?

6              THE COURT:  Sure, come on over.

7              (Bench conference outside the presence of

8    the jury and the court reporter.)

9              THE COURT:  For the record, the objection

10   is sustained.

11             But Mr. Kohler, you can go ahead and

12   rephrase the question or ask a new question if you'd

13   like.

14             MR. KOHLER:  Thank you, Your Honor.

15   BY MR. KOHLER:

16        Q.  You said that it made you feel -- it made you

17   feel messed up.  What do you --

18        A.  Yeah.

19        Q.  -- mean by that?

20        A.  Uncomfortable.

21        Q.  Okay.  Now, did you take any action once you

22   learned this from him?

23        A.  I had talked to Rushing and -- Detective

24   Rushing, and I asked if he --

25        Q.  I'm sorry.  Detective Rushing.  Tell us who he

1   is one more time.

2       A.   He's a detective here for Pinal County

3   Sheriff's.

4       Q.   Okay.  So what did you do next?

5       A.   I had talked to him and asked him if he could

6   get me in touch with somebody to talk to about it,

7   because that's one thing that -- I mean, it's -- it's

8   ruining a child's life doing something like that.

9       Q.   And did you eventually have an opportunity to

10  talk to another detective about that?

11      A.   Yes, I did.

12      Q.   And who did you talk to?

13      A.   Mr. Snyder.

14      Q.   Is that the Detective Snyder here, sitting

15  here --

16      A.   Yes, sir.

17      Q.   -- next to Mr. Long?

18           Now, did you convey this information to

19  Detective Synder?

20      A.   Yes, I did.

21      Q.   Now, I'm going to talk a little bit about the

22  timing, because we were talking about -- talking about

23  some months or times --

24      A.   Uh-huh.

25      Q.   -- you may have done some stuff.  I want to

1    relate these events in order, okay?  Were you made an

2    offer by the State for a year and a half in prison

3    before you talked to Detective Snyder or after you

4    talked to Detective Snyder?

5         A.   It was before I talked to him.

6         Q.   Had you signed that agreement before you talked

7    to Detective Snyder or after you talked with Detective

8    Snyder?

9         A.   Before I talked to him.

10        Q.   Okay.  So you had been given an agreement and

11   you had signed it --

12        A.   Uh-huh.

13        Q.   -- and then you talked to Detective Snyder?

14        A.   Yes.

15        Q.   Is that accurate?

16        A.   Yes, sir.

17        Q.   Okay.  So -- and that agreement was for a year

18   and a half?

19        A.   Yes.

20        Q.   You then talked to Detective Snyder and you

21   told him what you learned?

22        A.   Yeah.  Yes, I did.

23        Q.   Were you -- and during that time, were you --

24   what were you in jail for?  Were you waiting to be

25   sentenced or something else?

1    A.   It think it was a -- I think it was two Class 4

2  felonies and Class 5, and then there was -- I think it

3  was Class 6.

4    Q.   I'm sorry.  Thank you for bringing that up.  I

5  was going to talk about that in a second.

6         But not what charges were you in custody

7  for, what procedurally were you waiting for at that

8  point?  Because you've already signed it and you're

9  still in jail.  You haven't gone to prison yet.  So is

10  there --

11    A.   Oh, I was waiting for sentencing.

12    Q.   Okay.  And is that fairly typical, that you

13  wait -- after you enter a plea agreement you wait --

14    A.   Well --

15    Q.   -- to be sentenced?

16    A.   -- you enter the plea agreement, then you do

17  your pre-sentence report.  From there you go to

18  sentencing.

19    Q.   Okay.  So you were, during that time, waiting

20  for a report to be prepared --

21    A.   Yeah.

22    Q.   -- before you were sentenced?

23    A.   Yes, I was.

24    Q.   Okay.  And then you talked to Detective Snyder

25  and presumably you were later sentenced.  Is that

1    accurate?

2        A.   Yes, that is.

3        Q.   And you were sentenced to a year and a half?

4        A.   To a year and a half.

5        Q.   Okay.  Did your talking to Detective Snyder

6    change your plea agreement in any way?

7        A.   I was -- I don't believe it did.

8        Q.   Did it change -- did it change the time that

9    you did in the Department of Corrections in any way from

10   what you were originally offered?

11       A.   No.  No.

12       Q.   Now, you mentioned -- you mentioned previously

13   that you were charged with two Class 4 felonies, a Class

14   5 felony, and a Class 6 felony.

15       A.   Uh-huh.

16       Q.   Is that accurate?

17       A.   Yes, it is.

18       Q.   And in the first -- in the plea offer that you

19   were given before you talked to Detective Snyder, the

20   State made you an offer to plead guilty to one Class 6

21   felony.  Is that accurate?

22       A.   Yes, it is.

23       Q.   And that they would then dismiss the other

24   felonies?

25       A.   Yes.

1    Q.   Was that a change one to a 6 and drop the
2    others?

3    A.   Yeah.  They amend that -- amended it to a 6 and
4    dropped the others.

5    Q.   After you talked to Detective Snyder, did any
6    of that change?

7    A.   No.

8    Q.   So Mr. Boggs, did you -- did you receive any
9    net benefit to you personally by reporting on
10   Mr. Almanza to Detective Snyder?

11   A.   The only benefit I received out of it was peace
12   of mind.

13   Q.   Now, you did enter into -- oh, as you're
14   sitting here today --

15   A.   Uh-huh.

16   Q.   -- have you completed your sentence in the
17   Department of Corrections?

18   A.   Yes I have.

19   Q.   Now, I'm showing you what's been --

20          If I may approach, Your Honor?

21          THE COURT:  Yes.

22   BY MR. KOHLER:

23   Q.   -- what's been marked as State's Exhibit 128.
24   I know it's got a little bit of black all over it, but I
25   want you to tell me if you recognize that document.

1      A.   That's the plea agreement I signed.

2      Q.   Is that the plea agreement that you were --

3  that you were offered before you talked to

4  Detective Snyder?

5      A.   Yes, it was.

6      Q.   Now, in that plea agreement, if you turn to the

7  second page, do you remember reading those paragraphs in

8  that plea agreement?

9      A.   Yes, I do.

10     Q.   Are those paragraphs talking about your

11  agreement to testify?

12     A.   Yes, they are.

13     Q.   Now, do they talk about what could happen to

14  you if you testify falsely?

15     A.   Yes, it does.

16     Q.   And do you recall what they say about if you

17  testify falsely?

18     A.   I could be arrested for it.

19     Q.   Go ahead and read over paragraph 5 for me.

20  Could you look at that one?

21          Do you see it there?

22     A.   Yes.

23     Q.   In paragraph 5, it says that if you testify

24  falsely, you can -- the Court can ignore the plea

25  agreement, right?

1        A.   Yes, it does.

2        Q.   And it further goes on to say the Court could

3   also consider your false testimony at any sentencing.

4   Is that accurate?

5        A.   Yes, sir.

6        Q.   Mr. Boggs, you've already been sentenced in

7   this, haven't you?

8        A.   Yes, I have.

9        Q.   The Judge has already accepted this agreement

10  and you've already served your time on this agreement,

11  right?

12       A.   I completed it in October of last year.

13       Q.   So if you failed to testify, under this

14  agreement was there any consequence for you at all?

15       A.   No, there isn't, because there's double

16  jeopardy.

17       Q.   So Mr. Boggs, why are you here testifying today

18  if you're not getting any benefit under this plea

19  agreement for it?

20       A.   Like I just said, my own peace of mind.

21       Q.   Now, when you talked to Detective Snyder, was

22  that -- was that back in February of 2012?  Does that

23  sound about right?

24       A.   Yes, it does.  February, March, I believe.

25       Q.   When you talked to Detective Snyder, did you

1    mention to him anything about a young boy on the farm,

2    on the ranch?

3         A.   That was the victim's brother.

4         Q.   What did the Defendant tell you about the

5    victim's brother?

6         A.   That he was walking towards him, that he must

7    have been about 30 to 40 yards away.

8         Q.   That he was walking towards him when?

9         A.   When he was getting ready to sit down, I guess,

10   and have his lunch.

11        Q.   Okay.  And when was this in relation to the

12   Defendant inserting his finger into Ada's vagina?

13        A.   As he was sitting down.  He was --

14        Q.   Why don't --

15        A.   He was holding her, I guess, and as he was

16   sitting down is when he did it.

17        Q.   And why don't you go ahead and tell the jury

18   what you remember the Defendant saying about when he was

19   sitting down.

20        A.   That while he was sitting down he had his hands

21   holding under her butt, and when he sat down, he

22   inserted his finger.

23        Q.   And do you recall what the Defendant told you

24   about Jack's whereabouts at that time?

25        A.   He said that the boy must have been about 30,

1    40 yards away, walking towards him.

2              And, you know, it's my own belief that if

3    the boy wasn't walking towards him, it might have

4    been -- led somewhere else.

5        Q.   Did the Defendant ever talk to you about his

6    relationship with the victim's mother, Katie?

7        A.   Just that they worked on the ranch together and

8    that he had tried to get together with her a couple

9    times and she always denied him.

10       Q.   What do you mean by tried to get together with

11   her?

12       A.   Date her, go on a couple dates with her.

13             MR. KOHLER:  I have no further questions,

14   Your Honor.

15             THE COURT:  All right, sir.

16             Mr. Green?

17

18             C R O S S - E X A M I N A T I O N

19   BY MR. GREEN:

20       Q.   When did you first talk to Detective Snyder?

21       A.   Around February or March.

22       Q.   Of what year?

23       A.   '12.

24       Q.   And what you just told us and told the jury

25   today is what you told Detective Snyder at that time?

```
 1        A.   Pretty close.

 2        Q.   Pretty close?  Or --

 3        A.   Well, yeah, basically.

 4        Q.   I mean, maybe not the same words --

 5        A.   Not the --

 6        Q.   -- but close?

 7        A.   -- same words, yeah, but --

 8        Q.   Same information?

 9             THE COURT:  Hold on.  One of the things you

10   have to make sure is to let him finish whatever he's

11   going to ask before you start answering.

12             THE WITNESS:  Okay.

13             THE COURT:  So just wait, let him finish,

14   and then answer.

15             THE WITNESS:  All right.

16             THE COURT:  All right.  Go ahead, sir.

17   BY MR. GREEN:

18        Q.   Now, you said that the way you came to this

19   information was that Fernando was looking for some help

20   with legal issues; is that right?

21        A.   Yes.

22        Q.   Are you a lawyer?

23        A.   No.

24        Q.   You wrote some documents and things like that

25   for Fernando; is that right?
```

1       A.   Yes.

2       Q.   Did you file pleadings for him?

3       A.   I didn't file a pleading, I just filed motions.

4       Q.   You filed motions pleadings?

5       A.   Yeah.

6       Q.   And why was it that you were doing this for

7   him, that -- couldn't he do that for himself?

8       A.   Well, if you can't read or write, you can't do

9   it yourself.

10      Q.   So he told you that he couldn't read or write?

11      A.   Yes, sir.

12      Q.   Okay.  And did you have any reason not to

13  believe him that he couldn't read or write?

14      A.   Well, actually signed his name on a legal memo

15  one time and it was just, like, a scribble, so ...

16      Q.   So you were pretty much convinced that that was

17  probably true, right?

18      A.   Well, I never seen him pick up no books to

19  read.

20      Q.   So while you were doing this work for Fernando,

21  you had access to his papers and to his information; is

22  that right?

23      A.   No.  He told me this all before he had gotten

24  his paperwork, before he had gotten his discovery.

25      Q.   Did he ever show you his discovery?

1      A.   He showed me discovery after I had talked to

2   Mr. Snyder.

3      Q.   Can you describe Fernando in terms of he

4   doesn't read or write?  Do you know if he ever went to

5   school?  Did he ever tell you that?

6      A.   No.  He never mentioned anything about that.

7      Q.   Okay.  Did he seem confused about the paperwork

8   and the things that were going on?

9      A.   What he seemed confused about was the charges.

10     Q.   Okay.  So how do you know that?  Did he talk to

11  you about that?

12     A.   Well, basically what he told me was how could

13  they charge him for sexual assault if he didn't put his

14  penis in her, that it was only his finger.  That's what

15  was confusing him.

16     Q.   Was there anything else that was confusing?

17     A.   Basically it's just about that.

18     Q.   Okay.

19     A.   Excuse me.  He did also --

20     Q.   That's okay.  Do you want to add to that

21  answer?  Is that what you're --

22     A.   Well, yes.

23     Q.   Okay.  Go ahead.

24     A.   He also did discuss about DNA.

25     Q.   Okay.  Did he understand what DNA was?

       A.   No, he didn't know what it was.  He was
wondering about how it went, and he said if he was
castrating pigs and he had blood and whatnot from the
pigs, would they still be able to find DNA if there was
DNA from the child.

              MR. GREEN:  No more questions, Your Honor.

              THE COURT:  All right, sir.

              Mr. Kohler, any redirect?


              R E D I R E C T   E X A M I N A T I O N
BY MR. KOHLER:

       Q.   You said that you did eventually have access to
Mr. Almanza's court papers; is that right?

       A.   Uh-huh.

              THE COURT:  Wait a minute.  You need to say
"yes" or "no."

              THE WITNESS:  Yes, sir.

              MR. KOHLER:  Thank you, Your Honor.
BY MR. KOHLER:

       Q.   And you said that was after you talked to
Detective Snyder?

       A.   Yes.

       Q.   And then you mentioned that -- you mentioned
that he was confused about DNA?

       A.   Yes.

1      Q.   Were you able to explain to him a little bit

2  about DNA?

3      A.   What I told him basically was it's a blood

4  workup about a human body, that they could basically

5  trace it back to where it goes or whose it is.

6      Q.   And he was asking you if DNA could still be on

7  him after he had worked castrating pigs?  Is that

8  accurate?

9      A.   Yes.

10     Q.   Just one last question.  Did he tell you which

11  finger he used?

12     A.   His middle finger, right hand.

13          MR. KOHLER:  No further questions, Your

14  Honor.

15          THE COURT:  Thank you.

16          MR. KOHLER:  I'm sorry, wait, Your Honor.

17  BY MR. KOHLER:

18     Q.   Was he concerned about his DNA being present

19  on -- or I'm -- was he concerned about Ada's DNA being

20  present on him?

21     A.   Yes.

22          MR. KOHLER:  Nothing else, Your Honor.

23          THE COURT:  Mr. Kohler, may this witness be

24  excused?

25          MR. KOHLER:  Yes, Your Honor.

1            THE COURT:  Mr. Green?

2            MR. GREEN:  Yes, Your Honor.

3            THE COURT:  Okay, sir.  I'll take that.  I

4    thank you very much, Mr. Boggs.  You are excused.

5    Mr. Boggs, let me tell you, though, the rule of

6    exclusion has been invoked, so you cannot talk to

7    anybody else about your testimony here until the trial

8    is over --

9            MR. BOGGS:  All right.

10           THE COURT:  -- except for the lawyer.

11   Okay?

12           MR. BOGGS:  All right.

13           THE COURT:  Thank you.

14           MR. LONG:  Your Honor, before we get

15   started with this witness, could Mr. Green and I

16   approach briefly?

17           THE COURT:  Do you want to approach or do

18   we need a sidebar?

19           MR. LONG:  Just need to approach --

20           THE COURT:  Come on up.

21           MR. LONG:  -- Judge.

22           (Bench conference outside the presence of

23   the jury and the court reporter.)

24           THE COURT:  Ready?  Call your next witness.

25           MR. LONG:  I am, Your Honor.  State calls

1 Dr. Julie Klein.

2    THE COURT:  Ma'am, come all the way

3 forward, please, and I need you to come right over here.

4 She'll swear you in.

5    (The witness, Julie Klein, was duly sworn

6 by the clerk of the court, according to law.)

7    THE COURT:  Okay.  Please come on over here

8 and have a seat, Doctor.

9    Mr. Long?

10

11      **JULIE KLEIN**,

12 called as a witness herein, having been first duly

13 sworn, was examined and testified as follows:

14

15    D I R E C T   E X A M I N A T I O N

16 BY MR. LONG:

17  Q. Good afternoon, Doctor.

18  A. Hello.

19  Q. Would you introduce yourself to the jury,

20 please.

21  A. My name is Julie Klein.

22  Q. And what do you do for a living?

23  A. I am Board certified in pediatrics.  I work in

24 the Pediatric Emergency Department at Tucson Medical

25 Center, and I'm also the medical director for that

1    Pediatric Emergency Department.

2        Q.   And how long have you worked for Tucson Medical

3    Center?

4        A.   I have been in my current position for nine

5    years, and prior to that I did my pediatrics residency

6    there, so I have been there for a total of 12 years.

7        Q.   I'm assuming there was some education that you

8    went through in order to be qualified for your current

9    job?

10       A.   Yes.  Medical school of course, and then three

11   years of pediatrics residency.

12       Q.   You also stay up to date on research journals,

13   literature related to your field?

14       A.   I do.  I'm required to do at least 60 hours of

15   continuing education every two years, but I generally do

16   quite a bit more than that, including conferences,

17   journals like you mentioned.

18       Q.   Could you tell us just generally an overview of

19   what your day entails, particularly as it pertains to

20   seeing patients?

21       A.   Well, it's shift work, so when I arrive for my

22   shift, generally there's patients waiting already to be

23   seen, you know.  And I see about two and a half patients

24   per hour, so in a nine-hour shift I see around 20 to 26

25   patients, all -- you know, all different complaints.

1  It's a whole variety, some injuries, some there with

2  fevers or, you know, vomiting, whole variety of what you

3  could imagine would be average complaints for pediatric

4  patients.

5       Q.   And I wanted to talk about the pediatrics.

6  What does that mean?

7       A.   Age essentially zero, you know.  We -- every

8  now and then we'll have a baby that's dropped off on the

9  day of birth; sometimes we'll see babies that were just

10 discharged to home from the newborn nursery.  So

11 sometimes we'll see a baby that's as young as two or

12 three days old, all the way up until the day before your

13 18th birthday.

14            The day you turn 18 at Tucson Medical

15 Center generally you're seen over in the main Emergency

16 Department, although I have privileges to see up to age

17 21, and if the main Emergency Department is busier than

18 I am, well, then I will see up until that age.

19      Q.   So in layman's terms, if a kid comes in and

20 needs to be seen, you would be one of the people that

21 they could see; is that right?

22      A.   That's right.

23      Q.   For a various number of issues, ailments,

24 injuries, and whatnot?

25      A.   That's right.

1          Q.   Did you happen to see a child, a patient, on

2     October -- I guess the late evening of October 22, 2011?

3          A.   Yes.

4          Q.   And who was that that you saw?

5          A.   Ada Wilhelmi.

6          Q.   I saw you just glance down at a piece of paper.

7     Do you have a document in front of you?

8          A.   I do.

9          Q.   And what is that?

10         A.   This is the computer records from Ada's

11    Emergency Department visit on October 22nd, 2011.

12         Q.   And what goes into this record that you're

13    looking at there?

14         A.   It includes data such as what time did she

15    arrive in the Emergency Department, which nurse

16    initially saw her, what registration clerk saw her, and

17    then it includes my note, my documentation of her visit.

18         Q.   So this does include notes that you either

19    dictated or entered of work that you did?

20         A.   That's right.

21         Q.   I'm going to ask, actually, if I could take the

22    document in front of you and give you this document,

23    which is marked as Exhibit 109 for identification

24    purposes only.

25                   If you would scan through that and tell me

1    if that's the document that you were just referencing.

2        A.   It appears to be identical, yes.

3        Q.   All right.  And would there -- would there be

4    questions -- well, let me ask this:  Do you have an

5    independent memory of your interaction with Ada?

6        A.   I do.

7        Q.   Additionally, are there some details that you

8    may need to refer to your notes in order to refresh your

9    recollection?

10       A.   Yes.

11       Q.   What I'd ask is if a question arises where

12   there is a need to review that report, if you let us

13   know, and we'll give you that opportunity with the

14   Court's permission.  But until then, if you would set

15   that report aside, and if at some point you feel you

16   need it, let us know and we'll give you that

17   opportunity.  Okay?

18       A.   Okay.

19       Q.   What did Ada present for?

20       A.   Ada's chief complaint was possible sexual

21   assault with a need for a forensic exam.

22       Q.   Okay.  And are you a forensic examiner?

23       A.   No, I'm not.

24       Q.   As a physician that works in the Tucson Medical

25   Center, are these the type of exams that you do, that

1   is, the forensic medical exam?

2        A.   No.

3        Q.   Notwithstanding that, did you see Ada?

4        A.   I did, yes.

5        Q.   Did you -- did you look at her?

6        A.   Yes.

7        Q.   Did you talk to her?

8        A.   Yes.

9        Q.   As -- and why would you, if you're not a

10   forensic examiner, why would you -- why would you look

11   at her?  Why would you examine her?

12       A.   My job as the emergency room physician is to

13   ensure that Ada was medically stable, that there wasn't

14   an injury or another medical issue that required

15   immediate emergent medical attention.

16       Q.   And is that what you did in this case?

17       A.   Yes.

18       Q.   And as part of your job as a doctor, is getting

19   information from a patient important?

20       A.   Yes.

21       Q.   And why is that important?

22       A.   It's the framework for knowing how to help that

23   patient.

24       Q.   And does that information you get go into the

25   diagnosis?

1      A.   Yes.

2      Q.   And does it also go into a treatment?

3      A.   Yes.

4      Q.   Did you speak with Ada?

5      A.   Yes.

6      Q.   And when you spoke to her, did she tell you

7   anything?

8      A.   Yes.

9      Q.   What was that?

10      A.   Ada told me that Fernando asked her to go see

11   some pigs, asked if she wanted to go see some pigs with

12   him, and so she went with him.  And then he pulled down

13   her panties and he put his fingers in her, and his

14   fingernails were sharp and it hurt her.

15           And she told me also that he became mad

16   because she wouldn't do what he wanted her to do and he

17   hit her in the back with a shovel.

18      Q.   Okay.  As a pediatrician do you have experience

19   in talking to kids?

20      A.   Yes.

21      Q.   Talk to a number of kids as part of your job?

22      A.   That's right.

23      Q.   Was there anything about Ada's language that

24   was inappropriate to her age?

25      A.   No.

1    Q.   Have you ever dealt with situations where

2  children have talked or disclosed something, reported

3  something that caused you some concerns about whether or

4  not that child had been influenced?

5    A.   Yes.

6    Q.   And did you notice any of those concerns or

7  have any of those concerns with Ada?

8    A.   No.

9    Q.   Now, after speaking to her, did you --

10  actually, let me -- I'm going to ask you, if you would,

11  you gave us, I think, a summary from -- from memory from

12  what she told you.  Is that accurate?

13    A.   It's mostly from memory, but as you know, I

14  reviewed my notes before I sat down here, so ...

15    Q.   Okay.  I'm going to ask you if you'd look at, I

16  believe, page 16 of your report.

17          Does that contain your notes that document

18  your conversation with Ada?

19    A.   Yes.

20    Q.   And is there a quotation anywhere in your

21  notes?

22    A.   Yes.

23    Q.   What does that quotation mean?  Does that mean

24  anything?

25    A.   That does.  That means that those were Ada's

1    own words.

2        Q.   Okay.   And I'm going to ask you, if you would,

3    if you would read what is -- what the quotation was that

4    you documented in your report that Ada told you.

5                MR. GREEN:   Your Honor, I'm going to object

6    on hearsay grounds.

7                THE COURT:   Overruled.

8                You can go ahead and answer.

9                THE WITNESS:   Open quote, Fernando asked me

10   if I wanted to go check the pigs with him.   When we went

11   to check the pigs he pulled my panties down and he was

12   kissing me.   He put his fingers in me and his

13   fingernails are so sharp that they scratched me, closed

14   quote.

15   BY MR. LONG:

16       Q.   And was this a statement made to you?

17       A.   Yes.

18       Q.   Do you recall whether or not anyone else was in

19   the room when she made this statement?

20       A.   Ada's mother was in the room.   I don't remember

21   if a nurse or any other person was in the room.

22       Q.   Did Ada's mother do anything to encourage or

23   prompt her?

24       A.   No.

25       Q.   Is that something that you would have at least

1    made note of or observed?

2        A.   Yes.

3        Q.   And on page 21 of the report, towards the

4    bottom of the page, does that also provide a note of

5    what the -- what Ada said?

6        A.   Yes.

7        Q.   And is there also quotations on that?

8        A.   Yes.

9        Q.   Does that indicate that that's a direct quote

10   from what were the words of the child?

11       A.   Yes.

12       Q.   Tell us what that was.

13       A.   Open quote, Fernando, he scratched me, and

14   yeah, he was kissing me, closed quote.

15       Q.   Tell us about the examination that you

16   conducted, the physical examination that you conducted

17   with Ada.

18       A.   Do you mean explain my findings to you?

19       Q.   No.  If you could explain what the examination

20   was, what techniques -- or was it a visual inspection,

21   was there anything specific that you did as part of

22   looking at her, looking at her physically?

23       A.   So in a situation like this, in general if I

24   know that a forensic exam has been approved, I don't

25   look at the child's private parts.  But my understanding

1    was that it had not yet been approved and that I was

2    supposed to look and determine is there any reason why

3    she should have a forensic exam.

4              So I wore gloves; I explained to Ada my job

5    is to check your private parts and make sure that

6    there's not any injury or, you know, see if there's a

7    way that I'm going to help you feel better.

8              And so with mom in the room, I had Ada lie

9    on her back and I put her legs in a frog-leg position

10   and I looked at her private parts.  And in doing so, we

11   had to remove her panties, and so it was obvious that

12   the panties had spots of blood in them.

13        Q.   Tell us what, if anything, you observed on Ada.

14        A.   I observed that Ada had an abrasion just at the

15   base of her left labia minora, inside the labia majora,

16   but not involving the hymen.  There was no active

17   bleeding, but it was consistent with what Ada had

18   described to me as the mechanism of the injury

19   occurring.

20        Q.   And that mechanism of injury that she described

21   was what?

22        A.   Somebody putting their fingers in her private

23   parts and scratching her.

24        Q.   And to clarify, did Ada specifically say who

25   that person was?

A.    Ada said it was Fernando.

Q.    The injury that you saw, is that consistent with -- or I'll word it this way:  The blood that you saw in her underwear, based on your training and experience, did that appear to be directly related to the injury you observed?

A.    Yes.

Q.    If you could, describe the width of the injury.

And that might not be a very good question, but would you be able to describe -- describe the injury, I guess, visually what you saw.

A.    Well, the -- what I can say in terms of just a description is that, you know, I did not get a ruler out, so I can't tell you exactly how many millimeters in length or in width the wounds were, but they were wide enough that it was consistent with a fingernail scratch and -- and, yeah.

Q.    Okay.  Now, when you talk about the location, you said that it was near the labia minora but inside the labia majora.  Did I get that right?

A.    That's right.

Q.    And if we're talking about the structure, the female genital structure and referred to as the vulva, are you familiar with that term?

A.    Yes.

1    Q.   Based on your training and experience, was this
2  injury inside the vulva or outside the vulva?

3    A.   Inside.

4    Q.   Now, you said something, that Ada reported that
5  Fernando got mad and hit her with a shovel.  Did I get
6  that right?

7    A.   Yes.

8    Q.   Did you observe any injuries consistent with a
9  shovel?

10    A.   No, but that doesn't mean it didn't happen.

11    Q.   Why do you say that?

12    A.   There are many situations where we know that
13  blunt trauma occurred and we don't see any signs of it.
14  Sometimes bruises never develop, sometimes they develop
15  later on.  So that doesn't mean that the blunt trauma
16  didn't occur.

17    Q.   So that -- did you have an opportunity -- did
18  you take any colposcope pictures?

19    A.   No.

20    Q.   Are you familiar with what colposcope pictures
21  are?

22    A.   Yes.

23    Q.   At some point did you have an opportunity to
24  get access to the colposcope pictures that were taken of
25  Ada?

1      A.   Yes.

2      Q.   And is it your understanding that a sexual

3  assault nurse examiner examined Ada and took these

4  photos?

5      A.   Yes.

6      Q.   And you did examine those photos?

7      A.   Yes.

8      Q.   And recently?

9      A.   Yes.

10      Q.   When did that happen?

11      A.   At approximately 1 o'clock this afternoon.

12      Q.   And in viewing those images, was that

13  consistent with your memory of what you saw on Ada?

14      A.   Yes.

15      Q.   And is that also consistent with the notes that

16  you documented?

17      A.   Yes.

18      Q.   In coming to -- in offering a diagnosis or a

19  treatment plan, do you look for things that are

20  consistent with the report?

21      A.   Yes.

22      Q.   And in this case, is what you saw consistent

23  with what Ada reported?

24      A.   Very much so.

25      Q.   If we were to talk about other things that

1    might have caused the injury, could you offer an opinion

2    as to whether or not those would be consistent or

3    inconsistent with what you observed?

4         A.   Yes.

5         Q.   For example, a barbed wire.  Is what you saw on

6    Ada consistent with a barbed-wire scratch?

7         A.   Not particularly, no.

8         Q.   And what makes you say that?

9         A.   Ada's abrasions were wider than a barbed

10   wire -- than what I would expect a barbed-wire scratch

11   to appear.

12        Q.   Okay.  I'd like to show you Exhibit No. 106.

13   And on the -- there's a number of televisions here, if I

14   could ask you to look at that.

15                 Have you seen that photograph before?

16        A.   Yes, I have.

17        Q.   And in looking at that injury, is that injury

18   consistent with the injury that you saw on Ada?

19        A.   No.

20        Q.   Explain what the differences are.

21        A.   This injury is very narrow.  It appears to have

22   been caused by some -- a very fine point, and it's very

23   linear.

24        Q.   And the injury that you saw on Ada, how does

25   that -- how is that different than what you're seeing

1    here?

2        A.   It was wider, it did not appear to be created

3    by a fine point, and it was not nearly as linear as

4    this.

5        Q.   If someone was to report that this injury in

6    Exhibit No. 6 was caused by a barbed wire, would that be

7    consistent with what you're seeing here?

8        A.   Yes.

9        Q.   Let's talk about other potential causes.  Would

10   you expect that a fall -- I guess a fall from a fence or

11   onto a fence would cause this particular injury?

12       A.   I would not expect that, no.

13       Q.   Why is that?

14       A.   I have seen quite a few girls with straddle

15   injuries, and they almost always have bruising.  And I

16   recognize a few moments ago I told you that bruising

17   does not always develop, but in my experience with

18   straddle injuries, there almost always is a bruise

19   associated.

20       Q.   And is that associated with the blood flow in

21   that area potentially?  Is that one of the causes for

22   the bruising in that area?

23       A.   That area is very vascular, so it bruises

24   easily.

25       Q.   What about external injuries?  Would you

1    generally expect to see some other external injuries as

2    a result of a fall?

3        A.   Very commonly, yes.  Many kids if they have

4    fallen will have abrasions in other areas, their knees,

5    theirs hands, their elbows.

6        Q.   And did you note any injuries on, I guess,

7    Ada's hands, knees, or anywhere else?

8        A.   No.

9        Q.   And if you noted those -- or if you observed

10   those, is that something you would have noted?

11       A.   Yes, I would have documented that.

12       Q.   Additionally, talking about this area of the

13   body, inside the labia majora, inside the vulva, is this

14   an area that's generally fairly well protected?

15       A.   Yes.

16       Q.   Ask you, and with the Court's permission, if I

17   could show a diagram for demonstrative purposes only.

18            Your Honor, with your permission?

19            THE COURT:  Before you put it on, which

20   exhibit number is it?

21            MR. LONG:  This is Exhibit 101.

22            THE COURT:  All right.  Mr. Green, you've

23   had an opportunity to observe that?

24            MR. GREEN:  I believe, if that's the one we

25   just came up to talk about, Your Honor, then I have no

1  objection.

2              THE COURT:  No objection.  Go ahead, sir.

3  BY MR. LONG:

4       Q.   And Dr. Klein, if I could approach, have you

5  seen the image that I'm about to display?

6       A.   Yes.

7       Q.   If you'd describe, please, what it is.

8       A.   It's a drawing or a diagram of a female

9  external genitalia.

10       Q.   And does it show, from what you saw, all the

11  different parts that make up the female genitalia?

12       A.   The external, yes.

13              MR. LONG:   Your Honor?

14              THE COURT:  Go ahead, sir.

15  BY MR. LONG:

16       Q.   What I'd ask you to do, if you could hopefully

17  stand by the drawing there, and if you'd take us through

18  the anatomy here of the -- that's depicted in

19  Exhibit 101.

20       A.   So the labia majora, that's -- I call it the

21  labia majora, but you're right, many people call that

22  the vulva, the outside part of the vaginal area.  The

23  vaginal canal is in there, the labia minora are right in

24  here.

25       Q.   Then there appears to be an opening there.  Can

1  you identify what that is?

2  A.   So there's actually two.  The top one is the

3  urethral opening, and then the vaginal opening is below

4  that.

5  Q.   And you talked about the hymen.  Where is the

6  hymen located in relation to this diagram?

7  A.   The hymen is right in here.  In a child that's

8  not -- that has not yet reached puberty, a young girl,

9  the hymen would be right in here but appear to be a pink

10  doughnut.  Looks like a pink doughnut in that area.

11  Q.   And the injury that you observed, can you

12  indicate approximately where it is that you saw that?

13  A.   It was approximately in this area at the base

14  of the left labia minora.  So as I mentioned, it didn't

15  go into the hymen, but it was within the labia majora

16  and it was affecting the base of the labia minora.

17  Q.   I have just put a red mark in the area that

18  your finger is.  Would you agree approximately with that

19  area?

20  A.   Yes.

21  Q.   Dr. Klein, did you -- as part of your notes,

22  did you include a diagram of what you saw?

23  A.   Yes.

24  MR. LONG:  And approach, Your Honor?

25  THE COURT:  Yes.

1    BY MR. LONG:

2        Q.   And I'm showing you what's been marked as

3    Exhibit No. 102.

4                Do you recognize that?

5        A.   Yes.

6        Q.   And what is that?

7        A.   That is a page out of my note, my

8    computer-documented note, that shows a similar diagram

9    of external genitalia, where I indicated the location of

10   Ada's injury.

11               MR. LONG:  Your Honor, move for the

12   introduction of Exhibit No. 102.

13               THE COURT:  Mr. Green?

14               MR. GREEN:  Your Honor --

15               THE COURT:  You want to see -- look at the

16   diagram?

17               MR. GREEN:  The one that --

18               THE COURT:  102.  Do you want to come up

19   and see what it is?

20               MR. GREEN:  Yes, if I may, Your Honor.

21               Your Honor, no objection.

22               THE COURT:  No objection.  All right,

23   Exhibit 102 will be marked as admitted and admitted.

24               Go ahead, sir.

25               MR. LONG:  Thank you.  Permission to

1    publish, Judge?

2              THE COURT:  Sir?

3              MR. LONG:  I'm sorry.  Permission to

4    publish?

5              THE COURT:  Yes, sir.  I think we're about

6    to change interpreters, so go ahead and publish but hold

7    on with your questions.

8              (The proceedings resumed with the presence

9    of Sabine Michael, court interpreter.)

10             THE COURT:  Ready?  Okay.

11             Go ahead, sir.

12   BY MR. LONG:

13       Q.   Dr. Klein, the Exhibit 102 that's depicted on

14   the screen, does that include the diagram that you were

15   just discussing?

16       A.   Yes.

17       Q.   I'm going to ask you, if you can, if I put that

18   diagram side by side with the drawing that you were just

19   referencing, if you -- go ahead and get out of your --

20             THE COURT:  I'm sorry.  That's Exhibit No.

21   what?

22             MR. LONG:  102 is on the left, the exam

23   that Dr. Klein authored that was just admitted; 101 is

24   for demonstrative purposes.

25             THE COURT:  All right.

1          MR. LONG:  Sorry.  I knew it was going to

2    happen one of these times.  All right, I think I'm

3    ready.  Let's see how we did.

4          THE COURT:  Your witness can get up as soon

5    as you're ready.  You ready?

6          MR. LONG:  Yeah.

7          THE COURT:  Go ahead.

8    BY MR. LONG:

9      Q.   Dr. Klein, referring to the zoomed-in portion

10   of your report, if you would indicate where you noted

11   that injury.

12     A.   It's probably difficult to see, but there's a

13   number 1 in a circle right here indicating that the

14   injury was on the left side at the base of the labia

15   minora.

16     Q.   And if you were to correspond that with

17   Exhibit No. 101, could you indicate where it is you

18   observed that injury?

19     A.   Right in this area.

20     Q.   And again, that is -- you're -- you are

21   comfortable offering the opinion that that is inside the

22   vulva; is that accurate?

23     A.   Yes.

24     Q.   So in order to get to that place, something

25   would have had to penetrate the vulva; is that accurate?

1    A.    Yes.

2    Q.    And when we're talking about penetration, we're

3    not necessarily talking about penetration of the vaginal

4    canal but of the vulva, correct?

5    A.    That's right.

6    Q.    And in this instance, the report of penetration

7    of a finger to the vul- -- inside the vulva is

8    consistent with what you observed; is that accurate?

9    A.    Yes.

10   Q.    If you'd have a seat, please.

11         Now, I'd like to talk about another

12   possible cause of an injury.

13   A.    Yes.

14   Q.    If there was a report that Ada specifically had

15   pulled her underwear down and had reached down in or

16   near her vaginal area and had pulled outward or upward,

17   is that consistent with this injury?

18   A.    No, not based on the location of the injury.

19   Q.    Why do you say that?

20   A.    This injury was at about the 5:30 or 6 o'clock

21   position.  I would expect if Ada had scratched herself

22   in indicating where the injury was, it would have been

23   closer to a 12 o'clock or a 1 o'clock position.

24         MR. LONG:  Thank you, Doctor.  Those are

25   all my questions.

1          THE COURT:  All right, sir.  Thank you.

2          Mr. Green?

3

4          C R O S S - E X A M I N A T I O N

5  BY MR. GREEN:

6      Q.  Mr. Long was pretty good about coming up with

7  hypotheticals, but --

8          MR. LONG:  Your Honor, I object to that.

9          MR. GREEN:  I'm just --

10          THE COURT:  I'm going to overrule your

11  objection.  We'll let that stand.

12          Go ahead and ask your question.

13  BY MR. GREEN:

14      Q.  So my question to you is, is there anything

15  that could cause -- other than a finger, okay -- that

16  could cause an injury like that that you might come up

17  with?

18      A.  Yes.

19      Q.  And what would that be?

20      A.  Well, I can't think of anything off the top of

21  my head, especially because what Ada described fit the

22  injury so well.

23      Q.  But it's not the only thing that could cause

24  it?

25      A.  That's right.

1    Q.   And you said that it's not -- you answered, to
2    most of Mr. Long's questions, that it's not consistent
3    with was your answer, which is not a definitive answer
4    that says no, it could never happen.  Is that correct?
5        A.   That is correct.
6        Q.   So there are situations where other events
7    could have caused this injury?
8        A.   That's true.
9        Q.   Now, if I were to tell you that this was a very
10   rambunctious young lady who lived on a farm or a ranch
11   and ran around the ranch and played with her brother, is
12   there anything on that ranch that could have possibly
13   caused this injury other than my client's finger?
14       A.   Of course I've never been to that ranch, but I
15   would guess yes.
16       Q.   Imagine a ranch.  I mean, you know, I mean --
17       A.   Right.
18       Q.   -- there's a trailer in the middle of the -- of
19   the park and the kids sometimes probably played on that,
20   I don't know.  But there are other equipment and things
21   like that around the ranch that could possibly have
22   caused this injury in a child such as that?
23       A.   I would have to guess that yes.
24       Q.   As for the size of the injury, you said it was
25   consistent with a fingernail.  You didn't measure it,

1  but were there -- is the injury the size of my pinky

2  fingernail, bigger than that, or littler?

3      A.   I'm not sure how to answer that --

4      Q.   Okay.

5      A.   -- because all I can tell you is that when I

6  took a look, I recognized right away, boy, this really

7  looks like it could have been a fingernail scratch.

8          I can tell you it did not look like a

9  child's fingernail.

10     Q.   Okay.  Now, you told us earlier on that this

11  was an abrasion.

12     A.   Yes.

13     Q.   You called it an abrasion.  And you just said

14  it looked like a fingernail scratch.  Which is it, I

15  guess?  Or is that consistent?

16     A.   An abrasion indicates a superficial skin

17  injury, as opposed to a laceration that is a full

18  thickness through all the layers of the skin.  So what I

19  meant when I said that was interchangeable.  Scratch,

20  abrasion, I meant the same thing.

21     Q.   So am I right in saying that an abrasion is

22  kind of a -- something sliding across?

23     A.   It can be.

24     Q.   Okay.  Is there another way that an abrasion --

25  when I think of an abrasion it's sliding on my elbows on

1    the pavement when I trip or something.

2        A.    That can be, but again, it simply refers to the

3    thickness of the wound.  So you can have an abrasion

4    from a knife if it's a partial-thickness --

5        Q.    Okay.

6        A.    -- superficial injury.

7        Q.    So it's not what the injury looks like, it's,

8    what?  The depth of the injury?  That's what's

9    determinative of how you describe it?

10       A.    It's not necessarily how it occurred --

11       Q.    Sure.

12       A.    -- is what I'm trying to explain.  So it

13   doesn't have to be, you know, sliding on pavement.

14       Q.    Okay.  All right.  Is it possible that an

15   abrasion could have occurred without causing damage to

16   the underwear, to the vulva?  In this location, could an

17   abrasion have occurred without having damaged the

18   underwear or the vulva?

19       A.    Do you mean if it -- if it was a force from

20   outside of the underwear, if her underwear were still on

21   when it occurred?

22       Q.    Yes.

23       A.    Is that what you mean?

24       Q.    Yes.

25       A.    It's possible, but not likely.

1          MR. GREEN:  Your Honor, that's all my

2    questions.

3          THE COURT:  All right.  Thank you, sir.

4          Redirect, Mr. Long?

5          MR. LONG:  Yes, Your Honor.

6

7          R E D I R E C T   E X A M I N A T I O N

8    BY MR. LONG:

9      Q.   Just let me ask some of these follow-up

10   questions this way.  Based on your training and

11   experience, would it be reasonable to conclude that this

12   injury could be caused without damaging the underwear,

13   assuming she's wearing underwear?

14     A.   No.  It's not -- it would be unlikely.

15     Q.   So it's not reasonable?  It wouldn't be

16   reasonable to conclude that, based on your training and

17   experience?

18     A.   Right.

19     Q.   Would it be reasonable to conclude that this

20   injury was caused by rambunctious behavior and only this

21   injury?

22     A.   Can I expand on that a little bit?

23     Q.   Sure.

24     A.   From what I observed, Ada was a very bright --

25   or is, I should say -- is a very bright girl.  You know,

1    granted, I met her over a year ago.  She was very

2    bright, and she gave me an excellent description of what

3    she said happened, and based on that, I don't think it

4    occurred due to rambunctious behavior.

5         Q.   So when someone talks about a possibility, as a

6    scientist, you're certainly not going to say

7    definitively there's no other possibility; is that fair?

8         A.   That's fair.

9         Q.   But based on your training and experience, is

10   what you saw, the injury, is that consistent with what

11   Ada reported?

12        A.   Yes.

13        Q.   And when asked if there's another possibility,

14   you said yes, there's another possibility out there, but

15   if pressed, you can't think of one off the top of your

16   head.  Did I get that right?

17        A.   Yes.

18        Q.   So if other possibilities were likely or

19   reasonable, would you expect, given your experience, you

20   would be able to come up with one off the top of your

21   head?

22        A.   Yes.

23             MR. LONG:  Thank you, Dr. Klein.

24             THE COURT:  Mr. Long, may this witness be

25   excused?

1          MR. LONG:  Yes, Your Honor.

2          THE COURT:  Mr. Green?

3          MR. GREEN:  Yes, Your Honor.

4          THE COURT:  Okay.  You're not excused yet.

5    I need to see the attorneys real quickly.

6          (Bench conference outside the presence of

7    the jury and the court reporter.)

8          THE COURT:  Dr. Klein, occasionally we have

9    additional questions when the attorneys are done and

10   then I offer the attorneys the opportunity to follow up.

11

12              J U R Y   Q U E S T I O N S

13         THE COURT:  Did you participate in or are

14   you aware of whether or not the blood, the spot on Ada's

15   panties, were analyzed or was analyzed?

16         THE WITNESS:  No.  I did not have any

17   involvement in that.

18         THE COURT:  Okay.  Did you have any -- did

19   you collect those panties?  What happened after your

20   examination?

21         THE WITNESS:  After I examined Ada I spoke

22   with someone from the Pinal County Sheriff's Department,

23   and then they came to the Emergency Department.

24         THE COURT:  Okay.

25         THE WITNESS:  Or -- actually, I may have

1  misspoken.  I know the SART nurse came shortly after

2  that, and so either the Sheriff's representative or the

3  SART nurse would have collected those panties.

4             THE COURT:  But you had nothing to do with

5  the collection and analyzation -- or analyzing the

6  blood?

7             THE WITNESS:  That's correct.

8             THE COURT:  Okay.  Mr. Long?

9

10          F U R T H E R   E X A M I N A T I O N

11  BY MR. LONG:

12      Q.  Dr. Klein, is there any reason for you to think

13  that the blood that you saw in her underwear came from

14  anywhere other than the injury you observed?

15      A.  No.

16             MR. LONG:  Thank you.

17             THE COURT:  Mr. Green, do you have any

18  follow-up?

19             MR. GREEN:  No, Your Honor.

20             THE COURT:  Okay.  Now let me double-check

21  the jury.  Don't see any other notes there.

22             Ma'am, you are excused as a witness.  I do

23  need to tell you, as a formal matter the rule of

24  exclusion was invoked, so until the trial is over you

25  cannot speak to any other witness -- in fact, anybody

1   but the lawyers -- about your testimony.  Okay?

2   DR. KLEIN:  Yes.

3   THE COURT:  Thank you, ma'am.

4   Mr. Long, do the attorneys want to visit up

5   here?

6   MR. LONG:  Yes, sir.

7   THE COURT:  Come on up.

8   (Bench conference outside the presence of

9   the jury and the court reporter.

10   THE COURT:  Ladies and gentlemen, the topic

11   is one that we need to discuss, the attorneys and I,

12   without you here, so I'm going to invite you back to the

13   jury room.  We'll try to get you back here in five

14   minutes or less.  Just put your notebooks down and step

15   outside, if you would, please.

16   (The proceedings resumed outside the

17   presence of the jury.)

18   THE COURT:  All right.  Have a seat,

19   please.  Let's show the attorneys remain, Mr. Almanza is

20   still here, the jury has stepped out briefly.

21   Mr. Long, tell me what's going on.

22   MR. LONG:  Judge, the next witness that I

23   intend to call is Deputy Pecora.  My intent is to get

24   into an inconsistent statement that was made by Kate,

25   Kathryn Quinn.  Ms. Quinn was asked about whether or not

1   Ada came in earlier in the day and made a statement that

2   she tickled -- that Fernando tickled me.  She stated she

3   didn't remember.  So she was confronted with that, given

4   an opportunity to either admit or deny that statement,

5   and stated she doesn't remember.

6             So now I'd like to call Deputy Pecora in

7   order to confirm -- or have him offer the fact that

8   Ms. Quinn did give him that statement.  I acknowledge

9   that there is double hearsay; I believe they are

10  both -- that they can both be overcome.

11            So that may not have been real clear.

12            THE COURT:  No, it's not.

13            MR. LONG:  Ms. Quinn, in her testimony,

14  talked about when Ada came to her.

15            THE COURT:  Okay.

16            MR. LONG:  And she talked about how she

17  came and said, "Fernando touched me" and then

18  demonstrated the touch.

19            Mr. Green did confront her with a statement

20  that's contained in the police report where she said

21  that earlier in the day, Ada came and said, "Fernando

22  tickled me," and then it's reported that she dismisses

23  Ada and didn't think much about it until she came back.

24  And when asked about that conversation or whether or not

25  that took place, Ms. Quinn testified that she didn't

1    remember.

2              THE COURT:  Okay.

3              MR. LONG:  And so now I'd like to call

4    Deputy Pecora as a -- in order to now get into that

5    statement as a prior inconsistent statement.

6              THE COURT:  Mr. Green?

7              MR. GREEN:  Again, Your Honor, we're not

8    only talking about one level of hearsay here, but we're

9    talking about two, and so I object, I guess.

10             THE COURT:  Okay.  And Mr. Long, I'm going

11   to deny your request and sustain the objection calling

12   Detective -- or Deputy Pecora for that reason.  Okay?

13             MR. LONG:  That's why I wanted to bring it

14   up in front of the Court, sir.

15             THE COURT:  I'm glad you did.  And you have

16   a real clear record, so I'm glad you did.

17             Are we done with witnesses today?

18             MR. LONG:  Yes, sir.

19             THE COURT:  Okay.  Did I remember -- real

20   vague.  You only have two tomorrow?  Three tomorrow?

21             MR. LONG:  Three.

22             THE COURT:  Three.

23             MR. LONG:  The DPS analyst and --

24             THE COURT:  Two criminalists, right?

25             MR. LONG:  Correct.  And it is the

1  serologist, the DNA analyst, and Jackie Hess.  I

2  reasonably suspect that all of those witnesses will be

3  completed --

4            THE COURT:  By noon?

5            MR. LONG:  -- by noon.

6            THE COURT:  And then we don't have anybody

7  for Friday?  We have to wait for, what is it, Ms. Welch?

8            MR. LONG:  Ms. Welch, the SANE nurse.

9            THE COURT:  Okay.

10            MR. LONG:  And if it was almost any other

11  witness, Judge, I think we'd go -- I'd go without her,

12  but I'm asking for the Court's indulgence because of the

13  nature of the witness.

14            THE COURT:  Well, jurors, half of them will

15  be happy to have Friday off and half will be unhappy

16  they have to waste a day by coming back Monday, but

17  we'll deal with it.

18            You ready?  You ready to quit for the

19  evening?

20            MR. LONG:  Yes, sir.

21            THE COURT:  You, Mr. Green?

22            MR. GREEN:  Yes, sir, Your Honor.

23            THE COURT:  Okay.  Bring them in, please.

24            While they're not quite through the door,

25  you're going to play the audio also tomorrow, right?

1          MR. LONG:  Oh, that's correct, Judge.  I

2     think we'll have time to do it tomorrow, unless you want

3     to play that this afternoon.

4          THE COURT:  No.  How long is it?

5          MR. LONG:  30 to 45 minutes.

6          THE COURT:  No.  No.  And the only thing

7     that reminded me was having the limiting instruction

8     here.

9          And you've looked at it and that's the

10    limiting instruction I'm using?

11         MR. GREEN:  You mean this afternoon?

12         THE COURT:  Tomorrow.

13         MR. GREEN:  Oh, yeah.

14         THE COURT:  When the audio is played.  The

15    video audio.

16         (The proceedings resumed with the presence

17    of the jury.)

18         THE COURT:  Let's have the record show that

19    the attorneys, the Defendant, Mr. Almanza, are still in

20    the courtroom; the jury has now returned to the

21    courtroom.

22         The good news is you can put your notebooks

23    down.  We're going to recess for the evening.  Please

24    remember the admonition.  Please be back here, as we do

25    every morning, so we can have you all in the jury

1    assembly room about quarter to 9:00 and try to get you

2    up here by 9 o'clock; again, the attorneys at 8:30 in

3    the morning.

4              And again -- well, tomorrow morning I will

5    talk to you or tomorrow during the day I'll talk to you

6    more about our schedule for the next few days.  But

7    please, tomorrow morning, quarter to 9:00.  We'll get

8    you in here at 9 o'clock.  We may actually get done a

9    little bit early on Thursday, so if any of you have late

10   afternoon shopping trips or something planned, you might

11   be able to do it.

12             Please remember the admonition.  Okay,

13   folks.  And we'll recess -- oh.  He's signaling me.

14   Leave your badge in the seats if you haven't already

15   taken it off, and we'll you all in the morning.

16             Show we're on recess.

17             (4:03 p.m.)

18                   ---o0o---

19

20

21

22

23

24

25

```
 1                    C E R T I F I C A T E
 2            I, Jacquelyn A. Allen, RPR, a Certified
 3   Reporter in the State of Arizona, do hereby certify that
 4   the foregoing pages 1 - 250 constitute a full, true, and
 5   accurate transcript of the proceedings had in the
 6   foregoing matter, all done to the best of my skill and
 7   ability.
 8            SIGNED and dated this 28th day of February,
 9   2014.
10
11
12                    _____
                      JACQUELYN A. ALLEN, RPR
13                    Certified Reporter No. 50151
                      For the State of Arizona
14
15
16
17
18
19
20
21
22
23
24
25
```