# EXHIBIT G

IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

IN AND FOR THE COUNTY OF PINAL

| | |
|---|---|
| THE STATE OF ARIZONA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | No. CR201103026 |
| ) | Appeal No. |
| FERNANDO SEGOVIANO ALMANZA, ) | 2 CA-CR 2014-0034 |
| ) | |
| Defendant. ) | |
| ) | |

Florence, Arizona
October 7, 2013
1:20 p.m.

BEFORE:  THE HONORABLE BOYD T. JOHNSON, JUDGE

REPORTER'S EXCERPT TRANSCRIPT OF PROCEEDINGS
JURY TRIAL - DAY 5

Prepared for Appeal by:
MICHELLE L. WELLNER, CR, RPR
Certified Reporter #50742

 COPY

1                    A P P E A R A N C E S

2   On Behalf of the State:

3            MR. MATTHEW LONG
             MR. THOMAS KOHLER
4            Deputy County Attorneys
             Pinal County, AZ
5

6
    On Behalf of the Defendant:
7
             MR. PAUL GREEN
8            Attorney at Law

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

3

```
1                    I N D E X

2
    PROCEEDINGS                                    PAGE
3

4   Closing Argument by Mr. Long                     4

5   Closing Argument by Mr. Green                    30

6   Final Closing Argument by Mr. Long               40

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1          (Proceedings were had which are not herein

2     transcribed.)

3          MR. LONG:  Thank you, your Honor.

4          As I told you at the beginning of the trial,

5     the facts confirm that the defendant is a hunter.  Not a

6     regular hunter, no; not an honorable hunter, a poacher.

7     And what he searched for, this poacher, was the right

8     time, place, and manner where he could strike, strike the

9     prey that he had already selected, four-year-old Ada.  He

10    picked this place, the time, October 22, 2011, where he

11    lured his prey to a hidden place, an isolated place, where

12    he lured her and forced his finger into her vagina.  He

13    controlled everything, so if that four-year-old ever told,

14    it would be his word against the word of a child.  He

15    controlled everything so she wouldn't be believed, and he

16    would get away.  But what he couldn't control, he couldn't

17    get rid of, was Ada's body, and the truth it spoke when he

18    scratched the inside of her vulva.

19          Now, he is asking you to believe that Ada

20    made it up.  He's asking you to guess about what caused

21    that injury.  Your verdict will decide whether or not he's

22    right.

23          This hunter, this poacher, had his target

24    selected.  As I said, he wasn't looking for who he was

25    going to attack, but when, where, and how.  His selection,

1   his target, was right there in front of him because he had

2   access to her.  He had access to her by working on the

3   ranch where her home was.

4           There may have been certain things that --

5   about her that caused him to really -- to decide, this is

6   the one.  Her age, the way she looked, the way she dressed

7   on October 22, 2011.

8           It is a fact that her mother was divorced.

9   He thought she might be easy, easy prey.  Maybe it was the

10  fact that the defendant pursued her mother and had been

11  rebuffed by her mother.

12          But he knew this was his target.  But where,

13  when, and how.  Well, that was answered because the

14  defendant knew the layout of the house.  And you've seen

15  the Double Check Ranch and these pictures of Double Check

16  Ranch a number of times.  Defendant would be around the

17  pigs, back here in the back area, isolated, hidden.  No

18  one will see, knowing that her mother spends so much time

19  when she is working in that cutting house, working,

20  putting food on the tables of our community, where he

21  would have an opportunity to make it his word against the

22  word of a four-year-old.

23          The isolation is evident by the different

24  angles, the cover, the mesquite trees.  That even having

25  the same viewpoint of where they are, you can't see.  And

1  the defendant took advantage of this, finding his place,

2  so now it was a matter of when and how.

3          He was able to engage Ada for a number of

4  reasons.  Her comfort level at the ranch, the fact that

5  she was familiar with him, that he was known to be around

6  there, that he helped out, getting more and more

7  comfortable with being around him, even being alone with

8  him.  That's a form of engagement.

9          As you heard Carli Moncher talk about, the

10  fact that her brother would trust him to help would have

11  an impact on her.  The fact that she's young, innocent,

12  has no reason to suspect what he is, that he was hunting

13  for that time, place, and location, not knowing that all

14  he was looking for was an opportunity to isolate her from

15  those who could protect her so it would be her word

16  against his.

17          So the when was October 22, 2011, when he

18  used something that she loved, the pigs.  Used something

19  that wouldn't be suspected.  The fact that he would be

20  back there watering or helping with the pigs, and that's

21  what he used, knowing that no one would suspect it would

22  be odd that he was alone with this little girl with his

23  target, with his prey.

24          But he had to get rid of her little

25  brother -- her older brother, Jack.  And you've seen these

1   photos over and over again, the way that you have to go
2   back there, the isolation, the distance that you have to
3   travel in order to get back to his hunting grounds, to his
4   trap, the trap that he had laid.  And when he got her back
5   there, he was able to get Jack to go back, back to the
6   house to go get some treats for the pigs, knowing that
7   that was his opportunity to strike, to pounce.  And he
8   did.

9               But he has some other stuff he had to take,
10  he had to prepare.  He didn't just get to it assaulting
11  her, plunging his finger in her vagina the way he will,
12  the way he eventually does.  No, he wants her comfortable
13  with touch, breaking down these physical barriers.  And he
14  does that in a very short period of time that he does
15  that.  He does that by picking her up, carrying her, has
16  her sit on his lap, and he kisses her on the cheek
17  tenderly, as she's gotten so many times by her family
18  members, by people who love her, a four-year-old equating
19  a kiss with safety, protection, love.  That's how he sets
20  her up.

21              I think -- whatever is coming, all these
22  touches are good touches with this quick, quick and dirty
23  grooming done, he assaults her.  And he moves quickly
24  because he knows he's got a short period of time before
25  her little brother -- her older brother, Jack, comes back.

1        And this is the how.  He penetrate her with

2  his finger.  Thinking he could control things, thinking no

3  one would believe her, not knowing that her body was about

4  to scream the truth, scream the truth her voice never

5  could.  He hurt me.

6        This was the site of that assault.  Under

7  the cover of the mesquite trees, the isolation, the --

8  away from her family, away from her mother and her

9  brother.  And you heard her look at one of her favorite

10 pigs, Tinkerbell, and where she stood there and told you,

11 that's where he did it.  Vivid.  Her memory clear because

12 she experienced it.

13        But the defendant has his own ideas of how

14 this might be concealed, how no one will believe a

15 four-year-old.  A four-year old?  She's so young.  They

16 were alone.  He created that.  He set that up.  He hunted

17 for that, setting that trap.  He used the fact that Jack

18 was nearby.  Who would ever belief a four-year old if

19 there was somebody nearby.

20        And maybe she won't tell.  Maybe my touching

21 her, my hugging her, my putting her on my lap and the

22 kissing her will be enough for her not to know that this

23 was wrong.  Maybe she won't even tell.

24        And you heard from the experts that say so

25 often this is true, when the engagement is good, when the

1    engagement is long, more likely the kids don't tell.  And
2    you heard the experts talk about how if the engagement is
3    quick or if there is pain, the child is more likely to
4    tell.  And when he touched her in the most sensitive of
5    areas, he caused pain.  Causing that abrasion, tearing her
6    flesh, the tissue, and that left pain, which ultimately
7    caused her to tell, to talk about what she experienced, to
8    talk about about what her body went through.  He touched
9    me, and he's got sharp nails.  Trying to process things in
10   the language of a child, the language of a four-year old.
11   His nails are sharp.  Not, he scratched the inside of my
12   vulva.  Not, he molested me.  Not, it was a bad touch.
13   His nails are sharp.
14           Later her body is screaming the truth that
15   her voice tells, so she tells Mom, talks about the nails,
16   and they call police.  Find the blood in the underwear as
17   you would expect when tissue has been torn away, and she
18   is seen at the emergency room in Tucson.  And she tells
19   again what happened, in the words of a child.
20           And you've got to hear Dr. Klein relate to
21   you how she said it, how Ada said it that way.  Fernando,
22   he scratched me.  And, yeah, he was kissing me.  Very
23   matter of fact because she experienced it.  Fernando asked
24   me if I wanted to go check the pigs with him.  When we
25   went to check the pigs he pulled my panties down and he

1   was kissing me.  He put his fingers inside me, and his

2   fingernails are so sharp he scratched me.  Pain, sensory

3   experience.  Telling what happened, what really happened,

4   she experienced.

5           And Dr. Klein got to examine her body,

6   revealing the truth that the body told, that it screams

7   out, confirming that what her words say is true.  Is it

8   protocol?  Is it good practices?

9           Dr. Klein, although a qualified emergency

10  room doctor, sends her to the forensic nurse examiner,

11  Sharon Welch.  Again, another opportunity that this girl

12  has to speak her truth, say this is what happened to me.

13  And she does that with Sharon Welch.  Fernando stuck his

14  fingers and his nails in me where I go pee from.  Where I

15  go pee from.  The words of a child, of a four-year-old.

16  He told me to get on his lap.  He pulled my panties down,

17  then he put his fingers in me.  He kissed me on the side

18  of my cheek.  He touched my butt, too.

19          The concept she tells Dr. Klein and Sharon

20  Welch are exactly the same, but the words are different.

21  Exactly as you'd expect when somebody is telling the

22  truth.  Sharon Welch confirms the exact same thing.  And

23  you heard her, little eggshell abrasion right at the 6:00

24  o'clock position inside her vulva.  You heard Dr. Klein

25  talk about this dye that's used revealing the torn and

1  shorn tissue, revealing the trauma, the blunt force trauma

2  to this little girl's most sensitive areas that he caused.

3             You heard Sharon Welch talk about

4  demonstrations that Ada talked about, showed, I was

5  crossing my legs like this.  And even though she resisted,

6  even though she tried to stop him, could, as well as her

7  little four-year-old body could, he plunged that finger in

8  her.  And when he did it, he tore that flesh.  And Sharon

9  Welch confirms it, confirms that Ada's body screams the

10  truth of what she's already told.

11             The defendant -- the defendant is contacted,

12  and we see his ragged longer nails, we also see that his

13  hands are clean.  Defendant trying to control everything,

14  took an opportunity to remove any tissue, any cells that

15  might be left behind.

16             Now, the defendant is interviewed where he

17  changes his story a number of times.  No, don't know Ada.

18  All I know is Paul.  And he is asked, but did you see a

19  little girl yesterday?  Remember it's a day later when he

20  is interviewed by police.  A day where he has to wash his

21  hands, rub off those skin sells, anything that might be

22  left behind.  Did you see Ada yesterday?  Oh, yeah, I saw

23  her by the pigs.  Corroborating, confirming what Ada said.

24  She was alone with him, alone with him by the pigs.

25             While he's talking to police, he says a

1 number of things.  No, never touched her, never put my

2 hands on her.  Well, I mean, I might have picked her up

3 and moved her somewhere.  That's it, no more.

4                What about this kissing?  What about

5 kissing?  Oh, yeah.  I gave her a little kiss on the

6 cheek, exactly as Ada said.  But it's innocent, right?  I

7 mean, the kiss on the cheek, it's tender, it's something

8 that's innocent.  Maybe.  Unless you're kissing in order

9 to set her up to sexually violate her, to sexually

10 penetrate the way he did.  But he confirms he kissed her,

11 just like Ada said.

12                So Ada says he's alone by the pigs, and the

13 defendant confirms it.  Ada says he kissed her, and the

14 defendant confirms it.  Ada says he touches my butt, too.

15 He touched my butt, too, that day, and the defendant

16 confirmed it.  Said he cradled her up, picked her up, and

17 his hand might have touched her butt.  Confirming

18 everything that that little girl would say, but he won't

19 admit to being the poacher he is.  He won't admit

20 certainly to plunging his finger into her vagina, tearing

21 her skin because after all, there's trouble, and then

22 there's trouble.

23                But that's not the last time the defendant

24 spoke because in jail he comes in contact with John Boggs,

25 who you got a chance to hear from, who helped the

1   defendant out with a number of things.  But eventually the

2   defendant says he's confused.  He's confused about his

3   charges that we'll talk about in just a minute.  He's

4   confused with how they charge him with sexual intercourse.

5   He didn't put his penis in her, he says, just my finger,

6   confirming again what Ada said.  The truth she spoke and

7   truth her body screamed out he tells John, yeah, the

8   middle finger, but just a little bit, just a little bit.

9   Just a little bit.  Enough to tear skin tissue, leaving

10  his mark.

11          So these pictures that Sharon Welch took

12  were sent to Jackie Hess, nurse practitioner, who

13  confirmed exactly what two other medical professionals

14  said already.  That is where you would expect to find an

15  injury related to assault, the way she said it happened,

16  that's what I would expect.

17          All this that Ada experienced confirmed the

18  defendant is a poacher, that he searched not for his prey,

19  who he already had selected, but searched, hunted for the

20  time, place, and manner where he could strike.

21          Now, he's asking you to guess about what

22  caused that injury and to believe that Ada made it all up.

23  So we're here and submitted to you all after hearing all

24  of the witnesses, all the exhibits, seeing all the

25  exhibits, hearing from Ada herself, and this is what

1  you're asked to find.  There is one Count for your

2  consideration.  One thing that the defendant did, and that

3  was when he plunged his finger in her vagina, he committed

4  sexual conduct with a minor.

5          And there are a couple elements that the

6  State must prove in order to show he is that poacher, and

7  that is that he intentionally or knowingly engaged in

8  sexual intercourse or oral sexual contact.  In this case,

9  we are not talking about oral sexual contact, we're

10  talking about sexual intercourse.  And that the person

11  that they engaged in sexual intercourse with was under

12  15 years old.  There is also a special finding that the

13  victim in this case was 12 years old or younger.

14          So what is sexual intercourse under the law?

15  Now, we are not talking about the Bill Clinton definition

16  or somebody else's definition, we are talking about the

17  legal definition of sexual intercourse, and this is what

18  it is.  The penetration of the vulva, however slight, by

19  any body part of the body.  By any body part of the body.

20  Any part of the body, a finger in this case.

21          When he penetrated her vulva, however

22  slight, that is sexual intercourse.  So it doesn't have to

23  be the defendant can be educated now, his questions to Mr.

24  Boggs, doesn't have to be a penis.  Digital penetration is

25  sexual intercourse.

1          The vulva.  You heard three different
2 medical professionals talk about what that means, and it's
3 this; anything on the inside of the labia majora.  And you
4 heard all the medical professionals talk about what that
5 means, that when this little girl would be standing up,
6 not trapped with traction like you see in the diagram, the
7 injury is tucked away on the inside, protected.  So any
8 penetration into the vulva is sexual intercourse.
9          A couple of things legally.  Consent is
10 never a defense to sexual conduct with a minor.  The
11 defendant, although he knew her age, she was four, doesn't
12 even -- wouldn't even have to know that the child was
13 under 15.  But in this case, there is no question.  I only
14 stuck my finger in a little bit.  That is not a defense to
15 sexual conduct with a minor.
16          As we talk about the elements, talk about my
17 burden, it is this.  And I want to talk about reasonable
18 doubt because you're going to hear about it.  Mr. Green is
19 going to get up and talk about reasonable doubt and what a
20 high burden it is.  Going to make it out to be almost
21 impossible to reach, but it's not.
22          The judge read to you the instruction on
23 reasonable doubt, this is it.  It's proof that leaves you
24 firmly convinced.  Honestly, there will be holes, there
25 will be questions that certainly might be unanswered, but

1  those questions alone are not reasonable doubt.  If you're

2  firmly convinced the defendant put his finger, penetrated

3  her vulva, and you're firmly convinced of that, then the

4  defendant is guilty.  So worded another way, is there any

5  real possibility, a real possibility he is not guilty?

6              Now, we're going to talk about

7  possibilities, mere possibilities, speculation, guesses.

8  It is not that.  If you can, in your own mind, come up

9  with a mere possibility, that is not reasonable doubt.

10  You must feel real possibility based upon the evidence,

11  based on the evidence presented here.  Proof that leaves

12  you firmly convinced.

13             What are the ways that you should be firmly

14  convinced that the defendant is that poacher, the

15  defendant hunted for the time, place, and manner that he

16  could strike his prey, who he selected.  Well, in this

17  case, again, if you find that he penetrated her vulva,

18  however slight, Ada, the -- six years old now, was four

19  years old at the time, you must find the defendant guilty

20  of sexual conduct with a minor.

21             Fortunately there are a number of things

22  that you guys don't have to -- you don't have to consider.

23  There are a number of things that just aren't in dispute.

24  Number one, the age of Ada.  Defense isn't going to get up

25  here and say, wait, wait, wait, maybe she was 21.  Maybe

1   she was 19.  Maybe she was 18.  You got to see her, you

2   got to hear from her.  There is no question that Ada is

3   under 12 years old because she sits here today, she is

4   six.  But the defendant was with Ada on October 22, 2011.

5   That's not in dispute.  Defendant confirmed it, Ada

6   confirmed it, Jack confirmed it, Ada's body confirmed it.

7              The defendant was alone with Ada near the

8   pigs.  That's not in dispute.  But Ada had an abrasion on

9   her -- on her labia minora.  No one disputes that.  But

10  the injury that we're talking about is on the inside of

11  her vulva.  So with just that first one and the fifth one

12  there, most of the elements have been resolved for you.

13  Ada was under 15 years old, and the penetration here was

14  inside the vulva.

15             The other thing that is not in dispute is

16  the defendant was in jail with John Boggs.  So all these

17  things aren't in dispute.  The only issue then is the

18  defendant's finger penetrated her vagina, penetrated her

19  vulva.

20             With these things not in dispute, ladies and

21  gentlemen, when you go back and get the verdict form,

22  there will be two verdict forms.  One of them will say not

23  guilty, the other one, like this one, will say guilty.

24  Because there is no question about her age, immediately

25  you all can go back there and agree Ada is six.  She was

1    four at the time that the victim, beyond a reasonable

2    doubt, was under 12 years of age.

3                So if the defendant isn't a poacher, then

4    what is his theory?  It's this; maybe she lied or was told

5    to lie about what she said happened.  Maybe she injured

6    her vagina some other way.  And there was no DNA, so he

7    must be innocent.  And there is a number of reasons, three

8    specifically, that prove that that is not real, that that

9    is not true, but what is true is the defendant is that

10   poacher who hunted for the time, place, and manner that he

11   could strike, that Ada spoke her truth, and her body

12   screamed that it was true.  The three things are Ada's

13   testimony, John Boggs, and the injury itself.

14                Let's talk about Ada's testimony.  In jury

15   selection we were asking questions, and one of the

16   questions you might recall is whether or not you could

17   believe or convict on the word of a child.  And let's

18   start with the word of this child.  Not a child, but this

19   child, the child you heard from, let's talk about her.

20                First of all, the defendant hopes you will

21   not believe her simply because of her age.  He wants you

22   to hold her to a different standard than all the other

23   witnesses.  But as you're instructed, you can't do that

24   and should not do that, and I'm not going to ask you to do

25   that.  What I'm asking you to do is evaluate her testimony

1    when you got to see her and hear from her.  Consider her

2    language, not just last week, but at the time of her

3    interview.  Language to the medical professionals, Dr.

4    Klein, Sharon Welch when she said what happened.  Think

5    about her sensory experience.  It hurt.  His nails were

6    sharp.  He stuck his fingers in me.

7                    Consider the corroboration.  Jack has her

8    alone with the defendant for a short period of time, but

9    long enough for him to strike.

10                   There's a number of reasons why it makes

11   absolutely no sense why Ada would make this up.  What does

12   she have to gain, a four-year-old?  Go through two

13   different medical exams, have that toluidine blue placed

14   on her.  It hurt, it burned, as she told the forensic

15   interviewer.  Again, talk about her sensory experience.

16   And let's talk about this for a minute.  Defense wants you

17   to believe, oh, no, this is something she could make up.

18   Yet, when she talks about what she experienced in the

19   medical exam, she put some blue stuff on me, it hurt, it

20   burned.

21                   You heard from Sharon Welch that it's

22   acidic, like lemon juice on a cut.  A little girl, when

23   she experiences pain, she can tell you the source of that

24   pain.  We know that based on that toluidine blue uptake

25   that was put on her when she was examined.  This is a

1  little girl who knows when she experiences pain and can

2  articulate it.

3           So she goes through that.  She goes through

4  these interviews.  She has to come to court, be called a

5  liar.  Makes no sense.  Well, Ada's mom put her up to it.

6  Again, for the same reasons, it makes absolutely no sense,

7  given how Ada responded.  No evidence that Ada's mother

8  did this.  No evidence that Ada did anything but speak her

9  truth.  The truth that was confirmed by her body.  Well,

10  maybe they don't like the defendant or Mom has it out for

11  him.  Well, the defendant, in his own interview with

12  police, no problems, we were friends.  It makes no sense.

13           What you're left with, what the defendant

14  must ask you to do to find this true, is guess.  Do the

15  very thing in your first instruction as a duty to the jury

16  you are instructed not to do.  You should not guess about

17  any fact.  And that's what he's going to do, over and over

18  and over again, is beg you to guess.

19           Again, talking about the language.  Fernando

20  scratched me.  Yeah, he was kissing me.  Not he molested

21  me, not I've been molested.  He scratched me, and he was

22  kissing me.  Again, we went to check the pigs.  He put his

23  fingers inside me.  His fingernails were so sharp, and

24  they scratched me.  Sensory experience.

25           And again, to Sharon Welch, he kissed me,

1  put his fingers in me, he touched my butt, too.  How does

2  she describe it, the place where he put his finger in,

3  it's the place where I go pee.  Not my vulva, not my -- I

4  don't even know the word that the doctor used, an

5  anatomically correct word that she uses.  No, the place

6  where I go pe.  The words of a child speaking her truth.

7              And you got to experience that.  And you got

8  to see the demonstrations that this child gave in her

9  interview.

10             (Playing video.)

11             MR. LONG:  Less than a minute.  Look at all

12  demonstrations right here, right here.  I do like this.

13  It hurting.  It doesn't feel good.  Right here.  Showing.

14  I don't need to tell you, I can show you because I

15  experienced it.  That's what that minute of tape proves.

16             And ask questions.  Right here.  Well, was

17  it on the skin?  It was right here.  I can show you.

18  Being able to demonstrate what she experienced.  And she

19  does it again.  Just a couple seconds are very telling.

20             At about 17 minutes in she is asked a

21  question about who she told and how they reacted.

22             (Playing video.)

23             MR. LONG:  She said what?  Experiencing

24  what, the shock, the dismay that the woman he wants you to

25  believe put her up to it?  Over and over again for

1   30 minutes, this little girl, speaking her truth,

2   demonstrating what he did to her, only to be called a

3   liar.

4              But that's not all we have.  And I submit

5   that alone is enough.  Just the word of this child, the

6   way she confirmed the, the way she talked about what

7   happened to her is enough to be firmly convinced that what

8   she said happened, happened, and he did it.

9              But that's not all you have.  You have Jack,

10  who confirms along with the defendant that he left them

11  alone at the pigs, isolated, hidden.  The trap the

12  defendant had laid, a success without Jack knowing he was

13  a part of it.

14             Another factor that confirms, to prove the

15  defendant is this poacher, his theory making no sense,

16  John Boggs and his admissions that -- the defendant's

17  admission to John.  Put his fingers in Ada's vagina.  He

18  stopped when Jack came back.  His confusion about what

19  sexual intercourse means.  Confused how he can be charged

20  with sexual intercourse when he didn't put his penis in

21  her, he just put his finger in her.  The fact that John

22  Boggs had absolute -- absolutely nothing to gain by

23  speaking his truth, talking about things that no one knew

24  about but the defendant, sits up here speaking his truth

25  about what he experienced talking to the defendant with

1  absolutely nothing to gain except what he told you.  The

2  fact that he didn't like the defendant admitted to

3  penetrating this girl.

4            But that's not all we have.  I submit then

5  only this, if that's all you have, that would be enough to

6  leave you firmly convinced that what Ada said happened,

7  happened the exact way she said it did.  But you've got

8  more.  You have the truth that screamed by Ada's body.

9  And Ada talked about his fingernails being sharp, that

10  hurts her, not feeling good, it hurted.  But the defendant

11  wants you to guess, to guess without evidence about what

12  caused it.

13            Is it reasonable to conclude that Ada

14  injured her vagina in some other way?  It is not.  You

15  heard that by the medical professionals.  It is not

16  reasonable to conclude that.  And there's a couple of

17  reasons why.  Again, the objective evidence that can't be

18  controlled, that he couldn't control, tells us that Ada's

19  telling the truth.  If it was a fall or barbed wire, you'd

20  expect to see some other injuries.  And Sharon Welch

21  didn't note any.  In fact, said there weren't any on her

22  arms, on her legs, on the back, the back part of her body.

23  She had none of those.  No holes in the panties.

24            Now, Mr. Green asked a number of questions.

25  But isn't it possible that somebody could have done this

1    without causing injury to the underwear?  And the one

2    doctor said, my medical -- my professional opinion, no.  I

3    mean, I suppose it's possible.  I suppose that at some

4    point there might be some technology that somehow goes

5    through cloth and only injures skin.  I mean, I've seen

6    movies about it.  I've seen all types of stuff.  So I

7    guess when technology advances to the point where time

8    travel exists, then, yes, it's possible.  That is the

9    ridiculousness that he is asking you to believe.

10              Or you can use what you've been instructed

11   to continue to use.  In your instruction page 3, consider

12   all of the evidence in light of reason, common sense, and

13   experience.  His version makes no sense, and it is not

14   supported by facts or the evidence.  But what is supported

15   by the facts and the evidence, the fact what that little

16   girl said happened, happened exactly the say she said it

17   did.  She spoke her truth, and her body confirms it.

18              The defendant wants to say, well, there's no

19   DNA, therefore that's the answer.  He's really hoping that

20   you forget about what Peggy Toporek talked about, where

21   she talked about skin cells, how volatile they are, how

22   easy they are to get rid of.

23              And there are a number of reasons,

24   reasonable, real world explanations, how real science,

25   real evidence works.  The fact that he wasn't contacted

1   until a day later, having washed his hands, removed any

2   evidence.  The fact that simply skin cells aren't left

3   everywhere where it's touched or where you touch.  The

4   fact the defendant having worked and the way he works,

5   dirt on his hands and fingernails.  And you heard the

6   expert talk about how dirt is DNA's enemy, prevents

7   adherence and breaks it down.  His hands were set up both

8   before he violated her, before he penetrated her, and

9   after to insure you wouldn't have DNA.

10          But you don't need DNA.  What you have is

11  the little girl speaking her truth, what she experienced

12  with her own body, the fact that her body confirms that

13  what she said happened, and the fact that all the other

14  witnesses, Jack, John Boggs, everyone else who came up

15  here confirmed everything she said.  The fact the

16  defendant washed his hands afterwards, of course.  And you

17  got to see that just with the photos.

18          For the defendant's theory to make sense,

19  there's a number of things that must be true.  Ada would

20  have to be a medical expert.  She would have to know she'd

21  undergo a genital exam.  She'd have to know that what she

22  felt would leave some sort of a mark.  She'd have to know

23  it would still be present and know that a finger could do

24  what the doctor said it would do in the location that they

25  said it would be.  Ada would absolutely have to be the

1   most skilled four-year-old in the world as far as an

2   actress.  And you'd have to see again, just a couple

3   minutes ago, her demonstrations, her talking about pain,

4   and the sensory experience.  Talking about the reaction of

5   her mother, providing the context, the pigs, location, the

6   fact that her brother wasn't there, and all those

7   demonstrations over and over and over again.  Not just in

8   the interview, not in the recorded interview, but to

9   medical professionals exactly as they would expect to see

10  this injury.

11            In the language of a child, albeit an

12  intelligent child, an articulate child, but the language

13  of a child nonetheless, Ada told you what happened.  And

14  her body not only confirms it, it screams the truth of it.

15            Defendant chose that spot, hunted for the

16  time, location, and manner that he could strike where she

17  would be alone, for it to be his word against the word of

18  a four-year-old, not knowing that he left behind his mark.

19  Isolating her, setting a trap not just for Ada, but for

20  you all hoping that if it was isolated enough, if it was

21  just her word against his word, you would fall into his

22  trap, that he could control you all to ignore the medical

23  evidence, not just ignore it.  Actually to guess about

24  facts that just aren't there, and ignore all the things

25  that confirm what Ada said.

1          Now, that is a shot from the pig pen, a shot

2    that shows what Ada could have seen from when he violated

3    her, when he penetrated her, shearing off that tissue and

4    that skin, seeing the packing house, the cutting house

5    where her mom is isolated, alone, feeling pain.

6          That's another angle showing the isolation

7    that she must have felt.  So what would we expect to see

8    if the defendant is in fact the poacher that Ada talked

9    about, that he did do what Ada said happened.  What would

10   we expect her to say.  Here is what I experienced, it

11   hurt, it didn't feel, he scratched me, his nails are long.

12   And that's exactly what happened.

13         You see the condition of the defendant's

14   nails, and you got to see them in the photos.  You would

15   expect to see an injury, the doctors tell you, not

16   necessarily, but in this case, they did.  And we have one.

17   And is the injury consistent with what Ada said?  Exactly.

18   The resisting, the crossing her legs.  All that is what

19   she said happened, what she experienced that the defendant

20   did to her.  Over and over again talking about her senses,

21   what she felt, where she was.  And hopefully her underwear

22   show us she was injured.  The blood stains right in the

23   location down there in her crotch area near the anus,

24   right where the doctors -- the doctor and the nurses,

25   nurse practitioner saw that injury with that oval shape,

1    the serologist confirming it's blood.

2              We know that this injury was recent.  We

3    know that because of how quickly this area of the body

4    heals.  And you heard that.  But because they were able to

5    see the damage to the extent that they were, that is all

6    three medical professionals, we know that this happened

7    quickly or recently, which is exactly what Ada said.  Been

8    less than a day before she was seen by doctors, by a

9    doctor and the nurse and the nurse practitioner, and

10   ultimately nurse practitioner seeing the photos.

11             Dr. Klein said that this is absolutely

12   consistent with what Ada said happened, as did Sharon

13   Welch, as did Jackie Hess.  All medical professionals tell

14   you it was not reasonable to conclude that the other

15   things that -- other things that might have possibly

16   caused this injury, that that requires you to guess about

17   facts.  And it just doesn't make sense, given everything

18   that happens in this case, everything that exists in this

19   case.

20             And there was a couple of things -- another

21   question.  You remember Mr. Green decided to get up here

22   in his opening statement and said, okay, yes, the injury

23   is consistent with what she said happened, but in many

24   ways it's inconsistent.  And yet, one after one doctors

25   told you, the doctor, the nurse, and the nurse

1   practitioner said that not only is this consistent, but

2   there is nothing inconsistent about what she said

3   happened.  Nothing.

4              The defendant is a poacher.  A poacher that

5   already had his place selected, a poacher who was

6   searching for the right time, place, and manner where he

7   could strike so it would be his word against the word of a

8   child.  Controlling everything so that she wouldn't be

9   believed and he'd get away.  Finding that hidden location,

10  but not being able to control Ada's body, the truth that

11  cries out proving, showing evidence of his sexual crime.

12             For the defendant to be not guilty, ladies

13  and gentlemen, there are a number of people who must be

14  wrong.  Jack, Katie, Ada's mother, Carli Moncher, who gave

15  you the backdrop to understand about interviews and the

16  way children can respond appropriately, talk about sensory

17  perceptions, talking about context, language; Cathy

18  Bodwell, the person who conducted the interview; John

19  Boggs, who had nothing to gain about telling what the

20  defendant told him, about being confused about sexual

21  intercourse, that he didn't put his penis in her, just his

22  finger, which is exactly what Ada said happened; Detective

23  Snyder, Peggy Toporek, the DNA criminalist that educated

24  us on DNA and how volatile it is, particularly skin cells;

25  Dr. Julie Klein, Sharon Welch, forensic nurse examiner;

1   Jackie Hess, nurse practitioner.  These medical

2   professionals trained to deal with children, to deal with

3   trauma, to talk to children and Ada.

4              Because as I told you, Ada's word is enough

5   to convict.  Ada's word, the way she describes it, the way

6   she spoke her truth should leave you firmly convinced

7   about what she said happened.  She'd have to be wrong,

8   too.  Wrong about what she experienced, and her body would

9   have to be wrong when it cried out the truth that Ada

10  spoke.

11             Ladies and gentlemen, the defendant is a

12  hunter.  Not a regular hunter, not an honorable hunter, a

13  poacher.  One who already had his prey selected.  What he

14  searched for was the time, place, and manner that he could

15  strike, and now having struck he is asking you to ignore

16  the medical evidence, to guess about things and to ignore

17  Ada.

18             And, ladies and gentlemen, we're asking you

19  to speak your truth by finding the defendant guilty of

20  sexual conduct with a minor in making that finding that

21  Ada, being six years old, was under 12.  Thank you.

22             THE COURT:  Thank you, Mr. Long.

23             Mr. Green?

24             MR. GREEN:  Good afternoon.

25             Once again, ladies and gentlemen, this is my

1  opportunity to address you directly rather than through

2  the use of witnesses.

3          My client, Fernando Almanza, is a worker.

4  He worked to support his family and himself, and he worked

5  part time as a laborer at the Double Check Ranch in

6  Willcox.  He had worked there for approximately two years,

7  and prior -- prior to the -- to Katie Quinn joining the

8  ranch.  Katie joined the ranch about six months after

9  Fernando and brought her family and her two children, and

10 eventually they moved onto the ranch and lived in the

11 mobile home that you saw there on the land.

12          Katie had three children.  She had Jack, who

13 was eight at the time; Ada, who was four, and a baby boy

14 who doesn't play a role in this.

15          Jack and Ada, you heard tell basically had

16 the run of the ranch.  They played together among the

17 buildings and the equipment on the ranch, and they both

18 stated, I believe, that there was -- that they had great

19 fun living on the ranch.  It was a great place to live.

20          Now, on October 22nd, a Saturday, the event

21 that you've heard about allegedly took place.  At that

22 time Fernando was working on the ranch.  He had arrived on

23 the ranch at about 6:00 o'clock that morning.  He wasn't

24 really supposed to be working that day because he had had

25 a hernia surgery two weeks prior.  There was -- there was

1   some problems with the irrigation system, so he came in at

2   Katie's request.

3           Arrived around 6:00 o'clock and began his

4   work out in the fields.  He didn't spend a lot of time on

5   the ranch.  He spent most of his time out in the fields

6   dealing with the irrigation system.  It wasn't his job to

7   take care of the animals.  It wasn't his job to feed the

8   pigs.  He worked for Paul, not for Katie.

9           Now, on that day, we've heard several

10  stories about what happened.  First, we heard a story from

11  Ada in a forensic interview that happened two days, I

12  believe, after the -- after that day, so on the 24th of

13  October in 2011.  During that interview, Ada said that

14  they were out by the pigs, she and Fernando.  She said

15  that Mom was in the packing house, and that Jack was in

16  the house.  Now, wait a minute.  I mean, he was picking

17  worms, so Mom is in the packing house, Jack is in the

18  house or picking worms, one or the other, and Jaime wasn't

19  there.

20          At trial, just during the last week, Ada

21  told us that she and Jack and Mom always fed the pigs

22  together.  Mom was always there.  They never -- Jack and

23  she never went to feed the pigs without Mom.  Now, if Mom

24  was always there, how does Fernando come into the picture

25  and why is he needed?

1                We heard from Jack, and Jack told us, I was
2  in charge, he said.  I'm the guy whose job it was.  It was
3  my chores to feed the pigs.  And on that day, he and Ada
4  went to the shed, got the food, put it in buckets, put the
5  buckets in a wagon, and pulled the wagon across the
6  central part of the ranch through the gates of the corral,
7  over a large pipe, and he told us how he did that.
8  Remember, he moved the buckets back and forth in order to
9  get over the pipe out to the pigs where they were going to
10 feed the pigs.
11               But, you know, Jack wasn't able to really
12 remember where Fernando was.  He doesn't remember when
13 Fernando joined them, and he didn't remember whether
14 Fernando was able to help him with the wagon, getting that
15 wagon up over the pipe that he had to do.  He did say that
16 there were more than one occasion when Fernando helped
17 with the pigs.  So the question is, was he talking about
18 that day, that Saturday, or was he talking about some
19 other day, or did he have a whole bunch of days all mixed
20 up in his story.
21               Jack told us that sometimes the hose didn't
22 work.  There was a knob on the hose that he had to turn on
23 in order to get water to the pigs.  And sometimes they'd
24 have to get help from Fernando to get the water.  And
25 sometimes they'd have to just go over to the cows and

1    scoop water out of the tank.

2              Now, speaking of Jack just for a second, the

3    deputies probably could have helped you out with your job

4    and made it a lot easier.  Jack was reported early, early

5    on in the interviews with my client.  He was mentioned

6    early, early on when Johnny Boggs reported his story to

7    the police, but the police never interviewed Jack.  They

8    never asked Jack what had happened on this day.  They

9    simply ignored that information.

10             Now, Jack, two years ago might have

11   remembered better.  He might have known what happened the

12   day before or two days before or a week before, but two

13   years has passed, and police did not interview Jack until

14   he was -- they were asked by me for a defense interview of

15   Jack.

16             The detectives didn't go to the ranch until

17   almost a year later.  They never looked at the site.  They

18   never checked the crime scene.  They never looked for

19   evidence to either corroborate or prove false any of the

20   information that they were receiving from Ada and Jack and

21   Katie and my client.

22             Now, we heard from Katie.  Katie told us

23   another story.  And in Katie's version, she and Jack were

24   in the packing house, and Ada was not with them until Ada

25   arrived to tell what happened.  Now, Ada was four years

1  old.  That concerns me a little.  But the question is,

2  which story is true.  Is it true that Jack was with Ada?

3  Is it true that Jack was in the packing house working with

4  Katie?  Which story is true?

5           On her way to the forensic interview and on

6  the way to the police station, the sheriff's substation,

7  Ada took a car ride with her mom.  It was just Mom and Ada

8  in the -- in the car on the way down to the substation.

9  Now, Katie testified to my question as to what they talked

10  about when they went down that ride, and she said, we

11  didn't talk about what happened.  But she must have talked

12  to Ada at some point about what happened and at some point

13  before the forensic interview because during the forensic

14  interview Ada stated that she was -- that she was aware

15  somehow that the police had already talked to Fernando.

16  She had to get that information from somewhere, so someone

17  must have talked to her.

18           I find it difficult, and I'm confused by the

19  fact that a mother who cares about her daughter, and I

20  have no doubt that Katie cares about her daughter,

21  wouldn't talk to her daughter about what happened by way

22  of comforting her, by way of trying to get more

23  information so that when they get to the police station

24  she can give an accurate account to the sheriff's deputies

25  so that the actual information about what happened could

1    come out.

2              We learned from two, and actually today now

3    three separate witnesses that young children are

4    impressionable, that it's very important when questioning

5    a young child that the questioning be done carefully, and

6    especially when you are questioning about traumatic events

7    that the interviewer ask no questions that include details

8    that might influence the child that would either cause the

9    child to suppress her story or embellish it in an effort

10   to seek approval or to avoid consequences.

11             We also learned that the response of the

12   party receiving the report of sexual abuse can have a

13   significant impact on the child's disclosure.  It's not

14   necessary for Katie to have coached Ada intentionally.

15   It's not necessary that Ada be lying in order for there to

16   be inaccuracies in the story.  Ada could have been

17   influenced by a well-meaning conversation with her mother.

18   Ideas could have been put in her head about what happened.

19   The story that she told could have been altered by the

20   conversation that they had.

21             We also heard, and the State went through in

22   great detail with a fancy slide show, we learned from the

23   experts that where there's an allegation of sexual abuse

24   along with corroborating facts, that there are

25   characteristics and behaviors that may assist in

1  determining whether a child has been victimized.  Among

2  these things are fantastical statements, statements of

3  aggression or power over the perpetrator, statements of

4  physical sensation, disassociation or separating the

5  cognitive self from the physical self, and the ability to

6  recall details.  A child who has been victimized in sexual

7  assault cases, the child may exhibit aggression or

8  isolation or seductive behavior, a flat affect,

9  inappropriate laughter, they may climb on things or under

10  things, or they may exhibit inappropriate touching or they

11  may exhibit no behaviors at all.  Unfortunately, according

12  to the experts, we heard from them that none of these

13  characteristics is definitive.  And all of them require

14  some level of corroboration before they become helpful in

15  determining whether abuse has occurred or not.

16          Regardless of whether these factors are

17  definitive in general, in this case there are no facts

18  that any of these characteristics or behaviors are present

19  in Ada, who is alleged to be the victim in this case.  The

20  Ada we saw on the stand was a precocious, wonderful, cute

21  little girl.  There was no hiding within herself.  She was

22  not shy.  She was not laughing inappropriately.  She was

23  not behaving in any way other than a four-year-old girl

24  would behave.

25          The experts also gave us some tools to use

1   when defining what -- in attempting to identify what a

2   perpetrator looks like.  They described this process, a

3   victimization that included targeting, engagement,

4   grooming, assault, and concealment.  Again, the State put

5   those up on the screen.

6          When we apply these processes to my client,

7   we have a ranch worker who kept to himself, did his work

8   unless he was needed by the other workers, and then he

9   would help out.  There's no evidence of a history of

10  behaviors that would indicate an inappropriate interest in

11  children.  As a matter of fact, the only evidence that we

12  have that he was interested in anyone is that he was

13  interested in Katie and not the children.  There's no

14  evidence that Fernando did anything to ingratiate himself

15  into the family or with the children.  There's no evidence

16  that Fernando and Ada and their family had a relationship

17  of love and trust, nor is there evidence that Fernando

18  ever had exerted power and control over Ada.  No evidence

19  had been presented that Fernando had been grooming Ada.

20         In fact, all the evidence suggests against

21  that, suggests that Fernando was focused on his work,

22  concerned about getting home to his own ranch, and he did

23  what he could to remain separate from the children and

24  only had polite contact with them, and then only when they

25  sought him out.  He didn't seek them out.

1          Finally, there is no evidence that Fernando
2   did anything to conceal anything.  Detective Snyder
3   indicates that he was cooperative in the questioning -- in
4   the questions asked, answered the questions to the best of
5   his ability, considering the confusion that was caused by
6   the language barrier and his own ignorance.  Fernando has
7   no education.  He has never been to school.  He speaks
8   no -- or he speaks English, he speaks Spanish, but he
9   writes neither, and he reads neither.
10          The facts that we know for sure are that Ada
11  said what she said.  She said what she said, using not the
12  exact same words, but very similar words over and over
13  again to her mother, to the doctor, to the same nurse, and
14  to the forensic interviewer.  We know that Ada has a
15  superficial .379-centimeter abrasion to her posterior
16  commissure.  I had to write it down.  I didn't remember it
17  either.  Posterior commissure.  That spot at 6:00 o'clock
18  that all the doctors described.  We know that that's there
19  or was there.  We know that despite the State's efforts to
20  prove a negative, that there is no DNA evidence here that
21  links Ada and Fernando.  None.  We also know that despite
22  the State's heroic efforts to provide a negative to prove
23  a negative, and despite the fact that no sexual contact
24  was ever alleged that could have produced semen or
25  spermatozoa, that there is no evidence linking Ada and

1    Fernando with semen, spermatozoa, or blood.

2              Finally, there's only one person who truly

3    knows what happened or didn't happen here beyond a

4    reasonable doubt, only one, and that's Ada.  And Ada is

5    not on the jury.

6              During his defense of the soldiers in the

7    Boston Massacre in 1770, John Adams stated in his closing

8    arguments, facts are stubborn things.  And whatever be our

9    wishes, our inclinations are the dictates of our passion,

10   they cannot alter the state of facts and evidence.  In

11   this case, I leave it to you, the jury, to follow the

12   facts and evidence or the lack thereof and to find my

13   client not guilty of the charge of sexual conduct with a

14   minor.

15             Thank you.

16             THE COURT:  Thank you, Mr. Green.

17             Mr. Long?

18             MR. LONG:  I'd like to correct one

19   statement.  There are two people who know what happened,

20   and the defendant is the other.  The defendant also had

21   his own sensory experience when he plunged his finger into

22   her vagina, proving him to be that poacher.

23             I'm going to address a couple of things that

24   defense suggests because quite frankly, as I told you when

25   I got up and now that he's gotten up, a number of things

1  haven't changed.  There are still all those things I told

2  you that are not in dispute, it is still not in dispute.

3  Ada is still six years old and was four years old at the

4  time.  Ada was with the defendant on the ranch on

5  October 22, 2011.  Ada was alone with the defendant by the

6  pigs.  That is still not in dispute.  Ada has the abrasion

7  consistent with what she said happen.  That abrasion is on

8  the inside of her vulva.  And defendant was in jail with

9  John Boggs.  It has never been in dispute and it still

10  isn't in dispute.

11            So again, what defense has asked you to do

12  is guess about facts.  First of all, he says there is no

13  evidence linking the defendant to Ada with semen, sperm,

14  or blood.  Let's talk about semen or sperm.  We agree with

15  him.  There is also no video of it.  We agree with that,

16  too.  So I accept that when there is no allegation of

17  someone ejaculating, there will be no evidence of semen or

18  blood.  In this case, what we're talking about is skin.

19  And what the defendant again, what I told you he'd do, I

20  told you he'd do it, he hoped you'll ignore or forget what

21  the DNA criminalist said.  There's nothing to be seen

22  here.  Please ignore what they said.  Ignore what they

23  said because that's required for you to accept his

24  version.  You must ignore the expert.

25            There is no blood linking the defendant to

1  Ada.  Really?  In fact, there is because there's blood in

2  her underwear.  To say that there is not blood linking the

3  defendant to Ada is not following the facts as Samuel

4  Adams suggested.  It's ignoring them.

5           Now, there was a number of misstatements

6  about what the experts said.  There's no need to go point

7  by point through them because you have your reason and

8  common sense and experience to rely on, and that's what

9  the State is asking you to rely on, is the instruction

10  asks you to rely on.  And she says -- the defense says,

11  well, I don't believe or should be concerned that Mom

12  didn't talk to her more.  Right.  Because Mr. Defense

13  Attorney, detectives have been in trial with people like

14  you, and so they have instructed her, don't talk about it.

15  Let a person trained talk about it.  And what he's mad

16  about or frustrated about is that they followed protocol.

17  They used best practices to make sure that you would hear

18  what that little girl said from her.  And by doing that,

19  by these detectives doing good work with their training

20  and experience and how children are talked to, they told

21  her mother, don't talk to her.  We'll get a chance to talk

22  to her on the way to insure good information in a

23  narrative.  And because they did that, they took away his

24  argument because he rather have an argument than the

25  facts.

1          And again, in talking about, well, maybe

2   your reaction could have got Ada to say the way she said

3   things.  But there's no evidence of that.  Where is the

4   evidence of that?  There isn't any.  It's not found on

5   anything the experts said because he had an opportunity to

6   speak to every one of these experts.

7          And you notice what he never asked them, let

8   me talk about this case, let me talk about what we're here

9   to talk about.  No, no, no.  Because he rather have an

10  argument than the facts.  So let's talk just generally in

11  the world that might be out there.  I mean, could it

12  happen in some remote, however remote, I think one of his

13  questions was.  Well, yeah, if we're talking about however

14  remote in other cases, I suppose.  But he thought that was

15  reasonable in asking you to find that what his conclusions

16  are, are reasonable, then why didn't he ask the expert in

17  this case, is that reasonable.  In this case, could that

18  have happened.  Because he rather have an argument than

19  the facts because in this case there is no evidence that

20  Ada was impacted.  There is no evidence that anything that

21  she said was influenced by anyone, but rather the

22  evidence, the facts say otherwise.  They say that Ada

23  spoke her truth, that her body confirmed it, and the

24  defendant is a poacher.

25          I did enjoy, I guess, the fact that on the

1  one hand he says, this guy did nothing to engage these

2  children, this child in particular, nothing.  I mean,

3  except when they'd come and ask him to do things.  Again,

4  reason, common sense, and experience.  What child goes and

5  asks help from an adult they don't trust or don't think

6  will help them?  Defense acknowledges with that statement

7  alone that he engaged her in setting up the opportunity to

8  strike, having selected his prey, just looked for the

9  where, the when, and how, and he confirms it.

10           There is one thing that defense and I and

11  the State certainly agree on, is that when Ada spoke from

12  this chair, she was finally not hiding within herself.

13  She was speaking her truth, what she experienced, what her

14  body experienced.

15           Ladies and gentlemen, the facts do indeed --

16  or it can be followed to only one reasonable conclusion,

17  and it is a conclusion that must be found beyond a

18  reasonable doubt, and that is that what Ada said happened

19  in fact happened.  She experienced it, she told you what

20  she experienced, and all the evidence confirms it and

21  should leave you firmly convinced.

22           Again, closed away, I closed earlier, as Ada

23  spoke her truth, I ask you to go back there and speak

24  yours and confirm that you know after listening to Ada,

25  after looking at the evidence, that her body screams the

1   truth, and that the defendant is not a hunter, not a

2   regular hunter, but a poacher, whose search for the time,

3   place, location, the manner in which he could strike, tell

4   him that.

5               (Proceedings were had which are not herein

6   transcribed.)

7               (The proceedings were adjourned.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3

4

5

6                            C E R T I F I C A T E

7

8              I, MICHELLE L. WELLNER, CR, RPR, do hereby

9    certify that the foregoing pages constitute a full, true,

10   and accurate transcript of the proceedings had in the

11   foregoing matter, all done to the best of my skill and

12   ability.

13              WITNESS my hand this 25th day of April,

14   2014.

15

16              MICHELLE L. WELLNER, CR, RPR
                Certified Reporter #50742
17

18

19

20

21

22

23

24

25